**2023-1446, -1450, -2148 and -2149**

# United States Court of Appeals
# for the Federal Circuit

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP, LTD., HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SURE FIT HOME PRODUCTS, LLC, SURE FIT HOME DECOR HOLDINGS CORP., SF HOME DECOR, LLC,

*Plaintiffs-Appellees,*

– v. –

KARTRI SALES CO., INC., MARQUIS MILLS, INTERNATIONAL, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of New York in No. 1:15-cv-10154-PAE, Honorable Paul A. Engelmayer, Judge

## CORRECTED BRIEF FOR DEFENDANT-APPELLANT MARQUIS MILLS, INTERNATIONAL, INC.

DONALD J. COX
LAW OFFICE OF DONALD COX, LLC
300 Carnegie Center
Suite 150
Princeton, New Jersey 08540
(609) 921-1166
coxd@iplawonline.com

*Counsel for Defendant-Appellant Marquis Mills, International, Inc.*

JANUARY 26, 2024

**Reexamined U.S. Patent No. 6,494,248C1, Claim 1 (Appx428)**

1. A product comprising:

an item for hanging, wherein said item is a curtain,

said item comprising an opening for suspending said item from a rod,

said item comprising a ring attached to said opening such that said opening is reinforced by said ring,

said ring comprising an inner circumference,

said inner circumference comprising a top when said item is hanging,

said item comprising an upper edge,

said item comprising a slit extending from said upper edge through said ring to said opening, said slit intersecting said inner circumference of said ring at a point offset from said top,

said slit further comprising an approximately horizontal component when said item is hanging from the rod, and wherein said slit exits said ring at said upper edge of said curtain.

**U.S. Patent No. 7,296,609, Claim 1 (Appx443)**

1. A product, said product comprising:

a curtain, said curtain comprising a ring, said ring comprising an outer circumference;

said curtain comprising an opening such that said curtain is suitable for suspension from a rod;

said ring comprising a slit extending through said ring to said opening;

wherein said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring, and wherein said projecting edge is provided next to said slit.

**U.S. Patent No. 8,235,088, Claim 1 (Appx458)**

1. A product, said product comprising:

a shower curtain, said shower curtain comprising an outer edge and an opening such that said product is suitable for suspension from a rod, said shower curtain further comprising a ring, wherein said ring reinforces said opening;

said ring comprising a flat upper edge, an inner circumference, and an outer circumference;

said ring further comprising a slit extending from said inner circumference through said ring and through said outer edge of said shower curtain;

said ring further comprising a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring; and,

wherein said slit exits said inner circumference at a location which is offset from the 12 o'clock position on said inner circumference.

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant certifies the following:

1. The full name of the parties represented by me:
   **Marquis Mills International, Inc.**

2. Name of real-party-in-interest represented by me:
   **Marquis Mills International, Inc.**

3. Parent corporations and publicly held companies that own 10% or more of stock in the party:
   **None.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:
   Donald J. Cox, Jr.,
   LAW OFFICES OF DONALD COX, LLC

   Edward Thomas La Barr and Ryan W O'Donnell
   VOLPE & KOENIG, P.C.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b):
   **Keeco LLC et al. v. Kartri Sales Company, Inc., 1:23-cv-02003 (SDNY)**

6. Pursuant to Fed. Cir. Rule 47.4(6), all information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.
   Per F.R.App.P. 26.1 (b): Organizational Victims in Criminal Cases. In a criminal case, unless the government shows good cause, it must file a statement that identifies any organizational victim of the alleged criminal activity. If the organizational victim is a corporation, the statement must also disclose the information required by Rule 26.1(a) to the extent if can be obtained through due diligence.
   **None (and Not Applicable).**

7. Per F.R.App.P. 26.1 (c): Bankruptcy Cases. In a bankruptcy case, the debtor, the trustee, or, if neither party, the appellant must file a statement that: (1) identifies each debtor not named in the caption; and, (2) for each debtor that is a corporation, discloses the information required by Rule 26.1(a). **None (and Not Applicable).**

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

STATEMENT OF RELATED CASES ....................................................x

JURISDICTIONAL STATEMENT .........................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE ISSUES...............................................................4

STATEMENT OF THE CASE ..................................................................5

SUMMARY OF THE PATENT FACTS ................................................17

      A.    Prosecution History of the '248 Patent ....................................19

      B.    Prosecution History of the '609 Patent ....................................21

      C.    Prosecution History of the '088 Patent ....................................22

SUMMARY OF THE ARGUMENT ......................................................27

STANDARD OF REVIEW ....................................................................29

ARGUMENT .........................................................................................32

**I.**    **The Court Erred in Denying Kartri's Venue Challenge.**...............32

**II.**    **The Court Erred in Finding Infringement of the '248, '609 and '088 Utility Patents.**.....................................................33

      A.    The Court Erred in Claim Construction and Finding Infringement of the '248  Patent ................................35

      B.    The Court Erred in Claim Construction and Finding Infringement of the '609  Patent ................................45

      C.    The Court Erred in Claim Construction and Finding Infringement of the '088  Patent ................................50

**III.    The Appellees' Filing of Terminal Disclaimers to Promote an Erroneous Claim Construction Resulting in Unclean Hands.** ................................................................. 53

**IV.    Erroneous Finding of EZ ON Mark Standing.** ....................... 56

**V.    The Finding of Trade Dress Infringement Was Erroneous and the Trade Dress Is Invalid.** ................................... 57

**VI.    The Finding of Willfulness Was Erroneous.** ......................... 59

    A.    <u>Bundling of Patents and Trade Dress.</u> ........................ 59

    B.    <u>No Willful Infringement of Trade Dress.</u> ................... 60

    C.    <u>No Willful Infringement of the Patents.</u> .................... 60

**VII.    The Awarding of Attorneys' Fees Was Erroneous.** ....................... 61

CONCLUSION ................................................................. 63

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altman v. Bedford Cent. Sch. Dist.*,
   245 F.3d 49 (2d. Cir. 2001) ...................................................57

*Anderson v. Kimberly-Clark Corp.*,
   570 F. App'x 927 (Fed. Cir. 2014) .........................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................31

*Becton Dickinson and Company v. C.R. Bard, Inc.*,
   922 F.2d 792 (Fed. Cir. 1990) ...............................................43

*Berni v. International Gourmet Rests. of Am., Inc.*,
   838 F.2d 642 (2d Cir. 1988) ..................................................56

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................58

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*,
   Inc.,
   942 F.3d 1119 (Fed. Cir. 2019) .............................................30

*Convolve, Inc. v. Compaq Comp. Corp.*,
   812 F.3d 1313 (Fed. Cir. 2016) .............................................31

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed.Cir.2005) ...............................................37

*Envirotech Corp. v. Al George, Inc.*,
   730 F.2d 753 (Fed. Cir. 1984) ...............................................43

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)................................................................39

*Gerber Garment Tech. v. Lectra Sys., Inc.*,
   916 F.2d 683 (Fed.Cir.1990) ...........................................40, 55

*Gilead Scis., Inc. v. Merck & Co., Inc.*,
　888 F. 3d 1231 (Fed. Cir. 2018) ......................................................... 54

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
　753 F.3d 1208 (Fed. Cir. 2014) ......................................................... 59

*Goodyear Dental Vulcanite Co. v. Davis*,
　102 U.S. 222 (1880) ............................................................................ 39

*Halo Elecs., Inc. v. Pulse Elecs.*,
　579 U.S. 93 (2016) .............................................................................. 31

*Innogenetics, N.V. v. Abbott Labs.*,
　512 F.3d 1363 (Fed. Cir. 2008) ......................................................... 31

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
　58 F. 3d 27 (2d. Cir. 1995) ................................................................. 57

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
　811 F.3d 479 (Fed. Cir. 2016) ........................................................... 62

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
　542 F.3d 290 (2d Cir. 2008) ............................................................... 31

*Markman v. Westview Instruments, Inc.*,
　52 F.3d 967, 34 U.S.P.Q.2d 1321 (Fed. Cir. 1995) (en banc), aff'd.
　116 S. Ct. 1384 (1996) ........................................................................ 42

*McClain v. Ortmayer*,
　141 U.S. 419 (Sup. Ct. 1891) ............................................................. 53

*In re Micron Tech., Inc.*,
　875 F.3d 1091 (Fed. Cir. 2017) .................................................... 27, 30

*Iowa State Univ. Rsch. Found., Inc. v. Greater Continents Inc.*,
　81 F. App'x 344 (Fed. Cir. 2003) ....................................................... 60

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
　726 F.3d 1359  (Fed. Cir. 2013) ......................................................... 62

*New York Ass'n for Retarded Child. v. Carey*,
　711 F.2d 1136 (2d Cir. 1983) ............................................................. 63

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ..........................................................37

*Nora Beverages v. Perrier Grp. of Am.*, 164 F.3d 736, 744-745 (2d.
   Cir. 1998) ............................................................................................30

*Nystrom v. TREX Co.*, Inc.,
   424 F. 3d 1136 (Fed. Cir. 2005) ........................................................37

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ......................................................................61, 62

*Oscar Gruss & Son, Inc. v. Hollander*,
   337 F.3d 186 (2d Cir. 2003) ...............................................................29

*Rajamin v. Deutsche Bank Nat. Tr. Co.*,
   757 F.3d 79 (2d. Cir. 2014) ................................................................30

*Savin Corp. v. Savin Grp.*,
   391 F.3d 439 (2d Cir. 2004) ...............................................................30

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940).................33, 34, 38

*Sears, Roebuck & Co. v. Stiffel Co*,
   376 U.S. 225 (1964)............................................................................59

*Singer Mfg. Co. v. June Mfg. Co.*,
   163 U.S. 169 (1896)............................................................................59

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005) ..........................................................29

*Sulzer Mixpac AG v. A&N Trading Co.*,
   988 F.3d 174 (2d Cir. 2021), cert. denied, 142 S. Ct. 1359 (2022)....30

*Sure Fit Home Prods., LLC v. Maytex Mills, Inc.,*
   *No. 21 CIV. 2169 (LGS), 2021 WL 2134863 (S.D.N.Y. May 26,*
   *2021) (vacated May 16, 2023)* .............................................................62

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
   581 U.S. 258 (2017)..................................................4, 11, 12, 27, 32

*TechSearch, L.L.C. v. Intel Corp.*,
  286 F.3d 1360 (Fed.Cir. 2002) ........................................................43

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ......................................................31

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
  532 U.S. 23 (2001)...................................................................58, 59

*UCB, Inc. v. Yeda Research & Dev. Co.*,
  117 F. Supp. 3d 755 (E.D. Va. 2015) (affrm'd 837 F.3d 1256
  (CAFC 2016)) .............................................................................39

*V.E. Holding Corp. v. Johnson Gas Appliance Co.*,
  917 F.2d 1574 (Fed. Cir. 1990) ......................................................11

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*,
  529 U.S. 205 (2000)........................................................................58

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F. 3d 1571 (Fed. Cir. 1997) .....................................................39

*Westech Aerosol Corp. v. 3M Co.*,
  927 F.3d 1378 (Fed. Cir. 2019) ......................................................29

*In Re: Zahner Design Group, Ltd.*,
  No. 22-1026 (Fed. Cir. 2022)
  *aff'g Ex Parte Zahner Design Grp., Ltd. Pat. Owner & Appellant*,
  No. 2021-001988, 2021 WL 3726157 (P.T.A.B. Aug. 19, 2021).....................9, 62

## Statutes and Rules

15 U.S.C. § 1125(a)(3)) .........................................................................57

28 U.S.C. § 1295(a)(1)..............................................................................1

28 U.S.C. § 1338(a) ...................................................................................1

28 U.S.C. § 1400(b) ...................................................................11, 29, 32

28 U.S.C. § 2107(a) ...................................................................................1

35 U.S.C. § 102(b) ............................................................................19, 21

35 U.S.C. § 103 ................................................................20, 22, 25, 26

35 U.S.C. § 112 2nd ¶ ...............................................................24, 25, 51

35 U.S.C. § 121 ................................................................................40

Fed. R. Civ. P. 56(c) ........................................................................31

Fed. R. App. P. 4(a) ...........................................................................1

## Regulations

37 CFR 1.312 ....................................................................................38

## STATEMENT OF RELATED CASES

1.    **Related or prior cases.** Provide the case title, case number, and originating tribunal for each case. Fed. Cir. R. 47.5(b)(1).

- Keeco LLC et al. v. Kartri Sales Co., Inc., 1:23-cv-02003 (PAE)(SDA) (SDNY)

- Sure Fit Home Prods. LLC v. Maytex Mills, Inc., No. 21-2048 (Fed. Cir.), originating from 1:21-cv-02169 -LGS_GWG (SDNY)

- In re Zahner Design Grp., Ltd., No. 22-1026, 2022 WL 2525340 (Fed. Cir. July 7,2022), originating from PTAB No. 90/013,952

2.    Names of all parties involved in the cases listed above. Do not duplicate the names of parties. Do not relist the case information. Fed. Cir. R. 47.5(b)(2)(A).

Marquis Mills International, Inc.
Kartri Sales Co., Inc.
Focus Products Group International, LLC Zahner Design Group, Ltd.
Hookless Systems of North America, Inc. Sf Home Décor, LLC
Sure Fit Home Décor Holdings Corp. Sure Fit Home Products, LLC
Keeco LLC
Maytex Mills, Inc.

3.    Names of all law firms, partners, and associates in the cases listed above. Do not duplicate the names of law firms, partners, and associates. case information and party names. Fed. Cir. R. 47.5(b)(2)(B).

LAW OFFICES OF DONALD COX, LLC: Donald J. Cox, Jr.
VOLPE & KOENIG, P.C.: Ryan W O'Donnell, Edward Thomas La Barr
HUGHES HUBBARD & REED LLP: Patrice P. Jean, Emma L. Baratta, Lynn M. Russo
LAW OFFICE OF BERNHARD MOLLDREM: Bernhard Percival Molldrem, Jr.
LAW OFFICE OF ANGELA FOSTER: Angela Foster
GOLDBERG COHEN LLP: Morris E. Cohen, Lee A. Goldberg, Limor Wigder

RHOADS LEGAL GROUP P.C.: Donald Rhoads

LEECH TISHMAN FUSCALDO & LAMPL, LLC: Douglas H. Morseburg, Ivan M. Posey, Alan G. Towner, John J. Jacko, Alan M. Kindred, Esther J. Choe

## JURISDICTIONAL STATEMENT

(A) The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because the complaint included claims for infringement of intellectual property.

(B) This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) because the present appeal is from a final judgment of a district court having jurisdiction over this action based on 28 U.S.C. § 1338(a).

(C) This appeal was timely filed in accordance with 28 U.S.C. § 2107(a) and Rule 4(a) of the Federal Rules of Appellate Procedure because the notices of appeal were timely filed within 30 days of the filing of the final judgment by the district court.  It entered an injunction and disposed of all remaining controverted issues in the case by Order dated December 22, 2022.  Appx201-368.  Marquis timely noticed its appeal on January 23, 2023.  Appx517 (docket entry 511).  The district court then awarded attorney's fees by Order dated June 5, 2023, and formally dismissed outstanding claims related to a cancelled design patent on that same date.  Appx375-407, Appx5111-5113.  Final judgment on the case was entered on June 15, 2023.  Appx409-412.  Marquis timely noticed its second appeal on July 5, 2023.  Appx520 (docket entry 544).

(D) This appeal is taken from a final judgment that disposes of all of the claims and defenses in the district court.

1

**INTRODUCTION**

Marquis Mills International, Inc. ("Marquis") is a corporation organized and existing under the laws of the State of New Jersey, and with principal offices located at 1000 Lenola Road, Maple Shade, NJ 08052.  Marquis operated as importer for Kartri Sales Co., Inc. ("Kartri") specifically importing shower curtains and shower curtain parts for the products at issue in this lawsuit. David Middleberg worked as Director of Operations for Marquis starting in 2011.  Appx4326-4328. Joseph Ranieri as President and Owner formed the company in 2011 to operate as an importer.  Appx4559.  The company ceased operations in 2020 during the COVID pandemic.  Appx4594-4595.

Approximately thirty years ago, Appellees developed a grommet shower curtain aimed at facilitating easy hanging. This innovation, protected by U.S. Patent No. 5,186,232 ("'232 Patent"), enjoyed utility patent protection until 2010. Appx1352-1356. Subsequently, Appellees acquired additional utility and design patents for variations in slit ring curtain designs with specific ring and slit elements, including configurations where the slit opened to the top of the curtain.

In 2013, Appellant Kartri commenced selling the Ezy Hang grommet shower curtain, featuring a top-opening slit, supplied by Marquis.   The Ezy Hang curtain grommet has an outer circumference with a U-shaped underside and a flat upper edge across the entire upper edge giving the appearance of a D-shape rotated

clockwise 90°.  The ring further includes a circular opening to receive a curtain rod with an angled slit made up of two straight lines entirely offset to one side of the top of the circular opening.  The slopes of the two straight lines were measured in the Case Below to be 22° and 76° above horizontal. (Appx2076-2078).  The slit exits the ring through the flat upper edge.

Notwithstanding the existence of prior art and the general concept of grommet curtains, Appellees, in 2015, accused Kartri of patent infringement of multiple utility patents and unregistered trademark infringement and initiated legal proceedings ("Case Below"). In 2016, Appellees initiated legal proceedings against Marquis asserting the same multiple utility patents and unregistered trademark (EZ ON Mark) as well as, a design patent (later cancelled), and unregistered trade dress.

Grommet curtains with slit rings have been covered by expired patents, and the right to make and sell items in the public domain is acknowledged. Moreover, Appellees cannot employ trade dress to extend the life of expired patents. However, the district court allegedly failed to apply these principles, issuing an infringement decision that amalgamated patents, trademarks, and trade dress without appropriate legal standards or thorough analysis.

After its erroneous liability determinations, the district court trebled damages for alleged willfulness, amalgamating various forms of intellectual

3

property rights without rigorous analysis and ignoring the evidence that

Appellants' actions reflect a good-faith dispute about the extent of Appellees'

intellectual property rights. The court also awarded attorney's fees, disregarding

requirements set by higher courts. The Appealed Orders should be reversed based

on these merit-based arguments.

Additionally, the case's venue was deemed improper under *TC Heartland*, a

ruling that emerged during the case's pendency. Consequently, the case should be

dismissed or, alternatively, transferred after vacating the Appealed Orders.


## STATEMENT OF THE ISSUES

1. Whether the district court erred in its decision to deny Appellants'

motion to dismiss or transfer the case for improper venue.

2. Whether the district court erred in its claim construction findings.

3. Whether the district court erred in finding that the asserted utility patents

were not invalidated by the erroneous claim construction findings of the district

court.

4. Whether the district court erred in granting summary judgment of patent

infringement.

5. Whether Appellees' broadened claim construction positions asserted in

patent infringement litigation while simultaneously arguing narrower claim

construction positions for pending patent applications in the patent family before the USPTO precludes a damages award.

6. Whether the district court erred in finding that Appellees had standing to assert the EZ ON Mark.

7. Whether the district court erred in finding infringement and validity of Appellees' unregistered trade dress.

9. Whether the district court erred in trebling damages on grounds of willfulness.

10. Whether the district court erred in deeming this an "exceptional case" meriting an award of attorney's fees.

11. Whether the district court erred in awarding $929,126.95 in attorney's fees.

## STATEMENT OF THE CASE

**Preliminary Statement**

This patent, trademark and trade dress infringement case concerns grommet or eyelet curtains, which are typically hung on a rod by threading the rod through grommets integrated into the fabric of the curtain. The issues in this case require

some familiarity with the general look of grommet curtains hung on a rod as illustrated in Figure 1 of U.S. Patent No. 3,388,734 to Silvestre:[1]



U.S. Patent No. 3,388,734

FIG. 1

As exemplified by Silvestre, grommet curtains have a row of rings along the upper portion of the curtain, the rings being attached to the material of the curtain such that the bottom surface of each ring is co-planar with the material of the shower curtain.  The curtain rings are each fixed in place and provide an organized and symmetrical repeating visual pattern along the top width of the curtain. Grommet curtains lack any hooks protruding above the upper edge of the curtain, because they are hung on the curtain rod without hooks.

---

[1] The Silvestre patent is cited on the face of Appellee's U.S. Patent No. 5,186,232 (Appx1352).  Fig. 1 of Silvestre is provided for illustration (Silvestre's patent adds straps to  the classic grommet curtain style) but this patent was not relied on in the case below.  "It is . . . well-established that a court may take judicial notice of patents."  *Anderson v. Kimberly-Clark Corp.,* 570 F. App'x 927, 932 (Fed. Cir. 2014).

6

U.S. Patent No. 428,965, issued in 1890 to Sharp (Appx665-667), shows the

integrated rings (Figs. 2 and 3) through which the curtain rod is threaded (Fig. 5),

resulting in a pleasing arrangement (Fig. 1). Appx665.



The grommet curtains at the center of the dispute in this case are shower

curtains adapted with a slot or cut extending through flexible grommets. The

slotted grommet permits hanging and removal of the curtain by flexing the

grommet to widen the slot to receive the rod—without the need to unmount the

rod—as most shower curtain rods are not intended to be unmounted.

The general concept of a grommet curtain with a flexible, split ring is in the

public domain. For example, U.S. Patent No. 2,831,538 to Lishman, issued in

1958 (Appx942-943), discussed in Appellants' summary judgment briefing in the

Case Below, discloses grommet curtains with rings that contain an offset vertical

slit running through the top of the ring [16] and the curtain [18], as depicted below:



Lishman provided a functional advance over traditional grommet curtains by

providing a mechanism to hang the curtain on an already-hung rod. *See* Appx943,

Col. 2 lines 20-22 ("I have provided a curtain which can be hung from a rod in

such fashion that the rod need not be disturbed"; Appx943, Col. 1 lines 35-55 ("In

removing or hanging the curtains or drapes on a rod, the slit is pulled open, and the

curtain pulled away or mounted on the rod."). In 1993, Appellees were granted the

'232 Patent for a curtain with slits running between the grommets. Appx1352-

1356. Later, Appellees received additional patents for top-slit curtains. *Supra*.

8

**Asserted Trade Dress and EZ ON Trademark**

The trade dress infringement claims in this case concerns the appearance of a shower curtain when hung on a rod in the general style of a grommet curtain as illustrated by Sharp using slotted grommets as generally illustrated by Lishman. The trademark infringement concerns common law mark "EZ ON".  The patent infringement in this case refers to the '248, '609 and '088 utility patents and '078 design patent claiming various configurations and elements of the grommets and the slot.  The '078 patent is not at issue in this appeal as it was cancelled during reexamination before the USPTO, which was affirmed by this Court in *In Re: Zahner Design Grp., Ltd.*, No. 22-1026, 2022 WL 2525340 (Fed. Cir. 2022), *aff'g Ex Parte Zahner Design Grp., Ltd. Pat. Owner & Appellant*, No. 2021-001988, 2021 WL 3726157 (P.T.A.B. Aug. 19, 2021).

**Asserted Utility Patents**

Appellees assert the following utility patents (prosecution histories are discussed in more detail later in the brief):

The '248 Patent:  U.S. Patent No. 6,494,248, entitled "Suspended Materials Having External Slits," issued on December 17, 2002 (Appx413-426) and expired on July 17, 2020.   Relative to the '232 Patent, the '248 Patent relocated the slits to exit at the top of the curtain, with a slit featuring an "approximately horizontal

component" when the curtain hangs from a rod. The '248 Patent was reexamined in 2016 and reissued in 2017 (Appx427-428).

The '609 and '088 Patents:  U.S. Patents No. 7,296,609 ("the '609 Patent") and 8,235,088 ("the '088 Patent") are both entitled "Hanging Products."  The '609 Patent (Appx429-443) issued on October 29, 2007, and the '088 Patent (Appx444-458) issued on August 7, 2012.  Both patents claim priority to the '248 Patent and expired on July 17, 2020.  The '609 Patent claimed a slit-ring curtain with a projecting edge next to the slit, projecting from the outer circumference of the ring (Appx443, Claim 1).  Similarly, the '088 Patent claimed a slit-ring curtain with a flat upper edge and a projecting edge from the outer circumference of the ring (Appx458, Claim 1).

**Procedural History of the Case Below**

Appellees initiated the lawsuit against Kartri on June 30, 2015 (Appx524), asserting infringement of utility patents ('248, '609, and '088) and the "Plaintiffs' EZ-ON trademark," with no further description provided.  The initial complaint did not include allegations related to trade dress. Subsequently, on December 30, 2015, Appellees filed a second complaint, focusing solely on the infringement of the since-cancelled Design Patent.  Appx479, Appx541-552.

On February 5, 2016, Kartri impleaded Appellant Marquis, the supplier of the accused products, through a third-party complaint.  Appx480 (docket entry 13).

In March 2016, Appellees amended their complaint to include Marquis (*Id.* (docket entry 20)) as a defendant, alleging infringement of the three utility patents, the Design Patent, "Plaintiffs' trademark EZ-ON," (Appx565 ¶77) and an unregistered trade dress for "the visual appearance of its HOOKLESS® brand shower curtain products" (Appx567-562 ¶46).

In a subsequent amendment in May 2016, Appellees expanded their claims to include allegations of infringement of the three utility patents and trade dress. Notably, for the first time, factual assertions were made regarding Appellees' ownership rights to the trademark EZ ON through a licensing arrangement with third-party Carnation, which sold a design falling within the scope of Appellees' trade dress under the EZ ON mark.  Appx615-616 ¶58. The actions were consolidated on July 25, 2016. Appx485 (docket entry 67).

During the initial filings and responses, venue determinations in patent cases followed the *V.E. Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990) standard, allowing venue in any district where a defendant was subject to the court's long-arm jurisdiction.

However, the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. 258 (2017) on May 22, 2017, altered the law of patent venue by limiting "resides" in 28 U.S.C. § 1400(b) to the state of incorporation. This meant that Kartri and Marquis, which neither "resides" nor

11

maintains a regular and established place of business in the district, could no longer be considered under the previous venue standard.

On September 18, 2017, the parties notified the court of Appellees' intentions to amend the complaint and Appellant Kartri's move to dismiss or transfer based on improper venue, following the *TC Heartland* decision. As a component supplier that neither sold finished curtains nor used Kartri's accused EZY Hang Trademark, Marquis asked the court to be transferred with Kartri. The court ordered that any venue-related motion be filed by October 13, 2017 (Appx491).

Kartri timely filed its motion, arguing that it had not waived its venue objection, reiterated the impropriety and inconvenience of the venue, and explained that the early stage of litigation would not waste resources. The court held a conference on December 21, 2017, expressing that Kartri had forfeited its venue objection by not raising it seasonably, submitting to the cause, and actively conducting litigation in the venue after the *TC Heartland* decision (Appx12).

On August 9, 2018, the district court issued a claim construction ruling following briefs by the parties and a Markman hearing on July 26, 2018. Appx46-80. This ruling construed 16 claim terms spanning the three utility patents. None of the parties introduced expert testimony during claim construction. The court determined the standard for a Person of Ordinary Skill In The Art (POSITA) to be a lay judge. Appellants' noninfringement positions relied on amendments made

12

during prosecution in relation to a restriction requirement relevant to all three patents. The court ruled the restriction requirement was ambiguous and the amendments were not considered in construing the claims.

After the claim construction ruling rejecting consideration of the restriction requirement and related amendments, Marquis stopped importation of the accused curtains and components.

On March 26, 2019, based on the constructions provided by the district court, Appellees moved for summary judgment of infringement of their three utility patents. They also sought summary judgment on limited issues of trade dress. Appx88. Appellees further moved for damages and dismissal of Appellants' counterclaims. Appx107-110.

On April 17, 2019, Appellants moved for summary judgment on noninfringement and invalidity concerning Appellees' trademark and trade dress claims. Appx2439- 2441. They argued that the alleged trade dress lacked distinctiveness and was functional, citing ongoing sales by Carnation of EZ-ON products as a defense against exclusive trade dress rights. Regarding the EZ ON Mark, Appellants contended that Appellees failed to demonstrate ownership during the relevant period, and Carnation's registration precluded Appellees from claiming ownership.

Appellants also moved for summary judgment of non-infringement and invalidity in connection with Appellees' utility patents. Appx2391. Each invalidity motion was based on inconsistencies that arose from the claim construction. For the '248 patent, the district court construed the "slit exits the ring at said upper edge of said curtain" to include that the slit can exit "at or nearly" at the edge of the curtain. By adding this variance to the precise alignment of the slit with the ring and the curtain edge, the court's construction did not overcome the examiner's prior art rejection, which was only overcome by amending the claim so that the ring and upper curtain edge were aligned such that the slit did not extend into the curtain without the ring. Furthermore, the variance allowed the claim limitation to permit the slit to extend between the inner and outer portions of the ring.

In the case of the '088 patent, Marquis' invalidity argument was based on the district court construing the examiner's ground for withdrawal of the double patenting rejection as ambiguous. Therefore, the double patenting rejection was improperly withdrawn based upon the district court's construction.

On May 2, 2019, Appellees filed opposition arguments to Appellants' summary judgment motion. Included in the opposition brief were terminal disclaimers filed *that same day* on May 2, 2019, in the '088 patent file history— one terminal disclaimer for each of the species IV patents, including the '248 and '609 patents. Appx2723-2732.

On April 16, 2020, the district court reserved the standing question for the EZ ON Mark, granting summary judgment on patent infringement and trade dress invalidity due to genericism. Appx81-113. Appellees sought reconsideration (Appx502 (docket entry 303)), leading to the court vacating the invalidity finding on trade dress (Appx132-135), citing a mislaid burden of proof on genericism and relying on outdated case law for non-functionality (Appx125-126).

The case proceeded to a bench trial in June and July 2022, during which principals and executives testified about the history of their entry into the hook-free shower curtain market , including their belief up until the district court's claim construction ruling that their Ezy Hang product did not infringe Appellees' intellectual property rights. See generally Appx4400 et seq. (testimony of Karen Goskowski and Trish Kubus, of Kartri), Appx4175 et seq. (testimony of David Middleberg of Marquis).

On December 22, 2022, the district court issued a 168-page ruling in favor of Appellees, holding that Appellees had standing for the EZ ON Mark based upon construing the 2012 Carnation Agreement (Appx3413-3425). Appx246-252. The court found infringement of, and unfair competition with, the EZ-ON Mark, and the asserted trade dress against both Appellants, and the HOOKLESS® Mark against Appellant Kartri, conflating facts and circumstances between Appellees and Carnation and the utility patents with the trademarks and trade dress.

Advertising of Hookless® technology and enforcement actions for Appellee's patents and registered trademarks where misapplied to prove the existence of the trade dress. The order contained factual errors, such as misattributing the Federal registration of the EZ ON Mark to Appellees instead of Carnation.

The district court awarded damages for lost profits and royalties, finding willful infringement for a specific period and trebling damages. The court never seemed to understand how the scope of all the patents were changed when the Markman Order invalidated the Examiner's restriction, but after the Markman Order, Marquis stopped making and selling Appellant's grommet in suit. The court also declined to revisit the functionality decision on trade dress and requested briefing on attorney's fees.

Appellants appealed the December 22nd Order, and the appeals were stayed pending resolution of the outstanding design patent claim. Meanwhile, the parties briefed attorney's fees, with Appellees arguing for a full-fee award, and Appellants opposing it based on deficiencies in Appellees' claim substantiation.

On June 5, 2023, the district court issued a Fees Order, deeming the case exceptional and awarding $929,126.95 in attorney's fees. The court acknowledged deficiencies in supporting documentation but granted the award. Appellants timely appealed both the Fees Order and the final judgment.

This Court consolidated all appeals on August 2, 2023, designating one as the lead appeal (2023-1446) and lifting the stay of briefing.

## SUMMARY OF THE PATENT FACTS

**Facts Common to all Patents**

U.S. Patent No. 2,831,538 (Appx942-943) issued to Lishman on January 6, 1955, and Appellees' 232 Patent (Appx1352-1356) issued on February 16, 1993 are prior art to the '248, '609 and '088 patents and had expired prior to Appellants' manufacture and sales of their allegedly infringing shower curtain.

The '248, '609 and '088 Patents all list David Zahner as the sole inventor and were assigned to Zahner Design Group in an Assignment (Appx2447-2449) dated March 19, 2018 (long after the commencement of the Case Below) claiming an effective date of July 17, 2000.

The '609 and '088 Patents are continuation applications of the '248 Patent and share the same written disclosure and priority dates.  All three expired on July 17, 2020.

**Representative Claims of the Patents In Suit**

The representative claims are listed *supra* at the beginning of this brief.

**Patent Specification of the Patents In Suit**

The '248, '609 and '088 patent family discloses hanging products, namely, suspended materials having external slits, and in particular, curtains having flexible

17

slit rings for ease of hanging.  The shared patent specification includes the same

published written description and drawings, and incorporates by reference the

written descriptions and drawings of the  '232 Patent.  Appx1352-1356.

The asserted patents were examined in the context of a Restriction

Requirement mailed on June 7, 2001 in the '248 patent file history (Appx1409-

1410), which was accepted without traversing the grounds for the restriction

requirement on August 8, 2001.  The Examiner's restriction requirement found

nine (9) patentably distinct inventions as follows:

> Species I, drawn to figures 1-4, 6, 8-10, 12, 13, 16, 17, 30, 31b;
> Species II, drawn to figures 14, 31a, 32, 33;
> Species III, drawn to figure 15;
> Species IV, drawn to figures 18-20;
> Species V, drawn to figure 21;
> Species VI, drawn to figures 22-25;
> Species VII, drawn to figures 26;
> Species VIII, drawn to figures 27; and
> Species IX, drawn to figures 28.

In the '248 patent, the applicant elected claims limited to the invention

disclosed in Species IV, drawn to Figures 18-20.  Appx1409.  Figure 20 is the

representative figure for the '248 patent.  Appx413.  The '609 patent was also

limited to Species IV because the patentee received the same restriction

(Appx1033) and elected to proceed with the same Species IV (Appx1035).  In the

'088 patent, the  same Restriction Requirement was acknowledged as controlling at

multiple points during prosecution, as described *infra*.

**Prosecution History of the Patent Family**

A.    **Prosecution History of the '248 Patent**

1.    The patent application for the '248 patent was filed on July 17, 2000.

2.    On August 8, 2001, in response to the restriction requirement a broader version of now claim 1 was presented in an amendment (Appx1411-1418) as Claim 61:

> A product comprising: an item for hanging, said item comprising a ring, said ring comprising an outer circumference and an inner circumference, said inner circumference comprising a top when said item is hanging, said ring comprising a slit extending through said ring from said outer circumference to said inner circumference, said slit intersecting said inner circumference of said ring at a point offset from said top.

> a dependent claim 73 was also presented as:

> A product as claimed in Claim 61, wherein said ring includes a flat upper edge along at least a portion of said ring.

3.    On November 1, 2001, Claim 61 was rejected (Appx1421-1425) at least in part under 35 U.S.C. § 102(b) as being anticipated by Lishman (US Patent No. 2,831,538) and as being anticipated by White (U.S. Patent No. 2,666,481) as each patent was found to teach all the elements of Claim 61 and Claim 73 was withdrawn from further examination.

4.      On April 1, 2002, Claim 61 was amended (Appx1428-1434) to
overcome the November 1, 2001 rejections as follows:

> A product comprising: an item for hanging, <u>said item comprising an opening</u>
> <u>for suspending said item from a rod,</u> said item comprising a ring <u>attached to</u>
> <u>said opening such that said opening is reinforced by said ring,</u> ~~said ring~~
> ~~comprising an outer circumference and an inner circumference, said inner~~
> ~~circumference comprising a top when said item is hanging, said ring~~ <u>said</u>
> <u>item</u> comprising an upper edge, said item comprising a slit extending <u>from</u>
> <u>said upper edge</u> through said ring ~~from said outer circumference to said~~
> ~~inner circumference,~~ <u>to said opening,</u> said slit intersecting said inner
> circumference of said ring at a point offset from said top<u>, said slit further</u>
> <u>comprising an approximately horizontal component when said item is</u>
> <u>hanging from the rod</u>.

5.      On October 1, 2002, Claim 61 was allowed (Appx1443-1446) and
renumbered as Claim 1 and Claim 73 was cancelled from the patent.  The patent
issued on December 17, 2002.

6.      On July 14, 2016, the patent entered reexamination (Appx427) and
claim 1 was amended on May 8, 2017 to refer to the item as a "curtain" and the slit
"simultaneously" exits the ring and the upper edge of the curtain to overcome a
prior art under 35 U.S.C. § 103 as being obvious over Lishman (U.S. Patent No.

2,831,538) in view of either Hart (U.S. Patent No. 1,452,460) or Ginn (U.S. Patent No. 1,430,641).  Appx944-956.  The claim was again amended on June 23, 2017 to replace the temporal term "simultaneously" with a spatial term "at" (Appx964) at the recommendation of the examiner.  Appx959.

7.    On August 29, 2017, a reexam certificate (Appx886-887) was issued on the following amended claim:

A product comprising: an item for hanging, <u>wherein said item is a curtain</u> ... <u>and wherein said slit exits said ring at said upper edge of said curtain</u>.

**B.    Prosecution History of the '609 Patent**

1.    The patent application for the '609 patent was filed on August 23, 2005.

2.    On July 27, 2006 a broader version of now claim 1 was presented (Appx1407-1411) in an amendment as Claim 22:

A product, said product comprising: a curtain, said curtain comprising a ring, said ring having an opening such that said curtain is suitable for suspension from a rod, said ring comprising a slit extending through said ring to said opening, wherein said ring comprises a projecting edge, and wherein said projecting edge is provided next to said slit.

3.    On October 24, 2006, Claim 22 (Appx1416-1420) was rejected at least in part under 35 U.S.C. § 102(b) as being anticipated by or, in the alternative,

21

under 35 U.S.C. §  103 as being obvious over Brown (US Patent No. 635,295) as the Brown patent was found to teach or render obvious all the elements of Claim 22.

4.      On April 24, 2007, Claim 22 was amended (Appx1424-1432) to overcome the October 24, 2006 rejections as follows:

> A product, said product comprising: a curtain, said curtain comprising a ring, said ring comprising an outer circumference; said ~~ring having~~ curtain comprising an opening such that said curtain is suitable for suspension from a rod~~,~~; said ring comprising a slit extending through said ring to said opening~~,~~; wherein said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring, and wherein said projecting edge is provided next to said slit.

5.      On July 19, 2007, Claim 22 was allowed (Appx1452-1453) and renumbered as Claim 1 and the patent issued on November 20, 2007.

6.      Independent Claim 9 is a method claim having a single step of providing a product that matches the elements of claim 1.

## C.    Prosecution History of the '088 Patent

1.      The patent application for the '088 patent was filed on October 29, 2007 with a broader version of claim 1 (Appx1112) as follows:

22

A product, said product comprising: an item for hanging, said item comprising a ring having an opening such that said item is suitable for suspension from a rod, said item further comprising a projection from said ring in a location such that said projection can be moved to assist in widening said opening.

and included claim 12: A product as claimed in claim 1, wherein said item comprises at least two projections next to said opening.

2.     On September 15, 2008, Claim 1 was rejected (Appx1133-1137) under non-statutory obvious-type double patenting ("ODP") as unpatentable over the claims of US Patent Nos. 6.494,248, 6,935,402, and 7,296,609 (Appx1135).  It was also rejected over cited prior art.

3.     On March 16, 2009, Claim 1 was amended (Appx1143-1151) to overcome the September 15, 2008 to include the following:

said ring comprising an inner circumference and comprising a slit extending from said inner circumference through said ring; wherein said slit comprises a width, and wherein said ring has flexibility allowing increase of said width of said slit to insert said ring onto the rod; wherein said ring is provided with a **flat upper edge**; and wherein said slit exits said inner circumference at a location which is offset from the 12 o'clock position on said inner circumference. (Emphasis added.)

23

Appellees argued that this amendment overcame the ODP rejection over the '248 and '609 Patents. Appx1147 (claim amendment). The applicant contended that the claim amendments "overcome[] the rejection without the need for terminal disclaimer," (Appx1150), that is, the applicant argued that the amendments made the claimed curtain patentably distinct from the '248 and '609 Patents.

4.      On March 2, 2010, the ODP rejection of Claim 1 (Appx1178-1183) was withdrawn because of the inclusion of a "flat upper edge." The Examiner agreed that the amendments changed the application to a new, patentably distinct species (from the restriction requirement), and thus overcame the ODP rejection, noting that the added limitation of the flat upper edge "is drawn to a species which is not encompassed with the species as set forth in the ['248 and '609 Patents]." Appx1179-1183. This statement referred directly back to the restriction requirement issued in the parent patents. The applicant at no point disavowed the Examiner's express statement of patentable distinctiveness—specifically, that the '248 and '609 Patent claims did not encompass a flat upper edge, and that, in contrast, the '088 Patent claims did.

As a result of the amendment to Claim 1, Claim 12 was now rejected as indefinite under 35 U.S.C. § 112 2nd Para. for depending from Claim 1. This is because the specification did not support the flat upper edge species of Claim 1 in combination with "at least two projections" recited in Claim 12. Appx1180.

24

5.      On September 7, 2010, Claims 1 and 12 were amended (Appx1184-
1186) to overcome the March 2, 2010 rejections. The Claim 12 amendment
follows:

A product as claimed in Claim 1, wherein said item comprises at least ~~two~~
<u>one</u> projection~~s~~ next to said opening.

In response, the patentee amended Claim 12 to change the projections from
"two" to "at least one" to conform Claim 12 to Figure 31b (Species I) to overcome
the rejection.  Appx1185.  The patentee argued that a diagonal slit can be provided
with a projection next to the edge while maintaining the upper edge flat.
Appx1193.

6.      On September 27, 2010, amended Claim 1 was rejected (Appx1195-
1199) under 35 U.S.C. § 103.  The examiner issued a second indefiniteness
rejection of Claim 12 under 35 U.S.C. § 112 2nd para. stating that the patentee's
position—that when the slit is diagonal, a projection can be provided next to the
slit while maintaining the flat upper edge—was not supported by the specification.
Appx1197.

7.      On March 28, 2011 to overcome the September 27, 2010 rejections,
Claim 1 was amended (Appx1204), and in remarks to overcome indefiniteness of
Claim 12,  Claim 1 was argued to be a generic claim covering Figs. 21 and 31b as

having a flat upper edge and Claim 12 was argued to be supported by Fig. 31b (Appx1202).

8.      On June 9, 2011, amended Claim 1 was rejected (Appx1218-1223) under 35 U.S.C. § 103 as obvious.  The Claim 12 indefiniteness rejection was withdrawn.

9.      On December 9, 2011, Claim 1 was amended (Appx1230-1240) to overcome the September 27, 2010 rejections to include the Claim 12 projection: "said ring comprising <u>**a flat upper edge**</u>, an inner circumference<u>, and an outer circumference</u> ~~and comprising~~ ~~an external~~ <u>said ring further comprising a</u> slit extending from said inner circumference through said ring <u>and through said outer edge of said shower curtain; said ring further comprising a</u> **projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring**";

Claim 12 was cancelled.

Thus, the final independent claims allowed in the '088 patent are drawn to Figure 31b of Species I.  Appx1234.

10.      On December 19, 2011, Claim 1 was allowed (Appx1242-1246) and the patent issued on August 7, 2012.

## SUMMARY OF THE ARGUMENT

This case should not have proceeded to trial in the Southern District of New York, as venue is plainly improper under *TC Heartland*. The district court's determination that Kartri forfeited its venue objection by moving insufficiently "seasonably" contradicted this Court's directive in *Micron*, amounted to an abuse of discretion, and unfairly prejudiced Kartri and Marquis.

The liability findings in this case were also flawed, rooted in the district court's acceptance of Appellees' argument that "defendants have manufactured, sold, and distributed confusingly similar shower curtains, and thus have infringed Appellees' utility and design patents, infringed Appellees' trademarks and trade dress, and engaged in unfair competition under the Lanham Act and New York law" (Appx201, emphasis added). The district court overlooked the crucial distinction that a competitor's sale of a similar product does not necessarily constitute a violation of patent or trademark law. There was a failure to properly assess and respect the diverse scope of intellectual property rights and protections. The district court's conflation of word marks with the products themselves, confusion between trade dress and patented inventions, and the erroneous attribution of rights to Appellees that they did not own led to the flawed conclusion that Appellants infringed patents, trademarks, and trade dress without applying the correct legal standards to any of them.

27

The utility patents asserted by Appellees were not infringed, and the lower court's analysis of infringement without a holistic review of all claim limitations was flawed. The claim construction failed to appropriately distinguish between intrinsic and extrinsic evidence, leading to the improper reliance on extrinsic evidence to replace or contradict intrinsic evidence from the prosecution history. Claim scope surrendered during amendments was disregarded, and the court considered a restriction requirement to be ambiguous, contrary to the explicit amendments made by the patentee to overcome rejections.

Untimely terminal disclaimers were filed on May 2, 2019, in the USPTO for the '088 patent, referencing the '248 and '609 patents that had been the basis of a double patenting rejection on September 15, 2008. Appellees failed to file briefs or court decisions during prosecution inconsistent with their compliance with the restriction before the USPTO, violating their duty to disclose material information. This corrupted the public notice function of the prosecution history, hindering the public's understanding of what remains open for them.

After making erroneous infringement determinations, the district court proceeded to treble damages based on a flawed willfulness analysis. It combined patents and trade dress without separate analysis, determining that the period of "willfulness" for both began upon receipt of a cease-and-desist letter asserting only patents. The finding of willful infringement of trade dress overlooked the invalidity

of the trade dress, and in finding willful patent infringement, the court ignored evidence suggesting Appellants' good faith.

In its post-trial rulings, the district court further erred by awarding attorney's fees, deeming the case exceptional, and calculating an almost million-dollar award without mandatory substantiating documents. This calculation, using "deterrence" to fix a number, contradicted clear precedent from this Court.

To rectify these errors, this Court has the authority to vacate the appealed orders. It can order dismissal or transfer for improper venue, or if the trial is deemed proper in the Southern District of New York, it should vacate the erroneous infringement findings. Additionally, it should declare the unregistered trade dress invalid as a matter of law and annul the erroneous willfulness finding and the attorney's fees award that deviates from legal standards.

## STANDARD OF REVIEW

This Appeal relies upon the following Appellate Review Standards:

**<u>Findings of Fact and Conclusions of Law:</u>**  Findings of fact from a bench trial are subject to clear error review, while conclusions of law are reviewed *de novo*.  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1337 (Fed. Cir. 2005).

**<u>Venue:</u>**  Venue under 28 U.S.C. § 1400(b) is reviewed *de novo* (*Westech Aerosol Corp. v. 3M Co.*, 927 F.3d 1378, 1381 (Fed. Cir. 2019)), while findings of

waiver of venue objections are subject to abuse of discretion review. *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*, Inc., 942 F.3d 1119, 1132-33 (Fed. Cir. 2019); see *In re Micron Tech., Inc.*, 875 F.3d 1091 at 1095 (Fed. Cir. 2017).

**Standing:**  De novo review applies when standing is based on complaint allegations and undisputed facts, while factual findings on disputed matters are accepted unless clearly erroneous.  *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 85 (2d. Cir. 2014).

**Likelihood of Confusion:**  Factual determinations are subject to clear error review, but the ultimate determination of likelihood of confusion is a legal conclusion reviewed *de novo*.  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004).

**Trade Dress**:  Distinctiveness and functionality determinations are ordinarily reviewed for clear error, but summary judgment is reviewed *de novo*. *Nora Beverages v. Perrier Grp. of Am.*, 164 F.3d 736, 744-745 (2d. Cir. 1998); *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 182 (2d Cir. 2021), cert. denied, 142 S. Ct. 1359 (2022).

**Patent Claim Construction**.  A claim construction relying only on evidence intrinsic to the patent (*i.e.,* the claims and specification, along with the prosecution history), is reviewed *de novo*.  However, in considering extrinsic evidence, the

subsidiary factual findings underlying the claim construction are reviewed for clear error. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322 (Fed. Cir. 2015).

**Patent Infringment Summary Judgment.** This Court reviews a district court's summary judgment under the law of the regional circuit, here, the Second Circuit. *Convolve, Inc. v. Compaq Comp. Corp.*, 812 F.3d 1313, 1317 (Fed. Cir. 2016). "The Second Circuit reviews the grant or denial of summary judgment de novo." *Id.* (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)). Summary judgment is properly granted only when, drawing all reasonable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**Willfulness and Attorney's Fees:** An award of enhanced damages for willfulness and a grant of attorney's fees are both reviewed for abuse of discretion (*Halo Elecs., Inc. v. Pulse Elecs.*, 579 U.S. 93, 107 (2016)), with the use of the wrong legal standard constituting an abuse of discretion. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008).

## ARGUMENT

## I.    The Court Erred in Denying Kartri's Venue Challenge.

Venue in patent cases is exclusively proper where the defendant resides or commits acts of infringement with a regular place of business (28 U.S.C. § 1400(b)). Following *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258 (2017), a domestic corporation resides only in its state of incorporation. As Kartri is incorporated in Pennsylvania, it lacks residency in the Southern District of New York motion for transfer to PA. While Marquis "resides" and is headquartered in New Jersey, Marquis requested that as a component supplier, if Kartri's motion is granted, it remain joined with Kartri in PA.  Appx9 (8:1-5). The district court acknowledged that post-*TC Heartland*, Kartri's non-residency should have led to a dismissal or transfer. Appx5 (4:2-5).

Despite venue being improper, the district court erroneously denied Kartri's motion, citing forfeiture based on untimeliness.  Kartri has appealed the denial of the improper venue motion.  Should the Court grant Kartri's request to vacate the Appealed Orders based on the improper venue issue alone, leading to a dismissal or transfer of the case to an appropriate venue.  Marquis requests to remain joined with Kartri and be transferred to the same venue.

32

II.     **The Court Erred in Finding Infringement of the '248, '609 and '088 Utility Patents.**

The district court's summary judgment on utility patent infringement is marred by significant flaws that demand redress. Key issues include the court's failure to evaluate claims holistically, misconstrued limitations, and disregard for the written description and prosecution history. These critical errors, detailed below, necessitate a thorough reexamination.  Appx91-95.

Inadequate Evaluation of Claim Elements.  The court erred by focusing on specific limitations within each claim rather than assessing them collectively. For example, in the '248 patent, the court found infringement based on a single limitation, overlooking the necessity to evaluate all elements.  Similar missteps occurred with the "projecting edge" limitation in the '609 and '088 patents, as the court failed to analyze its relationship with other claim elements.

Incomplete Assessment of Claim Limitations.  The court's failure to analyze all claim limitations in the accused device led to an incomplete assessment. It overlooked the need to consider whether Appellants' grommet properly demarcates the ring to determine where the "outer circumference" ends and a "projecting edge" begins.

Neglect of Written Description and Prosecution History.  The court erroneously found ambiguity in the Examiner's decisions, applying a disavowal rule contrary to the objective legal standard. *Schriber-Schroth v. Cleveland Tr.*, 311

U.S. 211, 220-21 (1940)  The examiner-imposed restriction requirement covering nine distinct species at the beginning of the patent family and accepted by the patentee (Appx1409; Appx1417) was crucial and relied upon throughout prosecution of the patent family.  The court's Markman Order did not properly address the intrinsic evidence of surrendered claim scope from dependent claims (Appx1413) withdrawn (Appx1423) and cancelled (Appx1444) by the examiner after the patentee's election of species IV including a "ring" with a "flat upper edge."  Appx2407-2408.  The species IV patents, including the '248 and '609 patents, do not cover a "flat upper edge" grommet.  Appx2405-2406.  The failure to consider intrinsic evidence of these canceled ring shapes (Appx1444) was a crucial oversight affecting the claim scope of all three patents and validity of the '088 patent.

The district court's failure to assess claim elements collectively, consider restriction requirements and amendments in view of the restriction in the prosecution history, and accurately construe claim limitations based on surrendered scope resulted in a claim construction that invalidated patents and erroneously broadened the claims.

As explained below, none of the properly construed patents are infringed by an entirely flat upper edge grommet as used in Appellants' curtains.

A.    **The Court Erred in Claim Construction and Finding Infringement of the '248 Patent**

Claim Construction of the Terms "Approximately Horizontal" and "Said Slit Exits Said Ring at Said Upper Edge of Said Curtain".  In its Markman ruling, the Court defined the term "approximately horizontal component" as "a component that is either level or nearly so."  (Appx65). During the Markman hearing, the Court from the "familiar perspective of a lay judge" as POSITA (Appx49) expressed that an incline of 5 to 7 percent falls outside the bounds of 'nearly.'" (Appx1869-1870).  However, the court later broadened the interpretation of the term in the summary judgment stage, incorporating extrinsic evidence from measurements derived by Dr. Kyotoma, an expert enlisted by Appellees, who compared measurements of slit 232b in Figure 20 to Appellants' grommet.



Appx2029.  Notably, these expert measurements were not derived directly from the patent illustrations but rather from lines drawn on the patent drawings by

the expert.  The court, in error, accepted these measurements as a basis for finding

infringement, stating:

> And because the "approximately horizontal" component of Focus's design is
>
> 26° off horizontal, defendants' design, at 22°, is at least as "approximately
>
> horizontal" as Focus's is. Nor can defendants argue that the 26° angle of
>
> Focus's "approximately horizontal" component is inconsistent with the
>
> Court's Markman construction that an "approximately horizontal
>
> component" is "a component that is either level or nearly so."

Appx93. The court did not interpret the term "approximately horizontal" according

to the claim construction articulated in the Claim Construction Order falsely

believing from the measurements that any construction by the court excluding

Appellees' own design would be inconsistent and illogical.   Appx92-93.

But Appellees design was not excluded, the court ignored the fact that

Appellees explained during the Markman hearing that component 232b in Figure

20, "starts out ***almost exactly horizontal*** and then turns down a little bit, and it's

called 'approximately horizontal' in the specification.  So here's an example of

something that's not completely straight. There's a curvature downward."

Appx1866-1867 (emphasis added). The lines drawn by Appellees' expert, who

based the angle of the slit on a different part of the curve, contradicted Appellees'

position at the Markman hearing.[2]

Consistent with prior rulings, this Court has emphasized that district courts

should not rely on arguments based on drawings that are not explicitly to scale in

issued patents. *Nystrom v. TREX Co*., Inc., 424 F. 3d 1136, 1149 (Fed. Cir. 2005).

The examiner expressly stated Figure 20 was not to scale. Appx959. Moreover,

measurements derived from an expert's hand-drawn lines cannot replace the

absence of such disclosures in the specification. *Noah Sys., Inc. v. Intuit Inc.*, 675

F.3d 1302,1312 (Fed. Cir. 2012) (quoting *Default Proof Credit Card Sys., Inc. v.*

*Home Depot U.S.A., Inc*., 412 F.3d 1291, 1302 (Fed.Cir.2005)). In this case, the

expert drew two lines on Figure 20, using them as the foundation for

measurements and conclusions, which diverted attention from the Markman claim

construction where the court posited that even an incline of 5 to 7 percent falls

outside the bounds of "nearly" horizontal. Appx1869-1870. A 5 to 7 percent

incline converts to an angle of 2.9° to 4° (Appx2410), which is far less than

Appellants' 22° slit. The experts extrinsic evidence constitutes clear error as the

"approximately horizontal slit" limitation does not cover Appellants' grommet.

---

[2] In its opinion, the district court stated Appellants did not rebut the measurements
(Appx92), but ignored that Appellants objected to the line measurements.
Appx2400-2401.

<u>Claim Construction of the Term "Ring".</u>  The district court's Markman Order in construing the term "ring" ignored intrinsic evidence that the patentee surrendered claim scope in the form of withdrawn and cancelled dependent claims that covered several ring shapes, including the limitation for "said ring includes a flat upper edge along at least a portion of said ring." Appx1423.

During prosecution of the '248 patent, Claim 73 was withdrawn by the examiner from further examination.  Appx1423.  This claim depended from Claim 61 (now Claim 1) and stated, "A product as claimed in Claim 61 [now Claim 1], wherein said ring includes a flat upper edge along at least a portion of said ring." Appx1413. The basis for the withdrawal was that it was drawn to an unelected species as its basis for patentability.  Appx1423. The examiner later canceled the claim in an Examiner's Amendment with the Notice of Allowance.  Appx1443-1445. The examiner did not believe the original claim could be patented within the elected species.  The examiner further indicated that, should the cancellation of the claim be unacceptable to the applicant, an amendment may be filed as provided by 37 CFR 1.312.  Appx1444.  The applicant never disputed the cancellation of the claim nor did the applicant appeal the examiner's decision.

This amendment canceling claims to a curtain ring with a flat upper edge limits the scope of the claim.  In *Schriber-Schroth Co*., the Supreme Court stated that "[i]t is a rule of patent construction consistently observed that a claim in a

patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." 311 U.S. 211at 220-21.

"Moreover, the Supreme Court has held that narrower claims cancelled during prosecution may limit the scope of the independent claims on which they were intended to depend." *UCB, Inc. v. Yeda Rsch. & Dev. Co.,* 117 F. Supp. 3d 755, 775 (E.D. Va. 2015), *aff'd,* 837 F.3d 1256 (Fed. Cir. 2016)).  The district court improperly reasoned that cancelled or amended claims only limit the claim scope when included with subjective evidence that the patentee expressly disavowals the claim scope.  However, proper reasoning requires "the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002). *See Goodyear Dental Vulcanite Co. v. Davis*, 102 U. S. 222, 228 (1880) ("In view of [the amendment] there can be no doubt of what [the patentee] understood he had patented, and that both he and the commissioner regarded the patent to be for a manufacture made exclusively of vulcanites by the detailed process"); *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F. 3d 157778 (Fed. Cir. 1997) ("Prosecution history estoppel . . . preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent").

During prosecution of the '088 patent, the examiner rejected initial generic claims in the application for non-statutory double patenting in view of the '248 and '609 patents for which the patentee had previously made species IV elections. Appx1133-1135.  In response, the patentee amended the claims to include a ring with "a flat upper edge" (Appx1147), leading to the withdrawal of the rejection. Appx1182.  The third sentence of section 121 provides a safe harbor to patents resulting from a restriction requirement:

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

35 U.S.C. § 121.

Moreover, consonance, as required by this Court, mandates that the line of demarcation between independent and distinct inventions prompted by the restriction requirement be maintained. *Gerber Garment Tech.*, 916 F.2d 683, 688 (Fed. Cir.).  In this case, the inclusion of the "flat upper edge" ring shape in the '088 patent claim, after its cancellation from the '248 patent application, was relied by the patentee to overcome the examiner's double patenting rejection, thus maintaining consonance. Thus, the '248 patent does not cover Appellants' "flat upper edge" grommet.

40

Claim Construction of the Term "Said Slit Exits Said Ring at Said Upper
Edge of Said Curtain".  The district court's construction of the term "*said slit exits
said ring at said upper edge of said curtain*," which was added during
reexamination of the '248 patent, is flawed. The court interpreted it to mean "the
slit exits the ring *at or near* the upper edge of the curtain," misinterpreting the
patentee's use of the *temporal* term "*simultaneously*" (Appx946) and removal by
the examiner during reexamination (Appx959). The error arises from the court
considering "*simultaneously*" as a precise *spatial* term for which it believed
removal necessitated adding "or near", when it was actually rejected during
examination for attempting to define a spatial alignment using a term associated
with time.

The court's erroneous introduction of the term "*or nearly*" to the claimed
positional alignment allows for the slit to exit the ring slightly above or below the
curtain upper edge rendering the claim invalid.  If the slit aligns above the curtain,
the construction improperly broadens the claim scope under reexamination, lacking
antecedence with the limitation "*a slit extending from said upper edge through
said ring to said opening*," which was narrowed by an amendment in the original
patent.  Conversely, if the slit aligns slightly below the curtain, the claim fails to
overcome the obviousness prior art rejection for which the amendment was
offered.  Appx954.  The "or nearly" term renders the claim invalid on three fronts:

obviousness, an improperly broadened claim under reexamination, and lack of

antecedence with a previously amended claim limitation, rendering the limitation

indefinite.

Maintaining the lower court's claim construction would consequently render

the claim invalid. The court's misunderstanding of the patentee's use of

"simultaneous" and the addition of "or nearly" introduced ambiguity and potential

overbreadth, impacting the claim's validity under various grounds.  Appellants'

grommet slit extends from *the outer circumferen*ce to *the inner circumference* – a

slit surrendered in the April 1, 2002 amendment.  Appx1428-1434.

Infringement of the '248 Patent Based Upon a Single Limitation in the

Claim.  The court found infringement of claim 1 of the '248 patent by only

analyzing whether defendants' product had the limitation "*said slit further*

*comprising an approximately horizontal component when said item is hanging*

*from the rod.*"  Appellants' grommet does not infringe this limitation as it was

wrongly determined from inadmissible extrinsic evidence that contradicted the

Markman Order.

A determination of infringement requires a two-step analysis in which first

the claim is construed and then the properly construed claim is compared to the

allegedly infringing device.  *Markman v. Westview Instruments, Inc*., 52 F.3d 967,

976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  In considering the

issue of infringement of a patent, attention must be directed in the first instance to the words of each claim, which define the metes and bounds of the invention. If the accused device falls clearly within the terms of the claim infringement is made out. *Envirotech Corp. v. Al George, Inc*., 730 F.2d 753, 759 (Fed. Cir. 1984). Every element in a claim of a patent is material, and must be met by an alleged infringing device, either literally or by the Doctrine of Equivalents. *See generally Becton Dickinson & Co. v. C.R. Bard, Inc*., 922 F.2d 792, 797-98 (Fed. Cir. 1990). Under a literal infringement analysis, it is well settled that "[t]o establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused [product]." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).

The district erred in not applying every claim limitation to Appellants' curtains. For example, the '248 claim 1 limitation "*a slit extending from said upper edge through said ring to said opening*" was not construed during the Markman, but nevertheless should have been analyzed for infringement. This limitation was from a narrowing amendment defining a slit that begins at the upper edge *of the curtain* through the ring to the opening. This amendment was made in response to a rejection over the prior art, and thus was made for reasons relating to patentability. Referring to the photo and not the expert's measurements, the top of the grommet of the accused product is slightly above the upper edge of the curtain.

Appellants' ring has a slit that extends from the outer circumference to the inner circumference. Claim scope encompassing such a slit was surrendered on April 1, 2002 when the patentee amended the claims to add the limitation that the slit exits through the curtain itself and not the ring. Appx1428-1434.

**Slit in Defendants' Accused Products**



Appellants' grommet top lies slightly above the hem of the curtain as shown in the photo. When the grommet is above the curtain upper edge, the slit then extends from the outer circumference to the inner circumference of the ring. Accordingly, Appellant's product lack the slit limitation and does not infringe, and reversal of the finding of infringement of the '248 patent is warranted.

Accordingly, the Appellants' grommets do not infringe the '248 patent. They do not have an "approximately horizontal slit", a "slit from said upper edge" and a "slit exiting the ring *at* said upper edge". The '248 patent does not cover Appellants' "flat upper edge" grommet. Consequently, a reversal of the

44

infringement finding for the '248 patent is justified.  Including the term "or nearly"

in the claim construction is improper and, if not reversed, renders the patent

invalid.

B.    <u>The Court Erred in Claim Construction and Finding Infringement of the '609  Patent</u>

<u>Claim Construction of the Terms "Said Projecting Edge Being an Edge Which Projects from Said Outer Circumference of Said Ring".</u>  During the

Markman proceedings, the district court was made aware that the phrase "said

projecting edge being an edge which projects from said outer circumference of said

ring" does not have priority back to the original '248 patent specification and

therefore requires antecedence with the specification to maintain the priority claim.

The district court was provided with two definitions from the intrinsic record.

The first definition was from the patentee when the amendment (Appx1035)

was made in responding to a restriction requirement and stated:

> The enclosed new claims are directed to the projecting edge
> embodiment of the invention.  In accordance with the invention,
> instead of using a conventional ring, a ring is provided that includes
> a projecting edge, i.e. a ring edge which extends in a direction away
> from the hanging product and which is provided next to (adjacent
> to) the slit.

The patentee then provided support for the definition referring back to the

Figures, stating:

> Examples of such edges are provided in Figures 18-20.  The edges
> of elements 206, 216 or 226 each exemplify various projecting
> edges of the invention.

Appx441.

A second definition from the patent specification was adopted by the PTAB

and used as the basis for denying institution of an IPR on the '088 patent.

Applying the definition of "extension" found in the '088 patent specification to the

projecting edge as claimed, the PTAB stated, "[f]ollowing that logic, to project

from the outer circumference of the ring as required by the claims requires

projecting away from the ring, for example, "toward the ceiling," as the

specification indicates."  Appx1620-1621.

The district court diverged from the PTAB's claim construction, which

appropriately relied on the intrinsic record, by incorporating extrinsic arguments

presented by Appellees in a previous litigation. Specifically, Appellees contended

that the phrase should read as "an edge that projects from the outer circumference

of the ring." (Appx1340-1341). Rather than adhering to the intrinsic evidence, the

court expanded the term, asserting that "projects from" *cannot mean* as protruding

or jutting out from the outer circumference. (Appx69). Notably, the court failed to

provide a clear delineation between the outer circumference and the projecting

edge within this claim limitation. (Appx68-69). This lack of definition was

exacerbated when "outer circumference" was construed as an "outer edge that is

curved, at least in part," adding confusion to where the outer circumference ends

46

and the projecting edge begins, even in the context of a predictable structure like a circle. (Appx58).

The district court's reliance on extrinsic arguments to shape the claim construction deviated from the PTAB's interpretation, as well as conflicting with the written description and prosecution history. This departure introduced inconsistencies and obscured the demarcation between the structures in the specified claim limitation, creating confusion for a person of ordinary skill in the art (POSITA). The court's construction, therefore, lacks alignment with the intrinsic evidence and established legal standards.

The Court Erred in Its Claim Construction of the Term "Ring".  The '609 patent application elected prosecution under species IV, the same species as the '248 patent, where the ring shape of species IV could not cover a "flat upper edge". Appx1035.

Claim Construction of the Term "Next to Said Slit".  The court's determination that the projecting edge was found from portions of the flat upper edge and outer circumference in Appellants' grommet was erroneous.  The specification clearly distinguishes between the "outer circumference" and "flat upper edge" as separate and distinct ring structures.  This is evident in the '609 patent at 7:65-8:5 (Appx900), where the projecting edge is described as a "projection" off the ring's outer circumference, referencing Figures 18, 19, and 20.

47

In contrast, the description of a ring with an entirely flat upper edge appears in a different context as a "further embodiment" in 9:25-35 (Appx901), referring to Figure 21 without mentioning the outer circumference. Figures 18-20 and Figure 21 are distinct embodiments subjected to restriction during prosecution.

The written description does not support the notion that the flat upper edge is part of the outer circumference. However, the claim construction asserts that the projecting edge "projects from" the outer circumference, not the ring or flat upper edge. The written description does not depict a ring with an entirely flat upper edge as having a projection. Consequently, the court's construction that the claimed "projecting edge" of the slit could also be part of a flat upper edge is erroneous.

During the prosecution of the '088 patent, the patentee disavowed such claim scope to overcome an indefiniteness rejection related to Figure 21, illustrating a ring with an entirely flat upper edge (species V). The rejection asserted that this figure was not covered by rejected Claim 12, which had at least one projection. The patentee clarified that broad claim 1 was generic to Figures 31(b) and Figure 21, while claim 12 covered only Figure 31(b). Appx1180.

Therefore, the court's finding that a slit exiting within a "flat upper edge" of a ring was next to a projecting edge that projects from the outer circumference is in error. This conclusion contradicts the specification, figures, and the agreement

between the patentee and the patent examiner, which recognized these structures as patentably distinct embodiments of the claimed inventions.

    Infringement of the '609 Patent Based upon Two Limitations in the Claims.

The district court's summary judgment on infringement of claim 1 of the '609 patent is marred by several errors, primarily stemming from the narrow focus on only two aspects of the claim. The court's analysis centered on whether the defendants' product possessed the specified limitations related to the projecting edge and its placement next to the slit, overlooking the need to consider the claim in its entirety.

    Defendants-Appellants' grommets feature an entire U-shaped outer perimeter that aligns with the court's interpretation of outer circumference. However, the court, neglecting the significance of "projects from," identified a projecting edge in the ring itself that encompassed part of both the flat upper edge and the outer circumference. (Appx94-95). Notably, the court defined "ring" in the Markman order as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening." The specification's projections do not encompass the ring portion enclosing and reinforcing the opening for the curtain rod. The court's finding of a "projecting edge" spanning a large part of the ring structure failed to assess whether the "outer circumference" still circumscribes the structure and whether now utilizing projections to "enclose and reinforce an

49

opening" as mandated by its own claim construction of the ring is still projecting in relation to the outer circumference. By not first establishing the outer circumference as defined in its earlier claim construction, the district court made a preliminary error in the analysis of the projecting edge.

Crucially, the court's limited examination only addressed two out of several limitations in claim 1, disregarding and cannibalizing other elements, such as the ring and outer circumference, present in Appellants' product to establish a projecting edge. The court wrongly relied on extrinsic evidence to exclude consideration of "projects from" contradicting the specification. The '609 patent does not cover Appellants' flat upper edge grommet. Consequently, each reason alone requires a reversal of the infringement finding for the '609 patent.

**C.**  **The Court Erred in Claim Construction and Finding Infringement of the '088 Patent**

Claim Construction of the Terms "Said Projecting Edge Being an Edge Which Projects from Said Outer Circumference of Said Ring".  As previously discussed in relation to the '609 patent, the court's construction of the term "projecting edge" as "an edge that projects from the outer circumference of the ring" is erroneous. The intrinsic evidence supports that "projects from" does not equate to "protrudes or juts from." Not only did the court fail to provide adequate support for this construction, but it also deviated from the PTAB's claim

construction and the specification, which explicitly requires a structure that "projects from" the outer circumference.

In Claim 1 of the '088 patent, the ring encompasses a flat upper edge, an inner circumference, and an outer circumference. (Appx458). The patentee amended the '088 patent to include a genus claim covering species V (Fig. 21) having a entirely flat upper edge lacking a "projecting edge" and species I (Fig. 31b) having a "projecting edge", where "projecting edge" is specifically limited to projecting from the "outer circumference" and not the flat upper edge, as observed in the '088 patent. (Appx458; Appx67-69).

The specification for Figure 21 clarifies that the flat "upper edge can be the entire upper edge or used as a portion of the upper edge, e.g., in conjunction with an extension off the ring." The description of Figure 31(b) maintains this distinction, depicting "an edge 404 which is flat along at least a portion of the upper edge of the ring." (Appx457, 10:61-62). The extension 408 or "projecting edge" off the ring is explicitly illustrated as separate from the flat upper edge 404 by the slit 412. (Appx457, 10:63-64).

During '088 patent prosecution, a series indefiniteness rejections under 35 U.S.C. § 112, the patentee amended projections from "two" to "at least one" to align with Figure 31b (Species I) (Appx1180, Appx1185, Appx1197). In response to the second indefiniteness rejection that the restriction does not support an

invention with both (i) a flat upper edge in Claim 1 and (ii) at least one projection in dependent Claim 12, the patentee made a genus/species argument on the structures. The patentee argued that Claim 1 with a "flat upper edge" was a genus claim that covered Figure 31b (Species I) and Figure 21 (Species V) with an entirely flat upper edge. Accordingly, the patentee argued that the "projection" limitation of claim 12 was covered by Figure 31b (Species I) alone. Appx1202. The allowed claims of the '088 patent now collectively embody the "flat upper edge" and the "projecting edge" limitation of Species I (Appx1234).

Notably, the specification aligns with the prosecution history, particularly under the second indefiniteness rejection of the '088 patent application, where the patentee successfully argued that an entirely flat upper edge (as illustrated in Figure 21) does not have a "projection" (Appx457, 9:18-19), serve as intrinsic evidence contradicting the district court's finding of infringement relying on extrinsic evidence. Based on the specification and prosecution estoppel, the '088 patent cover Appellants' entirely flat upper edge grommet, requiring reversal of infringement.

The district court's failure to assess claim elements collectively, consider restriction requirements and amendments in view of the restriction in the prosecution history, and accurately construe claim limitations based on surrendered scope resulted in an erroneous summary judgment on utility patent infringement.

<u>Infringement of the '088 Patent Based upon One Limitation.</u>  The district court further erred in granting summary judgment for infringement that is limited to one limitation of claim 1 of the '088 patent.  The court found infringement of claim 1 by only analyzing whether defendants' product had the limitation of "said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring."  The court here again failed to consider the claim as whole and never determined whether other claim limitations of claim 1 of '088 patent were found in the Appellants' grommet.  This is significant given the current claim construction defines the "outer circumference" as "outer edge that is curved, at least in part."

Accordingly, reversal of the finding of infringement of the '088 patent is warranted.

## III.    The Appellees' Filing of Terminal Disclaimers to Promote an Erroneous Claim Construction Resulting in Unclean Hands.

The Supreme Court emphasizes that a patent serves both to define the legal property rights of the patentee *and* to provide public notice of what remains accessible. *See McClain v. Ortmaye*r, 141 U.S. 419, 424 (1891).  Appellees violated the public notice function by advancing arguments in litigation that were inconsistent with positions previously taken in prosecution of the patent—positions

53

on which Appellants as well as the rest of the public had a right to rely. This results in unclean hands.[3]

This Court has explained that unclean hands exists when "misconduct of a party seeking relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F. 3d 1231 (Fed. Cir. 2018). The doctrine requires a plaintiff to "have acted fairly and without fraud or deceit as to the controversy in issue," and "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Id.* (internal citations and quotations omitted).

As previously described *supra*, in prosecuting the '088 Patent, Appellees overcame an ODP rejection by amending the '088 claims to require rings "provided with a flat upper edge" (Appx1147), which the examiner determined were "not encompassed with the species as set forth in the applicant's prior patents"—*i.e.* the '248 and '609.[4]  Appx1182. During the claim construction phase of the Case Below, however, the district court ruled that the '248 and '609 Patents

---

[3] Appellants did not plead inequitable conduct in this case.

[4] As explained supra, during prosecution of the '248 Patent, the Examiner withdrew and then cancelled claims directed to rings having a flat upper edge as drawn to non-elected species of the invention.

*could* "contemplate flat-topped rings," based on Appellees' argument.  Appx57.

This lack of consonance[5] led Appellants to argue that the '088 was now invalid as

not patentably distinct from its parents.  In response (and seven years after the '088

Patent issued), Appellees filed terminal disclaimers at the USPTO disclaiming the

term of the '088 beyond the term of the '248 and '609 Patents, to mask the prior

reliance on the flat upper edge to overcome the ODP rejection.  Appellees alleged

infringement of all three patents in the Case Below by arguing that all three patents

covered rings with an entirely flat upper edge.  Appx768-772.  This argument was

entirely inconsistent with the Examiner's statement of the flat upper edge as a

patentable distinction—and the applicants' acquiescence in the Examiner's

statements—to gain a patent.

Consideration of unclean hands was erroneously denied during pre-trial

motions on grounds that unclean hands should have been plead in Appellants'

Answer to the 2017 Fourth Amended Complaint.  This ignores the fact that

Appellees' behavior resulting in unclean hands occurred *after* 2017—*i.e.* the 2018

Markman hearing and the May 2, 2019 terminal disclaimer filings.  Appellees'

contradictory statements about the scope of the claims in litigation on the one

---

[5] *See Gerber Garment Tech.*, 916 F. 2d at 688-689.

hand, and before the USPTO on the other, highlight their manipulation of the system, negating any entitlement to patent-related damages.

## IV.    Erroneous Finding of EZ ON Mark Standing.

The Appellees' claim on the EZ ON Mark in the Case Below is flawed due to their acquisition of rights in 2021, rendering them without standing during crucial periods. In 2015, when the case was filed, in 2016 and 2017 during Appellants' motions to dismiss, and in 2019 during the summary judgment motion, Appellees lacked standing. The district court erroneously based standing on the 2012 Carnation Agreement, misinterpreting its terms.

The 2012 Carnation Agreement did not convey ownership of the EZ ON Mark to Appellees.  Instead, it licensed Appellees' patents and HOOKLESS trademarks to Carnation.  Appx3414 (defining licensed IP).  The district court misread a paragraph, erroneously inferring ownership transfer, that conveyed the right to associate Carnation's EZ ON Mark with the licensed IP.  Appx3415 ¶4.2. Notably, the Agreement did not address the transfer of any associated goodwill, making any transfer of the trademark rights invalid as an 'in gross' transfer. (*Berni v. International Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988)).

Furthermore, the 2012 Agreement did not effectuate the transfer of EZ ON from Carnation to Appellees. In 2017, Carnation, not Appellees, obtained registration for the word mark EZ ON.  Appx815.  The assignment of these rights

to Appellees occurred in 2021, as documented in the records. Appx3653, Appx3651-3652. The district court's conclusion that the 2012 Agreement obliged Carnation to assign trademark application rights to Appellees is problematic. Even if such an obligation existed, the assignment happened in 2021 and cannot retroactively confer standing for past claims.

Under *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69-70 (2d. Cir. 2001), standing requires a plaintiff to possess standing when bringing a suit, based on a preexisting, legally protected interest. Appellees, lacking standing during critical junctures, should not benefit from a retrospective assignment. The finding of infringement on the EZ ON Mark should be vacated due to Appellees' lack of standing at relevant times. Appellees' claim lacks standing during pivotal periods, and the finding of infringement on the EZ ON Mark should be vacated accordingly.

## V.    The Finding of Trade Dress Infringement Was Erroneous and the Trade Dress Is Invalid.

A plaintiff asserting unregistered trade dress must establish distinctiveness, likelihood of confusion, and non-functionality (*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F. 3d 27, 31-32 (2d. Cir. 1995); 15 U.S.C. § 1125(a)(3)). The district court erred in finding infringement by failing to apply the correct legal standards.

Regarding genericism, the district court initially rightly deemed the purported trade dress invalid, recognizing it sought protection for a concept—hookless shower curtains. Appx106. Unfortunately, a reconsideration (Appx242) led to an incorrect denial of summary judgment. The court apparently misunderstood that, lacking registration, Appellees' trade dress didn't enjoy presumptions accorded to registered marks (*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 209, 216 (2000)). This misplacement of the burden of proof impacted the summary judgment ruling. Appx132. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (movant is entitled to summary judgment when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.")

Concerning likelihood of confusion, the court erroneously linked findings for word marks (EZ ON and HOOKLESS) to the trade dress. Appx298. This error assumes a parallel likelihood of confusion for product configurations based on word mark confusion.

On functionality, a statutory presumption favors features as functional until proven otherwise (*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 at 29-30 (2001)). The court, granting summary judgment of non-functionality despite strong evidence from a utility patent, erred. Appx125-126.

The asserted trade dress comprises the subject matter of the expired '232 utility patent, now in the public domain (*Sears, Roebuck & Co. v. Stiffel Co,* 376 U.S. 225 at 231 (1964)).  Upon expiration, the patent allows the public the right to make and sell the product without restrictions (*Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1212 (Fed. Cir. 2014)).  Consistent with legal principles, Appellees cannot use trade dress claims to deny public enjoyment of the now-public technology (*Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169 at 185 (1896); *TrafFix*, 532 U.S. at 29).  The court erred establishing trade dress rights from advertising and enforcement of the '232 patent rights.  Appx279, Appx3743 ¶172, Appx6804, Appx6806, Appx6812.

In light of the findings of distinctiveness, likelihood of confusion, genericness, functionality, and the public domain nature of the asserted trade dress, Marquis urges this Court to reverse the finding of infringement and declare the trade dress invalid as a matter of law.

**VI.    The Finding of Willfulness Was Erroneous.**

The willfulness determination faces several flaws, undermining its validity.

**A.    Bundling of Patents and Trade Dress.**

The willfulness finding erroneously combines patents and trade dress into a single analysis, stemming from a cease-and-desist letter dated February 27, 2015, focused solely on patents (Appx6888).  The letter did not alert Appellants to any

claims regarding unregistered trade dress, with those allegations only surfacing in the subsequent March 2016 Amended Complaint (Appx561-562 ¶¶43-48). Holding Appellants liable for "willfully infringing" trade dress rights they were unaware of for thirteen months is unjust.

**B.    <u>No Willful Infringement of Trade Dress.</u>**

The willful infringement finding concerning trade dress must be vacated due to its recent invalidation by separate judges, including the court in the Case Below (Appx105-107).  Appellants consistently maintained the trade dress's invalidity, and the district court erred in deeming their stance willful after initially acknowledging its invalidity.

**C.    <u>No Willful Infringement of the Patents.</u>**

The district court further found, based on the limited sophistication of the principals of both Appellants, that Appellants had acted negligently but not willfully in accepting their supplier's assurances of noninfringement and failing to seek more thorough legal advice. Appx351-352, Appx354-355. The district court held that Appellants' actions constituted willfulness once a cease-and-desist letter was received. This is error; a cease-and-desist letter alone does not trigger willfulness.  Where the record does not sufficiently establish the requisite level of willfulness, enhanced damages are not appropriate.  *Iowa State Univ. Rsch. Found., Inc. v. Greater Continents Inc.*, 81 F. App'x 344 (Fed. Cir. 2003).

There were substantial factors weighing against a finding of willfulness. No consideration was given to the Markman Order invalidating the USPTO restriction. Marquis understood that a patent under restriction could be analogized to a pizza, with slices representing different species, and that in this case Appellees had chosen to keep only two slices of a nine-slice pizza—and not the one (species V) covering grommets with an entirely flat upper edge. The court's acknowledgment of Marquis's understanding, and the fact that Appellants ceased production and sales following the Markman Order, both contradict the willfulness finding. Appx232-233.

The trebling of damages based on purported willfulness should be reversed, given the flawed willfulness determination concerning both trade dress and patents.

## VII.   The Awarding of Attorneys' Fees Was Erroneous.

The Fees Order relies on findings and conclusions from prior Appealed Orders (Appx376-377, Appx380), which are flawed. Challenges to these orders render the Fees Order precarious. Even if rulings on liability and damages stand, independent reasons necessitate the reversal of the Fees Order.  The district court's two factor determination that the case is exceptional is challenged.

First, the court erred in gauging the strength of Appellees' litigating position, focusing on Appellees' positions rather than Defendants'.  Appx370. *Octane Fitness, LLC v. ICON Health &  Fitness, Inc.,* 572 U.S. 545, 545-46 (2014) sets a

61

high bar for "exceptionally meritless claims," not met by Appellants' positions validated in other proceedings.  See, *In re Zahner Design Grp., Ltd.*, No.  2022-1026, 2022 WL 2525340 (Fed. Cir. July 7, 2022), *aff'g Ex Parte Zahner  Design Grp., Ltd. Pat. Owner & Appellant*, No. 2021-001988, 2021 WL 3726157,  at \*7 (P.T.A.B. Aug. 19, 2021); *Sure Fit Home Prods., LLC v. Maytex Mills, Inc.,  No. 21 CIV. 2169 (LGS), 2021 WL 2134863 (S.D.N.Y. May 26,  2021) (vacated May 16, 2023)*.  The district court did not find Appellants' positions to be "exceptionally meritless," contrary to the standard set by *Octane Fitness*.

Second, the court's emphasis on defendants' litigation conduct, with a laundry list of deficiencies, doesn't establish an overall vexatious litigation strategy.  Appx383. Under *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013), exceptionality requires more than isolated instances of unprofessional behavior; it demands a calculated vexatious strategy, absent in this case.

The court's use of a deterrence rationale rather than the lodestar method to determine the amount of fees contradicts established principles.  *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 484-85 (Fed. Cir. 2016).  Also, contemporaneous time records specifying by attorney the date, hours, and nature of work are a mandatory requirement for fee awards.  Appx4916 n.36, Appx5085-

5092.   *See*, *New York Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136, 1148
(2d Cir. 1983).  Appx4916 n.36, Appx5085-5092.

Marquis respectfully requests the reversal of the erroneous exceptionality
determination and the $929,126.95 fee award, citing flaws in prior orders and
independent reasons undermining the Fees Order.

## CONCLUSION

For the reasons stated earlier, Marquis respectfully requests the vacatur of the
Appealed Orders, and to find that the '248, '609, and '088 patents are not infringed
by Appellants' accused curtains.  Marquis also requests that the '248 Patent as
construed by the Court Below be held invalid, and that all of the asserted patents be
held unenforceable in this case for unclean hands.

Further, Appellants request that the Court reverse the finding of infringement
of the unregistered EZ ON Mark, as Appellees lacked standing to sue during the
alleged period of infringement.  Moreover, Appellants request that the Court reverse
the finding of infringement of the unregistered trade dress, as it is invalid for being
generic, functional, and the subject matter of expired patents.

The trebling of damages for willfulness and the award of attorneys' fees
should also be vacated, because the district court failed to consider factors including

Appellants' good faith beliefs and uncertainty regarding the scope and validity of Appellees' intellectual property.

Finally, should the Court grant Kartri's request to vacate the Appealed Orders based on the improper venue issue alone, leading to a dismissal or transfer of the case to an appropriate venue, Marquis requests to remain joined with Kartri and be transferred to the same venue.

Respectfully submitted,

Dated:   January 26, 2024          By: /s/ Donald J. Cox, Jr.
                                   Donald J. Cox, Jr.
                                   Law Offices of Donald Cox
                                   300 Carnegie Center, Suite 150
                                   Princeton, NJ 08540
                                   (609) 921-0477 (phone)
                                   (609) 921-1166 (fax)
                                   Coxd@iplawonline.com

                                   Attorney for Appellant
                                   MARQUIS MILLS,
                                   INTERNATIONAL, INC.

ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,  :
et al.,                                                     :
                                                            :
                                    Plaintiffs,             :        15 Civ. 10154 (PAE)
                                                            :
                                                            :        ORDER
                    -v-                                     :
                                                            :
KARTRI SALES COMPANY, INC., et al.,                         :
                                                            :
                                    Defendants.             :
------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        For the reasons set forth on the record of today's conference, defendant Kartri Sales

Company's motion to dismiss or transfer on the basis of improper venue is denied.  The Clerk of

Court is respectfully directed to terminate the motion pending at Dkt. 153.

        SO ORDERED.

                                                    _Paul A. Engelmayer_
                                                    Paul A. Engelmayer
                                                    United States District Judge

Dated:  December 22, 2017
        New York, New York

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/22/2017

Appx1

HCLPFOCC

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  FOCUS PRODUCTS GROUP, ET AL.,

 4                  Plaintiffs,

 5           v.                              15 CV 10154 (PAE)

 6  KARTRI SALES COMPANY, MARQUIS
    MILLS, INC.,
 7
                    Defendants.
 8
    ------------------------------x
 9                                       New York, N.Y.
                                         December 21, 2017
10                                       3:42 p.m.

11  Before:

12                    HON. PAUL A. ENGELMAYER,

13                                         District Judge

14                          APPEARANCES

15  GOLDBERG COHEN, LLP
            Attorneys for Plaintiffs
16  BY:  MORRIS COHEN, ESQ.
         LEE GOLDBERG, ESQ.
17

18  LAW OFFICE OF BERNHARD MOLLDREM
            Attorneys for Defendant Kartri Sales Company
19  BY:  BERNHARD PERCIVAL MOLLDREM , JR., ESQ.

20

21  VOLPE & KOENIG, P.C
            Attorneys for Defendant Marquis Mills, Inc.
22  BY:  DONALD J. COX , JR., ESQ.

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx2

HCLPFOCC

```
1              (In open court)

2              (Case called)

3              MR. COHEN:  For the plaintiffs, Morris Cohen and Lee

4    Goldberg from Goldberg Cohen LLP, your Honor.

5              THE COURT:  All right.  Very good.  Good afternoon,

6    Mr. Cohen, Mr. Goldberg.

7              MR. MOLLDREM:  Bernhard Molldrem for Kartri.

8              THE COURT:  All right.  Good afternoon, Mr. Molldrem.

9              MR. COX:  Donald Cox for Marquis Mills.

10             THE COURT:  Very good.  Good afternoon.

11             All right.  You may all be seated.  To begin with, let

12   me thank you for getting here early.  I appreciate that we

13   pulled a fast one on you and asked if we could meet a little

14   earlier today, but I'm grateful for your accommodation.

15             All right.  The main business of the conference today

16   is for me to resolve the venue-related motion, and I have a

17   bench opinion that I'm about to read aloud.

18             All right.  Good afternoon.  Pending before the Court

19   is a fully-breached motion to dismiss or transfer this case

20   based on allegedly improper venue.  Let me begin by thanking

21   all counsel for their helpful submissions.  The parties have

22   provided not only thorough briefing but also a series of useful

23   letters.  I've read all of these thoughtful submissions.  They

24   have helped enhance my understanding of the case and the issue

25   presented.  So I thank you.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx3

1        With that, I'm going to resolve from the bench right

2    now, defendant Kartri Sales Company's motion to dismiss or

3    transfer.  I will put on the record a brief explanation of the

4    reasons for my ruling.  There will not be a written decision on

5    this point.  Instead, the Court will issue only a brief

6    bottom-line order setting out the disposition of the motion.

7    So if the reasons for the Court's ruling are important to you,

8    you'll need to order the transcript.

9        As I indicated in an order dated November 22nd, 2017,

10   docketed at docket number 164, I'm going to deny the motion to

11   dismiss or transfer for improper venue.  Inasmuch as Kartri

12   also moves to dismiss the complaint for failure to state a

13   claim, I will deny that motion as well.  Although, I have some

14   questions as to one discrete point, one discrete challenge on

15   which I intend to solicit the parties' views and a little more

16   information at the back end of this conference.

17       As to venue, this motion arises outs of the Supreme

18   Court's recent decision in *TC Heartland, LLC v. Kraft Food*

19   *Group Brands, LLC*, 137 S.Ct. 1514 (2017).  The court held, for

20   purposes of the patent venue statute, that a domestic

21   corporation "resides" only in its state of incorporation.  This

22   decision displaced the Federal Circuit's prior holding in *VE*

23   *Holding Corporation v. Johnson Gas Appliance Company*, 917 F.2d

24   1574 (Fed. Cir. 1990), that a domestic corporation resides in

25   any judicial district in which the defendant is subject to the

Appx4

HCLPFOCC

1    court's long-arm jurisdiction.

2         It is undisputed here that Kartri -- and for that

3    matter, defendant Marquis Mills International -- are not

4    incorporated in New York.  They, therefore, do not reside in

5    New York for purposes of the patent venue statute.

6         Initially, the parties disagreed as to whether

7    Kartri's failure to raise a venue objection in any of its

8    responses to the complaints constituted waiver of the defense

9    under Federal Rule of Civil Procedure 12(h)(1) and 12(g)(2).

10   In effect, that meant that the parties disputed whether *TC*

11   *Heartland* constituted an intervening change in law such that a

12   venue defense previously unavailable to Kartri became

13   available.

14        That dispute, however, is no longer before the Court.

15   By letter dated November 16, 2017, docket number 160, the

16   plaintiffs withdrew their argument that TC Heartland *did not*

17   *constitute an intervening change of law.  They did so as a*

18   *result of the Federal Circuit's recent decision in In re:*

19   *Micron Technology Inc.*, 875 F.3d 1091 (Fed. Cir. 2017).  The

20   federal circuit held there that TC Heartland *did change*

21   *controlling law such that a previously unavailable venue*

22   *defendant, therefore, became available, "thus, making the*

23   *waiver rule of Rule 12(g)(2) and (h)(1)(A) inapplicable."*

24   *Citing 875 F.3d at 1094.*

25        Accordingly, the contested issues here have narrowed

HCLPFOCC

1    significantly.  Primarily, the parties now dispute whether

2    Kartri has forfeited a venue defense through its conduct and/or

3    by failing to raise its defense seasonally.  Secondarily,

4    Kartri's brief also raises several other grounds for dismissal

5    under Rule 12(b)(6), notwithstanding that the Court previously

6    denied a motion to dismiss under Rule 12(b)(6) on the record of

7    a July 14th, 2016, conference, reflected at docket number 71.

8    The Court now proceeds to explain first why it agrees with

9    plaintiffs, that Kartri has forfeited any venue defense, and

10   second, why Kartri's bid for a second bite at the apple with

11   respect to a 12(b)(6) motion fails.

12        As an initial matter, the Court incorporates by

13   reference the factual background set forth on the record of the

14   July 14th, 2016, conference.  I'll now supplement that recital

15   with some subsequent procedural history and relevant dates

16   pertaining to *TC Heartland*.

17        On July 26th, 2016, plaintiffs filed a third amended

18   complaint, docket 68.  On July 28th, Kartri filed an answer and

19   counterclaims, docket 69.  On August 17, 2016, plaintiffs

20   answered the counterclaims, docket 75.

21        On September 12, 2016, the petitioners in TC Heartland

22   *filed a petition for a writ of certiorari.  On December 14,*

23   *2016, the Supreme Court granted cert.  See 137 S.Ct. 614*

24   *(2016).  On March 27, 2017, the Supreme Court heard argument in*

25   *that case.*

HCLPFOCC

1          Meanwhile, back at the Southern District of New York,

2     this case proceeded with discovery and settlement negotiations.

3     Following a series of conferences with Magistrate Judge Ronald

4     L. Ellis and this Court, on May 22, 2017, the Court issued a

5     revised case management plan and scheduling order, docket

6     number 112.   That same day, May 22, 2017, as it happens, the

7     Supreme Court handed down its decision in *TC Heartland*.

8          On June 14, 2017, Judge Ellis so ordered an agreement

9     between the parties that Kartri would produce certain documents

10    in discovery, docket 114.   The parties thereafter filed a

11    series of letters regarding scheduling, docket numbers 116 to

12    119, resulting in another memo endorsement by Judge Ellis,

13    docket 120.

14         On June 30th, 2017, the parties filed a revised case

15    management plan, docket 123, which this Court so ordered on

16    July 20th, 2017, docket 125.   On July 25th, 2017, the

17    plaintiffs filed a letter concerning Kartri's request that the

18    Court construe plaintiffs' design patent, docket 128.

19         On July 27, 2017, Kartri responded with a letter

20    consenting to an extension with respect to plaintiff's *Markman*

21    briefing, but challenging plaintiffs' arguments as to the scope

22    of the Court's role in construing the design, docket 129.

23         On July 28th, 2017, this Court directed the parties to

24    address any dispute as to the design patent in the parties'

25    claim construction briefs, docket 132.

Appx7

1            Following another series of letters addressed to Judge

2     Ellis, on September 18, 2017, the parties filed a joint letter

3     indicating the plaintiffs' intent to amend the complaint to

4     add, *inter alia*, a new corporate entity as a defendant, docket

5     144.  In the same letter the defendants wrote:  "The addition

6     of additional defendants would need to meet the new venue

7     standard in patent cases, as outlined last term by the Supreme

8     Court in *TC Heartland, LLC* v. *Kraft Foods Group Brands, LLC*,

9     137 S.Ct. 1514 (2017).  Defendants further believe adding any

10    view parties to this case reopens consideration of venue for

11    all defendants."  The defendants then explained that they

12    planned to move to transfer venue and sought bifurcation of the

13    case, with Kartri seeking to move the case against it to the

14    Northern District of New York, and Marquis seeking to move the

15    case against it to the district of New Jersey.

16            The next day, the Court held a case management

17    conference, docket 158, and on September 20, 2017, the Court

18    issued an order permitting the plaintiffs to amend their

19    complaint and directing that any venue-related motion be filed

20    by October 13, 2017, docket 145.  The Court then issued another

21    revised case management plan, docket 147, after which, on

22    September 29, 2017, plaintiffs filed their fourth amended

23    complaint, docket 148.  On October 12, 2017, Kartri filed its

24    motion to dismiss on the basis of the improper venue, docket

25    149.  The next day, Kartri filed its answer, docket 150.

Appx8

HCLPFOCC

```
 1              On October 27, 2017, plaintiffs submitted their
 2      opposition brief, docket 153.  Later that day, Marquis filed a
 3      letter requesting that Marquis remain joined with Kartri such
 4      that the case continue against Marquis in the same forum as
 5      against Kartri, docket 155.  Marquis also sought to file a
 6      separate brief on the non-venue grounds for dismissal raised in
 7      Kartri's brief.  On October 31, 2017, plaintiffs responded with
 8      a letter requesting that both of Marquis' requests be denied,
 9      docket 156.  On November 3rd, 2017, Kartri filed its reply,
10      docket 157.
11              On November 16, 2017, plaintiffs filed their letter
12      bringing In re: Micron to the Court's attention, docket 160.
13      On November 17, Kartri filed a response, docket number 161.  On
14      November 22nd, 2017, the parties filed their joint claim terms
15      chart, docket 162.  The same day, plaintiffs filed a reply
16      letter regarding In re: Micron, docket 163.
17              On November 22, 2017, again, this Court issued an
18      order denying Marquis' request to file a separate brief and,
19      importantly, notify the parties of the Court's intention to
20      deny Kartri's motion, docket 164.
21              So with apologies for the great length, that's the
22      background that brings us here today.
23              The Court now proceeds to address Kartri's motion.
24      The Court finds that Kartri has forfeited its venue defense by
25      failing to raise it seasonally, by submitting to the cause, and
```

Appx9

1    by submitting through its conduct.

2            In *In re: Micron*, the Federal Circuit held that "TC

3    Heartland *changed the controlling law such that the venue*

4    *defense now raised by Micron, and others, based on TC*

5    *Heartland's* interpretation of the venue statute was not

6    'available,' thus, making the waiver rule of Rule 12(g)(2) and

7    (h)(1)(A) inapplicable."  875 F.3d at 1094.  Significantly,

8    however, in the next sentence the Court added the following,

9    and I quote:  "That waiver rule, we also conclude, is not the

10   only basis on which a District Court might reject a venue

11   defense for non-merits reasons, such as determining that the

12   defense was not timely presented."  The Court explained: "A

13   less bright-line, more discretionary framework applies even

14   when Rule 12(g)(2) and, hence, Rule 12(h)(1)(A) does not."

15           Accordingly, the Federal Circuit left to federal

16   district courts what conduct precisely would constitute

17   forfeiture.  The Federal Circuit emphasized that "nothing in

18   the Federal Rules of Civil Procedure would preclude a District

19   Court from applying other standards, such as those requiring

20   timely and adequate preservation, to find a venue objection

21   lost if, for example, it was not made until long after the

22   relevant venue rule took effect."  875 F.3d at 1100 and 1102.

23           This analysis aligns with decades of case authority to

24   the effect that, independent of any obligations under Rule 12,

25   a defendant may forfeit a venue defense by failing to raise its

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx10

1    objections seasonably, by formerly submitting to the cause, or

2    by submitting through conduct.

3          For example, in *In re: Electronic Books Antitrust*

4    *Litigation*, the court, per Judge Cote, held that "venue is a

5    personal privilege which may be lost by failure to assert it

6    seasonably, by formal submission in a cause, or by submission

7    through conduct."  Citing 11MD2293 (DLC), 2014 Westlaw 1642813

8    at page 8, Southern District of New York, April 24th, 2014,

9    quoting a 1943 Supreme Court case.  And in *Corporacion Mexicana*

10   *de Mantenimiento Integral v. Pemex-Exploracion Y Produccion*,

11   the Second Circuit held that, "An objection to venue 'may be

12   lost...by submission through conduct.'"  832 F.3d 92 at 104,

13   (2d Cir. 2016), quoting a 1939 Supreme Court case.

14         Indeed, several courts outside of this district have

15   already found forfeiture of venue objections specifically with

16   regard to the rights recognized in *TC Heartland*.  These courts

17   have held that whether or not *TC Heartland* effected a sea

18   change in patent venue law, parties that submitted to the venue

19   or failed seasonably to raise their venue objections thereby

20   forfeited the defense.

21         See, for example, *Realtime Data LLC, v. Carbonite*

22   *Inc.* -- I'll give you just the Westlaw cite -- 2017 Westlaw

23   3588048 at page 2 (E.D. Tex. Aug. 21, 201), which held that a

24   venue objection was forfeited when it was raised ten months

25   after the Supreme Court granted certiorari in *TC Heartland* and

HCLPFOCC

1    over a month after the Supreme Court heard oral argument.  The

2    court there stated that:  "With a Supreme Court decision

3    looming, it is not unreasonable to require a defendant to raise

4    the propriety of venue in accordance with the federal rules

5    and, therefore, preserve its consideration after the Supreme

6    Court issues its ruling."

7         See also *Koninklijke Philips N.V. v. ASUSTek Computer*

8    *Inc.*, 2017 U.S. Dist. Lexus 11189, at pages 7 to 8 (D. Del.

9    July 19, 2017)  There, the court found a forfeiture of a *TC*

10   *Heartland*-based venue objection through conduct.  The court

11   noted that the defendants had previously withdrawn a prior

12   motion to transfer and had:  "One, participated in the

13   scheduling conference; two, conducted discovery; three, entered

14   into a stipulation and protective order with the plaintiff;

15   and, four, moved the court to allow their out-of-state counsel

16   to appear *pro hac vice*."

17        Similarly here, the Court finds that Kartri has

18   forfeited its venue objection by failing to raise it

19   seasonably, by formally submitting to the cause, and by

20   actively conducting litigation in this venue after issuance of

21   *TC Heartland*.

22        First, Kartri simply took too long to raise its

23   objection.  As stated above, the cert. petition in *TC Heartland*

24   was filed on September 12, 2016.  The Supreme Court granted

25   cert. on December 14, 2016; and the Supreme Court heard

Appx12

1    argument on March 27, 2017.  All the while, as Kartri faced a

2    live patent dispute in a venue in which it was not

3    incorporated, the company failed to alert the Court to the

4    possibility that venue might be improper.  And once the Supreme

5    Court's decision came down on May 22, 2017, creating a newly

6    available venue defense, Kartri still failed to raise any

7    objection for four months.  Kartri has not claimed any excuse

8    for this delay, and the Court will not imagine one.  The Court

9    notes that experienced patent litigators can hardly claim

10   reasonable ignorance of the Supreme Court's decision in *TC*

11   *Heartland.*

12          Furthermore, Kartri apparently raised concerns about

13   *TC Heartland* only because, in its view, plaintiffs' latest

14   amended complaint "had reopened consideration of venue," see

15   docket number 144.  If Kartri intentionally waited to raise a

16   *TC Heartland* claim until the issue was, in its appraisal,

17   "reopened," as its comment above suggests, it made a fatal

18   tactical blunder as to such a claim.  Having to failed for four

19   months to amend its answer, move for transfer, or notify the

20   Court of a change in authority, Kartri's objection came way too

21   late.

22          A hypothetical illustrates the point.  Let's suppose

23   that the complaint in this action were filed today.  The *TC*

24   *Heartland* defense is clearly available.  Kartri would have had

25   21 days from today to serve a motion to dismiss for lack of

1    venue, under Rule 12(b)(3).  About extraordinary circumstances,

2    the Court surely would not grant the motion to dismiss for

3    improper venue filed more than four months after the basis for

4    the motion became apparent.  Here, the basis for Kartri's

5    motion became apparent no later than May 22nd, 2017; yet,

6    Kartri first raised its concern on September 18th, 2017.  As

7    the Court perceives nothing extraordinary in the circumstances,

8    the Court deems the objection forfeited.

9        Second, Kartri forfeited any venue objection by

10    formally submitting to the cause when it invoked this Court's

11    jurisdiction by asserting counterclaims and impleading Marquis.

12    As the Supreme Court has held:  "Having invoked the

13    jurisdiction of the Federal Court and submitted to it, the

14    defendant may not claim that he was present only for the

15    limited objectives of his answer and counterclaim."  Citing

16    *Freeman,* 319 U.S. at 454.  Instead, it has stated, such an

17    invocation is tantamount to presence and that presence, in

18    turn, is sufficient to satisfy venue.

19        Here, in its counterclaims, Kartri alleged "This Court

20    has jurisdiction and proper venue to hear defendant's

21    counterclaim causes," docket number 69, paragraph 170.  In its

22    third-party complaint, Kartri likewise asserted that venue was

23    proper as against Marquis, docket 13, paragraph 17.  Whatever

24    the basis for Kartri's counterclaims and impleader, which

25    Kartri does not suggest were compulsory, Kartri voluntarily

Appx14

HCLPFOCC

1    subjected itself to the authority of the Court.  It thereby

2    consented to venue in this district.  See *5C Wright & Miller*,

3    *Federal Practice & Procedure,* 1397, (3d ed. 2017), which states

4    that "It can be argued that by interposing a permissive

5    counterclaim, a party voluntarily asks the court for

6    affirmative relief and, thus, should not be allowed to make

7    objections based on personal inconvenience."

8        Finally, Kartri has also submitted, through its

9    conduct, that an objection to venue may be forfeited through a

10   defendant's conduct because "Courts affix to conduct

11   consequences as to place of suit consistent with the policy

12   behind venue statutes, which is 'to save defendants from

13   inconveniences to which they might be subjected if they could

14   be compelled to answer in any district or wherever found.'"

15   Citing *Corporacion Mexicana*, 832 F.3d at 104; citing, again, a

16   Supreme Court case.

17       In other words, because "venue is a doctrine of

18   convenience to the forum," citing *Maldonado-Padilla v. Holder*,

19   651 F.3d 325, 328 (2d Cir. 2011), a court may properly consider

20   whether the defendant has behaved in such a way as to suggest

21   the venue is convenient and, therefore, appropriate.

22       Here, far from being compelled to answer in an

23   inconvenient district, Kartri has willingly, and without any

24   evident inconvenience, participated in substantial pretrial

25   litigation.  At this point, fact discovery has concluded, the

Appx15

HCLPFOCC

1   parties' joint claim terms chart has been filed, a schedule for

2   *Markman* briefing has been set, see docket number 147.  To date,

3   Kartri has continually participated in litigation in this forum

4   without any indication that proceeding in another forum would

5   prove more convenient.

6        Further, in just the four months since *TC Heartland*

7   was decided, which certainly should have catalyzed a venue

8   motion if Kartri had not thought previously to make one, the

9   parties have engaged actively in discovery and begun to

10  litigate claim construction.  During that time they have sought

11  and received the intervention of this Court and Judge Ellis in

12  the form of conferences and orders.  Under these circumstances,

13  Kartri cannot now claim inconvenience.

14       In view of the foregoing, dismissal would not be

15  proper, and the interests of justice would not be served by

16  transfer.  Accordingly, Kartri's motion is denied.

17       Having addressed Kartri's motion for dismissal or

18  transfer on the basis of improper venue, the Court turns to

19  Kartri's non-venue based motion, which also seeks dismissal.

20       Kartri raises four arguments, first, that plaintiffs

21  have not adequately alleged that marketing and promotion of EZ

22  ON branded products have established any rights in that work,

23  which in any event, is owned by third-party Carnation Home

24  Fashions, Inc.; second, that plaintiffs failed to join

25  Carnation as an indispensable party under Rule 19; third, that

Appx16

HCLPFOCC

1  plaintiffs have failed to join another indispensable party,

2  Centre Lane Partners LLP; and, fourth, that plaintiffs' design

3  patent is currently subject to a reexamination proceeding,

4  which concluded that the patent's priority claim is improper.

5          The Court will explain its reasons for rejecting the

6  first three arguments.  The Court will then solicit information

7  from the parties regarding the fourth.

8          As to the first argument, the Court has previously

9  rejected Kartri's suggestion that the plaintiffs' prior

10  pleading did not adequately allege ownership of the EZ ON mark,

11  see docket number 71 at page 22, lines 11 to 23.  All that is

12  required at the motion to dismiss stage is a plausible

13  allegation of ownership, and the fourth amended complaint,

14  which reads as follows, clearly meets that burden:

15  "Plaintiffs' trademark rights include common law trademark

16  rights that plaintiffs own to the mark EZ ON.  Plaintiffs' EZ

17  ON mark has been used on shower curtains sold continuously and

18  exclusively in interstate commerce throughout the entire United

19  States through Carnation Home Fashions, Inc., a sub-licensee of

20  plaintiffs, and through plaintiffs' sales.

21          Regarding Carnation, plaintiffs, in a written license

22  agreement, have granted Carnation an exclusive sublicense in

23  connection with the sale of one particular design falling

24  within the scope of plaintiffs' trade dress, which particular

25  design has been sold and is currently being sold by Carnation

Appx17

HCLPFOCC

1    under the EZ ON trademark.

2         Those sales of product involving use of the associated

3    product design and associated trademark, legally, and by the

4    terms of the sublicense, accrue trademark and trade dress

5    rights to the plaintiffs.  Plaintiffs' continuous and exclusive

6    trademark use on such products commenced well before

7    defendants' adopted their infringing trademark and product, and

8    plaintiffs' use has continued to the present.  Docket 48 at

9    page 82.

10        Kartri now argues, however, that plaintiffs lack

11   standing as to their trademark challenge, given that the

12   trademark is registered to Carnation rather than plaintiffs.

13   See Kartri motion Exhibit E, which is the trademark to EZ ON

14   registered in the complaint.  See also reply brief at five to

15   six.  But plaintiffs have alleged that the EZ ON trademark

16   rights accrue to them by common law and by virtue of the

17   parties' sublicense.  This allegation may prove incorrect as a

18   matter of fact, but at this stage, the Court is constrained to

19   accept the complaint's allegations as true.  See *Bell Atlantic

20   v. Twombly*, 550 U.S. 544 at 572.  And Kartri has not

21   demonstrated that any embedded legal conclusion is valid.

22        For the same reason, at this stage, the Court cannot

23   find that Carnation is an indispensable party.  The fourth

24   amended complaint clearly alleges that Carnation is plaintiffs'

25   sub-licensee.  In this battle of competing allegations as to

Appx18

1    who genuinely owns the EZ ON mark, the complaint must prevail

2    at the motion to dismiss stage.  Once again, Kartri will have

3    an opportunity down the road to develop any factual and legal

4    arguments as to ownership of the EZ ON mark.

5          Likewise, as to Kartri's third argument, the Court

6    cannot find that Centre Lane is an indispensable party.  Kartri

7    argues that through discovery, "it has become evident" that

8    Centre Lane owns plaintiffs' Focus Products Group, Sure Fit

9    Home Decor Holdings Corp. and SF Home Decor, LLC.  Kartri brief

10   12.  Defendants, therefore, "believe that further discovery

11   will reveal that this case cannot be fairly adjudicated unless

12   Centre Lane Partners LLP is made a party in this lawsuit.

13   Kartri brief at 12.

14         Perhaps so, but such an argument is not cognizable on

15   the pleadings, as by Kartri's own admission, it depends on

16   evidence outside the pleadings, to which evidence Kartri may or

17   may not already have access.  If the discovery process yields

18   evidence that plaintiffs have failed to join an indispensable

19   party, the Court will accept briefing on that matter in the

20   future, but at present, any such motion appears premature.

21         Finally, the Court turns to Kartri's fourth argument,

22   that the design patent is not entitled to priority.  Kartri has

23   already raised this argument in a prior motion.  This Court has

24   already rejected it.  See docket 71 at 11 to 13.  The Court

25   held in its prior decision that "Defendants' claim of lack of

Appx19

1    priority is premature to resolve at this early stage.  Under 35

2    U.S.C. 282, there is a presumption that a patent is valid and

3    imposes the burden of proving invalidity on the attacker.  The

4    burden is constant and never changes and is to convince the

5    Court of invalidity by clear evidence.  Citing *Microsoft Corp.*

6    *v. i4i Ltd. Partnership*, 564 U.S. 91, at 97 to 98 (2011).

7    Whether a patent enjoys the priority rights of an earlier-filed

8    patent is a question of fact."  Docket 71 at page 12, line 25,

9    to page 13, lines 1 to 7.  In that ruling, the Court also

10   relied on the PTO's determination of priority, to which it

11   accorded special weight.  Docket 71 at page 13, lines 9 to 21.

12        Now, however, Kartri claims the patent is subject to

13   reexamination and that the PTO has concluded that plaintiffs'

14   priority claim was improper.  Kartri brief at 11.  Plaintiffs

15   respond that the PTO has not issued any final adjudication, and

16   that the reexamination proceedings have merely begun.

17   Plaintiffs brief at 23.

18        Kartri provides no authority to suggest that the mere

19   fact of reexamination compels dismissal of a well-pleaded

20   claim.  Instead, Kartri argues that the complaint must "mention

21   the current status" of the design patent in their pleadings.

22   Kartri brief at 11.  But upon my review of Exhibit F to

23   Kartri's motion, it is apparent that the PTO has only issued a

24   decision granting reexamination of the design patent at

25   Kartri's request.  Per the plaintiffs' declaration, docket 154,

Appx20

1    there has been no final adjudication regarding the design

2    patent.  Accordingly, any decision regarding the reexamination

3    process would be premature.

4              Nevertheless, the Court observes that the decision

5    granting reexamination appears to reach a conclusion as to

6    priority, under the heading "Comment on Claim for Domestic

7    Priority," the decision states "The claim for priority is

8    improper."  Kartri motion Exhibit 4.  The Court has some

9    questions about the significance of this statement, and this is

10   the open question that I propose to ask.

11             So let's begin with the plaintiff.  What is the

12   priority conclusion that has been reached by the PTO and is it

13   final or subject to revision?

14             MR. COHEN:  Thank you, your Honor.  That particular

15   statement by the PTO --

16             THE COURT:  Sorry, a little louder, counsel.

17             MR. COHEN:  Oh, sure.  Is this better?

18             THE COURT:  I don't know.  Let's see.  Talk to me.

19             MR. COHEN:  That statement by the PTO was a statement

20   initiating the exam proceedings and, importantly, that

21   statement was reached without any input whatsoever by

22   plaintiff.  The way the patent office procedure works on an ex

23   parte re-exam is that a party, such as defendant Kartri, may

24   submit arguments to the PTO requesting re-examination, and at

25   that stage, the plaintiff does not really participate.

HCLPFOCC

1           THE COURT:  When that happens, is the PTO, during the

2    pendency of the proceeding leaving the earlier priority

3    determination in place, or is it changing it consistent with

4    the language, the claim for priority is improper?

5           MR. COHEN:  The priority is in place until there is a

6    final determination, meaning --

7           THE COURT:  So what you're saying is you still have

8    the priority that you represented at the beginning of this

9    case, but because the issue is sub judice, if you will, before

10   the PTO, that could change?

11          MR. COHEN:  That is exactly correct, your Honor.

12   Basically, that's a preliminary opinion by the patent office,

13   which they then invite us to respond to, and that opinion is

14   not final in any manner until there is further proceedings.  In

15   particular, as a matter of due process, we're allowed to

16   respond.  We're allowed to give our views on that.

17          THE COURT:  Sure, understood.  So what you're saying

18   is two things; one is that the process is in midstream.

19          MR. COHEN:  That is correct.

20          THE COURT:  But as to the other issue, it sounds like

21   somebody at the PTO, or maybe the PTO at the highest level that

22   considers the patent at this point in the ex parte proceedings,

23   has concluded that the extant decision will need to be changed;

24   i.e. when they write the claim for priority is improper,

25   somebody has determined at this point that, more likely than

Appx22

HCLPFOCC

1    not, the patent will be found improper, something like that?

2            MR. COHEN:  Well, more specifically, the patent office

3    has determined there is a substantial question of

4    patentability.  It's not final.  It's not dispositive.  It is

5    akin to a rejection.  So at this point, they have issued a

6    rejection of the priority claim, but at the same time, as a

7    matter of due process, they've invited us to give our evidence

8    why that rejection should be withdrawn.

9            In fact, in the prior -- there have been prior

10   re-examination requests by Kartri, and in one request by Kartri

11   that's on another patent in suit, the '248 patent, the patent

12   office likewise issued a preliminary decision or opinion of

13   non-patentability, and then after the procedure of the

14   reexamination was concluded, the patent office issued in August

15   of 2016, the patent under '248C1, which confirmed the

16   patentability of the patent with minor amendments.

17           THE COURT:  How long does this process typically take,

18   this ex parte process, from the point at which, for example,

19   there is a preliminary, if that's the right word, statement

20   along the lines of the one here that states the claim for

21   priority isn't proper?  From that point to the conclusion of

22   the ex parte review, is there a normal life cycle?

23           MR. COHEN:  Yes.  The patent office has an internal

24   procedure and internal rule that re-examination proceedings

25   that are conducted in a matter that's in active litigation

Appx23

HCLPFOCC

1   shall be conducted with "special dispatch."  And even though

2   that does not set a specific time limit, at least not in

3   an ex parte re-examination proceeding, I would say based upon

4   statistical evidence, which I don't have in front of me and I'm

5   quoting from memory, I would assume that a determination would

6   be issued within approximately a year of the initial request

7   for re-examination to maybe a year and a half.

8           THE COURT:  And when was that initial request for

9   re-examination?

10          MR. COHEN:  Without having the exact date in font of

11  me, I believe it was May of 2017.  So I believe approximately

12  May of 2018, maybe August, maybe September, something in that

13  nature we would probably have a final determination.

14          THE COURT:  So if your projection holds true, we'd

15  have a final answer, you know, in the middle to the third

16  quarter of 2018?

17          MR. COHEN:  That is correct, and it could even be

18  earlier, but that is correct.

19          THE COURT:  Are there any statistics on how often it

20  is that the PTO, on this so-called ex parte review, changes a

21  priority status?

22          MR. COHEN:  Yes.  There are quite extensive

23  statistics.  Off the top of my head, it's hard to quote because

24  there's a new procedure called IPR, and there's a set of

25  different statistics for each one.  I believe we may have even

Appx24

1   included the statistical evidence with our opposition brief.

2   There was some statistical evidence that we attached, and it

3   might have included some statistical data in that.  I'd have to

4   look back at --

5           THE COURT:  Got it.

6           MR. COHEN:  -- one of the exhibits.

7           THE COURT:  The IPR, the counter-party has an

8   opportunity to effectively litigate before the PTO, although I

9   understand that's -- the constitutionality of that is all sub

10  judice.

11          MR. COHEN:  That is exactly correct.  The Supreme

12  Court is currently considering that exact issue in the

13  *Allstate's* case.

14          THE COURT:  How did that argument go?  Does the patent

15  court have any tea leaves on how that is likely to come out?

16          MR. COHEN:  Yes, we do.  There was oral argument

17  several weeks ago, and some of the justices expressed concerns

18  with the issue of government agency withdrawing private

19  property in a non-Article 3 proceeding.

20          Other justices on the court seemed to believe that it

21  would be permissible for an administrative agency to re-review

22  their own prior determination.  So based upon the oral

23  argument, some were leaning towards non-constitutionality, some

24  were not.  It's hard to say where it's going to end up.

25          THE COURT:  Of course.  Were the commentaries in the

Appx25

HCLPFOCC

1    Supreme Court or patent bards, did they lopsidedly have a

2    prediction as to which way it will come out?

3            MR. COHEN:  Not that I've seen.  It's interesting.

4    The reason why it's interesting is because the issue itself

5    could even effect the constitutionality of an ex parte re-exam,

6    such as the one we're talking about.

7            THE COURT:  Right.  This is an aside, but it's an

8    intriguing issue.

9            MR. COHEN:  Sure.

10           THE COURT:  As I understand it, the issue that is

11   before the Court arises solely in the context of an adversary

12   trying to effectively, through inter parte review, knock out,

13   if you will, an existing patent interest.  But if that is, in

14   fact, a property right, what difference does it make whether

15   there's another party or it's a sua sponte decision by the

16   agency?

17           MR. COHEN:  That is a good question and the Supreme

18   Court justices asked that same question.  The party that was

19   arguing at the time did not want to go so far.  I think he was

20   tying to limit what he was asking the court to do.

21           THE COURT:  Sure.  But, logically, what's the

22   distinction?

23           MR. COHEN:  I don't think there necessarily is a

24   distinction.  There were amicus briefs that did support the

25   position that there should be no distinction.  From the

Appx26

 1    perspective of property rights, they are both property rights

 2    of the same nature.  From the perspective of the agency

 3    determination, it's still a non-Article 3 proceeding.

 4          The argument that the parties that were trying to

 5    sustain it were trying to say is that at least there's more due

 6    process when there's an adversarial type of proceeding because

 7    there is that back and forth, as opposed to an ex parte

 8    proceeding.  I don't personally know that that really makes a

 9    difference for the constitutionality.

10          And in fact, just as an aside, from the

11    constitutionality perspective, if there is -- and I'm not going

12    to prejudge the Supreme Court's decision, but there are Seventh

13    Amendment rights, as well, implicated because patents,

14    especially with regard to invalidity issues, are subject to a

15    Seventh Amendment right to a jury trial, and that jury trial

16    can be said to be eviscerated in IPR.

17          THE COURT:  Suppose you try to get a patent and you're

18    denied it.  If it goes in the other direction, do you have a

19    right to challenge it in that direction, or is this a one-way

20    situation, where you have a property right, as opposed to

21    you've been denied one?

22          MR. COHEN:  No, you absolutely do have a right in both

23    directions.  If a patent is denied, for example, if a party is

24    applying for a patent, whether in an ex parte just application

25    or in ex parte re-exam or in IPR, under any of those

HCLPFOCC

1    circumstances, whether it's an adversary or whether it's a

2    proceeding just that's ex parte, in all of those cases there's

3    a right of appeal to the federal courts.

4           The exact nature of the right of appeal has been

5    changed a little bit by the American Inventor's Act that was

6    passed a few years ago, but just to give a broad outline, there

7    is a right of appeal either to the Federal Circuit or to a

8    District Court, which is now the Eastern District of Virginia,

9    in terms of the law, or both.

10          THE COURT:  Right.

11          MR. COHEN:  And just as taking a hypothetical example,

12   if someone were applying for a patent on, for example, computer

13   software, and the patent office were to determine that that was

14   not patentable under the Supreme Court's recent decision

15   several years going in the *Alice* case, that party would then

16   have a right of recourse after the patent office made its

17   determination to either appeal to the Eastern District of

18   Virginia, which is now across the street from the patent

19   office, or to the Federal Circuit, directly to the Federal

20   Circuit or to the Eastern District of Virginia and then to the

21   Federal Circuit.

22          THE COURT:  Right.  I've had a couple of *Alice* cases

23   that came here en route to the Federal Circuit.

24          MR. COHEN:  That's exactly right.

25          THE COURT:  Now, coming back to this case, the

Appx28

HCLPFOCC

```
1   important thing to me is to understand what the state of play
2   is, given the in-progress review at the patent office, and I
3   think what you're saying to me is, notwithstanding the notation
4   the claim for priority is improper, in fact, you still have the
5   priority that you have alleged, such that if somebody were to
6   act right now -- well, because it's priority, it's an awkward
7   word formulation -- you have all the rights right now that, in
8   here, in the priority determination that is being challenged?
9        MR. COHEN:  That is correct, and if I may make a few
10  comments just to clarify that and to supplement what I've
11  stated.  There is a distinction between two different types of
12  proceedings in the patent office.  One is called
13  re-examination, which has multiple types, as we've discussed.
14  Another is called reissue, and reissue is a proceeding in which
15  the patentee goes back and asks for the patent office to
16  reissue their own patent, for whatever reason, there's an error
17  that they have found in their patent.  Reissue requires a
18  surrender of the patent back to the patent office.
19  Re-examination, in contrast, does not involve any such
20  surrender.
21       So as it stands at present, the patent is still in
22  force.  It is under sub judice review, and it is subject to a
23  determination by the patent office, but it has not been
24  surrendered.
25       THE COURT:  What is the purpose by having this
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx29

HCLPFOCC

1    decision out there, that apparently has no force, that says the

2    claim for priority is improper?  I mean, I take it whether the

3    verb in that sentence is "is" or "isn't," there would be the

4    same latitude to act that the PTO has now and which you will

5    expect it to commit on by the third quarter of next year?

6        MR. COHEN:  The purpose of that is so that the

7    patentee, when they do their response, will address that.  If

8    the patentee, just hypothetically, were not to address that

9    conclusion at all, if they, for example, were to address other

10   points and not that, that patent office determination would

11   then become a final determination at the end of the

12   proceedings.

13       On the other hand, if the patentee were to address

14   that particular preliminary conclusion and provide evidence

15   which was persuasive to the patent office, which we are hoping

16   is the case in this instance, then the patent office can

17   final --

18       THE COURT:  I see.  So in other words, it supplies a

19   default ruling?

20       MR. COHEN:  It is --

21       THE COURT:  In the sense that if the statement is the

22   claim for priority is improper, then the patent holder just

23   lays down and does nothing, that can be, but doesn't required

24   to be, alone the basis for the patent office to stick to that

25   initial statement; so it functions as kind of a -- it sets a

Appx30

HCLPFOCC

1    default?

2         MR. COHEN:  That is exactly correct.  It's equivalent,

3    to some degree, to an office action in a patent in which the

4    patent office says we have found this evidence, we are

5    rejecting the claims as unpatentable, but you have the right to

6    ask for reconsideration before issuing our final determination.

7         THE COURT:  All right.  So where all this means with

8    us is, I take it, that your application is, since it's

9    imponderable what the PTO is going to do, since the expression

10   "the claim for priority is improper" is nothing more than a

11   tentative view expressed, that isn't legally binding or isn't

12   preclusive of what the outcome will be, there's no reason to

13   disturb the existing schedule?

14        MR. COHEN:  That is correct, your Honor.

15        THE COURT:  Okay.  So now, let me turn to you,

16   Mr. Molldrem.  All right.

17        Okay.  So, Mr. Molldrem, the discrete issue I'm

18   raising involves the status of priority.  Really, first of all,

19   just trying to understand as a factual matter what the state is

20   of Focus' patents priority.  Do you agree with Mr. Cohen in his

21   representation that, at least for now, Focus' patent still has

22   priority?

23        MR. MOLLDREM:  At this point, the patent office, or I

24   should say the re-examination examiner, has made a decision

25   which is to re-examine the patent on the basis that all this

Appx31

HCLPFOCC

1   art that came afterwards could be applied because of the loss

2   of priority.

3          THE COURT:  Well, right now, just at this snapshot

4   moment --

5          MR. MOLLDREM:  Well, it's --

6          THE COURT:  -- just one moment, please.  While I

7   understand that it is under review, but right now, does the

8   Focus patent still have the priority?

9          MR. MOLLDREM:  Well, there hasn't been a final

10  decision; so I suppose you're right, it does.

11         THE COURT:  I'm not right or wrong.  I'm channeling

12  what he represented, and I'm asking you if there's a difference

13  of view between counsel.  I don't think you're disagreeing, but

14  you're not quite answering the question.  Can you answer it,

15  please?

16         MR. MOLLDREM:  I don't think I can answer that.

17         THE COURT:  You don't know?

18         MR. MOLLDREM:  No, you know, I feel like it's inchoate

19  at the moment.  At this point, procedurally, after the

20  examination examiner issues his decision to institute the

21  re-examination, there's a period of time in which the patent

22  owner, which is Mr. Zahner, Mr. Cohen's client, has to file an

23  owner statement, and that was filed at the beginning of

24  November.

25         That triggers a two-month period for the requester,

HCLPFOCC

 1    Kartri, to file a rebuttal reply to the owner's statement,

 2    which is going to be filed by the 2nd of January.  At that

 3    point, the re-examination examiner, and he's required to

 4    consult with two other examiners, will make a decision as to

 5    whether to maintain their denial of priority or whether that

 6    decision to deny priority has been overcome.

 7            THE COURT:  Let me try it a little differently.  Do

 8    you agree with Mr. Cohen's assessment that in the ordinary

 9    course, one might expect a decision, in whatever direction,

10    somewhere in the middle to the third quarter of next year?  Is

11    that a fair projection based on ordinary practices?

12            MR. MOLLDREM:  I would expect so.

13            THE COURT:  Okay.  So we will know more in, ballpark,

14    six to nine months, you both agree?

15            MR. MOLLDREM:  Probably in the summer, maybe in late

16    June.

17            THE COURT:  Okay.  But where you are unprepared to

18    commit one way or the other is what the status is, in that the

19    plaintiff says he still has priority, and you are saying, in

20    effect, it's an imponderable because it's under review; and so

21    there's neither priority nor non-priority, it's just really

22    unknown until we have an outcome in sometime 2018?  Am I

23    capturing you correctly?

24            MR. MOLLDREM:  That's probably a better way of putting

25    it than I would have put it.

Appx33

HCLPFOCC

1          THE COURT:  Okay.  Given your perception as to the

2     significance of where things stand with the PTO, do you have a

3     view of what, if any, implications that has for the schedule

4     that we're currently under in this case?

5          MR. MOLLDREM:  Sorry, I couldn't --

6          THE COURT:  Yes.  Do you have a view as to whether or

7     not the fact that the claim for priority is under review, do

8     you have a view as to whether that should change the schedule

9     in this case in any way?

10          MR. MOLLDREM:  I think that should be resolved before

11     this case goes forward --

12          THE COURT:  Explain why.

13          MR. MOLLDREM:  -- in a meaningful way, at least as to

14     the design patent.

15          THE COURT:  Explain why.

16          MR. MOLLDREM:  Because whether the patent survives or

17     not would affect what the claims are.

18          THE COURT:  All right.  Let's suppose that the

19     determination that "the claim for priority is improper" carries

20     the day; sometime in late June that is the decision of the PTO.

21     What is the concrete impact on this case of that?

22          MR. MOLLDREM:  Well, I suppose that Kartri would move

23     to have that portion of the complaint dismissed on that basis.

24          THE COURT:  Right.  But I mean, is there still a valid

25     patent claim in this case?

Appx34

1              MR. MOLLDREM:  No.

2              THE COURT:  Is there still a need, for example, to

3    construe the terms of the patent?

4              MR. MOLLDREM:  I suppose we should still go forward

5    with that, sir.

6              THE COURT:  In other words, the next step in this case

7    is the Markman hearing, right?

8              MR. MOLLDREM:  That's correct.

9              THE COURT:  You're almost done with that, and we'll

10   talk about that in a second.  Regardless of whether the answer

11   is the claim for priority is improper or the claim for priority

12   is proper, will we still need to have a Markman hearing?

13             MR. MOLLDREM:  I think it would be advisable to go

14   forward with that.  It is absolutely not necessary and I'm not

15   against it.  I'm not making myself clear either.  It would not

16   take a lot of energy to construe the claim.

17             THE COURT:  Okay.  Even if it's a small waste of time

18   rather than a big waste of time, it's still a waste of time; so

19   I'm trying to figure out whether or not it's a waste of time.

20   In other words, if what you're saying to me is, under either

21   branch of the decision tree, eventually, if this case doesn't

22   settle, I have to make the same Markman hearing determinations.

23   Therefore, I might as well go ahead with the Markman hearing.

24   I think that's what you're saying, but can I ask you if that's

25   what you're saying?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx35

HCLPFOCC

1           MR. MOLLDREM:  I guess sort of, but unfortunately, now

2    that you mention it, if it is going to waste your time, we can

3    certainly forestall that section of the Markman hearing until

4    the patent issues is resolved at the patent office.

5           THE COURT:  All right.  Let me go back to Mr. Cohen on

6    this.

7           Assuming that you lose before the PTO on the priority

8    claim, i.e. it's determined to be improper, how, if at all,

9    does that change the nature or scope of what will be before me

10   at the currently-in-progress Markman hearing briefing?

11          MR. COHEN:  Yes, your Honor.  Regardless of what the

12   patent office determines on the design patent, it has no affect

13   on the utility patents, which all have to be construed under

14   the Supreme Court's decision in Markman.  There are three

15   utility patents at issue.  Each of those utility patents have

16   to be construed.  We have briefing due tomorrow, in fact.

17          THE COURT:  I know that.

18          MR. COHEN:  And the briefing on the utility patents

19   will not be affected, as far as I can tell, in any way

20   whatsoever by the design patent issue.

21          THE COURT:  Is there also a Markman issue with respect

22   to go to the design patent?

23          MR. COHEN:  Yes, there is.

24          THE COURT:  And what will that be?

25          MR. COHEN:  Well, we put that in our brief, and in

Appx36

1    particular, our position is, and this was in the letters that

2    you had cited, that under the Federal Circuit and Supreme Court

3    case law, the design patent is not to be construed, other than

4    to direct the jury to the drawings.

5            Specifically, if we go back to the Egyptian -- and the

6    brief will contain all of this; I'm just going to summarize.

7    If you go back to the *Egyptian Goddess* case, which is an

8    en banc Federal Circuit case that discussed design patents, the

9    Federal Circuit said that basically a picture is worth a

10   thousand words.  To try to construe a picture in words is

11   inadvisable because of the fact that it improperly directs the

12   jury to particular aspects of the design, rather than looking

13   at the design as a whole.

14           The defendants have asked the Court to construe the

15   design in words.  We have set forth in our brief, which your

16   Honor will receive, extensive case law by the Federal Circuit

17   district courts and so forth that said that you should not do

18   that.

19           THE COURT:  Be that as it may, does the determination

20   of the claim for priority bear in any way on the work that I

21   would be obliged to do as to the design patent?  I'm just

22   trying to figure out how this intersects with case management,

23   that's all.

24           MR. COHEN:  Right.  I personally don't think so.  I

25   personally think that your Honor is going to have to have a

Appx37

HCLPFOCC

1   Markman proceeding anyway on the utility patents.

2           THE COURT:  And you're saying that's the heart of the

3   Markman?

4           MR. COHEN:  That's the heart of the Markman.

5           THE COURT:  Mr. Cox, you've been quiet.  Do you have

6   any views on this?

7           MR. COX:  Yes, Your Honor.  I do have a couple of

8   points of view on this.  I think everything that Mr. Cohen gave

9   as to an overview of the status of the case and also what's

10  before you is fairly accurate.

11          I would point out, as a minor point, there is a

12  distinction between the IPR and the parties' re-exam and

13  ex parte re-exam, and it has to do with the way in which the

14  patent office courts have been handling the IPRs.  It's a very

15  binary situation with regard to they either determine that the

16  patent is still valid or that the patent and the claims at

17  issue in the IPR are invalid.

18          One of the distinctions in the ex parte re-exam is

19  that often times the examiner will take a look at what are the

20  property boundaries that the patent owner is entitled to, and

21  if they feel that, at the present state, given the new prior

22  art presented to them, that those boundaries should be

23  constrained, they will allow the patent to reissue with new

24  property boundaries that are smaller or slightly smaller than

25  what they were before.  The only difference is in an ex parte

1    re-exam, the property boundaries are never enlarged.  That was

2    a minor point to that.

3            Getting to the meat of what we're talking about now

4    with regard to the --

5            THE COURT:  But you're in agreement with the

6    fundamental point that Mr. Cohen offers that, for the time

7    being, at this snapshot moment, his priority claim remains

8    good?  He's at risk of losing eventually, but for the time

9    being, his claim for priority is the status quo?

10           MR. COX:  I would disagree with that, but I think, as

11   Mr. Molldrem had stated, the decision on that might come a

12   little bit earlier than what the overall decision will be in

13   this case.

14           Where we're at now, with the grant of the ex parte

15   re-exam, the examiner gave some boundaries as to how he's going

16   to determine what is prior art and not prior art.  In an

17   ex parte re-exam, the main focus or the primary focus is

18   whether the claims that are at issue are invalid because of the

19   presentation of new prior art.

20           In this instance, new prior art has been presented

21   because the issue as to where the priority claim should be

22   measured from has been changed by the office.  And that's a

23   preliminary finding that then will -- once it's determined,

24   will then determine where the real negotiations begin on the

25   status and scope of the claims.

1          THE COURT:  So tell me, the case management issue, the

2     fact that there is this unresolved issue as to priority, does

3     it have a consequential affect on any aspect of the Markman?

4          MR. COX:  Well, I would disagree with Mr. Cohen on the

5     issue as to whether the design patent has a place in the

6     Markman hearing.  There are cases out there -- I don't have

7     them in font of me at the moment -- that I believe that they

8     may have been cited in the letters that we put forth in the

9     summer, that do state that the prosecution history, in other

10    words, the comments that were made between the examiner and the

11    patentee's attorney had made during the prosecution of the case

12    may have a bearing on the scope of the claims and that those

13    arguments may bear on how the judge determines what is the

14    legal scope of those design patent claims, and that would be

15    independent of any discussion on how one would view the

16    drawings.

17         THE COURT:  Is there any way in which what's going to

18    happen before the PTO would bear on the utility patent?

19         MR. COX:  I don't believe that there's any way it

20    would have a bearing on the utility patents.

21         THE COURT:  Is Mr. Cohen right, that the heart of the

22    Markman before me, forgive me for not being familiar with this

23    yet, will focus on the utility patents?

24         MR. COX:  Yes.  The heart, the real meat and potatoes

25    is going to be on that.

HCLPFOCC

| | |
|---|---|
| 1 | THE COURT:  Given that, you're not, I take it, then |
| 2 | asking that I reassess any aspect of the current schedule of |
| 3 | the case, are you? |
| 4 | MR. COX:  Not as far as the Markman hearing goes, no, |
| 5 | sir. |
| 6 | THE COURT:  Okay.  Is there any application that you |
| 7 | have otherwise at this time? |
| 8 | MR. COX:  Not at this time, no, but certainly within |
| 9 | the months following Mr. Molldrem's reply or rebuttal to the |
| 10 | patentee's initial statements when the office comes out with -- |
| 11 | THE COURT:  Sorry, his rebuttal in which forum? |
| 12 | MR. COX:  In the ex parte re-exam.  He gets -- |
| 13 | THE COURT:  Sorry.  I didn't realize.  Mr.  Molldrem |
| 14 | is involved in that? |
| 15 | MR. COX:  Yes.  He has one rebuttal as to the initial |
| 16 | findings in the case. |
| 17 | THE COURT:  Got it.  Okay.  But for the time being, it |
| 18 | doesn't sound as if anybody is saying to me the schedule that |
| 19 | we have here is, at this point, ill suited to the needs of the |
| 20 | case, or is resulting in somebody's wasting time?  I'm not |
| 21 | hearing anybody saying that. |
| 22 | MR. COX:  No, your Honor. |
| 23 | THE COURT:  All right.  Then, look, you know, given |
| 24 | that the case is going to remain on the schedule set forth in |
| 25 | the revised case management plan, which is at docket 147, the |

HCLPFOCC

1    opening claim construction brief, therefore, is due tomorrow,

2    December 22.  The opposition remains due January 22, and the

3    reply, February 5.

4            I'm just going to go around the horn now and ask if

5    there's anything else I can attend to, beginning with you,

6    Mr. Cohen.  Anything from the plaintiff?

7            MR. COHEN:  Nothing at this time, your Honor.

8            THE COURT:  Mr. Molldrem anything for Kartri?

9    Anything you want to raise?

10           MR. MOLLDREM:  Oh, yes, I'm fine with that, sir.

11           THE COURT:  Okay.  Mr. Cox?

12           MR. COX:  No, your Honor, nothing new.

13           THE COURT:  All right.  Then, look, I only have one

14   more thing to say, which is I wish you all a very happy and

15   healthy holiday and new year and look forward to seeing you in

16   the new year.

17           I will continue to encourage you, with all the balls

18   in the air, to see if there's a way in which you can try to

19   resolve this thing because you now are fighting on two fronts.

20   Without telling me anything I shouldn't know, is there any

21   prospect of this matter resolving itself?

22           MR. COHEN:  Plaintiff is open to settlement

23   discussions.  We had several with Judge Ellis.  Unfortunately,

24   we lost Judge Ellis.  He --

25           THE COURT:  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx42

HCLPFOCC

1              MR. COHEN:  -- was a benefit.  We're open.

2              THE COURT:  I mean, I can make sure that the referral

3      goes to whichever magistrate judge has picked up the case on

4      his docket.  Has that been clearly indicated on the docket?

5              MR. COHEN:  Yes, there was an entry within the past

6      several weeks.

7              THE COURT:  Fine.  So you have a successor, even if

8      that person doesn't have the history that Judge Ellis had.

9              MR. COHEN:  That's exactly --

10             MR. MOLLDREM:  Stewart Aaron.

11             THE COURT:  Thank you.  Judge Aaron literally began

12     this week.  He hasn't even had his public swearing in he's so

13     new.  I mean, look, the question I'm raising is -- again, I

14     don't want to know about that which I shouldn't know, but is

15     there any prospect of this resolving itself?  Is there anything

16     that I can usefully do to say something or move the case in a

17     direction that will encourage that?

18             MR. COHEN:  Plaintiff is amenable, but we had heard

19     from defendant Kartri, not so much from Marquis but Kartri,

20     that they feel that a Markman decision is necessary to move

21     forward on settlement.  I don't personally think it is, but

22     that's the current stumbling block.

23             THE COURT:  Mr. Molldrem, is that your view, that

24     essentially the Markman is an important gating moment before a

25     good or productive settlement discussion?

Appx43

HCLPFOCC

1          MR. MOLLDREM:  Yes, absolutely.

2          THE COURT:  Okay.  May I ask you is that so with

3     respect to all aspects of the Markman, or only some?

4          MR. MOLLDREM:  I think --

5          THE COURT:  Seeing the submissions -- Mr. Molldrem,

6     first of all, just wait until I'm finished, but when you speak,

7     you need to belt it out into the microphone so that the court

8     reporter can hear.

9          My question is, I don't know what the Markman issues

10    are going to be, but it wouldn't surprise me to learn that

11    there are multiple issues and that some are consequential and

12    others are secondary.  Just yes or no, do all issues in the

13    Markman need to be resolved for you to have the guidance you

14    need to move productively forward in settlement, or are only

15    some really needed?

16         MR. MOLLDREM:  I think that there are some key ones,

17    but, yes, all of them should be.

18         THE COURT:  All right.  Let me ask this.  I'll ask

19    counsel, once the Markman briefing is farther along, to just

20    meet.  If you conclude collectively that there is a subset of

21    Markman issues that are particularly clarifying, I would

22    welcome getting a letter to that effect.  If only because, in

23    the use of my time, there may be some value in proceeding

24    piecemeal.

25         Again, I have no idea, but I'm always eager to

HCLPFOCC

1  structure my time and my efforts in a way that produces a

2  higher likelihood of settlement.  So if counsel believe that

3  there's really some key issue here and other items are

4  secondary, I might well think in those terms.

5          In any event, I invite you to give me that guidance.

6  Have a healthy and happy new year.

7          MR. COHEN:  Thank you, your Honor.

8          MR. MOLLDREM:  Thank you, your Honor.

9          MR. COX:  Thank you, your Honor.  You too.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx45

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/9/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                :

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,  :
et al.,
                                :

                    Plaintiffs,    :

                -v-                :

KARTRI SALES COMPANY, INC., et al.,       :

                  Defendants.   :

------------------------------------------------------------X

15 Civ. 10154 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      Plaintiffs Focus Products Group International, LLC, Zahner Design Group, Ltd.,

Hookless Systems of North America, Inc., SF Home Décor, LLC, Sure Fit Home Décor

Holdings Corp., and Sure Fit Home Products, LLC (collectively, "Focus") bring this action

against defendants Kartri Sales Company, Inc. ("Kartri") and Marquis Mills, International, Inc.

("Marquis") alleging, *inter alia*, infringement of three utility patents and a design patent.

      In connection with these claims, the parties have asked this Court to construe several

disputed terms of the patents-in-suit.  The Court held a *Markman* hearing in this action on July

26, 2018.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).  The Court's

constructions of the disputed terms are set forth below.

I.     **Background**

      A.     **Factual Background**

There are four patents at issue in this case. Each concerns shower curtains. The three

utility patents are U.S. Patent Nos. 6,494,248 B1 (the "'248 Patent"),[1] 7,296,609 B2 (the "'609

Patent"), and 8,235,088 B2 (the "'088 Patent"). Because these patents are "related," in the sense

that they derive from a common patent application, they share common specifications and

figures. The design patent is U.S. Design Patent No. D746,078 (the "Design Patent").

The parties nominally dispute 18 of the claim terms appearing in these patents. *See* Dkt.

162-1. As explained below, however, the scope of the parties' disagreement has narrowed, such

that only 14 terms remain in dispute.

**B.    Procedural History**

On December 30, 2015, Focus filed its initial complaint against Kartri. Dkt. 1. On

March 1, 2016, following Kartri's motion to dismiss, Dkt. 15, Focus amended its complaint to

add Marquis as a defendant, Dkt. 20. After each defendant moved to dismiss, Dkts. 27, 35,

Focus filed another amended complaint to amend its allegations against Marquis, Dkt. 47. After

Marquis moved to dismiss that complaint, Dkt. 55, on July 14, 2016, the Court issued a bench

decision denying the motions to dismiss, *see* Dkt. 63. Following discovery, on September 29,

2017, Focus filed the Fourth Amended Complaint, which is now operative. Dkt. 148.[2]

On November 22, 2017, the parties filed an amended joint claim terms chart. Dkt. 162.[3]

On December 22, 2017, Focus filed its opening *Markman* brief. Dkt. 169 ("Focus Br."). On

---

[1] On August 29, 2017, the Patent and Trademark Office ("PTO") issued an *ex parte* reexamination certificate amending the '248 Patent. *See* U.S. Patent No. 6,494,248 C1 (the "Amended '248 Patent").

[2] Kartri later filed a motion to dismiss or transfer on the basis of improper venue. Dkt. 149. The Court denied the motion on the record of a December 21, 2017 conference. *See* Dkt. 170.

[3] The parties had filed their original joint claim terms chart on July 7, 2017. Dkt. 124.

2

January 22, 2018, Kartri and Marquis each filed responsive *Markman* briefs. Dkts. 173 ("Kartri Br."), 174 ("Marquis Br."). On February 5, 2018, Focus filed two reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis filed a letter motion seeking leave to file an attached sur-reply. Dkt. 181. On February 14, 2018, Focus filed a letter consenting to Marquis' application on the condition that the Court also consider Focus's responsive letter brief. Dkt. 182. Although the Court had not commissioned these supplemental submissions, it has found them useful and considered them accordingly.

On July 26, 2018, the Court held a *Markman* hearing. *See* Dkt. 193 ("Tr.").

## II.    Applicable Law

Claim construction is an issue of law properly decided by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). In construing a patent, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

To determine the meaning of the claims, courts look "first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1313–14; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). Where an analysis of the intrinsic evidence fails to resolve some ambiguity in a disputed claim, the Court may then turn to extrinsic evidence, *Vitronics*, 90 F.3d at 1583, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," *Markman*, 52 F.3d at 980.

3

Subject to certain exceptions discussed below, there is a "heavy presumption" that each claim term should be construed according to its ordinary and customary meaning, as understood by a person of ordinary skill in the art in question at the time of the invention (a "POSITA"). *Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016) (quotation marks omitted); *see also Phillips*, 415 F.3d at 1312–13. In certain cases, "the ordinary meaning of claim language as understood by a [POSITA is] readily apparent even to lay judges, and claim construction [therefore] involves little more than the application of the widely accepted meaning of commonly understood words." *See Phillips*, 415 F.3d at 1314. The parties, who have not adduced any expert testimony, agree that this is such a case. *See* Tr. 3–4. Accordingly, the Court has construed the disputed terms from the familiar perspective of a lay judge.

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). "Absent implied or explicit lexicography or disavowal," the plain meaning of the claim terms governs. *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 n.2 (Fed. Cir. 2016).

The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309. As to lexicography, it is well settled that "patentees may choose their own descriptive terms as long as those terms adequately divulge a reasonably clear meaning to one of

4

skill in the art." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999). But to act as his or her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *GE Lighting Sols.*, 750 F.3d at 1309 (quoting *Thorner*, 669 F.3d at 1365). Likewise, "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature. Ambiguous language cannot support disavowal." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted), *cert. denied*, 137 S. Ct. 2267 (2017). Disavowal need not be explicit, however; a patentee may disavow claims by "distinguish[ing] or disparag[ing] prior art" in relation to the present invention. *Id.*

### III.    Disputed Claims in the Utility Patents

The Court proceeds now to construe the disputed terms of the utility patents, in the order provided in the parties' amended joint claim terms chart. *See* Dkt. 162-1. At the beginning of each subsection below, the Court has provided the parties' proposed constructions, as set forth in the amended joint claim terms chart, and, if applicable, the revised constructions defendants offered in their *Markman* briefs.

### A.    "Item"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| Item | Claim 1 in '248 Patent | Plain meaning | *Joint Chart*: Plain meaning | *Joint Chart*: Any item for hanging on a rod including grommet curtains, windscreens, accessory tapes, other hanging items, etc. restricted to Figures 18, 19 and 20. |

5

| | |
|---|---|
| *Brief*:<br>This term can be taken to mean "curtain" and in particular a "shower curtain."<br>[Kartri Br. 10] | *Brief*:<br>"Item" means "curtain."<br>[Marquis Br. 7] |

The parties do not dispute this term. *See* Tr. 5. Nor could they: Claim 1 of the '248 Patent, as amended, reads, "[a] product comprising an item for hanging, wherein said item is a curtain." Amended '248 Patent at 2:1–2. The Court construes the term "item" as "curtain."

**B.    "Ring"**

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Ring | Used in each patent in multiple claims | A piece of material (of any shape) that generally encloses an opening. | *Joint Chart*:<br>Annulus of generally round shape (Figs. 18, 19, 20, 31B). | *Joint Chart*:<br>"[A] ring attached to said opening" is a grommet. |
| | | | | *Brief*:<br>A fastener that reinforces the opening.<br>[Marquis Br. 7] |

The parties dispute the proper construction of the term "ring" along two axes: First, whether the ring must be of a "generally round shape," and second, as between Focus and Marquis, whether the ring must "reinforce" the opening it encloses.

As to the first, Focus now agrees that the ring may not take "any shape." *See* Tr. 6. It is true that the claim terms do not expressly restrict "ring" to any particular shape, and the specification notes that "the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral." *E.g.*, '248 Patent at 5:6–9. But as Focus conceded at argument, the fact that the claims refer to rings comprising "circumferences" strongly implies curvature. *See* Tr. 6. Likely for that reason, all embodiments in the specification include at least some curvature. *See, e.g.*, '248 Patent at Fig. 4A (a vertically elongated circle); *id.* at Fig. 4B (a horizontally elongated circle); *id.* at Fig. 21 (a shape resembling the letter D). Accordingly, the

Court's construction of "ring" will include the phrase "a piece of material that is curved at least in part."[4]

As to the second dispute, Focus agreed at argument that the ring must reinforce the opening it encloses. *See* Tr. 7. Properly so. Two of the patents' claims themselves define the ring as reinforcing the opening. *See* '248 Patent at 10:23–24 ("[A] ring attached to said opening such that said opening is reinforced by said ring . . . ."); '088 Patent at 11:14–15 ("[A] ring, wherein said ring reinforces said opening."). The '609 Patent's claim terms do not include the same language. Nevertheless, the specification of that patent explains that the invention "involves a series of reinforced openings." '609 Patent at 2:6–7. Although the Court typically will not import functional limitations not recited in the claims themselves, *see Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001), the Court perceives no basis for distinguishing the '609 Patent from the '248 and '088 Patents with respect to this feature, and therefore adopts Marquis' proposed requirement that the ring reinforce the opening. *See* Marquis Br. 7–8.

In view of the foregoing, the Court construes the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening."[5]

---

[4] This dispute also implicates whether the inner and outer circumference of the ring, at least in the '248 and '609 Patents, must be circular, as defendants contend, or just curved at least in part, as plaintiffs contend. The Court takes up that issue in the next section.

[5] In construing claims, the Court need not adopt the parties' proposed definitions. *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1376 (Fed. Cir. 2017).

### C.    "Inner circumference"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Inner circumference | Claim 1, '248 Patent; Claims 5, 13 in '609 Patent; Claims 1, 8 in '088 Patent | Inner curved edge. | *Joint Chart*: Round edge of the opening of the ring. | *Joint Chart*: Round edge of the opening of the ring. |
| | | | | *Brief*: The perimeter of the circular opening. [Marquis Br. 16] |

This claim, along with "outer circumference," implicates one of the more significant disputes between the parties. Each of these terms describes an edge: "inner circumference" refers to the internal edge bounding the ring's opening, and "outer circumference" refers to the external edge bounding the ring itself, except in the '088 Patent, where "outer circumference" refers to the external edge of the ring *other than* that portion comprising a "flat upper edge," *see* '088 Patent at 11:16–17 ("[S]aid ring comprising a flat upper edge, an inner circumference, and an outer circumference . . . ."). The crux of the parties' dispute is whether the "circumference" terms should be construed to connote only "circular" shapes, *see* Kartri Br. 10–12; Marquis Br. 8–16, or whether the terms contemplate other shapes that are curved, at least in part, *see* Dkt. 179 at 3–7.[6]

In customary usage, "circumference" often, but not always, refers to the perimeter of a circle. Dictionaries confirm that the term is not necessarily limited to circular shapes. *See, e.g.*, *Circumference (n.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/circumference (last visited Aug. 7, 2018) (either "the line that bounds a circular plane surface" or "perimeter"); *Circumference (n.)*, New Oxford American Dictionary, https://premium.oxforddictionaries.com/us/definition/american_

---

[6] Defendants allow that the '088 Patent contemplates a circular outer circumference with a flat upper edge. *See* Kartri Br. 10–12; Marquis Br. 16.

english/circumference (last visited Aug. 7, 2018) ("The enclosing boundary of a curved geometric figure, especially a circle."); *Circumference (n.)*, Oxford English Dictionary, http://www.oed.com/view/Entry/33281 (last visited Aug. 7, 2018) ("The line that forms the encompassing boundary, esp. of anything of a rounded form . . . ."). Accordingly, the term itself, as construed by a lay judge, does not definitively resolve whether the patents refer exclusively to a circle or also to other curved figures.

The patents' specification strongly suggests that the terms refer to shapes other than circles. The specification defines "inner circumference" simply as "inner edge . . . of the fastener or ring," without any reference to shape. *See, e.g.*, '248 Patent at 4:43–44. Likewise, they define "outer circumference" simply as "outer edge." *See, e.g., id.* at 4:42–43. Further, as noted above, the specification includes figures depicting vertically and horizontally elongated circles, *see, e.g., id.* at Figs. 4A, 4B, and provides that "the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral," *id.* at 5:7–9; *see also, e.g., id.* at 5:10–12 ("[T]he external and/or internal edges of the ring need not be rounded although they are preferably so.").[7] Were the analysis to end here, plaintiffs' view would prevail, as the specification clearly contemplates circumferences tracing shapes other than circles.

Defendants, however, offer two counterarguments arising from the patents' prosecution history. First, defendants argue that the patentee disavowed any non-circular shapes in response to a restriction requirement issued by the United States Patent and Trademark Office ("PTO") during prosecution of the '248 Patent. To wit, in June 2001, the PTO instructed the patentee to

---

[7] Indeed, Figure 4A, depicting a vertically elongated circle, is a preferred embodiment. *See id.* at 4:63–64. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) (quotation marks omitted).

elect from a series of nine patentably distinct species of the claimed invention. *See* Dkt. 174-5 at 52–53.[8] The PTO did not identify what was distinct about each species; rather, the notice identified only which figures corresponded to which species. In response, the patentee chose to proceed with one particular species ("Species IV") "without traverse"—*i.e.*, without objection. *See* Dkt. 174-5 at 55; Dkt. 173-5 at 51. That species, like certain others, was drawn only to figures depicting a ring with an approximately circular inner circumference and an approximately circular outer circumference, although the figures in this species featured projections directed upward from the top of the ring. *See* Dkt. 174-5 at 42; *see also* '248 Patent at Figs. 18–20. The patentee then proposed several new claims describing non-circular rings. *See* Dkt. 175-5 at 57. The PTO declined to consider those claims as "drawn to a nonelected species." *Id.* at 67.

Based on this history—*i.e.*, the patentee declining to object to a restriction that included only circular shapes, and the PTO characterizing claims describing non-circular rings as "drawn to a nonelected species"—defendants argue that Focus disavowed any non-circular construction of the "circumference" terms. *See* Kartri Br. 11; Marquis Br. 10–11; Dkt. 181-1 at 2–3. But defendants have failed to identify a "clear and unmistakable" disavowal sufficient to overcome the "heavy presumption that claim terms carry their full ordinary and customary meaning." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) (quotation marks omitted). Because several of the species identified by the PTO involved only circular rings, there is no indication that circularity was the basis for the restriction requirement. And as the Federal Circuit has made clear, where, as here, the PTO issues a restriction requirement "without

---

[8] The PTO issued the same restriction requirement as to the '609 patent. *See* Dkt. 173-5 at 48–49.

providing any reasons why in its view the application presented differing inventions," "[t]he election of an invention [without traverse] in response to an ambiguous restriction requirement . . . cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim." *Id.* at 1351.[9]

Likewise, the PTO's conclusion that certain claims regarding non-circular rings were not drawn to the elected species does not demonstrate the patentee's disavowal of such shapes. On the contrary, the fact that the patentee responded to the restriction requirement by submitting claims describing non-circular rings demonstrates that the patentee did *not* unambiguously disavow such shapes. *Cf. Plantronics*, 724 F.3d at 1351 (no unambiguous disclaimer where patentee elected certain figures without traverse but disagreed with the PTO as to the scope of a certain claim).

Defendants' second argument sounding in prosecution history, raised only by Marquis, arises from a double patenting rejection issued by the PTO in connection with the '088 Patent. On September 15, 2008, the PTO notified the patentee that the application for the '088 Patent did not claim a patentably distinct invention over the '248 and '609 Patents. *See* Dkt. 173-6 at 51. The patentee responded by amending the patent application to include, *inter alia*, a "flat upper edge" ring. *See id.* at 66. In response, the PTO withdrew the double patenting rejection in part. It stated, "[i]nasmuch as the claims have been amended to incorporate the limitation of the flat upper edge which is drawn to a species which is not encompassed with the species as set forth in the applicant's prior patents the double patenting rejection is no longer applicable." *Id.* at 98.

---

[9] Marquis argues that the PTO did demarcate the differences between at least several of the species. *See* Tr. 15–16 (citing Dkt. 174-5 at 39). These minimalist demarcations, however, say nothing about the circularity of the rings. *See* Dkt. 174-5 at 39.

This exchange, Marquis argues, demonstrates that the patentee did not intend the '248 and '609 Patents to cover a ring with a "flat upper edge." Marquis Br. 13–14.

This dispute turns primarily on the ambiguous phrasing used by the PTO: "the limitation of the flat upper edge which is drawn to a species which is not encompassed with the species as set forth in the applicant's prior patents." Marquis reads the phrase as an acknowledgment that a flat upper edge is not encompassed by the prior patents. Focus, by contrast, reads the phrase as an acknowledgement that a *limitation* of a flat upper edge is not encompassed by the prior patents. In other words, Focus argues, the '088 Patent is patentably distinct (at least in part) not because it contemplates a ring with a flat upper edge, but because the flat upper edge is a *mandatory* feature of the '088 Patent, such that an infringing product must have such an edge in order to be found to infringing.

The Court is inclined toward Focus's reading on the grounds that the claims of the '248 and '609 Patents, as well as the specification, contemplate flat-topped rings. Indeed, Marquis' co-defendant appears to agree that those patents can be infringed by a flat-topped ring. *See* Kartri Br. 10 (acknowledging that the '248 and '609 Patents contemplate a "D-shaped or U-shaped" ring, as in figure 31b, a ring with a flat upper edge).

But in any event, the dispute is academic, as nothing in the prosecution history, including this ambiguous statement from the PTO, amounts to an *unambiguous* surrender of claim scope whereby the patentee disavowed any expectation that the '248 and '609 Patents would reach a flat-topped ring. *See Plantronics*, 724 F.3d at 1351 ("This exchange with the PTO thus does not amount to anything clear or unambiguous to disclaim claim scope otherwise encompassed by the broadly drafted claims.").

12

In summary, the prosecution history does not offer unambiguous evidence that the patentee sought to narrow the claims to describe only circular circumferences. Accordingly, the Court declines to import a circularity restriction. Consistent with the specification, which defines "inner circumference" as "inner edge," *see, e.g.*, '248 Patent at 4:43–44, and plaintiffs' concession that the patents contemplate only circumferences that are curved at least in part, *see* Dkt. 162-1 at 1, the Court construes "inner circumference" as "inner edge that is curved, at least in part."

### D.    "Outer circumference"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Outer circumference | Claim 20, '248 Patent; Claims 1, 9 in '609 Patent; Claims 1, 8 in '088 Patent | Outer curved edge | *Joint Chart*: Outside edge of a circle or other curved shape; to wit, peripheral boundary of the ring. | *Joint Chart*: Outer circumference is the outer perimeter of a circular object. |
| | | | *Brief*: Round boundary or outside of the generally round ring. [Kartri Br. 12] | *Brief*: The perimeter of the circular ring. [Marquis Br. 16] |

For the same reasons, the Court declines to import a circularity restriction into the construction of "outer circumference." Instead, consistent with plaintiffs' concession that the circumference must be curved, *see* Dkt. 162-1 at 1, and the specification, which defines "outer circumference" as "outer edge," *see* '248 Patent at 4:42–43, the Court construes this term as "outer edge that is curved, at least in part."

Appx58

### E.    "[Inner circumference] comprising a top"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| [Inner circumference] comprising a top | Claim 1 in '248 Patent | The uppermost point of the inner circumference of the ring (*i.e.* the "12 o'clock position"). | *Joint Chart:* Top dead center of the ring's inner circumference. | *Joint Chart:* Inner circumference top is where a vertical radius at 0 degrees of the 360 degree inner circumference intersects the ring. |
| | | | *Brief:* The top is the upper portion of the inner circumference, *i.e.*, the top of the round opening where the item or ring rests on the shower curtain bar. [Kartri Br. 12] | *Brief:* Marquis has no objection to Plaintiffs' definition of "top" using a 12 o'clock position, if applied to the inner perimeter of a circle. [Marquis Br. 18] |

Leaving aside the parties' dispute over whether the ring must be circular—as explained above, the ring need not enclose a circle—the parties do not substantially disagree on the appropriate construction here. At argument, the Court proposed the following construction: "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point." Tr. 22. Plaintiff's counsel accepted this construction, but defense counsel objected that defining "top" in reference to a flat-topped oval creates a potential indefiniteness problem, as such a ring has a range of uppermost points. *See id.* 23–24. That objection, however, is precisely why the Court's proposed construction included the clause "where the ring has more than one [uppermost] point, the centermost such point." By identifying the top as the midpoint of a flat top, this construction avoids any ambiguity and substantially embraces each party's proposed construction. *See* Dkt. 162-1 (Focus proposing the "12 o'clock position," Kartri proposing the "top dead center," and Marquis proposing "where a vertical radius at 0 degrees of the 360 degree inner circumference intersects the ring"). Accordingly, the

14

Court construes this term as "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point."[10]

### F.   "Approximately horizontal component"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Approximately horizontal component** | Claim 1 in '248 Patent | Either level, or else tilted at a gradual incline. | *Joint Chart*: Curved portion of slit that proceeds in an arcuate path more-or-less concentric with the inner circumference of the ring; and configured such that the weight of the shower curtain urges the two edges of the slit to close together on one another rather than pull them apart. | *Joint Chart*: "Approximately horizontal" component refers to a linear or nonlinear component that starts and ends in the same horizontal plane passing over the inner circumference top. *Brief*: Regardless of any definition of the phrase "approximately horizontal component," the specification requires that the phrase be curved and not straight. [Marquis Br. 22] |

At argument, the Court proposed a construction different from those proposed by the parties: "component that is either level or nearly so." Tr. 27. The use of "level," in the Court's view, reflects the customary and ordinary meaning of "horizontal," as is evident in dictionary definitions. *See, e.g.*, *Horizontal (adj.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/horizontal (last visited Aug. 7, 2018) ("[P]arallel to the horizon: being on a level . . . ."); *Horizontal (adj.)*, Oxford English Dictionary, http://www.oed.com/view/Entry/88460 (last visited Aug. 7, 2018) ("Parallel to the plane of the horizon; at right angles to the vertical line; level; flat . . . .").

---

[10] The Court can conceive of geometric figures (*e.g.*, fabiform shapes) as to which even this definition might create ambiguity. The Court does not understand such shapes to be at issue in this case.

Defendants object to this construction on several grounds. First, Kartri argues that "nearly" fails to remedy the fundamental problem with the term "approximately," which is that the term is so vague as to render the '248 Patent indefinite. *See* Tr. 28; *see also* Kartri Br. 12–13. As the Court will now explain, however, Kartri has not met its burden to prove indefiniteness, and the Court therefore will construe the term as proposed.

Indefiniteness is a matter properly taken up at claim construction. *See, e.g.*, *Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, 310 F. Supp. 3d 457, 462–63 (S.D.N.Y. 2018). The party challenging patent validity on indefiniteness grounds bears the burden of proof. *See Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Interpreting the Supreme Court's decision in *Nautilus*, the Federal Circuit has held that "terms of degree are [not] inherently indefinite." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014); *see also id.* ("[A]bsolute or mathematical precision is not required . . . ."). Indeed, "words of approximation . . . are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (quotation marks omitted); *see also Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1002 (Fed. Cir. 2015), *rev'd and remanded on other grounds*, 137 S. Ct. 429 (2016) (upholding as definite the phrase "substantially centered"); *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821–22 (Fed. Cir. 1988) (noting that terms such as "closely approximate" are "ubiquitous in patent claims"). At bottom, the indefiniteness test "mandates clarity, while recognizing that absolute precision is

16

unattainable." *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1063 (Fed. Cir. 2017) (quoting *Nautilus*, 134 S. Ct. at 2129).

Kartri has declined to offer any evidence tending to show the relevant POSITA would not be able to ascertain the scope of the invention with reasonable certainty. *See* Dkt. 184 (parties agreeing not to offer expert testimony in connection with claim construction). Instead, Kartri argues only that the claim terms and specification are inherently "open to conjecture." Kartri Br. 13.

The Court is not persuaded. Although the words "substantially uniform" might similarly be described as "open to conjecture," the Federal Circuit rejected an indefiniteness challenge to that term, holding that the phrase, in context, "means what it says": "largely, but not wholly the same in form." *Ecolab*, 264 F.3d at 1369. Although the specification in *Ecolab* did not "reveal any special definition for the terms 'substantially' or 'uniform,'" the court held that the term "substantially" allowed the patentee to avoid a "strict 100% nonuniformity boundary." *Id.* at 1367. So too here: The term "approximately" allows the patentee to avoid an otherwise "strict 100%" horizontality boundary.

To be sure, the relevant POSITA here cannot determine with mathematical precision how far the component may deviate from the pure horizontal. But such precision is not required under the case law. *See One-E-Way*, 859 F.3d at 1060 (indefiniteness analysis "recognizes that all claims suffer from 'the inherent limitations of language'" (quoting *Nautilus*, 134 S. Ct. at 2128)). Instead, it is enough if the patent's claims, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with *reasonable* certainty." *Nautilus*, 134 S. Ct. at 2129 (emphasis added).

Kartri offers no extrinsic evidence to suggest that the scope of the invention cannot be determined with reasonable certainty. And to the extent that Kartri relies on intrinsic evidence, that evidence confirms that the claim is susceptible to reasonable certainty. In the specification, the patentee explained that, in one embodiment, the "approximately horizontal component" is distinct from either an "upper vertical component" or a "radial" component. *See* '248 Patent at 8:16–18; *see also id.* at Fig. 20. The Court therefore understands the Patent to recite a component of a slit that is neither vertical nor radial, at least where the slit does not include any segment of a horizontal radius. Likewise, as Kartri concedes, the prosecution history contains "[s]ome important clues" as to the meaning of the term. Kartri Br. 15. Before the PTO, the patentee noted that the approximately horizontal component makes it "difficult for the hanging item to be pulled off the rod, since the weight of the hanging item on the ring will close the slit." Dkt. 169-7 at 6. Such a component, necessarily, is "either level or nearly so."[12]

Accordingly, the Court is satisfied that the phrase "approximately horizontal component" provides reasonable certainty in the specific context of the present invention. In the absence of any evidence to the contrary, the Court stands by its proposed construction.

Defendants also raise a second objection. In their briefs, *see* Kartri Br. 14–15; Marquis Br. 21–22, as at argument, *see* Tr. 29–30, defendants contend that "approximately horizontal component" necessarily refers to a "curved," rather than "straight," component. This construction, the Court notes, is inconsistent with Marquis' prior concession, in the amended

---

[12] From this evidence, Kartri argues that the Court should limit the term "approximately horizontal component" to *only* those components designed such that the weight of the curtain, when hanging from the curtain rod, pulls the slit closed. *See* Kartri Br. 15–17. Although this history has informed the Court's construction, the Court will not import the functional limitation into the construction. *See Ecolab*, 264 F.3d at 1367 ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.").

joint claim terms chart, that the term may refer either to a "linear or nonlinear component." Dkt. 162-1 at 2. To be sure, the parties "reserve[d] the right to modify their positions in th[e] Joint Chart at any time . . . to facilitate agreement or the Court's proper construction of the terms in dispute." *Id.* at 1. But to generate an entirely new point of contention where the opposing party reasonably expected none subverts the purposes of S.D.N.Y. Local Patent Rule 11, which, among other things, promotes argument directed at stable points of opposition.

In any event, defendants' argument fails on the merits. Claim 1 of the '248 Patent says nothing about curvature. Defendants therefore rely on the following language from the specification: "As an alternative to a straight external slit, a curved external slit 232 can be provided as shown in FIG. 20. In one embodiment, curved slit 232 has an upper vertical component 232a, an approximately horizontal component 232b, and a radial component 232c." '248 Patent at 8:14–18. Defendants argue that this language indicates that the "approximately horizontal component" exists only where the slit is curved. *See* Kartri Br. 14–15; Marquis Br. 21.

Defendants misread the specification. The fact that the specification describes the approximately horizontal component in reference to a curved slit does not mean that the approximately horizontal component applies *only* to a curved slit. To hold in defendants' favor here would import a limitation from the written description of the claims—"one of the cardinal sins of patent law." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Further, the patentee, had he so desired, was fully capable of limiting a claim term to a curved slit, as he did in claim 20. *See* '248 Patent at 11:36–12:1 ("[S]aid item comprising a curved slit . . . ."). Given that claim 1 contains no reference to a curved slit, the Court will not import a curvature requirement into that claim. *See Nystrom v. TREX Co.*, 424

19

F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed.").

In light of the foregoing, the Court construes the term "approximately horizontal component" as "a component that is either level or nearly so."

### G.    "Said slit exits said ring at said upper edge of said curtain"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Said slit exits said ring at said upper edge of said curtain** | Claim 1 in amended '248 Patent | The slit exits the ring at the part of the ring which is at the upper edge of the curtain. (No requirement that the slit simultaneously exit the ring and the upper edge of the curtain.) | *Joint Chart*: The slit must exit the "ring" at the upper edge of the ring, which then requires that the ring must be aligned with the very edge of the upper hem of the shower curtain. | *Joint Chart*: "Slit exits said ring at said upper edge of said curtain" refers to a slit that exits both the ring and upper edge of the curtain at the upper edge of the curtain. |

The phrase "said slit exits said ring at said upper edge of said curtain" appears in claim 1 of the '248 Patent as reexamined. *See* Amended '248 Patent at 2:14–15. During patent reexamination, the patentee proposed the following amendment to claim 1: "and wherein said slit simultaneously exits said ring and said upper edge of said curtain." Dkt. 169-10 at 3. The PTO rejected this amendment on the ground that the '248 Patent "does not describe the slit 232 as exiting the ring and the upper edge of the curtain 'simultaneously.'" Dkt. 169-11 at 2; *see also* '248 Patent at Fig. 20. The PTO therefore proposed the language that now appears at the end of claim 1 in the '248 Patent: "and wherein said slit exits said ring at said upper edge of said curtain." Dkt. 169-11 at 2. The PTO explained that "[t]his limitation is considered to better define the invention as disclosed in the '248 Patent and does not limit the exit of the slit from the ring to the precise (and unsupported) location defined by Patent Owner's proposed 'simultaneously.'" *Id.* at 3. The patentee accepted that language. *See* Dkt. 169-12 at 9.

Notwithstanding the foregoing, defendants argue that the disputed phrase must be construed to require that the slit exit the ring and upper edge of the curtain simultaneously. *See* Kartri Br. 17–19; Marquis Br. 21. To be sure, the phrase "the slit exits the ring at the upper edge of the curtain" can plausibly be read to connote that the slit exits the ring and the top of the curtain simultaneously. Yet the prosecution history squarely forecloses such a reading, as the patentee accepted the PTO's unambiguous rejection of a simultaneity requirement. Further, the specification abounds with figures in which the slit exits the ring at points other than the upper edge of the curtain. *See, e.g.*, '248 Patent at Figs. 4B, 12, 20, 30.

Accordingly, in light of the specification and prosecution history, the POSITA here would understand "said slit exits said ring at said upper edge of said curtain" to mean "the slit exits the ring at or near the upper edge of the curtain." The term "at" may be used to indicate not only precise contact, but also "presence in, on, *or near*." *At (prep.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/at (emphasis added) (last visited Aug. 7, 2018). In any event, even if the plain meaning of "at" connoted only simultaneity, the specification and prosecution history together "communicate[] a deliberate and clear preference for this alternative definition." *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

Accordingly, the Court construes this term as "the slit exits the ring at or near the upper edge of the curtain."

### H.    "Closed ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Closed ring** | Claims 2, 13, 22 in '248 Patent | A ring wherein the slit normally has its edges pressed together. | *Joint Chart*: A ring with a slit, in which the two sides of the slit are normally pushed closed, one against the other. | *Joint Chart*: The term "closed ring" refers to the fact that the external slit is normally "closed"—*i.e.* the two radial edges which form the slit are pressed together. |
| | | | *Brief*: A closed ring is where the slit has the two edges pressed against one another. [Kartri Br. 19] | *Brief*: Plaintiffs' meaning of the term is acceptable to defendant Marquis. [Marquis Br. 8] |

At argument, the Court proposed the following construction: "A slit where the ring is 'closed'—*i.e.*, the two radial edges adjacent to the slit are pressed together." Tr. 43. This construction is adapted from the specification itself, which defines the term as follows: "The term closed ring refers to the fact that the external slit is normally 'closed'—*i.e.*, the two radial edges which form the slit 17 are pressed together." '248 Patent at 4:8–10. The parties accepted the Court's construction as consistent with the specification. *See* Tr. 43–44.

Accordingly, the Court construes this term as "a slit where the ring is 'closed'—*i.e.*, the two radial edges adjacent to the slit are pressed together."

### I.    "Projecting edge"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Projecting edge** | Claims 1, 9 in '609 Patent; Claims 1, 2, 8 in '088 Patent | An edge which projects from the outer circumference of the ring. | *Joint Chart*: An edge of a projecting member or salient that extends out and away from the round periphery of the ring. | *Joint Chart*: Projecting edge is a finger or extension that projects out away from the circumference or perimeter of the ring. |

> *Brief*:
> A projecting edge of
> a structural member
> that itself projects
> out from the outer
> boundary of the ring
> or buckle.
> [Kartri Br. 19–20]

The term "projecting edge" appears in the claims of the '609 Patent and the '088 Patent. Each patent's claims themselves define the term: "[S]aid projecting edge being an edge which projects from said outer circumference of said ring." *E.g.*, '609 Patent at 12:14–16; '088 Patent at 11:21–23. Accordingly, at argument, the Court proposed the same language, albeit substituting "that" for "which." *See* Tr. 45.

Defendants counter primarily by citing the specification, which provides as follows:

[I]n further embodiments of the invention, a ring 200, 210 or 220 is provided with a projecting edge, flange, extension, or finger 206, 216 or 226. Extensions 206, 216 or 226 are projections off of the ring (preferably off of the ring's outer circumference), which extend beyond the ring away from the hanging product (*e.g.* toward the ceiling).

'609 Patent at 7:67–8:1–5. From this language, defendants argue that a projecting edge must be a "finger or other structural element" that projects from the outer circumference. Kartri Br. 21; *see also* Marquis Br. 22. But the specification does not suggest that the projecting edge *must* be a structural element such as a finger. Rather, the specification provides only that such an element would itself be a "projection." In any event, even assuming *arguendo* that defendants' interpretation of the specification were correct, as noted above, the Court cannot import a limitation from the specification. *See SciMed Life Sys.*, 242 F.3d at 1340. Given the plain language of the claim terms (and, it bears noting, Marquis' own prior adoption of plaintiffs' definition during inter partes reexamination, *see* Marquis Br. 23), the specification offers no reason to depart from the Court's proposed construction.

Kartri also raises a brief, separate argument to the effect that Focus, in prior litigation, admitted that the term "projecting edge" requires "something that protrudes" or "juts out" from the outer circumference. *See* Kartri Br. 21. In a separate legal action, Focus described a figure of a flat-topped ring with a central, vertical slit as having no projecting edges. *See* Dkt. 173-11 at 3. But in the same discussion, Focus described another D-shaped ring, this one with a diagonal slit, as having a "projecting edge," notwithstanding that no portion of such a ring "protrudes" or "juts out." *See id.* at 1. Therefore, there is no basis for using Focus's prior representation to limit the clear scope of the claim terms.

Accordingly, as prefigured at argument, the Court construes this term as "an edge that projects from the outer circumference of the ring."

### J.      "Next to said slit"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Next to said slit** | Claims 1, 9 in '609 Patent | Adjacent to the slit. | *Joint Chart*: The edge of the projecting member or salient leaves off from the periphery of the ring where the slit itself ends. | *Joint Chart*: "[N]ext to said slit" means that the projecting member or salient leaves off from the periphery of the ring where the slit itself ends. |

At argument, the Court proposed the following construction: "adjacent to the slit." Tr. 45. No party objected to this construction. *See id.*

Accordingly, the Court construes this term as "adjacent to the slit."

### K.      "Extends toward the ceiling"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Extends toward the ceiling** | Claims 2, 10 in '609 Patent | Points upward (would hit a ceiling if extended). | *Joint Chart*: Points vertically upward. | *Joint Chart*: Projecting edge is a finger or extension that projects out away from the circumference or |

24

| | | | | |
|---|---|---|---|---|
| | | | *Brief:*<br>The edge that projects away from the curtain ring extends out from the edge of the ring or buckle, and upward in a generally vertical direction.<br>[Kartri Br. 22] | perimeter of the ring towards the ceiling when on a rod. |

At argument, the Court proposed the following construction: "points upward (would hit the ceiling if extended)." Tr. 45. No party objected to this definition. *See id.* 45–46.

Accordingly, the Court construes this term as "points upward (would hit the ceiling if extended)."

### L.     "Offset from said top"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| Offset from said top | Claim 1 in '248 Patent; Claims 5, 13 in '609 Patent | Set off center, *i.e.* to the side of the top. | *Joint Chart:*<br>To one side or the other away from top dead center. | *Joint Chart:*<br>A slit heading towards the top with an offset that avoids the top and exits at a point offset from the top. |
| | | | *Brief:*<br>The affected claims are indefinite.<br>[Kartri Br. 22–23] | *Brief:*<br>If "inner circumference" means inner perimeter of a circle, then Defendant Marquis does not object to Plaintiffs [sic] definition for this phrase.<br>[Marquis Br. 22] |

In the amended joint claim terms chart, this term is hardly disputed. *See* Dkt. 162. In briefing, however, defendants raised a concern that "top" is "indefinite" where the inner circumference is not a circle. *See* Kartri Br. 22–23; Marquis Br. 22.[14] The Court has previously addressed this concern. *See supra* Part III.E. Here too, the Court rejects this argument.

---

[14] Kartri also argues that "top" does not clearly refer to the "inner circumference," but may instead refer to the entire ring. *See* Kartri Br. 22–23. The claims of the '248 Patent clearly

At argument, the Court proposed the following construction: "to the side of the top." Tr. 46. At that point, defendants raised a new objection: that the offset from the top has a "functional component," as revealed "in the specification," and should be defined accordingly. Tr. 46–47. Whatever the merits of this argument, as noted above, the Court will not import a functional requirement not recited in the claim itself. *See Ecolab*, 264 F.3d at 1367.

The Court will, however, accommodate one final objection raised by Kartri's counsel. To ensure that the Court's construction allows for a deviation to *either* side of the top, the Court adopts the following construction, to which no party objected: "to a side of the top."

### M.    "Slit extends through"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|------|----------|-------------------------------|--------------------------------|--------------------------------|
| Slit extends through | Claims 17, 18 in '609 Patent | Slit passes through. | *Joint Chart*: The slit proceeds straight from the outer periphery to the opening. | *Joint Chart*: "Slit extends through" refers to straight linear slits. |

Claims 17 and 18 of the '609 Patent describe a product in which the slit "extends through" certain positions on the ring. *See* '609 Patent at 12:38–43. Defendants do not dispute that the plain and ordinary meaning of "extends through" is, as Focus proposes, "passes through." Instead, they argue that the slit must extend *straight* through the ring—*i.e.*, that the term refers only to "straight linear slits." Dkt. 162-1 at 4. As Kartri puts it, the theory here is

---

identify the "top" as a part of the "inner circumference." *See* '248 Patent at 10:25–26 ("[S]aid inner circumference comprising a top when said item is hanging . . . ."); *id.* at 28–30 ("[A]t a point offset from said top . . . ."). The claims of the '609 Patent are somewhat less clear. *See* '609 Patent at 11:46–49 ("[S]aid ring comprises an inner circumference and a top, and . . . said slit intersects said inner circumference at an [sic] position offset from said top."). Nevertheless, the specification is clear: In describing a slit that is "curved and offset," the specification explains that the "slit 232 exits the inner circumference of the ring at a location which is offset to the side, rather than exiting the ring at the top of the inner circumference of ring 220." *Id.* at 8:48–54. This statement leaves no doubt that the "top" to which these claims refer is the top of the inner circumference.

26

that the relevant claims "are directed only to the 'projecting edge' curtain rings," and "[t]he only clear examples of rings that comprise a projecting edge, and where the slit appears to extend through the ring, are Figs. 18, 19, and 31b, which have a slit that extends straight through." Kartri Br. 23.

The Court is skeptical of this argument, as it appears to ignore Figure 20, which has both a projecting edge and a slit that does not extend "straight" through the ring. *See* '609 Patent Fig. 20. But in any event, the text of the specification inters Kartri's argument: "[T]he slit 344 need not be in a straight line." *Id.* at 10:50–51. Thus even if the Court were empowered to import a limitation such as that suggested by defendants, the specification itself precludes such a construction.

Accordingly, adopting the plain and ordinary meaning, the Court construes this term as "slit passes through."

### N.    "O'clock position"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
| --- | --- | --- | --- | --- |
| O'clock position | Claims 17, 18 in '609 Patent; Claims 1, 3–6, 8–12 in '088 Patent | Corresponding to the position on a standard clock. | *Joint Chart:* No discernible meaning. *Brief:* This term is apparently intended to employ [a] clock's hour-hand positions for [a] particular angular relationship of the place where the slit enters the round opening of the ring with the orientation of the ring on the curtain. [Kartri Br. 24] | *Joint Chart:* From a defined point of reference, the division of a 360-degree field of view into 30 degree segments for a 12 hour clock and 15 degree segments for a 24 hour clock. |

Although defendants devote significant energy to litigating this term, the plain and ordinary meaning of "o'clock position" is readily apparent. The term refers to a concept familiar

27

to virtually every adult: position on a standard clock face. Although Kartri originally contended

that this term, ubiquitous in common usage, has "no discernible meaning," Dkt. 162-1 at 4, it

concedes in its brief that the term refers to hour positions on a clock that are 30 degrees apart,

with the one o'clock position "being thirty degrees from a vertical plumb line passing through

the spindle of the clock hands." Kartri Br. 24. This is an accurate description, but the Court sees

no reason to burden the factfinder with a hyper-technical description of what is assuredly a

familiar concept.

Marquis, for its part, raises two objections. First, Marquis notes that the claims are

"silent as to whether a standard 24-hour clock as used in Europe or by the US military or a

standard 12-hour clock as used by civilians in the U.S. is used." Marquis Br. 18. The Court is

quite confident that these patents, issued in the United States and directed to shower curtains,

unambiguously refer to the 12-hour clock face in standard use in the United States.[15]

Nevertheless, to avoid any possible confusion, the Court included in its proposed construction

the phrase "standard, 12-hour clock face." Tr. 50.

Second, Marquis notes that the claims and specification are "silent as to where the hands

should be positioned on an oval." Marquis Br. 19; *see also* Tr. 51–52. Instead, Marquis argues,

the clock positions are described only "in connection with rings having a circular opening."

Marquis Br. 19. To the extent this argument seeks to relitigate whether the openings must be

circular, the Court has already resolved that dispute. *See supra* Part III.C. And to the extent that

---

[15] Further, the Patents describe spatial relationships. Even if a 24-hour clock may be used for
timekeeping, spatial relationships are typically described with reference to a 12-hour clock. *See,
e.g.*, Federal Aviation Administration, *Pilot's Handbook of Aeronautical Knowledge* 14-26
(2016), https://www.faa.gov/regulations_policies/handbooks_manuals/aviation/phak/media/
pilot_handbook.pdf ("[T]raffic is referenced by azimuth from the aircraft in terms of the 12-hour
clock."); *id.* at 16-5 ("In most aviation operations, time is expressed in terms of the 24-hour
clock.").

Marquis seeks now to argue that the Patents are ambiguous because a POSITA could not determine whence the clock's hands originate, the Court rejects that argument, too. Any lay interpreter would understand the term "o'clock position" to contemplate a clock superimposed on the ring, with hands projecting from the center of the ring, whatever the shape of the ring.

In sum, the Court is satisfied that any potential ambiguity as to this term is easily resolved with the following construction, which embraces the plain and ordinary meaning of the term "o'clock position": "corresponding to the position on a standard 12-hour clock face."

O.    **"Approximately the 1 o'clock or 2 o'clock position on said ring"**

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Approximately the 1 o'clock or 2 o'clock position on said ring** | Claim 17 in '609 Patent | About 1 or 2 o'clock on a clock face (including anywhere in between). | *Joint Chart:* The slit goes straight through the ring at a position offset about 30 degrees from top dead center, or at about 60 degrees from top dead center.<br><br>*Brief:* The term or word "approximately" in the patent owner's chosen claim term subjects the claim to being indefinite and invalid . . . . [Kartri Br. 24] | *Joint Chart:* "Approximately the 1 o'clock or 2 o'clock position on said ring" is on a 360 degree inner circumference having an "approximate" center point, where 12 o'clock is a vertical radius from the "approximate" center point at 0 degrees of the 360 degree inner circumference, 1 o'clock is a radius 30 degrees right of 0 degrees, 2 o'clock is a radius 60 degrees right of 0 degrees. The "or" means the region between 1 or 2 o'clock position [sic] is not covered by the claim. |

The parties' dispute as to this term and the next concerns the meaning of the word "or." All agree that the term "approximately" allows for some flexibility, but the parties disagree as to

Appx74

whether the term contemplates only the areas immediately surrounding the 1 and 2 o'clock

positions, or whether the term refers as well to the space between.[16]

To be sure, as Marquis suggests, the word "or" is often used to connote alternatives. *See*

Marquis Br. 19 & n.12.  In *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326 (Fed.

Cir. 2001), for instance, the Federal Circuit held that in phrases such as "selecting either a

greatest magnitude or highest frequency search," the term "or" referred to exclusive alternatives.

*Id.* at 1330.  "[W]hatever the meaning of 'or' as a logical operator," the Court held, "it is quite

clear from the patent documents that Kustom was not using 'or' as a technical programming

operator, but in its ordinary meaning as stating alternatives."  *Id.* at 1331.

But to read *Kustom Signals* as controlling here, strictly because the Patent uses the word

"or," is to ignore that meaning derives from context.  *Cf. id.* at 1331 ("We agree with this

construction, for there is no indication that Kustom used these words with a different meaning.").

Here, unlike in *Kustom Signals*, there is ample indication that the patentee used "or" to express

something other than alternatives.

First, there is the word "approximately."  Consider the statement "the game starts around

1 o'clock or 2 o'clock."  The statement conveys an intentional imprecision—that the game starts

somewhere in the neighborhood of 1 or 2 o'clock.  The term "approximately" refers not to the

periods of time immediately surrounding 1 o'clock and 2 o'clock, but rather to the broader set of

possibilities encompassed in the phrase "1 o'clock or 2 o'clock," including, potentially, 1:30.

Further, that the claim refers to one broad region of the ring's circumference, rather than

two smaller regions, is confirmed by the patentee's use of the word "position."  Consider the

---

[16] To the extent defendants argue that "approximately" is necessarily indefinite, *see* Kartri Br.
24, the Court has already rejected that argument, *see supra* Part III.F.

difference between "approximately the 1 o'clock or 2 o'clock position" and "approximately the 1 o'clock or 2 o'clock positions." Had the patentee chosen the latter term, defendants' argument would be strengthened. Instead, the patentee chose "position" and thereby described one broad region rather than two.

The specification, too, supports this reading. The specification provides that the slit "can extend through any position on the ring, whether the '12 o'clock' position, or to 1 o'clock, 2 o'clock, 10 o'clock, 11 o'clock, or so forth." '609 Patent at 4:12–14. Notwithstanding the reference to specific clock positions, the clear implication of this language is that the slit may extend through *any* point on the circumference. Thus the clock positions serve not to identify precise positions, but rather to place labels on certain *areas* of the ring.

To be sure, this concept might have been expressed more clearly in the patent claims. But the same is true of defendants' alternative constructions (*e.g.*, "the area immediately surrounding the 1 o'clock position or the area immediately surrounding the 2 o'clock position"). In the end, "the claims represent the final product of a sometimes imperfect process." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1140 (Fed. Cir. 2003). The Court is left only to "focus objectively on the patent specification and claims." *Id.* And here, the specification and claims leave no doubt that the claim contemplates the region between the 1 o'clock and 2 o'clock positions.

Accordingly, the Court construes this term as "the area between and around the 1 o'clock and 2 o'clock positions on a standard 12-hour clock face."

31

### P.    "Approximately the 10 o'clock or 11 o'clock position on said ring"

| Term | Claim(s) | Focus's Proposed Construction | Kartri's Proposed Construction | Marquis' Proposed Construction |
|---|---|---|---|---|
| **Approximately the 10 o'clock or 11 o'clock position on said ring** | Claim 18 in '609 Patent | About 10 or 11 o'clock on a clock face (including anywhere in between). | *Joint Chart*: [N/A]<br><br>*Brief*: The term or word "approximately" in the patent owner's chosen claim term subjects the claim to being indefinite and invalid . . . . [Kartri Br. 24] | *Joint Chart*: "Approximately the 10 o'clock or 11 o'clock position on said ring" is on a 360 degree inner circumference having an "approximate" center point, where 12 o'clock is a vertical radius from the "approximate" center point at 0 degrees of the 360 degree inner circumference, 10 o'clock is a radius 300 degrees right of 0 degrees, 11 o'clock is a radius 330 degrees right of 0 degrees. |

The parties agree that the construction of "approximately the 1 o'clock or 2 o'clock

position on said ring" controls here too. Tr. 60. Thus the Court construes this term as "the area

between and around the 10 o'clock and 11 o'clock positions on a standard 12-hour clock face."

## IV.    Design Patent

Having construed all of the disputed terms of the utility patents, the Court turns now to

the Design Patent. Focus's Design Patent consists of a series of figures depicting the same

invention and, as is required by law, *see* 37 C.F.R. § 1.153, only one claim: "I claim the

ornamental design for a shower curtain, as shown and described above." Design Patent, cover

page.

Defendants offer proposed constructions of the terms "ornamental design" and "as shown

and described above." To wit, they ask the Court to define the "non-functional elements" of the

design as including "sharp corners, sharp edges, generally cylindrical inner side edge of opening,

lack of any tapering or rounding at the side, top or inner edges, and partly curved, partly straight shape of top hem of the shower curtain." Dkt. 162-1 at 5–6.[17]

To the extent that defendants seek a detailed verbal construction of the Design Patent, the Court declines the invitation. "Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc).

To the extent that defendants seek a judicial determination of which elements of the Design Patent are functional, however, the Court agrees that such an inquiry may be appropriate. To be sure, "[w]hether a patented design is functional or ornamental is a question of fact." *PHG Techs. v. St. John Cos.*, 469 F.3d 1361, 1365 (Fed. Cir. 2006). Thus if defendants were to argue that the Design Patent claimed a purely functional design (and was therefore invalid), any resolution of that dispute at claim construction would "unduly invad[e] the jury's fact-finding process." *Egyptian Goddess*, 543 F.3d at 680.

But where a design contains both functional and non-functional elements, as appears to be the case here, "a trial court can usefully guide the finder of fact by . . . distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Id.*

---

[17] The reference to a "top hem" is curious, as Marquis elsewhere argues that Focus has surrendered any entitlement to a hem in the Design Patent by virtue of a surrender of claim scope. *See* Marquis Br. 24–25 & n.15 (citing *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 702 (Fed. Cir. 2014)); Tr. 60–61. But this argument is without merit. The design claim was not "narrowed to the hemless design . . . when the broken-line hem of the Figure 1 drawing was deleted," Marquis Br. 25, because broken lines are never part of a claim and therefore cannot affect the claim's scope. *See* Design Patent, cover page ("The broken lines on the shower curtain depict features of the article that form no part of the claimed design."); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1317 (Fed. Cir. 2012) ("The parts of the side beyond the bezel, as well as the phone's back, are disclaimed, as indicated by the use of broken lines in the patent figures.").

(citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). That is because "a design patent, unlike a utility patent, limits protection to the ornamental design of the article," such that the jury may find liability only where the non-functional aspects of the design are infringed. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010). Thus, the Federal Circuit has "often blessed" claim construction decisions in which the district court identified the functional and ornamental features of the claimed design. *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (citing *OddzOn*, 122 F.3d at 1405; *Richardson*, 597 F.3d at 1293–94; *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1334 (Fed. Cir. 2015)).

The key question for a district court to consider, therefore, is whether breaking out the elements of the design patent as functional or non-functional would "usefully guide the finder of fact," or would instead "plac[e] undue emphasis on particular features of the design," thereby encouraging the jury to "focus on each individual described feature in the verbal description rather than on the design as a whole." *Egyptian Goddess*, 543 F.3d at 680. Unfortunately, Focus, in mounting a vigorous opposition to any verbal construction of the Design Patent, failed to address this question, let alone which elements of the Design Patent are functional and which are not. The same is true of Marquis.

Nevertheless, the ultimate goal here is to "usefully guide the finder of fact," *id.* at 680, and with no trial on the immediate horizon, there remains ample time to sort out what guidance, if any, this Court ought to provide a jury. Accordingly, the Court directs the parties as follows. By October 12, 2018, in the same joint letter described in this Court's August 2, 2018 Order, *see* Dkt. 195, the parties are directed to provide *brief* answers to the following questions: (1) whether the Design Patent contains both functional and non-functional elements; (2) whether instructions

distinguishing between functional and non-functional elements of the Design Patent would, on balance, assist the factfinder; and (3) whether the Court should take up the functional/non-functional analysis at summary judgment or in pretrial briefing concerning jury instructions.  For avoidance of doubt, the Court does not at this time invite argument as to *which* elements of the Design Patent are functional and non-functional, except as necessary to answer the foregoing questions.

Thus, pending further submissions, the Court reserves decision on how best to instruct the jury as to the Design Patent.  *See, e.g.*, *Depaoli v. Daisy Mfg. Co.*, No. 07-cv-11778-DPW, 2009 WL 2145721, at *5 (D. Mass. July 14, 2009) ("To the extent the scope of the [design patent's] claim must be limited by prosecution history or functionality, I will address those issues definitively if and when they are raised at some later stage in these proceedings, such as resolution of motions for summary judgment or as part of the jury instructions at trial.").

## CONCLUSION

For the foregoing reasons, the disputed terms, as set forth in the parties' claim construction submissions and at argument, are construed as set forth above.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 181.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 9, 2018
       New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS
SYSTEMS OF NORTH AMERICA, INC., SURE FIT
HOME PRODUCTS, LLC, SURE FITE HOME DÉCOR
HOLDINGS CORP., and SF HOME DÉCOR, LLC,

                                        Plaintiffs,

                    -v-

KARTRI SALES COMPANY, INC., and MARQUIS
MILLS, INTERNATIONAL, INC.,

                                        Defendants.

15 Civ. 10154 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Focus Products Group International, LLC ("Focus"), Zahner Design Group,

Ltd. ("ZDG"), Hookless Systems of North America, Inc. ("HSNA"), SF Home Décor, LLC, Sure

Fit Home Décor Holdings Corp., and Sure Fit Home Products, LLC (together, "Focus" or

"plaintiffs") bring this action against defendants Kartri Sales Company, Inc. ("Kartri") and

Marquis Mills, International, Inc. ("Marquis," and together with Kartri, "defendants") alleging

infringement of three utility patents and a related design patent, in violation of 35 U.S.C. § 271;

infringement of a registered and an unregistered trademark and infringement of unregistered

trade dress, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and unfair

competition, in violation of New York common law.  Defendants together bring 13

counterclaims, many but not all of which correspond to Focus's affirmative claims.  The parties

have cross-moved for summary judgment on a subset of these claims.  For the following reasons,

the Court grants in part and denies in part each side's motions.

## I.     Background

### A.     Factual Background[1]

---

[1] The Court draws its account of the underlying facts from the parties' respective, albeit at points confusingly organized, submissions on the cross-motions for summary judgment, including: the first declaration of Morris E. Cohen, Esq., (oddly included as Exhibit 44) and attached exhibits in support of Focus's motion, Dkt. 243 ("Pl. Ex."); the first declaration of Donald J. Cox, Esq., (unhelpfully hidden at the end of defendants' 56.1 statement, Dkt. 255-1, a separate ECF filing) and the exhibits attached to defendants' memorandum of law in support of their cross-motion, Dkt. 254 ("Def. Ex."); the second declaration of Morris E. Cohen, Esq., (unhelpfully included as Exhibit 25) and attached exhibits, in support of Focus's opposition to defendants' cross motion, Dkt. 273 ("Pl. Opp'n Ex."); and the second declaration of Donald J. Cox, Esq. (included as an unnumbered exhibit *after* the exhibits it attaches) and attached exhibits in support of defendants' reply, Dkt. 288 ("Def. Reply Ex."). For background only, the Court refers to the Fourth Amended Complaint, Dkt. 148 ("FAC"), and the counterclaims of defendants Kartri, Dkt. 150 ("Kartri Answer"), and Marquis, Dkt. 151 ("Marquis Answer").

Both parties also submitted Local Rule 56.1 statements: Dkt. 244 ("Pl. 56.1"); Dkt. 255 ("Def. 56.1 and Response"); Dkt. 272 ("Pl. 56.1 Response"). Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and are not denied by the other party, or are denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Notwithstanding their submission of a 56.1 statement, plaintiffs largely cite directly to the record. Consequently, the Court does as well. As for defendants, as plaintiffs correctly note, *see* Dkt. 269, their Rule 56.1 statement and response persistently fails to conform to the local rules and regularly lacks citations to the record. *See* Local Civil Rule 56.1. Factual propositions declared by the defense for which defense counsel has not submitted admissible evidentiary support have not been credited by the Court. The defense's 56.1 statement is a striking replica of defendants' memoranda of law, suggesting a lack of appreciation of the purpose of such a statement. This, along with the 56.1 statement's sometimes maddeningly incomprehensible formatting, makes it particularly unhelpful to the Court. *See House v. Wackenhut Servs., Inc.*, No. 10 Civ. 9476 (CM), 2012 WL 4017334, at *2 (S.D.N.Y. Aug. 20, 2012) ("[C]ounsel has broken just about every relevant rule (individual, local, and common sense) concerning how facts should be presented in moving papers."); *cf. Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 435 (7th Cir. 2002) ("Instead of summarizing the record so that we could learn what inferences in [appellee]'s favor the evidence fairly supports, [its] 'statement of facts'

### 1.    The Parties

Plaintiff ZDG owns, as relevant here, one design patent and three utility patents relating to shower curtains with integrated shower rings. ZDG granted an exclusive license for these patents to its affiliate, plaintiff HSNA. HSNA, in turn, granted an exclusive license for these patents to plaintiff Focus.[2]

Defendant Marquis makes, imports, and sells furniture and other home accessories, including shower curtains, in the United States. Defendant Kartri distributes furniture and other home accessories, including shower curtains, in the United States. Marquis supplies Kartri with the allegedly infringing shower curtains that are at issue in this lawsuit.

Non-party Carnation Home Fashions, Inc. ("Carnation"), is a sub-licensee of Focus.

### 2.    Plaintiffs' Intellectual Property

ZDG develops and commercializes designs and inventions for, *inter alia*, shower curtains. It owns the four patents at issue in this lawsuit: (1) Design Patent No. D746,078, entitled "Shower Curtain," ("'078 patent" or the "Design Patent"), FAC ¶ 23; *id.*, Ex. 1; (2) Utility Patent No. 6494,248, entitled "Suspended Materials Having External Slits," ("'248 patent"), Pl. 56.1 ¶¶ 6–7; (3) Utility Patent No. 7296,609, entitled "Hanging Products," ("'609

---

is a tendentious recap of the defense case. No opportunity to disparage [its opponent's] position is missed, and facts that might support [that] position do not see the light of day."); *id.* at 436 ("Courts are entitled to assistance from counsel, and an invitation to search [the appellate record] without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. Judges are not like pigs, hunting for truffles buried in the record." (internal quotation marks omitted)).

[2] Focus subsequently underwent a name change to Sure Fit Home Décor, LLC, also a plaintiff in this action. Thereafter, Sure Fit Home Décor, LLC (formerly known as Focus) sold all of the intellectual property that is at issue in this case to plaintiff SF Home Décor, LLC. Plaintiff Sure Fit Home Décor Holdings Corp. is the parent company of plaintiff SF Home Décor, LLC, which, in turn, is the parent company of plaintiff Sure Fit Home Products, LLC.

patent"), FAC ¶ 32; Pl. Ex. 9; and (4) Utility Patent No. 8235,088, entitled "Hanging Products," ("'088 patent," and together with the '248 patent and the '609 patent, the "utility patents"), FAC ¶ 33; Pl. Ex. 10.  ZDG, through its affiliate HSNA, has exclusively licensed each of these patents to Focus.  *See* Pl. Ex. 31; Pl. Ex. 42.  Focus sells shower curtains incorporating the patented inventions in the hospitality industry throughout the United States.  FAC ¶¶ 114, 120.

Plaintiffs have trademark rights in the registered mark HOOKLESS®.  Pl. Exs. 33–36.  Plaintiffs also claim to have common law trademark rights in the unregistered "EZ ON" mark, which they allege has been used on shower curtains sold throughout the United States, including through their sub-licensee Carnation.  FAC ¶ 82.

Finally, plaintiffs claim to have trade dress rights in the visual appearance of shower curtains sold under their HOOKLESS® brand.  *Id.* ¶ 104.  As described by plaintiffs, these shower curtains lack hooks protruding above the upper edge of the curtain.  *Id.*  Instead, they have a row of rings along the upper portion of the curtain.  *Id.*  These are coplanar with the curtain's material, fixed in place, and include a slit or gap, creating, as alleged, an "organized and symmetrical repeating visual pattern along the top width of the shower curtain."  *Id.*  The effect of this combination and arrangement of design elements, plaintiffs allege, is to give the "visual appearance of an essentially 'neat' and 'orderly'" shower curtain.  *Id.*

Plaintiffs claim that they have extensively marketed, promoted, and sold their shower curtains, including their associated trademarks and trade dress, throughout the United States, and that their shower curtain design has become the "leading shower curtain in the hospitality industry."  *Id.* ¶¶ 113–20.

### 3.    The Dispute

Plaintiffs claim that defendants have willfully infringed, and continue to willfully infringe, plaintiffs' patents by manufacturing, selling, using, and/or importing shower curtains

embodying the design of the '078 patent and the inventions of the '248, '609, and '088 patents. *Id.* ¶¶ 157–65. They claim that defendants have also infringed (1) plaintiffs' HOOKLESS® trademark; (2) plaintiffs' unregistered EZ ON trademark, by using the mark "EZY HANG" on the accused shower curtains; and (3) plaintiffs' trade dress, by copying the visual appearance of the shower curtains sold under plaintiffs' HOOKLESS® brand. *Id.* ¶¶ 166–74. Plaintiffs claim that in making and selling the accused products, defendants have acted in bad faith, deliberately seeking to "trade off of the goodwill, secondary meaning, and success" that plaintiffs' trademark and trade dress have accrued in the marketplace. *Id.* ¶ 131. Finally, plaintiffs claim that defendants' use of the EZY HANG mark and imitation of plaintiffs' trade dress is likely to cause confusion and to mislead consumers to believe that their goods originate from, are sponsored by, or are affiliated with plaintiffs. *Id.* ¶ 132.

Defendants deny these allegations. They contend that their products do not infringe on plaintiffs' patents, trademarks, or trade dress or, in the alternative, that such patents, trademarks, and trade dress are invalid for a variety of reasons. *See* Kartri Answer; Marquis Answer. Ten of defendants' counterclaims dispute plaintiffs' claims. Marquis Answer pp. 22–33, 36–40. Their remaining two counterclaims allege tortious interference, monopolization, and patent misuse by plaintiffs. *Id.* pp. 33–36; Kartri Answer pp. 18–21.

### 4.     The Cross-Motions for Summary Judgment

The parties have brought cross-motions for summary judgment on a subset of the claims in this litigation. Focus has moved for summary judgment on these claims: (1) that defendants have infringed the '248, '609, and '088 utility patents as a matter of law; (2) that defendants have

5

infringed plaintiffs' trade dress; and (3) certain damages theories.[3]  Focus also opposes all of

defendants' counterclaims, either cross-moving for summary judgment or contending that

genuine disputes of material fact preclude their resolution at this time.

Defendants purport to oppose each claim for which Focus seeks summary judgment,

although, as discussed below, the Court finds that defendants have abandoned certain

counterclaims by failing to defend them in their briefing.

### B.    Procedural History[4]

#### 1.    The Initial Phase of Litigation

On June 30, 2015, Focus filed a complaint against Kartri in a related action,

No. 15 Civ. 5108, bringing claims for infringement of the three utility patents, for trademark

infringement, and for common law unfair competition.  No. 15 Civ. 5108, Dkt. 1.  On

December 30, 2015, Focus filed the original complaint in this action against Kartri.  No. 15

Civ. 10154, Dkt. 1.  Focus brought claims for design patent infringement, trademark and trade

dress infringement, and common law unfair competition.  On February 4, 2016, Kartri filed a

third-party complaint against Marquis.  Dkt. 11.

On February 9, 2016, Kartri moved to dismiss the complaint, Dkt. 15, and the Court

granted Focus leave to amend, Dkt. 16.  On March 1, 2016, Focus filed the First Amended

Complaint, which amended its claims against Kartri and added Marquis as a defendant.  Dkt. 20.

The amended complaint brought claims against Marquis for utility patent infringement that

mirrored Focus's claims against Kartri in the related action.  On April 11, 2016, Kartri dismissed

---

[3] Focus does not, however, seek summary judgment on its claims of design patent infringement,
infringement of the HOOKLESS® trademark, infringement of the EZ ON trademark, its New
York unfair competition claim, or other theories of damages.

[4] Unless otherwise specified, all references to the docket refer to the lead case in this litigation,
No. 15 Civ. 10154.

its third-party complaint against Marquis. Dkt. 32. That day, Marquis moved to dismiss the

amended complaint, Dkt. 35, and the Court granted Focus leave to amend its complaint as to

Marquis, Dkt. 37. On July 14, 2016, the Court denied the motions to dismiss in a bench

decision. Dkt. 63; Dkt. 71 ("MTD Tr.").[5] On July 25, 2016, the Court formally consolidated the

two cases, Dkt. 67, and approved a case management plan, Dkt. 65. On September 29, 2017,

following the close of fact discovery, Focus submitted its Fourth Amended Complaint, Dkt. 148

(FAC), which is the operative complaint in this litigation. On October 13, 2017, Marquis and

Kartri submitted their respective answers to the FAC. Kartri Answer; Marquis Answer.[6]

On October 12, 2017, Kartri filed a new motion to dismiss on the basis of improper

venue. Dkt. 149. On November 22, 2017, the Court issued an order denying the motion,

Dkt. 164, and on December 21, 2017, explained its reasons in a bench opinion, Dkt. 171

(transcript of bench opinion).

### 2.    The *Markman* Hearing and Ruling[7]

On July 7, 2017, the parties filed their original joint claim terms chart. Dkt. 124. On

November 22, 2017, the parties filed an amended joint claim terms chart. Dkt. 162. On

December 22, 2017, Focus filed its opening *Markman* brief. Dkt. 169. On January 22, 2018,

---

[5] Also during this period, on March 24, 2016, Kartri moved to dismiss the amended complaint
and/or to strike certain allegations in it. Dkt. 27. On May 5, 2016, plaintiffs filed an Amended
Complaint as to Marquis. Dkt. 47. On May 26, 2016, Marquis moved to dismiss that complaint.
Dkt. 55.

[6] Also during this period, on July 26, 2016, Focus filed its Third Amended Complaint. Dkt. 68.
On July 28, 2016, Kartri and Marquis filed their respective answers and counterclaims against
Focus. Dkts. 69, 70. On August 17, 2016, Focus filed its answers to the counterclaims.
Dkts. 75, 76.

[7] The Supreme Court, in *Markman v. Westview Instruments, Inc.*, held "that the construction of a
patent, including terms of art within its claim, is exclusively within the province of the court."
517 U.S. 370, 372 (1996).

7

Kartri and Marquis each filed responsive *Markman* briefs. Dkts. 173, 174. On February 5, 2018, Focus filed two reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis filed a letter motion seeking leave to file an attached sur-reply. Dkt. 181. On February 14, 2018, Focus filed a letter consenting to Marquis' application on the condition that the Court also consider Focus's responsive letter brief. Dkt. 182.

On July 26, 2018, the Court held a *Markman* hearing. See Dkt. 193 (transcript of hearing). On August 9, 2018, the Court issued its *Markman* ruling, in which it construed 16 disputed claim terms relevant to the utility patents. Dkt. 198 ("*Markman* Op."). The Court's construction of those terms governs its findings as to the utility patents in this decision.

### 3.    The Instant Summary Judgment Litigation

On March 5, 2019, the Court held a pre-motion conference, Dkt. 241 ("Pre-motion Tr."), and set a briefing schedule for the cross-motions for summary judgment, Dkt. 230. On March 26, 2019, Focus filed a memorandum of law in support of its motion ("Pl. Mem."), Dkt. 243; the first Cohen Declaration and attached exhibits ("Pl. Ex."), *id.*; and a Rule 56.1 statement, Pl. 56.1. On April 17, 2019, defendants filed a memorandum of law in support of their cross-motion for summary judgment and in opposition to Focus's motion ("Def. Mem."), Dkt. 253; the first Cox Declaration with accompanying exhibits ("Def. Ex."), *id.*; and a counter 56.1 statement, Def. 56.1 and Response. On May 7, 2019, Focus filed its combined opposition to defendants' cross-motion for summary judgment and reply in support of its own motion with an accompanying memorandum of law ("Pl. Opp'n Mem."), Dkt. 273; the second Cohen Declaration, with attached exhibits ("Pl. Opp'n Ex."), *id.*; and its response to defendants' 56.1 statement, Pl. 56.1 Response. On May 21, 2019, defendants filed a reply memorandum of law in support of their cross-motion for summary judgment ("Def Reply Mem."), Dkt. 288; and the second Cox Declaration, with attached exhibits ("Def. Reply Ex."), *id.* Because defendants have

submitted joint briefing on summary judgment, the Court treats their claims collectively except where otherwise specified.

During summary judgment briefing, Focus moved to strike defendants' 56.1 statement on the basis of widespread asserted deficiencies, including defendants' failure to support factual propositions with record evidence. Dkt. 269. Defendants opposed this motion. Dkt. 270. The Court denied the motion to strike but notified the parties that "the Court will be mindful of plaintiffs' claim that deficiencies in defendants' Rule 56.1 Statements require, *inter alia*, that certain of defendants' factual assertions be discounted or disregarded altogether." Dkt. 279. The Court has followed this approach in resolving the parties' cross-motions. *See also supra* note 1.

Finally, the Court, prompted by Focus's motion, solicited separate briefing on whether it should preclude defendants from relying on revenue and cost data, and expert materials based on the same, that were allegedly not produced to Focus until after the close of fact discovery. *See* Dkt. 230 (briefing schedule); Pre-motion Tr. The parties submitted briefs in support of and in opposition to Focus's motion to preclude in parallel with their summary judgment briefs. *See* Dkt. 246 (Focus's motion to preclude); Dkt. 254 (defendants' opposition); Dkts. 274 & 275 (Focus's reply). The Court discusses (but does not resolve) that motion in its discussion regarding damages, *infra*.

## II.   Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

9

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

The Court first addresses the claims and counterclaims regarding the utility patents. It then turns to the claims and counterclaims regarding the HOOKLESS® mark, the EZ ON mark, and plaintiffs' trade dress. It then addresses defendants' remaining counterclaims. Finally, the Court addresses Focus's summary judgment motion relating to certain damages claims.

### A.    Claims Related to the Utility Patents

The Court first addresses Focus's claims that defendants have infringed on the three utility patents, and defendants' counterclaims that they have not so infringed. "An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the accused device to determine,

10

Appx90

as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999). If, however, the "parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of [a given claim is correct], the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

### 1.    Infringement of the '248 Patent

Focus's motion for summary judgment as to infringement of the '248 patent is limited to one aspect of Claim 1: defendants' alleged inclusion, in their integrated shower curtain ring, of an "*approximately horizontal component* when [the shower curtain] is hanging from the [curtain] rod." Pl. Ex. 7 at 13 (emphasis added). In its *Markman* ruling, the Court construed the term "approximately horizontal component" as "a component that is either level or nearly so." *Markman* Op. at 20. The Court has no reason to revisit this definition now.

Focus contends that "[t]he sole dispute on infringement is whether the slit component in Defendants' product is 'approximately horizontal.'" Pl Opp'n Mem. at 5; *see also* Pl. Mem. at 2–3. Defendants argue that "[n]o reasonable person could find that Defendants' diagonal slits are 'approximately horizontal.'" Def. Mem. at 11. The Court disagrees.

The approximately horizontal component of Focus's design is labeled 232b in the below diagram:



| The '248 Patent | Defendants' Design |
| --- | --- |

Focus's expert measured the angle of the horizontal component of each design. He determined that Focus's "approximately horizontal component" has an angle of 26°, while the horizontal component of defendants' design has an angle of 22°. Pl. Ex. 6. In other words, the horizontal component of defendants' design is even closer to horizontal, *i.e.* 0°, than Focus's design. Because the Court has construed the term "approximately horizontal component" as "a component that is either level or nearly so," *Markman* Op. at 20, this is powerful evidence that defendants' design infringes this aspect of Claim 1 of the '248 patent.

Defendants offer no direct rebuttal to Focus's evidence. Nor do they take issue with the measurements proffered by Focus's expert. Instead, they argue that an angle of 22° cannot possibly be considered "approximately horizontal." Def. Mem. at 10–11. For at least two reasons, this argument is unpersuasive. First, as Focus points out, the '248 patent describes this component of Focus's design—which has an angle of 26°—as "approximately horizontal." Whether defendants would have labeled it as such is beside the point. *See, e.g., Dig. Biometrics,*

12

*Inc. v. Identix, Inc.*, 149 F.3d 1335, 1343–44 (Fed. Cir. 1998). And because the "approximately horizontal" component of Focus's design is 26° off horizontal, defendants' design, at 22°, is at least as "approximately horizontal" as Focus's is. Nor can defendants argue that the 26° angle of Focus's "approximately horizontal" component is inconsistent with the Court's *Markman* construction that an "approximately horizontal component" is "a component that is either level or nearly so." *Markman* Op. at 20. The Court was construing the term "approximately horizontal" as used by Focus to describe this aspect of the product design. For the Court's construction to exclude Focus's own design would be nonsensical. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim construction that excludes the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case"); *see also Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019).[8]

For these reasons, the Court concludes that defendants have failed to raise a triable issue of fact as to whether their design includes an "approximately horizontal" component; it does. Defendants have therefore infringed on this aspect of the '248 utility patent. The Court grants Focus's motion for summary judgment as to this discrete issue, and denies Marquis's first counterclaim for a declaratory judgment that there is no such infringement.

---

[8] Defendants also attempt to argue that an angle of 22° cannot be found to be "approximately horizontal" because such an angle, according to defendants, has a *grade* of 40%. Defendants then proffer examples of, *inter alia*, notably steep roadways with a lesser grade. This argument is unavailing. First, defendants fail to offer any admissible evidence in support of it. Second, defendants seek to compare apples to oranges: A grade is not the same as an angle. Grade is measured by dividing rise over run; thus, crucial to determining the grade of an incline is the distance over which it increases in elevation.

13

2.     **Infringement of the '609 and '088 Patents**

Focus's motion for summary judgment as to infringement of the '609 patent is again limited. Focus seeks a ruling on whether defendants' shower curtain ring tracks two aspects of Claim 1 of the '609 patent: first, whether defendants' ring includes "*a projecting edge*, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring; and, second, whether, on defendants' ring, the "projecting edge . . . [is] provided *next to said slit*," *i.e.*, the opening that allows the ring to be attached to the shower curtain rod. Pl. Ex. 9 at 15 (emphasis added).

Similarly, Focus's motion for summary judgment as to infringement of the '088 patent is limited to one aspect of Claim 1 of that patent: whether defendants' shower curtain ring includes "*a projecting edge*, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring. Pl. Ex. 10 at 15 (emphasis added).

In its *Markman* ruling, the Court construed "projecting edge"—relevant to both the '609 and '088 patents—as "an edge that projects from the outer circumference of the ring." *Markman* Op. at 24. The Court construed "next to said slit"—relevant to the '609 patent only— as "adjacent to the slit." *Id.* at 25. Defendants contend that their design does not contain these components of the '609 patent or the '088 patent. Def Mem. at 13, 19. The Court disagrees.

First, as to whether defendants' design includes a "projecting edge," the Court agrees with Focus that it does. Notably, defendants' only argument against such a finding is that "where [p]laintiffs have proposed an 'edge projecting from' [d]efendants' ring there [sic] not a discernable structure to show something 'projecting from' [sic] outer circumference of the ring." Def. Mem. at 16. This argument is foreclosed by the Court's *Markman* ruling, in which the Court explicitly rejected defendants' contention that a "projecting edge" requires something that protrudes or juts out from the outer circumference. *Markman* Op. at 24. Moreover, as with the

14

'248 patent, the fact that defendants would have chosen a different term than "projecting edge" to describe this component of the '609 and '088 patents is irrelevant.  *See, e.g., Dig. Biometrics, Inc.*, 149 F.3d at 1343–44.  The Court therefore concludes that defendants' design includes a projecting edge as described in Claim 1 of the '609 and '088 patents.

Second, having found that defendants' design includes a projecting edge, the Court has no trouble finding that, relevant to the '609 patent, the projecting edge is "next to said slit."  This is readily apparent from a photograph of defendants' design, as shown below.

Defendants' Design (adapted from Pl. Ex. 4)



The Court therefore concludes that no reasonable juror could find that defendants' design does *not* include a "projecting edge," and, as to the '609 patent, that the projecting edge is *not* "next to" the slit.  Defendants have therefore infringed on these aspects of Claim 1 of the '609 patent and Claim 1 of the '088 patent.  The Court grants Focus's motion for summary judgment as to these discrete issues, and denies Marquis's first counterclaim for a declaratory judgment that there is no such infringement.

15

### 3. Defendants' Counterclaims of Patent Invalidity as to the Utility Patents

Defendant Marquis's fourth, fifth, and sixth counterclaims challenge the validity of the three utility patents. An issued patent "shall be presumed valid," and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). "The reason for this is plain. The United States Patent Office is staffed by expert and experienced personnel uniquely qualified to determine questions of patentability." *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1028 (2d Cir. 1982). When raising a claim of patent invalidity in litigation, the moving party "must prove the facts to establish invalidity of each claim by clear and convincing evidence." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Focus contends that defendants' failure to adduce expert testimony in support of its allegations of patent invalidity is fatal to their claims. The cases cited by Focus, however, do not support such a bright-line rule.[9] Rather, they are cases where the party with the burden of proof failed to adduce any plausible evidence, including but not limited to expert evidence, to support a claim of patent invalidity. The Court therefore considers defendants' arguments as to the alleged invalidity of each of the utility patents.

#### a. *The '248 Patent*

Defendants contend that the '248 patent is invalid for two reasons. First, defendants allege that the '248 patent is invalid for indefiniteness. Def. Mem. at 12–13; *see* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and

---

[9] *Howes*, 679 F.2d at 1028; *Astrazeneca AB v. Mylan Labs., Inc.*, 490 F. Supp. 2d 381, 535 (S.D.N.Y. 2007); *Plastic Contact Lens Co. v. W.R.S. Contact Lens Labs., Inc.*, 330 F. Supp. 441, 443 (S.D.N.Y. 1970)

distinctly claiming the subject matter which the inventor or a joint inventor regards as the

invention."). The Supreme Court has offered the following guidance on the definiteness inquiry:

> First, definiteness is to be evaluated from the perspective of someone skilled in
> the relevant art. Second, in assessing definiteness, claims are to be read in light of
> the patent's specification and prosecution history. Third, definiteness is measured
> from the viewpoint of a person skilled in the art at the time the patent was filed.

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014) (internal citations, quotation

marks, and alterations omitted).

Here, defendants argue that,

> [i]f Claim 1 is construed to literally or under the Doctrine of Equivalents cover
> Defendants' ring where the slit extends from outer circumference of the ring to
> the inner circumference of the ring because of the reexam amendment where the
> Markman Order held "said slit exits said ring at or near said upper edge of said
> curtain" (Dkt. 198 at 21) the claim must be held to be indefinite as such a
> determination would be in conflict with the limitation that the slit extends "from
> said upper edge through said ring to said opening."

Def. Mem. at 12. The Court agrees with Focus that defendants have failed to engage in, or

provide the Court with the relevant information, *e.g.*, admissible evidence, to engage in the

*Nautilus* analysis. Defendants have therefore failed to establish that the '248 patent is invalid for

indefiniteness, let alone by clear and convincing evidence.

Defendants next contend that the '248 patent is invalid because it was anticipated by prior

art. 35 U.S.C. § 102(a). Specifically, defendants contend that the '248 patent is anticipated by

one Jacob Lishman's 1958 design for "drapery support." *See* Patent 2,831,538 ("Lishman").

The Federal Circuit has long held that "[a]nticipation under 35 U.S.C. § 102 requires the

presence in a single prior art disclosure of each and every element of a claimed invention."

*Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987); *see also Schering

Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Focus responds to defendants'

claim by arguing that the '248 patent is not anticipated by Lishman as a matter of law because

Lishman's design does not contain a slit with "an approximately horizontal component." The Court agrees. Defendants have therefore failed to prove, by clear and convincing evidence, that the '248 patent is invalid by virtue of anticipation.

> ### b.   The '609 Patent

As to the '609 patent, defendants allege that Claim 1 of this patent is invalid for failure to satisfy the written description requirement. Def. Mem. at 17–18. Found in the first paragraph of 35 U.S.C. § 112, the written description requirement provides that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

35 U.S.C. § 112(a). "The purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of *the invention*." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991) (emphasis in original). "[T]he test for sufficiency" of the written description is whether it "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *Id.* at 1563 (quoting *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985)).

Defendants argue that the '609 patent is invalid because the written description fails to support Claim 1, and specifically its reference to a "projecting edge." Def. Mem. at 17–18. Defendants do not cite any admissible evidence in support of this argument. And defendants fail to show at all, beyond declaring the point, how the written description in the patent fails to provide a "person skilled in the art to which [the patent] pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112. Because defendants fall far short of

establishing the invalidity of the '609 patent by clear and convincing evidence, *Microsoft Corp.*, 564 U.S. at 95, the court denies defendants' motion for summary judgment on this point.

        *c.     The '088 Patent*

Finally, defendants contend that the '088 patent is invalid, for two reasons. First, defendants argue that "[f]or the same reasons given . . . for the '609 patent, the definition of 'Projecting Edge' recited in Claims 1 and 8 is not supported by the written description of the '088 patent." Having rejected this argument as to the '609 patent, the Court rejects it as to the '088 patent as well. Second, defendants argue that the '088 patent is invalid for "double patenting." Focus, while contesting the argument as "meritless," reports that it has filed terminal disclaimers to obviate any double patenting issue. *See* Pl. Opp'n Ex. 8. Defendants' double patenting claim is therefore denied as moot. *See* 37 C.F.R. § 1.321(c); *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) ("In legal principle, the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection.").

**B.      Claims Related to Trademark and Trade Dress**

    **1.      Defendants' Counterclaim That the HOOKLESS® Trademark Is Invalid**

In support of Marquis's tenth counterclaim, defendants argue that the HOOKLESS® mark is invalid because it has become generic. "Generic marks, consisting of words that identify the type or species of goods or services to which they apply, are totally lacking in distinctive quality; they are not entitled to any protection against infringement, even if they have become famous as marks, because according such protection would deprive competitors of the right to refer to their goods by name." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001). In essence, defendants assert that "[p]laintiffs do not show that Kartri is misusing

19

plaintiffs' registered trademark, but rather that customers have come to use 'hookless' as a generic word for the type of shower curtain that [p]laintiffs sell under their Hookless® mark." Def. Mem. at 42.

Focus first notes that it has not accused Marquis of infringing the HOOKLESS® mark, and so contends that Marquis has no standing to pursue this counterclaim. Focus then argues that Kartri, the sole defendant that Focus has accused of infringement, FAC ¶¶ 91–93, 95, has waived the affirmative defense of genericness, because Kartri neither asserted the alleged invalidity of the HOOKLESS® mark—on any basis—as an affirmative defense nor included it as a counterclaim. Focus is correct. "Failure to plead an affirmative defense ordinarily results in forfeiture of that defense." *Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015); *see also Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("An affirmative defense, once forfeited, is excluded from the case." (internal quotation marks and alterations omitted)); Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]"); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case."). Marquis's tenth counterclaim is therefore dismissed.[10]

---

[10] The Court thus does not need to reach Focus's merits arguments, including that "hookless" has not become a generic term for "shower curtain," that defendants have failed to support their position with the required evidence, and that registration of the HOOKLESS® mark gives it a presumption of validity that defendants have not overcome. Pl. Opp'n Mem. at 30–34.

   2.    **Infringement of the EZ ON Trademark**

        *a.    Defendants' claim of affirmative non-infringement*

Defendants next move for summary judgment on Marquis's second counterclaim. They

ask the Court to find, as a matter of law, that defendants' use of the "EZY HANG" mark does

not infringe Focus's mark "EZ ON." Def. Mem. at 37–39. Focus opposes this motion on the

ground that disputed material facts preclude summary judgment.

        "A plaintiff's trademark is protected by federal law against infringement by use of

colorable imitations of the mark which are 'likely to cause confusion, or to cause mistake, or to

deceive.'" *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996)

(quoting 15 U.S.C. § 1114(1)). "In determining whether there is a likelihood of consumer

confusion for trademark infringement," courts in the Second Circuit "apply the eight-factor

balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492

(2d Cir. 1961)." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,

823 F.3d 153, 160 (2d Cir. 2016). The factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the
> products and their competitiveness with one another; (4) evidence that the senior
> user may "bridge the gap" by developing a product for sale in the market of the
> alleged infringer's product; (5) evidence of actual consumer confusion; (6)
> evidence that the imitative mark was adopted in bad faith; (7) respective quality
> of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

"The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate

question of whether, looking at the products in their totality, consumers are likely to be

confused." *Id.* (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (internal

quotation marks omitted)).

Here, defendants argue that consumer confusion is unlikely, and that Focus and defendants sell their respective EZ ON and EZ HANG products to different segments of the market.  "No single [*Polaroid*] factor is dispositive," however, and defendants have failed to address the remaining six.  *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995).  Nor have they demonstrated why the remaining "factor[s] [are] irrelevant to the facts at hand."  *Id.*  Moreover, as to the factors defendants do address, they do not cite any evidence in support of their position.  On the basis of this showing, the Court has no difficulty concluding that defendants have failed to meet their burden on summary judgment.  The Court is unable to conclude, as a matter of law, that no reasonable juror could find infringement by defendants' EZ HANG mark.  Defendants' motion for summary judgment on this issue is therefore denied.

> b.    *Defendants' claim that Focus lacks standing to allege infringement of the EZ ON mark*

Marquis's ninth counterclaim asserts that defendants cannot be found to have infringed the EZ ON mark as a matter of law because Focus does not own the mark and therefore lacks standing to bring this claim.  This argument is premised on the fact that Carnation, a sub-licensee of Focus, Pl. Opp'n Ex. 11 ("Sublicense Agreement"), registered a trademark for EZ ON in its own name after signing a sub-license agreement with Focus, *see* Pl. Opp'n Ex. 12, but has not assigned its rights to that mark to Focus, Pl. Opp'n Mem. at 28.

Focus, while pointing to the Carnation sublicense agreement as evidence that Carnation's actions do not impact its ownership of the EZ ON mark, Sublicense Agreement, concedes that there is a factual dispute on this issue and therefore does not cross-move for summary judgment.

Section 5.3 of the Sublicense Agreement requires that Carnation assign, *inter alia*, "any . . . trademark application . . . filed [by Carnation] during the term of th[e] agreement" when

22

such an application "fall[s] within the scope of" the sublicense. Whether non-party Carnation's

trademark application for the EZ ON mark falls within the scope of the Sublicense Agreement is

a collateral dispute not before the Court. A reasonable juror could so find, however—and

therefore find that Focus owns the EZ ON mark—by looking, for example, to the inclusion of the

EZ ON mark on the packaging of products that are indisputably covered by the sublicense

agreement. *See* Sublicense Agreement § 4.2 ("As part of said sublicense, [Focus] hereby grants

sub-licensee the right to use the following trademark on the Licensed Products: 'EZ ON Shower

Curtain[.]'"); *see also* Pl. Opp'n Ex. 22 (photo of the EZ ON Shower Curtain packaging). The

Court therefore denies defendants' motion for summary judgment on this question a result of

disputed material facts.

>    3.    **Trade Dress Infringement**

Focus next claims that defendants have infringed on its trade dress, in violation of

Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). "In addition to protecting registered

marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person

of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely

to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . .'" *Wal-Mart*

*Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (quoting 15 U.S.C. § 1125(a)). As

originally conceived,

> "trade dress" referred only to the manner in which a product was "dressed up" to
> go to market with a label, package, display card, and similar packaging elements.
> However, "trade dress" has taken on a more expansive meaning and includes the
> design and appearance of the product as well as that of the container and all
> elements making up the total visual image by which the product is presented to
> customers. Thus, trade dress is essentially a product's total image and overall
> appearance as defined by its overall composition and design, including size,
> shape, color, texture, and graphics.

23

Appx103

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995) (internal citations, quotation marks, and brackets omitted).

Courts "exercise particular caution when extending protection to product designs." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (internal quotation marks omitted). That is because trade dress claims, particularly as applied to product design, "raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.' While most trademarks only create a monopoly in a word, a phrase, or a symbol, 'granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.'" *Id.* at 115 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379–80 (2d Cir. 1997)). "Although the Lanham Act protects marks that consumers are likely to rely upon in distinguishing goods," *id.* at 114, "almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the *source* of the product, but to render the product itself more useful or more appealing," *Samara Bros.*, 529 U.S. at 213 (emphasis added).

Thus, "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein, Inc.*, 58 F.3d at 32. In "[d]rawing the line between 'ideas' or 'concepts' on the one hand and 'concrete expressions' on the other," the Second Circuit instructs that a "helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products." *Id.* at 33.

Here, Focus asserts trade dress rights in the visual appearance of its shower curtains, which, *inter alia*: (1) lack hooks; and (2) have a row of rings, possessing slits or gaps, fixed in

place along the upper portion of the curtain that is "essentially co-planar with the material of the

shower curtain." FAC ¶ 104.  It alleges that the combination of these elements gives rise to the

appearance of a "neat" and "orderly" upper edge.  *Id.*  To succeed on a claim of trade dress

infringement involving the appearance of a product, Focus must show that "(1) the claimed trade

dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a

likelihood of confusion between the plaintiff's good and the defendant's."  *Sherwood 48 Assocs.*

*v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (citing *Yurman Design, Inc.*, 262 F.3d

at 115–16).  Focus must also offer "a precise expression of the character and scope of the

claimed trade dress."  *Landscape Forms, Inc.*, 113 F.3d at 381.  As to this final requirement, the

Court has already found that Focus has "recite[d] in specific detail the geometric and aesthetic

characteristics" of its trade dress in a manner that is "sufficiently precise."  MTD Tr. at 28.  The

Court has no reason to revisit this finding now.  The Court therefore considers the remaining

elements of trade dress infringement.

> a.    *Secondary Meaning*

Focus has the burden to show that its trade dress has acquired secondary meaning.  A

product has secondary meaning, also known as acquired distinctiveness, when "in the minds of

the public, the primary significance of [the trade dress] is to identify the *source* of the product

rather than the product itself."  *Yurman Design, Inc.*, 262 F.3d at 115 (emphasis added) (quoting

*Samara Bros.*, 529 U.S. at 211).  The Court considers six factors to determine whether secondary

meaning has attached: "(1) advertising expenditures, (2) consumer studies linking the mark to a

source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize

the mark, and (6) length and exclusivity of the mark's use."  *Mana Prod., Inc. v. Columbia*

*Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995).

Appx105

"[A] showing of secondary meaning," however, "is insufficient to protect product designs that are overbroad or 'generic'—'those that refer to the genus of which the particular product is a species.'" *Yurman Design, Inc.*, 262 F.3d at 115 (quoting *Jeffrey Milstein*, 58 F.3d at 32, 33); *see also Two Pesos, Inc.*, 505 U.S. at 768–69. Because "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves," courts "accord protection to [trade dress that] consumers are likely to rely upon in distinguishing goods, while denying protection that would hamper efforts to market competitive goods." *Landscape Forms, Inc.*, 113 F.3d at 380.

In this litigation, Focus has asserted trade dress rights solely in its product design: shower curtains, which, *inter alia*: (1) lack hooks; and (2) have a row of rings, possessing slits or gaps, fixed in place along the upper portion of the curtain that is "essentially co-planar with the material of the shower curtain." FAC ¶ 104. It alleges that the combination of these elements gives rise to the appearance of a "neat" and "orderly" upper edge. *Id.* The Court finds that this specific trade dress—unlike, say, the packaging in which the shower curtains are sold, or the various word marks and branding connected to the shower curtains—is generic. "Despite its initial novelty within the [hospitality] industry," Focus's "trade dress cannot qualify for trade dress protection because [Focus] is effectively seeking protection for an idea or concept— [hookless shower curtains]. It is clear that the first manufacturer to create a [shower curtain with hooks] could not have claimed trade dress protection for all [such shower curtains], since a trade dress described as consisting solely of [shower curtains with hooks] would simply refer to the genus of which the particular product is a species." *Jeffrey Milstein, Inc.*, 58 F.3d at 33 (internal quotation marks and alteration omitted).

26

Focus is of course free to develop, and receive protection for, trade dress that helps consumers associate the hookless shower curtains it manufactures with its brand—as, for example, Tide has done with its "squat, brightly decorated plastic bottles for its liquid laundry detergent," *Samara Bros.*, 529 U.S. at 212—and to assert patent protection for the shower curtains themselves, as it has already done. But to afford trade dress protection to Focus's product design would unduly risk "stifl[ing] competitors' efforts to market similar goods"— indeed, nearly any other hookless shower curtain—"to consumers." *Landscape Forms, Inc.*, 113 F.3d at 380.

Because generic trade dress is ineligible for protection, *Yurman Design, Inc.*, 262 F.3d at 115, the Court need not reach the remaining elements of trade dress infringement. The Court denies Focus's motion for summary judgment and grants defendants' corresponding counterclaims (Marquis's second and eleventh counterclaims) insofar as they relate to Focus's claimed trade dress for its product design only.

### C. Defendants' Other Counterclaims

Next, the Court addresses defendants' remaining counterclaims.

#### 1. Kartri's First Counterclaim for Tortious Interference and Monopoly

Kartri brings a single counterclaim against Focus that, read generously, raises both a claim of tortious interference and a claim of monopoly. Kartri Answer ¶¶ 204–17. Focus moves for summary judgment on this counterclaim on the basis that defendants have failed to adduce any evidence to support a *prima facie* case for either theory. The Court need not reach the merits of this argument, however, because defendants have failed to address this counterclaim in their summary judgment briefs. The Court therefore deems this counterclaim abandoned and dismisses it.

27

### 2. Marquis's Eighth Counterclaim for Patent Misuse

Marquis's eighth counterclaim alleges that Focus committed patent misuse. "[P]atent misuse [is] the patentee's act of impermissibly broadening the physical or temporal scope of the patent grant with anticompetitive effect. When the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant, [courts] have held that an accused infringer may invoke the doctrine of patent misuse to defeat the patentee's claim." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (internal quotation marks, citations, and alterations omitted). Defendants' memorandum of law explains their basis for this counterclaim thusly:

> Plaintiffs misused the patents in filing for a lawsuit that contravened the scope of the patents surrendered in overcoming the '088 patent double patenting rejection and in fraudulently asserting to fake claims for common law trademark infringement that they covered up in bad faith by submitting a redacted license and subsequently marketing a product under EZ ON to obscure the court from their misdeeds. If Defendants prevail on the infringement claims above, Defendants request leave of the Court to conduct limited discovery on communications between Plaintiffs and their counsel to determine the extent to which Plaintiffs' counsel directed the inclusion of the common law claims.

Def. Mem. at 44.

Defendants, however, do not point to any evidence in their brief, or in their 56.1 statement, in support of this counterclaim. The Court therefore finds that, on this record, no reasonable juror could find that Focus committed patent misuse. The Court therefore grants summary judgment to plaintiffs on this counterclaim.

### 3. Marquis's Third Counterclaim for Lack of Inventorship

In their memorandum of law in support of their cross-motion for summary judgment, defendants voluntarily dismissed Marquis's third counterclaim, which alleged a lack of inventorship. Def. Mem. at 44; *see also* Marquis Answer ¶¶ 39–53. This counterclaim is therefore dismissed on consent.

28

**D.      Focus's Motion for Summary Judgment on Certain Damages Claims**

**1.      Focus's Ability To Seek Damages for Infringement of the Patents**

Focus next moves for a ruling that, as the exclusive licensee of the patents at issue in this case (for use on shower curtains), it will be entitled to pursue damages for any infringement found by defendants. Pl. Mem. at 12. Focus makes this argument in response to a contention to the contrary by defendants' damages expert Graham Rogers. Def. Ex. 32 ("Rogers Report") ¶¶ 65–66. Defendants do not make any attempt to defend this position in their briefs, however, other than to make the blanket assertion that it is premature for the court to consider damages. Def. Mem. at 43–44. The cited paragraphs of the Rogers Report, as its author all but admits, *see* Rogers Report ¶ 67, are bald legal argument and entitled to no deference. Nevertheless, to avoid follow-on litigation on this issue, the Court addresses it here. Focus's position is clearly correct.

"[A]n exclusive licensee may sue on a patent, if the patent owner is joined as a party." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 956 (Fed. Cir. 2006); *see also, e.g.*, *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367–68 (Fed. Cir. 2008), *mandate recalled and modified to include additional instructions on remand*, 557 F.3d 1377 (Fed. Cir. 2009); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202–03 (Fed. Cir. 2005); *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995). "To be an exclusive licensee for standing purposes, a party must have received[] not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468–69 (1926)). By contrast, "[i]f the party has not received an express or implied promise of exclusivity under the patent, *i.e.*, the right to exclude others from making, using, or selling the

29

patented invention, the party has a 'bare license,' and has received only the patentee's promise that that party will not be sued for infringement." *Id.*; *Mars, Inc.*, 527 F.3d at 1368.

Here, patent holder ZDG has given an exclusive license to the relevant intellectual property to HSNA, which has in turn given an exclusive license to Focus. *See* Pl. Ex. 31 at 9–10; Pl. Ex. 42 ¶ 3; FAC ¶ 45. Focus is an exclusive licensee as described in *Rite-Hite Corp.*, 56 F.3d at 1552, and all three entities—ZDG, HSNA, and Focus—are parties to this lawsuit. Focus is therefore entitled to seek damages for any violations of the patents found by this Court.

### 2.    Focus's Remaining Summary Judgment Damages Claims

Finally, Focus moves for summary judgment on some, but not all, of its damages claims. It is the Court's considered judgment that such an exploration of damages is premature. Liability is far from resolved. In addition to the several issues identified in this Opinion as presenting disputes of material fact, there exist additional claims and counterclaims for which neither party has sought summary judgment.

For substantially similar reasons, the Court also holds Focus's motion to preclude—a motion focused solely on damages evidence—in abeyance. The Court is hopeful that the guidance in this Opinion will provide a basis for renewed settlement talks between the parties. And even if such discussions are ultimately unsuccessful, it is nevertheless prudent to resolve all issues of liability before turning time and attention to damages disputes, and to address all issues concerning damages at one time.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the parties' cross-motions for summary judgment, as follows:

30

Appx110

- Plaintiffs' First Cause of Action:
  - Alleged infringement of the '248 utility patent: Summary judgment granted as to "approximately horizontal" component of Claim 1;

  - Alleged infringement of the '609 utility patent: Summary judgment granted as to "projecting edge" and "next to said slit" components of Claim 1;

  - Alleged infringement of the '088 utility patent: Summary judgment granted as to "projecting edge" component of Claim 1;

  - Alleged infringement of the Design Patent: Not before the Court;

- Plaintiffs' Second Cause of Action:
  - Alleged infringement of the HOOKLESS® trademark: Not before the Court;

  - Alleged infringement of the EZ ON trademark: Not before the Court;

  - Alleged infringement of plaintiffs' trade dress, as specified in this Opinion: Summary judgment denied;

- Plaintiffs' Third Cause of Action: Not before the Court;

- Plaintiffs' motion for partial summary judgment on damages: Denied without prejudice;

- Defendant Kartri's First Counterclaim alleging tortious interference and monopolization: Dismissed;

- Defendant Marquis's First Counterclaim alleging non-infringement of the '248, '609, and '088 utility patents: Summary judgment denied;

- Defendant Marquis's First Counterclaim alleging non-infringement of the '078 design patent: Not before the Court;

- Defendant Marquis's Second Counterclaim alleging non-infringement of the HOOKLESS® trademark: Not before the Court;

- Defendant Marquis's Second Counterclaim alleging non-infringement of the EZ ON trademark: Summary judgment denied;

- Defendant Marquis's Second Counterclaim alleging non-infringement of plaintiffs' trade dress, as specified in this Opinion: Summary judgment granted;

- Defendant Marquis's Third Counterclaim alleging patent invalidity for alleged lack of inventorship: Dismissed on consent;

31

Appx111

- Defendant Marquis's Fourth Counterclaim alleging invalidity of the '248 utility patent: Dismissed;

- Defendant Marquis's Fifth Counterclaim alleging invalidity of the '609 utility patent: Dismissed;

- Defendant Marquis's Sixth Counterclaim alleging invalidity of the '088 utility patent: Dismissed;

- Defendant Marquis's Seventh Counterclaim alleging invalidity of the '078 design patent: Not before the Court;

- Defendant Marquis's Eighth Counterclaim for patent misuse: Dismissed;

- Defendant Marquis's Ninth Counterclaim alleging invalidity of the EZ ON trademark: Summary judgment denied;

- Defendant Marquis's Tenth Counterclaim alleging invalidity of the HOOKLESS® trademark: Dismissed; and

- Defendant Marquis's Eleventh Counterclaim alleging invalidity of plaintiffs' trade dress, as specified in this Opinion: Summary judgment granted.

Barring settlement, this case will now proceed towards trial on the remaining claims. The Court is also today issuing an order referring this case, for settlement purposes only, to the Honorable Stewart D. Aaron, United States Magistrate Judge. The Court directs counsel, promptly, to jointly contact Judge Aaron's chambers to arrange for a settlement conference. Within two weeks of the completion of the settlement conference, the parties are directed to file a letter notifying the Court of the same and, if necessary, outlining the remaining issues to be decided. If necessary, the Court will then set a schedule requiring submissions of a Joint Pretrial Order and the other required pretrial filings set forth in the Court's Individual Rules.

The Court respectfully directs the Clerk of Court to terminate the motion pending at docket 243.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 16, 2020
       New York, New York

33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS
SYSTEMS OF NORTH AMERICA, INC., SURE FIT
HOME PRODUCTS, LLC, SURE FITE HOME DÉCOR
HOLDINGS CORP., and SF HOME DÉCOR, LLC,

                                    Plaintiffs,

                        -v-

KARTRI SALES COMPANY, INC., and MARQUIS
MILLS, INTERNATIONAL, INC.,

                                    Defendants.

15 Civ. 10154 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

Before the Court is defendants' motion for partial reconsideration of its April 16, 2020

summary judgment decision, Dkt. 297 ("MSJ Op."). Dkt. 300 ("MTR"). For the following

reasons, the motion is denied.

Defendants' motion is governed by Federal Rule of Civil Procedure 59(e) and S.D.N.Y.

Local Civil Rule 6.3. District courts "ha[ve] broad discretion in determining whether to grant a

motion [for reconsideration]." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).

"Reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality

and conservation of scarce judicial resources. Accordingly, the Second Circuit has held that the

standard for granting a motion to reconsider 'is strict, and reconsideration will generally be

denied unless the moving party can point to controlling decisions or data that the court

overlooked—matters, in other words, that might reasonably be expected to alter the conclusion

reached by the court.'" *Coventry Capital US LLC v. EEA Life Settlements Inc.*, No. 17 Civ. 7417

(VM), 2020 WL 638524, at *4 (S.D.N.Y. Feb. 11, 2020) (quoting *Shrader v. CSX Transp., Inc.*,

70 F.3d 255, 257 (2d Cir. 1995)).

"The major grounds for justifying reconsideration are 'an intervening change in controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice.'" *In re Pishevar*, No. 19 Misc. 503 (JGK) (SDA), 2020 WL 1862586, at *2 (S.D.N.Y.

Apr. 14, 2020) (quoting *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560

(S.D.N.Y. 2011)); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255

(2d Cir. 1992); *King Cty. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 317, 319–20

(S.D.N.Y. 2012). "A [m]otion to [r]econsider, therefore, is not a motion in which a movant may

reargue those issues already considered when a party does not like the way the original motion

was resolved . . . . Local Rule 6.3 should be narrowly construed and strictly applied to avoid

repetitive arguments already submitted to the Court." *Evolution Fast Food Gen. P'ship v.

HVFG, LLC*, No. 15 Civ. 6624 (DAB), 2018 WL 1779377, at *2 (S.D.N.Y. Mar. 28, 2018)

(internal quotation marks and citations omitted); *see also Lichtenberg v. Besicorp Grp. Inc.*,

28 F. App'x. 73, 75 (2d Cir. 2002); *In re GE Sec. Litig.*, 856 F. Supp. 2d 645, 651–52 (S.D.N.Y.

2012).

The Court assumes the parties' familiarity with the issues in this litigation and its

summary judgment decision. Defendants raise three broad arguments in their motion. First, they

challenge the Court's finding with regard to the '248 utility patent. MTR at 2–5. Second, they

challenge the Court's findings regarding the '088 and '609 utility patents. *Id.* at 5–6. Finally,

they argue that ownership of the EZ On mark, as between plaintiffs and non-party Carnation,

must be resolved before litigation in this litigation can continue. *Id.* at 6–8.

2

Defendants' first argument is a recapitulation of their efforts to rely on the Court's *Markman* decision, and statements made by the Court during the *Markman* hearing, to argue that the claim term "approximately horizontal" cannot embody the relevant component of their shower curtain ring design. The Court considered, and rejected, this argument for the detailed reasons given in its summary judgment decision. *See* MSJ Op. at 11–13. Defendants' other arguments regarding the '248 utility patent are similarly unavailing. They track the same arguments made by defendants in their summary judgment briefs. They amount to no more than a bid to "reargue those issues already considered when a party does not like the way the original motion was resolved." *Evolution Fast Food Gen. P'ship*, 2018 WL 1779377, at *2. The Court carefully considered, and rejected on the merits, each of these arguments. Because defendants' offer no "intervening change in controlling law," "availability of new evidence," or "clear error" resulting in a "manifest injustice," the Court denies defendants' motion for reconsideration as to the '248 utility patent. *See Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255.

Defendants' second set of arguments, regarding the '609 and '088 utility patents, is equally unavailing. As to these utility patents, defendants argue that the Court's ruling is inconsistent with its construction in its *Markman* decision of the term "projecting edge" and "next to said slit." *See* MSJ Op. at 14–15. Here, too, defendants' argument is a summary of the same argument by defendants that the Court carefully considered and rejected on the merits at summary judgment. For those same reasons, the Court denies defendants' motion for reconsideration as to the '609 and '088 utility patents.

Finally, defendants ask for reconsideration as to a portion of the Court's ruling regarding the disputed EZ ON mark. As to this claim, the Court denied defendants' motion for summary judgment, finding that materially disputed facts needed to be resolved by a fact finder. *See* MJ

3

Op. at 22–23. In their instant motion, defendants now argue that "the true ownership of the EZ On mark should be resolved prior to proceeding to trial in this matter," "out of an abundance of fundamental fairness." MTR at 7. Defendants therefore ask the Court to allow "[p]laintiffs and Carnation to resolve the ownership" of the EZ ON mark as between them before the issue of defendants' alleged infringement of the mark is litigated before this Court. *Id.* at 8.

The relief that defendants now seek as to the EZ On mark goes beyond the matters litigated at summary judgment. In its decision, the Court merely held that plaintiffs had carried their burden of showing that factual questions prevented a definitive pretrial resolution of the issue of infringement of the EZ ON mark. Defendants' motion for reconsideration does not challenge this holding or its premise. Defendants' motion does not, for example, identify an intervening change in controlling law, new evidence, or a clear error that makes clear that there was in fact no material dispute of fact preventing resolution on summary judgment of plaintiffs' claim of infringement of the EZ ON mark. On the contrary, defendants—in ostensibly seeking reconsideration—appear to acknowledge the Court's recognition of disputed facts regarding infringement. Because defendants do not challenge the court's limited finding as to the EZ ON mark, to wit, that disputes of material fact prevent summary judgment as to infringement, their motion for reconsideration of this issue is denied. To the extent that defendants renew their arguments as to ownership and standing, that issue will be resolved at trial, at which both parties will have the burden of showing that they have standing to assert their respective affirmative claims. There may also be a proper place for motions *in limine* bearing on the litigation of this claim, but any such motions are premature pending the parties' settlement conference with Judge Aaron and subsequent submission of a joint pretrial order.

For the foregoing reasons, defendants' motion for reconsideration is denied in its entirety.

The Court respectfully directs the Clerk of Court to terminate the motion pending at docket 300.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 4, 2020
       New York, New York

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS
SYSTEMS OF NORTH AMERICA, INC., SURE FIT
HOME PRODUCTS, LLC, SURE FITE HOME DÉCOR
HOLDINGS CORP., and SF HOME DÉCOR, LLC,

                                        Plaintiffs,

                    -v-

KARTRI SALES COMPANY, INC., and MARQUIS
MILLS, INTERNATIONAL, INC.,

                                        Defendants.

15 Civ. 10154 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs have moved, *see* Dkt. 303 ("MTR"), for clarification and partial reconsideration of the Court's April 16, 2020 summary judgment decision, *see* Dkt. 297 ("MSJ Op."). The Court assumes familiarity with that decision and the broader history of this litigation. Plaintiffs' motion addresses two discrete points.

First, plaintiffs seek clarification that the Court's rulings equate to a finding that summary judgment is merited for them as to their claims of infringement of the three utility patents. That is correct. The Court held that defendants' products had infringed on these patents—the '248, '609, and '88 patents—as a matter of law, and denied the defendants' mirror-image counterclaims for declaratory relief. MSJ Op. at 10–15. The Court also denied defendants' motion for summary judgment on these claims, based on the defense that the patents were invalid, finding that defense meritless. *Id.* at 16, 30, 32. There are no remaining matters to be resolved related to the claims of infringement of the utility patents. Plaintiffs are thus correct

that these patents were infringed as a matter of law, and are entitled to summary judgment on those claims.

Second, as discussed in the body of this decision, plaintiffs seek reconsideration of the Court's decision *sua sponte* to enter summary judgment for defendants on plaintiff's trade dress infringement claim. Plaintiffs claimed to have trade dress rights in the visual appearance of shower curtains sold under their Hookless® brand, and that defendants had infringed their trade dress by copying the visual appearance of those shower curtains. MSJ Op. at 4–5. They thus moved for summary judgment on these claims. *Id.* The Court, however, noting that product designs that are generic—*i.e.*, "those that refer to the genus of which the particular product is a species"—are ineligible for protection, found plaintiffs' trade dress generic. *Id.* at 26–27 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001)). It accordingly entered summary judgment against plaintiffs' trade dress infringement claim. *Id.* In seeking reconsideration, plaintiffs note that defendants did not raise the defense of genericism, and that reconsideration on that point would enable the plaintiffs to be heard on that claim.

For the reasons that follow, plaintiffs are correct that reconsideration of this ruling is in order. On reconsideration, the Court is persuaded that it has not been established that plaintiffs' trade dress is generic. However, the Court cannot find that plaintiffs are entitled to summary judgment motion on their claims for trade dress infringement. That claim is instead properly left to resolution at trial.

## I.    Motion to Reconsider

Plaintiffs' motion for reconsideration is governed by Federal Rule of Civil Procedure 59(e) and S.D.N.Y. Local Civil Rule 6.3. District courts "ha[ve] broad discretion in determining whether to grant a motion [for reconsideration]." *Baker v. Dorfman*, 239 F.3d 415, 427

2

(2d Cir. 2000). A motion to reconsider "is not a motion in which a movant may reargue those

issues already considered when a party does not like the way the original motion was resolved."

*Evolution Fast Food Gen. P'ship v. HVFG, LLC*, No. 15 Civ. 6624 (DAB), 2018 WL 1779377,

at *2 (S.D.N.Y. Mar. 28, 2018) (internal quotation marks omitted). "The major grounds for

justifying reconsideration are 'an intervening change in controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice.'" *In re Pishevar*,

No. 19 Misc. 503 (JGK) (SDA), 2020 WL 1862586, at *2 (S.D.N.Y. Apr. 14, 2020) (quoting

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560 (S.D.N.Y. 2011)).

Here, plaintiffs argued at summary judgment that defendants had infringed both their

trademark and trade dress. The Court held that plaintiffs' trade dress was generic and thus

ineligible for protection. MSJ Op. at 27. The Court therefore did not reach plaintiffs' claims that

their trade dress was infringed. As plaintiffs note in pursuing reconsideration, although the

defendants argued that the trademark Hookless® was generic, they did not argue that plaintiffs'

trade dress was generic. Because the defendants never raised trade dress genericism in their

summary judgment arguments, the plaintiffs never had occasion to respond on that point. That

supplies good cause for reconsideration. "While a district court may grant a motion for summary

judgment 'on grounds not raised by a party,' it must first 'giv[e] notice and a reasonable time to

respond.'" *Lawson v. Homenuk*, 710 F. App'x 460, 466 (2d Cir. 2017) (summary order)

(alteration in original) (quoting Fed. R. Civ. P. 56(f)). The Court did not give plaintiffs such

notice. Accordingly, reconsideration of its ruling on genericism is merited. The Court therefore

vacates that holding. *See ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 523 (2d Cir. 2018)

("The Supreme Court has emphasized that prior notice is a prerequisite to a *sua sponte* grant of

summary judgment."). And the Court considers anew plaintiffs' motion for summary judgment

Appx121

on their claim of trade dress infringement, and whether defendants merit summary judgment on that claim based on the alleged genericism of plaintiffs' trade dress.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### III.    Trade Dress Infringement

Plaintiffs claimed to have trade dress rights in the visual appearance of shower curtains sold under their Hookless® brand, and that the defendants infringed on this trade dress in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  MSJ Op. at 4.  "Trade dress" includes the "design and appearance of the product . . . and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995).  "In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods.'" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (alterations in original) (quoting 15 U.S.C. § 1125(a)).

In determining whether a particular trade dress is protectable, the Second Circuit instructs that a "helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products." *Jeffrey Milstein, Inc.*, 58 F.3d at 32–33.  However, "[t]here is no question that trade dress may protect the 'overall look' of a product." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381–82 (2d Cir. 1997).  The "use of a product or package design that is so similar to that of another producer that it is likely to confuse purchasers as to the product's source may constitute 'false designation of origin.'" *Id.* (quoting *Inwood Lab'ys., Inc. v. Ives Lab'ys., Inc.*, 456 U.S. 844, 863 (1982) (White, J., concurring)).

5

To succeed on a claim of trade dress infringement involving the appearance of a product, a plaintiff must (1) offer a "precise expression of the character and scope of the claimed trade dress," and establish that: (2) the claimed trade dress is nonfunctional; (3) the claimed trade dress has acquired secondary meaning; and (4) there is a likelihood of confusion between the plaintiffs' and the defendant's products. *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599 (RWS), 2012 WL 3240442, at *3 (S.D.N.Y. Aug. 7, 2012); *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (summary order).

As to the first element, plaintiffs have asserted trade dress rights solely in its product design: to wit, shower curtains which, *inter alia*: (1) lack hooks; and (2) have a row of rings, possessing slits or gaps, fixed in place along the upper portion of the curtain that is "essentially co-planar with the material of the shower curtain." Dkt. 148 (Fourth Amended Complaint, "FAC") ¶ 104; MSJ Op. at 26. Plaintiffs argue that the combination of these elements gives rise to the "visual appearance of an essentially 'neat' and 'orderly'" shower curtain. MSJ Op. at 4 (quoting FAC ¶ 104). The Court has found that this specification of the elements of plaintiffs' trade dress supplies the required "precise expression." *See* Dkt. 71 ("MTD Tr.") at 27; MSJ Op. at 25 (holding plaintiff had "'recite[d] in specific detail the geometric and aesthetic characteristics' of its trade dress in a manner that is 'sufficiently precise'" (quoting MTD. Tr. at 28)). The Court does not have good reason to revisit that holding now.

The Court thus turns to the remaining three factors. Importantly, even where a plaintiff makes a showing of these factors, such a showing is "insufficient to protect product designs that are overbroad or 'generic.'" *Yurman Design, Inc.*, 262 F.3d at 115. The Court thus examines first whether plaintiffs have established these three factors, and then whether they have shown that their trade dress is not generic.

6

### A.      Nonfunctional

As to the nonfunctionality element, "[i]n general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (alteration in original) (quotations omitted).  The Second Circuit has stated that "[t]rade dress is functional, and thus not protectable, when it is 'essential to the use or purpose of the article.'" *Cartier, Inc. v. Scardell Jewelry, Inc.*, 294 F. App'x 615, 620 (2d Cir. 2008) (summary order) (quoting *Yurman Design*, 262 F.3d at 116).  However, even where a design "operate[s] to perform a function, the trade dress is not 'functional' [if] there are many alternative designs that could perform the same function." *Id.* at 621.

Here, as the Court found at the motion to dismiss stage, "a neat and orderly appearance is in no way essential to the functional purpose[s] of [a] shower curtain: protecting privacy and preventing water from spraying outside the shower area.  An alternative design—*e.g.*, one involving hooks—could certainly perform the same functions."  MTD Tr. at 18 (alterations in original) (quotations and citations omitted).  Plaintiffs have since demonstrated the availability of alternative designs to theirs, thus showing that protection of their hookless trade dress would not bar competitors from using hooked curtains, or all possible alternative hook-free designs.  *See, e.g.*, Dkt. 243 ("Pl. MSJ"), Ex. 22 ¶ 69 ("[A]lternative designs, such as one involving hooks, could certainly perform the same functions").  Nothing in defendants' summary judgment materials has indicated the contrary: either that a shower curtain has a different "functional purpose" or that there is no alternative design that could perform the same function.

In response, defendants instead argue that trade dress can also be functional "if the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage."

Dkt. 253 ("Def. MSJ Mem.") at 33, 40 & n.12 (citing *Yurman Design*, 262 F.3d at 116). But defendants have not shown that exclusive use of the trade dress would put competitors at a significant non-reputation-related disadvantage, such as because the trade dress "is essential to the use or purpose of the device or when it affects the cost or quality of the device," *TrafFix Devices*, 532 U.S. at 33. Defendants have not pointed to any admissible evidence demonstrating this claimed "disadvantage." Accordingly, because plaintiffs have adduced sufficient evidence to establish this element, and defendants have failed to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment," *Jaramillo*, 536 F.3d at 145, plaintiffs have established this element of trade dress infringement.

### B.    Secondary Meaning

To protect their trade dress, plaintiffs must also show that the dress has a secondary meaning, also known as acquired distinctiveness. A product has secondary meaning when, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Yurman Design, Inc.*, 262 F.3d at 115 (quoting *Samara Bros.*, 529 U.S. at 211). The Court considers six factors to determine whether secondary meaning has attached: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Mana Prod., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995).

Here, plaintiffs have adduced admissible evidence, including through expert testimony, of a number of these factors. As to the first, they have persuasively shown their substantial advertising expenditures. *See, e.g.*, Pl. MSJ, Ex. 23 ¶ 31 ("[O]ver more than twenty years, Plaintiffs, directly or through their licensee(s) and/or predecessors, have expended at least

Appx126

hundreds of thousands, or millions of dollars in advertising their products and their associated

trade dress, including, but not limited to, marketing and advertising their products at trade shows

throughout the country, extensive marketing on QVC, internet marketing on YouTube . . . .").

As to the third, they have adduced evidence that their "trade dress has also been the subject of

industry awards, including, for example, awards on QVC for Best New Product, and awards at

trade shows." *Id.* ¶ 34.  As to the fourth, plaintiffs have demonstrated that they have achieved

substantial sales success in selling their product for a number of years.  *See id.* ¶ 36.  ("Plaintiffs

have had sales of many millions of dollars in shower curtain products bearing Plaintiffs' trade

dress and trademark."); *id.* ¶ 41 ("[P]laintiffs have for a period of over twenty years,

continuously, exclusively, and extensively, used their trade dress in interstate commerce.").  And

as to the fifth, plaintiffs have presented expert testimony that their trade dress has "been the

subject of numerous attempts by third parties to plagiarize the same." *Id.* ¶ 38.  Defendants do

not contest the evidence as to these factors.  *See* Dkt. 288 ("Def. MSJ Reply") at 50–51.

Defendants instead oppose a finding of secondary meaning on two grounds.  First, they

argue that "[a]dvertising may not support secondary meaning where the promotional material

does not use the design alone, but instead [does so] with other marks." *Id.* at 12–13 (citing *LVL*

*XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 656 (S.D.N.Y. 2016),

*aff'd*, 720 F. App'x. 24 (2d Cir. 2017) (summary order)).  But this case is easily distinguished

from the case, before this Court, from which that proposition is derived.  At issue in *LVL XIII*

*Brands* were luxury sneakers.  The plaintiff pursuing a finding of secondary meaning had "not

established that any of its promotional materials called attention *to the [metal toe plate*

*characteristic of its sneaker]* as an indication of source." *LVL XIII Brands*, 209 F. Supp. 3d 612

at 655 (citations omitted).  "To the contrary," the Court found, LVL XIII failed to identify a

9

single article that discussed the toe plate or distinguished it from other elements of the sneaker design, such as the "LVL XIII" inscription. *Id.* at 656. Thus, the plaintiff had relied on promotional materials to support its claim that the metal toe plate feature had acquired a secondary meaning, but those materials were not focused at all on the toe plate component of the design at issue. This case is quite different. Although plaintiffs use the trade dress and Hookless® mark together, the word mark is descriptive of the very trade dress in the pictures. Unlike in *LVL XIII*, plaintiffs are not attempting to capitalize on attention paid to their product that is independent of the feature over which they claim trade dress.

Second, defendants dispute plaintiffs' showing of secondary meaning on the ground that plaintiffs have not presented consumer surveys linking the trade dress to a particular source. Def. MSJ Reply at 13; Dkt. 305 ("MTR Opp'n") at 14–15. That argument has more traction as a basis for denying plaintiffs' motion for summary judgment. Although no one factor is necessary to establish secondary meaning, evidence of consumer perceptions linking the mark to their source is indeed often an important, if not a decisive, means by which secondary meaning is established. *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) ("In assessing the existence of secondary meaning, no 'single factor is determinative,' and every element need not be proved." (citation omitted)). The Second Circuit has emphasized that to prove secondary meaning, a plaintiff must show "that in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Cartier, Inc.*, 294 F. App'x at 617 (quoting *Yurman Design, Inc.*, 262 F.3d at 115). To do this, "consumer surveys have been consistently cited as the most persuasive evidence of secondary meaning. And, in a borderline case where it is not at all obvious that [a] designation has been used as a mark, survey evidence may be necessary to prove trademark perception."

10

Appx128

*LVL XIII Brands*, 209 F. Supp. 3d 612 (alteration in original) (quotations and citations omitted); *see also Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 534–35 (S.D.N.Y. 2002) (where the plaintiff "chose not to offer into evidence[] any consumer surveys . . . demonstrating the requisite link in the minds of consumers," despite three other factors weighing in plaintiffs' favor, the court was "most persuaded by the evidence it has not seen: direct survey evidence," and therefore found that the plaintiff failed to meet "its burden of demonstrating by a preponderance of the evidence" that the marks acquired a secondary meaning).

Plaintiffs here elected not to come forth with evidence of any consumer surveys. But they argue that they have other evidence of how consumers perceive their trade dress. They point, largely, to the deposition testimony of Patricia Kubus, Vice President and President of Sales of defendant Kartri Sales Company, Inc. ("Kartri"), admitting that buyers seek "hookless-style shower curtains," and often do so by pointing to pictures from Focus' own website. Pl. MSJ at 11 (citing *id.*, Ex. 29 at 4–6). Kubus's testimony, plaintiffs argue, evinces consumer recognition of the acquired meaning associated with plaintiffs' hookless shower curtains.

The Court agrees that plaintiffs have adduced sufficient evidence on which a finder of fact could find secondary meaning. But this evidence is far from conclusive on the point. A reasonable juror could also discount Kubus's non-expert testimony as non-systematic, isolated, and personal—and thus far less reliable and probative than a well-drawn survey. Accordingly, with the record lacking more solid evidence that, as to the trade dress at issue, the "public [views] the primary significance of the mark [as] to identify the source of the product rather than the product itself," *Cartier, Inc.*, 294 F. App'x at 617 (quotations omitted), the Court finds that a reasonable factfinder could resolve this element either way. Viewing the evidence "in the light most favorable" to defendants, *Holcomb*, 521 F.3d at 132, there is a genuine dispute whether

11

plaintiffs' trade dress carries a secondary meaning.  Plaintiffs therefore are not entitled to summary judgment on that claim.

### C.    Likelihood of Confusion

The final factor, "likelihood of confusion," in the context of trade dress, "is determined by the multi-factor test set out in *Polaroid Corp. v. Polarad Elecs. Corp.*"  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001) (citing 287 F.2d 492, 495 (2d Cir. 1961)).  These factors include:

> the strength of [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap [between the two products], actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* (alterations in original) (quoting *Polaroid Corp.*, 287 F.2d at 495).  In denying defendants' motion to dismiss, the Court found that the plaintiffs had adequately pled a likelihood of confusion as to their trade dress in alleging that: (1) there is successful use of their trade dress in commerce; (2) there is a high degree of similarity between plaintiffs' trade dress and defendants' infringing trade dress; (3) there is no gap between plaintiffs' and defendants' products because they both market shower curtains; and (4) defendants acted in bad faith in adopting the infringing trade dress.  MTD Tr. at 26–27.

In moving for summary judgment, plaintiffs pointed to evidence supporting each of these points.  To show the use of their trade dress in commerce, plaintiffs adduced evidence of sales of "many millions of dollars in shower curtain products bearing Plaintiffs' trade dress."  Pl. MSJ, Ex. 23 ¶¶ 35–37 ("Plaintiffs' shower curtain products . . . [are] the leading shower curtain in the hospitality industry (*e.g.*, hotels and motels) throughout the U.S.").  To show the high degree of similarity between plaintiffs' trade dress and defendants' alleged infringing dress, plaintiffs'

12

expert pointed to examples, including the product that plaintiffs license to Carnation. *See*, *id.*

¶¶ 52–56 (comparison of Defendants' accused design to Carnation product). Plaintiffs also

adduced evidence that defendants' products are within the scope of plaintiffs' trade dress, as both

products are "sold by the same distributors . . . at comparable price-points (approximately $12–$35),

and to largely the same target markets (hospitality buyers, distributors, retailers, and/or online)."

*Id.* ¶ 60. Finally, plaintiffs have adduced evidence that, on several occasions, defendant Kartri's

employees have recommended their Ezy-Hang shower curtains to customers who ask about

plaintiffs' Hookless® shower curtain. *Id.* ¶¶ 63–64, 69–72; Pl. MSJ at 11.

This assembled proof is certainly sufficient to establish that defendants' products pose a

likelihood of confusion with plaintiffs' trade dress. However, on plaintiffs' motion for summary

judgment, the evidence must be viewed in the light most favorable to the defendants. So viewing

plaintiffs' evidence, the Court cannot find it conclusive as to likelihood of confusion. A jury

could find plaintiffs' evidence, which lacks survey support or numerous examples of confusion,

too episodic and limited to carry the day. And there are also, at a minimum, genuine issues of

material fact as to whether defendants acted in bad faith in adopting their trade dress. Resolution

at trial is therefore necessary on this claim. *See Akiro LLC v. House of Cheatham, Inc.*, 946 F.

Supp. 2d 324, 340 (S.D.N.Y. 2013) (concluding that case must proceed to trial as to likelihood of

consumer confusion element, and noting that "issues of good faith are generally ill-suited for

disposition on summary judgment" (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d

Cir. 1991))); *see also Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996)

(noting that although survey evidence is not strictly required, "the absence of surveys is evidence

that actual confusion cannot be shown").

Appx131

Accordingly, the Court denies plaintiffs' motion for summary judgment on its claim of trade dress infringement.

**D.    Genericism**

In arguing that the Court should decline to revisit its grant of summary judgment on grounds of genericism, defendants note that even if plaintiffs had proven that the dress had a secondary meaning, "a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic'—'those that refe[r] to the genus of which the particular product is a species.'" *Yurman Design, Inc.*, 262 F.3d at 115 (alteration in original) (quoting *Jeffrey Milstein*, 58 F.3d at 32, 33); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–69 (1992); MTR Opp'n at 8–9. That is correct. But, on considered review, defendants have not established that plaintiffs' hookless curtains are generic, so as to entitle defendants to summary judgment on plaintiffs' trade dress infringement claims. This issue, too, requires resolution by the trier of fact.

The governing principles are important to articulate. Because "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves," courts "accord protection to [trade dress that] consumers are likely to rely upon in distinguishing goods, while denying protection that would hamper efforts to market competitive goods." *Landscape Forms, Inc.*, 113 F.3d at 380. Courts "exercise particular caution when extending protection to product designs." *Yurman Design, Inc.*, 262 F.3d at 114 (quotations omitted). Thus, "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein, Inc.*, 58 F.3d at 32; *see also Samara Bros.*, 529 U.S. at 213 ("[A]lmost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is

14

intended not to identify the source, but to render the product itself more useful or more appealing."). In "[d]rawing the line between 'ideas' or 'concepts' on the one hand and 'concrete expressions' on the other," the Second Circuit instructs that a "helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products." *Jeffrey Milstein, Inc.*, 58 F.3d at 33; *see, e.g.*, *Hartford House Ltd. v. Hallmark Cards Inc.*, 846 F.2d 1268, 1274 (10th Cir. 1988) ("Blue Mountain has not been granted exclusive rights in an artistic style or in some concept, idea, or theme of expression. Rather, it is Blue Mountain's specific artistic expression, in combination with other features to produce an overall Blue Mountain look, that is being protected." (footnote omitted)).

Here, to demonstrate that plaintiffs' trade dress is generic, defendants must show that plaintiffs' trade dress became generic by the time defendants entered the market. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 744 (2d Cir. 1998). One way defendants could so establish would be through evidence that another product that included the features of plaintiffs' trade dress was being sold as of the date when defendants began their alleged infringement. Defendants argue that they have done so here, via evidence of a generic shower curtain that was then for sale. *See, e.g.*, MTR Opp'n at 11 (citing Def. MSJ Mem., Exs. 25, 31 (showing that shower curtains with attached rings similar to plaintiffs' were sold in Walmart as generic, *i.e.*, unbranded, curtains)). But the exhibits to which defendants point fall short because they do not show that these generic shower curtains were sold as of the date defendants began their infringement. The only date displayed on the exhibit is April 16, 2019, some four years into this litigation. Defendants also point to other exhibits that do not establish,

15

Appx133

either, that such goods were sold before the date of infringement. *See* Def. MSJ Mem., Ex. 26.
Defendants' proof falls far short of establishing the lack of material fact as to genericism.

There may, however, be a sufficient basis on which a jury could find genericism.
"[T]rade dress cannot qualify for trade dress protection [when a plaintiff] is effectively seeking
protection for an idea or concept." *Jeffrey Milstein, Inc.*, 58 F.3d at 33. And, as the Court
explained in its decision, the first manufacturer to create a shower curtain with hooks could not
have claimed trade dress protection for all such shower curtains. Rather, a trade dress described
as consisting solely of shower curtains with hooks would simply refer to the genus of which the
particular product is a species. MSJ Op. at 25 (citing *Yurman Design, Inc.*, 262 F.3d at 115).
Plaintiffs, in their motion to reconsider, do not clearly show why the parallel as to hookless
shower curtains is not also true. In the Court's judgment, neither side has made a convincing and
secure showing on this issue sufficient to merit summary judgment.

In so holding, the Court is unpersuaded by plaintiffs' argument that hookless shower
curtains are by nature incapable of being found generic. Plaintiffs admit that "overextension of
trade dress protection can undermine restrictions in copyright and patent law that are designed to
avoid monopolization of products and ideas." MTR at 17 (quoting *Landscape Forms*, 113 F.3d
at 380). But, they argue, protecting their hookless-shower-curtain trade dress will not
"risk . . . stifling competitors' efforts to market similar goods" because there are potential
alternative designs for no-hook-type shower curtains. *Id.* at 17–19; *id.*, Exs. 1–7. While the
Court found that evidence persuasive in finding that plaintiff's trade dress was nonfunctional, *see*
*supra* p. 7, that evidence does not necessarily denote plaintiffs' hookless shower curtain as not
generic. *See Jeffrey Milstein, Inc.*, 58 F.3d at 32 ("[N]either does trade dress law protect an idea,
a concept, or a generalized type of appearance."). Most of the patents and proposed alternative

16

Appx134

hookless shower curtains to which plaintiffs point do not appear to have ever been sold; and as to the one such product which demonstrably has been on the market, plaintiffs admit that it is a "factual question" whether that product has been a "success." Dkt. 308 ("MTR Reply") at 7. On the sparse record at hand, neither party has convincingly established whether plaintiffs' hookless shower curtain is or is not generic. That issue, too, will be resolved at trial.

## CONCLUSION

For the foregoing reasons, the Court denies plaintiffs' and defendants' summary judgment motions on trade dress infringement. The Court does, however, clarify that, based on the rulings in its April 16, 2020 decision, plaintiffs are entitled to summary judgment on their claims of infringement of their three utility patents.

Barring settlement, the remaining claims in this long-running case will now proceed to trial. The Court directs the parties to promptly meet and confer in an attempt to resolve their differences. The Court directs counsel to submit a joint letter, due January 19, 2021, (1) stating whether they have been able to resolve this matter, and (2) if not, proposing a date no later than February 19, 2021 for the submission of the parties' joint pretrial order and the accompanying required pretrial submissions, as set out in the Court's Individual Rules.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 303. SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 4, 2021
       New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FOCUS PRODUCTS GROUP
INTERNATIONAL, LLC, *et al.*,

                    Plaintiffs,

          v.                              15 CV 10154 (PAE)

KARTRI SALES COMPANY, INC. and
MARQUIS MILLS INTERNATIONAL,
INC.,

                    Defendants.                   Conference
------------------------------x
                                        New York, N.Y.
                                        August 5, 2021
                                        3:00 p.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                        District Judge


                         APPEARANCES

GOLDBERG COHEN LLP
     Attorneys for Plaintiffs
BY:  MORRIS E. COHEN
     LEE A. GOLDBERG

BERNHARD P. MOLLDREM (by phone)
ANGELA FOSTER (by phone)
     Attorneys for Defendant Kartri Sales Company, Inc.

DONALD J. COX, JR. (by phone)
     Attorney for Defendant Marquis Mills International, Inc.



Also Present:  Michelle Young (by phone)

Appx136

1          (Case called)

2          MR. COHEN:  For the plaintiffs, Morris E. Cohen.  I'm

3    joined by my partner, Lee Goldberg.

4          THE COURT:  Good afternoon, Mr. Cohen.  Good

5    afternoon, Mr. Goldberg.  Nice to see you again.  You may be

6    seated.

7          Whom do I have by phone for the defendant Kartri?

8          MR. MOLLDREM:  Bernhard Molldrem here.

9          THE COURT:  Good afternoon, Mr. Molldrem.

10         MS. FOSTER:  Angela Foster.

11         THE COURT:  Good afternoon, Ms. Foster.

12         Who do I have for the defendant Marquis Mills

13   International, Inc.?

14         MR. COX:  Donald Cox, your Honor.

15         THE COURT:  Good afternoon, Mr. Cox.

16         MR. COHEN:  Your Honor, before we start, I was

17   wondering if Michelle Young could join by phone, the general

18   counsel for the plaintiff Sure Fit.

19         THE COURT:  I'm happy to have that person.  That

20   person is just not on my appearance sheet.  Who is that?

21         MR. COHEN:  Michelle Young.  We had e-mailed her name

22   yesterday.

23         THE COURT:  Ms. Young is the general counsel of Focus?

24         MR. COHEN:  Focus, which is now Sure Fit, correct.

25   It's also a named plaintiff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx137

1          THE COURT:  Welcome to Ms. Young.

2          Counsel, I am going to resolve a number of the pending

3   motions *in limin*e.  I am going to been with a brief summary of

4   where the case stands and then turn to those rulings.  I am not

5   going to issue a written decision on these points.  I will

6   simply issue a bottom-line ruling reflecting that I have

7   resolved those motions in a bench ruling.  So, counsel, if the

8   Court's reasoning in these decisions matters to you, you will

9   need to order the transcript.  I will note at the outset that

10  among the tidal wave of motions *in limin*e that have been filed,

11  I have chosen to tackle at the start those brought by Focus.

12  Those, I determined, are generally the more consequential of

13  the pending motions.  My hope is that with my having resolved

14  these motions and thereby clarified the nature of, and the many

15  rules of engagement at, the upcoming trial, that will

16  facilitate a renewal of the parties' settlement discussions.  I

17  would ordinarily have waited to issue this ruling until I had

18  resolved the defense motions as well, but there is an element

19  of time urgency for me to communicate these outcomes now.  That

20  is because, under the district's protocols for jury trials

21  during COVID, each district court's applications for trial

22  spots for the fourth quarter of 2021 are due in mid-August, a

23  week from Friday.  Resolving as many motions as I could by then

24  and thereby giving all of us a clearer picture of the trial's

25  length will enable the Court to put in for a trial date during

Appx138

1    the fourth quarter in a way that is more fully informed.  That

2    is why I could not accommodate counsel's otherwise reasonable

3    request to defer this conference until later in August.  In the

4    event that there is not a forthcoming settlement, I will, of

5    course, turn shortly to the other pending motions *in limine*,

6    those filed by the defense.

7            By way of background, plaintiffs, whom I am going to

8    refer to as Focus for short, filed this lawsuit in December

9    2015.  Since then, the Court has denied a motion to dismiss and

10   held a *Markman* hearing and, after extensive discovery, the

11   Court resolved cross-motions for summary judgment.  Parts of

12   three causes of action remain to be resolved at trial and,

13   again, subject to the COVID-era protocols for selecting trials,

14   will proceed to trial soon, hopefully this fall.

15           In Count I, Focus alleges infringement of three

16   utility patents -- '248, '609, and '88, and a related design

17   patent, in violation of Title 35, United States Code, Section

18   271.  The only remaining issues relating to the utility patent

19   are as to damages.  *See* docket 297, the first summary judgment

20   opinion, at pages 1, 30, and 31; *see also* docket 312, the

21   summary judgment reconsideration opinion, at page 1; and *see*

22   *also* docket 323, the joint pretrial order, at pages 3-7.  In

23   Count II, Focus alleges infringement and unfair competition of

24   two different trademarks, "HOOKLESS" and "EZ ON," and also

25   alleges trade dress infringement and unfair competition, in

Appx139

1   violation of Section 43(a) of the Lanham Act, 15, United States

2   Code, Section 1125(a).  In Count III, Focus alleges unfair

3   competition, in violation of New York common law.  I note that

4   in the first summary judgment opinion at page 31.

5          On January 4 of this year, 2021, the Court set a

6   schedule for pretrial submissions.  On April 15, Focus filed

7   five motions *in limin*e.  Those are at dockets 324-28.  Kartri,

8   one of the defendants, filed 12 motions *in limin*e, which are

9   contained at various points between dockets 330 and 344.

10  Defendant Marquis Mills International, Inc., which I'll call

11  Marquis, filed three motions *in limin*e only, dockets 338, 340,

12  and 342.

13         As I said earlier, because of the limited space for

14  jury selection in the district during the COVID-19 pandemic and

15  because a limited number of courtrooms have been reconfigured

16  for trials to be held consistent with social distancing, the

17  district has implemented a centralized calendaring system.  I

18  have got to put in dates for any requested trials in the fourth

19  of this year by August 13, and that is why I asked my law clerk

20  to reach out to you about your availability in the fourth

21  quarter.  Thank you for responding with those dates so quickly.

22  You are busy people.  That much I learned, at least, from the

23  submissions.  Those will help guide me in what I put in for.

24         At the end of this ruling I am also going to ask you a

25  few questions about what the impact of the rulings that I've

Appx140

1   issued is as to the length of trial and the need, perhaps, for

2   certain personnel to appear at it.  To the extent that such

3   personnel's availability or not may limit my range of motion in

4   scheduling, it's going to be useful for me to put that question

5   to you.

6          In any event, I will make my submission to the central

7   authority, which sounds Orwellian, doesn't it, as to trial

8   dates soon.  As soon as I've heard from them what date we are

9   allotted, I will let you know.  The odds are high that whatever

10  date we are given we will not be batting first, but batting

11  second or third.

12         That being said, my experience so far during the

13  pandemic is that cases are really settling or pleading with

14  some dispatch -- Steve, the court reporter, knows better than I

15  and is nodding -- so even if we are in a secondary or worse

16  position for any given date, the operating assumption has to be

17  that you are likely to go to trial or have the opportunity to

18  on that date.

19         On now to the rulings on the motions *in limine*.

20         Focus' first motion at docket 324, which I will Focus

21  New MIL 1, relates exclusively to damages.  It argues that the

22  defendants have violated Federal Rule of Civil Procedure 26's

23  mandatory disclosure requirement first by failing to produce

24  documents subject to automatic initial disclosure rules, and

25  later by failing to supplement and correct the disclosures they

Appx141

1   made.  These documents include financial evidence relating to

2   defendants' costs and revenue in connection with defendants'

3   allegedly infringing product.

4          Focus moves, under Federal Rule of Civil Procedure 37,

5   which permits courts to impose sanctions for violations of Rule

6   26.  It seeks to preclude defendants from introducing at trial

7   the damages evidence that was not disclosed during fact

8   discovery and upon which defendants' expert intends to rely at

9   trial.  I note that this is Focus' second motion to preclude

10  along these lines.  Focus' first such motion to preclude was

11  filed in March 2019.  *See* docket 246, which I will refer to as

12  Focus Original MIL 1.  The Court held that motion in abeyance

13  in its first summary judgment opinion at page 30.

14         For the following reasons, the Court now holds that

15  the defendants are precluded from introducing at trial any

16  evidence related to damages that was not disclosed during fact

17  discovery, and precludes the defendants' damages expert from

18  referring to or relying on such materials in trial testimony.

19         Briefly, the history of the discovery dispute at issue

20  is as follows.  On July 29, 2016, Focus served defendants with

21  discovery requests.  These sought, in large measure, financial

22  information, including data as to defendants' "revenue,

23  expenses, and profits derived, from defendants' sale of said

24  accused products, from inception of sales through the present."

25  *See* Focus Original MIL 1 at page 5.  Focus specifically

1   requested: "All manufacturing costs per unit on an itemized

2   basis, the selling costs per unit, the amount of gross profit

3   and net profit realized per unit, and other expenses which in

4   any way include or relate to sale of the accused products."

5          *Id.*, Exhibit 6 at page 2.

6          Focus argues, and defendants do not deny, that

7   defendants did not produce in full the requested documents.

8   *See* docket 246 at page 5.

9          On September 27, 2016, Focus served defendants with

10  interrogatories.  These again requested, for each of the

11  defendants' products, total sales revenue by year "from

12  inception of sales through to the present."  I'm quoting Focus'

13  Original MIL 1, Exhibit 7, at 2 and 6.  That is interrogatory

14  No. 7.  They all sought "all relevant data pertaining to those

15  profits . . . and alleged costs" *Id.* (Interrogatory No. 9).

16  Although defendants did produce some summary sales figures,

17  Focus determined that defendants had failed to provide full

18  sales information, such as cost and product descriptions.  To

19  address defendants' noncompliance, Magistrate Judge Ellis held

20  a telephone conference on May 17, 2017 with counsel.  Docket

21  235.  On June 14, 2017, defendants agreed, and indeed

22  Magistrate Judge Ellis ordered them, to supplement their

23  discovery, including with "any documents that need to be

24  produced in response to the interrogatories."  Docket 114.

25          In January 2019, more than three years into this

1    litigation and after Focus had submitted its expert report on

2    damages based on the data produced by defendants during fact

3    discovery, defendants came forward with additional raw

4    financial data.  This had not yet been previously disclosed to

5    Focus.  Defendants, however, furnished the new data to their

6    damages expert, Graham Rogers, on January 26-27.  I'm citing

7    Focus' Original MIL 1, Exhibit 30, which is the Rogers depo, at

8    pages 24 and 52.  But even after providing the evidence to

9    Rogers, defendants failed to immediately turn over the

10    previously-undisclosed material to Focus.  Focus only

11    discovered its existence, and that it had been produced to

12    Rogers, during Focus' deposition of Rogers, which took place on

13    February 21, 2019.  I'm citing docket 274 at page 6.

14            Turning to Rule 26, Rule 26(a) requires that a party

15    turn over either a "copy or a description by category and

16    location, of all documents . . . the disclosing party has in

17    its possession, custody, or control and may use to support its

18    claims or defenses."  Rule 26(e), in turn, requires the

19    disclosing party to supplement its disclosures and response "in

20    a timely manner if the party learns that in some material

21    respect the disclosure or response is incomplete or incorrect."

22    This includes information in an expert report and "information

23    given during the expert's deposition."

24            Tellingly, defendants do not squarely deny that,

25    during fact discovery, they possessed the documents and data at

1    issue.  Instead, defendants argue that "costs information was

2    not *readily* available on a spreadsheet, on June 7, 2017."

3    Citing docket 254, the defendants' MIL 1 original opposition at

4    page 6.  But, even if the defendants did not have the

5    information available to them on a spreadsheet, they do not

6    deny that they did possess or had access to the material during

7    fact discovery, and therefore could have communicated it, in

8    either document or disclosure form, to Focus.  As Focus stated

9    in its reply in support of its motions *in limine* on page 5,

10   "defendants provide no factual declarations averring that the

11   requested information was unavailable when it was requested, or

12   when Magistrate Judge Ellis ordered its production."  Citing

13   docket 383, Focus' new reply memo at page 5.

14           The record instead clearly reveals the defendants had

15   the cost information available during fact discovery and chose

16   not to turn it over.  Fact discovery closed on December 31,

17   2018.  Defendants admit that just a few weeks later, when their

18   expert, Rogers, requested the material in January 2019, the

19   defendants produced the previously undisclosed material to

20   Rogers within 3-4 days.  *See* Focus New MIL 1 at 4; Rogers depo

21   at 22-24.  But defendants did not then turn over that evidence

22   to Focus, even though at that point it was without a doubt in

23   their possession.  It was not until Rogers' deposition on

24   February 21, 2019 that Focus learned of the undisclosed

25   evidence.  Only when Focus, having learned of this material,

1   asked the defendants for it, did defendants do so.  *Id.*

2          For these reasons, the Court finds that defendants had

3   access to financial evidence during fact discovery, which they

4   did not disclose until well after fact discovery closed and

5   well after Magistrate Judge Ellis ordered them to comply with

6   Rule 26.  Defendants admit this latter point.  In their

7   opposition to Focus' original motion *in limine* on this issue,

8   at page 14, defendants admit that they made a "submission of

9   [this] evidence 28 days after the close of fact discovery."

10  Nor do the defendants dispute that their expert witness relied

11  on this material.  During Rogers' deposition, citing here

12  docket 246, Exhibit 30, page 53, he testified:  "Once I found

13  out that [the undisclosed materials] were considered more

14  accurate, I went with these."

15         The final question in the Rule 26(a) analysis is

16  whether these documents "may be used to support defendants'

17  claims or defenses."  Here, too, there is no dispute.

18  Defendants state that they intend to do so viewing the

19  belatedly produced evidence as "critical to this case" and

20  "important to the ultimate truth of this case."  Citing

21  defendants' MIL 1 original opposition at 15.

22         The Court accordingly holds that because defendants

23  failed to timely produce documents that were in their

24  possession which defendants propose to use in support of their

25  claims and defenses, including in connection with the provided

1  testimony of their expert witness, defendants violated Rule 26.

2          I now turn to the remedy for this violation, which is

3  governed by Rule 37, which serves to assure compliance with

4  Rule 26's mandatory disclosure requirements.

5          Rule 37(c)(1) provides:  "If a party fails to provide

6  information . . . as required by Rule 26(a) or (e), the party

7  is not allowed to use that information . . . at a trial unless

8  the failure was substantially justified or is harmless."

9          The Second Circuit has instructed that the

10  discretionary decision whether to preclude evidence under Rule

11  37 should be guided by four factors:  "(1) a party's

12  explanation for the failure to comply with the federal rules,

13  (2) the importance of the evidence (3) the prejudice suffered

14  by the opposing party as a result of having to prepare to meet

15  the new evidence, and (4) the possibility of a continuance."

16  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir.

17  2006).  The Court will address each factor in turn.

18          The first issue is whether defendants have shown that

19  their conduct was "substantially justified or" was harmless.

20  They have not.  As a Court in this district has stated:

21  "Substantial justification may be demonstrated where there is

22  justification to a degree that could satisfy a reasonable

23  person that parties could differ as to whether the party was

24  required to comply with the disclosure request, or if there

25  exists a genuine dispute concerning compliance."  Citing

Appx147

1    *Ritchie Risk-linked Strategies Trading (Ireland), Ltd. v.*

2    *Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012).  The

3    *Ritchie* court further explained:  "The party that fails to

4    comply with Rule 26(a) or (e) bears the burden of proving both

5    that its noncompliance was substantially justified and that it

6    was harmless."

7         Here, defendants attempt to justify their lapses by

8    arguing that "there is no showing that defendants' actions were

9    willful."  Defendant MIL 1 original Opp. at 14.  But even if

10   defendants' failures were not the product of bad faith but

11   merely sustained sloppiness and ignorance, such would fail to

12   provide a justification for the defendants' actions, which is

13   the focus of this factor.  As an aside, I do note that there

14   have been actions by defendants during this litigation that

15   have indicated bad faith.  I will address that later.  But to

16   order preclusion a court need not find bad faith, as the Second

17   Circuit has noted.  *Design Strategy*, 469 F.3d at 296.

18        As to the first factor, justification, defendants also

19   claim to have "provided the additional financial information as

20   soon as defendants were aware."  Docket 366, Defendants' New

21   Opp., at 6.  That is simply false.  The record demonstrates

22   that defendants provided the information to their expert a

23   month before they gave it to Focus and that it was not

24   defendants' initiative to provide it to Focus.  They did so

25   only after Focus, having ascertained during Rogers' deposition

Appx148

1    that defendants had provided him with information that Focus

2    had never been given, demanded such information.  Bottom line

3    as to factor 1:  Defendants have failed to come forward with

4    any justification, let alone a substantial one, for failing to

5    timely turn over the historical records and data as to cost and

6    the like that are at issue here.

7          The next factor is the importance of the evidence that

8    defendants withheld.  All agree that the withheld evidence, if

9    credited, would be important in tabulating damages.  Defendants

10   state that the evidence they long withheld is "critical" and

11   "important to the ultimate truth of this case."  Defendants'

12   MIL 1 Original Opp. at 15.

13         The third factor inquires whether plaintiffs suffered

14   prejudice as a result of the failure of disclosure.  That is

15   clearly so.  The undisclosed information bears on plaintiffs'

16   damages, insofar as the fuller portrait of defendants' costs

17   yielded by the belatedly produced information would tend to

18   offset damages from the defendants' infringement.  Here,

19   because defendants did not disclose this information until

20   after the deposition of defendants' damages expert during

21   expert discovery, Focus was badly stymied in multiple respects.

22   Focus did not have an opportunity to follow up by propounding

23   additional fact discovery as to these financial data points.

24   Focus did not have the opportunity to question defendants' fact

25   witnesses about this new information.  Focus did not have an

Appx149

 1   opportunity to integrate this new information, once factually

 2   vetted, in its own expert's report, which instead could not and

 3   did not take defendants' late-disclosed costs into account; and

 4   Focus did not have an informed opportunity to examine

 5   defendants' damages expert about such information, insofar as

 6   it became known only in the course of that deposition.  In sum,

 7   Focus has been left unable to verify the accuracy and

 8   completeness of defendants' raw financial data, or investigate

 9   related lines of defense.

10        Consistent with defendants' characterization of the

11   evidence as critical, it follows that Focus has been severely

12   prejudiced by the failure to timely produce this material.

13   Focus has been unable to verify or investigate this

14   information, to depose witnesses about it, or to integrate it,

15   once carefully vetted, into its expert's report.  Focus instead

16   built its case around the more limited discovery as to defense

17   costs and the like that was timely produced.  Allowing

18   defendants at trial to exploit this material, which was

19   unjustifiably withheld for so long despite a magistrate judge's

20   order to defendants to get their discovery house in order,

21   would cause Focus unfair prejudice.

22        The final issue is the possibility of a continuance.

23   The only way to avoid prejudice to plaintiffs would be to grant

24   a continuance and reopen discovery.  That is not realistic.

25   Here, fact discovery, as well as expert discovery, would have

Appx150

1    to be very substantially reopened.  And doing so would create

2    unfair prejudice of its own.  It would cost the parties time

3    and money and distraction.  It would require junking and

4    redoing lots of work.  This case has been ongoing since 2015.

5    As this Court has already stated, on November 15, 2018, after

6    the Court granted the parties' joint application for an

7    extension of fact and expert discovery deadlines, neither

8    deadline would again be extended.  *See* docket 213.  This case,

9    while complex in certain respects, has been ongoing for a long

10   time.  Focus is entitled to take its case on the remaining

11   claims to trial without further delay.

12           Important, too, there is a context for this most

13   recent discovery lapse.  Throughout the past nearly six years

14   of this litigation, defendants have repeatedly disregarded this

15   Court's rules.  That was reflected in the need for Magistrate

16   Judge Ellis to take defendants to task for their delinquent

17   discovery.  More recently, in connection with summary judgment,

18   this Court state noted in its first opinion on page 2 that

19   defendants' "Rule 56.1 statement and response persistently

20   fails to conform to the local rules and lacks citations to the

21   record"; the Court noted that the defense filings are

22   "maddeningly incomprehensible," making them "particularly

23   unhelpful to the Court."  Citing docket 297 at page 2, note 1.

24   The Court also noted that defense counsel has "broken just

25   about every relevant rule (individual, local, and common sense)

1    concerning how facts should be presented in its moving papers."

2    *Id.* And, in the Court's ruling this past May, denying

3    defendants' 11th hour attempt to raise an utterly meritless

4    defense, the Court regretfully noted that the defendants had

5    "utterly failed to explain their abject failure to raise

6    certain defenses until the 11th hour," even though they "had

7    three years after the patent assignment was publicly recorded .

8    . . to raise defenses based on it." Docket 365 at 5.

9         Plaintiffs have demanded a timely trial. The Court

10   will not reward defendants' failure to comply with discovery

11   obligations with a lengthy and costly continuance.

12        The outcome of this motion *in limin*e should by now be

13   clear. As numerous other courts in this district have done,

14   the Court precludes all evidence that defendants failed to

15   timely produce during discovery. Defendants' experts are also

16   precluded from referring to or relying on such materials at

17   trial. As examples of rulings effecting similar relief, I

18   would draw your attention to, for example, *Richmond v. General*

19   *Nutrition Centers, Inc.*, 2012 WL 762307, at page 8 (S.D.N.Y.

20   March 9, 2012), where this Court precluded the use at trial of

21   documents relating to damages not produced during discovery,

22   *Unicorn Crowdfunding, Inc., v. New Street Enterprises*, 507

23   F.Supp. 3d 547, 572 (S.D.N.Y. 2020), where Judge Berman

24   precluded use of documents at trial where the defendant did

25   "not offer any explanation for why it did not produce those

1    documents during discovery"; *Douglas v. Victor Capital Group*,

2    1997 WL 716912 at page 2 (S.D.N.Y. Nov. 17, 1997), where

3    Magistrate Judge Peck stated:  "Since the document was

4    requested but not produced in discovery, plaintiff is precluded

5    from using the return receipt card on the summary judgment

6    motion or at trial"; *Texaco A/S S.A. v. Commercial Insurance*

7    *Company of Newark, New Jersey*, 1996 WL 603915, at page 1

8    (S.D.N.Y. Oct. 21, 1996), where the Court "emphatically

9    declined to consider those documents Texaco now submits that it

10   did not produce to defendants during discovery."  That ends the

11   discussion of this motion.

12        Focus' second motion *in limine*, at docket 325, moves

13   to preclude defendants from raising certain defenses that

14   defendants identified in the joint pretrial order at docket

15   323.  I will address each in turn.  At the start, however, I

16   will take up broader legal points that apply to a number of

17   these defenses.

18        Specifically, the Court holds that all affirmative

19   defenses that were not timely raised, and here there are some

20   that defendants failed to raise not only at the pleading stage,

21   but during discovery and summary judgment as well, have been

22   forfeited.  There is abundant authority for doing so.  See, for

23   example, *Foster v. Lee*, 93 F.Supp. 3d, 223, at 229 (S.D.N.Y.

24   2015), where the court recited the familiar principle that

25   "failure to plead an affirmative defense ordinarily results in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx153

1  forfeiture of that defense."  The United States Supreme Court

2  has said the same thing:  "An affirmative defense, once

3  forfeited, is excluded from the case."  *Wood v. Milyard*, 566

4  U.S. 463, 470 (2012).

5        Here, most of the potential defenses that the

6  plaintiffs seek to preclude in this motion were not timely

7  raised.  In particular, where defendants have not denied in

8  their opposition to the second motion *in limine* that they

9  failed to raise these defenses at a prior stage in the

10  litigation, the Court accepts Focus' representation that the

11  defendants in fact failed to timely raise the defenses at

12  issue.  It is, after all, black letter law that "a plaintiff

13  effectively concedes a defendant's arguments by his failure to

14  respond to them."  *See Felski v. Hischmann*, No. 10 CV 8899

15  (RMB), 2012 WL 716632 at page 3 (S.D.N.Y. Mar. 1, 2012).  The

16  same, of course, is true in reverse.  A defendant similarly

17  concedes a point in plaintiffs' argument by a failure to

18  respond to it.

19        Focus asks the Court to preclude defendants'

20  anticipate argument that "profit disgorgement and last profits

21  are not appropriate or available as plaintiffs do not sell a

22  competing product covered by the patents in suit; rather, Focus

23  sells a noninfringing alternative product among other issues."

24  Joint pretrial order at 11.  Focus states that the defendants

25  failed to raise this defense in their pleadings; defendants do

1  not deny this in their opposition.  Thus, this defense is

2  precluded.  *See* docket 381 at pages 2-3.

3       In addition, to the extent this defense was envisioned

4  as to the utility patents, the Court precludes it as now

5  irrelevant.  That is because whether Focus' product is

6  "covered" by the patent relates at most to infringement, that

7  is, to liability, not damages.  And in the Court's summary

8  judgment reconsideration opinion, on page 1, the Court held

9  that "there are no remaining matters to be resolved related to

10  the claims of infringement of the utility patents."

11       Focus next asks the Court to preclude defendants'

12  anticipated argument that Focus' trade dress is functional, a

13  defense which defendants imply they will raise.  *See* joint

14  pretrial order at 9.  The Court grants this motion, too.  As

15  the Court recently reiterated in rejecting defendants' motion

16  for reconsideration of aspects of its summary judgment

17  decision, Focus has shown nonfunctionality.  The Court

18  explained there:  Because plaintiffs have adduced sufficient

19  evidence to establish nonfunctionality, and defendants have

20  failed to come forward with admissible evidence sufficient to

21  raise a genuine issue of fact for trial in order to avoid

22  summary judgment, plaintiffs have established this element of

23  trade dress infringement.

24       Docket 312, at 8.

25       Next, Focus asks the Court to preclude defendants'

1    anticipated argument that Focus' trademarks and trade dress do

2    not have secondary meaning because they failed to mark their

3    products with source-identifying information.  *See* joint

4    pretrial order at 9.  The Court already has ruled that there is

5    a triable issue about whether Focus' trade dress for its shower

6    curtains sold under the HOOKLESS registered mark carries a

7    secondary meaning.  *See* summary judgment reconsideration

8    opinion, docket 312 at pages 2 and 11-12.  However, in this

9    motion, Focus appears to be asking that defendants be precluded

10   not from making the broad argument that there is no secondary

11   meaning, but from making the narrower one that there is no

12   secondary meaning specifically because Focus failed to mark its

13   products in this fashion.

14        It is unclear to the Court whether the defendants are

15   indeed planning on presenting such a defense at trial.  If they

16   are, they are directed to submit to the Court a two-page letter

17   saying so and pointing to case law supporting this point.  Any

18   such letter is due August 12.  If the defendants do file such a

19   letter, Focus' response is due one week later, on August 19.

20   The Court does not authorize a reply.  If the defendants do not

21   timely file such a letter, the defense will be held forfeited.

22        Focus next asks the Court to preclude defendants'

23   anticipated argument that Focus' registered "HOOKLESS"

24   trademark is generic.  *See* joint pretrial order at 8.  The

25   Court has previously held that both defendants are precluded

Appx156

1  from raising this defense.  As the Court stated in its first

2  summary judgment opinion, Marquis lacks standing to raise this

3  defense since Focus does not accuse Marquis of HOOKLESS R

4  trademark infringement.  *See* docket 297 at 20.  Nor can Kartri

5  raise this claim at trial because Kartri neither asserted the

6  alleged invalidity of the HOOKLESS R mark as an affirmative

7  defense nor included it as a counterclaim.  Kartri thus has

8  already forfeited it.

9          Focus next asks the Court to preclude defendants'

10  anticipated argument that plaintiffs' trade dress is generic.

11  See joint pretrial order at 9.  The Court, in its summary

12  judgment reconsideration opinion, held that the question of

13  whether Focus' hookless curtains are generic requires

14  resolution by the trier of fact.  *See* docket 312 at 14.  Thus,

15  as a general matter, the defendants are allowed to make this

16  argument at trial.  However, in attempting to prove genericism

17  at trial, the defendants can rely only on evidence that was

18  produced during discovery.  The Court will not permit

19  defendants to offer evidence that was not previously disclosed.

20          Focus next asks the Court to preclude defendants'

21  anticipated argument that defendants have been engaging in

22  "noninfringing fair use" of the HOOKLESS trademark and trade

23  dress.  This is a statutory affirmative defense under the

24  Lanham Act.  As Judge Daniels has explained, "Section 33(b) of

25  the Lanham Act provides an affirmative defense to a claim of

1  trademark infringement where the use of the name charged to be

2  an infringement is a use, otherwise than as a mark, which is

3  descriptive of and used fairly and in good faith only to

4  describe the goods or services of such party, or their

5  geographic origin." Citing *Disney Enterprises, Inc., v.*

6  *Sarelli*, 322 F.Supp. 3d 413, 430 (S.D.N.Y. 2018). Here,

7  however, defendants failed to raise this affirmative defense in

8  their pleadings, or indeed through summary judgment. It is

9  thus forfeited.

10        Focus next asserts that defendants apparently intend

11  to argue that, as a matter of law, Focus' trade dress

12  definition must be "recited in plaintiffs' business records,"

13  and because it has not been, Focus' trade dress rights are

14  invalid. Focus MIL 2 at 13. In the joint pretrial order, at

15  11-12, the defendants do indeed state that Focus' "trade dress

16  is invalid for failure to comply with one or more of the

17  requirements for common law rights and infringement, including"

18  because "there are no business records establishing or

19  acknowledging ownership, licensing rights, advertising to

20  establish secondary meaning and goodwill in the trade dress

21  definition." Focus counters that "there is no legal

22  requirement that the definition of the trade dress be recited

23  in plaintiffs' business records." *See* docket 325 at 13. Focus

24  is right. Defendants have not provided any support for their

25  legal claim in their opposition. They have not identified any

1   statute or case law requiring a plaintiff to produce business

2   records establishing a trade dress definition.  Nor has the

3   Court found any.  Accordingly, the Court precludes any such

4   argument, insofar as there is no legal basis for one.

5          Focus next asks the Court to preclude defendants'

6   argument that defendants cannot be found to have infringed on

7   the EZ ON trademark and trade dress rights because Focus lacks

8   standing to allege infringement and failed to join an

9   indispensable party, Carnation.  These claims appear to be

10  based on defendants' argument that Focus does not own the EZ ON

11  trademark, as stated in the joint pretrial order at 9.

12  Specifically, defendants argue that Focus lost ownership when

13  Carnation registered the trademark in its own name and then

14  failed to assign it to Focus.  The only dispute appears to be

15  whether Carnation's trademark application for the EZ ON

16  trademark falls within the scope of the agreement.  That

17  specific issue is a triable one reserved for the jury.  It,

18  thus, is not precluded.  *See* first summary judgment opposition

19  at page 22.

20         Focus next asks the Court to preclude defendants'

21  argument that Focus' filing of a terminal disclaimer in the

22  patent office limits Focus from collecting damages.  Focus

23  makes this request because in the joint pretrial order, on page

24  11, defendants state that "the damages period is limited by

25  laches and equitable estoppel running from the bad-faith late

1    filing of terminal disclaimer in the U.S. Patent and Trademark

2    Office altering the perceived scope of the patents in suit."

3    However, as Focus stated in its motion, in their pleadings,

4    neither defendant raised a "terminal disclaimer" defense. *See*

5    docket 150 and 151.  And defendants, in opposing this motion *in*

6    *limin*e, do not contest that they failed to timely raise this

7    terminal disclaimer defense.  See docket 381.  Accordingly,

8    this argument is forfeited and precluded at trial.

9            Focus next asks the Court to preclude defendants'

10   argument that Focus' damages are limited by the Smallest

11   Salable Patent Practicing Unit (SSPPU) doctrine.  Focus argues

12   that this defense was forfeited because it was first raised

13   only in defendants' rebuttal expert report and thus was not

14   timely disclosed to plaintiffs' expert.  The defendants respond

15   by arguing that this point was "fully developed in defendants'

16   motion to exclude testimony of John Elmore, the plaintiffs'

17   expert, docket 342, as well as the report of John Elmore,

18   docket 243-26."  Docket 381 at 2.  The Court, however, has

19   reviewed those exhibits and did not find any portions of those

20   materials that appropriately preserve that argument.  But the

21   defendants' larger issue is that they failed to point to any

22   part of the record demonstrating that they timely disclosed

23   this defense, and in particular, at a time when the plaintiffs'

24   expert would be able to respond.  Conceivably, I have missed

25   something, and so I will permit defendants, by the close of

Appx160

1    business tomorrow, to submit a letter that cites by docket,

2    page, and line number filings demonstrating that the defense

3    was timely preserved.  Otherwise, though, it is forfeited.

4            Finally, Focus asks the Court to preclude defendants

5    from raising any additional defenses that defendants did not

6    list in the joint pretrial order.  This part of the motion I

7    grant as well.  Defendants are barred from raising any

8    affirmative defenses that were not previously raised.  As the

9    Second Circuit stated in *National Market Share, Inc., v.*

10   *Sterling National Bank*, 392 F.3d 520, 526 (2d Cir. 2004),

11   "generally a failure to plead an affirmative defense results in

12   a waiver."  Because the defendants have demonstrated an

13   intention to continue to pursue untimely and indeed some

14   explicitly precluded defenses, the Court admonishes defendants

15   to carefully measure their trial defenses so as to assure that

16   any defense they intend to raise at trial was previously timely

17   raised.  The Court admonishes defendants that any attempt

18   before the jury to inject defenses that the Court has now

19   precluded, or that defendants later conjure that were not pled,

20   will merit a rebuke in front of the jury.  Defendants'

21   continued attempts to raise defenses and make arguments that

22   have already been forfeited or rejected has wasted counsel and

23   the Court's time.  The Court will not allow the defendants to

24   reprise such conduct before the jury.

25            That ends that set of motions.  I am going to take a

1   ten-minute comfort break for everybody's benefit.  When I

2   resume, I'll resolve the *Daubert* motion.  Thank you.  See you

3   in ten minutes.

4          (Recess)

5          THE COURT:  Welcome back, counsel.  Be seated.

6          I see that plaintiffs' counsel are still here.  Let me

7   just confirm with Kartri.

8          Mr. Molldrem, are you still there?

9          MR. MOLLDREM:  I am, sir.

10          THE COURT:  Ms. Foster?

11          MS. FOSTER:  Yes, I am.

12          THE COURT:  Mr. Cox.

13          MR. COX:  Yes, your Honor.

14          THE COURT:  Let me resume.

15          In their third motion *in limine*, docket 326, Focus

16   asks the Court to preclude the report and testimony of

17   defendants' expert witness, Paul Hatch, in its entirety

18   pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S.

19   579 (1993).  Defendants have retained Hatch as an expert to

20   address, as to plaintiffs' remaining claims, "trademark and

21   trade dress issues, including ownership and right to use,

22   distinctiveness as to the source, a/k/a secondary meaning, and

23   likelihood of confusion."  See docket 380.  Defendant's MIL 3

24   Opp. at page 2-3.  Defendants expect Hatch to testify about the

25   similarities between defendants' mark, EZY HANG and Focus'

1    mark, EZ ON, and to further testify about defendants' use of

2    the word "Hookless" and Focus' HOOKLESS registered mark.  *Id.*

3    Specifically, Hatch proposes to opine about "how the particular

4    purchaser or ordinary observer would answer questions raised in

5    the examination of trademarks and trade dress claims."  Docket

6    326-3, the Hatch report at page 2.  This testimony, Hatch

7    states, would be based on Hatch's understanding of "how a

8    person who purchased a particular product perceives and

9    appreciates the visual appearance." *Id.*  This "understanding"

10   on his part, Hatch states was through his work, "as a designer

11   and managing teams of designers." *Id.*

12          The Second Circuit explained in *United States v. Pryor*

13   that the latitude Federal Rule of Evidence 702 provides for the

14   opinion testimony of an expert witness is available "so long as

15   the witness is qualified as an expert and (1) the testimony is

16   based on sufficient facts or data, (2) the testimony is the

17   product of reliable principles and methods, and (3) the expert

18   has reliably applied the principles and methods to the facts of

19   the case."  474 Fed. App'x 831, 834 (2d Cir. 2012) (quoting

20   Federal Rule of Evidence 702).  Critically, the Supreme Court

21   has instructed district courts, in resolving *Daubert* motions

22   addressed to these gating requirements, to "make sure that an

23   expert, whether basing testimony upon professional studies or

24   personal experience, employs in the courtroom the same level of

25   intellectual rigor that characterizes the practice of an expert

1   in the relevant field." *Kumho Tire Co v. Carmichael*, 526 U.S.

2   137, 152 (1999).  The standards in resolving *Daubert* motions

3   are very well established.  Rather than recite them at length

4   here, I incorporate by reference my lengthy recap of them in

5   two decisions:  *LVL XIII Brands, Inc., v. Louis Vuitton*

6   *Malletier S.A.*, 209 F.Supp. 3d 612, 636 (S.D.N.Y. 2016),

7   *affirmed sub nom.*, *LVL XIII Brands, Inc., v. Louis Vuitton*

8   *Malletier SA*, 720 Fed. App'x 24 (2d Cir. 2017), and *In re*

9   *Mirena IUS Levonorgestrel-related Products Liability*

10  *Litigation*, 341 F.Supp. 3d 213, 239-242 (S.D.N.Y. 2018).

11        As the Second Circuit reminds us, "the proponent of

12  expert testimony has the burden of establishing by a

13  preponderance of the evidence that the admissibility

14  requirements of Rule 702 are satisfied." *United States v.*

15  *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Here, I find for

16  two distinct and independent reasons that the defendants have

17  failed to meet their burden here.  These are, first, that Hatch

18  is not qualified to offer expert testimony on any topic on

19  which he proposes to opine; and, second, that Hatch's opinions

20  are not based on any reliable methodology.  The Court

21  accordingly grants Focus' motion and precludes Hatch's proposed

22  opinion testimony on each of these grounds.  I will elaborate

23  on each in turn.

24        Rule 702 states that a witness may be "qualified as an

25  expert by knowledge, skill, experience, training, or

Appx164

1  education."  Thus, as the Second Circuit explained in *McCullock*

2  *v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995), even if

3  a proposed expert lacks formal training in a given area, he may

4  still have "practical experience" or "specialized knowledge"

5  that qualifies him to give opinion testimony.  However, as a

6  colleague of mine has explained, "if the witness is relying

7  solely or primarily on experience, then he must explain how

8  that experience leads to the conclusion reached, why that

9  experience is a sufficient basis for the opinion, and how that

10  experience is reliably applied to the facts."  *Pension*

11  *Committee of University of Montreal Pension Plan v. Bank of*

12  *America Securities, LLC*, 691 F.Supp.2d 448, 473, note 148

13  (S.D.N.Y. 2010).  An expert can be "insufficiently qualified"

14  because his "expertise is too general or too deficient."  *Stagl*

15  *v. Delta Airlines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

16          Here, defendants have set out a number of means by

17  which they claim Hatch is qualified to give the testimony he

18  proposes to give.  Hatch holds a B.A. with honors in industrial

19  design from the University of Northumbria at Newcastle in the

20  United Kingdom.  Hatch report at 2.  He is currently the CEO of

21  TEAMS Design USA.  *Id.* at 1.  It is a global product design

22  consultancy that specializes in global product-oriented brand

23  management.  *Id.* at 2.  He has over 25 years of experience

24  designing mass-produced products used in the hospitality

25  industry, including in bathrooms.  *Id.* at 2.  Hatch also owns

1   57 design and utility patents and is a certified expert witness

2   by the Industrial Designers Society of America.  A number of

3   years ago, he attended a two-day course on patent litigation

4   that, among a myriad of topics, discussed trademarks.  *Id.* at

5   3.

6           As I said, under Rule 702, a witness may be "qualified

7   as an expert by knowledge, skill, experience, training, or

8   education."  But defendants here have failed to show that Hatch

9   is qualified by any of these methods to give the testimony he

10  proposes to give.  As to training and education, he has neither

11  sufficient to make him an expert on trademarks or trade dress.

12  Instead, defendants appear to base Hatch's qualifications on

13  his experience designing products and related research.  But,

14  as this Court has said before in the *Louis Vuitton Malletier*

15  case, 209 F.Supp. 3d at 636, where a "witness is relying solely

16  or primarily on experience, then he must explain how that

17  experience leads to the conclusion reached, why that experience

18  is a sufficient basis for the opinion, and how that experience

19  is reliably applied to the facts."  Hatch has failed to do

20  that.

21          I note that defendants state that Hatch was retained

22  to opine on ownership and right to use, secondary meaning, and

23  likelihood of confusion.  However, Hatch's experience does not

24  qualify him to opine on any of these topics; to the extent, I

25  might add, that they are the proper province of a finder of

Appx166

1    fact and not the Court.

2          First, as to ownership and right to use trademarks and

3    trade dress, Hatch has never previously been certified by a

4    Court as an expert on trademark or trade dress.  He has not

5    professed any substantially knowledge, skill, experience, or

6    training as to the pertinent trademark principles, including

7    ownership and right to use.  As demonstrated by his deposition

8    testimony, Hatch does not grasp the principles of Section 43(a)

9    of the Lanham Act and thus the basis for trademark ownership

10   and the right to use.  Hatch's qualifications simply do not

11   indicate that, as to issues related to ownership and right to

12   use, he will be able to "help the trier of fact to understand

13   the evidence or to determine a fact in issue."  Federal Rule of

14   Evidence 702.  And, of course, any testimony he might give as

15   to legal matters is independently out of bounds.  As the Second

16   Circuit stated in Marx & Co., Inc., v. Diners' Club, Inc., 550

17   F.2d 505, 511, (2d Cir. 1977):  "The question of interpretation

18   of the contract is for the jury and the question of legal

19   effect is for the judge.  In neither case do we permit expert

20   testimony."

21         As to secondary meaning, Hatch claims that his

22   expertise derived from his experience as a design consultant

23   supplies a reliable basis for him to opine on consumer

24   perception of products, and specifically a product's secondary

25   meaning.  But his experience does not qualify him to do that

Appx167

1   here.  As this Court synopsized the doctrine in the *Louis*
2   *Vuitton* case:  "Because the primary element of secondary
3   meaning is a mental association in buyers' minds between the
4   alleged mark and a single source of the product, the
5   determination whether a mark or dress has acquired secondary
6   meaning is primarily an empirical inquiry." 209 F.Supp. 3d at
7   638.  Accordingly, courts have long held that consumer surveys
8   are the most persuasive evidence of secondary meaning.  *See,*
9   *for example, Sports Traveler, Inc. v. Advance Magazine*
10  *Publishers, Inc.*, 25 F.Supp.2d 154, 164 (S.D.N.Y. 1998), which
11  state that had "consumer surveys have become the usual way of
12  demonstrating secondary meaning"; and also citing *Ergotron,*
13  *Inc. v. Hergo Ergonomic Support Systems, Inc.*, 1996 WL 143903
14  at page 8 (S.D.N.Y. Mar. 29, 1996), which stated that "a
15  consumer survey is the most persuasive element in demonstrating
16  secondary meaning, because such a survey provides direct
17  evidence."  Thus, as this Court has noted, "the expertise most
18  germane to such a determination involves training or experience
19  performing empirical analyses."  Citing *Louis Vuitton*, 209
20  F.Supp. 3d at 639.
21          As to this critical qualification, Hatch's credentials
22  are woefully deficient.  Defendants have not presented any
23  evidence that Hatch has any experience performing empirical
24  analyses in measuring secondary meaning.
25          To be sure, consumer surveys are not the only form of

1    evidence that may be used to determine secondary meaning.  The

2    Circuit has identified five other potentially relevant factors:

3    (1) advertising expenditures, (2) unsolicited media coverage of

4    the product, (3) sales success, (4) attempts to plagiarize the

5    mark, and (5) length and exclusivity of the mark's use.  *See*

6    *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830

7    F.2d 1217, 1222 (2d Cir. 1987).  But defendants have failed to

8    demonstrate why Hatch's experience makes him particularly

9    qualified to opine on any of these factors either.  Under these

10   circumstances, the Court is simply "not persuaded that Hatch

11   can offer opinion testimony [as to secondary meaning] that is

12   anything other than conjecture."  Citing *Louis Vuitton*

13   *Malletier S.A.*, 209 F.Supp. 3d at 636.  The Court, therefore,

14   determines that Hatch is not qualified to offer expert

15   testimony on this topic.

16        Finally, I turn to likelihood of confusion, the last

17   area on which defendants propose to offer Hatch as an expert.

18   To determine whether there is a likelihood of confusion, the

19   circuit instructs district courts to apply the eight-factor

20   *Polaroid* balancing test developed by Judge Friendly in *Polaroid*

21   *Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.

22   1961).  The factors:  (1) strength of the trademark; (2)

23   similarly of the marks; (3) proximity of the products and their

24   competitiveness with one another; (4) evidence that the senior

25   user may "bridge the gap" by developing a product for sale in

Appx169

 1  the market of the alleged infringer's product; (5) evidence of

 2  actual consumer confusion; (6) evidence that the imitative mark

 3  was adopted in bad faith; (7), respective quality of the

 4  products; and (8) sophistication of consumers in the relevant

 5  market.

 6         Strikingly however, in his report addressing

 7  likelihood of confusion, Hatch failed to consider these factors

 8  at all.  And defendants have failed to explain why Hatch's

 9  qualifications indicate that his opinion on these factors would

10  be any more instructive than the conclusions the jurors

11  themselves can derive from the admissible evidence.  As the

12  Supreme Court stated in General Electric Co. v. Joiner, 522

13  U.S. 136, 146 (1997), "nothing in either *Daubert* or the Federal

14  Rules of Evidence requires a district court to admit opinion

15  evidence that is connected to existing data only by the *ipse*

16  *dixit* of the expert."

17         The Court therefore holds that Hatch is not qualified

18  to offer expert testimony on the trademark and trade dress

19  issues in this case, which are the issues on which Hatch has

20  been propounded as an expert.  I therefore preclude his

21  testimony and report on that basis.

22         There is, however, a separate and independent basis to

23  preclude his testimony.  Hatch's methodology, such as it is, is

24  also not reliable.  I turn now to that point.

25         Under *Daubert*, the Court must ensure that expert

1   testimony "is not even relevant, but reliable," that is, that

2   the proffered testimony is "more than subjective belief or

3   unsupported speculation."  509 U.S. at 589-90.  As the Second

4   Circuit has explained, this "gate-keeping function applies not

5   just to scientific expert testimony, as discussed in *Daubert*,

6   but also to testimony based on technical and other specialized

7   knowledge."  *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91

8   (2d Cir. 2000).

9           In *Daubert*, the Supreme Court set out a list of

10  nonexclusive factors that the Court may consider in determining

11  whether an expert's methodology is reliable.  These are: (1)

12  whether the expert's technique or theory can be or has been

13  tested; (2) whether it has been subjected to peer review and

14  publication; (3) whether there is a high error rate for the

15  expert's technique, and whether there are "standards

16  controlling the technique's operation"; and (4) whether the

17  expert's technique or theory is generally accepted by the

18  relevant scientific community.  *Daubert*, 509 U.S. at 592-94.

19  Further, as this Court has explained, "expert testimony should

20  be excluded if it is speculative or conjectural . . . or where

21  the proffered opinion is based on data, a methodology, or

22  studies that are simply inadequate to support the conclusions

23  reached." Citing the *Louis Vuitton* case, 209 F.Supp. 3d at 644.

24          Hatch states, on page 2 of his report, that his

25  testimony will be based on his understanding of "how a person

Appx171

1    who purchased a particular product perceives and appreciates

2    the visual appearance and/or functional merits of a product's

3    design."  He further states that these understandings on his

4    part are "based on decades of user research and the iterative

5    design of hundreds of products." *Id.*

6         THE WITNESS:  This methodology does not come close to

7    withstanding scrutiny under *Daubert*.  Indeed, it does not

8    satisfy any of the aforementioned *Daubert* factors.

9         First, and most significant, Hatch's methodology has

10   not been and cannot be tested or challenged in any objective

11   sense.  Hatch has not shown that there is any way to replicate

12   or test the methodology that was used to form his opinions.

13   This methodology essentially consists of Hatch's personal

14   journey.  Hatch has thus "made it impossible for a court or

15   adversary to test, or a jury to assess, his methodology, as

16   applied here for veracity and reliability." *Louis Vuitton*, 209

17   F.Supp. 3d at 645.  "For this reason alone, exclusion of

18   [Hatch's] conclusions is mandatory under *Daubert*." *Id.*

19        As to the second factor, Hatch has "never published on

20   the topic of trademark studies or consumer confusion." See

21   Focus MIL 3 at 7.  And defendants have failed to show that the

22   methodology that Hatch intends to use has been subjected to

23   peer review or ever been published.

24        As to the third factor, whether there is a high error

25   rate for the technique, "the Court has not located any prior

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx172

1    occasion on which [Hatch] applied this methodology to assess"

2    likelihood of confusion.  Citing *Louis Vuitton*, 209 F.Supp. 3rd

3    at 646.  And by its nature, it is incapable of being tested for

4    error.  Notably, defendants have not pointed to any "standards

5    controlling the technique's operation," *Daubert* 509 U.S. at

6    592-94.  Defendants thus fail to carry their burden as to this

7    factor as well.

8           Finally, as to the fourth factor, defendants do not

9    even attempt to provide any evidence that Hatch's methodology

10   is recognized by courts or has gained acceptance within the

11   relevant expert community.  Thus, all four *Daubert* factors

12   decisively point toward's precluding Hatch's testimony.

13          To be sure, as Judge Preska has explained, that

14   "testimony is qualitative, rather than quantitative, does not

15   mean that it must be excluded" under *Daubert*.  Citing her

16   decision in a different Louis Vuitton Malletier case, *Louis*

17   *Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp. 3d

18   485, 505 (S.D.N.Y. 2015).  But the Court may not abdicate its

19   gatekeeping function simply because an expert's methodology

20   does not fit neatly into *Daubert*'s four-factor test.  Use of a

21   qualitative or experience-based methodology does not exempt an

22   expert from *Daubert* scrutiny.  *See Kumho Tir*e, 526 U.S. at

23   151-52; and this Court's decision in *Louis Vuitton*, 209 F.Supp.

24   3d at 647, in which the Court synopsized the case law this way:

25   "A vague claim of prior experience cannot salvage an opinion

Appx173

1  that is the product of guesswork.  Otherwise, proffered expert

2  witnesses could easily circumvent the requirements of *Daubert*

3  by resorting to ambiguous claims of past experience."  Omitting

4  various internal quotations.

5          Here the problems with Hatch's methodology go far

6  beyond foregoing any quantitative model.  He has failed

7  entirely to show, as the Second Circuit has held is required, a

8  "sufficiently rigorous analytical connection between [his

9  qualitative] methodology and [his] conclusions."  *Nimely v.*

10  *City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  Hatch has

11  supplied virtually no insight into the considerations that

12  shaped and drove his qualitative analysis.  There is thus no

13  basis to which to hold that his opinions derive from a reliable

14  methodology.  The Court is left instead to assume that they are

15  the product of Hatch's "subjective belief or unsupported

16  speculation." *Daubert*, 509 U.S. at 590.  The Court's role as

17  "gatekeeper" thus requires it to preclude Hatch's testimony.

18  *See Williams*, 506 F.3d at 160.

19          In sum, the Court holds that Hatch's report and

20  testimony are inadmissible for two independent reasons:  Hatch

21  is not qualified to offer the proffered testimony and he did

22  not use a reliable methodology.  The Court, therefore, grant's

23  Focus' motion to preclude Hatch's report and testimony in its

24  entirety.

25          In its fourth motion *in limine*, Focus asks that the

1    Court preclude defendants from introducing evidence at trial,

2    or making arguments, that describe any or all plaintiffs in

3    pejorative or inflammatory terms.  The defendants do not

4    contest this motion.  They state that they "are not planning to

5    present any testimony or exhibits of that sort." Docket 367.

6    The Court expects no less and is confident that all counsel

7    will abide by the decorum required in a federal courtroom.

8         Nevertheless, for the sake of clarity, the Court will

9    specify the following.  No party is to use words like "bully"

10   or "monopolist" to refer to another.  This case is not a

11   Sherman Act 2 case and these words have no bearing on any

12   claim.  They are irrelevant and have the capacity to inflame.

13   I expect counsel to avoid similar name calling and, in the

14   words of the Supreme Court long ago, to strike hard blows but

15   not foul blows.  *See Berger v. United States*, 295 U.S. 78, 88

16   (1935).

17        Focus also asks the Court to preclude any argument

18   that it made misleading statements to customers.  The Court

19   noted at summary judgment that this argument related to

20   defendants' counterclaim that defendants did not preserve and

21   which the Court dismissed.  See docket 297 at 27.  This

22   argument has no bearing on the surviving claims, which are all

23   brought by plaintiffs.  The Court accordingly precludes

24   defendants from making such argument at trial.

25        In their last motion *in limine*, or its last motion *in*

1    *limine*, Focus seeks an "order precluding defendants from

2    introducing at trial any evidence or testimony that describes

3    untrue or misleading facts that may be prejudicial to

4    plaintiffs."  Docket 328 at 1.  Put in such broad terms, that

5    motion replicates Federal Rules of Evidence 401 and 403, which

6    already preclude such evidence.  Such an order is unnecessary.

7    The Court, however, will address certain specific evidence that

8    Focus identifies as meriting preclusion.

9         Focus asks the Court to preclude defendants from

10   stating or implying that design patent No. D746,078, known here

11   as the '078 patent, is invalid.  Kartri makes a related

12   argument in its 11th motion *in limine*, docket 343 at 1, which

13   seeks to "preclude mention at trial of the existence or the

14   status of" the '078 patent.  That patent is currently the

15   subject of a reexamination at the USPTO.  The Court agrees with

16   both Focus and Kartri that there is no cause for reference to

17   that patent at trial, let alone its status, and directs counsel

18   to steer clear of that subject.

19        Focus is nonetheless concerned that an inquiry into

20   that patent could be prompted, say, on cross-examination, by

21   inquiries on direct that open the door to it.  See docket 376

22   at 16.  The Court admonishes all counsel to be careful not to

23   do so.  If the trial takes a turn that leads counsel to believe

24   that reference to this patent or an inquiry that might lead in

25   that direction is merited, counsel are to alert the Court,

Appx176

1    outside the presence of the jury, before embarking on any

2    questions of this nature.

3          That concludes the substance of today's rulings.  The

4    Court has resolved all of Focus' motions *in limine*.  With these

5    rulings giving the parties, I believe, considerable additional

6    parameters as to the upcoming trial, the Court encourages, in

7    the strongest possible terms, counsel to resume settlement

8    discussions in earnest.  I recall that at least with one of the

9    defendants you had gotten extremely close to the goal line,

10   only to have victory snatched by the jaws of defeat.

11         If you would like me to re-refer this to the

12   magistrate judge for settlement purposes, let me know.  In the

13   meantime, if there is not a sign of progress in short order, I

14   will then turn to defendants' motions *in limin*e.

15         Based on the parties' availabilities regarding trial

16   dates in the fourth quarter, I am going to put in a request to

17   the central scheduling system next week.  I thank everyone for

18   the details you gave my law clerk about your and your

19   witnesses' availabilities.  That said, based on my rulings

20   today, more dates should open up.  Mr. Hatch's constraints, for

21   example, appear irrelevant at this point.  They no longer

22   apply.

23         What I'd like to do is give counsel -- I'll step away

24   and come back in five or ten minutes.  I'd like counsel to take

25   a few minutes to discuss among yourselves whether my rulings

Appx177

1  have lifted any calendaring restrictions and whether the

2  estimate length of the trial is any different than you have

3  previously anticipated.  In a moment I'll step away and come

4  back in no more than ten minutes to see if there is anything

5  else you want to clarify.

6          One question I will be asking counsel for Marquis,

7  given the damages ruling relating to Mr. Rogers, is whether you

8  still intend him to testify.  Given the significant amount of

9  restrictions that his schedule created for my ability to

10 schedule this, convenient for everybody else, I'd like to learn

11 a little more about his calendar.  It sounds like he is

12 extremely busy in some other trial, but it's far from clear

13 that he is going to be testifying every day in that trial,

14 whether that trial is near New York and whether he can testify,

15 for example, assuming that we were flexible in the trial here

16 as to his schedule, during the third week of November, first

17 two weeks of December.

18         I am similarly interested from plaintiffs the

19 availability of your expert, Kytomaa, whether Dr. Kytomaa might

20 be able to testify, assuming that I committed to being flexible

21 about his schedule within the trial parameters, during the

22 significant swatches of time that he professes to be

23 unavailable.

24         I'll come back in ten minutes with those questions for

25 you.  And then, based on what I learn, I'll pull in for trial

1  dates and we will see what the system spins out.  I do need to

2  say this.  Given the limited number of trial spots during the

3  COVID year, once we are given a date for trial, that's it.

4  That's your trial date.  I am not going to be granting other

5  adjournments.  That should have a bearing on the urgency with

6  which you pursue settlement discussions.

7          To put a finer point on it, there is obviously a

8  backlog, as you can imagine, of criminal trials.  And one of

9  the problems we have here is, only one jury trial can commence

10 each day because we have one room, central jury room, that's

11 used for jury selection.  And only five jury trials can be

12 ongoing at a given point because unless and until the COVID

13 courtroom restrictions let up, there are only five courtrooms

14 that have been retrofitted, including with Plexiglas boxes for

15 the witness and the questioner and socially distanced extra

16 space, including public space for the jury.  One should

17 consider it a gift to be given a trial date under this time

18 period.  Once we have such a date, I really need you to stick

19 to it.

20         I'm about to take a break.  It looked as if Mr. Cohen

21 had something to say.

22         MR. COHEN:  Your Honor, if I may get clarification.

23 Just one matter.

24         The Court, at the beginning of the recitation,

25 indicated the issues that remain to be tried.  I believe that

1    we also have the issue of willfulness, which is what

2    Mr. Kytomaa is for.  I just wanted to confirm that that's

3    correct.

4            THE COURT:  I didn't mean to take that off the table.

5    If I left it out, that was my bad.  I certainly wasn't meaning

6    to change the scope of what was left based on the summary

7    judgment rulings.  If my summary was inadequate, it's the prior

8    rulings that govern.

9            MR. COHEN:  Thank you, your Honor.  I appreciate it.

10           The second question is, one witness that we have,

11   Mr. Zahner, who is the inventor and also the head of ZDG,

12   Zahner Design Group, and Hookless Systems of North America,

13   because of his age and his health reasons, he would need to

14   testify by video.  He is not able to travel.  He lives in

15   Florida.  I just want to make sure that that's --

16           THE COURT:  It's certainly fine with me.  I certainly

17   would hope that both sides would accommodate a gentleman under

18   those circumstances.  It's actually easy to accommodate with

19   enough advance planning.  The Court here has done quite well

20   with remote testimony.  Again, as I say, with advanced planning

21   we can do that.

22           I assume what you're anticipating is live testimony

23   where he would appear on a screen and counsel would question

24   him remotely from this courtroom with a jury and I watching in

25   real time, as opposed to essentially getting canned testimony

 1   that would then be played to the jury.

 2          MR. COHEN:  Your Honor's former assumption is

 3   completely correct.  Live testimony remotely.

 4          THE COURT:  The answer is, we have an app for that.

 5   We can make that work.  It just requires advanced planning and

 6   coordination with the Court's technical staff and perhaps a bit

 7   of patience, but that's not going to be a problem.  I take it

 8   you're implicitly representing that your adversary has

 9   graciously agreed to accommodate such a person.

10          MR. COHEN:  We haven't raised it yet.  We wanted to

11   make sure that the Court can accommodate it.

12          THE COURT:  I can accommodate it, and I would be very

13   disappointed to learn that if there is a health reason in the

14   era of a pandemic that that would become a problem.

15          MR. COHEN:  Thank you, your Honor.

16          THE COURT:  I'll be back in ten minutes.  Thank you.

17          Counsel, you can speak freely.  The court reporter

18   will not be taking down what you say.  When I come in, I'll

19   knock on the door so you'll know and your adversary will know

20   that I'm not here, in case there's something you are saying

21   that you don't want me to hear.

22          In the first instance, the important issues for me are

23   the length of the trial and what, if any, enhanced flexibility

24   I have by virtue of these rulings.  I would not be disappointed

25   to learn that you had also set aside a new date to discuss

1    settlement.  Thank you.

2              MR. COHEN:  Thank you, your Honor.

3              (Recess)

4              THE COURT:  Welcome back.  Let me just confirm that

5    defense counsel are here.  I see the plaintiffs' lawyers.

6              Mr. Molldrem, are you still on the phone?

7              MR. MOLLDREM:  I am still here, sir.

8              THE COURT:  You are here, but you sound like you're

9    far from your phone.  Just a little clearer.

10             MR. MOLLDREM:  I'm about six or eight inches from my

11   phone.

12             THE COURT:  I'll take your word for it.

13             Ms. Foster, are you still there?

14             MS. FOSTER:  Yes, I am.

15             THE COURT:  Mr. Cox.

16             MR. COX:  Yes, your Honor.

17             THE COURT:  Let me begin with the biggest question.

18   I'll ask plaintiffs' counsel first because you may be able to

19   speak for the collective, but then I'll give defense an

20   opportunity to speak.  Is there any change, based on these

21   rulings, on the collective anticipated length of the trial?

22             MR. COHEN:  Yes, your Honor.  We expect three to five

23   days, as opposed to our original estimate.

24             THE COURT:  Which has been what, four to six days?

25             MR. COHEN:  We had said four to five, and we are

 1   thinking maybe six, but now this will cut out a day at least,

 2   we believe.

 3          THE COURT:  It increases the likelihood that although

 4   I wouldn't necessarily sit on Friday, if I chose to do so and

 5   we were able to start on a Monday, all of which are deeply

 6   speculative, given the COVID and the like, that we could get

 7   this in within a week.

 8          MR. COHEN:  Yes, your Honor.

 9          THE COURT:  That's No. 1.

10          Next question is, counsel for Marquis, this is

11   relating to -- I'll ask Mr. Cox.

12          Mr. Hatch's availability is no longer a limitation,

13   right, Mr. Cox?

14          MR. COX:  Understanding your Honor's order, that

15   sounds correct, your Honor.

16          THE COURT:  I don't see how his schedule matters

17   anymore, but since you had identified -- Sorry.  I'm speaking.

18   Since his availability has been a not insubstantial limiting

19   factor with the dates you gave me, I just want to make sure

20   that as my staff and I now formulate our identification of

21   available dates, on dates where he was our only problem child,

22   he was the only limiting factor, those dates are all available.

23          Do I have that right, Mr. Cox?

24          MR. COX:  Just to clarify, your Honor, today's ruling

25   was based solely on the trademark and trade dress, is that

Appx183

1    correct?

2              THE COURT:  Today's ruling excluded his testimony.

3              MR. COX:  I see.  That also included to any patent

4    matters, including infringement.

5              THE COURT:  Today's ruling excluded his testimony.  I

6    don't know how many other ways I can put it.  Unless there is

7    some theory under which he is sitting at the table and you need

8    him there as a member of your legal team, I don't see how his

9    availability matters anymore.  Maybe I shouldn't have raised

10   the issue because it's too obvious.

11             Next question is for you, Mr. Cox.  As it relates to

12   Rogers, I've taken off the table not his testimony as a

13   conceptual matter, but significant bases for and, therefore,

14   parts of his testimony.  Do you still envision his testifying

15   at trial?

16             MR. COX:  Actually, your Honor, I would like to defer

17   to Angela Foster for that response.

18             THE COURT:  That's fine.

19             Ms. Foster, do you still envision Mr. Rogers

20   testifying at trial?

21             MS. FOSTER:  Actually, I am going to defer to

22   Mr. Molldrem for that.

23             THE COURT:  This is now Tinkers to Evers to Chance.

24             Mr. Molldrem -- I'm sorry.  Somebody is speaking while

25   I'm speaking, which cannot happen.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Appx184

```
 1              Mr. Molldrem, do you expect Rogers to testify at

 2    trial?

 3              MR. MOLLDREM:  As it stands right now, no.

 4              THE COURT:  Can I, therefore, in scheduling the trial,

 5    treat Mr. Rogers' dates of unavailability as not a factor?

 6              MR. MOLLDREM:  That's right.

 7              THE COURT:  That is helpful.  Thank you.

 8              Plaintiff, Mr. Cohen, your expert, Kytomaa, assuming

 9    that I give you some latitude within the trial days, among the

10    trial days when to call him, can we schedule a trial during the

11    weeks that you have tagged him as unavailable due to another

12    trial?  I can't imagine he's really going to be needed for the

13    entirety of that length of time.  I appreciate that the peer of

14    mine who is supervising that trial may also have some limited

15    visibility into his range of motion.  But at some point it

16    becomes borderline unreasonable for me to knock out a number of

17    weeks because he needs to set aside a number of weeks for some

18    other trial.

19              MS. FOSTER:  Your Honor, while you were on the break,

20    we actually conferred, the plaintiffs' counsel as well as

21    defense counsel, and we came up with some dates based on

22    exactly the same analogy that you are doing.  I'm not

23    suggesting the Court should do what it is going to do.  I would

24    like to offer you the dates that we came up performing the same

25    exercise.
```

Appx185

```
 1              THE COURT:  I'm delighted to do that.  In a moment
 2    I'll call you on that.
 3              But first I want to deal with these more specific
 4    issues.  The reason is, while I'm happy to consider counsel's
 5    preferred dates, I have constraints, too.  Beyond that, the
 6    district has constraints, including criminal trials and other
 7    things that take priority over this, which is being scheduled
 8    as a trial for the first time.  The inquiry for me is not
 9    really counsel's references.  It's really just identifying
10    dates where you were literally unavailable, where we could not
11    house the trial without losing a necessary person.  With
12    respect --
13              MS. FOSTER:  That's exactly what we did, your Honor.
14    That's exactly the analogy we did.  We didn't take our
15    preferences.  We took out the people who were not going to be
16    there as well.
17              THE COURT:  Let me come back to you after the question
18    that I had posed when you spoke up to plaintiffs' counsel.  Let
19    me wait for that to be answered.
20              Plaintiffs' counsel, Kytomaa.
21              MR. COHEN:  Your Honor, I wonder whether we could
22    consider maybe having him testify remotely as well to kind of
23    make it easier to work with his dates.  Would that be a
24    possibility?
25              THE COURT:  It's a possibility.  But what I'm really
```

Appx186

```
 1    trying to do is -- look.  Ultimately, if we are given dates

 2    where the only way to make it work is by having a witness

 3    testify, particularly if it's a damages witness or something

 4    like that, where their credibility as to, you know, events

 5    conversations is not really the point, I would certainly expect

 6    everyone to be flexible about that.

 7            In the end, I am just trying to get a sense.  It was

 8    an ambitious set of dates that you were proposing that I

 9    eliminate on account of him.  I'm just trying to get a sense

10    of, is that real?

11            MR. COHEN:  He had indicated to us that these were

12    testimony dates, but they could change in the future.  I know

13    the problem is, we have to figure out by next week, meaning

14    that he could be scheduled to testify for a trial which

15    settles.  At the present time I asked him about two days ago.

16    These were the dates that I got.  I can't be sure whether some

17    of those dates will open up.

18            THE COURT:  If I were to indicate, albeit not as my

19    first choice, but some swatches of dates that include ones

20    where he's unavailable, I take it you don't know that he is

21    literally unavailable on those dates.  He is just doing what

22    lawyers do, which is being uber cautious and blocking out a

23    whole bunch of time.  But if we got a trial and, therefore, he

24    had to commit to be here on one of those days, there is a good

25    chance we would be able to salvage that.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. COHEN:  Yes.  I would say if your Honor gave us

2     proposed dates, we would go back to him and see whether he

3     could rearrange or come by video.  I would certainly do that

4     for the Court's convenience.

5          Putting aside the video and just assuming that the

6     issue is flexibility for him to be here for, let us say, one

7     day during the trial window that I am given, I'd like to think

8     that since he's unlikely to be testifying for all of those days

9     in a row, if I am assigned a particular set of trial dates and

10     I get back to you and say, look, tell me one of these days that

11     we need to reserve to make sure.  If he has to testify out of

12     order, he testifies and you choose the Wednesday, I can commit

13     that Wednesday is his day, and you would then, in turn, tell

14     him that since I'm not a wall flower and I've got to some right

15     to schedule trials, too, and I am not going to defer just

16     because he thinks some judge -- he can choose a day within

17     three weeks, so his schedule then blocks out three weeks for

18     us.  I want to make sure if I do that, he will go back and

19     report to the folks who have hired him in connection with the

20     other trial to say, I've now got an issue on that Wednesday.

21          MR. COHEN:  Of course, your Honor.  I would put your

22     schedule first.  If you came up with a trial date, I would go

23     back to him -- he is not going to be on the stand that long --

24     and let him know that we want him live on one particular day

25     and for this amount of hours and, worst comes to worst, try to

Appx188

1   do video, but we would ask him to come live, if possible.

2          THE COURT:  What is your guess, without holding you to

3   it, as to the approximate duration of his direct testimony in

4   this case?

5          MR. COHEN:  I believe he would be on the stand only

6   for a couple of hours.

7          THE COURT:  Then assuming --

8          MR. COHEN:  For direct, at least.

9          THE COURT:  Of course.  Then assuming that cross is

10  usually symmetrical length, we are talking about a witness who,

11  if we managed this right, ought to be on and off within the

12  same day.

13         MR. COHEN:  Yes, that is my intention.  Unless he went

14  on at the very end of a day, he would be on and off the same

15  day.

16         THE COURT:  That would be part of the planning, which

17  would be if I had to accommodate somebody, you would interrupt

18  your case and take him out of order in order to get him on and

19  off within a single day, if that's what proved to be necessary.

20         MR. COHEN:  We would be happy to do that, your Honor.

21         THE COURT:  Ms. Foster, as to that point, any reason

22  to disagree with that?

23         MS. FOSTER:  No, your Honor.

24         THE COURT:  My hope is that all the witnesses can be

25  in person, save somebody who literally has a health reason why

1    they can't travel during the pandemic.  But as to that, does

2    the defense have a view, if it were necessary to allow somebody

3    like that to be questioned remotely while the balance of the

4    trial, save the witness with the health issue, would the

5    defense have any problem with that?

6         MS. FOSTER:  No, your Honor.  We may have some similar

7    situations we are trying to nail down ourself with other

8    witnesses and health issues, that may we also want to probe the

9    same thing.

10        THE COURT:  These are details we can cross the bridge

11   on, but it strikes me as encouraging that both of you would be

12   asking for similar solicitude from the other side with respect

13   to accommodations during this extraordinary time in our

14   country's history and extraordinary time in terms of housing

15   jury trials.  The fact that each of you have a mutual interest

16   in civility and collegiality, the combination is encouraging.

17   That's helpful to know.

18        With that, Ms. Foster, I'm delighted to hear what you

19   all have come up with and happy to give weight to the dates you

20   are identifying.  In the end, I think we will do a double-check

21   on the schedule, now that we have been able to remove certain

22   blocks.

23        Go ahead, Ms. Foster.  Say it loud and clear.

24        MS. FOSTER:  First, your Honor, I want to give credit

25   to Mr. Morris because he actually orchestrated what I am going

 1    to tell you.

 2              THE COURT:  Mr. Cohen.

 3              MS. FOSTER:  I'm sorry.  I got another case.

 4    Mr. Morris.  Mr. Cohen.  I'm sorry.

 5              We came up with December 1, 2, 3, 6, 7, 8 and the week

 6    of December 13.

 7              THE COURT:  What else?

 8              MS. FOSTER:  That was it.

 9              THE COURT:  That's helpful to know.  Some of those

10    days don't work for the Court.  I have, among other things, a

11    judicial conference committee meeting that will knock out some

12    of those dates, but some of those we had indicated were on our

13    available list.  From the charts you gave me, once we start

14    eliminating Messrs. Hatch and Rogers, and once we treat Kytomaa

15    as not sort of a flying wedge in the middle of the fall, I

16    think there is actually a considerably greater amount of

17    availability.

18              Am I to take from that, Ms. Foster, that, in effect,

19    those dates in December are something of a preference from this

20    collective group?

21              MS. FOSTER:  No, your Honor.  They were actually dates

22    that we were looking at, comparing the dates that we had all

23    submitted with schedules for counsel.  Not so much the

24    witnesses, but with counsel and the conflicts.  I think there

25    were some planned vacation on plaintiffs' side and there were

1    some other conflicts.

2          When Mr. Cohen was going through the exercise we went

3    through, November we couldn't find an entire week except, of

4    course, Thanksgiving week, that there wasn't some conflict with

5    somebody, and the same thing happened in October.

6          THE COURT:  I am going to rely on the specific dates

7    you had given me because I think my read on that, even before

8    learning that some of these conflicts no longer are preclusive,

9    found a little more time available.

10         MS. FOSTER:  We were using those same dates that you

11    have.

12         THE COURT:  Mr. Cohen, let me just ask you, there is a

13    witness Elmore.  Is the same flexibility that we talked about a

14    moment ago also true?  In other words, I'm really trying to

15    work something out so we can get this case on trial.  Can I

16    assume that if we have a trial that overlaps with some of the

17    Elmore problem dates that, again, it is likely a solvable

18    problem.  We could find a way for Elmore's testimony to be

19    slotted in.

20         MR. COHEN:  I see that his dates of October 1 to the

21    15th are the dates that he's unavailable due to another trial.

22    We would do our best to schedule him for one particular day and

23    to get him in and out on that day.  I have to ask him, of

24    course.

25         THE COURT:  Do you know what his role is in that other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Appx192

1   trial?

2           MR. COHEN:  He's a damages expert in general.  I

3   believe he is testifying in that case, as in this case, as a

4   damages expert.

5           THE COURT:  The problem is, in effect, understandably,

6   he is basically saying, I've got no idea when I'm testifying in

7   the other trial.  To play it safe, let's blow up half of

8   October.

9           The problem is, from my perspective, that's a gain of

10  chicken that winds up with both courts eventually knocking out

11  huge periods of time because of a gentleman who may need to

12  testify for a less than a day in each of the two proceedings.

13          MR. COHEN:  I understand.  We would, of course, your

14  Honor, work around your schedule.  If you find a date that

15  overlaps with his trial, we would immediately go back to him

16  and just confirm that for one particular day, whatever it is,

17  we would need him to participate, if possible.

18          THE COURT:  Counsel, this is helpful.  In the end I'm

19  actually more solicitous of preplanned vacations by counsel

20  than I am about experts who block out half a month for obvious

21  reasons.  It's one thing to, you know, ask the expert to go

22  back and say, look, I have now got a conflict during one or one

23  and a half of those days.  It's quite another to tell

24  hard-working counsel who have families that they travel with, I

25  have got to fly back from the Caribbean for a day in the middle

 1   of a vacation.  That's not going to happen.  It's these long

 2   swatches that are problematic.

 3          MR. COHEN:  Thank you, your Honor.  We will do our

 4   best to accommodate whatever dates your Honor comes up with.

 5          THE COURT:  Like I say, all I'm doing is putting in

 6   requests, and then it's being fed into a system in which this

 7   trial is lower priority than most because it's not a criminal

 8   trial.  There is nobody in custody.  And this would be the

 9   first quarter in which I would be putting in a bid.

10          In the nature of things, it's not a case that has a

11   lot of equities relative to some of the competitors, so we will

12   get what we get.  We are kind of like freshmen looking for

13   university housing now and next quarter we will be sophomores.

14          I imagine I will be assigned a date for the case, and

15   I imagine you will be in the second through fourth slot or

16   something for that case.  As I say, we have had cases well down

17   in the queue for their particular day to go to trial.  There is

18   something about setting a trial date that leads both criminal

19   and civil litigants to settle.  So there is a good shot,

20   whatever date we are given, you'll go.  In any event, we will

21   keep you up to date.

22          MR. COHEN:  Thank you.  Appreciate that.

23          THE COURT:  Without telling me the content.

24          MS. FOSTER:  Your Honor, I wanted to just to kind of

25   focus on October, too, because there is some issues, too, on

```
 1    our side as well.  I have the last week of October, which I
 2    have a conflict, but you were talking about the other times,
 3    and I think October 4 to the 10th and then the 18th to the
 4    24th.  That's one of the defendants that cannot come -- that
 5    was the only time he couldn't come.  Any other time is fine
 6    because they have something else, a prior contractual
 7    engagement that they cannot undo.
 8         THE COURT:  Is it literally the case that they know
 9    that they will be unavailable all of those days or they need to
10    set aside that block because one day they will be unavailable?
11         MS. FOSTER:  They need all those days.  It's just -- I
12    think it's like two weeks.  It's two weeks.  That's what it is.
13         THE COURT:  If that's literally the case and it's a
14    necessary witness and they literally can't be here, I'll
15    schedule around that.  But I'm relying on your representation
16    of counsel that the person is literally out all those days, as
17    opposed to being protective about the possibility that some
18    subset of those days will be unavailable.  But I'm taking you,
19    Ms. Foster, to be representing, as to the people you have
20    indicated, that they are literally out of pocket all of those
21    days.  That's what you are saying.
22         MS. FOSTER:  Yes.  That's what was relayed to me and
23    even in detail.
24         THE COURT:  I am not going to cross-examine you
25    further.  If that's what you were told, I have no reason to
```

Appx195

1    believe it's untrue.

2            With that, I'll be back to you as soon as the central

3    scheduling command gives us more information.

4            Mr. Cohen, I'll just ask you this question without,

5    obviously, any content as to settlement.  Were you able to

6    discuss the prospect of reigniting and rescheduling a time for

7    settlement discussions?

8            MR. COHEN:  Yes, your Honor, we did.  We broached that

9    subject.

10           THE COURT:  Is it anticipated that there will be a

11   renewed round of discussions?

12           MR. COHEN:  We are amenable to it.  We are waiting for

13   the defendants to get with their clients, but we have strongly

14   indicated our preference of engaging in discussions.

15           THE COURT:  I'll just simply state what you know what

16   I'm about to say, which is, defense counsel, I fully appreciate

17   that you need to speak with your clients and help them absorb

18   the implications, whatever they are from your perspective, of

19   today's rulings.  But I regard this as a case that rationally

20   ought to settle and strongly encourage you to speak with your

21   clients with, you know, sort of taking a very rationalist focus

22   as to the risks and rewards presented by going to trial

23   relative to what may be available in connection with a

24   settlement.

25           Let me just ask Ms. Foster, you've been very helpful,

Appx196

1    is there a particular motion *in limine* of yours that might

2    prove outcome determinative in enabling a settlement to go

3    forward?  In other words, is there something very important

4    that hangs on a particular motion *in limine* that, in your view,

5    with irresolution at this point is impeding settlement, or does

6    settlement turn on other matters?

7         MS. FOSTER:  Your Honor, I think it turns on other

8    matters.  I would like to answer that question, and I would ask

9    my cocounsel to also join in.

10        I would say we have a similar motion regarding

11   plaintiffs' experts, both their experts, motions *in limine* to

12   preclude.  It might help if those motions are decided.

13        THE COURT:  That's helpful.

14        MS. FOSTER:  Again, I defer to Mr. Cox, as well as

15   Mr. Molldrem.  That's just me thinking off the top of my head.

16        THE COURT:  That's helpful.

17        Mr. Molldrem, any other motions of yours that are

18   genuinely important in promoting settlement?

19        MR. MOLLDREM:  I think the motion concerning James

20   Roberts is probably the one that's more crucial.  It's not like

21   the rest of them --

22        THE COURT:  Thank you.  Mr. Cox --

23        MR. MOLLDREM:  We are not going --

24        THE COURT:  Mr. Molldrem, I am going to move past you

25   because, for whatever reason, whether it's the speaker or the

1    communication, you're mumbling.  The court reporter is shaking

2    his head because he can't understand what's being said.  It's

3    as if it didn't happen.

4         Mr. Cox, do you have anything to add?

5         MR. COX:  Yes, your Honor.  Sorry.  I forgot that I

6    had it on mute.

7         The experts would be the most important.

8         THE COURT:  That's helpful.  I can't commit to any

9    resolution of that soon.  I have other things on my plate.  But

10   to the extent I'm turning in a short-to-intermediate term back

11   to motions *in limine* within the defense motions, if I haven't

12   heard that there is progress on settlement, I will note to

13   prioritize those.

14        Counsel.

15        MS. FOSTER:  Your Honor, just for your information as

16   well, the parties decided that the defense is going to let

17   counsel for plaintiff know by the end of business day tomorrow,

18   after we had a chance to talk to our client, as well as confer

19   ourselves, what we want to do next.

20        Because your Honor also gave some instructions which

21   were, I think was something August 12, which was a two-pager.

22   I am not saying we are going to do it or not, but we do need to

23   discuss it.  And, also, something else that was due by the

24   close of business day tomorrow.

25        With that in mind, we are going to meet and confer and

Appx198

 1    get back to plaintiff about settlement talks.

 2         THE COURT:  Very good.  I would ask you, just because

 3    it will help organize my time, if you have set aside a date for

 4    settlement discussions, again, without sharing any content, if

 5    you would let me know in writing on the docket of the case what

 6    that date is, that would be useful to know because if the

 7    settlement discussions don't bear fruit, then there will be

 8    homework for me and presumably counsel once we have a trial

 9    date as to trial, so it will be useful for me to know.

10         Let me make something clear, although it's implicit.

11    No more motions.  We are done with motions *in limine*.  I have

12    got dozens of them.  You deal with the consequences of the

13    rulings, and I'll have more if the case doesn't settle.  But

14    today's rulings are not an invitation for a new round of

15    motions.

16         With that, I am going to go around the horn to see if

17    there is anything else from anyone.

18         Mr. Cohen.

19         MR. COHEN:  Nothing more from the plaintiffs.  Thank

20    you, your Honor.

21         THE COURT:  For Kartri, Ms. Foster, since I can hear

22    you and we are having difficulty getting a clear elocution from

23    Mr. Molldrem on this line, Ms. Foster, anything further from

24    Kartri?

25         MS. FOSTER:  No, your Honor.  Thank you.

Appx199

1        THE COURT:  Mr. Cox.

2        MR. COX:  No.  That's it, your Honor.

3        Is there going to be something put into the record as

4    to what's due by tomorrow?

5        THE COURT:  No.  It's what I said.  The only thing

6    that we will issue is simply a bottom-line two-sentence order

7    that reflects the fact that I have resolved the plaintiffs'

8    motions *in limin*e on the record of today's transcript and,

9    therefore, it closes out those motions.  But the content of

10   today's ruling is set out in the transcript and you're at

11   liberty, and I encourage you if you need it, to order it.  But

12   I assumed everyone was taking notes, particularly when I set

13   out the two deadlines for very short follow-ons.

14       Thanks very much.  I wish everyone a very good and

15   happy and healthy summer.  I hope, and I should have said this

16   at the outset, that notwithstanding the rigors of the pandemic,

17   I hope that you and your family and loved ones are all well.

18       Thank you.  We stand adjourned.

19       (Adjourned)

20

21

22

23

24

25

Appx200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., and SF HOME DÉCOR, LLC,

                                    Plaintiffs,

                        -v-

KARTRI SALES CO., INC., and MARQUIS MILLS
INTERNATIONAL, INC.,

                                    Defendants.

15 Civ. 10154 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52 following a six-day bench trial in this case.

Plaintiffs manufacture, sell, and distribute shower curtains with hookless rings that are

coplanar with the curtain. These products have obtained considerable acclaim and commercial

traction within the hospitality industry, insofar as they enable shower curtains to be put up more

quickly and easily than conventional shower curtains that attach by means of hooks. Plaintiffs

claim that defendants have manufactured, sold, and distributed confusingly similar shower

curtains, and thus have infringed plaintiffs' utility and design patents, infringed plaintiffs'

trademarks and trade dress, and engaged in unfair competition under the Lanham Act and New

York law. Plaintiffs further claim that defendants' infringements were willful, warranting

enhanced damages. Defendants deny these claims and advance a host of affirmative defenses.

During lengthy pretrial litigation, the Court conducted a *Markman* hearing, resolved

many pretrial motions, and entered summary judgment for plaintiffs on their utility patent

infringement claims. Trial was held on June 27–29 and July 26–28, 2022. The Court received

testimony from 14 witnesses. As to six, called by plaintiffs,[1] the Court received direct testimony

by affidavit, followed by live cross and redirect examination.[2] As to nine, the Court heard

testimony in wholly live form.[3] The Court also received testimony, in the form of deposition

excerpts, from five witnesses,[4] and received hundreds of exhibits.[5]

The findings of fact that follow are based on the Court's review of the entire trial record.

Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility

determinations based on the Court's assessment of, *inter alia*, the relevant witness or witnesses'

experience, knowledge, and demeanor.

---

[1] The Court here lists witnesses by the party who presented their direct testimony. A number of witnesses appeared on both sides' witness lists, but, at the Court's direction for economy's sake, testified on only one party's case, with unrestricted cross-examination.

[2] These were: Stacy Dubinski, Ryan Erickson, David Kreilein, Charles Kuehne, David Zahner, and Adrian Whipple. Their affidavits are filed at Dkts. 455-2 ("Dubinski Aff."); 455-1 ("Erickson Aff."); 455-3 ("Kreilein Aff."); 455-4 ("Kuehne Aff."); 473-1 ("Zahner Aff."); and 473-2 ("Whipple Aff.").

[3] These were: Robert Burbank, Sandra Kemp, and John Elmore, called by plaintiffs; and Samantha Dolph, Karen Goskowski, Patricia Kubus, David Middleberg, Joseph Ranieri, and Graham Rogers, called by defendants.

[4] For plaintiffs, these were Goskowski, *see* Dkt. 455-6 ("Goskowski Dep. Tr."); Kubus, *see* Dkt. 455-7 ("Kubus Dep. Tr."); Lawrence Mayer, *see* Dkt. 455-5 ("Mayer Dep. Tr."); Middleberg, *see* Dkt. 455-8 ("Middleberg Dep. Tr."); and Ranieri, *see* Dkt. 455-9 ("Ranieri Dep. Tr."). For defendants, this was Mayer.

[5] Citations herein to "PTX" refer to a plaintiff exhibit; "DTX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep." to deposition designations of the person indicated. The Court has reviewed the parties' most recent proposed findings of fact and conclusions of law, *see* Dkts. 494, 500; exhibits; and pertinent letters, *see* Dkts. 454, 475, 480, 481. Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

For the reasons that follow, the Court finds for plaintiffs on all claims tried;[6] dismisses defendants' counterclaims and affirmative defenses; awards plaintiffs lost profits and reasonable royalty damages of $2,938,337, which reflects the trebling of certain damages; and commissions briefing on pre- and post-judgment interest and attorneys' fees.

## I.    Findings of Fact

### A.    The Parties and Other Relevant Entities

Plaintiff Focus Products Group International, LLC ("Focus Products") was a limited liability company organized under the laws of, and with its principal place of business in, Illinois. Kreilein Aff. ¶ 3; PTX 88. On March 6, 2017, Focus changed its name to Sure Fit Home Décor, LLC ("Sure Fit Home Décor"), also a plaintiff here. Kreilein Aff. ¶ 6; PTX 88 at 3. Plaintiff Sure Fit Décor Holdings Corp. ("SFD Holdings") is a Delaware corporation with a principal place of business in New York City. Kreilein Aff. ¶ 10. Plaintiff SF Home Décor LLC ("SF Home Décor") is a subsidiary of SFD Holdings and a Delaware limited liability company with its principal place of business in Pennsylvania. *Id.* ¶ 9. Plaintiff Sure Fit Home Products, LLC ("SF Home Products") is a subsidiary of SF Home Décor and a Delaware limited liability company with a principal place of business in Pennsylvania. *See* PTX 416. Non-party Hollander Sleep Products acquired the Sure Fit entities in 2021. *See* Dkt. 494 at 3. However, the Sure Fit entities continue to exist. *Id.*

Plaintiffs Zahner Design Group, Ltd. ("ZDG") and Hookless Systems of North America ("HSNA") are affiliated New York corporations each with a principal place of business in New

---

[6] Plaintiffs' design patent infringement claim was not tried. As explained below, the parties agreed to stay litigation on that claim pending the outcome of a reexamination of that patent's validity by the United States Patent and Trademark Office ("PTO").

York. Dkt. 323 ("JPTO") at 12. Non-party David Zahner, who invented the hookless shower rings forming the basis of this intellectual property dispute, wholly owns ZDG and HSNA.[7] *Id.*

Non-party Arcs and Angles, Inc. ("A&A Inc.") was a corporation registered and with its principal place of business in New York.[8] Non-party Arcs & Angles, LLC ("A&A LLC") was a limited liability company. On July 9, 2004, HSNA exclusively licensed its rights in the hookless shower ring patents to A&A Inc. PTX 387 at 1–14. On December 22, 2010, A&A Inc. assigned those rights to A&A LLC. *Id.* at 23–24. On October 10, 2012, Focus acquired A&A LLC and its intellectual property rights. *Id.* at 28–29; *see also* Dkt. 297 at 3 ("SJ Op.").

Defendant Kartri Sales Company, Inc. ("Kartri") is a Pennsylvania corporation with its principal place of business in Forest City, Pennsylvania. JPTO at 12; Tr. at 626.

Defendant Marquis Mills International, Inc. ("Marquis") was a New Jersey corporation with its principal place of business in New Jersey that went out of business in 2020. JPTO at 12; Tr. at 576. Marquis manufactured and sold the accused shower curtains to Kartri, which sold these to resellers, mostly in the hospitality market. Middleberg Dep. Tr. at 96; Kubus Dep. Tr. at 14–15.

Non-party Carnation Home Fashions, Inc. ("Carnation") once owned the EZ-ON Mark pertinent to the trademark infringement claims here.

Non-party Star Linen, Inc. ("Star Linen") is a company that resells Kartri's products to the hospitality and healthcare industries. Tr. at 549. Middleberg worked in acquisitions for both Marquis and Star Linen. *Id.*

---

[7] The Court will refer to all plaintiffs collectively as "plaintiffs," to Focus Products and all its successor entities by the shorthand "Focus," and to all the Sure Fit entities as "Sure Fit."

[8] *See Arcs & Angles, Inc. v. Carnation Home Fashions, Inc.*, No. 09 Civ. 1467 (JPO) (FM) (S.D.N.Y. Feb. 18, 2009), Dkt. 1 ¶ 1.

Non-party Ramtex is a manufacturer of hospitality products based in Shaoxing, China. It assisted Marquis in manufacturing the accused shower curtains. Middleberg Dep. Tr. at 46–47. Non-party Pong Hsu ("Pong") is an individual employed by Ramtex in 2012 and 2013. *Id.* at 58. Pong had formerly worked for Waytex, a manufacturer that supplied the HOOKLESS® product to Focus and its predecessor A&A LLC. Pong had been a "part of [Focus's] product development team and . . . manufacturing team." Tr. at 554.

**B.     Witnesses**

Plaintiffs' witnesses were Burbank, Sure Fit's CEO; Dubinski, who from 2018 to May 2022 held leadership roles in marketing and branding for Sure Fit Home Décor and Hollander Sleep; Erickson, Sure Fit's vice president of mass-market retail sales; Kemp, Focus's former senior vice president of hospitality; Kreilein, Focus's former executive vice president; Kuehne, Focus's former CFO; Whipple, Sure Fit's CFO; Zahner; and Elmore, a damages expert.

Defendants' witnesses were Dolph, Kartri's sales operations manager; Goskowski, Kartri's co-owner and president; Kubus, Kartri's co-owner and president of sales and marketing; Mayer, Carnation's former owner; Middleberg, Marquis's director of global operations and president of Star Linen; Ranieri, Marquis's owner; and Rogers, a damages expert.[9]

---

[9] The Court found plaintiffs' witnesses consistently credible and relevant. The Court found the testimony of Kemp, who between 2008 and 2020 occupied a series of positions germane to this controversy, particularly illuminating and has drawn on it heavily. In 2008, Kemp was Focus's director of operations, overseeing the retail and hospitality distribution channels, and a member of the team that acquired Arcs & Angles Inc., which then held the intellectual property at issue. Tr. at 212–14. In late 2010 or January 2011, Kemp took charge of Focus's hospitality business. *Id.* at 214. From then until her 2020 retirement, Kemp served, sequentially, as vice president, senior vice president, and general manager of Focus and its successor entities.

### C.    The Intellectual Property in Dispute

#### 1.    The Patents

ZDG owns the four patents at issue—one design patent and three utility patents.  Zahner

Aff. ¶¶ 2–3.

The first is Design Patent No. D746,078, entitled "Shower Curtain" (the "'078 Patent" or

"Design Patent").  It covers the design of the shower curtain ring that is worked into the shower

curtain at the curtain's upper edge.  It looks like this:



**FIG. 1**

The second patent is Utility Patent No. 6,494,248, entitled "Suspended Materials Having

External Slits," (the "'248 Patent").  PTX 3 at 1.  The '248 Patent's abstract describes it as

"openings each having a slit therein for attachment to a fixed rod, . . . reinforced with rings

having projecting flanges . . . [which] make[] it easier to open up the ring" and thus "facilitate

the placement of [a shower] curtain upon the fixed rod."  *Id.*  It looks like this:

Appx206



*See id.* at 5.

The third and fourth patents are Utility Patent Nos. 7,296,609, entitled "Hanging Products" (the "'609 Patent"), PTX 4 at 1, and 8,235,088, entitled "Hanging Products," (the "'088 Patent"), PTX 5 at 1. The abstracts for these patents describe them as "[h]anging products" with "an opening for suspending the item from a rod," where each opening is strengthened "with a ring having a gap," and the ring contains "a movable member for opening and closing the gap." PTX 4 at 1; PTX 5 at 1.

Relevant here, the '248 Patent claimed an "approximately horizontal component," that is, a slit, when the shower curtain "is hanging from the rod," Dkt 148-2 at 13; the '609 Patent claimed a ring that included "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring, and that "projecting edge . . . [is] provided next to said slit," Dkt. 148-3 at 15; and the '088 Patent similarly claimed "a projecting edge, said projecting edge being an edge which projects from [the] outer circumference of" the shower curtain ring, Dkt. 148-4 at 15. ZDG has exclusively licensed each of these patents to Focus Products and Sure Fit through its affiliate HSNA. *See* PTX 89; Kreilein

Appx207

Aff. ¶ 4. Sure Fit sells shower curtains incorporating the patented inventions in the hospitality industry throughout the United States.

In its summary judgment decision on April 16, 2020, the Court held that defendants had infringed plaintiffs' three utility patents. *See* SJ Op.

## 2.    The EZ-ON Trademark and HOOKLESS® Trademark

The design patent and utility patents are incorporated into shower curtains and sold under the HOOKLESS® Trademark ("Hookless Mark") and the EZ-ON Trademark ("EZ-ON Mark") (collectively, the "Marks"). The HOOKLESS® Mark is registered with the PTO. It was registered to its inventor Zahner's company ZDG, initially under U.S. Trademark Registration number 2,355,554 (Principal Register), and then under the numbers 2,381,995 (Supplemental Register) and 4,127,283 (Principal Register). *See* PTXs 84, 86, 520. The EZ-ON Mark was not registered with the PTO as of the date this suit was filed. On September 26, 2017—within defendants' challenged conduct—it was registered to ZDG on the Principal Register under U.S. Trademark Registration number 5,296,144.[10] PTX 113.

Plaintiffs' HOOKLESS® product, as sold in curtains, looks like this:



Plaintiffs' EZ-ON product, sold by Carnation pursuant to a sublicensing agreement with Focus, looks like this:

---

[10] The Court will refer to the EZ-ON Mark as "EZ-ON," not "EZ-ON®."



PTX 270 excerpt (EZ-ON shower curtain product, as sold by Carnation).

### 3.    Plaintiffs' Trade Dress

Plaintiffs claim that they have trade dress rights in the overall appearance of shower curtains sold under the HOOKLESS® and EZ-ON brands (the "Trade Dress"). Plaintiffs circumscribe the scope of their claimed trade dress by four factors:

> (1) a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;
>
> (2) and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;
>
> (3) wherein each ring includes a slit or gap in the ring;
>
> (4) and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

Dkt. 148 ¶¶ 104–105; *see also* Erickson Aff. ¶ 28 (quoting same).

The claimed Trade Dress, plaintiffs clarified at trial, does not reach all shower curtains that do not contain hooks above their upper edge. It does not, for example, reach the Zenna

Home Quik Hang Peva shower curtain, which contains rings partially embedded in the curtain's upper edge and partially jutting out above the edge, Erickson Aff. ¶ 31, and looks like this:



Partial screenshot of Dkt. 303-7. The protruding rings, plaintiffs explain, put the Zenna design outside of the first element of plaintiffs' Trade Dress—"lack[ing] any hooks protruding above the upper edge of the curtain." Erickson Aff. ¶ 34.

Similarly, plaintiffs disavow that their claimed Trade Dress covers products by Croydex, which include hooks preinstalled on the shower curtain to facilitate the installation of the shower curtain. *Id.* ¶ 36. Also outside the parameters of the claimed Trade Dress is a shower curtain named "InterDesign" that, lacking hooks, is affixed to the shower rod by buckles that hang from the rod and snap onto the shower curtain below. *See* PTX 132; *see also* PTX 131 (Brown design, similar). So, too, are a Pierce product that uses clips that protrude above the curtain's upper edge, *see* PTX 133; a Fields design that functions like a pull-down window shade and does not rely on hooks or rings, *see* PTX 129; and a Giumarra hookless spiral-notebook-like design in which rings, perpendicular to the curtain's surface and protruding above its edge, are threaded

onto the rod, *see* PTX 130. Plaintiffs state that their Trade Dress does not constrain those non-hooked shower curtain designs, which have been sold commercially by Focus's competitors.[11]

As Erickson testified, plaintiffs' claimed Trade Dress leaves room for various forms of shower curtain designs that enable easier installation than installing hooks. Tr. at 176 ("Croydex and Zenna have pre-installed rings, . . . or a mechanism to suspend or hang or put that shower curtain on the shower curtain rod.").[12]

### 4.  Defendants' Accused Ezy Hang Product

The product accused of infringement here is the shower curtain ring and corresponding curtains defendants have manufactured and sold under the unregistered "Ezy Hang" mark. Marquis manufactures and sells the accused curtain to Kartri. Kartri brands the accused curtains as "Ezy Hang" and resells them to distributors and end users in the hospitality market. The accused products look like this:



PTX 26, Kartri's Accused Product No. 1 (excerpt of image).

---

[11] The Zenna design has been commercialized by Maytex Mills, Erickson Aff. ¶ 33. The Croydex design has been commercialized by QK Supplies in the United Kingdom, *id.* ¶ 37.

[12] Some of Zahner's own designs fall outside Focus's claimed Trade Dress. For example, Figures 15, 16, and 17 of the '248 Patent protrude above the curtain's upper edge. *See* PTX 134.

Appx211



PTX 27 Kartri's Accused Product No. 2 (excerpt of image).

**D.    Kartri's and Marquis's Businesses and Relationship**

Kartri was founded in 1975 and incorporated in 1979. Tr. at 626–28. It is operated by—
and its name is derived from the first names of—Karen Goskowski and Patricia ("Trish") Kubus,
sisters who in 2005 took over Kartri from their father. *Id.* at 630, 633–34. Kartri manufactures
the Ezy Hang product in its facility in Forest City, Pennsylvania, and through a contractor in
Mexico and stores that supply in an Arizona warehouse. *Id.* at 656–57.

Marquis is an importer and supplies to Kartri. PTX 297 ("Elmore Rep.") ¶ 31. The two
entities had a longstanding business relationship predating the challenged conduct. *See* Tr. at
551. Marquis sources its products, *inter alia*, from Ramtex in China. *Id.* at 589. Marquis
provided fully finished curtains to Kartri. *Id.* at 712. Kartri would manufacture more
individualized headers—the top part of the curtain containing the rings. *See id.* at 642–43. Until
the challenged conduct began, Marquis and Kartri manufactured and sold traditional, hooked
shower curtains. They then sought to compete with Focus's HOOKLESS® product in the
hospitality market, which had significantly shifted the hospitality market "in the direction of
hook-free curtains," *id.* at 660, and in which Focus had established a dominant market share, *see,
e.g.*, *id.* at 472, 511, 743. This set the stage for the parties' commercial—and now legal—battle.

**E.    Plaintiffs' Claims, Defendants' Counterclaims, and Rulings Narrowing
the Issues to Be Tried**

Plaintiffs' claims are in five categories: (1) against both defendants, for infringement of plaintiffs' utility and design patents under 35 U.S.C. §§ 101 *et seq.*; (2) against both defendants, for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under 15 U.S.C. § 1125(a); (3) against Kartri, for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under 15 U.S.C. § 1125(a); (4) against both defendants, for unfair competition with plaintiffs' EZ-ON Mark and Trade Dress under New York law; and (5) against Kartri, for unfair competition with plaintiffs' HOOKLESS® Mark under New York law. Plaintiffs seek damages on the patent infringement claims and all infringement and unfair competition claims as they relate to the EZ-ON Mark and the Trade Dress, but not on the infringement claims relating to the HOOKLESS® Mark. Plaintiffs seek injunctive relief on their Lanham Act and unfair competition claims, attorneys' fees, and pre- and post-judgment interest.

Defendants have raised affirmative defenses of lack of statutory standing, failure to join an indispensable party, non-infringement of plaintiffs' EZ-ON Mark, invalidity of plaintiffs' EZ-ON Mark, non-infringement of plaintiffs' trade dress, and invalidity of plaintiffs' trade dress.

Rulings on summary judgment and on motions *in limine* pruned the issues to be tried:

- In an April 16, 2020 decision, the Court granted summary judgment to plaintiffs on the claim that defendants infringed the utility patents ('248, '609, and '088), leaving unresolved whether the infringements were willful. *See* Dkts. 297 at 31; 312.[13]

---

[13] The Court also granted summary judgment for plaintiffs on (1) Kartri's first counterclaim alleging tortious interference and monopolization; (2) Marquis's first counterclaim alleging non-infringement of the utility patents; (3) Marquis's fourth counterclaim alleging invalidity of the '248 patent; (4) Marquis's fifth counterclaim alleging invalidity of the '609 patent; (5) Marquis's sixth counterclaim alleging invalidity of the '088 patent; (6) Marquis's eighth counterclaim alleging patent misuse; and (7) Marquis's tenth counterclaim alleging the invalidity of the HOOKLESS® trademark. *See* Dkt. 297 at 32.

- The parties later agreed to stay plaintiffs' claim that defendants infringed the fourth, design patent ('078)—and with it, Marquis's first counterclaim alleging non-infringement of that patent, and seventh counterclaim alleging the '078 patent's invalidity—in light of reexamination proceedings initiated by Kartri at the PTO as to that patent. See PF at 4, 7–8.

- In a January 4, 2021 decision, the Court ruled that plaintiffs' trade dress is non-functional, *see* Dkt. 312 at 7–8, thereby establishing that element of plaintiffs' trade dress infringement claim.[14]

Accordingly, the following claims were left for resolution at trial:

- On plaintiffs' claims that both defendants infringed the EZ-ON Trademark under the Lanham Act and engaged in unfair competition with that Mark under the Lanham Act and New York state law, the issues of liability, damages, and injunctive relief;

- On plaintiffs' claim that Kartri infringed the HOOKLESS® Mark under the Lanham Act and engaged in unfair competition with that Mark under the Lanham Act and New York state law, the issues of liability and injunctive relief;

---

[14] On May 14, 2021, the Court dismissed defendants' affirmative defense that plaintiffs lack patent standing. Dkt. 365. And on August 5 and November 23, 2021, in bench rulings resolving motions *in limine,* the Court precluded as abandoned or forfeited, these affirmative defenses: (1) nominative fair use and descriptive fair use of plaintiffs' trademarks; (2) equitable estoppel and unclean hands; and (3) all other affirmative defenses not timely raised. *See* Dkts. 412, 436. The parties have dismissed, on consent, Marquis's third counterclaim alleging patent invalidity for alleged lack of inventorship, and its second counterclaim alleging the non-infringement of the HOOKLESS® trademark. *See* Dkt. 297 at 31; PF at 7; Dkt. 412 (bench ruling resolving plaintiffs' motions *in limine*); 436 (bench ruling resolving defendants' motions *in limine*).

14

- On plaintiffs' claim that defendants infringed plaintiffs' trade dress under the Lanham Act and engaged in unfair competition under the Lanham Act and New York state law, the issues of liability, damages, and injunctive relief;

- On defendants' infringement of the '248, '609, and '088 patents, the issue whether defendants' infringement was willful, and the tabulation of damages; and

- On all claims, the issue of reasonable attorneys' fees, to be briefed and decided in post-trial proceedings.

The following defenses and counterclaims were also left for resolution at trial:

- The defense that plaintiffs lack standing to bring its claim that defendants infringed the EZ-ON Mark, in light of non-party Carnation's alleged ownership of the intellectual property at issue here, and the related defense that plaintiffs failed to join Carnation as an indispensable party;

- Marquis's ninth counterclaim alleging invalidity of the EZ-ON Mark;

- Marquis's second counterclaim alleging non-infringement of the EZ-ON Mark;

- Marquis's eleventh counterclaim alleging invalidity of plaintiffs' Trade Dress; and

- Marquis's second counterclaim alleging non-infringement of plaintiffs' Trade Dress.

**F.    History, Ownership, and Licensing of the Intellectual Property at Issue**

**1.    1992–1997: Zahner's Invention, the '232 Patent, Early Commercialization Efforts, and "Game-Chang[ing]" Success**

In or about 1992, Zahner conceived of inventing a hookless shower curtain ring. Zahner Aff. ¶¶ 5–6, 68; *see also id.* ¶ 69 ("I began experimenting with various shower curtain designs. My goal was to create a design that was both easy to install and aesthetically attractive."). Developing the invention involved manual labor, experimentation with rudimentary materials, and refinements by trial and error. *Id.* ¶¶ 70–72. On May 18, 1992, Zahner filed an application

15

Appx215

to patent his invention with the PTO. PTX 303. On February 16, 1993, the PTO granted the application, under the original '232 Patent. *Id.*

For three or four years, Zahner attempted to commercialize his invention by meeting with investors and manufacturers. Those efforts failed. Zahner Aff. ¶¶ 77–82. In June 1996, Zahner joined forces with John Benis and Teddy Marcus to form HSNA. *Id.* ¶¶ 83–84. Benis supplied capital; Marcus was HSNA's marketing and sales expert. *Id.* ¶ 85. As of that time, Zahner testified, the idea of a curtain that attached without hooks was novel: "[N]o one had ever seen anything like that before. . . . It [had been] just, you know, shower curtains with hooks." Tr. at 121. By 1997, that three-person team, operating as HSNA, was seeking to market Zahner's hookless shower curtain technology. Zahner Aff. ¶¶ 86–88.

At some time between 1997 and 1999, Marcus pitched Zahner's technology to Kartri. *Id.* ¶ 89; Tr. at 724–25. Then a small company, Kartri declined. Zahner Aff. ¶ 91; Tr. at 725–26. After approximately a year of refining and pitching the product, and having spent $250,000 in research and development, Zahner Aff. ¶¶ 94, 99, HSNA made its first sale to Gracious Home, a retail store in New York City, *id.* ¶ 103.

Zahner's product soon swept the hospitality market, until then dominated by traditional hooked curtains. Focus's Dubinski termed it "revolutionary" and "a game changer." Dubinski Aff. ¶ 12. The design was "innovative," neat, and "unique," *id.* ¶¶ 12, 20; it saved hospitality providers installation time and reduced workers' compensation claims from injuries sustained installing hooked curtains, which required effort and balance. Kartri's Kubus acknowledged that HOOKLESS® was "known in the industry . . . . [I]t saves the housekeeper time and money to put this product up. It's just known. [Zahner has] done really well in that marketing direction." Kubus Dep. Tr. at 52–53.

16

The Court found illuminating two videos of live demonstrations of the HOOKLESS®

products' ease of installation. These showed ZDG's Marcus installing the HOOKLESS® curtain

on the telemarketing channel QVC. In each, Marcus snaps into place, with ease and in about 10

seconds, a HOOKLESS® curtain on a rod. *See* PTXs 471, 472 (video exhibits). The symmetric

placement of the curtain's slits—connecting pairs of adjacent rings—ensured that the curtain

billowed uniformly across the curtain rod. As installed, the curtain had a "neat" appearance

consistent with plaintiffs' claimed trade dress. The video demonstrations made apparent the

efficacy of the HOOKLESS® product relative to conventional shower curtains, and its appeal to

hotel and motel chains that must install and remove shower curtains in bulk daily.

### 2. The HSNA-A&A License Agreement and Its Chain of Transfers

On March 2, 1999, ZDG licensed all of its patent, trademark, and trade dress rights (the

"Intellectual Property Rights") to HSNA. DTX 89.

On June 6, 2000, ZDG registered the Hookless Mark with the PTO, turning HSNA's

common law rights in the previously unregistered Hookless Mark into the rights under the

Lanham Act accorded to a registered trademark. PTX 84. On May 31, 2004, HSNA licensed its

intellectual property rights to Arcs and Angles, Inc. PTX 387 ("HSNA-A&A License

Agreement") at 1; Zahner Aff. ¶ 337. On May 16, 2008, Arcs & Angles, Inc. was acquired by

Arcs & Angles Holdings, LLC, which owned Focus. PTX 268; Zahner Aff. ¶¶ 345–346, Tr. at

214. Kemp, Focus's then-director of operations, *id.* at 212–13, testified that Arcs & Angles

Holding, LLC acquired "all the assets, the inventory, open receivable records, everything," *id.* at

214. Focus thus controlled Arcs & Angles Holdings, LLC, Arcs & Angles, Inc., and the

Intellectual Property Rights associated with Zahner's invention.

On December 14, 2010, Focus transferred the Intellectual Property Rights to Arcs &

Angles, LLC. PTX 387 at 23–24. Zahner executed the amendment to the HSNA-A&A License

Agreement on HSNA's behalf. *Id.*; Zahner Aff. ¶¶ 347–348. On October 10, 2012, Focus

transferred the Intellectual Property rights to itself, that is, Focus Products Group International

LLC. PTX 387 at 28–29; Zahner Aff. ¶¶ 350–351. This amendment to the HSNA-A&A License

Agreement was executed by Zahner. PTX 387 at 29; Zahner Aff. ¶ 352; Kreilein Aff. ¶ 4.

On March 6, 2017, Focus was renamed Sure Fit Home Décor LLC. PTX 88 at 3;

Kreilein Aff. ¶¶ 5–6. On July 13, 2017, Sure Fit Home Décor sold its license in the Intellectual

Property Rights to SF Home Décor LLC. PTX 89; Kreilein Aff. ¶¶ 8–9. There were no further

transfers of the Hookless Trademark and the Trade Dress or relevant licensing agreements.[15]

### 3. The EZ-ON Trademark, Plaintiffs' Dispute with Carnation, and the Carnation Licensing Agreement

The parties dispute whether the unregistered EZ-ON Mark was among the Intellectual

Property Rights subject to the series of transfers above. The history of that mark is complicated,

on the one hand, by a course of dealings between ZDG and A&A, and on the other, third party

Carnation, which had originally owned and used that then-unregistered mark. The Court here

sets out the facts bearing on the ownership of the EZ-ON Mark. These are context for the

Court's finding, *infra*, that, by the time Kartri's sales of the accused products began in 2013,

plaintiffs, not Carnation, owned the EZ-ON Mark.

The EZ-ON Mark was undisputedly originally used and commercialized by Carnation.

Until 2008, ZDG and A&A had produced hookless shower curtains under their FLEX-ON

Trademark, registered with the PTO under the number 2,948,547 (the "FLEX-ON Mark"). *See*

PTX 532. Carnation's owner and president, Lawrence Mayer, testified that Carnation had sold

hookless shower curtain products under the unregistered EZ-ON Mark since 2009. Mayer Dep.

---

[15] ZDG has entered into license agreements with other companies that are not at issue here. *See, e.g.*, Tr. at 124 (Zahner, testifying about license agreement with On The Right Track).

Tr. at 15, 33. In fact, a letter adduced in discovery establishes that Carnation's use of this mark dated back to at least to 2008. *See* PTX 360. The letter, dated December 16, 2008, is from counsel for ZDG and A&A to Carnation. It challenges Carnation's use of the EZ-ON Mark. *See id.* ZDG and A&A there claimed that Carnation's sale of shower curtains under the EZ-ON Mark imitated their FLEX-ON Mark, was likely to cause consumer confusion between the two, and likely infringed ZDG's three utility patents. *Id.* The letter directed Carnation to cease the alleged infringement. *Id.* Carnation refused.

On February 18, 2009, ZDG and A&A filed suit against Carnation in this District for patent infringement and unfair competition. *See Arcs & Angles, Inc*, No. 09 Civ. 1467. On February 1, 2012, the parties resolved that lawsuit via a settlement agreement, PTX 390, and a separate licensing agreement, PTX 370 ("Carnation Licensing Agreement").

Salient here, the Carnation Licensing Agreement in § 4.1 granted Carnation a license to sell the shower curtains that had given rise to the dispute; in § 4.2 granted A&A a "sublicense" to Carnation to use intellectual property associated with these products, including the EZ-ON Trademark; and in § 5.3 required Carnation to assign any newly conceived, commercialized, or registered intellectual property not explicitly covered in §§ 1.6–1.9 to ZDG and HSNA. More fully, the Carnation Licensing Agreement contained these provisions, among others:

> ***Section 1.6 (definition of "Licensed Products")***: The 'Licensed Products' shall be defined herein as shower curtains having integrated rings of the form depicted in Appendix A. The term Licensed Products shall also include any rings having a substantially similar appearance to that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +/– 15 degrees from that shown in Appendix A.

Appendix A looks like this:

Appendix A



Fig. 1

PTX 370 at 13.

*Section 1.7 (definition of "Licensed Patents")*:  The 'Licensed Patents' shall be defined herein as all patents and patent applications licensed by [Arcs & Angles, LLC] from HSNA pertaining to the Licensed Products that are issued, pending or filed in the future [worldwide].  The Licensed Patents include, but are not limited to, [patents '248, '609, and '402]; any divisions, reissues, reexaminations, continuations, continuations-in-part, extensions thereof, and all foreign counterparts thereto.

*Section 1.8 (definition of "Licensed Trademarks")*:  The "Licensed Trademarks" shall include U.S. Trademark Registration No. 2,381,995 for HOOKLESS®; U.S. Trademark Application No. 77/878,05 for HOOKLESS, and CTM Trademark Registration No. 847,355 for HOOKLESS®.

*Section 1.9 (definition of "Intellectual Property")*:  The "Intellectual Property" shall be defined herein defined as the Licensed Patents and the Licensed Trademarks.

*Section 4.1 (non-exclusive sublicense to Carnation)*:  [Arcs & Angles, LLC] hereby grants Carnation, upon and subject to all the terms and conditions of this Agreement, a sub-license under the Intellectual Property to make, have made on its behalf, use, import, offer for sale, have offered for sale on its behalf, sell, have sold on its behalf, and export, the Licensed Products [worldwide] for the Term of this Agreement.  Such sublicense to Carnation is non-exclusive with respect to ZDG's current licensees, namely, HSNA [and A&A LLC].

20

*Section 4.2 (rights sublicensed to Carnation)*:  As part of said sublicense, [A&A LLC] hereby grants sub-licensee the right to use the following trademark on the Licensed Products: 'EZ ON Shower Curtain'; and also may use the phrase 'with patented HOOKLESS® technology' in small print . . . .  However, sub-licensee shall not use the trademark HOOKLESS® as a brand name for the Licensed Products.

*Section 4.3*: Carnation shall provide an example of a pre-production proof or sample of any Licensed Products, packaging, advertising, or other marketing or promotional material to A&A [LLC] before commercialization[.]

*Section 4.4*:  This section restricts Carnation's sublicense to sell to retailers.

*Section 4.5*:  This section prohibits Carnation from sublicensing, transferring, or assigning its rights under the Carnation License Agreement to another party.

*Section 5.3 (assignment of newly registered intellectual property to ZDG)*:  In the event that any intellectual property falling within the scope of Licensed Patents, Licensed Trademarks, or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by sublicensee during the term of this agreement, such additional intellectual property shall be assigned to ZDG and deemed included within the scope of the present agreement.

PTX 370.  By the time the Carnation Licensing Agreement was executed on February 7, 2012, A&A Inc. had assigned its intellectual property rights to A&A LLC.  On October 10, 2012, Focus acquired A&A LLC and, with it, A&A LLC's intellectual property rights under the Carnation Licensing Agreement. *See* PTX 387 at 28–29.

The parties dispute whether, upon execution of the Carnation License Agreement in February 2012, A&A (and soon thereafter Focus) or Carnation owned the EZ-ON Trademark. Plaintiffs advance two arguments as to why ownership rights in the EZ-ON Mark vested in them from the moment the agreement was executed.  First, § 4.2's provision that Arcs & Angles, LLC "grant[ed] sub-licensee [*i.e.*, Carnation] the right to use" the Mark "EZ ON Shower Curtain" and the phrase "with patented HOOKLESS® technology" on the packaging of the EZ-ON curtain supports the inference that Arcs & Angles owned the EZ-ON Mark.  That is because plaintiffs could not grant a sublicense to Carnation in a mark that plaintiffs did not own.  Second, § 5.3

21

Appx221

created an obligation for Carnation to assign to ZDG any "intellectual property" not captured by

§§ 1.7 and 1.8 that was "conceived, reduced to practice, or developed, or [on which] a patent or

trademark application is filed for by [Carnation] during the term of [the Carnation Licensing

Agreement]." Insofar as the EZ-ON Mark, which was not registered until Carnation received a

registration from the PTO on September 26, 2017, PTX 113, fell outside the "Intellectual

Property" defined in the agreement as later registered, this was covered by § 5.3 and was

assigned to ZDG pursuant to that provision.

Defendants counter with three arguments. First, they note that Carnation—specifically

its CEO Mayer—subjectively continued to believe, after the agreement, that it owned the EZ-ON

Mark, both before and after its registration in September 2017. Defendants ask that Carnation's

understanding be credited. Second, they argue that § 4.2 should be read not as a licensing by

plaintiffs to Carnation of the right to use the EZ-ON mark, but as vesting ownership of those

rights in Carnation. And third, they assert, § 5.3 does not change this result, because it does not

include the EZ-ON Mark. The Court resolves this dispute *infra*, in plaintiffs' favor, in the course

of rejecting Marquis's affirmative defense that plaintiffs lack standing under the Lanham Act to

pursue the EZ-ON trademark infringement claim because they purportedly did not own the EZ-

ON Mark.

In the years after the agreement, a disagreement arose between Focus and Carnation as to

who owned the EZ-ON Mark. Focus, understanding the agreement to vest ownership of the

mark in A&A, upon its acquisition by A&A began to sell shower curtains using the EZ-ON

Mark. Kreilein Aff. ¶ 14; Erickson Aff. ¶ 14. Zahner, who signed the agreement, Tr. at 131,

testified at trial that he understood "that once this agreement was executed, [ZDG] would own

the rights to the EZ ON shower curtain trademarks . . . and [ZDG] would license it [to HSNA]

22

Systems, and [HSNA] would license it back to Carnation," *id.* at 126. Carnation, however, took

a different view, and on March 3, 2017, issued a cease-and-desist letter to Focus objecting to

Focus's usage of the EZ-ON Mark. DTX 127 (Carnation letter); Kreilein Aff. ¶ 15. Carnation

proposed to consent to Focus's usage if Focus made payments to it. DTX 127; Kreilein Aff.

¶ 15. In this litigation, Carnation's president and owner, Mayer, gave deposition testimony in

November 2018, in which he admitted he was "not sure" which entity owned the EZ-ON Mark

following execution of the Carnation Licensing Agreement, Mayer Dep. Tr. at 31–32, but

refused to concede that plaintiffs owned it, *see, e.g., id.* at 111. From his perspective, the

Carnation Licensing Agreement had allowed Carnation "to get out of the [protracted] lawsuit,"

while "creat[ing] a little space that would permit [Carnation] to sell the [EZ-ON] product." *Id.* at

31.

On September 29, 2021, Carnation and Focus's successor, Sure Fit, resolved their dispute

over who owned the EZ-ON Mark, executing an amendment to the Carnation Licensing

Agreement that assigned all rights to the EZ-ON Mark to ZDG. On October 1, 2021, plaintiffs

filed a letter attaching that amendment, *see* Dkt. 414-1 at 14–15; *see also* PTX 113 (registration

of EZ-ON Trademark under number 5,296,144 with PTO to ZDG), and Carnation recorded that

assignment with the PTO. Dkt. 414-2. This Court held that it would not consider the September

2021 amendment as evidence as to who had owned the EZ-ON Mark at the time of the Carnation

License Agreement, as the agreement was entered into after discovery had closed. Tr. at 6–7.

**G.**     **Advertising, Promotion, and Recognition of Plaintiffs' Products**

In 1997, HSNA began promoting Zahner's shower curtain products. On March 30, 1998,

shortly after HSNA began selling these through the retail store Gracious Home, *New York*

*Magazine* featured the products in its "Best Bets" column. PTX 543 at 2. Zahner's hookless

products gained national exposure on QVC, in a segment for new products called "The Big

23

Time." Zahner Aff. ¶¶ 109–110.  In it, Zahner's products competed with other new products—and won.  *Id.* ¶ 112.  HSNA received positive feedback from those appearances and presented its Hookless products several more times on the QVC segment "Today's Special Value."  *Id.* ¶¶ 115–118.  In 2000, HSNA entered into a sales licensing agreement with the home furnishing company CHF Industries, Inc.  PTX 368.

HSNA's successors-in-interest A&A Inc., A&A LLC, Focus Products, and Sure Fit, widely advertised their shower curtains through various channels.  From 2008 on, Focus "did television ads, print ad[]s, trade shows, catalogs, websites, distributor buying guides, et cetera," Tr. at 217 (Kemp), plus physical flyers and website banners, *id.* at 237; *see also id.* at 227.

Focus and its predecessors have also heavily advertised their shower curtain products on TV.  Between 1997 and 2005, HSNA promoted plaintiffs' shower curtain products on QVC.  Between 2005 and 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC.  *See* Tr. at 227; PTX 521 at 117 (listing TV appearances).  Sales followed: Kemp testified that the Hookless® product "broke records. . . .  They ran through the stock. . . .  In fact, QVC continuously asked to air it because the product did so well for them."  Tr. at 229.  Focus's television marketing included the videos in which Marcus quickly installed the product onto a shower curtain rod, *see* Tr. at 228–30 (video demonstrated); PTXs 471, 472 (video exhibits), and advertisements that began to appear around 2011, Tr. at 230; PTX 470.  Plaintiffs today continue to promote the products on QVC, Tr. at 227 (Kemp); *see also* PTX 469, 470 (video exhibits), exposing the products to millions of viewers.  Zahner Aff. ¶ 155.

In the retail market, A&A LLC promoted the HOOKLESS® shower curtains for their "ease of installation"; "ten second[]" installation time, PTX 547; the absence of missing or broken rings, "draping perfectly [and] sliding effortlessly," PTXs 547, 552, 560; the reduced

"hassle" of changing shower curtains, PTX 548; "install[ation] like magic in just seconds" with

"no need to remove the rod," PTX 552; and lower maintenance costs and increased safety,

satisfaction, and morale among hospitality and housekeeping staff, PTX 550, 559. *See also* PTX

554 (reduced labor costs due to reduced installation time), 561 (same), 562 (same), 549, 553,

555, 558. Focus, after acquiring A&A LLC's intellectual property rights, similarly touted the

products as "[s]imple and dependable, . . . install[ing] in seconds, eliminat[ing] snags, and

draw[ing] perfect folds in the curtain." PTX 121. By 2013, Focus asserted, its HOOKLESS®

shower curtain had been "a fixture in retail for a decade." *Id.*

On the hospitality side of its business, Focus advertised its shower curtains in annual

catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015); *see also*

PTXs 474, 476, 480, 481, 545, 564. HOOKLESS® products have been prominently displayed in

advertising catalogs by the American Hotel Register Company ("AHR"). Dubinski Aff. ¶ 17.

That catalog distributed between 200,000 and 250,000 copies a year to hotel chains nationwide.

*Id.* ¶¶ 17, 19. AHR was Focus's second-largest customer. Tr. at 237 (Kemp). Its catalog ads

were often financed with so-called rebates, in which Focus subsidized a distributor's advertising

by paying a lump sum or a share of sales toward the advertising cost. *Id.* at 140–41 (Dubinski).

Percentages of sales could range between 1% (for example, at Bed Bath & Beyond) to 10% (for

example, at Amazon). Tr. at 240 (Kemp). In 2013, such rebates amounted to a total of

approximately $250,000 on the hospitality business side, and approximately $200,000 on the

retail business side. *Id.* at 241. Between 2009 and 2013, Focus spent approximately $1.2 million

in rebates, covering both the hospitality and retail arms of its business. *Id.*

In 2013, Focus's total advertising budget for its hospitality business exceeded $500,000.

*Id.* at 246. Focus also promoted its products via approximately "150 field reps" who were

25

trained at distributor trade shows. *Id.* at 248. In its retail business, Focus also drew customers who had been exposed to its HOOKLESS® products during their stays at hotels. *Id.*

In 2013, HOOKLESS® curtains were hung in approximately 2.5 million hotel rooms. *Id.* at 251. At an average occupancy rate of 76% per hotel, and an average length of stay of 2.5 to three days, that meant "over 100 million individual exposures" per year. *Id.* (Kemp). This had "enormous value" in increasing brand awareness. *Id.* Focus received so many individual consumer inquiries from hotel guests about its curtains that it prepared a dialogue script for its customer service team specific to such inquiries. *Id.* at 252.

Plaintiffs also promoted their products at trade shows. Between 2005 and 2009, Arcs & Angles made 34 trade show appearances. *See* PTX 521 at 117–18 (listing appearances). These continued after Focus acquired Arcs & Angles in 2009. *See* Tr. at 242–43, 245 (Kemp). The trade shows promoted the products to retailers, hospitality chains, and other distributors. *Id.* at 242.[16] Before trade shows, Focus conducted short training sessions with some vendors. *Id.* A&A LLC and Focus also pitched their HOOKLESS® products at AHR's sales expos and gave rebates and advertising allowances to customers who agreed to promote the product. Dubinski Aff. ¶¶ 15–16, 32. HOOKLESS® products dominated attention at many trade shows, Tr. at 243; between 2008 and 2013, Focus promoted its HOOKLESS® products in at least 15–20 trade shows per year, and thus in 60–100 during a five-year period. *Id.* at 243–44 (Kemp). In 2013, Focus had an approximately $250,000 budget for trade shows in the hospitality business and a

---

[16] *See also* Tr. at 244 (Kemp) ("[I]f it's a retail industry show, it's going to be the retail buyers that are coming in, maybe some designers. If it's a hospitality industry show, it could be designers, independents, boutiques, chains, hotel owners, decision makers, basically, as well as like, I said the chain designers. And if it's a chain show, it's going to be the individual brand hotels, the owners of the hotels and decision makers coming.").

26

separate budget for retail-oriented trade shows, both of which increased over time. *Id.* at 245–46.

Arcs & Angles and Focus also advertised their shower curtain products on their websites. *See* PTXs 461, 566. Plaintiffs' distributors—such as Guest Supply and True North—have also advertised plaintiffs' products. *See* PTXs 462, 521 at 82.

Plaintiffs' products have received favorable, unsolicited media coverage. As mentioned, in 1998, *New York Magazine* featured HSNA's HOOKLESS® curtain in its "Best Bets" section, calling the curtain "cutting-edge" in sparing customers the effort of "contorting to attach ugly hooks." PTX 543 at 2. In September 2001, the American Society of Interior Designers' magazine, *Icon*, featured the "ingenious" HOOKLESS® curtain in an editorial. *See* PTX 429. In 2009, *Woman's Day* magazine featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. In 1997, after a multi-week competition, QVC named plaintiffs' shower curtain the "Best New Product." Zahner Aff. ¶ 183.

Plaintiffs also introduced evidence of the shower curtains' favorable recognition in the hospitality industry, *see, e.g.*, Dubinski Aff. ¶¶ 9, 12, 20, 28, unsolicited customer testimonials for Hookless curtains, *see, e.g.*, PTXs 438, 457 at 2, 467, and customers' brand loyalty, *see* Dubinski Aff. ¶ 55; Erickson Aff. ¶ 25. Kartri's Kubus acknowledged that plaintiffs' HOOKLESS® shower curtains "gained a lot of momentum" in the hospitality market. Kubus Dep. Tr. at 26.

**H.    Plaintiffs' Market Share and Revenues**

By the time defendants were developing their accused product in 2012, plaintiffs were the leading seller of shower curtains in the hospitality market. *See* Tr. at 661 (Goskowski, conceding that Focus, by late 2012, had established dominant market share). Throughout defendants'

Appx227

accused conduct—October 2013 to November 2018—plaintiffs' market share was approximately 50%. Elmore Rep. ¶ 80; Tr. at 512 (Elmore).

By 2005, plaintiffs' curtains were used by more than 25 hotel and motel chains, and in more than one million hotel or motel rooms across the United States. PTX 551; Zahner Aff. ¶ 186. In 2007, these had grown to 39 hotel and motel chains and more than two million rooms. These chains included Hilton, Holiday Inn, Motel 6, and Red Roof. PTX 563; Tr. at 521.

Between 2005 and September 2013, Focus sold more than $150 million of Hookless shower curtains, with about 65% of these revenues coming from hospitality customers and the balance from retail customers. Tr. at 252–53 (Kemp).[17]

Between 2013 and August 2017, Focus's revenues for its HOOKLESS® shower curtains exceeded $81 million in the hospitality market: $14.7 million in 2013; $16.5 million in 2014; $21.2 million in 2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518; Elmore Rep. ¶ 98. These reflected sales of approximately 5.76 million shower curtains. PTX 515. During the same period, revenues for the HOOKLESS® shower curtains in the retail market exceeded $54 million: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million in 2016; and $8.9 million in January through August 29, 2017. These reflected sales of approximately 4.57 million shower curtains. PTX 514.

## I.    Plaintiffs' Actions Against Alleged Infringers

Plaintiffs have taken various legal actions to defend the intellectual property at issue here.

---

[17] Additional evidence of plaintiffs' sales during that early period comes from Arcs & Angles's reported sales figures. Between 2005 and 2010, Arcs & Angles reported that sales for products under the HOOKLESS® brand had reached a volume of $88 million. PTX 521 at 116; Zahner Aff. ¶ 189. Carnation independently reported more modest sales figures. Between 2009 and January 2013, Carnation has had a total sales volume of $225,710. PTX 591.

On September 25, 2007, Arcs & Angles filed a complaint against Royal Pacific Corporation, claiming infringement of its HOOKLESS® Mark and '248 patent. *See* PTX 99. On December 6, 2007, that litigation ended in settlement and Royal Pacific's agreement to desist from its challenged conduct.  PTX 537.  Plaintiffs brought similar such challenges, with similar outcomes, against Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (settlement and agreement to desist executed April 1, 2008); DFW Motel Supply & Textiles, Inc., *see* PTXs 102 (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); Neilmax Industries, Inc., *see* PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); and Trend Supply, Inc., *see* PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010).  Plaintiffs also sent cease-and-desist letters to alleged infringers, which ended in agreements to desist. Recipients included: Courtesy Products, Inc., *see* PTX 381 (November 27, 2007 letter); Linens4Less Inc., *see* PTXs 589 (June 16, 2009 letter), 590 (email noticing desistance sent June 16, 2009); and Champion Supply Co., Inc., *see* PTXs 585 (January 6, 2009 letter), 586 (letter noticing desistance; undated, but fax watermark indicating receipt on January 8, 2009).

Through such measures, the Court finds, plaintiffs maintained exclusive control over its hookless shower curtains in the hospitality market between 1997, when the trade dress was introduced, and 2013, when defendants' alleged infringement began.  The above entities either ceased the challenged conduct, or entered into license agreements with plaintiffs.

### J.    Defendants' Challenged Conduct

#### 1.    Late 2012–Early 2013: Pong Pitches Samples to Marquis

Middleberg testified as follows.  In late 2012 or early 2013, he traveled to China to meet Pong Hsu of the Chinese textile manufacturing company Ramtex. Tr. at 549–50.  Pong and Middleberg had known each other through business dealings for more than 20 years. *Id.* at 548.

Appx229

Middleberg usually purchased products from Ramtex either on behalf of Star Linen, or on behalf of Marquis, to resell those products in the United States. *Id.* at 549, 551.[18]

At this meeting, Pong showed Middleberg a sample of a hook-free shower curtain with a "D-shaped grommet." *Id.* at 550. Pong represented that he had developed the idea himself, that he had obtained a Chinese patent for it, and that he was in the process of applying for a United States patent. *Id.* at 553–54. Pong showed Middleberg a document with Chinese characters, representing it to be a Chinese patent. Middleberg, who does not read Chinese, relied on Pong's representation. *Id.* at 602. The samples provided by Pong and the accused products at issue in this lawsuit were "[e]ssentially" the same. Middleberg Dep. Tr. at 94–95. Pong proposed that Marquis acquire the product design to sell it to a U.S.-based manufacturer. *Id.* at 59–60.

Middleberg and Pong knew of Focus Products and the HOOKLESS® product. The two had spoken about Focus "many times." Tr. at 554. And Pong had formerly worked for Waytex, a manufacturer that supplied the HOOKLESS® product to Focus and its predecessor A&A LLC, and was "part of [Focus's] product development team and . . . manufacturing team. *Id.* Pong stated that his product competed with Focus's HOOKLESS® product, but claimed his design was "original" and "unique." Middleberg Dep. Tr. at 61–62. Pong also represented that he had consulted with his attorney and understood that Focus's patents in the HOOKLESS® technology had expired or were due to expire soon, and that Pong would soon secure his own patent on the sampled shower curtain ring. *See* Tr. at 555 (Middleberg testifying that "[Pong] mentioned to me that it had become a public domain kind of product; that the patent had run out or was about to run out"). Middleberg concluded that, if Marquis and its U.S. customers "could come into the market with this new idea, we might be able to carve out a niche for ourselves." *Id.* Pong

---

[18] Star Linen and Marquis are owned and run by the same person—Joseph Ranieri. Tr. at 550.

connected Middleberg to Pong's lawyer, Tommy Wang, who stated "that [Pong's] patent was pending and . . . felt confident that it would be issued." *Id.* at 554; *see also id.* at 582.

Despite knowing of Focus's HOOKLESS® product, Middleberg did not investigate whether Marquis's plan to roll out Pong's proposed product was limited by any valid United States patent—including as owned by Focus or its affiliates. *Id.* at 554. No Marquis official, employee, or attorney investigated whether A&A LLC or Focus held valid intellectual property rights in the HOOKLESS® technology, or whether Pong's proposed design might infringe those. Middleberg "rel[ied] on what Pong told [him]" in forming his belief that there was no legal impediment to Marquis's ability to sell the accused product. Middleberg Dep. Tr. at 72–75.

Kartri's Goskowski similarly testified that, despite knowing of Focus's existing patents in the HOOKLESS® technology, she was not concerned that Kartri's Ezy Hang products might infringe Focus's rights. Goskowski Dep. Tr. at 41–43. Goskowski did not seek advice from counsel. *Id.* at 43; *see also* Tr. at 643 (Kubus, testifying that "[Middleberg and Marquis] came with the name EZY-Hang and moved forward with the design, listening to Mr. Middleberg and Marquis that there was a patent, that everything was clear and safe, as I use the word 'safe.' It may not be the right word, but that's the way we approached it").

> **2.    Late 2012–August 2013: Marquis Presents the Design Samples to Kartri; Kartri Purchases Test Orders; Defendants Profess Ignorance of Legal Restrictions on Their Sales of the Accused Products**

In late 2012 or early 2013, during a sales meeting between Star Linen and Kartri, Middleberg, acting as Marquis's representative, presented Pong's pitched ring to Dolph—and possibly Kubus—of Kartri. Tr. at 549, 553, 641; Middleberg Dep. Tr. at 58–59, 83–84. Kartri's representatives "expressed some interest and took the samples back to their offices." Middleberg Dep. Tr. at 81. By this time, as Goskowski admitted, "the hospitality market had . . . gone in the direction of hook-free curtains," and Focus had established a dominant market share, to the

detriment of sellers of hooked shower curtains, Tr. at 660–61. Kartri felt market pressure from its customers to pivot toward vendors of non-hooked shower curtains. *Id.* at 663–64 (Goskowski). Thus, "in an effort to keep up with . . . the changing business in the hospitality area, [Kartri] decided to purchase [the proposed curtain design] from Marquis." *Id.* at 661.

Marquis and Kartri, assisted by Pong, experimented with refinements to Pong's sample, including because, in the initial product, "the fabric tended to pull away from the grommet." Tr. at 553, 556; Middleberg Dep. Tr. at 84, 89. Although the D-shaped ring's initial design included a straight slit with no angles, Marquis and Kartri ultimately settled on a D-shaped ring with a slit in the shape of a "lightning bolt"—the angled slit visible in the accused product. Tr. at 557, 593 (Middleberg). This design choice was advantageous because such rings could be snapped onto the shower curtain rod with one hand—allowing hospitality staff installing such curtains to secure themselves with their free hand. *Id.* at 558 (Middleberg).[19]

In or about August 2013, Kartri began purchasing small "test orders" of the accused product. Middleberg Dep. Tr. at 95–96, 124–25. Kartri sold those to other resellers. *Id.* Those products were met with "positive reception," and Kartri, through Kubus, began to place larger orders. Middleberg Dep. Tr. at 97–98. Although Marquis and Kartri knew they were competing with Focus's HOOKLESS® products on price and design, Middleberg testified that he and other executives believed Pong's representation—that Focus's patents were "running out"—until the point that Focus accused Marquis of infringement, Middleberg Dep. Tr. at 99–100, 108–09. He also testified that he believed—until the Court's 2018 ruling following the *Markman* hearing in this case—that Focus's patents did not cover the particular design of the Ezy Hang curtain ring.

---

[19] At trial, Middleberg sought to demonstrate this by having an assistant hold up a shower rod and Middleberg execute a one-handed installation. The demonstration went less than smoothly; as Middleberg "very much used two hands throughout the entire process." Tr. at 567–71.

*See* Tr. at 587–88 ("The way it was described to me was that . . . it was like a whole pizza and that prior to the *Markman* hearing, that the [USPTO] had ruled that each slice of the pizza with its own toppings . . . had to be patented itself. After the *Markman* hearing, the [J]udge said no, that's too restrictive and you can patent the whole pizza, and that was the way I understood it."). Middleberg did not have any training or expertise in patent law. *Id.* at 595, 665.

### 3.    August 2013–February 2015:  Communications Within Defendants Admitting the Similarity Between the Accused Products

Kartri marketed its accused product under the brand "Ezy Hang." *See, e.g.*, Kubus Dep. Tr. at 18–20. When customers inquired whether Kartri sold hookless products, Kartri personnel were directed to respond that Kartri could not sell that exact product, but that its competing Ezy Hang products were an adequate substitute. *Id.* at 18–23. If a client was interested in Ezy Hang, Kartri would "take it from there." *Id.* at 24. Kartri adopted this approach because it was "just try[ing] to do business. . . . [F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless. I could never supply anything." *Id.* at 24.

The following communications of or with Kartri employees and executives, plaintiffs argue, reflect Kartri's appreciation—even before February 2015, when Focus sent a cease-and-desist letter to Kartri—of the strong similarity between plaintiffs' and defendants' products:

- On August 30, 2013, Middleberg emailed Kubus, stating, "if I understand correctly [Fairfield Inn] want[s] the same product that [A&A LLC] is using. What was your understanding?" Kubus responded by proposing to fill an order of the accused product "thinking we might get lucky." Middleberg Dep. Tr. at 127, 128, 130.

- On December 18, 2013, Dolph, Kartri's sales operations manager, sent an email with the subject line "HOOKLESS" to Kimberly Ihsen, product manager at Best Western International. The email stated that Kartri has "a version of hookless called EZY

33

Hang, [and] we would like to know how we can go about getting this product

considered as an offering on Best [W]estern supply." PTX 230 at 2.

- On April 24, 2014, in an email exchange among Pam Cales of GMK Associates and,
  *inter alia*, Sarah Woody, a Kartri sales director, Cales requested a price quote for
  "Hookless shower curtain[s]." Woody, without correcting Cales's misperception,
  provided the requested quote. PTX 231.

- Between December 8 and 16, 2014, in an email exchange initiated by retail customer
  Rick Roberts, Roberts requested a price quote for "Hookless Shower Curtains."
  Dolph quoted a price for a "Hookless Double H Chevron pattern" curtain. PTX 232.

Kartri also frequently received phone calls from consumers attempting to order Focus's

products. Kubus testified that consumers often called Kartri demanding "Hookless" products,

and "they either have a picture attached from Focus's website. . . . And it's just known in the

industry. I mean, they've bombarded the industry with that particular product because it saves

the housekeeper time and money to put this product up. It's just known. [Zahner has] done

really well in that marketing direction." Kubus Dep. Tr. at 52–53. She estimated that 50% of

buyers inquiring about hookless shower curtains asked Kartri for Focus's products. *Id.* at 53.

In early 2014, Middleberg heard "from fabric suppliers, weavers, jobbers, people with

whom we've had years of relationships that the suppliers weren't getting paid; that Focus was in

financial trouble; that it was—that there was an opportunity in the market for us to get aggressive

and get out there and sell because they had been cut off by their suppliers." Tr. at 573.

### 4. February 27, 2015–2017: Focus Issues a Cease-and-Desist Letter and Sues Kartri; Defendants Continue to Sell the Accused Products

On February 27, 2015, Focus, through counsel, sent a letter to Marquis stating that its

manufacture and sale of the accused products infringed Focus's intellectual property rights, and

34

demanding Marquis cease and desist. PTX 152 at 1.[20] That day, Woody, Kartri's general office sales director, forwarded the letter to Kartri's owners Goskowski and Kubus, who brought the letter to Middleberg's attention. PTX 166. The same day, Middleberg replied: "Don't worry about this [Pong and I] will submit our pa[t]ent number. There is nothing they can do." PTX 166 at 1; Tr. at 608. Middleberg did not confer with counsel before so responding, and "did nothing in response to this letter." Tr. at 608. Kubus did not ask Middleberg whether he had conferred with counsel in reaching this conclusion. *Id.* at 773. At some point in this period, Goskowski conferred with Kartri's counsel, Bernhard Molldrem, and "came away with the understanding that [she was] complying with the law." *Id.* at 648–49.

Marquis and Kartri thereafter "continued to market the product," Middleberg Dep. Tr. at 113, 121, for another three-and-a-half years, until November 12, 2018, three months after this Court issued its *Markman* ruling on August 9, 2018. Tr. at 587, 615, 654. Communications during this period, including the following, bear on defendants' contention that until then, they did not appreciate that their Ezy Hang product might be infringing Focus's patents or marks.

*Reliance on purported Chinese patent*: On March 3, 2015, days after receiving the cease-and-desist letter, Goskowski emailed Middleberg and Kubus, asking, "David, how do we get away with a China patent? How does that cover us in the U.S.?" *See* Goskowski Dep. Tr. at 99 (quoting email in PTX 167). Goskowski nevertheless testified that, upon seeing Pong's purported patents, she believed—despite these being in Chinese and untranslated—that these

---

[20] Before receiving the cease-and-desist letter, Kubus knew that Focus manufactured and distributed hook-free shower curtains for hotels, but had not inquired into Focus's patents. Tr. at 645 (Kubus). At an unspecified date before receiving the letter, Goskowski received a phone call from Bucklew, Focus's then-president. In that call, Goskowski told Bucklew that in her view, Kartri was not infringing. Tr. at 648–49 (Goskowski).

covered Kartri's Ezy Hang products. *Id.* at 99–100.[21]  Goskowski never sought a translation of

the Chinese-language patent. Tr. at 668.  Although she attested that she had received the

Chinese-language patents in 2013, these bear the date March 19, 2014. *See* PTX 28-1 at 12.

Goskowski testified that she had relied on Middleberg's claim to have found reliable Pong's

claim to own a Chinese patent that would protect the Ezy Hang design in the United States, and

believed Kartri's products were covered by that patent. Tr. at 674.  Goskowski never contacted

her attorney, Molldrem, about the purported Chinese patents. *Id.* at 675.[22]

   ***Filing of Focus's first lawsuit***:  On June 30, 2015, Focus filed the first of two lawsuits

today consolidated in this action. Its Complaint alleged that Kartri had infringed design patent

'232 and the utility patents '248, '609, and '088. *Focus Prods. Grp. Int'l, LLC et al. v. Kartri

Sales Co.*, No. 15 Civ. 5108 (PAE) (S.D.N.Y.), Dkt. 1.  The lawsuit was served on Kartri on

September 11, 2015. *See id.*, Dkt. 8.

   ***Discovery of Carnation's EZ-ON product***:  In summer 2015, Kartri discovered

Carnation's nearly identical EZ-ON product. Tr. at 676 (Goskowski).  The packaging of

Carnation's product, Goskowski admitted, displayed on the front the language "using patented

hookless technology," and listed the applicable U.S. patents—the design and utility patents at

issue in this suit—on the back. Tr. at 678; *see* PTX 28 (Goskowski declaration) at 1 ("During

the summer of 2015, we discovered [a] shower curtain, sold by Carnation . . . which had

---

[21] *See* PTX 28-1 (declaration by Goskowski, stating that "[i]n 2013, Mr. David Middleberg, contacted us to introduce a new style shower curtain that had an embedded buckle incorporated in its top margin," that "Mr. Middleberg had his supplier in China send [Kartri] patents that the supplier had obtained for the shower curtain embedded buckle," and that one such patent was "Chinese Utility Model patent CN 203852180 U (in English translation)," and another was "Chinese Design Patent CN 302766325 S (no translation available).").

[22] Middleberg later abandoned his view that Kartri's sales were lawful after Pong admitted to him that he did not in fact own a valid Chinese patent. Tr. at 603.  The record does not reflect whether or when Middleberg communicated this to Kartri.

embedded flat-top rings that have an overall shape similar to the buckles in Kartri's Ezy-Hang curtains.")

*Decision not to conduct an infringement analysis*: On September 21, 2015, Pong, prompted by Middleberg, emailed his lawyer Wang, asking for his view whether the Ezy Hang product likely infringed the Focus patents, whether Pong's patent was valid, and whether Wang would be prepared to defend Pong in a lawsuit. PTX 258 at 2. On September 22, 2015, Wang responded, offering to conduct an infringement analysis and draft an infringement report for $3,500. *Id.* Marquis did not commission this analysis, despite Middleberg's awareness that Focus had claimed infringement of its design ('232) and two utility ('248 and '609) patents. Tr. at 599, 601 (Middleberg). Middleberg testified that, "in retrospect," Marquis "probably shouldn't have" continued to manufacture the accused Ezy Hang product, "but at the time we thought we were right and we continued to move forward." Tr. at 600.

*Filing of Focus's second lawsuit*: On December 30, 2015, Focus filed the instant action against Kartri. *Focus Prods. Grp. Int'l, LLC et al. v. Kartri Sales Co., Inc.*, No. 15 Civ. 10154 (PAE) (S.D.N.Y.), Dkt. 1. On February 4, 2016, Kartri brought Marquis into this action by initially filing a third-party complaint against it. *Id.* Dkt. 11; *see also id.* Dkt. 19 (Marquis waiver of service executed February 10, 2016).

*Pong's statements to Middleberg about a pending U.S. patent*: After litigation began, Pong claimed to Middleberg that he had a pending United States patent on the Ezy Hang product. On February 2, 2016, Middleberg emailed Pong: "When we last spoke in China you mentioned that the US Patent on the shower curtain buckle would be given to you in February [of 2016]. Can you please update me on perhaps a more specific date on which you expect to receive the patent?" PTX 183 at 2. Pong responded that patent approval would take "another 6–

37

8 months." *Id.* at 1. Marquis's president, Ranieri, interjected that "6–8 months could prove to be

a problem." *Id.* Marquis nonetheless continued to sell the accused products to Kartri, for resale

to hospitality or retail customers, believing that "Focus [was] in deep financial trouble," and that

it and Kartri could "take advantage of that vulnerability." Tr. at 610–11 (Middleberg).

**Kartri's wariness of Pong**: On January 19, 2016, Goskowski emailed Middleberg,

expressing frustration that he had had asked Kartri to accept payments directly from Pong, of

whom her counsel had urged Kartri to steer clear. PTX 182.[23]

**Continued sales to customers of "Hookless" curtains**: After litigation began, Kartri

continued in internal and customer communications to hold out Ezy Hang as equivalent to the

HOOKLESS® product. On July 1, 2015, Woody, in an email to Kubus, referred to a certain Ezy

Hang product as "our equivalent of the Hookless Double H pattern." PTX 217. In an email

exchange between May 11 and 23, 2016, Kubus and Cheryl Hicks, a Kartri customer support

representative, discussed a price quote for a hospitality customer seeking a "sub[stitute] or

similar item" for an out-of-stock Focus product. PTX 609. In an email exchange in June 2016,

retail customer Karen Teska of Standard Textile requested a quote for "Hookless shower curtains

using our matrix fabric." Dolph quoted a price for Ezy Hang. PTX 246.

**K.    Procedural History of This Litigation**

**1.    December 30, 2015–December 21, 2017:  The Prior Related Action**

On June 30, 2015, ZDG, HSNA, and Focus (the "original plaintiffs") sued Kartri,

alleging willful infringement of the utility patents '248, '609, and '088 and of the EZ-ON

Trademark, and unfair competition under the Lanham Act and New York law. *Focus Prods.*, 15

---

[23] *See also* PTX 182 at 1 (Kartri email to Middleberg, stating "now you want me to take a check
from [Pong] and put it thr[ough] my company and send something back to you, NOT GOING
TO happen, I am not going to take the chance of an audit by them and have them see a check
from Pong").

Civ. 5108, Dkt. 1. On October 1, 2015, Kartri answered and filed counterclaims. Dkt. 9. On

October 26, 2015, the original plaintiffs answered. Dkt. 16. On February 8, 2016, Kartri filed a

third-party complaint alleging that Marquis was the liable party. Dkt. 22.

### 2.    December 30, 2015–December 21, 2017:  Initial Stages

On December 30, 2015, the original plaintiffs filed the initial complaint in this litigation

against Kartri, alleging willful infringement of the design patent '078. Dkt. 1; *see also* Dkt. 7

(refiling). On February 4, 2016, Kartri filed a third-party complaint against Marquis, alleging

that Marquis was the liable party. Dkt. 11; *see also* Dkt. 13 (refiling). On February 9, 2016,

Kartri moved to dismiss. Dkt. 16. On March 1, 2016, the original plaintiffs filed the first

amended complaint against defendants, now alleging willful infringement of the design patent

and the utility patents, and willful infringement of, and unfair competition with, the EZ-ON and

Hookless Trademarks and the original plaintiffs' trade dress, and adding Marquis as a third-party

defendant. Dkt. 20. On March 22, 2016, Kartri filed, and on March 24, 2016, refiled, a partial

motion to dismiss and strike certain allegations from the amended complaint, a memorandum of

law, supporting exhibits, and a declaration in support. Dkts. 26–29. On April 11, 2016, the

original plaintiffs opposed the motion. Dkts. 33–34. On April 12, 2016, the original plaintiffs

voluntarily dismissed the related action at 15 Civ. 5108 and converted Kartri from a third-party

defendant into a defendant. Dkts. 28, 32, 36. On April 18 and 19, 2016, Kartri filed a reply in

support of its motion to dismiss. Dkts. 39–41. On May 5, 2016, the original plaintiffs filed the

second amended complaint, amending claims and adding factual allegations. Dkt. 47. On May

26, 2016, Marquis filed a partial motion to dismiss. Dkt. 55. On June 17, 2016, the original

plaintiffs opposed the motion, Dkt. 58, and, on June 24, 2016, replied, Dkt. 59.

On July 14, 2016, the Court denied both motions to dismiss in their entirety. *See* Dkts.

63, 77 (bench ruling transcript). On July 25, 2016, the Court approved a case management plan

and consolidated this case with 15 Civ. 5108. Dkts. 65, 67. On July 26, 2016, the original

plaintiffs filed a third amended complaint consolidating all allegations from the two actions.

Dkt. 68. On July 27, 2016, the Court dismissed 15 Civ. 5108 with prejudice. *See* 15 Civ. 5108,

Dkt. 30. On July 28, 2016, both defendants answered and filed counterclaims. 15 Civ. 10154,

Dkts. 69, 70. On August 17, 2016, the original plaintiffs answered defendants' counterclaims.

Dkts. 75, 76.

Over the next 13 months, discovery proceeded, contentiously. *See, e.g.*, Dkts. 106, 112,

125. On September 19, 2017, the Court ordered the filing of a Fourth Amended Complaint.

Dkts. 145, 158. On September 29, 2017, that complaint—now entailing all plaintiffs in the

action—was filed. Dkt. 148 ("FAC"). On October 12, 2017, Kartri filed a motion to dismiss or

transfer for improper venue. Dkt. 149. On October 13, 2017, both defendants answered the

FAC and filed counterclaims. Dkts. 150, 151. On October 27, 2017, plaintiffs opposed Kartri's

motion and filed supporting declarations and exhibits. Dkts. 153–154.

On December 21, 2017, the Court denied Kartri's motion in a bench ruling. Dkt. 171.

### 3. July 7, 2017–August 9, 2018: The *Markman* Hearing and Ruling

On July 7, 2017, the parties filed their original joint claims chart, Dkt. 124, and, on

November 22, 2017, an amended such chart. Dkt. 162.[24] On July 26, 2018, the Court held a

---

[24] On December 22, 2017, plaintiffs filed an opening *Markman* brief. Dkt. 169. On January 22,
2018, defendants filed *Markman* briefs and supporting exhibits. Dkts. 173, 174. On February 5,
2018, plaintiffs filed reply briefs. Dkts. 177, 179. On February 9, 2018, Marquis sought leave to
file, and submitted, a sur-reply. Dkt. 181. On February 14, 2018, plaintiffs consented to
Marquis's filing of the sur-reply, on the condition that the Court also consider plaintiffs'
responsive letter brief. Dkt. 182.

*Markman* hearing. *See* Dkt. 193 (transcript). On August 9, 2018, the Court issued its *Markman* ruling, construing 16 disputed terms relevant to the utility patents. Dkt. 198.[25]

### 4.   March 5, 2019–January 4, 2021: The Summary Judgment Decisions

On March 5, 2019, the Court held a pre-motion conference. *See* Dkts. 230, 241 (transcript). On March 26, 2019, plaintiffs filed a summary judgment motion and supporting materials on their claims of design patent and trade dress infringement and on damages theories. *See* Dkts. 243, 244. They also moved to preclude defendants from offering revenue and cost data—and expert testimony based on it—that they had not produced in fact discovery. Dkt. 246.

On April 17, 2019, defendants filed a cross-motion and supporting materials, on their counterclaims that plaintiffs' Hookless Trademark is invalid, that defendants had not infringed the EZ-ON Trademark, and that plaintiffs lacked standing to allege infringement of the EZ-ON Trademark. Dkts. 253, 255. They also opposed plaintiffs' motion to preclude. Dkt. 254. On

---

[25] The Court construed the utility patents' terms as follows. For the '248 patent, the term "item" as "curtain," Dkt. 198 at 6; for all three utility patents, the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening," *id.* at 7; for all three utility patents, the term "inner circumference" as "inner edge that is curved, at least in part," *id.* at 13; for all three utility patents, the term "outer circumference" as "outer edge that is curved, at least in part," *id.*; for the '248 patent, the term "comprising a top" as "the uppermost point of the inner circumference of the ring; where the ring has more than one such point, the centermost such point," *id.* at 15; for the '248 patent, the term "approximately horizontal component"—which referred to the slit in the ring—as "a component that is either level or nearly so," *id.* at 20; for the '248 patent, the term "said slit exits said ring at said upper edge of said curtain" as "the slit exits the ring at or near the upper edge of the curtain," *id.* at 22; for the '248 patent, the term "closed ring" as "a slit where the ring is 'closed'—that is, the two radial edges adjacent to the slit are pressed together," *id.* at 23; for the '609 and '088 patents, the term "projecting edge" as "an edge that projects from the outer circumference of the ring," *id.* at 25; for the '609 patent, the term "next to said slit" as "adjacent to the slit," *id.*; for the '609 patent, the term "extends towards the ceiling" as "points upward (would hit the ceiling if extended)," *id.* at 26; for the '248 and '609 patents, the term "offset said top" as "to a side of the top," *id.* at 27; for the '609 patent, the term "slit extends through" as "slit passes through," *id.* at 28; for the '609 and '088 patents, the term "o'clock position" as "corresponding to the position on a standard 12-hour clock face"; and for the '609 patent, the term "approximately the 1 o'clock or 2 o'clock position on said ring" as "the area between and around the 1 o'clock and 2 o'clock positions on a standard 12-hour clock face," *id.* at 33.

May 7, 2019, plaintiffs filed an opposition to defendants' cross-motion and reply, a reply in support of their motion to preclude, and supporting materials. Dkts. 272–275. On May 21, 2019, defendants filed their reply and supporting materials. Dkt. 288.

On April 16, 2020, the Court resolved the cross-motions for summary judgment, and held the motion to preclude in abeyance. Dkt. 297. On May 14, 2020, plaintiffs moved for limited reconsideration of the Court's holding that plaintiffs' trade dress was generic and a memorandum and exhibits in support. Dkt. 303. On May 27, 2020, defendants filed a memorandum in opposition. Dkt. 305. On June 5, 2020, plaintiffs replied. Dkt. 308. On June 30 and July 1, 2020, plaintiffs supplemented their briefing. Dkts. 309, 310.

On January 4, 2021, the Court granted plaintiffs' motion for reconsideration, reversing its holding that their trade dress was generic and reserving that issue for trial. Dkt. 312.

### 5. April 15, 2021–June 24, 2022: Final Pretrial Matters

On April 15 and 16, 2021, the parties filed their joint pretrial order and proposed *voir dire* and jury instructions. Dkts. 323, 329, 345, 346. On April 15, the parties filed motions *in limine*—five by plaintiffs, Dkts. 324–328, three by Marquis, Dkts. 338, 340, 342, and 12 by Kartri, Dkts. 330–337, 339, 341, 343, 344. On May 21, 2021, the parties filed oppositions. Dkts. 366–381. On May 28, 2021, the parties filed replies. Dkts. 383–387. On August 5, 2021, the Court resolved plaintiffs' motions *in limine* in a bench ruling. Dkts. 393, 412 (transcript). On November 23, 2021, the Court resolved defendants' motions *in limine* in a bench ruling. Dkts. 425, 433 (order), 436 (transcript).

On April 13, 2022, the parties consented to a bench trial. Dkt. 443. On April 25, 2022, the Court scheduled trial for June 15–17 and June 27–29, 2022. Dkt. 444. On May 14, 2022, defendants filed proposed findings of fact, conclusions of law, and a supporting exhibit. Dkt. 453. On May 20, 2022, defendants filed excerpts of supporting deposition testimony. Dkt. 454.

That same day, plaintiffs filed their proposed findings of fact, conclusions of law, and supporting exhibits and deposition testimony excerpts. Dkt. 455. On June 3, 2022, defendants filed objections to plaintiffs' witness declarations. Dkt. 463. On June 7, 2022, the Court adjourned the June 15–17 trial dates, kept the June 27–29 trial dates, and scheduled new trial dates for July 26–28, 2022. Dkt. 468. On June 10, 2022, plaintiffs responded to defendants' objections. Dkt. 471. On June 21, 2022, the Court overruled these objections. Dkt. 474. On June 24, 2022, defendants submitted further objections to plaintiffs' witness declarations. Dkt. 478.

On June 27–29 and July 26–28, 2022, the Court held a bench trial. On August 11, 2022, plaintiffs filed updated proposed findings of fact and conclusions of law. Dkt. 494. On August 25, 2022, defendants did the same. Dkt. 500.

## II.    Conclusions of Law as to Liability on the Claims Before the Court

### A.    Jurisdiction

The FAC brings claims of patent infringement under 35 U.S.C. §§ 101 *et seq.* (Count I), and of trademark infringement and unfair competition under 15 U.S.C. § 1125(a) (Count II). The Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1331. *See Smith v. Harris*, No. 21 Civ. 571 (PAE), 2021 WL 4655943, at *2 (S.D.N.Y. Oct. 6, 2021) (citing *Bay Shore Union Free Sch. Dist. v. Rain*, 485 F.3d 730, 734–35 (2d Cir. 2007)).

Count III brings a New York common law claim of unfair competition with plaintiffs' Trade Dress. The Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1367, as it arises from a common nucleus of fact as the federal claims, in that all turn on the same allegedly infringing conduct. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

Appx243

### B.    Standing Under the Lanham Act

At the threshold, the Court must determine whether any plaintiff has standing under the Lanham Act to bring claims of infringement and unfair competition for the Hookless Mark, the EZ-ON Mark, and the Trade Dress. This turns on whether any plaintiff owns the two marks and Trade Dress. The parties particularly contest ownership of the EZ-ON Mark.

### 1.    Applicable Legal Framework

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act "provides separate causes of action for, among other things, infringement of registered and unregistered trademarks." *Fed. Treasury Ent. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013); *see* 15 U.S.C. § 1114 (registered trademark); *id.* § 1125 (unregistered trademark or trade dress). An infringement action under § 1114 for registered trademarks—such as the HOOKLESS® Mark—is available only "to 'registrant[s]' of the trademarks at issue, which the Act defines to embrace the actual registrant's 'legal representatives, predecessors, successors and assigns.'" *SPI Spirits*, 726 F.3d at 72 (quoting 15 U.S.C. § 1127). By contrast, § 1125(a) allows "any person who believes that he or she is or is likely to be damaged" by a defendant's actions to bring an infringement action for an unregistered trademark or a trade dress. 15 U.S.C. § 1125(a). A plaintiff must also show that the trademark or trade dress is valid. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).

### 2.    Ownership and Validity of the HOOKLESS® Mark

"A certificate of registration with the PTO is *prima facie* evidence that the mark is registered and valid (*i.e.*, protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 433 (S.D.N.Y. 2019) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 217 n.10 (2d Cir. 2012)) (alteration in *Capri Sun*). "As such, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 239 (S.D.N.Y. 2013) (citing, *inter alia*, *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976)).

Plaintiffs have produced certificates of registration that meet their *prima facie* burden. These show that, on June 6, 2000, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 2,355,554, PTX 84, and on August 29, 2000, ZDG registered the Hookless Mark on the PTO's Supplemental Register, PTX 85. On a date the record does not specify, the PTO refused to continue the Hookless Mark's registration, on the grounds that it was merely descriptive of the shower curtain product. *See* PTX 87. On November 23, 2009, ZDG filed a response opposing that determination. *Id.* On August 3, 2010, ZDG registered the Hookless Mark on the PTO's Supplemental Register under registration number 3,829,837. PTX 86. On April 17, 2012, ZDG registered the Hookless Mark on the PTO's Principal Register under registration number 4,127,283. PTX 520.

Defendants have not adduced evidence of the Hookless Mark's invalidity. As the Court explained in its summary judgment decision on April 21, 2020, plaintiffs have accused only Kartri of infringing the Hookless Mark. Marquis thus lacked standing to challenge the mark's validity. Dkt 297 at 20. And, the Court held, Kartri had failed to timely assert the defense and

45

thereby waived it. *See id.* ("Failure to plead an affirmative defense ordinarily results in forfeiture of that defense." (quoting *Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015))).

The Court accordingly finds the Hookless Mark valid and that plaintiffs own that mark. Plaintiffs have standing to bring their Lanham Act claims pertaining to the HOOKLESS® Mark.

### 3.    Ownership and Validity of the EZ-ON Mark

#### a.    *Ownership*

To establish ownership over an unregistered trademark, a plaintiff must show "prior use of the trademark." *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 573 (S.D.N.Y. 2013). "[A] plaintiff can demonstrate prior use through licensing the trademark to a licensee." *Id.* at 574 (citing *Haw.–Pac. Apparel Grp. Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006)). This is so even where the "first and only use of the mark was made . . . by the licensee," so long as the licensor "exercise[s] some control over the licensee's use of the mark." *Id.* (citing *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002)).

Plaintiffs argue that the February 1, 2012 Carnation License Agreement, PTX 370, unambiguously conferred ownership of the EZ-ON Mark on plaintiffs' predecessor A&A LLC, and thus gave plaintiffs standing to bring infringement and unfair competition claims as to that Mark. The Court must therefore interpret that Agreement to determine whether this is so.

"Under New York law, the interpretation of a contract 'is a matter of law for the court to decide.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 650 F. App'x 70, 71 (2d Cir. 2016) (summary order) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). "If the Court finds contract provisions to be unambiguous, then it must interpret those provisions in light of 'their plain and ordinary meaning.'" *Id.* (quoting *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011)). "However, if the

contract is ambiguous and relevant extrinsic evidence as to its meaning is available,

its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance*

*Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006). "In interpreting an ambiguous contract

provision, the factfinder 'should, when possible, apply the same measure as the parties have

applied in performing their obligations.'" *Id.* at 112 (citations omitted).

     The Carnation License Agreement unambiguously gave A&A LLC, Focus's predecessor,

control over Carnation's use of the intellectual property that is the subject of that agreement.

Section 4.1 states that the "sublicense to Carnation is non-exclusive with respect to ZDG's

current licensees, namely HSNA, A&A [LLC and others]." Section 4.2 states that, "[a]s part of

said sublicense, [A&A LLC] hereby grants [Carnation] the right to use the following trademark

on the Licensed Products: 'EZ ON Shower Curtain[.]'" And § 5.3 requires that Carnation assign,

*inter alia*, "any intellectual property falling within the scope of Licensed Patents, Licensed

Trademarks, or Licensed Products . . . or a patent or trademark application is filed for by

sublicensee during the term of this agreement."

     The only point of contention between the parties is whether the EZ-ON Mark falls within

the scope of the Carnation License Agreement, that is, whether the agreement required Carnation

to assign the EZ-ON Trademark when it applied for its registration with the PTO.

     For three independent reasons, the Court finds that, by its unambiguous terms, the

Carnation Licensing Agreement bound Carnation to assign its rights in the EZ-ON Trademark to

ZDG.

     First, § 1.6 defines the "Licensed Products" as "shower curtains having integrated rings

of the form depicted in Appendix A" and "any rings having a substantially similar appearance to

that shown in Appendix A, namely, rings having a flat upper edge, an opening for suspension of

the shower curtain on a shower rod, and a diagonal slit for placement of the opening on the shower curtain rod, wherein the slit extends from the inner circumference of the opening to the outer circumference of the opening, and wherein said diagonal slit is within +/– 15 degrees from that shown in Appendix A." Comparing the images of Appendix A to the Carnation License Agreement and the EZ-ON Mark as Carnation used it at the time makes clear the two are "substantially similar."

### Appendix A



Fig. 1



Second, under § 4.2, A&A LLC "grants" Carnation the right to use the mark "EZ ON Shower Curtain"—at the time unregistered—on its licensed products. The restrictions that the Carnation License Agreement imposes on these products thus restrict the use of the EZ-ON Mark on those products. It would not have made sense for licensor A&A LLC to grant Carnation the right to *use* the EZ-ON Mark on its shower curtain products if Carnation *owned* the Mark.

Defendants argue that Carnation has professed a contrary subject understanding of § 4.2, and that Carnation's understanding should control. That contention does not fairly reflect the record. Mayer, Carnation's CEO, testified that he viewed § 4.2 to mean merely that A&A LLC and ZDG consented to Carnation's usage of the Mark, not that A&A LLC or ZDG owned it. Mayer Dep. Tr. at 121 ("A: I took it to mean that it was [a] recognition that we were already doing this, so, I wasn't aware that [ZDG and A&A LLC] were granting a right that [they] possessed."). But he did not dispute that, under § 4.2, plaintiffs had granted Carnation the right to use the EZ-ON Mark. *Id.* Pressed, Mayer acknowledged that "what [§ 4.2] says" was that A&A LLC had granted Carnation a sublicense in the EZ-ON Mark. *Id.* And when questioned whether "someone [could] sublicense rights if they don't own those rights," Mayer conceded, "I would think not." Mayer Dep. Tr. at 138–39. In any event, the plain language of the agreement controls, not one party's claimed understanding. *Lantheus Med. Imaging*, 650 F. App'x at 71. In light of the plain language of § 4.2, Carnation was undeniably required to assign the unregistered EZ-ON Mark and its trademark application to ZDG.[26]

Third, § 5.3 independently establishes that plaintiffs owned the EZ-ON Mark. It states: "In the event that any intellectual property falling within the scope of Licensed Patents, Licensed

---

[26] It is undisputed that Carnation filed a trademark application with the PTO for the EZ-ON Mark during the term of the Carnation License Agreement. Mayer Dep. Tr. at 134.

Trademarks, or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by sublicensee during the term of this agreement, such additional intellectual property shall be assigned to ZDG and deemed included within the scope of the present [a]greement." PTX 370 at 5. The phrases "intellectual property" and "additional intellectual property" are not capitalized in this provision; they are thus used in the vernacular, not in the defined sense that § 1.9 uses the capitalized term "Intellectual Property." And reading "intellectual property" in § 5.3 to refer to the "Intellectual Property" in § 1.9 would create an inconsistency, as "Licensed Patents, Licensed Trademarks, or Licensed Products" encompass the definition of "Intellectual Property" of § 1.9. It is also clear that the EZ-ON Mark is intellectual property that "falls within the scope" of the Intellectual Property defined in §§ 1.6–1.9, as the Court has found, *supra*, that the D-shaped ring under the EZ-ON Mark is "substantially similar" to the ring depicted in Appendix A. Further, the unregistered EZ-ON Mark was, between 2012 and the start of this suit in December 2015, "reduced to practice," and a trademark application as to it was filed only later. *See* Mayer Dep. Tr. at 33, 129 (conceding that Carnation, "at a subsequent date[,] . . . applied for and received [a] trademark for [the EZ-ON Mark]"). The unregistered EZ-ON Mark and its trademark application thus are "additional intellectual property" that Carnation was required to assign to ZDG.[27]

---

[27] Defendants' counterargument, as articulated by Mayer, fails. He contended that "EZ On [does not] fall[] within any of those categories [in § 5.3] to any rights that Focus [held]." Mayer Dep. Tr. at 125. He based this reading on a conflation of § 5.3's term "intellectual property" with § 1.9's term "Intellectual Property"—specifically defined as the "Licensed Patents" as defined in § 1.7 and the "Licensed Trademarks" as defined in § 1.8, but not covering the "Licensed Products" of § 1.6. *Id.* at 126. But § 5.3 in its entirety refers to lower-case "intellectual property falling within the scope of the Licensed Patents, Licensed Trademarks, or Licensed Products" as each term is defined in §§ 1.6–1.8. As noted, Mayer's construction would make the agreement internally contradictory. At trial, the Court questioned Zahner as to his understanding why "Intellectual Property" in § 5.2 was capitalized, but not capitalized in § 5.3, and whether it meant

In contesting plaintiffs' ownership of the EZ-ON Mark, defendants also point to

Carnation's March 3, 2017 cease-and-desist letter to Focus. DTX 127. That letter is not

cognizable, because the Court finds the Carnation License Agreement textually unambiguous.

*See Lantheus Med. Imaging*, 650 F. App'x at 71. But even if considered, the letter would not

guide the meaning of the Agreement. It would merely reflect a post-agreement dispute as to its

terms, which the Court finds unambiguous. And, although disputing that § 5.3 covered and

made assignable to ZDG newly developed intellectual property, Mayer conceded facts making

the EZ-ON Mark such property, in that the Mark appeared on the packaging of a Licensed

Product and that he had filed a trademark application for the Mark within the term of the

Carnation License Agreement. Mayer Dep. Tr. at 129, 134, 179; *see* PTX 113 at 1 (Carnation

application to register EZ-ON Trademark with PTO, filed March 3, 2017, granted September 26,

2017); *see also* Tr. at 131–32 (Zahner, testifying that PTX 270 contained a true and correct

image of a packaged EZ-ON curtain product that Carnation used in selling the EZ-ON product).

The Court accordingly finds that plaintiffs own the EZ-ON Mark.[28] They thus have

standing under the Lanham Act to bring their claims that defendants infringed and unfairly

---

that § 5.2 referred to the Intellectual Property extant at the time of the formation of the Carnation
License Agreement, whereas § 5.3 referred to intellectual property to be generated. Tr. at 127–
28. Non-lawyer Zahner initially could not explain the differing capitalization in the sections. *Id.*
at 128. But, when later questioned as to his understanding as to who held proprietary rights
under the Carnation Agreement, Zahner testified that it covered "anything that's developed by
Carnation during this time that relates to the intellectual property that we're licensing them,
whether it be a trademark, trade dress, or manufacturing method, a patent, an extension, an
improvement, all those things would be assigned to [ZDG] and licensed to [HSNA] and [then]
licensed to the appropriate person [at Carnation]." *Id.* at 130.

[28] In so finding, the Court does not rely on evidence plaintiffs adduced of a new agreement
entered into deep in this litigation. On October 1, 2021, three years after the close of fact
discovery, plaintiffs filed a letter and supporting exhibits representing that, on September 29,
2021, plaintiffs ZDG, HSNA, SF Home Décor, and Sure Fit Home Products, and non-party

competed with that Mark. Defendants' affirmative defense that plaintiffs lack standing as to this claim is dismissed.

       b.     *Validity of the EZ-ON Mark, and Marquis's Counterclaim of Invalidity*

Marquis's only argument that the EZ-ON Mark is invalid is that, as of the alleged infringement in August 2013, not enough time had passed for Focus to acquire the consumer goodwill associated with the EZ-ON Mark. But a licensee's use of a trademark—such as Carnation, the seller of the EZ-ON product—"inures to the benefit of the licensor," *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000); *see also* 15 U.S.C. § 1055; *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 20–21 (S.D.N.Y. 2001), *aff'd in relevant part and remanded*, 277 F.3d 253 (2d Cir. 2002). Marquis does not adduce authority that is contrary to this proposition. The Court thus finds the EZ-ON Mark valid and denies Marquis's counterclaim that it is invalid.

---

Carnation had executed an agreement, Dkt. 414-1 (the "("AA"), that amended and clarified their existing Licensing Agreement of February 1, 2012. Dkt. 414. The AA specified, in effect, that the intellectual property rights in the EZ ON Trademark and trade dress were owned by ZDG, and had been since the time of the License Agreement's execution. The AA stated that: (1) "[p]ursuant to the [Licensing] Agreement, all intellectual property rights to the Ring and to the Shower Curtains incorporating that Ring . . . were owned and to be owned by ZDG," AA § 1(d); (2) "Carnation hereby irrevocably assigns to ZDG all rights, title, and interest that Carnation has or may have in the intellectual property associated with the Ring and Shower Curtain . . . including all rights in the EZ ON Trademark and EZ ON Trademark Registration and all good will associated therewith," *id.* § 2(a); (3) Carnation would not contest ZDG's ownership in the intellectual property rights in the HOOKLESS® Mark from February 1, 2012, *id.* § 3(a); and (4) Carnation would not contest ZDG's ownership in the intellectual property rights in the EZ ON mark from February 1, 2012, *id.* § 3(b). On October 1, 2021, Carnation registered the AA with the PTO. Dkt. 414-2. Plaintiffs contended that this letter confirms that they have owned the EZ ON Trademark and trade dress since at least February 1, 2012. Although the Court does not rely on this letter as proof of ownership, the Court denies defendants' post-trial request, at Dkt. 480, to strike the letter or plaintiffs' counsel's references to it.

### C.    Failure to Join an Indispensable Party

Marquis asserted as its 11th affirmative defense that plaintiffs had failed to join an

indispensable party (Carnation) that had an ownership interest in, *inter alia,* the common law

trademark of EZ-ON, and the trade dress at issue here.[29] Dkt. 151 at 21.

A party may seek dismissal under Rule 12(b)(7) at any stage of a proceeding before or

during trial, for failure to join a necessary party under Rule 19. Rule 12(b)(7) requires a district

court to "dismiss an action where a party was not joined only if: (1) an absent party is required,

(2) it is not feasible to join the absent party, and (3) it is determined 'in equity and good

conscience' that the action should not proceed among the existing parties." *In re Great Atl. &*

*Pac. Tea Co., Inc.,* 467 B.R. 44, 58 n.9 (S.D.N.Y. 2012) (quoting *Republic of Phil. v. Pimentel,*

553 U.S. 851, 862–63 (2008), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.,*

508 F. App'x 63 (2d Cir. 2013) (summary order)).

> Under Rule 19(a)(1), a person must be joined as a necessary party, if feasible, if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing
> parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so
> situated that disposing of the action in the person's absence may: (i) as a practical
> matter impair or impede the person's ability to protect the interest; or (ii) leave an
> existing party subject to a substantial risk of incurring double, multiple, or
> otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). The second prong of Rule 19(a) requires that "there must be more than

an unsupported assertion that [the non-joined party] has a claim to that interest." *Jonesfilm v.*

*Lion Gate Int'l,* 299 F.3d 134, 140 (2d Cir. 2002) (citing Rule 19(a)(2)).

---

[29] The defense also asserted the indispensable party's ownership and interest in the design and
utility patents. As to the design patent, that issue is not before the Court, with the proceedings as
to that patent presently stayed. As to the utility patents, the Court found on summary judgment
that defendants have infringed the utility patents; this defense is therefore meritless.

Appx253

"Where a court makes a threshold determination that a party is necessary under Rule 19(a) and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is 'indispensable' under Rule 19(b)." *Dunn v. Standard Bank London Ltd.*, No. 05 Civ. 2749 (DLC), 2006 WL 217799, at *2 (S.D.N.Y. Jan. 30, 2006) (citing *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002)).

Carnation was not a necessary party to this suit. The Court therefore need not determine whether it was indispensable. Marquis's defense turns on its claim that Carnation, not plaintiffs, own the EZ-ON Mark. And while it is "obvious [that] trademark owners are treated as necessary parties to a trademark infringement action[,] . . . [a] party that has assigned its entire interest in United States trademark rights is generally not treated as a necessary party." *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18 Civ. 407 (NG) (RLM), 2022 WL 1665453, at *9 (E.D.N.Y. May 25, 2022) (citing *Escamilla v. M2 Tech., Inc.*, 536 F. App'x 417, 420–21 (5th Cir. 2013) (summary order); and *Shima Am. Corp. v. S.M. Arnold, Inc.*, No. 88 Civ. 10064, 1989 WL 65014, at *2 (N.D. Ill. June 7, 1989)). Here, the Court has held that, under the 2012 License Agreement between plaintiffs and Carnation that settled the lawsuit between them, plaintiffs have owned the EZ-ON Mark. This alone supports denial of Marquis's Rule 19 defense. *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, No. 04 Civ. 4099 (DLC), 2005 WL 1164073, at *11 (S.D.N.Y. May 18, 2005) (denying 19(a) motion where non-party had assigned its trademark rights to a party); *Shima Am. Corp.*, 1989 WL 65014, at *2 ("By the October 1988 agreement, Kanebo has assigned all rights and duties to Shima and cannot be considered a necessary party to this action.").

Nor is there a threat of duplicative future litigation. In an amendment to the 2012 License Agreement executed on September 29, 2021, Carnation explicitly contracted not to

challenge plaintiffs' ownership of the EZ-ON Mark and trade dress. *See* Dkt. 414-2 at 2[30]; *see also De Beers LV*, 2005 WL 1164073, at *10, *12 (rejecting concern about future litigation where non-party had assigned trademark rights to a party).

The Court accordingly denies Marquis's affirmative defense under Rule 19(a).

Having resolved all threshold issues and finding plaintiffs to have standing to bring all claims in this action, the Court proceeds to the merits.

### D.    Infringement of Plaintiffs' Patents

There are no live issues at liability for patent infringement. The Court ruled, on summary judgment, that defendants have infringed plaintiffs' utility patents '248, '609, and '088. *See* Dkt. 297. And, as noted, plaintiff's patent infringement claim as to the design patent '078 has been stayed on consent pending a decision by the PTO as to its validity. JPTO at 4.

### E.    Infringement of the HOOKLESS® Trademark, EZ-ON Trademark, and Trade Dress Under Lanham Act Claims

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). To prevail on a trademark infringement, false designation of origin, or unfair competition claim, a plaintiff must show, first, that it owns a valid mark entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See, e.g.*,

---

[30] On the first day of trial, the Court notified counsel that it would not consider the amendment as evidence of ownership, but reserved doing so for other purposes, Tr. at 6–7, such as that here.

*Louboutin*, 696 F.3d at 224; *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003);

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

Section 43(a) protects "not just word marks, such as 'Nike,' and symbol marks, such as

Nike's 'swoosh' symbol, but also 'trade dress'—a category that originally included only the

packaging, or 'dressing,' of a product, but in recent years has been expanded by many Courts of

Appeals to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S.

205, 209 (2000); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).

### 1.    Entitlement to Protection

Having found the EZ-ON and HOOKLESS® Marks valid and owned by Focus, the Court

turns to whether Focus's Marks and Trade Dress are protectable.

#### a.    *Applicable Legal Framework*

For a mark to be "protectable," it must be "distinctive." *Louboutin*, 696 F.3d at 216.  A

mark is "inherently distinctive" if its "intrinsic nature serves to identify a particular source."

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also Qualitex Co. v.

Jacobson Prod. Co.*, 514 U.S. 159, 162–63 (1995) (inherently distinctive marks "almost

*automatically* tell a customer that they refer to a brand" (citation omitted) (emphasis in

original)).  Inherently distinctive marks are classified as either "suggestive" or "arbitrary or

fanciful." *Morgans Grp. LLC v. John Doe Co.*, No. 10 Civ. 5225 (KMW) (HBP), 2012 WL

1098276, at *4 (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d

Cir. 1992)).  Even if a mark is not inherently distinctive, it may "acquire" distinctiveness by

achieving "secondary meaning" in the relevant consumer market. *Two Pesos*, 505 U.S. at 769.

A mark has acquired "secondary meaning" when, "'in the minds of the public, the primary

significance of a product feature . . . is to identify the source of the product rather than the

product itself.'" *Id.* at 766 n.4 (quoting *Inwood Labs, Inc. v. Ives Labs., Inc.*,  456 U.S. 844, 851

n.11 (1982)). Such marks are termed "descriptive." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 313–14 (S.D.N.Y. 2012), *as amended* (Sept. 19, 2012).

On the other hand, "generic marks . . . are deemed not to be distinctive and are not afforded . . . protection, because they merely identify the class of goods or services offered, rather than a particular characteristic of those goods." *Id.* "[T]he initial classification of a mark to determine its eligibility for protection is a question of fact left to the determination of the district court." *Bristol-Myers Squibb*, 973 F.2d at 1039–40; *see also Rockland*, 894 F. Supp. 2d at 314.

A plaintiff asserting rights in a trade dress for product design must "surmount additional hurdles." *Yurman Design*, 262 F.3d at 115. The Supreme Court and Second Circuit have instructed that courts must exercise "particular 'caution,' when extending protection to product designs." *Id.* at 114 (quoting *Landscape Forms, Inc. v. Colum. Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997)); *see also Wal-Mart*, 529 U.S. at 215. That is because, unlike word marks and product packaging, whose "predominant function [is often] source identification," *Wal-Mart*, 529 U.S. at 212, product design "almost invariably" serves another purpose: "to render the product itself more useful or more appealing," *Yurman Design*, 262 F.3d at 114–15 (quoting *Wal-Mart*, 529 U.S. at 213).[31] Accordingly, trade dress protection for product design "entails a greater risk of impinging on ideas," *id.* at 116, and "hamper[ing] efforts to market competitive goods," *Landscape Forms*, 113 F.3d at 380.[32]

---

[31] *See also* Restatement (Third) Unfair Competition § 16 cmt.b (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.").

[32] *See also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1001 (2d Cir. 1997) ("[O]ver-inclusive protection of the product design risks conferring benefits beyond the intended

Appx257

Relevant here, in *Wal-Mart*, the Supreme Court held that product design can never be inherently distinctive, and thus always requires secondary meaning to be protected. 529 U.S. at 216. Thus, whereas word marks and product packaging can be held distinctive by virtue of *either* inherent distinctiveness or secondary meaning, "[t]he product design plaintiff . . . must always make the second, more difficult showing." *Yurman Design*, 262 F.3d at 115 (citing *Wal-Mart*, 529 U.S. at 213–14).[33] Finally, the claimed product design cannot be "generic," that is, so broad that it refers only "to the genus of which the particular product is a species." *Id.* (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32–33 (2d Cir. 1995) (internal quotation marks omitted)).

The Court considers the distinctiveness of, in turn, the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress.

> b.    *Protectability of the HOOKLESS® Mark*

The HOOKLESS® Trademark has been a federally registered trademark on the Principal Register since August 3, 2010. *See* PTX 86 (PTO Trademark Reg. No. 3,829,837). Such registration "creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *see also* 15 U.S.C. § 1115(a). Where a defendant does not rebut

---

scope of the Lanham Act and entering what is properly the realm of patent law."); *Landscape Forms*, 113 F.3d at 380 ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

[33] An additional "doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is 'not functional.'" *Yurman Design*, 262 F.3d at 116 (quoting 15 U.S.C. § 1125(a)(3)). A design feature is functional, and thus not protectable, if it is "essential to the use or purpose of the article, . . . affects the cost or quality of the article," or, in cases involving an aesthetic feature, if its protection "would put competitors at a significant non-reputation-related disadvantage." *Id.* at 116 (quoting *TrafFix*, 532 U.S. at 32–33) (internal quotation marks omitted).

Appx258

that presumption, a plaintiff need not make a showing of secondary meaning to establish that a mark is protectable. *Id.* Neither Marquis nor Kartri has adduced evidence to rebut that presumption. The Court accordingly finds the HOOKLESS® Mark inherently distinctive—and entitled to Lanham Act protection.

> c.    *Protectability of the EZ-ON Mark*

The EZ-ON Mark was not registered with the PTO until September 26, 2017—21 months after this suit was commenced and some four years after defendants' challenged conduct began. *See* PTX 113 (PTO Trademark Reg. No. 5,296,144).[34] The infringing conduct lasted from August 2013 until approximately November 12, 2018, when the Court issued its *Markman* ruling. Dkt. 198; *see* Tr. at 587 (Middleberg testifying that sales of infringing products stopped on November 12, 2018), 613 (same on cross). For the period of infringement before September 26, 2017, the Court therefore must assess the strength of the EZ-ON Mark by determining its category of distinctiveness.

The Court finds that the EZ-ON Mark is suggestive—and thus inherently distinctive.

"Marks are classified, in ascending order of strength, as '(1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful.'" *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384–85 (2d Cir. 2005) (alteration in original) (citation omitted). "Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 121 (2d Cir. 2022). "A suggestive mark 'employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought[,]

---

[34] For this registration, too, defendants have not adduced evidence rebutting the presumption of the EZ-ON Mark's inherent distinctiveness.

and perception to reach a conclusion as to the nature of the goods.'" *Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 28 (N.D.N.Y. 2003) (quoting *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)). "A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities[,] or characteristics of the goods." *Stix Prods., Inc. v. United Merchants & Mfrs*, Inc., 295 F. Supp. 479, 488 (S.D.N.Y. 1968) (footnote omitted). Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus.*, 412 F.3d at 385. "Qualitatively, the distinction [between suggestive and descriptive marks] may be illustrated by the difference in the creativity which must be summoned to devise, as well as the sequential thought necessary to catch the linkage [between the product's mark and its source]." *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 197 (S.D.N.Y. 2000).

"EZ-ON" is a suggestive mark because it does not merely describe what the product is—a shower curtain that incorporates rings into its fabric just beneath the upper edge—but invites the mind to draw an inference as to the characteristics that make the product preferable to hooked shower curtains—namely, that it "easily" snaps "onto" the shower rod. "EZ-ON" is not a descriptive mark because, on its own, it does not convey that it is a shower curtain. Nor does the mark neutrally describe the features of its underlying product. The EZ-ON Mark, in other words, *suggests* a reason it is superior to competing products, leaving it for the customer to associate this attribute with the product upon engaging with it. Finding this mark suggestive aligns with caselaw. *See Big Star Ent.*, 105 F. Supp. 2d at 197 (contrasting suggestive name "PASSION" for a fragrance for which "creativity . . . must be summoned to devise, as well as the sequential thought necessary to catch the linkage" between the mark and the source with the descriptive name "LITTLE TAVERN" for a restaurant, in which no such creative effort was necessary

(citing *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal, S.A.R.L.*, 673 F. Supp. 1238 (S.D.N.Y. 1987); and *Little Tavern Shops v. Davis*, 116 F.2d 903 (4th Cir. 1941)); *Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 283, 289–90 (S.D.N.Y. 2008) (finding mark "Alpha Beta Peel" for a skincare product descriptive where the word mark referred to alpha and beta hydroxy acids contained in the product, not a purported "alpha step" and "beta step" in the product's application); *RiseandShine*, 41 F.4th at 121–22 (affirming finding that "Rise" mark for coffee product was suggestive because "the word 'Rise' evokes images of morning, which suggests a quality or qualities of the product through the use of imagination, thought, and perception" (cleaned up)); *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 72 (S.D.N.Y. 2021) (finding shoe trademark "Traveltime" suggestive, and thus inherently distinctive, because "'Traveltime' connotes that it is time to engage in movement, and movement often requires putting on a pair of shoes"); *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 164–65 (2d Cir. 2004) (upholding finding that "Wet Ones" is a suggestive mark for pre-moistened towelettes); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 302–03 (S.D.N.Y. 2021) (finding mark "Two Hands" for sit-down cafés serving food and coffee suggestive, and thus inherently distinctive, because the term "evoke[d] images of restaurants and eating food" but "require[d] some degree of imagination . . . to invest the mark with its intended mental association" (citations and internal quotation marks omitted)).

The EZ-ON Mark is suggestive—and, the Court finds, inherently distinctive.

### d.    *Protectability of the Trade Dress*

#### i.    The Trade Dress is not functional

To establish the protectability of a trade dress, a plaintiff must establish that it is not functional. This requires a showing that a trade dress is not "essential to the use or purpose of the article." *Cartier, Inc. v. Scardell Jewelry, Inc.*, 294 F. App'x 615, 620 (2d Cir. 2008) (summary

61

order) (quoting *Yurman Design*, 262 F.3d at 116). The Court has held, on reconsideration of its summary judgment decision, that the Trade Dress is not functional. Dkt. 312 at 7–8. There is no occasion to revisit this decision here.

ii.    The Trade Dress is not generic

The parties disagree whether the Trade Dress is generic (and thus unprotectable) or descriptive (and thus protectable on a showing of secondary meaning). On summary judgment, this Court initially held that it was generic, Dkt. 297 at 26, but was persuaded on reconsideration to leave the question open for trial, Dkt. 312 at 14–16.

In determining the distinctiveness of a trade dress, courts must ultimately "look[] at all its elements and consider[] the total impression the trade dress gives to the observer." *Fun-Damental Too*, 111 F.3d at 1001. That determination must be made as of the date of the alleged infringement. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 744–45 (2d Cir. 1998). Courts do not protect "an idea or concept" if it "is too broad or too general to warrant protection." *Landscape Forms*, 113 F.3d at 380. Two factors guide this inquiry. "[F]irst, overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." *Id.* The Second Circuit has therefore required "a precise expression of the character and scope of the claimed trade dress," to enable courts "to evaluate how unique and unexpected the design elements are in the relevant market." *Id.* at 381. "Second, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Id.* (quotations marks and citation omitted). However, "trade dress may protect the 'overall look' of a product. [And] although each element of a trade dress individually may not be inherently distinctive, . . . the combination of elements may be indicative of source." *Id.*; *see*

*also Steven Madden, Ltd. v. Yves Saint Laurent*, No. 18 Civ. 7592 (VEC), 2019 WL 2023766, at *8 (S.D.N.Y. May 8, 2019).[35]

"Courts in this Circuit—or applying this circuit's law—have found an entire product line's trade dress to be distinctive . . . both when the trade dress is virtually identical across the product line and when certain strong features marking the trade dress are found throughout the product line." *Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1174 (N.D.N.Y. 1995) (citing, *inter alia*, *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1264 (Fed. Cir. 1995) (furniture) (applying Second Circuit law); *Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42, 45–46 (2d Cir. 1994) (boat caulking products); and *Saban Ent., Inc. v. 222 World Corp.*, 865 F. Supp. 1047, 1055 (S.D.N.Y. 1994) (copyright, characters in children's television program)).

Unless otherwise noted, the following analysis covers the Trade Dress as manifested by both the HOOKLESS® product and the EZ-ON product, which were co-branded. *See* PTXs 123, 194 (images of bagged EZ-ON curtains in which the packaging displayed).[36]

The Court finds that plaintiffs' Trade Dress is not generic—and that plaintiffs thus may attempt to establish secondary meaning and hence protectability—for three related reasons.

---

[35] In deciding "whether a mark is descriptive or suggestive . . .[,] it is necessary to surmise the mental processes of those in the marketplace at whom the mark is directed." *Thompson Med.*, 753 F.2d at 213. Significantly, "the relevant purchasing public is not the population at large, but prospective purchasers of the product." *Lane Cap. Mgmt.*, 192 F.3d at 344 (citations omitted). This is a heavily factual question. *Id.* The party asserting genericism must prove such assertions for each market in which it competes. *See Landscape Forms*, 113 F.3d at 379 ("[A]nalysis will always require a look at the product and the market in which it competes."). Here, the relevant market is the hospitality market.

[36] The use of the trademark and trade dress rights of the products sold by plaintiffs' licensees— such as Carnation, the vendor of the EZ-ON product—also "inure[d] to the benefit of [plaintiffs]." *E.G.L. Gem Lab, Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000); *see also* 15 U.S.C. § 1055; *Twentieth Century Fox Film Corp.*, 155 F. Supp. 2d at 20–21. The rights arising from license Carnation's sales of the EZ-ON products accordingly accrue to plaintiffs, the licensors of the EZ-ON Mark effective 2009.

63

Appx263

First, plaintiffs describe their Trade Dress with sufficient specificity. Second, the Trade Dress is narrow enough to permit competing commercial products and not confer a monopoly on plaintiffs. And third, the Court's ruling that the Trade Dress is non-functional bolsters the finding of secondary meaning. The bases for these conclusions are as follows.

As noted, plaintiffs circumscribe their claimed Trade Dress as outlined below:

[1] a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

[2] and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

[3] wherein each ring includes a slit or gap in the ring;

[4] and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

FAC ¶¶ 104–105; *see also* Erickson Aff. ¶ 28 (quoting same).

Plaintiffs' Trade Dress is drawn in clear and specific detail. It specifies that the affixture of the shower curtain to the rod is to be by rings, not hooks (or buckles, clasps, or any other means of affixing). Those rings are to be integrated into the shower curtain so as to be co-planar with it (not perpendicular or at any other angle relative to the fabric). The rings are not to protrude above the curtain's upper edge. The rings are to contain slits that are fixed in place that allow the user to snap the curtain onto the rod—either ring by ring where the slit connects to the curtain's upper edge, or in pairs of rings where the slit horizontally connects two rings and travels through the curtain's fabric. The resulting appearance of the curtain's surface billowing back and forth across the curtain rod makes the appearance "neat and orderly."

This level of specificity goes well beyond proposed trade dress descriptions that have been held unprotectible and generic—for example, "the 'theme' of skeletons engaging in sexual activities . . . used in [a] t-shirt design," *Jeffrey Milstein*, 58 F.3d at 32 (citation omitted), a "'generalized concept' of grotesque figures in toys," *id.*, or a combination of the words "sports" and "traveler" in a certain spatial arrangement, in a certain font, and enhanced by a model, *Sports Traveler, Inc. v. Advance Mag. Pub's, Inc.*, 25 F. Supp. 2d 154, 162–63 (S.D.N.Y. 1998); *see also Laurel Rd. Bank v. CommonBond, Inc.*, No. 18 Civ. 7797 (ER), 2019 WL 1034188, at *5 (S.D.N.Y. Mar. 5, 2019) (trade dress for advertisements generic where trade dress was described as "[1] a color palette with a dark background; [2] a statement in large, light-colored, sans serif font at the top of the advertisement; [3] a 'hierarchal' typography with smaller, sans serif font under the large typeface sentences; [4] center or left-side alignment; and [5] a colored line under a subset of words in the large typeface sentences" (brackets in original) (footnotes omitted)); *ID7D Co. v. Sears Holding Corp.*, No. 11 Civ. 1054 (VLB), 2012 WL 1247329, at *10 (D. Conn. Apr. 13, 2012) (trade dress for portable grill generic where plaintiff described it as "shiny exterior comprised of a rounded trapezoidal shaped lid on top, with a plastic handle and a rounded trapezoidal base pan at the bottom[, with t]he entire grilling unit [being] secured on top of four wire chrome legs with curved feet"). Plaintiffs' Trade Dress also does not capture a mere idea, but a concrete expression of it. *Cf., e.g., Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir. 1989) (trade dress protectable where it consisted of "beige, single-face (no fold) cards containing sentimental verses and frequently using ellipses written in Roulo's handwriting with brown ink"; "[f]lanking the messages on the left and right borders [were] a series of four stripes, two silver-foil stripes, enveloping one brown and one colored stripe in the middle"), *cert. denied*, 493 U.S. 1075 (1990).

Second, plaintiffs' Trade Dress leaves ample room for competing hook-free products. As reviewed above, these include the Brown design, featuring a curtain without hooks whose rings protruded above the upper edge and are perpendicular to, not coplanar with, the curtain, Zahner Aff. ¶¶ 287–290; the Zenna design, sold by Maytex, which contains rings worked into the shower curtain's fabric but protruding above its upper edge, Erickson Aff. ¶ 34; the Croydex design, sold by QK Supplies, which includes hooks pre-attached to the shower curtain, *id.* ¶ 36; and the Pierce design, which relies on clips instead of slitted rings, PTX 133; Zahner Aff. ¶¶ 292–293. Kartri's patented design using gliders is also not outside plaintiffs' Trade Dress. *See* PTX 110; Zahner Aff. ¶¶ 304–307.

Finally, that a trade dress is not functional bespeaks a lessened threat to competition. Trade dress is functional "when it is 'essential to the use or purpose of the article.'" *Cartier*, 294 F. App'x at 620 (quoting *Yurman Design*, 262 F.3d at 116). But where a design "operate[s] to perform a function, the trade dress is not 'functional' [if] there are many alternative designs that could perform the same function," because enforcing a plaintiff's rights in its design "will not inhibit its competitors from being able to compete effectively in the market." *Id.* at 621. Before trial, the Court held plaintiffs' Trade Dress not functional. *See* Dkt. 312 at 7–8. Trial reinforced that finding, insofar as the evidence revealed various alternative designs to plaintiffs', including the Pierce, PTX 133; Fields, PTX 129; and Giumarra, PTX 130 at 4, designs.

Plaintiff's Trade Dress is thus not generic. Plaintiffs may establish its protectability by showing secondary meaning. That showing is commonly made under the first factor of the second element of the infringement analysis: likelihood of confusion.

      **2.    Likelihood of Confusion**

          *a.    Applicable Legal Framework: The* Polaroid *Test*

66

To show a likelihood of confusion, a plaintiff need not show "actual or potential confusion *at the time of purchase*"; "initial-interest confusion" and "post-sale confusion" may alternatively be shown. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir. 1986) (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975) (emphasis in *Grotrian*)). But the plaintiff must demonstrate "'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" *Star Indus.*, 412 F.3d at 383 (quoting *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) (internal quotation marks omitted).

Courts in this Circuit assessing the likelihood of confusion consider the "*Polaroid* factors," famously articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *Star Indus.*, 412 F.3d at 384. Those are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the plaintiff's customers. *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999); *see also Polaroid*, 287 F.2d at 495. In applying the *Polaroid* test, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharm.*, 984 F.2d at 572 (citing *Lois Sportswear*, 799 F.2d at 873). "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco*

*Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020) (citations and internal quotation marks omitted).

> b.    *Strength of the HOOKLESS® Mark and EZ-ON Mark*

"The first *Polaroid* factor 'focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source.'" *LVL XIII Brands*, 209 F. Supp. 3d at 667 (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace," that is, secondary meaning. *Id.* at 667–68 (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

The Court has found the HOOKLESS® and EZ-ON Marks inherently distinctive. This obviates the need to analyze their strength under *Polaroid*. *See Big Star Ent.*, 105 F. Supp. 2d at 197 ("The suggestive name does not depend upon a showing of secondary meaning to entitle it to trademark registration." (citing *Abercrombie & Fitch Co.*, 537 F.2d at 8)); *Easy Spirit*, 515 F. Supp. 3d at 72 ("The Traveltime trademark is therefore suggestive and inherently distinctive."). The Court thus finds the two Marks strong.

> c.    *Strength of the Trade Dress (Secondary Meaning)*

"[A] trade dress based on the design of a product can never be inherently distinctive." *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 363 (S.D.N.Y. 2003). The Court must instead analyze the Trade Dress's strength—its secondary meaning. A trade dress has secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Louboutin*, 696 F.3d at 216 (quoting *Inwood Labs.*, 456 U.S. at 851 n.11). "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an

68

article because of its source," *id.* at 226 (citation omitted), that is, whether "an appreciable

number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to

the source of the goods in question, or are likely to believe that the mark's owner sponsored,

endorsed, or otherwise approved of the defendant's use of the mark," *Naked Cowboy v. CBS*, 844

F. Supp. 2d 510, 517 (S.D.N.Y. 2012) (quotation marks and citation omitted). This question

"requires a fact intensive examination of 'the probable reactions of prospective purchasers of the

parties' goods.'" *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 309

(S.D.N.Y. 2019) (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990)).

The Second Circuit has identified six non-exclusive factors that bear on this inquiry:

"(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited

media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and

(6) length and exclusivity of the mark's use." *Id.* (internal quotation marks and citation omitted).

"[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co.*

*v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (internal quotation marks and citation omitted).

"A plaintiff bears the burden of proving that his mark acquired secondary meaning by the time

the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654

(citing *Thompson Med. Co.*, 753 F.2d at 217).

(i) *Advertising expenditures*: Such expenditures are regarded as "indirect evidence of the

possible effect that advertising may have on consumers' association of the trade dress with the

source of the product." *Id.* at 654–55 (citing *Ergotron, Inc. v. Hergo Ergonomic Support Sys.*,

No. 94 Civ. 2732 (SAS), 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996). "Targeted, albeit

low-cost advertising, may establish the advertising factor." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d

400, 425 (S.D.N.Y. 2012). But "[m]erely showing that a certain amount was spent on

advertising provides little support for secondary meaning. It must be shown that there was promotion of the mark as an identifier for the product." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007) (alteration in original) (citation omitted).

Here, plaintiffs have adduced ample, uncontroverted evidence of extensive expenditures on advertising promoting their Trade Dress. Focus "did television ads, print ad[]s, trade shows, catalogs, websites, [and] distributor buying guides," physical flyers and website banners, and rebates to distributors. Tr. at 217, 237 (Kemp). In 2013, Focus's ad budget for its hospitality business exceeded $500,000. *Id.* at 246.[37] It spent most such dollars on distributor rebates. In 2013, these totaled approximately $250,000 for hospitality customers and $200,000 for retail customers, *id.* at 241 (Kemp); between 2009 and 2013, Focus spent approximately $1.2 million in rebates, *id.* The balance was spent on television ads, print ads, trade shows, catalogs, websites, and distributor buying guides, all exclusively or prominently featuring the HOOKLESS® product and trade dress. *See id.* at 217–51. From 2005 to 2009, Arcs & Angles ran 91 separate programs promoting those products on QVC, on which Focus continues today to advertise. *See id.* at 227 (Kemp); PTX 521 at 117 (listing TV appearances).

In addition, approximately 150 field representatives promoted Focus's products with its distributor customers. Tr. at 248 (Kemp). Focus's products also gained attention among retail customers from the fact that, by 2013, its curtains were hung in approximately 2.5 million hotel and motel rooms. *Id.* at 248–51. At an average hotel occupancy rate of 76% and an average stay of 2.5 to 3 days, this equated to "over 100 million individual exposures," and greater brand

---

[37] *See RVC Floor Decor*, 527 F. Supp. 3d at 319 (ad spend favored secondary meaning where ad "budget started at $10,000 in 1975, grew to $100,000 per year by 1981, and surpassed $100,000 per year ever since").

awareness. *Id.* at 251. To address the resulting volume of customer inquiries about its curtains, Focus prepared a script for its customer service team. *Id.* at 252.

That plaintiffs' advertising efforts were focused on promotion of its Trade Dress is reflected in TV and print ads for the HOOKLESS® product line. In these, Focus touted the "ease of installation," the "ten second[]" installation time, PTX 547; the enhanced experience of a curtain that lacks missing or broken rings and "drap[es] perfectly [and] slid[es] effortlessly," PTX 547, 560; the reduced "hassle" of changing shower curtains, PTX 548; and "install[ation] like magic in just seconds" with "no need to remove the rod," PTX 552. The evidence at trial was persuasive that these ads succeeded. Kemp testified that the HOOKLESS® product "broke records. . . . They ran through the stock. . . . In fact, QVC continuously asked to air it because the product did so well for them." Tr. at 229 (Kemp).[38] To hospitality customers, Focus's ads also touted the benefits including lower maintenance costs and increased safety, satisfaction, and morale among hospitality and housekeeping staff, PTX 550, 559; *see also* PTXs 554 (reduced labor costs due to reduced installation time), 561 (same), 562 (same), 553, 555, 558. Focus also promoted its shower curtains in its AHR catalogs, *see* PTXs 394 (2011 catalog), 393 (2012), 418 (2013), 419 (2014), 420 (2015). Between 2006 and 2012, Focus annually distributed between 200,000 and 250,000 catalogs to nationwide hotel chains. These prominently displayed the HOOKLESS® products. Dubinski Aff. ¶¶ 17, 19.[39] These effective efforts and expenditures easily satisfy this factor.

---

[38] *See Lopez*, 883 F. Supp. 2d at 425 ("[T]o support a finding of secondary meaning, such advertising must have reached the targeted audience.").

[39] *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 218 (S.D.N.Y. 2012) ("GRG Stripe" mark appeared on 20% of all Gucci accessories, making it an effective identifier).

*(ii) Consumer studies linking the Trade Dress to Focus*: "[C]onsumer surveys are the most persuasive evidence of secondary meaning," as the determination whether a mark or trade dress has acquired secondary meaning is "an 'empirical question of consumer association.'" *LVL XIII Brands*, 209 F. Supp. 3d at 638–39 (quoting *Two Pesos*, 505 U.S. at 770–71).[40] Plaintiffs have not come forward with such a survey. *See* Dkt. 494 at 38–39. But that is not dispositive as to secondary meaning. *Shen Mfg. Co. v. Suncrest Mills, Inc.*, 673 F. Supp. 1199, 1204 (S.D.N.Y. 1987) (internal quotations and citations omitted).[41]

Cognizable alternative proof of consumer recognition of a trade dress's source may include direct testimony of customers as evidence of secondary meaning. *27-24 Tavern Corp. v.*

---

[40] *See also, e.g.*, *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer surveys have become the usual way of demonstrating secondary meaning."); *Ergotron, Inc.*, 1996 WL 143903, at *8 ("A consumer survey is the most persuasive element in demonstrating secondary meaning, because such a survey provides direct evidence." (citations omitted)).

[41] *See also Rubik's Brand v. Flambeau, Inc.*, No. 17 Civ. 6559 (PGG) (KHP), 2021 WL 363704, at *17 (S.D.N.Y. Jan. 31, 2021) ("[T]he extensive evidence of secondary meaning . . . could support a finding, even without survey evidence, that consumers identify the Rubik's Cube and its 3x3 Cube Design as source identifiers."); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) ("[A]lthough plaintiffs have failed to present consumer survey evidence of secondary meaning, 'every element need not be proved' for a determination of secondary meaning to be made"); *PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 406 (S.D.N.Y. 1989) (where plaintiffs did not come forward with a survey, granting permanent injunction based on other evidence of secondary meaning); *Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc.*, 648 F. Supp. 1026, 1035 (S.D.N.Y. 1986) ("[T]he "absence of [a consumer survey] here is damaging to plaintiff [where it] has offered nothing but its own conclusion[s]."), *aff'd*, 810 F.2d 1160 (2d Cir. 1986); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1582 (Fed. Cir. 1988) (The "absence of consumer surveys need not preclude a finding of acquired distinctiveness."); *E.T. Browne Drug Co. v. Cococare Prods.*, 538 F.3d 185, 201 (3d Cir. 2008) ("We never have held, and do not hold today, that a party seeking to establish secondary meaning must submit a survey on that point."). *Cf. Brown v. Quiniou*, 744 F. Supp. 463, 470 (S.D.N.Y. 1990) ("[A]lthough failure to undertake a consumer survey concerning recognition of [its] mark is not by itself fatal to [a] plaintiff['s] assertion of secondary meaning, where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiff['s] position.").

*Dutch Kills Centraal*, No. 14 Civ. 1625 (FB) (RER), 2015 WL 5772158, at *9 (E.D.N.Y. Sept. 29, 2015) (citing *Rockland*, 894 F. Supp. 2d at 320). Plaintiffs did not call customers on this point, but they elicited probative admissions from Kartri owner Kubus. She testified that customers frequently called Kartri demanding "Hookless" products, or "either have a picture attached from Focus's website"; she estimated that 50% of buyers inquiring about hookless shower curtains asked Kartri for *Focus*'s products. Kubus Dep. Tr. at 52–53Such unprompted inquiries strongly indicate secondary meaning. In a survey context, a 19.4% rate of unaided brand awareness has been held indicative of secondary meaning. *See Stix Prods.*, 295 F. Supp. at 491 n.43. The high rate of unsolicited calls to Kartri evincing confusion between the parties' products—and the mistaken belief that Kartri was the source of Focus's products—is indicative of secondary meaning.

The second factor, too, weighs, albeit to just a slight degree because of the lack of a data set prepared with rigor, in favor of finding secondary meaning.

*(iii) Unsolicited media coverage of the Trade Dress*: "[E]xtensive, unsolicited media coverage of a product is a strong indication that a [trade dress] has obtained secondary meaning." *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021) (collecting cases) (emphasis in original). In contrast, "isolated incidents of . . . unsolicited media coverage in several industry-specific publications are insufficient to show secondary meaning." *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112 (AJP), 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014), *appeal dismissed*, No. 14-1156 (2d Cir. May 19, 2014).

Plaintiffs have adduced modest evidence on this point. In 1997, QVC named their shower curtain the "Best New Product." Zahner Aff. ¶ 183. In 1998, *New York Magazine* featured the HOOKLESS® product in its "Best Bets" section, calling the curtain "cutting-edge"

in sparing customers the effort of "contorting to attach ugly hooks." PTX 543 at 2. In

September 2001, the American Society of Interior Designers' magazine, *Icon*, featured the

"ingenious" HOOKLESS® curtain in an editorial. PTX 429. In 2009, *Woman's Day* magazine

featured plaintiffs' shower curtain as a product one has "gotta have." PTX 468 at 2. Although

these four affirmations over a 12-year period benefit plaintiffs, they are not, measured by the

case law, strong enough to assign this factor heavy weight for plaintiffs.[42] *See Strange Music,*

*Inc. v. Strange Music, Inc.,* 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004) ("dozen or so unsolicited

articles that praise[d plaintiffs' product]" not probative of secondary meaning).

    *(iv) Sales success*: A product's sales success may indicate whether a substantial portion

of the purchasing public associates the trade dress with the product's source. *RVC Floor Decor,*

527 F. Supp. 3d at 320. In assessing sales success, courts have considered sales volume, *Easy*

*Spirit*, 515 F. Supp. 3d at 64–65; market share, *Conn. Cmty. Bank v. The Bank of Greenwich*, 578

F. Supp. 2d 405, 414–15 (D. Conn. 2008); whether sales grew over time, *RVC Floor Decor*, 527

F. Supp. 3d at 320; whether sales data was broken down by year, *Rockland*, 894 F. Supp. 2d at

321 (citing cases); and whether sales data was convincingly linked to the mark-bearing product,

*Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009), *aff'd in relevant part*

*sub nom. Erchonia Corp. v. Bissoon,* 410 F. App'x 416 (2d Cir. 2011) (summary order).

    This factor strongly favors plaintiffs, given Focus's substantial sales figures, both in the

hospitality industry and among retail customers. Focus adduced convincing documentary

evidence and testimony, largely via Kemp, on this point. Revenues for HOOKLESS® brand

products between 2005 and September 2013 exceeded $150 million, with revenues from

---

[42] Plaintiffs note that their products were distributed through third-party websites, such as
kaboodle.com, QVC.com, SignatureHardware.com, and thefind.com. PTX 521 at 90–100. But
distribution through these channels does not speak to the extent of media coverage.

Appx274

hospitality market sales being $14.7 million in 2013; $16.5 million in 2014; $21.2 million in

2015; $16.9 million in 2016; and $12.1 million in January through August 29, 2017. PTX 518.

Spread across roughly 250 distributors, these reflected sales of some 5.76 million shower

curtains in that market. PTX 515. This data corroborated Kemp's and Elmore's testimony that,

as of October 2013, HOOKLESS® was "the number one shower curtain in [the] hospitality

[sector]," Tr. at 253 (Kemp), in which Focus (with a more than 50% market share) was the

dominant player, with Karti second, *id.* at 512 (Elmore).

In the retail market, Focus's sales revenues for its HOOKLESS® shower curtains were

also formidable: $8.7 million in 2013; $11.4 million in 2014; $13 million in 2015; $12.5 million

in 2016; and $8.9 million between January 2017 and August 29, 2017. These reflected retail

sales during these years of approximately 4.57 million shower curtains. PTX 514. Sales by

plaintiffs' licensee Carnation of EZ-ON products are properly included in the analysis of the

retail sales success of products bearing plaintiffs' Trade Dress. Between 2009 and January 2013,

Carnation had sales volume of $225,710. PTX 591.

The sales success factor thus strongly favors plaintiffs. *See, e.g., R.F.M.A.S., Inc. v. Mimi

So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million sales indicative of secondary meaning);

*Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) ($3 million

revenues held "indisputable sales success"); *Easy Spirit*, 515 F. Supp. 3d at 65 (finding sales

success where plaintiff's data "reflect[ed] millions-of-dollars in sales revenue"); *Conn. Cmty.

Bank*, 578 F. Supp. 2d at 414–15 finding sales success to favor plaintiff whose market share was

3.95% in a competitive market).

*(v) Attempts to plagiarize the Trade Dress*: "Evidence that a [trade dress] has been

widely copied is persuasive evidence of secondary meaning because it demonstrates that the

[dress] has become a 'strong source identifier in the eyes of the purchasing public.'" *Lopez*, 883 F. Supp. 2d at 428 (quoting *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993)); *accord, Centaur Commc'ns*, 652 F. Supp. at 1109. "Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (footnote omitted) (citing *Bristol-Myers Squibb*, 973 F.2d at 1042). The key question is "whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004).

Here, plaintiffs have introduced extensive evidence that third parties—not only Kartri and Marquis—have attempted to copy and commercially exploit Focus's intellectual property by marketing products with its Trade Dress. Each time, Focus responded by sending the malefactor a cease-and-desist letter—which resulted in agreements to desist—or by filing complaints, which resulted in similar agreements.[43] Competitors' efforts to parrot the Trade Dress reinforce that it has acquired secondary meaning in the hospitality market. *See Edible Arrangements, LLC v. Provide Com., Inc.*, No. 14 Civ. 250 (VLB), 2016 WL 4074121, at *7 (D. Conn. July 29, 2016) ("numerous attempts to plagiarize the mark" probative of secondary meaning where plaintiff had sent "dozens of cease and desist letters" to "large and small businesses"). *But cf. MZ Wallace*

---

[43] Most apposite here, given these competitors' similar designs to Focus's, are the copying efforts by (1) Aim-Co., Inc., *see* PTXs 100 (complaint filed January 25, 2008), 594 (agreement to desist executed April 1, 2008); (2) DFW Motel Supply & Textiles, Inc., *see* PTXs 102 (complaint filed October 1, 2007), 350 (agreement to desist executed in October 2007); (3) Neilmax Industries, Inc., PTXs 340 (complaint filed November 16, 2007), 117 (agreement to desist executed in January 2008); (4) Trend Supply, Inc., PTXs 103 (complaint filed April 15, 2010), 118 (agreement to desist executed May 24, 2010); and (5) Royal Pacific, *see* PTXs 99 (cease-and-desist letter sent September 25, 2007, 537 (agreement to desist reached December 6, 2007).

*Inc. v. Fuller*, No. 18 Civ. 2265 (DLC), 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (few letters not probative of attempts to plagiarize where trade dress described in the letters "is inconsistent and often contains significant variations from that" in the case).

The attempts by Kartri and Marquis to capitalize on Focus's Trade Dress also strongly indicate intentional plagiarism. Before developing their Ezy Hang product, Kartri and Marquis demonstrably were aware of Focus's HOOKLESS® product and its success in the hospitality market. Tr. at 743 (Kubus). Kartri, in fact, had declined to commercialize the Hookless patent when HSNA's Marcus had pitched it to Kartri's president in the late 1990s. Tr. at 724–25, 727–28, 772; Zahner Aff. ¶ 387.

As to Marquis, the facts overwhelmingly reflect that it willfully closed its eyes to the high probability that the Ezy Hang design it was obtaining in China and furnishing to Kartri to sell in the U.S. was infringing Focus's intellectual property rights. Middleberg and Pong had spoken about Focus "many times" when Pong—whom Middleberg knew had worked for a manufacturer of Focus's in China—pitched the D-shaped shower ring. Tr. at 554, 593–94. Middleberg accepted, uncritically, Pong's unsubstantiated representations that Focus's utility patents "had become a public domain kind of product" and/or were "about to run out." *Id.* at 555. Marquis did not investigate whether the product they proceeded to market was covered by a valid patent—whether owned by Focus, an affiliate, or anyone else—in the United States. *Id.* at 554, 596–97. And when Pong's patent attorney offered to conduct a patent analysis for $3,500, PTX 258 at 2, Middleberg spurned the offer, Tr. at 599. Instead, he chose to credit Pong's dubious claims—based on an untranslated Chinese language document—to own a Chinese patent on the D-shaped ring. *Id.* at 554. Middleberg also put weight on Pong's statement that Focus was "in deep financial trouble," *id.* at 611 (quoting PTX 159 at 1). But while that statement appears to

have emboldened Middleberg to conclude that Focus would be too weak to fight, it said nothing about Focus's intellectual property rights.Notably, Marquis continued to develop the accused products even after Focus's 2015 cease-and-desist letter to Kartri, which was forwarded to Marquis. Its sales to Kartri of EZY-Hang curtains for sales in the United States persisted until November 2018, nearly three years after Focus brought this lawsuit.

Kartri, too, ignored the obvious. Kubus admitted deferring to Marquis's representations that, in light of Pong's purported patent, "everything was clear and safe." *Id.* at 643. Kartri did not investigate whether Focus (or others) had intellectual property rights to the shower curtains, despite her familiarity with Focus's products and her admission that Focus's hookless curtains had upended shower curtains sales in the hospitality market in which the parties competed. And Kartri openly described its Ezy Hang product as a "version of HOOKLESS®," despite knowing that Focus's product was widely referred to by that name.[44]

This factor strongly favors a finding that the Trade Dress had secondary meaning at the time of defendants' accused conduct.

(vi) *Length and exclusivity of the Trade Dress's use*: "[T]he longer and more exclusive the trade use, the more likely it is that a [trade dress] has acquired secondary meaning." *BigStar Ent.*, 105 F. Supp. 2d at 203. In contrast, "[t]he use of part or all of the mark by third parties" cuts against exclusivity of use and thus "weakens its overall strength." *Time, Inc.*, 173 F.3d at 118 (citing *Streetwise Maps*, 159 F.3d at 744); *see also Kind LLC v. Clif Bar & Co.*, No. 14 Civ. 770 (KMW) (RLE), 2014 WL 2619817, at *6 (S.D.N.Y. June 12, 2014) (same). Although "no

---

[44] *See, e.g.*, PTXs 230 (December 18, 2013 email exchange between Dolph and Best Western representative, subject line "HOOKLESS," and discussing Ezy Hang as "a version of hookless"), 231 (April 14, 2014 email exchange between Kartri and GMK Cales Associates discussing price quote for "Hookless shower curtain[s]"), 232 (December 8–16, 2014 email exchange discussing price quote for "Hookless Shower Curtains").

absolute time span can be posited as a yardstick, courts have indicated that continuous exclusive usage of a trade dress over a five-year period may support—but does not necessitate—a finding of secondary meaning." *Easy Spirit*, 515 F. Supp. 3d at 67.

That standard and benchmark are easily met here. Zahner invented his Hookless product around 1992, and obtained his first patent—the '232 Patent—on February 16, 1993. PTX 303. In 1997, Zahner, through Hookless Systems of North America, introduced the invention to the market, where such Trade Dress was new. *See* Zahner Aff. ¶¶ 83–84; Tr. at 121 ("[N]o one had ever seen anything like that before." (Zahner)). Kubus agreed that the HOOKLESS® product was an innovative new design. Tr. at 772. Defendants first began to sell the accused product in 2013. Thus, for 16 years, between 1997 and 2013, plaintiffs had exclusivity over their product. And plaintiffs vigorously defended that exclusivity via cease-and-desist letters or lawsuits. This factor strongly favors plaintiffs. *See Landscape Forms*, 117 F. Supp. 2d at 366–67 ("[P]laintiff's five year period of continuous use of the Petoskey trade dress provides additional evidence of the secondary meaning that these products had obtained."); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 375 ("[G]iven the well-defined nature of plaintiff's market . . . three to four years of exclusive use is somewhat significant.").

*(vii) Weighing the subfactors*: Four of the six relevant factors—advertising spend, sales success, attempts to plagiarize the Trade Dress, and length and exclusivity of use—strongly favor plaintiffs. The second—consumer confusion studies—is not required, and plaintiffs have adduced other proof to the same effect. The third—unsolicited media coverage—lightly aids plaintiffs' claim. Weighing these factors, the Court finds plaintiffs' Trade Dress strong. The first *Polaroid* factor as to the Trade Dress infringement claim weighs heavily in plaintiffs' favor.

         d.      Polaroid *Factors (2) Through (8) for the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress*

Having found the HOOKLESS® Mark, the EZ-ON Mark, and the Trade Dress all strong, the Court now considers the remaining *Polaroid* factors. In conducting this analysis, the Court notes that while plaintiffs' Lanham Act claims of infringement of the EZ-ON Mark and Trade Dress are pursued against both defendants, their claim of infringement of the HOOKLESS® Mark is brought against Kartri only. Thus, although analyses of the three sets of infringement claims overlap—including because plaintiff's Trade Dress embraces curtains containing the EZ-ON Mark rings and curtains containing HOOKLESS® Mark rings—the Court has considered as bearing on Marquis only that evidence relevant to EZ-ON and Trade Dress claims.

*(2) Similarity*: "[C]ourts look to the overall impression created by the [marks and] trade dress and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078. "[T]he test . . . is whether confusion is probable among numerous customers who are ordinarily prudent." *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 480–81 (S.D.N.Y. 2020) (quoting *Estee Lauder Inc. v. The Gap*, 108 F.3d 1503, 1511 (2d Cir. 1997)); *Brennan's, Inc. v. Brennan's Rest., L.I.C.*, 360 F.3d 125, 133 (2d Cir. 2004). Courts compare the marks "in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar,'" *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000), *aff'd*, 234 F.3d 1262 (2d Cir. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)), and "look[] at the visual and aural similarity of the marks, in addition to how they are presented in the marketplace," *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 447 (S.D.N.Y. 2016) (internal citations omitted).

*Visual similarity between the Trade Dress as manifested by the EZ-ON Mark and the Ezy Hang curtain*: Focus's Trade Dress is manifested in both the HOOKLESS® Mark and the EZ-

80

Appx280

ON Mark. A side-by-side comparison of each with the accused Ezy Hang product shows that the

Ezy Hang product is exceptionally similar to the trade dress manifested by EZ-ON Mark, and

quite similar to the Trade Dress manifested by the HOOKLESS® Mark.

As to EZ-ON, the juxtaposition looks like this:



*Ezy Hang product, regular finish, ring slits facing in the same direction. See PTX 26.*



*Ezy Hang product, chrome finish, ring slits facing each other. See PTX 27.*



*EZ-ON product, as sold by Carnation. See DTX 90.*

The dresses are nearly identical. Both rings are integrated into the curtain's fabric, are D-

shaped, have their flat edge align with the curtain's upper edge, and display an upward-pointing

slit that reaches the ring's upper edge near one of its corners. The only nominal difference—and

it is nominal, indeed—is that Carnation's ring has a straight slit, while the Ezy Hang ring has an

angle in its slit. *See* Tr. at 557 (Middleberg referring to angle as a "lightning bolt"). That angle does not change the big picture: that the two marks are overwhelmingly similar. Were it not for the lightning bolt angle, the Court might have found the two marks effectively identical.

   *Visual similarity between the Trade Dress as manifested by the HOOKLESS® Mark and the Ezy Hang curtain*: A side-by-side comparison of the Ezy Hang product with the Trade Dress as manifested by the HOOKLESS® product looks like this:



*Side-by-side comparison of the HOOKLESS® and Ezy Hang curtain rings*

   The strong similarity between these products is apparent. Although the slit of the HOOKLESS® product protrudes horizontally and into the curtain's fabric to connect with an adjacent ring, the overall appearance is of a ring with a slit designed to accommodate a curtain rod. In both, the ring portion of the curtain occupies a small percentage of the overall curtain and its appearance. The "neat and orderly appearance" of the evenly billowing curtain that results from its affixture by rings that are coplanar with its fabric is a prominent feature of the Trade Dress. Its appearance does not depend on the placement or angulation of the slits, but on the curtain's arrangement on the rod that rings using such technology make possible.

*Aural similarity between EZ-ON Mark and Ezy Hang mark*: The names "EZ-ON" and "Ezy Hang" are confusingly similar. The first half of each name is pronounced "easy."[45] "Easy" modifies the second half in each mark—"on" and "hang." Both words evoke the act of (easily) affixing the curtain on the rod. Although phonetically different, the respective second halves are semantically similar because the curtain is intended to facilitate the easy *hanging on* of the rod. *See Heartland Trademarks, Ltd. v. Dr. Flax LLC*, No. 17 Civ. 795 (MAD) (ATB), 2017 WL 3278905, at *4 (N.D.N.Y. Aug. 1, 2017) (finding "obvious similarity between the FLAX mark and the different variations of Dr. Flax, which simply add the title 'doctor' before the word 'flax'" and that, "[d]espite the addition of the title 'doctor,' the dominant word remains 'flax'"); *Classic Liquor Importers*, 201 F. Supp. 3d at 447 ("[T]he ELITE and ELIT components of the marks are functionally equivalent in meaning and commercial impression,"," and "there is no genuine dispute that ELITE and ELIT are intended to be pronounced identically"). The marks are used in the same context: the packaging and sale of shower curtains to customers in the hospitality market.[46]

The Court accordingly finds that the Ezy Hang mark is so strongly similar in look and sound to the EZ-ON Mark as to be nearly identical. *See, e.g., Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) (finding defendant's marks "similar in both

---

[45] The Court found highly unpersuasive Goskowski's claim that EZ-ON could be pronounced "ezzon." Tr. at 688. Throughout trial, all parties otherwise pronounced the mark "Easy On."

[46] There is no aural similarity between the word marks "HOOKLESS®" and "Ezy Hang."

83

name and design to a number of Plaintiff's marks,"[47] and noting that the branded products "appear[ed] in similar contexts as both are used in the sale, packaging and promotion of women's apparel and accessories"). The Court finds that the Ezy Hang mark is strongly similar to the HOOKLESS® Mark, albeit in look only, not sound.

These findings compel a similar outcome as to the Trade Dress. Regardless whether the Court considers the HOOKLESS® manifestation of the Dress or the EZ-ON manifestation, the similarity of the Ezy Hang curtain's overall look and appearance is clear.

*(3) Competitive proximity of the products*: "The 'competitive proximity' factor concerns whether and to what extent products bearing the two parties' marks compete with each other." *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045 (PAE), 2020 WL 5758917, at *12 (S.D.N.Y. Sept. 28, 2020); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). Courts consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (internal quotation marks and citation omitted); *see also Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) ("Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price." (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d

---

[47] The marks at issue that were found similar looked like this:



**Juicy Couture**
(Samuelson Decl. Ex. A)

**Juicy Girl**
(Suen Deposition Ex. 20.)

*Juicy Couture*, 930 F. Supp. 2d at 500.

Cir. 1979), *superseded on other grounds by Fed. R. Civ. P. 52(a) as stated in RiseandShine*, 41

F.4th at 120)). Where the products "serve the same purpose, fall within the same general class,

or are used together, the use of similar designations is more likely to cause confusion." *Lang*,

949 F.2d at 582.

    *Ezy Hang's proximity to HOOKLESS® products*: The parties' products are exceedingly

proximate. Both sell shower curtains without hooks, compete for the same consumers in the

hospitality market, and extol the same product virtues. Those are—as reflected in the products'

names and advertisements—the ease and speed of installation, which, of importance to the

hospitality market, are associated with lower maintenance and labor costs. *Compare* PTXs 547

(Focus ad touting HOOKLESS®'s "ease of installation," its "ten second[]" installation time),

548 (Focus ad promoting reduced "hassle" of changing shower curtains), 552 (same, praising

"install[ation] like magic in just seconds" with "no need to remove the rod"), 121 (same), 554

(Focus ad breaking down reduced labor costs due to reduced installation time), 561 (same), 562

(same), *with* Tr. at 558 (Middleberg testifying that design choice of D-shaped ring for Ezy Hang

was advantageous because such rings could be easily snapped onto the shower curtain rod,

allowing hospitality staff installing such curtains to secure themselves with their free hand).

    *Ezy Hang's proximity to EZ-On products*: The products' markets are adjacent. Focus's

licensee, Carnation, sells the EZ-ON curtain in the retail market, while Kartri is active in the

hospitality market. These markets are proximate and interrelated. The evidence reflected that

individual consumers often develop interest in buying a hook-free shower curtain product based

on exposure to it during a hotel stay. Accordingly, as "these products 'serve the same purpose

[and] fall within the same general class,' they have market proximity and thus are 'likely to

85

cause confusion.'" *RVC Floor Decor*, 527 F. Supp. 3d at 325 (alteration in original) (citation omitted).

The proximity factor weighs overwhelmingly in plaintiffs' favor as to the HOOKLESS® Mark; very strongly in plaintiffs' favor as to the EZ-ON Mark; and overwhelmingly in plaintiffs' favor as to the Trade Dress, which is embodied by both products, and thus even more likely to be confused with the Ezy Hang curtain than either of plaintiffs' Marks in isolation.

*(4) Bridging the gap*: This factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (citation omitted). This factor "protects the plaintiff's interest in being able to enter a related field at some future time." *Cartier*, 294 F. App'x at 619 (citing *Savin Corp.*, 391 F.3d at 459–60). Where the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant the *Polaroid* analysis." *Star Indus.*, 412 F.3d at 387 (treating factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (same, where both parties used marks in connection with sale of coffee products); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015) (same, where both parties' marks appeared on sunglasses).

*Gap between Ezy Hang and the HOOKLESS® product*: As to the HOOKLESS® product, as explained, there is no gap to bridge. Both the HOOKLESS® curtain and defendants' Ezy Hang curtain are sold in the hospitality market.

*Gap between Ezy Hang and the EZ-ON product*: Kartri argues that the products are not proximate because Carnation sold its licensed EZ-ON curtains in the retail market, while Kartri served the hospitality market. That does not preclude finding proximity. As the Second Circuit

has emphasized: "[T]he assumptions of the typical consumer . . . must be taken into account." *Cadbury*, 73 F.3d at 482 ("Because it is surely plausible that a manufacturer of branded products such as Cadbury would enter the private-label market, it is also plausible that a wholesale purchasing agent would conclude that Cadbury *had already done so—i.e.,* that Cadbury had already bridged the gap."). That principle applies with force here. Focus's HOOKLESS® product had been a fixture in the hospitality market for over a decade by the time defendants' accused conduct began. Having a dominant foothold in that market with HOOKLESS® would have enabled Focus, through Carnation, to handily introduce the EZ-ON product in the hospitality market. Indeed, under Focus's licensing agreement with Carnation, the EZ-ON products were co-branded with the HOOKLESS® Mark on its packaging. PTXs 123 (images of packaging showing cobranding), 194 (same), 370 § 4.2 (licensing agreement so agreeing).

Moreover, the retail and hospitality markets are closely linked because hotel guests are exposed to the curtains at issue during their stay and often then seek to buy one for at-home use. *See* Dubinski Aff. ¶¶ 53–54. Kemp testified that, as a result of its curtains' presence in more than 2.5 million U.S. hotel and motel rooms, Focus received so many retail customer inquiries that it developed a script for its service team to use in processing those inquiries. Tr. at 251–52.

The Court accordingly finds the following. For the infringement claim as to the HOOKLESS® Mark, the bridging-the-gap factor is neutral, as the Ezy Hang and HOOKLESS® already compete in the hospitality market. For the infringement claim as to the EZ-ON Mark, this factor strongly favors plaintiffs, as the retail and hospitality markets are closely related, and it would have been easy for plaintiff to introduce the EZ-On product into that market. As to the Trade Dress infringement claim, the factor moderately favors plaintiffs, as 65% of plaintiffs'

Appx287

sales volume occurred in the hospitality market (to which the bridging-the-gap factor is not germane), and 35% occurred in the retail market (to which this factor is germane).

*(5) Actual confusion*:  Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, "[t]here can be no more positive or substantial proof of the likelihood of confusion," *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 385 (S.D.N.Y. 2008) (quoting *Savin Corp.*, 391 F.3d at 459) (alteration in *Dooney & Bourke*).  Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport*, 86 F. Supp. 2d at 319 (collecting cases).  But "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion." *Lois Sportswear*, 799 F.2d at 875 (citation omitted).

"Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport*, 86 F. Supp. 2d at 319.  To be germane under the Lanham Act, the confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang*, 949 F.2d at 583; *see also Trs. of Colum. Univ. v. Colum./HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

*Confusion of the HOOKLESS® Mark and Trade Dress with the Ezy Hang curtain*: Plaintiffs have adduced significant anecdotal evidence of actual consumer confusion.  Burbank testified that Focus had received Kartri products in its warehouse from customers attempting to return it to seller. Tr. at 40.  Although Burbank did not know the nature of the customers who did so—"could be distributor, could be a franchisee," *id.*—such events bespeak *some* consumers'

Case: 23-1446    Document: 48    Page: 367    Filed: 01/26/2024

Case 1:15-cv-10154-PAE    Document 501    Filed 12/22/22    Page 89 of 168

misapprehension that the source of the Ezy Hang product was Focus. Kemp similarly recounted

calls Focus's customer service department received from confused customers. These typically

came from a hotel's head of housekeeping or general manager, lodging a quality complaint. Tr.

at 267. In these calls, in which the Focus representative would "run through a series of questions

about the product to verify a production date," it would become apparent that the caller was

complaining about an Ezy Hang product, usually because, as described by the customer, the tag

was a Kartri tag. *Id.* at 267, 269–70. Kemp testified that customers were mystified how they

ended up with a Kartri product—notwithstanding the nominal difference in appearance.[48]

Distributors also mistakenly lodged complaints with Focus about Kartri curtains. *Id.* at 273.

These reached Focus about "three to four times a month." *Id.* at 268 (Kemp).

    This anecdotal evidence is compelling. That hotel chains would realize their confusion

only *after* they had purchased and used the Ezy Hang product and called Focus powerfully

establishes that this confusion "inflict[ed] commercial injury [on Focus] in the form of . . . a

diversion of sales." *Lang*, 949 F.2d at 583. It also bespeaks likely harm to Focus's goodwill and

reputation, *id.*, insofar as the calls concerned the malfunctioning or poor performance of a

purported Focus product.[49] *See Mejia & Assocs., Inc. v. Int'l Bus. Machines Corp.*, 920 F. Supp.

540, 550 (S.D.N.Y. 1996) (actual confusion factor moderately favored plaintiff where plaintiff

---

[48] *See* Tr. at 267 ("A lot of times—some of the time the . . . hotel manager would respond, what do you mean? This is Hookless. And we'd say, that's not made by Focus Hookless. And they'd say, I thought I was buying Hookless, you know, how did I get this product?"); *id.* at 269 ("Q: So as far as you understand, there was actually confusion between your horizontal slit product and the Kartri product? A: That's correct. It has the same design look to a hotel property or a general manager. They don't always notice where the slit location is.").

[49] A member of Kartri's own executive staff was also demonstrably confused by the parties' products. Dolph, a 30-year employee and Kartri's sales operations manager from 2013 on, was shown a Kartri shower curtain during her deposition. *See* PTX 642 at 15–18. She mistakenly identified it as a Focus curtain, before looking at the tag and correcting herself. *Id.* at 22–23.

documented 27 incidents of potential customers mistaking plaintiff for a company that already

serviced them); *De Venustas v. Venustas Int'l, LLC.*, No. 07 Civ. 4530 (LTS) (THK), 2007 WL

2597122, at *6 (S.D.N.Y. Sept. 11, 2007) (actual confusion factor weighed in plaintiff's favor

where confused callers "were fashion and beauty field insiders, and thus are important potential

sources of referrals for its consulting work"); *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045

(PAE), 2020 WL 5758917, at *13 (S.D.N.Y. Sept. 28, 2020) (actual confusion factor weighed in

plaintiff's favor where, "[t]ellingly, [defendant's] consumers are contacting Goat Fashion and

searching for [defendant]'s items on [plaintiff]'s website").

    *Confusion of the HOOKLESS® Mark and Trade Dress with the Ezy Hang curtain*:  As to

the confusion between the Ezy Hang curtain and the EZ-ON curtain sold by Carnation, plaintiffs

have not adduced evidence of actual consumer confusion.

    In sum, the actual confusion factor weighs in Focus's favor as to the infringement claim

of the HOOKLESS® Mark and, by virtue of the HOOKLESS® Mark's embodiment of the

Trade Dress, as to the infringement claim of the Trade Dress.  However, as to the infringement

claim of the EZ-On Mark, the actual confusion factor weighs against Focus.

    *(6) Bad faith*:  This inquiry "'considers whether the defendant adopted its mark with the

intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between

his and the senior user's product.'"  *De Beers LV Trademark Ltd. v. DeBeers Diamond

Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at

460).  "Evidence of intentional copying by a junior user may be indicative of an intent to create a

confusing similarity between the products."  *Bristol-Myers Squibb*, 973 F.2d at 1044 (citation

omitted).  Where the junior user's mark is not fully identical to the senior mark, the Second

Circuit has upheld findings of bad faith where the junior user knew of the prior mark and the

junior mark showed "similarities so strong that it seems plain that deliberate copying has

occurred." *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir.

1993) (citation omitted). But "[t]here is a considerable difference between an intent to copy and

an intent to deceive." *Starbucks Corp.*, 588 F.3d at 117 (citations omitted). "The intent to

compete by imitating the successful features of another's product is vastly different from the

intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745.

Where the junior user "prominently displays" its own mark and "uses a trade dress dissimilar to"

the senior user's, such efforts "negate[] an inference of intent to deceive consumers as to the

source of the product." *Kind LLC*, 2014 WL 2619817, at *11 (citation omitted).

Here, for the reasons reviewed in connection with defendants' attempts to plagiarize

Focus's Trade Dress, the evidence is compelling that defendants, aware of the inroads Focus's

innovation had made in the shower curtain market, intentionally sought to mimic Focus's Trade

Dress to deceive customers to purchase Ezy Hang and thereby to capitalize on Focus's goodwill.

The close similarity—in both looks and sound—between Kartri's Ezy Hang product and Focus's

EZ-ON product reinforces this conclusion. These similarities are "so strong that it seems plain

that deliberate copying has occurred," *Paddington Corp.*, 996 F.2d at 587. Defendants did not

offer a benign justification for these similarities—especially not for the strong similarities in look

*and* sound between the Ezy Hang product and EZ-ON product. It is unavoidably clear that

defendants intentionally, and in bad faith, sought to all-but-replicate the EZ-ON Mark so as to

capitalize on competitor Focus's intellectual property and good will. *See, e.g., Playboy Enters.*

*Inc. v. Chuckleberry Pub'g, Inc.*, 687 F.2d 563, 565 (2d Cir. 1982) (affirming finding of bad faith

where defendant offered no credible explanation for the similarity to the senior user's product).

The Court accordingly finds that the bad faith factor, too, favors Focus. Although the proof of bad faith is especially obvious in connection with the Ezy-Hang product, the Court finds that the factor of bad faith cannot be logically cabined to the EZ-ON Mark. Defendants' strategy of deliberate infringement, the Court finds, was holistic.

*(7) Quality of defendants' product*: This factor "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 324, 340 (S.D.N.Y. 2013). "On the one hand, the court must determine 'whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.' On the other hand, if the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality' may tend to create confusion as to source by bringing the products into even closer proximity." *Id.* (quoting *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999)). *But see Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003) ("[T]he quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009) (same).

Here, defendants' inferior products, coupled with the source confusion that consumers demonstrably expressed, tended to tarnish Focus's reputation. This factor favors plaintiffs, as to all three infringement claims. And the evidence strongly showed that the Ezy Hang product was inferior to Focus's. Kemp testified that, in 2015, Focus sent several Ezy Hang product specs to its China-based factory for quality testing of individual components. Tr. at 264. This resulted in a finding that "compared to the Focus Hookless product, [each tested product] was . . . inferior." *Id.* The overall fabric of the Ezy Hang curtain was of lower quality, the fabric window was lower weight, and the "snaps on the snap-in liner were thinner, flimsier material." *Id.*

Kemp also persuasively testified that, based on her observations, the Ezy Hang product was of lower quality. During a meeting with its customer HD Supply, which resells Focus's products, HD Supply's senior buyer Greg Syrek confronted Kemp with Kartri's proposal that HD Supply replace Focus's snap-in liners with Kartri's. *Id.* at 265. Syrek pulled a sample Kartri curtain from a rack, "[a]nd when he pulled it out, two or three of the snaps broke on the floor as he was pulling them." *Id.* at 266. In light of the quality concern, Syrek lost interest in switching HD Supply's account to Kartri. *See id.* Where the junior product consists of lower-quality materials than the senior product, the quality factor favors plaintiff. *See Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 455 (S.D.N.Y. 2017) (quality factor favored plaintiff where junior fragrance product "use[d] less expensive, synthetic oils, rather than the natural oils used in [plaintiff's] fragrances, and it employ[ed] less expensive packaging components").

Other evidence is in accord. Focus's Dubinski testified that she had heard of consumer complaints that the Ezy Hang product did not slide on the curtain rod as easily as Focus's. Tr. at 148–49. Defense witnesses gave testimony to similar effect. Middleberg testified that, at least initially, the fabric was coming off the grasp of the Ezy Hang ring, *id.* at 590–91; he did not testify whether quality issues were remedied. Kubus testified that, during Ezy Hang's initial commercialization in 2013 and 2014, "[w]e had a lot of issues getting it resolved with quality," *id.* at 766; *see also id.* at 767. Kartri encountered problems of curtains that were "falling apart"; it replaced those curtains for its customers. *Id.*; *see also Tiffany & Co.*, 127 F. Supp. 3d at 253 (finding disparity in quality between engagement rings where, unlike the senior user, junior user faced issues with diamond falling out of its ring, did not use quality control standards, and did not use highest quality diamonds), *grant of summary judgment vacated and remanded for reconsideration of other* Polaroid *factors*, 971 F.3d 74 (2d Cir. 2020).

The assembled evidence persuasively establishes that the Ezy Hang curtain suffered from quality issues. And defendants have not adduced evidence of deficiencies with Focus's curtain. Thus, "the junior user's product [was] of inferior quality," creating a risk that "the senior user's reputation could be jeopardized." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotations and citation omitted); *see also Sunny Merch. Corp.*, 97 F. Supp. 3d at 498 (factor favored plaintiff where "[t]here [was] no dispute that [defendant's] products are of an inferior quality to [plaintiff's]").

The quality factor accordingly weighs in plaintiff's favor as to the HOOKLESS®, EZ-ON, and Trade Dress infringement claims.

*(8) Consumer sophistication*: The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (internal quotation marks and citation omitted) (alteration in original). "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011). Confusion is thus more likely "where the goods are cheap and bought casually." *Dooney & Bourke*, 561 F. Supp. 2d at 389 (quoting McCarthy on Trademarks § 23:96) (internal quotation marks omitted). And where "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside*, 182 F.3d at 143.

With the Court's having found that the Ezy Hang product is nearly identical to the EZ-ON product and strikingly similar to the HOOKLESS® product, there is a presumption that the likely customers of Focus's and Kartri's products would be confused among them, unless they

are exceedingly sophisticated. *See id.* The evidence does not establish such sophistication. To the extent defendants operated through distributors, as was often the case for Focus's HOOKLESS® product, Kemp testified that such distributors usually buy hundreds, even thousands, of different products pertaining to bedding, bath, and related categories. Tr. at 274–75. Given the breadth of this suite of products, she testified, distributors "will never be experts [in non-hooked shower curtain products], no matter how hard we train them." *Id.* at 275. Where a distributor relies on a field team, expertise may be particularly unlikely. *Id.* at 273 (Kemp). As to the parties' ultimate purchasers, these are, on the whole, of either medium sophistication (particularly as to hospitality-market purchasers) or low sophistication (retail-market purchasers). In the hospitality market, to the extent the purchasing decision is made by a higher-up executive, these are unlikely to be expert in particular shower curtain products. Erickson Aff. ¶ 13. In the retail market, individual customers may purchase a HOOKLESS® or Ezy Hang products based on encountering it at a hotel, not on comparison shopping or research. Such consumers are unlikely to be savvy to the differences between the parties' products. *See id.*

The inexpensive cost of a shower curtain is also consistent with lower sophistication. The shower curtains at issue in this litigation typically range in price between $12–31 for a Focus curtain, and $12–28 (in some instances $45) for a Kartri curtain. Elmore Rep. ¶ 91. They thus fall within the "inexpensive [product category that] does not require any sophistication on the part of the buyer." *Snuggly Plushez*, 809 F. Supp. 2d at 156; *see also Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011) ("[p]urchasing fashionable yet affordable ladieswear" did not require any heightened degree of sophistication (internal quotation marks omitted)); *see Capri Sun GmbH v. Am. Beverage Corp.*, No. 19 Civ. 1422 (PAE) (DCF), 2022 WL 976270, at *56 (S.D.N.Y. Mar. 31, 2022) (juice pouches, sold in cartons

95

priced between $2 and $20, did not require consumer sophistication), *motion to certify interlocutory appeal denied*, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022); *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 398–99 (S.D.N.Y. 2014) (similar).

Kartri responds that some customers knew they had bought Kartri's products and proceeded anyway. That does not refute confusion. "[T]o be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 411 (S.D.N.Y. 1989) (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinemas Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979)). Kartri has not adduced evidence that its customers knew what they were purchasing was unconnected to—and not sponsored or endorsed by—Focus. On the contrary, Kartri blurred the distinction between the two products by, for example, referring to the Ezy Hang curtain as "a version of hookless" to inquiring customers. PTX 230; *see also* PTXs 231 (similar), 232 (similar). And Kartri's attempt to bring in customers seeking a "version of hookless" stood to mislead customers, from the outset, that they were buying a product allied with the HOOKLESS® product. Where a customer is

> [m]isled into an initial interest, a potential . . . buyer may satisfy himself that the less expensive [product] is at least as good, if not better, than [the senior product]. Deception and confusion thus work to appropriate [plaintiff]'s good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company.

*Grotrian*, 523 F.2d at 1341 (internal quotation marks and citation omitted).

The final *Polaroid* factor thus also favors plaintiffs as to all three infringement claims.

**Weighing the Polaroid Factors**: "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to

be confused." *Tiffany & Co.*, 971 F.3d at 85. "The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366 (S.D.N.Y. 2003). "[T]he Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works*, 7 F. Supp. 3d at 399 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).

The Court finds, on balance, that the *Polaroid* factors establish a likelihood of confusion as to the HOOKLESS® Mark infringement claim as to Kartri, and the EZ-ON Mark and Trade Dress infringement claims as to both defendants. The assessments differ slightly by issue.

*HOOKLESS® Mark*: The Court found the HOOKLESS® Mark inherently distinctive due to its suggestiveness. That established the Mark's strength without the need of a showing that it had acquired secondary meaning over time. There is also a strong similarity between the marks (and between the curtains bearing the HOOKLESS® Mark and the Ezy Hang curtains). And plaintiffs' and defendants' marks compete in the same market. The first three factors of *Polaroid*—which the Second Circuit has recognized as the most important—decisively favor plaintiffs. The balance of the factors—bridging the gap, actual confusion, bad faith, quality, and consumer sophistication—also handily favors plaintiffs. Although bridging the gap is neutral here because the parties operate in the same market, the remaining factors—anecdotal evidence of actual confusion, the clear record of defendants' bad faith in imitating plaintiffs' design, the lower quality of defendants' Ezy Hang curtain, and the low-to-medium sophistication of purchasers and end users—all strongly favor a finding of likelihood of consumer confusion.

*EZ-ON Mark*: As to the EZ-ON Mark, the Court found it, too, inherently distinctive, but weaker than the HOOKLESS® Mark. That is of no moment, however, because the second factor—similarity—almost single-handedly establishes a finding of likelihood of confusion. That is because the similarity between the EZ-ON and the Ezy Hang Marks is extreme; the two are so alike as to be almost identical. And the markets in which the two products are sold—EZ-ON in retail, Ezy Hang in hospitality—are proximate. The first three *Polaroid* factors—carried decisively by the second—thus strongly favor a finding of likelihood of confusion. Of the remaining factors, only the absence of evidence of actual confusion weighs in defendants' favor. But the others—bridging the gap between the adjacent markets, quality issues, and consumer sophistication—favor plaintiffs. Most important, the Court has found overwhelmingly that defendants acted in bad faith in attempting to imitate the EZ-ON Mark.

*Trade Dress*: The Trade Dress is embodied by curtains under the HOOKLESS® Mark and the EZ-ON Mark. The finding of a likelihood of confusion as to the two Marks compels a similar finding of likelihood of confusion as to the Trade Dress.

Having found that both Marks and the Trade Dress are entitled to protection, and that plaintiffs have shown the requisite likelihood of confusion as to each, the Court finds that Kartri infringed the HOOKLESS® Mark, and that both defendants infringed the EZ-ON Mark and the Trade Dress.

### 3.    Marquis's Counterclaim of Non-Infringement as to the EZ-ON Mark

Marquis has counterclaimed that it did not infringe the EZ-ON Mark. In light of the above analysis and findings, that counterclaim is denied.

### F.    Unfair Competition with Focus's EZ-ON Mark, Hookless Mark, and Trade Dress

The elements of an unfair competition claim under New York common law "mirror" those of Lanham Act claims for trademark or trade dress infringement. *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018) (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)). But the proponent of such a claim "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant]'s bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Info. Superhighway, Inc. v. Talk Am., Inc.,* 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (alteration in *LVL XIII Brands*)); *see also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000). A plaintiff "must prove: (1) actual confusion or a likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order)).

The findings above resolve this claim. The Court has found a likelihood of confusion based on the *Polaroid* factors' application to both Marks and the Trade Dress, and that, with respect to these, defendants acted in bad faith. The Court thus finds that Kartri engaged, under New York common law, in unfair competition with the HOOKLESS® Mark, and that both defendants engaged in unfair competition with the EZ-ON Mark and the Trade Dress.

## III.    Findings of Fact and Conclusions of Law as to Damages

### A.    Overview

Plaintiffs pursue three types of damages. First, they request disgorgement of defendants' profits arising from their infringement of plaintiffs' EZ-ON Mark and Trade Dress.[50] *See* PTX

---

[50] Plaintiffs do not seek monetary damages for the infringement of the HOOKLESS® Mark. And disgorgement for patent infringement is not available. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 964 & n.6 (2017).

637 at 10. Second, as an alternative, they seek their own lost profits arising from defendants'
infringement of the utility patents and Trade Dress, that is, from defendants' sales of the
infringing products. To the extent that a lost-profits award does not assume that defendants'
sales would have gone to plaintiffs but for the infringement, they ask to receive a reasonable
royalty award keyed to such sales, and for the infringement of the EZ-ON Mark. *See id.* Third,
if a lost-profit award is not ordered, plaintiffs request the royalty awards from all of Kartri's sales
infringing plaintiffs' patents or Trade Dress, and from the infringement of the EZ-ON mark. *See
id.* Plaintiffs measure each proposed award for two possible periods of infringement, each
beginning October 16, 2016: one would end July 31, 2018, the other November 15, 2018. The
Court thus must choose the proper measure of damages and the proper period of infringement.
The damages that plaintiffs calculate on each theory are as follows:

| Damages Theory | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| • *Profit disgorgement* | Total:   $4,083,259 | Total:   $4,468,268 |
| • *Lost profits* (assuming plaintiffs would have captured 90% of Kartri's illicit sales) | $987,155 | $1,078,137 |
| • *Reasonable royalty* from Patent/Trade Dress infringement (based on uncaptured 10% of Kartri's sales) | $54,842 | $59,897 |
| • *Reasonable royalty* from EZ-ON Mark infringement | $87,747 | $95,834 |
|  | Total:   $1,129,744 | Total:   $1,233,868 |
| • *Reasonable royalty* from all of Kartri's Patent or Trade Dress Sales | $548,419 | $598,965 |
| • *Reasonable royalty* from EZ-ON Mark infringement | $87,747 | $95,834[51] |

---

[51] The trial demonstrative displayed $94,834, a $1,000 difference from the same item in the
second set of damages calculations. Elmore testified that this was a typo. *See* Tr. at 476.

Appx300

| | Total: $636,166 | Total: $694,799[52] |
|---|---|---|

Under each theory, plaintiffs also seek enhanced—trebled—damages for defendants'
allegedly willful conduct.

Plaintiffs base their damages calculations on the report of expert John Elmore.  PTXs 297
("Elmore Rep."), 297-1.  Defendants rebut with a report by expert Graham Rogers.  DTX 47
("Rogers Rep.").  The Court first reviews the governing legal framework and then applies these
principles to the facts.

**B.    Applicable Legal Frameworks**

**1.    Disgorgement of Defendants' Profits**

Plaintiffs first seek to disgorge defendants' profits as a remedy for their infringement of
the Trade Dress and the EZ-ON Mark.  "Under the Lanham Act, [a plaintiff] is entitled 'to
recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of
the action.'"  *Brooks v. Dash*, 454 F. Supp. 3d 331, 341 (S.D.N.Y. 2020) (quoting 15 U.S.C. §
1117(a)), *aff'd*, 852 F. App'x 40 (2d Cir. 2021) (summary order).  In tabulating such profits, it is
plaintiff's burden "to prove defendant's sales"; it is defendant's burden to "prove all elements of
cost or deduction claimed."  15 U.S.C. § 1117(a); *see Hilton v. UK Fragrances, Inc.*, No. 12 Civ.
6346 (JFB) (AKT), 2014 WL 794304, at *6 (E.D.N.Y. Feb. 25, 2014).  "[D]isgorgement is an
inherently equitable remedy."  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics
GmbH*, No. 14 Civ. 585 (AJN), 2018 WL 4253181, at *16 (S.D.N.Y. Sept. 5, 2018).  Under
principles of equity, "a trademark defendant's mental state is a highly important consideration in
determining whether an award of profits is appropriate"—albeit not an "inflexible precondition."

---

[52] The trial demonstrative incorrectly calculated a total of $1,173,971.  The Court has corrected
this error in its determination.

*Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).[53] "The Second Circuit recognizes three theories under which a court may order disgorgement of defendant's profits: unjust enrichment, compensation, and deterrence." *River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13 Civ. 3669 (DLC), 2015 WL 3916271 (June 25, 2015), at \*5 (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014)).

## 2.    Plaintiffs' Lost Profits

Plaintiffs also seek lost profits for the patent and Trade Dress infringement that resulted from the sales of the Ezy-Hang product. *See* PTX 637 at 2. Because the sales underlying both infringements are the same, plaintiffs have elected to request a lost profits award as calculated based on a showing of liability patent infringement. *See* Elmore Rep. ¶ 63; PTX 637 at 3–6. The Court accordingly sets forth that framework only.

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "Lost-profits damages are appropriate whenever there is a reasonable probability that, 'but for' the infringement, the patentee would have made the sales that were made by the infringer." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013) (cleaned up). "In *Panduit Corp. v. Stahlin Bro[ther]s Fibre Works[, Inc.*, 575 F.2d 1152 (6th Cir. 1978)], the Sixth Circuit set forth the widely used four-factor test to determine when lost profits damages are available." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at \*26 (S.D.N.Y. July 14, 2022); *see also Rite-Hite Corp. v.*

---

[53] This holding abrogates the holding of *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992), that willfulness is a prerequisite for a profits award under 15 U.S.C. § 1125(a). *See Experience Hendrix*, 2020 WL 3564485, at \*6 n.4 (clarifying that equitable principles historically used in deciding whether to award profits "continue to be applicable").

*Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*); *Grp. One Ltd. v. GTE GmbH*, No. 20

Civ. 2205 (MKB) (JRC), 2022 WL 4010850, at *25 (E.D.N.Y. Sept. 2, 2022). The factors

governing a showing of but-for causation under *Panduit* include: "(1) demand for the patented

product, (2) absence of acceptable noninfringing alternatives, (3) [capacity] to exploit the

demand, and (4) the amount of profit [the patentee] would have made." *Am. Tech. Ceramics

Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 630 (E.D.N.Y. 2020) (quoting

*Panduit*, 575 F.2d at 1156) (alterations in *Presidio*). Under "the second prong, the patent owner

may rely on proof of its established market share rather than proof of an acceptable

noninfringing substitute." *Bic Corp. v. First Prominence Co.*, No. 00 Civ. 7155 (SHS) (RLE),

2001 WL 1597983, at *2 (S.D.N.Y. Dec. 10, 2001) (citing *State Indus. v. Mor-Flo Indus.*, 883

F.2d 1573, 1578 (Fed. Cir. 1989)). The burden of making this showing is on the patentee. *FCX

Solar, LLC v. FTC Solar, Inc.*, No. 21 Civ. 3556 (RA) (VF), 2022 WL 3584946, at *2 (S.D.N.Y.

Aug. 22, 2022) (citing *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir.

2003)). And "where lost profits are the best measure of damages in the but-for world where the

defendant had not infringed, they are available to fully compensate the patent holder for

the infringement." *Town & Country Linen Corp.*, 2022 WL 2757643, at *26 (citation omitted).

### 3. Reasonable Royalties

Plaintiffs also seek two types of reasonable royalties. The first is for the infringement of

the utility patents and Trade Dress, which resulted from the same sales of the Ezy-Hang product.

Plaintiffs propose varying awards, based on whether such an award is made in addition to a lost

profits award, or stands alone. The second is for Kartri's unlawful branding of its Ezy-Hang

products with the EZ-ON Mark. Here, plaintiffs propose a fixed award regardless of whether the

Court awards lost profits.

> *a.    Reasonable Royalties for Patent and Trade Dress Infringement*

103

"For sales in which the patentee cannot prove the elements necessary to establish entitlement to lost profits, [35 U.S.C. § 284] guarantees the patentee a reasonable royalty for those sales." *Grp. One Ltd.*, 2022 WL 4010850, at *26 (quoting *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017)). A "common approach used to calculate a reasonable royalty is the 'hypothetical negotiation,' which 'attempts to ascertain the royalty upon which the parties would have agreed [*ex ante*] had they successfully negotiated an agreement just before infringement began.'" *FCX Solar*, 2022 WL 3584946, at *3 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). "In calculating a reasonable royalty under this approach, courts rely on the . . . fifteen factors detailed in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 692 (S.D.N.Y. 2011); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 853 & n.3 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

The *Georgia-Pacific* factors are:

[1] the past and present royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;

[2] the rates paid by the licensee for the use of other patents comparable to the patents in suit;

[3] the nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted;

[4] the licensor's policies and practices regarding the grant of licenses to its technology;

[5] the commercial relationship between the licensor and the licensee;

[6] the effect of selling the patented specialty in promoting sales of other products of the license, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative convoyed sales;

[7] the duration of the patent and term of the license;

[8] the established profitability of the product made under the patent; its commercial success; and its current popularity;

[9] the utility and advantage of the patent property over the old modes or devices, if any that has been used for working out similar results;

[10] the nature of the patented invention as well as its commercial embodiments and benefits;

[11] the extent the infringer used invention and evidence of the value of that use;

[12] the customary profit for use of the invention or analogous inventions;

[13] the portion of the infringer's profit that should be credited to the invention;

[14] the opinion of qualified experts; [and]

[15] the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement.

*See ResQNet.com, Inc.*, 828 F. Supp. 2d at 692–93 (citing *Ga.-Pac.*, 318 F. Supp. at 1120).

b.    *Reasonable Royalties for EZ-ON Mark Infringement*

Unlike the Patent Act, the Lanham Act does not expressly provide for a reasonable royalty remedy, 15 U.S.C. § 1117(a). Instead, "[a] plaintiff in a trademark action may recover a 'reasonable royalty' under the [Lanham Act's] heading of actual damages." *Gucci Am., Inc. v. Guess? Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012). "However, because they are inherently difficult to calculate in a vacuum, courts often decline to award such damages unless the parties had a prior licensing agreement." *Id.*; *see also Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC), 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006) (in trademark context, reasonable royalties "generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty"); *The Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02 Civ. 10037 (DLC), 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005) (royalty award a "seldom-used method for computing trademark damages"). Absent a prior licensing agreement, "courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to

105

calculate them." *Gucci Am., Inc.*, 858 F. Supp. 2d at 254. In such instances, the *Georgia-Pacific* factors serve as a guiding framework.

### C.    Plaintiffs' Damages Report

#### 1.    The Elmore Report and Its Relation to Plaintiff's Damages Requests at Trial

In his report, plaintiffs' expert Elmore provides the calculations and data underpinning plaintiffs' three damages theories: (1) disgorgement of profits, (2) plaintiffs' lost profits, complemented by reasonable royalties for defendants' (i) infringement of the utility patents and infringement of and unfair competition with the Trade Dress and (ii) infringement of and unfair competition with the EZ-ON Mark, and (3) a larger, standalone reasonable royalties award for defendants' (i) infringement of the utility patents and infringement of and unfair competition with the Trade Dress and (ii) infringement of and unfair competition with the EZ-ON Mark.[54] *See* Elmore Rep.; PTXs 297-1 (appendices); 637 at 2 (damages requests).[55]

The Court will supplement its summary with expansions and clarifications that Elmore supplied in his trial testimony. Elmore's report covers an infringement period from October 16, 2013 to July 31, 2018. But, at trial, plaintiffs urged an extended infringement period for which to calculate damages: from October 16, 2013 to November 15, 2018. *See* PTX 637. That was to correct a lapse by the defense, which produced defendants' sales data only through July 31, 2018, whereas the infringement extended until November 15, 2018. *See* Tr. at 401–04; *id.* at

---

[54] For infringement of the HOOKLESS® Mark, plaintiffs seek only injunctive relief because, unlike with the EZ-ON Mark "readily associated" with plaintiffs' products, it was not possible to reliably quantify the damages for infringement of that mark. Tr. at 405–06 (Elmore).

[55] Elmore's report was issued January 14, 2019. The cover page of the original report gave a date of January 14, 2018, notwithstanding setting out damages calculations for a period ending July 31, 2018. Elmore's updated report at trial repeated this date. *See* PTX 637 at 2 *et seq.*; Tr. at 505–06. The 2018 date was a typographical error. Tr. at 503–10.

545. Elmore tabulated damages for the added period between August 1, 2018 and November 15, 2018 by extrapolating each defendant's revenues from its respective monthly average revenue between January 2017 and July 2018 and applying that average to August–October and November (prorated) 2018. *Id.* at 519–20; *see also id.* at 402 ("Same methodology just extending the date range." (Elmore)), 404–05, 520, 532.

### 2. Qualification of Elmore as an Expert Witness

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). "Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." *LVL XIII Brands*, 209 F. Supp. 3d at 636. Under Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* (quoting Fed. R. Evid. 702). "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)), *aff'd*, 982 F.3d 113 (2d Cir. 2020). These words must "be read in light of the liberalizing purpose of" Rule 702. *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141 (1986).

Elmore is qualified to opine on the computation of damages on plaintiffs' claims. On November 23, 2021, the Court rejected defendants' motion *in limine* to exclude Elmore's report, finding Elmore amply qualified under Rule 702 and *Daubert*. *See* Dkt. 436. Elmore holds a bachelor's degree in economics, a Master of Business Administration, and a Juris Doctor, and is a Certified Public Accountant, "accredited in business valuations, certified in financial forensics,

and holds a designation as a Master of Financial Forensics." *Id.* at 35. In 2017, Elmore joined

the financial advisory firm Ernst & Young LLP as a manager in its valuation and business

modeling, and before then led the intellectual property valuation services practice at a different

business valuation firm. *Id.* Elmore had done valuation and damages analyses on more than 200

matters, many involving patent and trademark issues, across numerous industries. *Id.* at 35–36;

*see also* Elmore Rep. ¶¶ 10–15 (qualifications). Elmore's qualifications were not objected to at

trial. *See* Tr. 398–400.

### 3.    Admissibility of Elmore's Report

Under Rule 702, after the witness is qualified as an expert, the party seeking to admit

expert testimony must show that "(1) 'the testimony is based on sufficient facts or data,' (2) 'the

testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably

applied the principles and methods to the facts of the case.'" *United States v. Pryor*, 474 F.

App'x 831, 834 (2d Cir. 2012) (summary order) (quoting Fed. R. Evid. 702). The proponent

must further show that (4) "the testimony is relevant and will assist the [trier of fact]," *In re

Mirena*, 341 F. Supp. 3d at 240, and "has the burden of establishing by a preponderance of the

evidence that the admissibility requirements of Rule 702 are satisfied," *United States v.

Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

The Court again affirms its ruling, denying defendants' motion *in limine* to exclude

Elmore's report. *See* Dkt. 436 at 36–38. The Court there rejected defendants' arguments that

Elmore relied on unreliable data by (1) partially relying on data that a third-party analyst had

synthesized from data that defendants provided in discovery; (2) failing to update the sales data

through December 2018; and (3) introducing inconsistencies suggesting his report had been

prepared in 2017. *See id.* The Court also rejected arguments by the defense questioning the

persuasiveness of the Elmore Report. *See id.*

108

### 4.    The Elmore Report's Damages Calculations[56]

#### a.    *Disgorgement of defendants' profits*

**Defendants' revenues**: Elmore presents data of each defendant's relevant sales:

|  | **Marquis** | **Kartri** | **Totals** |
|---|---|---|---|
| Oct. 16–Dec. 31, 2013 | $2,753 | $886 | $3,639 |
| 2014 | $50,364 | $70,055 | $120,419 |
| 2015 | $285,981 | $344,802 | $630,783 |
| 2016 | $252,312 | $874,964 | $1,127,276 |
| 2017 | $932,522 | $227,405 | $1,159,927 |
| Jan. 1–July 31, 2018 | $365,650 | $675,565 | $1,041,215 |
| **Totals** | $1,889,582 | $2,193,677 | $4,083,259 |

Elmore Rep. ¶ 185; *id.* Att. 4.0.

Marquis's and Kartri's figures are based on records that each produced in discovery.

Elmore Rep. ¶ 185.  Marquis's data captures its sales of accused Ezy Hang curtains to Kartri.  *Id.*

Kartri's data captures its sales to its customers.  *Id.*[57]

At trial, Elmore offered updated sales figures covering the period through November 15,

2018, based on extrapolations from the initial infringement period:

|  | **Marquis** | **Kartri** | **Totals** |
|---|---|---|---|
| Total sales Oct. 16, 2013–July 31, 2018 | $1,889,582 | $2,193,677 | $4,083,259 |

---

[56] Where relevant, the Court supplements the report's figures with the updated figures to which Elmore testified at trial, capturing the infringement period ending November 15, 2018.

[57] The data and computations underlying Marquis's sales figures are set out in Attachments 7.0 and 7.1.  Attachment 7.1 lists all Marquis invoices from November 27, 2013, through May 4, 2017.  Marquis provided this data to Elmore in the form of a generated accounting.  Tr. at 494. He did not receive the underlying invoices themselves.  *Id.*  Each line specifies the date, invoice, number, item number, item description, the quantity ordered, the dollar cost per unit, the dollar sales price per unit, the total cost incurred for the order, and the total revenue Marquis gathered from the order.  Each line further included a gross margin percentage, which Elmore calculated by dividing the total cost by the total revenue, and subtracting that percentage from 100%.  Some such profit margins show a negative percentage.  Elmore explained that such figures, based on Marquis's own disclosures, resulted from its selling to Kartri at a loss.  Tr. at 490–93.

| Sales Aug. 1–Nov. 15, 2018 | $182,825 | $202,184 | $385,009 |
| --- | --- | --- | --- |
| **New Totals** | $2,072,407 | $2,395,861 | $4,468,268 |

PTX 637 at 4.

*Estimates of defendants' profits*: Elmore next estimates each defendant's profits, notwithstanding the fact that defendants bear the burden of "proving appropriate costs and deductions." 15 U.S.C. § 1117(a); Elmore Rep. ¶ 187.

*Marquis's profits*: For Marquis, Elmore does not rely on Marquis's cost data. That is because Marquis, in discovery, did not break out the fixed costs independent of Marquis's sales volume. Elmore Rep. ¶ 188; *see* Tr. at 421 ("[Marquis's cost data] reflected some other measure of cost, and it's not certain as to whether that cost—what Marquis included in computing that level of cost."). Elmore uses "incremental profits" in calculating profits, which entails applying the variable costs associated with the products sold against those products' revenues. Elmore Rep. ¶¶ 188–189.

Accordingly, Elmore calculates Marquis's gross profits and profit margins for each year by looking at the revenues and costs associated with the Ezy Hang curtain. Those figures are:[58]

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | **Total** |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Revenue | $2,753 | $50,364 | $285,981 | $252,312 | $932,522 | $365,650 | $1,889,582 |
| Costs | ($2,423) | ($44,320) | ($250,347) | ($231,708) | ($798,810) | ($305,165) | ($1,632,773) |
| Gross profit | $330 | $6,044 | $35,634 | $20,604 | $133,712 | $60,485 | **$256,809** |
| Gross margin | 12.0% | 12.0% | 12.5% | 8.2% | 14.3% | 16.5% | 13.6% |

---

[58] PTX 637 did not provide updated figures as to this chart.

*Id.*, Att. 7.0; *see also id.* ¶¶ 189–190.  Marquis's minimum profit for disgorgement is thus $256,809.  This figure, Elmore states, may understate Marquis's profits, in that the variable cost figures that Marquis provided may include fixed costs that he would have excluded.  *Id.* ¶ 190.[59]

*Kartri's profits*:  As to Kartri, the data and computations underlying its sales figures are contained in Attachments 6.0, 6.1, and 6.2.[60]  Elmore testified that, in compiling his report, he observed that Marquis's reported number of curtains sold to Kartri was significantly higher than the number of curtains Kartri sold in the hospitality market.  This suggested that Kartri may have underreported its sales figures.  Tr. at 421–22.  Kartri's data, as noted, lacks cost figures, despite cost being a defendant's burden to prove.  *Id.* ¶ 191.[61]  Elmore nonetheless calculates gross margins as best he can—by matching a product's identification number to an entry in Marquis's data, where possible.  Where such a match exists, Elmore uses Marquis's sales price to Kartri as reflecting Kartri's cost for that item, and calculates the corresponding gross margin.  Tr. at 523–24.

Elmore's tabulation of Kartri's total revenue was as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|

---

[59] Attachment 7.1 does not provide sales data beyond May 4, 2017.  But Attachment 7.0, whose only identified source is Attachment 7.1, provides sales, profit, and gross margin figures through July 31, 2018.  This was not explained at trial.

[60] Attachments 6.1 and 6.2 list all invoices Kartri provided from November 27, 2013, through May 4, 2017.  For the period January 1, 2017 through July 31, 2018, Kartri provided total sales figures to plaintiffs' counsel in a letter dated September 4, 2018 (the "September 2018 Letter").  *See* Att. 6.0 n.2.  That total figure was $657,565.  *Id.*  Attachment 6.1 covers sales from Ezy Hang curtains that Kartri purchased from Marquis.  Each line specifies the order's date, a "detail" number, order ID, invoice number, unit price, quantity, total revenue for the order, and a product identification number.  Attachment 6.2 covers sales from Ezy Hang curtains that Kartri made itself by, for example, filling orders made to certain specifications.  *See* Tr. at 513–14.

[61] As noted, on August 5, 2021, the Court excluded the cost data Kartri provided its rebuttal damages expert Graham Rogers, on account of defendant's discovery violation.  Dkt. 412.

111

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue, Att. 6.1 | $353 | $11,042 | $45,596 | $359,271 | $114,066 | n/a | n/a |
| Revenue, Att. 6.2 | $544 | $59,829 | $303,222 | $525,883 | $115,987 | n/a | n/a |
| Total | $896 | $70,871 | $348,818 | $885,154 | $230,053 | $675,565[62] | $2,211,357 |
| Credits | ($10) | ($816) | ($4,016) | ($10,190) | ($2,648) | 0 | ($17,680) |
| Net Revenue | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |

Elmore Rep., Att. 6.0.

To calculate Kartri's disgorgeable profits, Elmore does not rely on the spotty gross margin data he was able to derive from matching Kartri's data to Marquis's. Instead, he takes as a proxy *Focus*'s profit margins in the hospitality industry. *Id.* ¶ 192. That margin, across the board, is 50%. *Id.* ¶ 194.[63] Kartri's profits subject to disgorgement thus amount to:

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Net Revenue | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Margin | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Disgorgeable Profit | $443 | $35,028 | $172,401 | $437,482 | $113,703 | $337,783 | $1,096,839 |

*Id.* Applying this profit margin, Kartri's total profit to be disgorged, for the infringement period ending on July 31, 2018, is $1,096,839.

At trial, plaintiffs argued that because defendants had not met their burden to reliably prove their costs, defendants' entire revenue should be disgorged. *See* PTX 637 at 9. For the

---

[62] In tabulating revenues for the period after May 4, 2017, the last date for which Kartri provided invoice data, Elmore referred to the September 2018 Letter. It provided a total sales figure for January 1, 2017–July 31, 2018. Elmore Rep., Att. 6.0 n.2. Elmore subtracted the sales figure for January 1–May 4, 2017 from the figure in the September 2018 Letter. *Id.*; Tr. at 538–42.

[63] Elmore arrived at this figure by reducing *Focus*'s 54.1% profit margin to account for distribution costs of 2% of sales, sales commissions of 0.6% of sales, and other contingent factors. *See* Elmore Rep. ¶¶ 106, 108–109, 193.

infringement periods ending on July 31, 2018 and November 15, 2018, these revenues are, respectively:

| Defendant | Disgorgeable Revenues for Infringement Period Ending July 31, 2018 | Disgorgeable Revenues for Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| Marquis | $1,889,582 | $2,072,407 |
| Kartri | $2,193,677 | $2,395,861 |
| Totals | $4,083,259 | $4,468,268 |

b.    *Lost profits*

Lost profits are available under the Patent Act and the Lanham Act. Because defendants' infringement of the utility patents and Trade Dress arose from the same accused sales, Elmore tabulated lost profits by applying the four *Panduit* factors, which guide the determination of lost profits for patent infringement. Elmore's report analyzed whether (1) demand for the patented product exists; (2) there were no acceptable non-infringing substitute products to satisfy that demand; (3) the owner of the patent possessed the manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profits can be quantified. Elmore Rep. ¶¶ 65–66.

**Panduit** *factor 1 (consumer demand)*: According to Elmore, demand for the patented products exists because both plaintiffs and defendants have generated substantial revenues and profits from selling their respective products. Focus, between 2013 and August 2017 alone, sold HOOKLESS® curtains for total revenues of $81.4 million in the hospitality market and $54.4 million in the retail market. *Id.* ¶ 74. Its hospitality market profit margins were, on average, 54.1% each year, and 33.5% in the retail market. *Id.*; *see also id.* Att. 8.1, Att. 8.2.[64]

---

[64] Plaintiffs did not include their own sales data beyond August 2017—more than 14 months before the last date of the infringement period—or update those figures at trial. Although in theory Focus's profitability might have changed between August 2017 and November 15, 2018, defendants did not argue at trial that Focus's dataset was unrepresentative or inadequate.

Marquis's total sales for the Ezy Hang product were $1,889,582 between October 16, 2013 and July 31, 2018. *Id.* ¶ 75; Att. 7.0.[65] Through November 15, 2018, those sales were $2,072,407. PTX 637 at 7, 16. Kartri's estimated net sales revenue for the Ezy Hang product for the period through July 31, 2018 was $2,193,677. *See* Elmore Rep. ¶ 75; Att. 6.0. Through November 15, 2018, those were $2,395,861. PTX 637 at 7, 9.

This, Elmore opines, establishes the existence of demand for the patented products in-suit. Elmore Rep. ¶ 76.

**Panduit *factor 2 (no non-infringing products to satisfy demand, market share approach)*:** To establish that no non-infringing alternatives to Focus's hook-free products were available to customers, Elmore first opines that the hook-free shower curtain market essentially consisted of two players—Focus and Kartri.[66] *Id.* ¶ 94. The only other player to sell hook-free curtain products in the hospitality market was Carnation, a licensee of Focus's. *Id.* ¶ 81.[67] Even though consumers in the hospitality market have the choice of buying "traditional hook-based" shower curtains, such have essentially been displaced by hook-free shower curtains. *Id.* ¶ 79. Elmore's report, and testimony, are that, with defendants' infringing products on the market, Focus captured a share of roughly 50%, with the rest allocated to Kartri due to its infringing sales. *Id.* ¶ 80. Kartri's products directly competed with Focus's. *Id.* ¶ 89.

---

[65] Elmore's report erroneously states an amount of $1.9 million and refers to Attachment 7.0. Elmore Rep. ¶ 75. But that amount and attachment refer to Marquis's revenues, whereas the revenues in question are those of Kartri, the party selling the Ezy Hang product to end consumers in the hospitality market. Elmore clarified at trial that this was a transposition error. *See* Tr. at 501. The Court has used the correct figures here.

[66] Although Elmore does not so state explicitly, the analysis for lost profits damages is necessarily restricted to the hospitality market, as Kartri sold its products—and deprived plaintiffs of profits—only in that market.

[67] A company offering a third hook-free curtain product in the *retail* market—Hospi-Tel Manufacturing Company—failed and went out of business in 2016. Elmore Rep. ¶ 81.

Elmore next opines that, but for defendants' infringement, Kartri's customers would have purchased their curtains from Focus. Elmore establishes this in two ways. First, he relies on deposition testimony by Kartri's Kubus and Goskowski that customers came to Kartri looking for a HOOKLESS® product and were persuaded to buy a Kartri product instead, *id.* ¶¶ 83–84, 86; on email records and testimony to the effect that Kartri sometimes exploited the confusing similarity between its products and Focus's, *id.* ¶¶ 87–89; on testimony that Focus and Kartri charged almost the same prices for their products, *id.* ¶ 91 ($12–31 for a Focus curtain and $12–28, and in some instances $45, for a Kartri curtain, according to Kubus); and on evidence that Focus and Kartri often sold to the same distributors, *id.* ¶ 92. He concludes that, but for Kartri's infringing conduct, there would not have been a non-infringing alternative to Focus's patented products that Kartri's customers could have purchased—and thus that, but for the infringing conduct, Focus would have captured Kartri's sales. *Id.* ¶ 95. Second, because Focus and Kartri operate in a two-player market, the sales captured by Kartri's similar, directly competing product would have likely gone to Focus. *Id.* ¶¶ 94–95.

**Panduit *factor 3 (manufacturing and marketing capability)*:** To show that Focus had the manufacturing capacity to meet the demand Kartri and Marquis served with their infringing products, Elmore takes the parties' sales figures as proxies for their ability to meet demand. He compares Focus's sales figures in the hospitality and retail markets for the period between November 2013 and August 2017 to Kartri's accused sales for that period. Those figures are:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Focus Hosp Sales | $14,657,045 | $16,517,346 | $21,232,118 | $16,875,520 | $12,069,562 | $81,351,591 |
| Focus Retail Sales | $8,717,162 | $11,395,366 | $12,978,872 | $12,475,069 | $8,872,335 | $54,438,804 |
| Total | $23,374,207 | $27,912,712 | $34,210,991 | $29,350,589 | $20,941,897 | $135,790,395 |

115

Appx315

| Kartri Accused Sales | | | | | $1,518,112 |
|---|---|---|---|---|---|

Elmore Rep. ¶ 98.

Elmore calculates that Kartri's sales volume constitutes 1.1% of Focus's sales. *Id.* This, he opines, establishes that Focus would have needed only to modestly expand its manufacturing capacity to meet the additional demand associated with a 1.1% increase of its sales. *Id.* ¶ 99.

As to marketing capabilities, Elmore reasons that, based on plaintiffs' 20-year presence in the market, the scale of HOOKLESS® curtain sales, its broad brand recognition, and its established distribution network, Focus would have easily been able to do the marketing necessary for the additional output it would have had but for the infringement. *Id.* ¶¶ 100–101.

*Panduit factor 4 (lost profits can be quantified)*: Elmore quantifies Focus's lost profits as follows. He assumes a two-player hospitality market, divided between Focus and Kartri, *id.* ¶ 103, and that Kartri's infringing sales would have gone to Focus absent Kartri's infringement. *Id.*; *see also id.* ¶¶ 104 (noting that Focus's pricing was comparable to Kartri's), 107 (reasoning, based on Kubus's testimony that approximately 90% of Kartri's sales are in the hospitality business, that most of Kartri's sales would have gone to Focus and at Focus's profit margin).

To calculate the sales Focus lost, Elmore starts with Kartri's accused sales—$2,193,677 for the period ending July 31, 2018, *id.* ¶ 110,[68] and $2,395,861 for the full infringement period ending November 15, 2018, PTX 637 at 9. And, "to account for any contingencies such as small marketplace participants or other factors that impact [p]laintiffs['] ability to capture all of the

---

[68] This figure corrects the confusion of Marquis's and Kartri's sales figures in the Report. *See* Elmore Rep. ¶ 110; *see also supra* note 65; PTX 637 (showing corrected figure).

116

accused sales," Elmore reduced these sales figures by 10 percent.[69] Elmore Rep. ¶¶ 103, 110. The resulting figures are $1,974,309 and $2,156,275, respectively for the partial and full infringement periods. *Id.* ¶ 110; PTX 637 at 9.

Elmore then derives Focus's profit. He tabulated a 50% profit margin, which, as noted, *see* note 63, *supra*, reflected deductions totaling 4.1% Focus's profit margin of 54.1%, which in turn was determined by taking the average (weighted by sales volume) of Focus's reported yearly margins in the hospitality sector between 2013 and August 2017. *See id.* ¶¶ 106, 108–109.

Elmore's full lost profits calculation for both infringement periods, with corrections for erroneous figures, thus amounts to:

|  | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| Kartri's total accused revenue | $2,193,677 | $2,395,861 |
| Percentage of Kartri's accused sales captured by Focus absent infringement | 90% | 90% |
| Focus's lost revenue | $1,974,309 | $2,156,275 |
| Focus's average profit margin, applied to lost revenue | 50% | 50% |
| Focus's lost profits | **$987,155** | **$1,078,137** |

*Id.* ¶ 110 (corrected); *id.*, Att. 2.0; PTX 637 at 7.

    *c.*   *Reasonable Royalties*

---

[69] The Elmore Report states that a 10% reduction of Kartri's accused sales figure corresponds to a 10% reduction of Focus's market share. *See* Elmore Rep. ¶ 103 ("I have included a 10 percent reduction to Plaintiffs' but-for market share. Accordingly, for purposes of my analysis, I have used a 90 percent market share to allocate the accused sales to Plaintiffs."). That is incorrect, in that, assuming a 50% market share for Focus, Kartri's gross accused sales reflect the remaining 50% of the market, and reducing *Kartri's sales* by 10% would leave it with 45% of the total market. Allocating that share to Focus would in turn leave it with 95% of the total market.

Elmore calculates two reasonable royalties. The first is for defendants' infringement of the utility patents and Trade Dress. He urges that this award should be added to any lost profits award, but be calculated to apply only to the market share unaddressed by the lost profits award, such that, the smaller the market share used to calculate a lost profits award, the proportionately larger the reasonable royalty award for defendants' patent and Trade Dress infringement should be.[70] The second royalty is for infringement of the EZ-ON Trademark. *See* PTX 637 at 10.[71]

Elmore measures such damages for both the period ending July 31, 2018, and the full infringement period from October 16, 2013 to November 15, 2018:

| Damages Theory | Infringement Period Ending July 31, 2018 | Infringement Period Ending Nov. 15, 2018 |
|---|---|---|
| (Assuming award of lost profits based on a 90% market share)<br>• Reasonable royalty from Patent/Trade Dress infringement<br>• Reasonable royalty from EZ-ON Mark infringement | $54,842<br><br>$87,747<br><br>Total:  $142,589 | $59,897<br><br>$95,834<br><br>Total:  $155,731 |
| (Assuming no award of lost profits)<br>• Reasonable royalty from Patent/Trade Dress infringement<br>• Reasonable royalty from EZ-ON Mark infringement | $548,419<br><br>$87,747 | $598,965<br><br>$95,834 |

---

[70] *See* Tr. at 475 ("THE COURT: . . . If one were to use the lost profits approach, from your perspective, if that approach is applied to anything less than 100 percent of the sales, the remaining percentage method logically needs to be captured by a reasonable royalty calculation. That's the bottom line? THE WITNESS: Yes . . ."). On this reasoning, were lost profits awarded based on the assumption that (but for the infringement) plaintiffs would have captured 90% of the market in the two-player market, it would calculate a reasonable royalties award for the remaining 10% of uncaptured infringing sales. *See* PTX 637 at 14.

[71] Elmore argued that the two royalty calculations should be cumulative because the infringing sale of the patented products and Trade Dress was a distinct wrong from the infringing promotional use of the EZ-ON Mark. Tr. at 477–78. *But see id.* 446–47, 478 (noting that as an alternative, the royalty remedy from the EZ-ON infringement could be treated as subsumed into royalty damages for the patent and Trade Dress infringement).

| | Total: $636,166 | Total: $693,799 |
|---|---|---|

Elmore's reasoning in support of each award was as follows.

        *i.*     *Reasonable royalty for the patent and Trade Dress infringement*

Elmore gives varying weight to the 15 *Georgia-Pacific* factors. Elmore Rep. ¶ 118. The weightiest is the 15th, *id.* ¶ 115—the reasonable royalty that would be "'willingly negotiated' by both parties in a hypothetical negotiation [at] or around the time of the first infringement," *id.* ¶ 114. He posits such a negotiation as the start of defendants' infringement "during or around October 2013." *Id.* ¶ 119. He assumes that the parties came to the negotiation with the following knowledge. Plaintiffs (1) own several utility and design patents protecting their hook-free shower curtains; (2) have a track record of commercializing their patented technology by manufacturing and selling their products through licensees; (3) recognize that defendants are direct competitors; and (4) recognize that a license to defendants would likely harm plaintiffs' profitability. *Id.* ¶ 120. Defendants recognize (1) the advantages and utility of the patented shower curtain technology and that such drives customer demand of the accused Ezy-Hang product; (2) that for over 20 years, plaintiffs have taken on risks and expenditures to research, develop, and market their patented product; and (3) that no acceptable non-infringing shower curtain ring design was available to them. *Id.* All parties would thus appreciate, he posits, that plaintiffs' bargaining position is strong. *Id.* ¶ 121. That understanding informed Elmore's analysis under the remaining *Georgia-Pacific* factors. *Id.* ¶ 115.

Of these, Elmore first finds six factors (1–4, 7, and 12) inconclusive.

***Factor 1***: Elmore parses five agreements—some amended over time—in which Focus or its predecessors (Arcs & Angles and HSNA) licensed the utility and design patents to its hook-free shower curtain technology to licensees at royalty rates. These are:

- HSNA Agreement: In March 1999, ZDG entered into a license agreement with plaintiff HSNA. *Id.* ¶ 125. Elmore discounts this agreement as not probative of an established royalty rate because Zahner owned both ZDG and HSNA, such that there was not an arms-length negotiation between the parties. *Id.*

- CHF Agreement: On July 9, 1999, HSNA entered into a joint venture agreement with CHF Industries ("CHF"). *Id.* ¶ 126. It granted CHF a worldwide, exclusive license to the '232 Patent—the original design patent that Zahner registered in 1993 which is not in suit here—and proprietary business and intellectual property not pertinent to this royalty determination. *Id.* CHF was to pay HSNA an annual royalty of 10% of gross sales or $300,000, whichever was greater. *Id.*

- Arcs & Angles Agreement: On May 31, 2004, HSNA entered into a joint venture agreement with Arcs & Angles. *Id.* ¶ 127. It granted Arcs & Angles a worldwide, exclusive license to the Design Patent and the three Utility Patents in this suit, trademarks including the HOOKLESS® Mark, and other proprietary information. *Id.* Arcs & Angles was to pay HSNA an annual royalty of 3.25% of gross sales or $130,000, whichever was greater. *Id.* On July 1, 2007, HSNA and Arcs & Angles amended the agreement to increase the annual royalty 4.5% of gross sales (excepting sales to its customer Wal-Mart). *Id.* ¶ 128.

- OTRT Agreement: On May 28, 2007, HSNA entered into a joint venture agreement with On The Right Track Systems ("OTRT"). *Id.* ¶ 129. Under it, OTRT was to pay HSNA an annual royalty of 3.25% of gross sales or certain minimum amounts not specified in the Elmore Report, whichever was greater. *Id.*

120

- A&A Holdings Agreement: On October 24, 2014, HSNA and Focus, which inherited the intellectual property rights and obligations set out in the Arcs & Angles Agreement, *id.* ¶¶ 131–133, amended that agreement, to define four tiers of Focus customers, and four corresponding royalty rates. The rates were 2%, 2.5%, 3%, and 4.5%, respectively, and applied to Focus's gross sales to each tier of customers. *Id.* ¶ 134.

Elmore opines that these agreements are non-probative of an established royalty rate because they involved related parties, contemplated joint venture transactions, and/or were entered in non-comparable circumstances. *Id.* ¶ 136. Accordingly, "there is no established royalty." *Id.*

*Factors 2–4, 7, and 12*: As to factor 2—past royalties paid by the licensee—Elmore is unaware of any relevant patent royalties paid by defendants. *Id.* ¶ 143. As to factor 3, Elmore states that licenses tend to command higher royalties if they are exclusive, geographically broad, and expansive in the know-how and commercialization they permit. *Id.* ¶ 140. He observes that the hypothetical negotiations between the parties would have resulted in a non-exclusive, U.S.-based, "minimal license," *id.* ¶ 142, but concludes that this would not have a downward effect on the royalty rate. As to factor 4, Elmore is not aware of a formal licensing policy of plaintiffs. *Id.* ¶ 138. As to factor 7, Elmore states that royalty rates increase where the remaining term of the underlying patent is short. *Id.* ¶ 141. Because the utility patents were due to expire in 2019, Elmore concludes that this fact would have had an upward effect on the royalty rate agreed upon by the parties. *Id.* ¶ 142. And as to factor 12—customary or standard royalty rates in the field—Elmore's research did not find usable benchmarks. *Id.* ¶¶ 144–146.

*Factors 9–11*: These are (9) the utility and advantages of the patented invention over the old modes or devices; (10) the nature, commercial embodiment, and benefits of the patented

invention; and (11) the extent to which the infringer used the invention. *Id.* ¶ 147. As to these, Elmore canvasses testimony by Goskowski admitting that the advantages of Focus's patented shower curtain rings include quicker and safer installation, corresponding reduced costs, and a lower number of parts to be assembled compared to a hooked curtain. *Id.* ¶ 148. He notes, too, Kubus's concession that the advantages of Focus's patented products made it the leading shower curtain in the hospitality industry. *Id.* ¶ 149.

*Factors 5, 6, 8, and 13*: These are (5) the commercial relationship between the licensor and the licensee; (6) the extent to which sales of other products by the licensee benefit from the promotional effect of selling the licensed patented products; (8) the profitability of the patented licensed product; and (13) the portion of the infringer's profit that should be ascribed to the patented invention. *Id.* ¶ 154. The commercial relationship between the parties, according to Elmore, is one of direct competitors, which "has an upward impact on the royalty." *Id.* ¶ 155. He opines that he cannot identify any collateral commercial benefits that defendants derived from their sale of the infringing curtains. *Id.* ¶ 156. As to the profitability of the patented products, Elmore points to Focus's own gross margins on hook-free shower curtains of 50%, and to Table 5.4 of the January 2019 *Global Shower Curtains Industry Market Research Report* by the HeyReport Market Data Survey Center (the "Curtain Industry Report"), according to which the typical gross margin for *traditional* shower curtains is around 25%. *Id.* ¶ 160 & n.173. From the disparity in profitability between hook-free and hooked shower curtains, Elmore concludes that "the patented technology contributes substantially to the commercial success and profitability of the hook-free shower curtain products." *Id.* ¶ 160.

Finally, Elmore calculates the proposed reasonable royalty rate attributable to defendants' infringement of plaintiffs' utility patents and Trade Dress. Given the absence of non-infringing

alternatives and the parties' direct competition in a two-player market, he opines that plaintiffs were in a strong bargaining position in the hypothetical royalty negotiation, *id.* ¶¶ 161–164. He selects—as the base against which the royalty amount is to apply—the sales of the accused products by Kartri, the defendant that sold the infringing products to the end-customers in the hospitality market. *Id.* ¶¶ 165–166. He then calculates the royalty rate to be applied to that base. He reasons that a reasonable royalty is the difference between the profit margin typically earned on sales of the accused products and the profit margin typically earned on sales of traditional hooked shower curtains. *Id.* ¶ 167. As evidence for Kartri's margin for hook-free curtains, Elmore, in his report, relies on Kubus's testimony—estimating that margin to be 50%—and Elmore's calculation estimating Kartri's average gross margin, based on Kartri's sale price and per-unit costs paid to Marquis, as approximately 52%. *Id.* ¶ 169; *id.*, Att. 3.0; *id.*, Att. 6.0. He chooses the lower, 50% figure. As to the profit margin in the sale of traditional hook-based curtains, Elmore relies on the 25% figure of the Curtain Industry Report. *Id.* ¶ 170.

The resulting royalty rate is 25%: 50% (the margin for hook-free curtains) minus 25% (the margin for hooked curtains). Elmore applies this rate to the revenue Kartri derived from its sales of the accused products. He arrives at the following royalty figures:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| Reasonable Royalty | $222 | $17,514 | $86,201 | $218,741 | $56,851 | $168,891 | $548,419[72] |

---

[72] Attachment 3.0 erroneously listed the total figure as $379,528. *See* Elmore Rep. ¶ 172. At trial, the figure was corrected. *See* PTX 637 at 2.

*Id.* Att. 3.0.

The total figure of $548,419 covers the period through July 31, 2018. *See id.*, At trial, Elmore extended his analysis to Kartri's infringing sales of $2,395,861 over the full infringement period ending November 15, 2018. There, he arrived at a royalty award of $598,965. *See* PTX 637 at 14.

ii.      *Reasonable royalty for the EZ-ON Mark infringement*

In assessing a reasonable royalty for Kartri's infringement of the EZ-ON Mark, Elmore uses the same *Georgia-Pacific* framework, albeit in abbreviated fashion. He did not consider factors 9–11 and 13. *See* Elmore Rep. ¶ 197. As in its reasonable royalty analysis pertaining to Kartri's patent/Trade Dress infringement, he finds factor 15—the hypothetical reasonable royalty negotiation between the parties—the weightiest, and decisive, factor. *Id.* ¶¶ 198–199. The hypothetical negotiation is assumed to occur at the start of the infringement (October 2013), *id.* ¶ 200, and to concern only Kartri's hospitality market sales, which make up 90% or more of Kartri's business. *Id.* ¶ 201.

*Factors 1–4, 7, and 12*: As to factor 1, he finds non-probative the licensing agreements entered into by Focus and its predecessors. *Id.* ¶¶ 202–204. As to factor 2, he is not aware of any past royalties that the defendants paid for licenses to similar trademark rights. *Id.* ¶¶ 211–212. As to factor 3, he opines that the hypothetical license would likely be a non-exclusive license to sell plaintiffs' EZ-ON-marked products in the hospitality and retail industries that lasted from October 2013 until the date of trial. *Id.* ¶ 210. As to factor 4, he observes that plaintiffs have actively licensed their trademarks to joint venture partners to promote their hook-free shower curtain products and distinguish them from competitors. *Id.* ¶ 206. As to factor 7, no predetermined end term exists for trademarks—rather, they exist for as long as its owner is

willing and able to maintain and protect it. *Id.* ¶ 208. And as for factor 12, he finds two data points useful in assessing customary royalties for comparable trademark licenses in the shower curtain industry. One was obtained from Markables, an online database on trademark data licenses. *Id.* ¶ 215. It estimates an implied royalty of between 3.5% and 5.15% of net sales. *Id.* ¶ 216. The other is from the 2013 guidebook *Licensing Royalty Rates*, which, based on proprietary data accumulated since 1996, estimates royalty rates for trademarks associated with curtains as generally between 3% and 6.5%. *Id.* ¶ 217.

**Factor 5**: As to the parties' commercial relationship, Elmore again notes that they are direct competitors, which tends to drive up the royalty. *Id.* ¶¶ 219–220. The advantages of the EZ-ON Mark (factor 6) and the product's profitability and popularity (factor 8) are the same as with respect to the patent/Trade Dress infringement royalties, he opines. *Id.* ¶¶ 221–222.

Synthesizing these assessments, Elmore concludes that the parties would reasonably have agreed on a royalty rate of 4% of gross sales for the EZ-ON mark. *Id.* ¶ 228. That rate is based on the ranges found in the Markables database (3.5% to 5.1% with a mean of 4.3%) and the *Licensing Royalty Rates* guidebook (3% to 6.5% with a mean of 4.75%). *Id.* ¶ 227. He lowers these means to 4% to allow for downside contingencies during the negotiation. *Id.*

Applying this 4% rate to the revenue Kartri derived from its sales of the Accused Products, the Elmore Report arrives at the following royalty:

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $675,565 | $2,193,677 |
| Royalty Rate | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| Reasonable Royalty | $35 | $2,802 | $13,792 | $34,999 | $9,096 | $27,023 | |

Appx325

| | | | | | | | $87,747[73] |
|---|---|---|---|---|---|---|---|

*Id.* Att. 5.0.

The total figure of $87,747 covered the period through July 31, 2018. *See id.* Applying

the 4% reasonable royalty rate to Kartri's revenue of $2,395,861 through November 15, 2018

from the sales of the accused products yields an award of $95,834. *See* PTX 637 at 10.

### D.    Defendants' Rebuttal Report to Elmore's Damages Report

#### 1.    Overview of Rogers's Report

Rogers's report seeks to rebut Elmore's calculations of disgorgeable profits,[74] lost profits

damages, and reasonable royalty damages. Rogers Rep. ¶ 34. Like Elmore, Rogers opines that a

damages award must avoid "double compensat[ion]." *Id.* ¶ 49.

#### 2.    Qualification of Rogers as an Expert

As the Court found at trial, Rogers is qualified to opine as to damages. *See* Tr. at 833.

He has extensive experience testifying on damages in intellectual property disputes. *See* Rogers

Rep., Ex. A at 45–47. He has authored dozens of expert reports on damages—for plaintiffs and

defendants. *Id.* He has taught on valuation issues relating to intellectual property. *Id.* at 43. He

has done damages assessments at accounting firms, including, today, his own. *Id.* at 38. He has

pertinent certifications and degrees. *Id.* at 44; *see generally* Tr. at 831–32.

#### 3.    Admissibility of Rogers's Report

"The 'task of a rebuttal expert is different from that of an affirmative expert. A rebuttal

expert, by nature, criticizes the methodology and/or opinions of another. There is no

---

[73] Attachment 5.0 erroneously listed the total figure as $60,724. At trial the figure was, again, corrected, and the Court included it here. *See* PTX 637 at 10.

[74] Rogers's report also addresses damages for design patent infringement. Rogers Rep. ¶¶ 29–30. Because that claim has been stayed, the Court does not address that aspect of the report.

requirement that a rebuttal expert himself offer a competing analysis.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (citation omitted). Rebuttal experts thus "have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiff['s] expert[]." *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (internal quotation marks omitted) (second alteration in original). "[H]owever, rebuttal experts must [still] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (collecting cases). Important here, under Federal Rule of Civil Procedure 26, the rebuttal expert's opinion must also rely on data disclosed to opposing counsel during discovery.[75]

In light of a flagrant breach of Rule 26 by defendants that led to an August 5, 2021 bench ruling excluding Kartri's cost data, the Court received a heavily redacted version of Rogers's report. Redacted—and not considered by the Court—were Rogers's calculations and opinions based on the excluded cost data. *See* Dkts. 324 (plaintiffs' motion *in limine* to exclude cost data for Kartri's failure to produce it in fact discovery), 412 (bench ruling transcript), 246 (original motion *in limine*, filed March 26, 2019).[76] The Court, however, permitted Rogers to rely upon Marquis's cost data, as to which there had not been a discovery breach.

---

[75] *See* Fed. R. Civ. P. 26(a) (requiring party to turn over either a "copy—or a description by category and location—of all documents . . . the disclosing party has in its possession, custody, or control and may use to support its claims or defenses"); Fed. R. Civ. P. 26(e) (requiring disclosing party to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect").

[76] The Court found that Kartri had knowingly failed to produce this data in discovery, in violation of Rules 26(a) and (e)t. The Court accordingly precluded Rogers "from referring to or relying on such materials in trial testimony." Dkt. 412 at 7, 11–12, 17. As the Court's bench

Appx327

### 4. Rogers's Rebuttals

#### a. Disgorgement

Rogers agrees with Elmore that, in calculating disgorgeable profits for trademark or trade dress infringement, the plaintiff has the burden to adduce evidence of defendant's revenues, and the defendant has the burden as to applicable costs and deductions. Rogers Rep. ¶ 44.

*Marquis's disgorgeable profits*: Rogers's revenue and cost data differ from Elmore's. Rogers admits that this was because defendants produced "more complete and more current information" to him than to plaintiffs. *Id.* ¶ 104. Whereas the Court excluded Kartri's cost data as a result of this discovery violation, plaintiffs did not move for such relief as to Marquis, as the data Rogers presented proved *more* favorable to plaintiffs than that available to Elmore. For 2013 through 2017, the sales data Rogers presents are identical to Elmore's and the cost data are only negligibly different. But as to 2018, Rogers's report shows far higher sales—$918,653, compared to Elmore's $365,650—and far higher costs—$800,402, compared to Elmore's

---

ruling recited, on July 29, 2016, Focus had served discovery requests. These sought financial information as to defendants' "revenue, expenses, and profits derived, from Defendants' sale of said Accused Products, from inception of sales through the present," and "all manufacturing costs per unit on an itemized basis, [the] selling costs per unit, the amount of gross profit and net profit realized per unit, [and] other expenses which in any way include or relate to the sale of the Accused Products." Dkt. 246 at 5; *id.*, Ex. 6 at 2. On September 27, 2016, Focus served defendants with interrogatories. These sought, for each product, total sales revenues by year "from inception of sales through the present," *id.*, Ex. 7 at 2, 6 (Interrogatory No. 7), and "all relevant data pertaining to those profits . . . [and] alleged costs," *id.* (Interrogatory No. 9). Although defendants produced some summary sales figures, they failed to provide full sales information, such as cost and product descriptions. To address the noncompliance, Magistrate Judge Ellis held a telephonic conference on May 17, 2017 with counsel, Dkt. 235, and, on June 14, 2017, ordered defendants to supplement their discovery, including with "any documents that need to be produced in response to the interrogatories," Dkt. 114. Defendants did not do so, although they furnished such data to Rogers on January 26–27, 2019, for use in his rebuttal report. Dkt. 246, Ex. 30 at 24, 52. Focus discovered that this evidence existed and had been shared with Rogers during its deposition of Rogers on February 21, 2019. Dkt. 274 at 6.

$305,165. *Id.* ¶¶ 104–105. Marquis's gross profit, according to Rogers, is $314,414, as compared to Elmore's tabulation of $256,809. *Id.* ¶ 106.

Marquis's sales, costs, and profits, according to Rogers, were as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue | $2,753 | $50,364 | $285,981 | $252,312 | $932,522 | $918,653 | $2,442,585 |
| Costs | ($2,423) | ($44,320) | ($250,233) | ($231,622) | ($799,171) | ($800,402) | ($2,128,171) |
| Gross profit | $330 | $6,044 | $35,748 | $20,690 | $133,351 | $118,251 | **$314,414** |
| Gross margin | 12.0% | 12.0% | 12.5% | 8.2% | 14.3% | 12.9% | 12.9% |

*Id.*

**Kartri's disgorgeable profits**: As to Kartri, in light of the preclusion of the late-produced data, Rogers's report had no non-redacted data to add to that considered by Elmore. *See id.* ¶¶ 110, 113–114.

> b.     *Lost Profits*

Rogers's report takes issue with Elmore's reasoning as to the second, third, and fourth *Panduit* factors. *See* Tr. at 848 (not disputing Elmore's analysis of factor 1).

**Panduit** *factor 2 (absence of non-infringing alternatives)*: Rogers concedes that "[f]or the most part," Elmore's analysis of this factor "is correct." *Id.* ¶ 54. But Rogers makes two objections. First, "more than 50 percent of Kartri's sales of their alleged infringing product are custom made products." *Id.* ¶ 55. These fall into two categories: in one, the curtain is made of "specific fabric identified by a customer or even provided by a customer"; in the other, the curtain is made at "custom length or width." *Id.* Focus generally did not fill such custom orders, but sought to persuade customers to buy an existing product. *Id.* Rogers does not address how similar or different the custom products were to Focus's, but suggests that these products do not compete in the hospitality market with Focus's. *Id.* ¶ 57. Had Focus accepted custom orders, it

might have required "up to four months" to obtain materials from their manufacturers. *Id.* ¶ 56. This, he opines, also undermines Elmore's premise of direct competition. *Id.* ¶ 58.[77]

    *Panduit factor 3 (manufacturing and marketing capabilities)*:  Rogers offers two rebuttals to Elmore's analysis.  First, as to plaintiffs' marketing capabilities, Elmore should have focused on the capacities of only ZDG and HSNA, the owners of the infringed patents and Trade Dress, and disregarded those of Focus and its Sure Fit successors, which were sublicensees of ZDG and HSNA. *Id.* ¶ 61.  Because parent companies do not market the products sold by their sublicensees, they would not have had the marketing capability necessary to advertise the volume of Kartri's sales. *Id.*  Second, as to manufacturing capability, Rogers again notes that most of Kartri's orders were low-quantity custom orders, whereas plaintiffs' manufacturing capacities were geared towards uniform orders of larger quantities. *Id.* ¶ 63.  Elmore, he urges, did not fully analyze Focus's ability to handle such orders. *Id.*

    *Panduit factor 4 (quantification of plaintiffs' profits)*:  Rogers has three objections as to this factor.[78]  The first two reprise objections above: that Elmore conflated sublicensee Focus's lost profits with those of right-owners HSNA and ZDG, *id.* ¶ 65, and that Elmore does not show a precise match between Focus's infringed products and defendants' infringing products, *id.*  Third, he opines that Elmore's reduction of Focus's market share, but for Kartri's infringement, to 90%, is "arbitrary," making his lost profit estimate short of "reasonably certain." *Id.* ¶ 70.

---

[77] At trial, Rogers briefly appeared to fault Elmore for, purportedly, failing to compare Focus's products to the infringing products.  Tr. at 849–50.  That is wrong.  Elmore's report explained his bases for finding no non-infringing alternatives to plaintiffs' products.  These include the parties' products' similar pricing, the confusing similarity between the HOOKLESS® and the Ezy Hang products, and Kartri's having attempted to persuade customers looking for HOOKLESS® curtains to purchase Ezy Hang curtains. *See* Elmore Rep. ¶¶ 82–93.

[78] A fourth objection was redacted, pursuant to the Court's preclusion of Kartri's cost data.

c.    *Reasonable Royalties*

**Patent and Trade Dress claims**:  Rogers objects on four grounds to Elmore's reasonable

royalty analysis, each keyed to a *Georgia-Pacific* factor.

**Factor 15**:  Rogers argues that Elmore wrongly included Focus, alongside ZDG and

HSNA, as a party on plaintiffs' side in the hypothetical reasonable-royalty negotiation, on the

grounds that Focus did not own the patent rights at issue.  *Id.* ¶ 76.  Were Focus not at the table,

Rogers opines, plaintiffs' bargaining position would have been different, in that (1) the patents

are commercialized through royalty-generating sub-license agreements (not by manufacturing

and selling patented products, as Focus did); (2) unlike Focus, ZDG and HSNA did not directly

compete with defendants, but would have seen defendants as revenue-generating promoters of

ZDG and HSNA's invention; and (3) any license with defendants would have likely increased

ZDG and HSNA's royalty income (instead of decreasing its profits from direct competition).  *Id.*

¶¶ 79–82.  Rogers agrees, however, that ZDG and HSNA would still have a "relatively strong"

bargaining position vis-à-vis defendants.  *Id.* ¶ 83.

**Factor 1**:  Rogers objects to Elmore's discounting of four prior license agreements: those

between HSNA and CHF, HSNA and Arcs & Angles, HSNA and OTRT, and the A&A Holdings

agreement acquiring Arcs & Angles and its intellectual property rights later assigned to Focus.

These set out royalty rates between 2% and 10% of the licensee's gross sales.  *Id.* ¶ 85.  Rogers

contends that these were probative of an established royalty rate.  *Id.* ¶¶ 85–86.  He finds that a

reasonable royalty rate should be around 4.5% percent, on the lower end of the band of rates

used in the four pertinent agreements.  *Id.*

**Factor 12**:  Rogers faults Elmore for discounting as insufficiently comparable 55 license

agreements Elmore found on RoyaltySource.com.  Elmore, he states, should have described

these licenses in more detail. *Id.* ¶ 87. Elmore explains that none of the 55 licenses "were directed to a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145. Rogers does not state why more information was needed to support this conclusion, or identify any feature of any such agreement that stood to undermine Elmore's conclusion.

*Factor 8*: Rogers objects to Elmore's calculation of the royalty rate based on Focus's profit margin of 50% in the hospitality market, and the usual 25% profit margin for hook-free shower curtains in that market. Rogers Rep. ¶ 89. This objection is based on Kartri's cost data, which was redacted from Rogers's Report.

In summary, Rogers advocates for a royalty rate of 4.5%. He notes that ZDG and HSNA had frequently sub-licensed their patents for 10 percent of gross sales or less. *Id.* ¶ 98.

**EZ-ON Mark claims**: Rogers's rebuttal consists effectively of a legal argument. He states that, in his experience, courts rarely award a reasonable royalty for trademark infringement under circumstances factually akin into these here. *Id.* ¶¶ 115–119. The Court disregards this opinion—essentially distinguishing past court decisions—as impermissible expert testimony.

### E.    The Damages Award

#### 1.    Applicable Period of Infringement

The Court must first decide the end date of the infringement period—July 31, 2018 or November 15, 2018—for the purpose of calculating damages. Although the earlier date was used in Elmore's expert report, that was attributable to discovery violations by the defense, and the evidence at trial convincingly showed that the infringement extended until mid-November 2018. The Court accordingly uses the later date.

It is undisputed that defendants' sales continued until November 12, 2018, and that data as to those sales existed. Marquis's Middleberg admitted at trial that sales of the accused

132

curtains continued until that date. Tr. at 587, 613. As Elmore testified, however, he had not received any data from the defense as to sales of the Ezy Hang curtain after July 31, 2018, Tr. at 401–04, 545, despite the fact that defendants provided such data to their rebuttal expert, Rogers, for use in his analysis. Dkt. 246, Ex. 30 at 24, 52.

A court may draw an adverse inference where a party with control over evidence "had an obligation to timely produce it," failed to do so with a "culpable state of mind," and the missing evidence would "support [a] claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *see also id.* ("purposeful sluggishness" may constitute a culpable state of mind). "[T]he party seeking the adverse inference must show both that its opponent defied a court order or an obligation under the Federal Rules of Civil Procedure, and that the evidence it has requested in fact exists." *Odyssey Marine Expl., Inc. v. Shipwrecked & Abandoned SS Mantola*, 425 F. Supp. 3d 287, 293 (S.D.N.Y. 2019) (citations omitted); *Hendrix, LLC v. Chalpin*, 461 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) (in bench trial, court itself may draw adverse inference; court inferred that non-produced documents would have supported plaintiff disadvantaged by defendant's discovery breach).

Those standards are met here. As reflected in the August 5, 2021 bench ruling precluding late-produced data, *see* Dkt. 412, defendants admittedly possessed and had an obligation to produce in discovery records of infringing sales between August 1 and November 12, 2018; they did not do so in the face of unambiguous orders and despite producing these to their own expert. This gives rise to an inference of a culpable state of mind. Elmore was thereby forced to limit his report to the period ending July 31, 2018, despite the fact that data covering the ensuing 3.5 months was clearly germane to damages. With the Court's permission, Elmore at trial extrapolated as to what the missing underlying revenue data would show for the period of

August 1 through November 15, 2018.[79]  He did so by averaging Kartri's monthly revenue

between January 1, 2017 and July 31, 2018, and applying that average to the 3.5-month period.

Tr. at 519–20.  This inference accords with record data and evidence.  Accordingly, applying its

"broad discretion" whether to grant an adverse inference, *Valenti v. Penn Mut. Life Ins.*, 850 F.

Supp. 2d 445, 452 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013) (summary order);

*Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 776 (2d Cir. 2005) (summary order), the

Court finds October 16, 2013 through November 15, 2018 to be the appropriate infringement

period for the purpose of calculating damages.

    2.    **Legal Framework for the Damages Award**

        *a.    Damages available under the Lanham Act and Patent Act*

    The Lanham Act provides for money damages for trademark and trade dress infringement

in the form of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the

costs of the action," subject to "the principles of equity."  15 U.S.C. § 1117(a).  Where a court

finds an award "inadequate or excessive," it may, in its discretion, "enter judgment for such sum

as the court shall find to be just, according to the circumstances of the case."  *Id.*  Courts have

accordingly awarded disgorgement and lost profits under the act, but absent a prior licensing

arrangement, generally have not awarded reasonable royalties.  *See Apollo Theater Found.*, 2005

WL 1041141, at *13 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d

197, 208–09 (3d Cir. 1999)); *Microban Prod. Co. v. Iskin Inc.*, No. 14 Civ. 5980 (RA) (DF),

2016 WL 4411349, at *8 (S.D.N.Y. Feb. 23, 2016), *report and recommendation adopted*, No. 14

---

[79] Although the evidence at trial showed that the infringement continued until November 12,
2018, Elmore's extrapolation covered three additional days, till the mid-point of the month,
presumably for convenience.  Although using November 12, 2018 would have been more
precise, the defense did not object to Elmore's use of November 15, 2018.  The Court therefore
will not recalculate Elmore's damages calculation to eliminate the three additional days.

Civ. 5980 (RA), 2016 WL 4411414 (S.D.N.Y. Aug. 18, 2016); *Gucci Am., Inc.*, 858 F. Supp. 2d at 254 (courts grant royalty awards only where "the evidence provides a sufficiently reliable basis from which to calculate [that award]" (collecting cases)).

The Patent Act, in turn, provides that a court should award a successful claimant damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Courts have recognized lost profits and reasonable royalty awards under this statute, but not "disgorgement of ill-gotten profits," which "Congress abolished in the patent context." *SCA Hygiene Prod. Aktiebolag*, 137 S. Ct. at 964.

      *b.*    *Choosing between a disgorgement and actual damages award*

Courts applying the Lanham and Patent Acts "have often [held] that awarding the disgorgement of the defendant's profits and plaintiff's own lost profits based on the same sales would constitute 'an impermissible double recovery.'" *Church & Dwight Co.*, 2018 WL 4253181, at *16 (quoting *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 264 (E.D.N.Y. 2008) (citation omitted)). Because "disgorgement is an inherently equitable remedy," a plaintiff may not elect disgorgement over an award of actual damages—such as an award of lost profits or based on a reasonable royalty—merely because a disgorgement award is "the greater of the two." *Id.* Rather, the Second Circuit has recognized three purposes for which it may be proper to order disgorgement of defendant's profits: "unjust enrichment, compensation, and deterrence." *River Light V*, 2015 WL 3916271, at *5 (citing *Merck Eprova*, 760 F.3d at 262). In determining whether a disgorgement award is proper, a court must also balance equitable factors. These include "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by

135

plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933

F.3d 202, 214 (2d Cir. 2019) (citing *George Basch Co.*, 968 F.2d at 1540). "[T]he statute's

invocation of equitable principles as guideposts in the assessment of monetary relief vests the

district court with some degree of discretion in shaping that relief. Nevertheless, that discretion

must operate within legally defined parameters." *U.S.A. Famous Original Ray's Licensing Corp.*

*v. Tisi's Pizza & Pasta Inc.*, No. 09 Civ. 5517 (RMB) (AJP), 2009 WL 4351962, at *2 (S.D.N.Y.

Dec. 1, 2009) (quoting *George Basch Co.*, 968 F.2d at 1537), *report and recommendation*

*adopted*, No. 09 Civ. 5517 (RMB) (AJP), 2009 WL 5178023 (S.D.N.Y. Dec. 31, 2009).

In contrast, in fixing an award of actual damages, the "quantum of damages," as opposed

to the plaintiff's entitlement to damages, ordinarily "must be demonstrated with specificity."

*Hilton v. UK Fragrances, Inc.*, No. 12 Civ. 6346 (JFB) (AKT), 2014 WL 794304, at *7

(E.D.N.Y. Feb. 25, 2014) (internal quotation marks and citations omitted). "[A]n award of

actual damages under the Lanham Act must be based on an evidentiary showing, not sheer

speculation that plaintiffs suffered a financial loss." *Solid 21, Inc. v. Jomashop Inc.*, No. 19 Civ.

1179 (MKB), 2020 WL 9816843, at *10 (E.D.N.Y. Nov. 30, 2020) (citation omitted) (alteration

in original).

> ### 3.    Overview of the Court's Damages Analysis

The Court awards plaintiffs actual damages for the full infringement period between

October 16, 2013 and November 15, 2018, and declines to award disgorgement of defendants'

profits. The Court first explains its analysis of the damages it awards: lost profits and reasonable

royalties for the patent and Trade Dress infringement, and lost profits but no reasonable royalty

for the EZ-ON Mark infringement, with both are trebled for the period between February 27,

2015 and November 15, 2018. The Court first addresses lost profits and then reasonable

royalties. The Court then explains, in light of these awards, its decision not to award

disgorgement of defendants' profits. The Court's approach tracks Judge Nathan's thoughtful

analysis in *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14 Civ. 585

(AJN), 2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018), in which she granted a lost profits award

under the Lanham Act (for false advertisement); assessed whether to treble that award; and then

set out the reasons for not ordering disgorgement of the defendant's profits, *see id.* at *13–17.

### 4. The Lost Profits Award

As to lost profits, the Court applies the four-factor *Panduit* framework.

**Panduit *factor 1 (consumer demand)*:** Focus's impressive sales figures easily establish

that consumer demand existed; Kartri's sales figures independently support the point. By 2013,

approximately 2.5 million HOOKLESS® curtains were hung in hotel and motel rooms

nationwide. Tr. at 248–51. And Focus's HOOKLESS® sales in the hospitality market—the

market in which it mostly competed with defendants—were $81.4 million between 2013 and

August 2017 alone. Elmore Rep. ¶ 74. That figure represented sales of approximately 5.76

million shower curtains. PTX 515. Kartri's sales in the same market were also substantial, viz.

$2.1 million. Elmore Rep. ¶ 75; *id.*, Att. 6.0.

Defendants' expert Rogers conceded that such demand existed, Tr. at 848, and did not

rebut Elmore's factor 1 analysis. Defendants' executives admitted the same. Kubus admitted

that the product "took off," "exploded" onto the scene, and "started a whole marketing trend."

Tr. at 730. The first *Panduit* factor is thus satisfied. *See Stryker Corp. v. Intermedics

Orthopedics, Inc.*, 891 F. Supp. 751, 820 (E.D.N.Y. 1995) (finding "overwhelming evidence

of demand for the patented product" in, *inter alia,* the "sales of the

Appx337

patent's commercial embodiment" and of the infringing product), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996).[80]

      **Panduit** *factor 2 (no non-infringing alternatives to satisfy demand)*:  Under this factor, "the patent owner may rely on proof of its established market share rather than proof of an acceptable noninfringing substitute." *Bic Corp.*, 2001 WL 1597983, at *2 (citing *Mor-Flo Indus.*, 883 F.2d at 1578).  Use of this approach is particularly sensible where the parties effectively operate in a two-player market.  Such is so here, given the uniform testimony that hook-free shower curtains are a distinct market and that the only non-minor sellers of such curtains were Focus, its licensee Carnation, and Kartri.  Elmore Rep. ¶¶ 81, 94.  Defendants' expert Rogers acknowledged that it was appropriate to apply *Mor-Flo*'s market share analysis.  Tr. at 848–49; *see also* Rogers Rep. ¶ 54 (*Panduit* factor 2 analysis "[f]or the most part . . . correct").  Elmore also opined, without dispute, that Focus captured a market share of approximately 50%, and Kartri captured the rest.  *Id.* ¶ 80 (citing Kubus and Goskowski deposition testimony).  To account for contingencies, Elmore further reduced the market share Focus would have captured but for Kartri's infringing sales to 90%.  Elmore Rep. ¶ 103; Tr. at 512.  In such a two-player market, the Court finds that, but for Kartri's infringing sales, those sales would have gone to the plaintiff.

      The evidence, in fact, establishes that Kartri knowingly exploited the similarity of the products.  For example, in a July 1, 2015 email to Kubus, Kartri's sales director, termed the Ezy-Hang product as "our equivalent of the Hookless Double H pattern." PTX 217.  And, between

---

[80] "This factor presupposes that the patented product and infringing product are sufficiently similar to compete in the same market for the same customers, and thus that demand for the infringer's and patent owner's products are interchangeable." *Stryker Corp.*, 891 F. Supp. at 819–20 (citation omitted).  Defendants do not dispute this.

May 11 and 23, 2016, a customer support representative quoted a price for an Ezy-Hang product for a hospitality customer seeking a "sub[stitute] or similar item" for a Focus product that was out of stock. *See* PTX 609.

Defendants' expert resisted that the parties' products were interchangeable, on the ground that Kartri's sales purportedly consist of "custom-made" curtains. Rogers Rep. ¶ 55; *see* Tr. at 849–50. But the Ezy-Hang products, whether manufactured according to custom orders or pre-fabricated specifications, were confusingly similar to plaintiffs' products and clearly infringing. And as Elmore demonstrated in his report, they sold for similar prices to plaintiffs' curtains. The label "custom made" does not alter the analysis as to this factor. And damages awards for lost profits have been upheld where the infringing product was deemed to have taken away market share not only from products protected by the patents-in-suit but also from related products. *See Rite-Hite Corp.*, 56 F.3d at 1547–48. The second *Panduit* factor is met.

**Panduit *factor 3 (manufacturing and marketing capability)*:** Plaintiffs easily establish their manufacturing and marketing capability to fill the orders they would have received but for Kartri's infringing sales. As Elmore notes, Focus's total sales between 2013 and 2017 comprised $81.4 million in the hospitality market, and $54.4 million in the retail market. Elmore Rep. ¶ 98. In that same period, Kartri's accused sales were $1.5 million. Using Focus's sales figures as proxies for its capacity to manufacture HOOKLESS® curtains, Focus would have been able to meet the additional volume represented by Kartri's sales—a mere 1.1% increase.[81]

---

[81] Kartri's modest sales figures relative to Focus's contrast with the approximate parity in market shares between the two. The Court cannot resolve this tension here, save to note that Kartri's sales and market-share calculations turn on information provided in discovery by Kartri, whose discovery compliance was shoddy and incomplete. As to market share, the testimony on this point of Kartri's leaders, Kubus and Goskowski, supplied Elmore's basis for his conclusion as to market share. *See* Elmore Rep. ¶ 80. In any event, the ultimate damages award turns on Kartri's sales—figures to which neither Kartri's counsel nor its rebuttal expert objected.

Defendants counter by asserting that Focus's practice was to refuse custom orders or orders for less than 200 curtains. Their expert, Rogers, testified that Focus was "stringent" about not accepting an order below 200. Tr. at 851. He opined that, had Focus accepted custom orders, it might have required "up to four months" to obtain the source products and materials from their manufacturers. Rogers Rep. ¶ 56. This, he opined, raised doubt about the extent to which Focus could have met the manufacturing demand of Kartri's infringing products. *Id.* ¶ 58.

This argument is unpersuasive. A product-by-product mapping is not required to demonstrate manufacturing capability. *See Rite-Hite Corp.*, 56 F.3d at 1547–48. Beyond that, the record refutes Rogers's claim that Focus would have been unable to fill custom orders specifying the curtain's fabric, length, or width. On the contrary, several plaintiffs' witnesses credibly testified that Focus's customers routinely specified characteristics such as fabric, dimensions, color, or ring shape, and that Focus met these specifications. Kemp, for example, testified that custom orders could be filled and turned around within approximately 30 days for the first such order, and one week for follow-on orders. Tr. at 276–77. Focus also routinely received "soft spec" orders which left room for variations. *Id.* at 249–50 (Kemp). As to Rogers's basis to opine that Focus had a minimum quantity requirement of 200 curtains per order, he admitted at trial that he relied not on information from Focus, but on Middleberg's testimony. *Id.* at 851. Pressed, Rogers could not point to evidence of a single instance in which Focus rejected an order below 200 curtains. *Id.* at 853–55. He conceded that he was unaware of any evidence that, had Focus taken on the custom and other orders Kartri handled, Focus's "economics[,] profits[,] or costs would have been materially different." *Id.* at 903.

The evidence also established that Focus had the marketing and distribution capabilities to handle the additional orders. It established Focus's 20-year history of energetically marketing

its curtains, and its regular sales channels, customer relations, and market presence. As to this, Rogers urged that Elmore should have disregarded the capacities of Focus and its successors and considered the marketing capacity only of the owners of the infringed patents—ZDG and HSNA. Rogers Rep. ¶ 61. But defendants did not cite any authority why the capacities of the owners' licensees, who handle the manufacturing and marketing of these goods, should be disregarded.

The third *Panduit* factor is therefore met.

**Panduit *factor 4 (quantifying lost profits)*:** In the main, the Court finds Elmore's tabulation of plaintiffs' lost profits persuasive. It is logical to conclude—in a two-player hospitality market, shared by Focus and Kartri, with the competitors having similar price points—that, but for Kartri's infringement, its sales generally would have gone to Focus. Elmore Rep. ¶¶ 103–104. Elmore's conservative assumption that something short of 100% of Kartri's sales—he proposed 90%—would have shifted to Focus "to account for any contingencies such as small marketplace participants or other factors," *id.* ¶¶ 103, 110, was well taken. Finally, the Court accepts as reasonable Elmore's proposed downward adjustment of Focus's profit margin (54.1%) to 50%, *id.* ¶¶ 106, 108–109.

The Court makes a minor adjustment to Elmore's analysis: to the sales figure used as the baseline for calculating Focus's lost profits. At trial, Elmore used a sales figure of $2,395,861 for the full infringement period, ending November 15, 2018. PTX 637 at 13. But those sales cover both the hospitality and retail markets. Elmore's analysis, however, was restricted to the hospitality market, which Elmore opined accounts for 90% of Kartri's revenue from sales of the accused shower curtain. Elmore Rep. ¶ 107. Accordingly, the Court will treat the sales that Focus lost in the hospitality market due to Kartri's infringement as 90% of $2,395,861—,that is, $2,156,275. With that one adjustment to Elmore's math, Focus's lost profits are as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | Jan. 1–Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749 | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's market share but for infringement | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue but for infringement | $717 | $56,745 | $279,290 | $708,721 | $184,199 | $710,977 | $1,940,647 |
| Profit margin | 50% | 50% | 50% | 50% | 50% | 50% |  |
| Lost profits | $359 | $28,373 | $139,645 | $354,361 | $92,099 | $355,488 | **$970,325** |

Rogers's rebuttal on this point is again unpersuasive. He found Elmore's 10% reduction of Focus's market share "arbitrary." *Id.* ¶ 70.[82] But Elmore's market share approach sensibly "allows the plaintiff to recover lost profits by establishing with reasonable probability sales it would have made 'but for' the infringement." *Bic Corp.*, 2001 WL 1597983, at *2 (internal quotation marks omitted); *see also Church & Dwight Co.*, 2018 WL 4253181, at *10 ("In the absence of complete information, courts have credited the application of a market share allocation methodology because it inherently accounts for a range of market factors."). And

---

[82] Rogers also reprises his objections that Elmore should have examined only the lost profits of HSNA and ZDG, and did not precisely match Focus's infringed products to defendants' infringing products, Rogers Rep. ¶ 65. These objections fail for the reasons addressed above.

Elmore's 10% reduction of Focus's market share is prudent to account for contingencies that could "impact [p]laintiffs['] ability to capture all of the accused sales." Elmore Rep. ¶¶ 103, 110.  At trial, Rogers retreated from this position, stating that he "[did]n't necessarily disagree with" Elmore's assessment to impute a 90%, rather than 100%, market share to Focus.  Tr. at 848.[83]

The Court accordingly tabulates a lost profits award of $970,324.

### 5.    Reasonable Royalties—Patent and Trade Dress Infringement

"A patentee receives a reasonable royalty for any of the infringer's sales not included in the lost profit calculation." *Crystal Semiconductor Corp. v. TriTech Microelec's Int'l, Inc.*, 246 F.3d 1336, 1354 (Fed. Cir. 2001) (citing *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996); and *Mor-Flo*, 883 F.2d at 1577.  "Thus, a patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation and reasonable royalties for any remaining infringing." *Id.* (citing *King Instruments Corp. v. Perego*, 65 F.3d 941, 952–53 (Fed. Cir. 1995)); *see also Mor-Flo*, 883 F.2d at 1573 (affirming award of lost profits for 40% of market share, and reasonable royalty for the remainder of infringer's sales).

Here, plaintiffs have demonstrated in their *Panduit* analysis that, but for Kartri's infringement, 90% of its sales would have gone to Focus.  The issue thus is the royalties attributable to the remaining 10% of Kartri's sales, which the Court has, conservatively, assumed would have gone elsewhere.  As to these, the Court finds Elmore's reasonable royalty analysis, in which he applies the *Georgia-Pacific* factors to derive a 25% royalty rate, persuasive.

---

[83] Had the Court not reduced Focus's assumed market share, damages would have been higher.

Elmore's starting assumption (factor 15) is correct that plaintiffs' bargaining position vis-à-vis Kartri would be strong, supporting a high royalty rate. Elmore Rep. ¶ 121. As he notes, plaintiffs own the utility patents, have widely and successfully commercialized those through joint venture and licensing agreements, including with Focus, and would directly compete with Kartri in a two-player market; to license their products to competitors in a market in which Focus is dominant would likely harm the profitability of the patented products. *Id.* ¶ 120. And the licensees would appreciate that to offer a product that (like Ezy Hang) used plaintiffs' hook-free technology would infringe plaintiffs' patent rights, and that no non-infringing alternative was available to meet the demand for HOOKLESS® products in the market. *Id.*[84]

Elmore also rightly excluded existing license agreements with affiliated entities as non-probative of an established royalty rate. Elmore Rep. ¶¶ 125–136. Those entailed rates between 2% and 10% of the licensee's gross sales. *See id.* Rogers objected that Elmore did not explain disregarding these agreements, Rogers Rep. ¶ 85, but Elmore did so, on the ground that they "involve[d] related parties or contemplate[d] joint venture transactions," Elmore Rep. ¶ 136. By contrast, a licensee such as Kartri would enter the hospitality market as a direct competitor, to whom Focus would not rationally cede market share for less than a formidable royalty. *See Panduit,* 575 F.2d at 1158 (in royalty analysis, the plaintiff and the infringer "cannot be treated" as if engaged in "ordinary royalty negotiations among truly 'willing' patent owners and licensees," as "the infringer would have nothing to lose and everything to gain if he could count

---

[84] Rogers seeks to diminish plaintiffs' bargaining power by urging that only the owners of the patent-in-suit, and not licensee Focus, would not have been included among the parties in the hypothetical reasonable royalty negotiation. Rogers Rep. ¶¶ 79–83. That is unpersuasive. Had ZDG and HSNA negotiated without Focus, they would still have been mindful that the license payments Focus paid them, tied to its sales, would have come under downward pressure had they allowed a competing licensee into the market.

on paying only the normal, routine royalty non-infringers might have paid"). The Court rejects Rogers's proposed 4.5% royalty rate, which is at the lower end of ordinary such rates.

Also unpersuasive is Rogers's attack on Elmore's assessment (factor 12) that a search did not yield probative benchmarks of customary or standard royalty rates in the field, Elmore Rep. ¶¶ 144–146. Rogers faults Elmore for inadequately explaining why he put aside the 55 license agreements he found on RoyaltySource.com. Rogers Rep. ¶ 87. But Rogers does not identify from this dataset a single example undermining Elmore's explanation that none involved "a means of hanging curtains or involved technologies and terms that are sufficiently comparable to this matter." Elmore Rep. ¶ 145.

Elmore's basis for choosing a royalty rate of 25% (factor 8) is convincing. He explains that Kartri's alternatives to infringing would have been to continue to sell traditional, hooked shower curtains, or to obtain a license to sell the patented hookless shower curtains. Hooked curtains had a hospitality-market profit margin of approximately 25%. Elmore Rep. ¶ 160 & n.173. Hookless shower curtains had a margin of approximately 50%. *Id.* Because Kartri would not have rationally agreed to pay above the rate it otherwise could have garnered, Elmore inferred agreement on a 25% rate.[85] Although Rogers objected based on Kartri's own profit margins, Rogers Rep. ¶ 89, this was based on redacted data, and the Court disregards it.[86]

The Court accordingly adopts Elmore's 25% royalty calculation and applies it to the 10% of Kartri's sales in the hospitality market that the Court has found would not have gone to Focus. This yields the following:

---

[85] This rate gives Kartri the benefit of the doubt, in that such terms would have denied Focus the 50% rate it stood to gain on such sales, had the customer come to Focus.

[86] Rogers does not find fault with Elmore's analyses of factors 2–7, 8–11, and 13–14, and the Court finds these analyses——some yielding inconclusive answers—persuasive.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[87] | $2,395,861 |
| Percentage of Kartri's accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Market share not captured by Focus after recovering lost profits | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Accused sales on which to apply reasonable royalty rate | $80 | $6,305 | $31,032 | $78,747 | $20,466 | $78,997 | $215,628 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| Reasonable Royalty | $20 | $1,576 | $7,758 | $19,687 | $5,117 | $19,749 | **$53,907** |

6.    **Reasonable Royalties—EZ ON Mark Infringement**

The Court declines to award reasonable royalty damages for defendants' infringement of

the EZ ON Mark.  Courts have generally granted such an award where an infringer "continued

[to] use . . . a product beyond authorization" of a license agreement, "and damages were

measured by the license the parties had or contemplated." *The Apollo Theater Found.*, 2005 WL

---

[87] This number adds together Kartri's sales figures for January 1 to July 31, 2018, and August 1 to November 15, 2018.

1041141, at *13 (quoting *A & H Sportswear, Inc.*, 166 F.3d at 208–09); *see also Microban ProdsProd. Co.*, 2016 WL 4411349, at *8; *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11 Civ. 3684 (SRC) (CLW), 2016 WL 3545529, at *29 (D.N.J. June 29, 2016) ("'[T]he use of royalties in trademark is 'atypical.'" (quoting *A & H Sportswear*, 166 F.3d at 208 (collecting cases))). Here, there was no license agreement, actual or contemplated, between the parties.

Otherwise, courts have granted royalty awards for trademark infringement only where "the evidence provides a sufficiently reliable basis from which to calculate [that award]." *Gucci Am., Inc.*, 858 F. Supp. 2d at 254 (collecting cases). There is none here. Focus's expert, Elmore, acknowledged that "[t]here is no established royalty rate for the trademark rights at issue." Elmore Rep. ¶ 224. He noted that (1) the licensing agreements entered into by Focus and its predecessors did not help calculate a royalty for infringement of that mark, *id.* ¶¶ 203–204; (2) defendants had not paid past royalties for a similar product, *id.* ¶¶ 211–212; and (3) although plaintiffs had actively licensed their trademarks to other licensees, *id.* ¶ 206, the terms of those licenses varied by licensee and industry, *see id.* ¶ 209.

Elmore did recommend a royalty rate of 4% of gross sales, but his analysis on this point was threadbare. He did not address *Georgia-Pacific* factors 9–11 and 13, *see id.* ¶ 197, or identify apt licensing history between Focus and third parties. His sole basis for proposing this royalty was Markables, an online database on trademark licenses, *id.* ¶¶ 215–216, and the 2013 guidebook *Licensing Royalty Rates, id.* ¶ 217. These sources are unreliable for this purpose. The Markables estimate was for a trade name (not a trademark), and was "implied" from the terms of a larger acquisition of a company that sold, among other products, shower curtains. *Id.* ¶ 216. The *Licensing Royalty Rates* estimate was drawn from trademark licenses "associated

with the promotion of *curtains*." *Id.* ¶ 217 (emphasis added). It does not identify the industry (for example, hospitality or retail) in which these were sold or limit its analysis to *shower* curtains. Elmore's royalty determination thus rests on just three *Georgia-Pacific* factors (12, 14, and 15). *See Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, No. 08 Civ. 573, 2009 WL 5876245, at *2–4 (E.D. Va. July 23, 2009) (denying reasonable royalty on trademark claim where expert relied on scant evidence and applied only three factors). The Court cannot fashion a *reasonable* royalty on such tenuous evidence. *See Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14 Civ. 1254 (SHS), 2022 WL 4554480, at *3 (S.D.N.Y. Sept. 29, 2022) (denying royalties in trademark action where plaintiff had produced vague data on royalties received from third parties on the trademark at issue); *cf. QS Wholesale, Inc. v. World Mktg., Inc.*, No. 12 Civ. 451, 2013 WL 1953719, at *5 (C.D. Cal. May 9, 2013) (royalty award available for trademark infringement where there was "a detailed record of business negotiations between [the parties] regarding the outright *purchase* of the mark" (emphasis in original)).

In sum, the Court awards, before trebling, the following damages amount to plaintiffs: lost profits in the amount of $970,324, and reasonable royalties in the amount of $53,907.

### 7.    Treble Damages

Under the patent statute, a "court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," that is, behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016). A plaintiff must establish such willfulness by a preponderance of the evidence. *Adrea, LLC v. Barnes & Noble, Inc.*, 227 F. Supp. 3d 303, 312 (S.D.N.Y. 2017) (citing *Halo Elecs.*, 579 U.S. at 107).

148

"[A]wards of enhanced damages are discretionary," *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017) (citing *Halo Elecs.*, 579 U.S. at 106), and "a finding of willful infringement does not command the enhancement of damages," *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018) (summary order). Rather, on a finding of willfulness, a court should "take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Kewazinga Corp. v. Microsoft Corp.*, 558 F. Supp. 3d 90, 118 (S.D.N.Y. 2021) (quoting *Halo Elecs.*, 579 U.S. at 104), *reconsideration denied*, No. 18 Civ. 4500 (GHW), 2022 WL 4236301 (S.D.N.Y. Sept. 14, 2022). A court "must "explain the basis for the [enhanced damages] award, particularly where the maximum amount is imposed." *Grp. One Ltd.*, 2022 WL 4010850, at *27 (quoting *Polara Eng'g, Inc. v. Campbell Co.*, 894 F.3d 1339, 1355 (Fed. Cir. 2018) (alteration in *Grp. One Ltd.*) (further citations omitted)). Analysis is typically guided by the non-exclusive factors set out in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). *Georgetown Rail Equip. Co.*, 867 F.3d at 1244. The *Read* factors are: "(1) 'whether the infringer deliberately copied the ideas of another'; (2) 'whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed'; (3) 'the infringer's behavior as a party to the litigation'; (4) the '[d]efendant's size and financial condition'; (5) the '[c]loseness of the case'; (6) the '[d]uration of the defendant's misconduct'; (7) '[r]emedial action by the defendant'; (8) the '[d]efendant's motivation for harm'; and (9) '[w]hether the defendant attempted to conceal its misconduct.'" *Grp. One Ltd.*, 2022 WL 4010850, at *26–27 (quoting *Georgetown Rail Equip. Co.*, 867 F.3d at 1245 n.6).

For the reasons that follow, the Court finds that both Marquis and Kartri acted willfully from February 27, 2015, the day that Focus's counsel sent its cease-and-desist letter to Kartri, which was forwarded to Marquis's Middleberg on the same day. The Court thus holds that an enhancement of Focus's lost profits and reasonable royalty awards for patent infringement is warranted for the period between February 27, 2015 and November 15, 2018. And because the *Read* factors decisively favor plaintiffs, a trebling of such damages for that period in in order.

*Marquis's state of mind before the February 27, 2015 cease-and-desist letter*: In the period before it received Focus's February 27, 2015 cease-and-desist letter, Marquis, through its president Middleberg, was careless as to Focus's intellectual property rights. When Pong, whom Middleberg knew had been a manufacturer for Focus, presented his D-shaped ring design to Middleberg in late 2011 or early 2012, both were well aware of Focus's HOOKLESS® product. Tr. 548–50, 555. Middleberg, however, chose to believe Pong's claims that he owned a Chinese patent for the ring design, that he was in the process of obtaining a United States patent for it, and that Focus's patents relating to its HOOKLESS® products had expired or were due to expire soon. Middleberg did nothing to verify these self-serving claims, and instead accepted Pong's representation that a document comprised of Chinese characters was a Chinese patent on the ring design. Given its awareness that Focus then or recently had patent rights in the HOOKLESS® product, Marquis should have inquired into the state of Focus's rights, by, for example, consulting counsel. "Notice of [Focus's] patent to . . . [Marquis] gave rise to an affirmative duty of care requiring [Marquis] to obtain competent legal advice before engaging (or continuing to engage) in conduct that might potentially infringe on [Focus's] patent." *WeddingChannel.com, Inc. v. The Knot, Inc.*, No. 03 Civ. 7369 (RWS), 2004 WL 2984305, at *3 (S.D.N.Y. Dec. 23, 2004) (citing *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998)).

Appx350

Instead, Middleberg testified, he relied on the word of Pong's Chinese counsel, a Tommy Wang, who summarily stated "that [Pong's] patent was pending and [that Wang] felt confident that it would be issued." Tr. at 554.

Marquis's lax efforts fell short of its duty to ascertain that its D-shaped ring was not infringing any existing patents. The legal opinion sought by an infringer as to another's patent rights "must be 'competent' or it is of little value in showing the good faith belief of the infringer." *Comark Comm'ns*, 156 F.3d at 1191. Such an opinion "must be authoritative, not just conclusory, and objective," which ordinarily "include[s] a thorough review of the cited prior art and prosecution history." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996) (citations omitted). The summary statement of Wang—who represented the self-interested Pong——does not come close to satisfying this standard. *See also Berger & Gorin, Inc. v. Gary Plastic Packaging Corp.*, 691 F. Supp. 740, 752 (S.D.N.Y. 1988) ("The law is not designed to permit patent counsel to market casually rendered opinions as immunizations against findings of willful infringement.").

However, although the question is close, the Court does not find, by a preponderance, *Adrea, LLC*, 227 F. Supp. 3d at 312, that Middleberg's actions were so flagrant and egregious as to support trebling. Instead, based on the facts and its assessment of Middleberg's demeanor, credibility, and limited sophistication, the Court finds that he acted negligently but not willfully in failing to seek out competent legal advice. *See Radware, Ltd. v. F5 Networks, Inc.*, No. 13 Civ. 2024 (RMW), 2016 WL 4427490, at *4 (N.D. Cal. Aug. 22, 2016) (rejecting, in light of *Halo*, that "willfulness can be proven by negligence"). Marquis was surely opportunistic in moving to commercialize Pong's design—Middleberg admittedly sought to capitalize on an early 2014 rumor that "Focus was in financial trouble," perceiving "an opportunity in the market

for us to get aggressive and get out there and sell[.]" Tr. at 573. But Marquis's competitive motive, even coupled with its inattention to legality, does not establish "egregious infringement behavior" that was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs.*, 579 U.S. at 103–04. The Court finds that, until February 27, 2015, Marquis, in selling Pong's infringing product, acted with naïveté and negligence, but not willfulness.

   ***Marquis's state of mind after the February 27, 2015 cease-and-desist letter***: Marquis's claim of ignorance of infringement on Focus's rights, however, is unsustainable after February 27, 2015, the date it received Focus's cease-and-desist letter to Kartri. *See* Tr. at 606 (letter was forwarded to Middleberg). That letter documented that the manufacture and sale of the accused products infringed Focus's intellectual property rights, and demanded that Marquis cease and desist. *See* PTX 152. Almost unimaginably, Middleberg—notwithstanding the letter's clear articulation of the basis of Focus's rights—disregarded the letter, in favor of his unfounded belief that Pong would soon obtain U.S. patents. He told Kartri's Goskowski and Kubus not to "worry" and that "[t]here's nothing [Focus] can do." PTX 166 at 1. Marquis continued to sell the accused products to Kartri for it to resell. It still did not seek advice of counsel. Tr. at 608.

   On September 11, 2015, Focus served Kartri with the Complaint in the related action to this, alleging, *inter alia*, infringement of the utility patents '248, '609, and '088. No. 15 Civ. 5108 (PAE) (S.D.N.Y.), Dkt. 8. On September 21, 2015, Pong, at Middleberg's request, emailed his lawyer Wang, seeking an assessment whether, *inter alia*, Ezy Hang infringed Focus's patents. PTX 258 at 2. The next day, Wang offered, for $3,500, to conduct an infringement analysis and draft an infringement report. *Id.* Marquis still did not commission such an analysis. Tr. at 599, 601 (Middleberg). Nor did it do so when this action was filed against Kartri on December 30,

2015, or when Marquis was impleaded and executed a waiver of service on February 10, 2016.

No. 15 Civ. 10154 (PAE) (S.D.N.Y., filed December 30, 2015), Dkts. 1, 11, 19. Instead,

Marquis continued to sell infringing products to Kartri through November 12, 2018. *See* Tr. at

600.

Marquis's repeated failure to desist, investigate, or consult counsel, in the face of clear

notice that its shower curtains infringed on the patents identified in Focus's letter, was plainly

willful. *See, e.g., Etna Prod. Co. v. Q Mktg. Grp., Ltd.*, No. 03 Civ. 3805 (SAS), 2004 WL

1769794, at *14 (S.D.N.Y. Aug. 6, 2004) ("question of willfulness [was] not close" where

defendant had "blatantly infringed [plaintiff]'s patent for over a year" and "[w]hen confronted

with a cease and desist letter . . . did virtually nothing to remedy its infringement"); *Keystone*

*Glob. LLC v. Auto Essentials Inc.*, No. 12 Civ. 9077 (DLC) (GWG), 2014 WL 4897104, at *5

(S.D.N.Y. Oct. 1, 2014) (recommending finding willfulness where defendant "was notified of its

infringing conduct [by cease-and-desist letters] on October 25, 2012, and again on November 7,

2012, but still continued to distribute the infringing product" (citations omitted)), *report and*

*recommendation adopted*, No. 12 Civ. 9077 (DLC), 2015 WL 224359 (S.D.N.Y. Jan. 16, 2015);

*Stryker Corp.*, 891 F. Supp. at 816 (patent infringement willful where infringer had actual notice

of plaintiff's patent, "ignore[d] its own patent attorney's requests for a search of similar

technology, [and] failed to seek competent legal advice and conduct a patent search until after

[defendant received a] cease and desist letter"), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996). A

defendant's continued sales of infringing products after a complaint has been filed against it can

also, on its own, warrant a finding of willfulness. *See Apple Inc. v. Samsung Elecs. Co.*, 258 F.

Supp. 3d 1013, 1027 (N.D. Cal. 2017) ("[P]ost-filing conduct alone can serve as the basis of a

jury's willfulness finding and an award of enhanced damages."). Middleberg himself testified

153

that, "in retrospect," Marquis "probably shouldn't have" continued to sell the accused products for as long as it did. Tr. at 600.

The Court accordingly finds that, between February 27, 2015 and November 15, 2018, Marquis infringing conduct was willful.

***Kartri's state of mind before the February 27, 2015 cease-and-desist letter***:  As with Marquis, the evidence shows, throughout, a striking lack of concern about infringing on others' intellectual property rights on the part of Kartri owners Kubus and Goskowski. Through the cease-and-desist letter of February 27, 2015, this concern is properly found negligent, not willful.

Kartri had long been aware of the existence of Focus's HOOKLESS® products and their earlier iterations. In the late 1990s, HSNA's Marcus unsuccessfully pitched the invention to Kartri's then-president, who was Kubus and Goskowski's father. Tr. at 724–28. Kubus also was aware that plaintiffs had commercialized the hookless curtain and that it had been tremendously successful. *Id.* at 730–31 (Kubus). And, when Kartri began developing and rolling out the Ezy Hang product, she was aware of Focus's patent rights on the slit in the HOOKLESS® product and its trademark rights. But, she testified, she concluded that the Ezy Hang product was not infringing. *Id.* at 772–73. Her basis was Middleberg's assurance that the Ezy Hang product did not infringe. *Id.* at 773. Kubus testified that she relied on these representations despite knowing that non-lawyer Middleberg had no qualifications in patent law and that Middleberg was relying on Pong's self-serving statements. *Id.* at 773–74.

The state of mind of Kartri co-owner Goskowski before February 27, 2015 was less clearly developed. In a declaration, she attested to having received two Chinese patents from Pong—one translated into English and one in Chinese. *Id.* at 667–68; PTX 28-1 at 2. She stated that, based on the Chinese patents, she had determined that Kartri was not infringing any of

Focus's U.S. patent rights. *See* Tr. at 668.[88] She also did not seek guidance from counsel before February 27, 2015, nor otherwise inquire whether Ezy Hang infringed on patent rights. *Id.* at 669. In this, she, too, relied on Middleberg's assurances. *Id.*

In sum, between early 2013 and February 27, 2015, there is substantial evidence that Kartri's owners had notice that the product with which they proposed to compete—Focus's HOOKLESS® curtains—was patented. Besides relying on their suppliers' conclusory, self-interested, and suspect remarks, they took no action to ascertain whether Ezy Hang infringed on others' patent rights. Kartri thus abandoned its duty to competently ascertain whether its product infringed existing patent rights. *WeddingChannel.com*, 2004 WL 2984305, at *3.

Nonetheless, the Court, as with Marquis, cannot find that Kartri's pre-February 27, 2015 conduct crossed the line from negligent to "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Halo Elecs.*, 579 U.S. at 103–04. Having carefully evaluated the testimony of Kubus and Goskowski, the Court finds that they acceded to the helm of a modest-sized family business without sophistication in intellectual property matters. Until Focus squarely put them on notice of Kartri's breaches, their failure to investigate is best ascribed to naiveté and ignorance of legal obligations, not willfulness.

***Kartri's state of mind after the February 27, 2015 cease-and-desist letter***: In contrast, Kartri's infringing conduct after receiving the cease-and-desist letter was clearly willful. There is no evidence that Goskowski received, let alone, reasonably relied upon, advice of counsel to

---

[88] Goskowski's declaration stated that she had received copies of the two patents in 2013. The copies reflect issuance dates in 2014. Tr. at 670–71.

the effect that it was lawful to market Ezy Hang.[89]  Instead, on March 3, 2015, she emailed

Middleberg, asking "David, how do we get away with a China patent?  How does that cover us

in the US?"  PTX 167.  And Kartri continued to sell the accused Ezy Hang product.  Tr. at 587.

It continued to do so after it was served, on September 11, 2015, with plaintiffs' initial complaint

(in Dkt. 15 Civ. 5108) alleging infringement of the utility patents.  *See* No. 15 Civ. 5108 (PAE),

Dkt. 8.  And it continued to do so, even after receiving notice of this action, filed December 30,

2015, Dkt. 1, and served on Kartri on February 9, 2016, *see* Dkt. 15.  Kartri's sales continued

until November 12, 2018, more than three months after the Court, on August 9, 2018, issued its

*Markman* ruling.  Dkt. 198.  Kartri's flagrant and prolonged disregard of plaintiffs' intellectual

property rights compels a finding that, like Marquis, Kartri, after February 27, 2015, acted

willfully, deliberately, and in bad faith.  *Halo Elecs.*, 579 U.S. at 103–04.

      The Court accordingly finds that, for both Marquis and Kartri, enhanced damages are

warranted for the period between February 27, 2015 and November 15, 2018.

      ***Trebling Marquis's and Kartri's damages for February 27, 2015 to November 15,***

***2018***:  The nine *Read* factors, in combination, strongly favor the maximum enhancement of

treble damages.

      First, defendants "deliberately copied [Focus's] ideas."  *Grp. One Ltd.*, 2022 WL

4010850, at \*26.  They were well aware of Focus's innovative product and success.  Middleberg

and Pong discussed Focus's HOOKLESS® as early as the meeting in 2012 at which Pong

---

[89] At trial, Goskowski volunteered that, after receiving the letter, she had conferred with Kartri's counsel in this case, Bernhard Molldrem, Esq.., and "came away with the understanding that [she was] complying with the law."  Tr. 648–49.  Because Kartri did not advance an advice-of-counsel defense or waive attorney-client privilege, the content of any such communications were not developed.  The Court considered this aspect of Goskowski's testimony solely as evidence of her asserted state of mind.

pitched his D-shaped ring. Tr. at 548–50. Marquis, in 2014, saw a chance to break into Focus's market share, in light of Focus's rumored financial trouble. *Id.* at 573 (Middleberg) ("[T]here was an opportunity in the market for us to get aggressive and get out there and sell because they had been cut off by their suppliers."); Kubus Dep Tr. at 24 ("[F]or 25 years, I've sat on the sidelines because [the market has] been monopolized by Hookless."). Defendants' introduction of their infringing product reflects deliberateness and opportunism. This factor strongly favors plaintiffs.

Second, Marquis, aware that Focus's HOOKLESS® technology was patent protected, did not investigate the scope of those patents. Middleberg declined the offer of Pong's lawyer to conduct an infringement analysis. Kartri's Kubus and Goskowski did not investigate either. This factor also strongly favors plaintiffs.

Third, in this litigation, both defendants repeatedly dallied. They reiterated arguments the Court had rejected. *See, e.g.*, Dkts. 297 at 20, 412 at 12, 436 at 23. They breached discovery obligations by withholding its cost data from plaintiffs in discovery while furnishing it to their expert. *See Apple Inc.*, 258 F. Supp. 3d at 1032 ("Typically, 'litigation misconduct' refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." (quoting *i4i Ltd.*, 598 F.3d at 859)). This, too, favors plaintiffs.

Fourth, in contrast, defendants' relatively small size and financial condition, compared to Focus's, favors defendants. On Focus's estimation, Marquis's infringing sales in the hospitality market were $2,072,407 and Kartri's were $2,395,861, whereas Focus's were $81,351,591—all in the hospitality market alone. *Cf. Radware*, 2016 WL 4427490, at *8 (infringer's large size weighed in favor of enhanced damages).

Fifth, liability in this case is clear. The Court granted summary judgment for plaintiffs on the utility patent infringement claims. Dkts. 297, 312. And here, in resolving the trademark and Trade Dress infringement claims, the Court has found (1) ownership, validity, and protectability of the HOOKLESS® and EZ-ON Marks, (2) standing to sue for the infringement of the EZ ON Mark, (3) the strength of the Trade Dress given its acquired secondary meaning, and (4) that the *Polaroid* factors measuring the likelihood of confusion overwhelmingly favored Focus both as to the marks and the Trade Dress. The fifth *Read* factor strongly favors plaintiffs.

Sixth, "a long duration [of misconduct] tends to support enhanced damages more than a short duration." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 118 (D. Conn. 2022). Defendants' misconduct lasted nearly three years before litigation commenced, and then persisted for nearly another three years. *See id.* (citing, *e.g.*, *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07 Civ. 1200, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (six years of misconduct "substantial," favoring enhancement)); *Broadcom Corp. v. Qualcomm Inc.*, No. 05 Civ. 467 (JVS), 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) (two years of infringement before lawsuit, and continued infringement thereafter, favored increased damages), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007). The sixth *Read* factor favors plaintiffs.

Seventh, the record does not reflect any remedial actions taken by defendants. On the contrary, they continued to infringe until after the Court's *Markman* ruling three years into this litigation. This factor, too, favors plaintiffs.

Eighth, as to motivation to harm, "[w]hen the infringer is a direct competitor, this factor generally weighs in favor of enhanced damages." *Probatter Sports, LLC*, 586 F. Supp. 3d at 119 (citation omitted); *see also Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116–17 (N.D. Cal. 2009) (where "the infringer engages in infringing conduct to gain an edge

over the patentee in a competitive market, this factor favors an award of enhanced damages"). Kartri undisputedly is a direct competitor of Focus in the two-player hospitality market. And Marquis's economic incentives align with those of Kartri, its supplier; Middleberg pitched Pong's design to Kartri as a means to break into Focus's market. This factor favors plaintiffs.

The ninth factor does not favor plaintiffs, in that defendants did not conceal their conduct, but openly infringed. *See Probatter Sports, LLC*, 586 F. Supp. 3d at 119 (factor did not favor of enhancement where infringer "put [its] product and the infringement in the open marketplace").

In sum, seven of the *Read* factors favor plaintiffs; only two favor defendants. Viewing the factors in totality, these do not mitigate the gravity of defendants' willful infringements.

The Court accordingly imposes the maximum enhancement and trebles defendants' damages to the extent incurred between February 27, 2015, and November 15, 2018.

Defendants' overall damages thus are as follows. For lost profits:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Aug. 1–Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[90] | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's market share but for infringement | 90% | 90% | 90% | 90% | 90% | 90% | 90% |

---

[90] This figure adds Kartri's sales for January 1 to July 31 and August 1 to November 15, 2018.

Appx359

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Focus's Lost revenue but for infringement | $717 | $56,745 | $279,290 | $708,721 | $184,199 | $710,977 | $1,940,648 |
| Profit margin | 50% | 50% | 50% | 50% | 50% | 50% | |
| Lost profits | $359 | $28,372 | $139,645 | $354,360 | $92,099 | $355,488 | $970,324 |
| Enhancement | 0 | 0 | 300%[91] | 300% | 300% | 300% | |
| Final Award | $359 | $28,373 | $349,112 | $1,063,081 | $276,297 | $1,066,465 | **$2,783,687** |

For the reasonable royalty award:

| | 2013 | 2014 | 2015 | 2016 | 2017 | Aug. 1– Nov. 15, 2018 | Total |
|---|---|---|---|---|---|---|---|
| Revenue, Accused Products | $886 | $70,055 | $344,802 | $874,964 | $227,405 | $877,749[92] | $2,395,861 |
| Percentage of accused revenue in hospitality market | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Focus's lost revenue in hospitality market | $797 | $63,050 | $310,322 | $787,468 | $204,665 | $789,974 | $2,156,275 |
| Focus's uncaptured market share | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Focus's lost revenue but for infringement | $80 | $6,305 | $31,032 | $78,747 | $20,466 | $78,997 | $215,627 |
| Royalty Rate | 25% | 25% | 25% | 25% | 25% | 25% | 25% |

---

[91] Having found that defendants acted willfully after February 27, 2015, the Court, treating each month's revenue as comparable, trebles 10/12, or 83.3%, of the lost profits award for that year.

[92] This figure totals Kartri's sales for January 1 to July 31 and August 1 to November 15, 2018.

Appx360

| Reasonable Royalty | $20 | $1,576 | $7,758 | $19,697 | $5,117 | $19,749 | $53,907 |
|---|---|---|---|---|---|---|---|
| Enhancement | 0 | 0 | 300%[93] | 300% | 300% | 300% | |
| Final Award | $20 | $1,576 | $19,395 | $59,060 | $15,350 | $59,248 | **$154,649** |

Adding those two awards yields a final award of $2,938,337. Plaintiffs are entitled to recover that sum from defendants.

### 8. Disgorgement Is Not Available

In light of the above analysis, a disgorgement remedy is not warranted here. In *Church & Dwight Co.*, Judge Nathan found disgorgement of profits unwarranted because the lost profits award adequately achieved compensation and deterrence. 2018 WL 4253181, at *1, 17; *see also 4 Pillar Dynasty*, 933 F.3d at 214. So too, here. The enhanced award above is sufficient to compensate Focus for its losses, divest defendants of any unjust enrichment, and deter similar misconduct by Kartri (Marquis went out of business in 2020, Tr. 576).

In so holding, the Court is mindful that the remaining four nonexclusive factors identified as considerations in whether to award disgorgement award do, or may, favor plaintiffs.[94] But on review, the Court finds that the award above, which reflects trebled damages for much of the infringement period, will in practice achieve the objectives served by disgorgement. The award here also has the virtue of being anchored in reliable data. A disgorgement award, in contrast, would be impossible to tabulate with anything close to precision, given defendants' lapses in producing evidence of their expenses. Although a court may resolve doubts against a defendant

---

[93] Having found that defendants acted willfully after February 27, 2015, the Court, treating each month's revenue as comparable, trebles 10/12, or 83.3%, of the reasonable royalty award for that year.

[94] These are "the degree of certainty that the defendant benefited from the unlawful conduct," "the role of a particular defendant in effectuating the infringement," "any delay by plaintiff," and "plaintiff's clean (or unclean) hands." *4 Pillar Dynasty*, 933 F.3d at 214.

whose inadequate recordkeeping prevents precise tabulations, *Aris Isotoner Inc. v. Dong Jin Trading Co.*, No. 87 Civ. 890 (RO), 1989 WL 236526, at *5 (S.D.N.Y. Sept. 14, 1989), "some reasonable basis for computation has to be used," *Chloe v. Zarafshan*, No. 06 Civ. 3140 (RJH) (MHD), 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009). Here, plaintiffs pursue disgorgement of all of defendants' revenue. That request is plainly unreasonable, as plaintiffs' own damages expert has estimated that Marquis's yearly profit margin likely averaged around 13.6%, Elmore Rep., Att. 7.0, and there is no basis to assume that Kartri's costs were negligible so as to justify an assumed 100% profit margin. Plaintiffs' alternative proposal, which assumes profit margins for Marquis and Kartri of 75% and 44%, respectively, PF at 96–97, is based on isolated, anecdotal data taken from a stray facet of Kubus's testimony, which the Court is unprepared to credit as accurately capturing the company's revenues and costs. *See* Tr. at 763–64.

Accordingly, the Court declines to award disgorgement on top of, or as an alternative to, the lost profits and reasonable royalty awards set out above.

### 9. Reasonable Attorney's Fees

The Patent Act and the Lanham Act, in identical language, provide that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285; 15 U.S.C. § 1117(a). "[A]n 'exceptional' case . . . is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (applying 35 U.S.C. § 285 standard)); *see also Sleepy's*

*LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (*Octane Fitness*

standard applies to identically worded 15 U.S.C. § 1117(a) provision). "The 'exceptional'

standard 'demands a simple discretionary inquiry; it imposes no specific evidentiary burden.'"

*Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, No. 18 Civ. 6504 (NRB), 2020 WL

729518, at *2 (S.D.N.Y. Feb. 13, 2020) (quoting *Octane Fitness*, 572 U.S. at 557). District

courts are "given wide latitude" in the "case-by-case exercise of their discretion, considering the

totality of the circumstances[,] . . . frivolousness, motivation, objective unreasonableness (both in

the factual and legal components of the case) and the need in particular circumstances to advance

considerations of compensation and deterrence." *4 Pillar Dynasty*, 933 F.3d at 215; *see also*

*Blair v. Alstom Transport., Inc.*, No 16 Civ. 3391 (PAE), 2020 WL 4504842, at *7 (S.D.N.Y.

Aug. 5, 2020). And while "fraud, bad faith, or willful infringement are no longer required for a

fee award," they remain "highly relevant" post-*Octane*. *Hello I Am Elliot, Inc. v. Sine*, No. 19

Civ. 6905 (PAE), 2021 WL 1191971, at *3 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks

and citations omitted). Thus, "courts continue to hold claims of baselessness to a high bar, [and]

most post-*Octane* cases awarding fees continue to involve substantial litigation misconduct." *Id.*

(internal quotation marks and citations omitted).

Neither party has briefed attorney's fees, properly treating it as reserved for after trial.

*See* PF at 6; Elmore Rep. ¶ 230; Rogers Rep. ¶ 35. The Court orders plaintiffs, within four

weeks of the date of this opinion and order, to file an opening brief as to such fees, with

supporting documentation and calculations. Defendants' opposing brief is due four weeks later.

Plaintiffs' reply is due two weeks after that.

### 10.    Prejudgment and Postjudgment Interest

In a patent infringement case, "prejudgment interest should ordinarily be awarded," even

though such an award is not "requir[ed] . . . whenever infringement is found." *Metso Mins., Inc.*

*v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 343 (E.D.N.Y. 2011) (quoting

*Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–57 (1983)). Although "there is no

mandatory interest rate and no standard rate for calculating an award of prejudgment interest,"

*TiVo, Inc. v. EchoStar Comm'ns Corp.*, No. 04 Civ. 1, 2006 WL 6830818, at *5 (E.D. Tex. Aug.

17, 2006), "[t]he Federal Circuit has given district courts great discretion when determining the

applicable interest rate for an award of prejudgment interest," *Metso Mins., Inc.*, 833 F. Supp. 2d

at 343 (citations omitted). "[M]ost often courts will award either the prime rate or the U.S.

Treasury rate." *Id.* (citation omitted). By contrast, the Lanham Act "does not provide for

prejudgment interest." *Merck Eprova*, 760 F.3d at 263 (citation omitted). But "such an award is

within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Id.* at

263–64 (citation omitted).

Post-judgment interest is available in Lanham Act actions and Patent Act actions

pursuant to 28 U.S.C. § 1961(a). *See WowWee Grp. Ltd. v. Haoqin*, No. 17 Civ. 9893 (WHP),

2019 WL 1316106, at *4 (S.D.N.Y. Mar. 22, 2019) (Lanham Act); *Rentrop v. Spectranetics

Corp.*, 514 F. Supp. 2d 497, 507 (S.D.N.Y. 2007) (Patent Act), *aff'd*, 550 F.3d 1112 (Fed. Cir.

2008). Consistent with § 1961(a), the rate of post-judgment interest is the weekly average one-

year constant maturity Treasury yield for the week preceding entry of judgment. Post-judgment

interest is compounded annually. 28 U.S.C. § 1961(b).

The Court orders the parties to address, in their briefs as to attorneys' fees, the issues of

pre- and post-judgment interest.

### F. Injunctive Relief as to Both Defendants' Infringement of and Unfair Competition with the EZ-ON Mark and Trade Dress, and Kartri's Infringement of and Unfair Competition with the HOOKLESS® Mark

The Lanham Act "authorizes the Court to 'grant injunctions, according to the principles

of equity and upon such terms as the court may deem reasonable, to prevent the violation of any

right of the registrant of a mark registered in the Patent and Trademark Office[.]'" *Ideavillage Prods. Corp. v. Shenzen City Poly Hui Foreign Trade Co.*, No. 17 Civ. 8704 (JGK) (BCM), 2019 WL 12339638, at *7 (S.D.N.Y. Dec. 12, 2019) (quoting 15 U.S.C. § 1116(a)). To obtain a permanent injunction, a plaintiff that has established liability under the Lanham Act "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (*eBay* factors apply to trademark infringement action under Lanham Act), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (summary order).

*Irreparable harm*: This is established where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused." *Lobo Enters., Inc. v. Tunnel Inc.*, 822 F.2d 331, 333 (2d Cir. 1987). The Court has found a likelihood of confusion among shower curtain purchasers. This satisfies the first *eBay* factor.

*No adequate remedies at law*: This "is satisfied where the record contains no assurance against defendant's continued violation of Plaintiff's trademark." *Ideavillage Prods. Corp.*, 2019 WL 12339638, at *7 (citation omitted). There is none here. That defendants eventually ceased their infringing sales "[does] not prevent [a] court from considering [defendant's] previous infringing behavior as justification for an injunction." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 405 (2d Cir. 2004); *accord Balady, Inc. v. Elhindi*, No. 14 Civ. 855 (SJ) (RER), 2014 WL 7342867, at *11 (E.D.N.Y. Dec. 23, 2014). Here, defendants ceased infringing nearly three years into this litigation. Later, they sought to reprise their baseless claims that the

HOOKLESS® Mark was generic, and thus invalid, *see* Dkt. 297 at 20, and Marquis continues to assert the invalidity of the EZ ON Mark and Trade Dress. A court is entitled to consider a defendant's cessation of infringing conduct skeptically where it "has already infringed, continues to contest the lawfulness of its actions, and ceased its infringing conduct only after the initiation of this lawsuit. If not enjoined, [the defendant] would have little incentive not to employ [plaintiff's] trademarks in advertising its product in the future." *Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866 (RWS), 2001 WL 913894, at *3 (S.D.N.Y. Aug. 14, 2001); *see also Nat'l Geographic Soc'y v. Conde Nast Pubs. Inc.*, 687 F. Supp. 106 (S.D.N.Y. 1988) (injunction issued where defendant agreed to cease trademark infringement only after lawsuit). The Court finds that a remedy at law for defendants' violations is inadequate. The second *eBay* factor is met.

*Balance of hardships*: This factor overwhelmingly favors plaintiffs, who may continue to suffer irreparable harm to their business, profits, goodwill, and reputation as a result of defendants' willful infringement of the trademarks and Trade Dress. *Kelly Toys Holdings, LLC v. alialialiLL Store*, No. 21 Civ. 8434 (AKH) (RWL), 2022 WL 2072567, at *12 (S.D.N.Y. June 9, 2022). Defendants, in contrast, have not identified any cognizable hardship they could experience from an injunction. *See Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011). Lost business attributable to unlawful infringement does not qualify as a hardship. *See Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). The third *eBay* factor is met.

*Public interest*: The public has an interest in not being deceived and "in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344

Appx366

(S.D.N.Y. 2010); *accord Ideavillage Prods. Corp.*, 2019 WL 12339638, at *10. Such is so here. A permanent injunction also favors the public interest, and the fourth *eBay* factor is met.

The Court thus enjoins defendants from further infringement or unfair competition with the EZ-ON Mark and Trade Dress, and Kartri from further infringement or unfair competition with the HOOKLESS® Mark. Such conduct includes, but is not limited to, manufacturing, selling, advertising, or in any way commercializing the Ezy Hang product. Defendants are also enjoined from branding or advertising their products in any way that suggests an affiliation with the EZ-ON or HOOKLESS® Marks or Trade Dress.

## CONCLUSION

For the reasons above:

1. The Court finds Marquis and Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' EZ-ON Trademark and trade dress under 15 U.S.C. § 1125(a); and for unfair competition with plaintiffs' EZ-ON Mark and Trade Dress under New York law.

2. The Court finds Kartri liable to plaintiffs for infringement of and unfair competition with plaintiffs' HOOKLESS® Mark under 15 U.S.C. § 1125(a); and for unfair competition with plaintiffs' HOOKLESS® Mark under New York law.

3. The Court denies all of defendants' affirmative defenses, namely: lack of statutory standing, failure to join an indispensable party, non-infringement of the EZ-ON Mark, invalidity of the EZ-ON Mark, non-infringement of the Trade Dress, and invalidity of the Trade Dress.

4. The Court finds that defendants' infringement of the utility patents and Trade Dress was willful between February 27, 2015 and November 15, 2018.

5. The Court awards plaintiffs lost profits, in the amount of $970,324, for defendants' infringement of the utility patents and Trade Dress. That award covers the period from October

16, 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November

15, 2018. The final, enhanced lost profits award amounts to $2,783,687.

      6.   The Court awards plaintiffs a reasonable royalty of $53,907, for defendants'

infringement of the utility patents and Trade Dress. That award covers the period from October

16, 2013 to November 15, 2018. The award is trebled for the period March 1, 2015 to November

15, 2018. The final, enhanced reasonable royalty award amounts to $154,649.

      7.   The Court enjoins both defendants from infringing or unfairly competing with the

EZ-ON Mark and the Trade Dress under the Lanham Act, and from unfairly competing with the

EZ-ON Mark and the Trade Dress under New York law. The Court further enjoins Kartri from

infringing or unfairly competing with the HOOKLESS® Mark under the Lanham Act, and from

unfairly competing with the HOOKLESS® Mark under New York law.

      8.   The Court denies plaintiffs' claim for a disgorgement of defendants' profits, and

their claim for a reasonable royalty for defendants' infringement of the EZ-ON Mark.

      9.   The Court orders plaintiffs, within four weeks of the date of this opinion and order,

to file their opening brief, with supporting documentation, on the issues of reasonable attorney's

fees, prejudgment interest, and postjudgment interest. Defendants are ordered to file their

opposing brief within four weeks of plaintiffs' due date. Plaintiffs are ordered to file their reply

brief within 14 days thereafter.

      SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 22, 2022
      New York, New York

Appx368

Case 1:15-cv-10154-PAE   Document 513   Filed 01/25/23   Page 1 of 5

Case 1:15-cv-10154-PAE   Document 512   Filed 01/24/23   Page 1 of 1



**GOLDBERG COHEN LLP**
1350 AVENUE OF THE AMERICAS, 3RD FLOOR, New York, NY 10019
PHONE: 646.380.2087  FAX: 646.514.2123

January 24, 2023

**Via ECF**
Hon. Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    *Focus Products Group International, LLC et al. v. Kartri Sales Company, Inc.*
               Civil Action No. 15 Civ. 10154 (PAE)

Dear Judge Engelmayer:

      We represent Plaintiffs in this matter. We are writing to submit an unopposed request for leave to file a declaration of counsel that was cited in Plaintiffs' previously filed Motion for Attorneys' Fees motion but unintentionally omitted from the ECF filing.

      As background, Plaintiffs filed their Motion for Attorneys' Fees (Dkt. 505) this past Thursday January 19, 2023. It recently came to our attention that the attached declaration was inadvertently omitted from that filing. The declaration was saved to our system on Thursday January 19th at 9:17 pm, which was both before the filing of the motion at approximately 9:28 pm, and before the midnight cutoff of the due date. It was only due to an oversight that this was not filed on ECF. On January 23rd at 2:44 pm, we notified and emailed a copy of the declaration to opposing counsel, evidencing that date and time stamp. The contents of the declaration were also incorporated in the filed motion by numerous references thereto.

      In summary, upon learning of the oversight, we immediately brought it to the attention of counsel for the Defendants. We also met and conferred with counsel for both Defendants today, and they do not oppose this request. Accordingly, we respectfully request the Court's leave to file the declaration on ECF as part of Plaintiffs' motion.

      We thank the Court in advance for its attention to this matter.

Granted. SO ORDERED.

                      Respectfully submitted,

                      */s/ Morris E. Cohen*

                      Morris E. Cohen (MC-4620)

_____
PAUL A. ENGELMAYER
United States District Judge
January 24, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP, LTD., AND HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SF HOME DÉCOR, LLC, SURE FIT HOME DÉCOR HOLDINGS CORP., and SURE FIT HOME PRODUCTS, LLC, | Civil Action No.: 1:15-cv-10154 (PAE)(SDA) |
| Plaintiffs, | |
| v. | |
| KARTRI SALES COMPANY, INC. AND MARQUIS MILLS, INTERNATIONAL, INC. | |
| Defendants. | |

**DECLARATION OF MORRIS E. COHEN
IN SUPPORT OF PLAINTIFFS' MOTION FOR
ATTORNEY'S FEES**

I, Morris E. Cohen, an attorney with Goldberg Cohen LLP ("GC"), counsel to Plaintiffs

in this action, declare the following under penalty of perjury:

1.    Attached as Exhibit 1 to Plaintiffs' brief is a true and correct copy of a compilation of

invoices of Plaintiffs' counsel from counsel's current billing system (with invoices dated

from August 12, 2016 to January 18, 2023), based on contemporaneous time records.

2.    Attached as Exhibit 2 to Plaintiffs' brief is a true and correct copy of a compilation of

invoices of Plaintiffs' counsel from counsel's prior billing system (with invoices dated

from March 2, 2015 through June 14, 2016), based on contemporaneous time records.

3.    Attached as Exhibit 3 to Plaintiffs' brief is a true and correct copy of a summary

spreadsheet created by Plaintiffs' counsel regarding the breakdown of attorneys' fees and

1

expenses. For completeness, all invoices in this matter are included, including invoices not found in Exhibit 1 because they were only for expenses (with no attorneys' fees billed on them, *viz.*, invoice numbers 1420, 1558, 1611, 1690, 1691, 1692, 1715).

4.    Attached as Exhibit 4 to Plaintiffs' brief is a true and correct copy of an excerpt from the Report and Recommendation issued by Magistrate Judge Stewart D. in *est Brands Consumer Products, Inc., v. Versace 19.69 Abbigliamento Sportivo S.R.L, et al,* Civil Action No. 1:17-cv-04593-VSB-SDA, Dkt. 122 at 18, n. 21 ("the Versace case").

5.    Attached as Exhibit 5 to Plaintiffs' brief is a true and correct copy of an excerpt from Plaintiffs' Proposed Findings of Fact and Conclusions of Law in the Versace case, Dkt. 108 at 25 ¶124 (including discussion of rates for undersigned counsel and firm).

6.    Attached as Exhibit 6 to Plaintiffs' brief is a true and correct copy of an excerpt of a decision by Judge Gregory H. Woods in *Beverly Hills Teddy Bear Company v. Best Brands Consumer Products, Inc. et al,* Civil Action No. 1:19-cv-03766-GHW, Dkt. 202 at 6.

7.    All of those invoices in Exhibits 1 and 2 have been paid by Plaintiffs, other than the invoice just issued for work in the month of December.

8.    As to the hourly rates of the firm's attorneys, from 2015 through 2020, Messrs. Cohen and Goldberg billed at $600/hour, and Ms. Wigder at $425/hour. Ms. Wigder's rate increased to $475/hour as of January 1, 2021, and Messrs. Cohen and Goldberg's rate increased to $675/hour as of January 1, 2022.

9.    Mr. Cohen is an attorney admitted before the Bar of this State and this Court, with over twenty-seven (27) years of experience, having been admitted to the Bar of this State in August 1995. He has also been an Adjunct Professor (teaching Patent Law and

Advanced Patent Law) at the Benjamin N. Cardozo School of Law in New York since 1996.

10.    Mr. Goldberg is an attorney admitted before the Bar of this State and this Court, with almost thirty-two (32) years of experience, having been admitted in February 1991.

11.    Ms. Wigder is an attorney admitted before the Bar of this State and this Court, with approximately ten and a half (10 ½) years of experience, having been admitted to the Bar of this State in July 2012.  (In a prior case before this Court (see, Exhibit 6), the Court reduced her rate since it was only her second copyright case.  However, in the present context, she has assisted over the past 10 ½ years with numerous patent and trademark cases).

12.    Messrs. Goldberg and Cohen, and Ms. Wigder, are all registered patent attorneys.

13.    The three of them are also intellectual property specialists, and intellectual property litigators, concentrating in patent, trademark, and copyright matters, and the like.

14.    Ms. Sherika Sterling is a paralegal with eighteen (18) years of experience in intellectual property litigation, as of 2021 when she joined this case, and billed at a rate of $225/hr in this case.

15.    Mr. Stadler was pre-law when he assisted at trial (he is now a law student) and was billed at a rate of $150/hr.

16.    Based on the undersigned's knowledge of the market, intellectual property specialists typically command higher rates than generalists such as litigators in general commercial litigation.

17.    Also based on the undersigned's knowledge of the market, including the New York market, it is respectfully submitted that the rates of attorneys Goldberg, Cohen, and

3

Wigder, are reasonable hourly rates, or even low compared to other attorneys having comparable expertise and experience.

18. In June – July 2016, the firm changed its billing software to a new system and began issuing invoices even more detailed than before (Exhibit 1). For those bills from the old system which do not have an hourly breakdown (Exhibit 2 other than Inv-211105), we have attempted to retrieve the hourly details from the old system, but have been unable to do so to date since the system was with a prior vendor and our account is inactive.

19. Goldberg Cohen LLP, in an effort to be fair to clients, currently uses a time keeping system which allows for time tracking by the minute, and bills in tenths of an hour, i.e., six (6) minute increments.

20. Plaintiffs have paid all bills from the inception of this litigation (other than the bills issued yesterday for time through December 31, 2022).

I hereby certify and affirm that all of the facts herein are true based upon my personal knowledge, or are believed to be true to the best of my knowledge, and certify the truth of these statements under penalty of perjury.

Dated: January 19, 2022                    /s/ Morris E. Cohen
                                           Morris E. Cohen

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., *and* SF HOME D DÉCOR, LLC,

                                        Plaintiffs,

                        -v-

KARTRI SALES COMPANY, INC., *and* MARQUIS MILLS
INTERNATIONAL, INC.,

                                        Defendants.

15 Civ. 10154 (PAE) (SDA)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

The Court has received the parties' briefing on the pending motion for attorneys' fees.

To spare the Court an arithmetic exercise, the Court orders plaintiffs to file, by May 25, 2023, a

letter tabulating the total hours for which plaintiffs have sought a fee award as to, respectively,

Morris E. Cohen, Lee A. Goldberg, Limor Wigder, and Sherika Sterling, as reflected in the

exhibits attached to docket 505.

        SO ORDERED.

                                        *Paul A. Engelmayer*
                                        Paul A. Engelmayer
                                        United States District Judge

Dated: May 23, 2023
       New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., *and* SF HOME D DÉCOR, LLC,

                                    Plaintiffs,

                    -v-

KARTRI SALES COMPANY, INC., *and* MARQUIS MILLS,
INTERNATIONAL, INC.,

                                    Defendants.

15 Civ. 10154 (PAE) (SDA)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves—and grants—a motion by the prevailing plaintiffs for an award of

reasonable attorneys' fees in this litigation under the fee provisions of the Patent Act, 35 U.S.C.

§ 285, and the Lanham Act, 15 U.S.C. § 1117(a). The Court also grants plaintiffs' motions for

awards of permissible costs, and pre- and post-judgment interest.

## I.    Background

The long and tangled history of this case is set out in detail across various opinions and

orders in this case, including in the Court's 168-page bench trial decision, issued December 22,

2022, resolving the claims in the case not previously resolved on summary judgment. *See* Dkt.

501 ("Trial Decision"). The following brief overview is limited to the context necessary for the

present motions.

### A.    Key Pretrial Events

Plaintiffs—to whom the Court collectively refers as "Focus"—manufacture, sell, and

distribute distinctive "hookless" shower curtains. These have obtained considerable acclaim and

success in the hospitality industry for their ease of installation and replacement. In this litigation,

Focus alleges that defendants Kartri Sales Company, Inc. ("Kartri"), and Marquis Mills,

International, Inc. ("Marquis"), together manufactured, sold, and distributed confusingly similar

shower curtains, and in so doing, unlawfully exploited Focus's intellectual property, in violation

of federal and state law.

On June 30, 2015, Focus initiated this litigation. It came, in short order, to include claims

of willful infringement of three utility patents and one design patent, in violation of the Patent

Act; willful infringement of and unfair competition with two trademarks and trade dress, in

violation of the Lanham Act; and unfair competition, in violation of New York law.

On July 14, 2016, in a bench ruling, the Court denied, in their entirety, motions to dismiss

by both defendants. Dkt. 77.

On April 16, 2020, after a *Markman* hearing and long and contentious discovery, the

Court resolved cross-motions for partial summary judgment. These resulted predominantly in

(1) entry of summary judgment for plaintiffs on certain infringement claims under each of the

three utility patents; and (2) dismissal of numerous counterclaims brought by Marquis. Dkt. 297;

*see id.* at 31 (design patent not before Court).

On August 5, 2021, the Court resolved plaintiffs' motions *in limine* in a bench ruling.

Dkt. 412. On November 23, 2021, the Court resolved defendants' motions *in limine* in a bench

ruling. Dkt. 436.

**B.      The Bench Trial and Decision**

On June 27–29 and July 26–28, 2022, the Court held a bench trial as to the remaining

claims. On December 22, 2022, the Court issued a lengthy decision resolving the outstanding

claims. Dkt. 501.

2

Appx376

As to liability, the Court: (1) found both defendants liable for infringement of and unfair competition with plaintiffs' EZ-ON[1] trademark mark and trade dress under 15 U.S.C. § 1125(a), and for unfair competition with plaintiffs' EZ-ON mark and trade dress under New York law; (2) found Kartri liable for infringement of and unfair competition with plaintiffs' HOOKLESS mark under 15 U.S.C. § 1125(a) and for unfair competition with plaintiffs' HOOKLESS mark under New York law; (3) denied all of defendants' affirmative defenses; and (4) found defendants' infringement of the utility patents and trade dress to have been willful between February 27, 2015 and November 15, 2018.

As to damages, the Court (1) awarded plaintiffs lost profits, in the amount of $970,324, for defendants' infringement of the utility patents and trade dress, covering the period October 16, 2013, to November 15, 2018; the Court trebled the award for the period March 1, 2015 to November 15, 2018, resulting in a final, enhanced lost profits award of $2,783,687; (2) awarded plaintiffs a reasonable royalty of $53,907 for defendants' infringement of the utility patents and the trade dress, covering the period October 16, 2013 to November 15, 2018; the Court trebled the award for the period March 1, 2015 through November 15, 2018, resulting in a final, enhanced reasonable royalty award of $154,649; (3) enjoined both defendants from future infringements of, and unfair competition with, the EZ-ON mark and trade dress; and Kartri from the same as to the HOOKLESS mark; and (4) denied plaintiffs' claims for disgorgement of defendants' profits and a reasonable royalty for defendants' infringement of the EZ-ON mark.

The Court also set a schedule for the briefing of the issues of reasonable attorneys' fees, prejudgment interest, and post-judgment interest.

### C.    The Motions for a Fee Award, Prejudgment Interest, and Post-Judgment Interest

---

[1] As in its trial decision, the Court will refer to the mark as "EZ-ON." Trial Decision at 8 n.10.

Appx377

On January 19, 2023, plaintiffs filed a memorandum of law in support of their motion for attorneys' fees, prejudgment interest, and post-judgment interest. Dkt. 505 ("Focus Mem."). In support, plaintiffs filed two sets of invoices, Dkt. 505-1; Dkt. 505-2; a spreadsheet summarizing these, Dkt. 505-3; and other materials, Dkts. 505-4–7. Plaintiffs sought a fee award of $1,549,544.91. On February 16, 2023, Kartri filed a memorandum of law in opposition, Dkt. 524 ("Kartri Mem."), with attached exhibits, Dkts. 524-1–4. On February 17, 2023, Marquis filed a brief memorandum of law in opposition, Dkt. 525 ("Marquis Mem."), with attached exhibits, Dkts. 525-1–2, that principally adopted Kartri's arguments. On March 2, 2023, Focus filed a reply, Dkt. 530 ("Focus Rep."), with attached exhibits, Dkts. 530-1–5, and a supplemental declaration, Dkt. 531.

## II.    The Motion for an Award of Fees and Costs

### A.    Governing Legal Principles

"Ordinarily, under the 'American Rule,' each party must bear its own attorneys' fees." *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2018 WL 3574864, at *5 (S.D.N.Y. July 25, 2018), *aff'd*, 771 F. App'x 71 (2d Cir. 2019) (summary order). "However, where there is 'explicit statutory authority,' courts may award attorneys' fees." *Id.* (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602–03 (2001)). In identical language, the Patent Act and Copyright Act each confer such authority, stating that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *See* 35 U.S.C. § 285; 15 U.S.C. § 1117(a).

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), the Supreme Court construed the Patent Act provision. The Second Circuit has since adopted that

construction as governing fee applications under the Lanham Act. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530–31 (2d Cir. 2018).

Under *Octane*, an "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 572 U.S. at 554. District courts have wide latitude to determine whether a case is exceptional; the inquiry is a case-by-case exercise that considers the totality of the circumstances. *Id.*

In applying this standard, courts may consider a nonexclusive list of factors including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); *see Manhattan Rev. LLC v. Yun*, 765 F. App'x 574, 578 (2d Cir. 2019) (summary order) (district courts are "encourag[ed]" to apply "the *Fogerty* factors from the Copyright Act context" in exercising discretion as to fee requests under the Lanham Act).

Although highly relevant, fraud, bad faith, or willful infringement are no longer required for a fee award under the Lanham Act. *See 4 Pillar Dynasty LLC. v. N.Y. & Co.*, 933 F.3d 202, 215–16 (2d Cir. 2019) (precedents requiring a showing of willfulness have been overtaken by *Octane*). However, "although *Octane* reduced the showing required for an award on the ground of objective baselessness, courts continue to hold claims of baselessness to a high bar." *Small v. Implant Direct Mfg. LLC*, No. 06 Civ. 683 (NRB), 2014 WL 5463621, at *3 (S.D.N.Y. Oct. 23, 2014). As a result, "most post-*Octane* cases awarding fees continue to involve substantial litigation misconduct." *Hockeyline, Inc. v. STATS LLC*, No. 13 Civ. 1446

(CM), 2017 WL 1743022, at *5 (S.D.N.Y. Apr. 27, 2017); *see, e.g.*, *Small*, 2014 WL 5463621, at *4 (collecting cases).

**B.    Discussion**

**1.    Whether a Fee Award Is Warranted**

Focus undisputedly was the prevailing party here. It prevailed virtually across the board, securing findings in its favor as to infringement—indeed, of willful infringement—of its three utility patents, of its two trademarks, and of its trade dress.[2] And it obtained substantial, and enhanced, damages on these claims. Kartri and Marquis, although disputing that this was an exceptional case, do not dispute that Focus was the prevailing party.

The Court, however, finds this to have been an "exceptional case" justifying a fee award for two reasons identified in *Octane*: the strength of plaintiffs' litigating position and the objective unreasonableness of the manner in which the case was defended. The Court addresses these in the order set out in *Octane*, although the second reason is by far predominant in the Court's assessment.

*a.    Strength of Focus's Litigation Position*

Focus's litigating position was uncommonly strong, as reflected in the Court's detailed analysis of Focus's claims in the summary judgment decision and especially the bench trial decision.

What particularly distinguishes this case from a garden-variety one in which a trademark or patent holder has successfully established infringement of such rights, however, is defendants' willful infringement, which the Court found with respect both to Focus's trademarks and patent

---

[2] The Court did not resolve plaintiffs' patent infringement claims as to its design patent '078, which was stayed on consent pending a decision by the United States Patent and Trademark Office as to its validity. *See* Trial Decision at 55.

Appx380

for much of the relevant period. In its bench decision, the Court reviewed the evidence that Kartri and Marquis, in long marketing nearly identical products, had intentionally plagiarized Focus's trade dress and patents. *See* Trial Decision at 77–78. This evidence overwhelmingly showed, the Court held, that Marquis had "willfully closed its eyes to the high probability that the Ezy Hang design [Marquis] was obtaining in China and furnishing to Kartri to sell in the U.S. was infringing Focus's intellectual property rights." *Id.* at 77.

For example, Marquis uncritically accepted an unsubstantiated representation of a Chinese vendor, whom it knew had worked for a manufacturer of Focus's in China, that Focus's utility patents "had become a public domain kind of product" and "were about to run out"; Marquis and Kartri chose not to investigate whether the shower curtain product they proceeded to market was covered by a valid patent in the United States or elsewhere. *Id.* And when the vendor's patent attorney offered to conduct a patent analysis for $3,500, Marquis spurned the offer. *Id.* Marquis chose instead to credit the vendor's unsubstantiated claims that it owned a Chinese patent and that Focus, being "in deep financial trouble," was too weak to fight to vindicate its intellectual property rights. *Id.* at 77–78. Even after Focus sent a 2015 cease-and-desist letter, which spelled out the legal basis for its rights in terms that prefigured the Court's eventual ruling, Kartri and Marquis stood pat, disregarding the letter and outrageously declining to investigate Focus's representation to have superior rights. *Id.* at 78. Instead, the defendants persisted in marketing their infringing product, openly describing it as a "version of HOOKLESS," the name by which they knew Focus's product was known. *Id.*

For these and related reasons, the Court found, in its Lanham Act rulings, bad faith on the part of defendants.

[T]he evidence is compelling that defendants, aware of the inroads Focus's innovation had made in the shower curtain market, intentionally sought to mimic

7

> Focus's Trade Dress to deceive customers to purchase Ezy Hang and thereby to
> capitalize on Focus's goodwill. The close similarity—in both looks and sound—
> between Kartri's Ezy Hang product and Focus's EZ-ON product reinforces this
> conclusion. These similarities are so strong that it seems plain that deliberate
> copying has occurred. Defendants did not offer a benign justification for these
> similarities—especially not for the strong similarities in look *and* sound between
> the Ezy Hang and the EZ-ON product. It is unavoidably clear that defendants
> intentionally, and in bad faith, sought to all-but-replicate the EZ-ON Mark so as to
> capitalize on competitor Focus's intellectual property and good will. . . . Although
> the proof of bad faith is especially obvious in connection with the Ezy-Hang
> product, the Court finds that the factor of bad faith cannot be logically cabined to
> the EZ-ON Mark. Defendants' strategy of deliberate infringement, the Court finds,
> was holistic.

*Id.* at 91–92 (emphasis in original) (internal citations omitted).

And in connection with its findings as to damages on the patent claims, the Court found

enhanced—treble—damages in order as a punitive sanction for "'egregious infringement

behavior,' that is behavior that is 'willful, wanton, malicious, bad-faith, deliberate, consciously

wrongful, flagrant or—indeed—characteristic of a pirate.'" *Id.* at 148 (quoting *Halo Elecs., Inc.*

*v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016)). Analyzing the "*Read* factors" that guide the

treble damages analysis, the Court found that both defendants had acted willfully from the point

at which they had received Focus's cease-and-desist letter on or about February 27, 2015, and

that they had continued to do so for more than 42 months, through November 15, 2018. *Id.* at

150; *id.* at 152–54 (analyzing willfulness of Marquis during this period, and noting that its

executive, Middleberg, "[a]lmost unimaginably[]—notwithstanding the letter's clear articulation

of the basis of Focus's rights—disregarded the letter," and that Kartri's owners continued to sell

the accused products to Kartri without seeking advice of counsel, and that such continued for

three years after being served the original complaint in this case); *id.* at 155–56 (analyzing

willfulness of Kartri during this period, and noting that it, too, engaged in "flagrant and

prolonged disregard of plaintiffs' intellectual property rights" after being put on explicit notice of

them). Other *Read* factors favoring enhanced damages, the Court found, included defendants'

failures to investigate, the duration of their misconduct, the absence of any remedial actions, and

their profit motivation, as direct competitors of Focus, to infringe. *Id.* at 157–58.

The strength of Focus's case, and the willfulness and egregiousness of the conduct giving

rise to defendants' liability, "stand[] out from others," *Octane*, 572 U.S. at 554, finding

trademark or patent infringement (or, as here, both). The Court bases this finding on the

distinctive facts of this case, as measured against the assembled case law, and against the many

such cases under these statutes that this Court has supervised. This factor supports an award of

fees. *See, e.g., NetSoc, LLC v. Chegg Inc.*, No. 18 Civ. 10262 (RA), 2020 WL 7264162, at *4–5

(S.D.N.Y. Dec. 10, 2020) (awarding fees under § 285 where plaintiffs pursued "exceptionally

weak arguments" by, *inter alia*, failing to correct errors in their pleadings for months despite

being informed of them); *Advanced Video Techs. LLC v. HTC Corp.*, No. 11 Civ. 06604 (CM),

2015 WL 7621483, at *5–9 (S.D.N.Y. Aug. 28, 2015) (same), *aff'd*, 677 F. App'x 684 (Fed. Cir.

2017); *Microban Prods. Co. v. Iskin Inc.*, No. 14 Civ. 05980 (RA) (DF), 2016 WL 4411349, at

*11 (S.D.N.Y. Feb. 23, 2016) (awarding attorneys' fees under Lanham Act where defendants'

infringement was willful), *report and recommendation adopted*, 2016 WL 4411414 (S.D.N.Y.

Aug. 18, 2016); *Sub-Zero, Inc. v. Sub Zero N.Y. Refrigeration & Appliances Servs., Inc.*, No. 13

Civ. 2548 (KMW) (JLC), 2014 WL 1303434, at *7 (S.D.N.Y. Apr. 1, 2014) (same); *Malletier v.

Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 358–59 (S.D.N.Y. 2010) (same).

> b.  *Objective Unreasonableness of Kartri and Marquis's Conduct in
> This Litigation*

In a host of ways, Kartri and Marquis defended this case in an objectively unreasonable,

thoughtless, and unprofessional manner. They thereby materially and needlessly prolonged this

litigation, drove up costs for their prevailing adversary, and burdened the Court.

Appx383

A thoroughgoing canvass of the docket in this case would reveal a dismaying collection of unreasonable acts and omissions ill-befitting the standards of this District. A decidedly nonexclusive summary of defendants' litigation improprieties includes conduct in the following four categories[3]:

  i.    *Flagrant Breaches of Discovery Obligations Relating to Damages*

In 2016, plaintiffs served discovery requests on defendants seeking financial information, including relating to revenues, costs, and profits arising from sales of the accused products. Defendants failed to provide such information in full. Plaintiffs raised the issue with Magistrate Judge Ellis, identifying these (and other) discovery deficiencies; Judge Ellis ordered defendants promptly to supplement their discovery. *See* Dkt. 114 (6/14/17 order). Defendants, however, did not do so. In late January 2019—some 19 months later, now more than three years into the litigation, and after the close of fact discovery, and after plaintiffs had submitted their expert report based on the limited damages discovery defendants had furnished—defendants furnished financial data to their damages expert, Graham Rogers. These data were squarely responsive to plaintiffs' earlier discovery demands and Judge Ellis's order. As this Court later summarized in resolving a motion *in limine* in which it imposed the sanction of precluding defendants and the expert from relying on the late-produced data:

> [T]he Court finds that defendants had access to financial evidence during fact discovery, which they did not disclose until well after fact discovery closed and well after Magistrate Judge Ellis ordered them to comply with Rule 26. Defendants admit this latter point . . . . Nor do the defendants dispute that their expert witness relied on this material.

---

[3] Plaintiffs' motion for fees fairly chronicles, in addition to the above, other missteps by defendants and their counsel during this litigation. *See* Focus Mem. at 4–14.

*See* Dkt. 412 at 11; *see also id.* at 7–16 (8/5/21 conference, recounting pertinent history, in

explaining imposition of sanctions under Fed. R. Civ. P. 37). Further, in the course of litigating

this point, defendants dissembled to the Court, falsely representing that they had produced the

data in question. As the Court ruled in imposing sanctions:

> [D]efendants also claim to have "provided the additional financial information as
> soon as defendants were aware." That is simply false. The record demonstrates
> that defendants provided the information to their expert a month before they gave
> it to Focus and that it was not defendants' initiative to provide it to Focus. They
> did so only after Focus, having ascertained during Rogers' deposition that
> defendants had provided him with information that Focus had never been given,
> demanded such information.

*Id.* at 13–14 (internal citation omitted).

These breaches were consequential. Indeed, defendants admitted that the evidence they

had willfully denied plaintiffs was "critical" and "important to the ultimate truth of this case."

*Id.* at 14. Defendants' breaches caused the parties and the Court to devote substantial time

attempting to enforce defendants' discovery obligations and later litigating and fashioning a

remedy for defendants' breaches. Further, defendants' brazen failure to produce their sales and

profit data from the accused profits stymied plaintiffs in attempting to reliably establish their

damages. *See id.* at 15 (recounting ways in which defendants' failure to produce data relevant to

damages impaired Focus's fact discovery, expert analysis, questioning of defendants' damages

expert, and ability to investigate pertinent topics). And, as reflected in the bench trial decision,

defendants' breach denied the Court, in its capacity as factfinder, the best evidence of damages,

forcing the Court to base aspects of its damages calculations on reasonable assumptions rather

than on hard and complete data. *See, e.g.*, Trial Decision at 110, 132–34.[4]

---

[4] Relatedly, the sales data Kartri did produce was demonstrably false. As plaintiffs' expert John
Elmore persuasively testified at trial, Kartri's data underreported its sales, so as to create the

        *ii.*     *Repeated Violations of the Scheduling Order, the Federal*
                        *Rules of Civil Procedure, and the Court's Individual Rules*

In a host of contexts, defendants breached basic court protocols and rules. Albeit

generally by modest margins, they repeatedly missed filing deadlines—including for their

summary judgment brief, *compare* Dkt. 230, *with* Dkt. 253, for their motion for reconsideration,

*see* Dkt. 307, and for their expert report, *see* Dkt. 217, and filed an unauthorized and untimely

motion *in limine*, *see* Dkt. 364 at 9. Their submissions on summary judgment were grossly

deficient, compelling the Court to state the following in its summary judgment decision:

> [Defendants'] Rule 56.1 statement and response persistently fails to conform to the
> local rules and regularly lacks citations to the record. Factual propositions declared
> by the defense for which defense counsel has not submitted admissible evidentiary
> support have not been credited by the Court. The defense's 56.1 statement is a
> striking replica of defendants' memoranda of law, suggesting a lack of appreciation
> of the purpose of such a statement. This, along with the 56.1 statements' sometimes
> maddeningly incomprehensible formatting, makes it particularly unhelpful to the
> Court.

Dkt. 297 at 2 n.1 (internal citations omitted). Defendants also persistently failed to meet and

confer before raising issues, as the Court's Individual Rules required. *See, e.g.*, Dkt. 424. And

they improperly raised defenses at the brink of trial that they had not raised earlier, including in

the parties' joint pretrial order; these included purported defenses of a lack of standing, of "non-

infringing fair use," of "profit disgorgement preclusion," of a "terminal disclaimer" defense, and

of unclean hands and equitable estoppel. *See* Dkt. 365 at 5 ("Defendants have utterly failed to

explain their abject failure to raise these defenses years ago, and their delay in doing so until the

11th hour in this litigation."); *see also* Dkt. 412 at 19–24. The Court ultimately was required,

---

impression that it had long sold its accused shower curtains at a loss. Dkt. 488 at 421–22. This
was both improbable and inconsistent with the fact that Kartri elsewhere had admitted making a
profit. *See* Dkt. 490 at 716; *see* Focus Mem. at 6 & n.6 (elaborating on basis for asserting such
falsity).

Appx386

after hearing plaintiffs' response, to preclude these and any additional defenses not raised or listed in the joint pretrial order, and to admonish defendants—at a point when the case was headed for a jury trial—as follows:

> Because the defendants have demonstrated an intention to continue to pursue untimely and indeed some explicitly precluded defenses, the Court admonishes defendants to carefully measure their trial defenses so as to assure that any defense they intend to raise at trial was previously timely raised. The Court admonishes defendants that any attempt before the jury to inject defenses that the Court has now precluded, or that defendants later conjure that were not pled, will merit a rebuke in front of the jury. Defendants' continued attempts to raise defenses and make arguments that have already been forfeited or rejected has wasted counsel[s'] and the Court's time. The Court will not allow the defendants to reprise such conduct before the jury.

Dkt. 412 at 26.[5]

### iii.    Flouting or Ignoring Court Rulings

On multiple occasions, defendants flouted prior court rulings, requiring the Court (and plaintiffs) to revisit these issues. Three examples suffice. First, although the Court had ruled that plaintiffs had shown the non-functionality of their trade dress, defendants listed that in their joint pretrial order as a defense they intended to pursue at trial. The Court thus had to preclude it expressly, in bench rulings. *See id.* at 20; Dkt. 436 at 7. Second, in the joint pretrial order, defendants stated that they planned to pursue at trial a defense that the HOOKLESS trademark is generic. The Court thus had to preclude that defense expressly, too. *See* Dkt. 412 at 21–22. Third, the Court had denied defendants' motion for summary judgment on the issue of whether the February 1, 2012 Carnation license agreement conferred ownership of the EZ-ON mark on

---

[5] *See also, e.g.*, Dkt. 204 (rejecting defendants' attempt, years after the *Markman* hearing and the Court's issuance of the *Markman* order, to propose a new claim construction, of the word "from," stating: "The time for proposing claim constructions has long since passed. Despite ample opportunity, Kartri never placed the term "from" in dispute. It therefore forfeited the opportunity to do so now. The Court is confident that the jury will have no difficulty understanding this commonplace term.").

13

plaintiffs' predecessor, ruling that this was a question of fact that required resolution at trial. Defendants, however, pursued the same relief in the form of a motion *in limine*, which the Court denied. *See* Dkt. 436 at 4–5 ("[D]efendants have already moved for summary judgment on the same claim, and the Court has denied that motion . . . who owns the EZ[-]ON mark remains a question of fact, to be decided by a jury. The Court will not revisit it here.").

iv. *Taking Baseless Positions*

Defendants at numerous points took indefensible and unsubstantiated litigation positions. Some, like some of the arguments above, were unreasonable on account of preclusive earlier court rulings; others were substantively unreasonable; others were devoid of legal authority or factual support. The following are representative examples.

At the outset, Kartri brought a counterclaim appearing to allege tortious interference and monopolistic conduct. But Kartri did not adduce any evidence in support, and it did not defend (or address) the counterclaim when plaintiffs moved against it at summary judgment, leaving the Court to grant plaintiffs' motion as unopposed. Dkt. 297 at 27. Marquis similarly brought a counterclaim for "patent misuse," but it did not adduce—or attempt to adduce—any evidence in support, resulting in its dismissal, too, on summary judgment. *Id.* at 28. At summary judgment, defendants also argued that plaintiffs' three utility patents were invalid, but did not offer any admissible evidence in support. The Court rejected that claim as baseless. *Id.* at 17–19.

Later, in the joint pretrial order, defendants stated that they intended to defend on the ground that "[p]laintiffs and/or their licensees have failed to mark product packaging and/[]or marketing materials displaying [p]laintiffs' common law trademark and trade dress with notice to identify the source of the goods to establish secondary meaning." Dkt. 323 at 9. After plaintiffs called out this argument as meritless and contrary to established law, Dkt. 325 at 12–13, the

14

Court gave defendants until August 12, 2021 to indicate whether they intended to pursue such a defense, and to identify case law in support, Dkt. 412 at 21. Defendants did not do so, resulting in the Court's striking this defense. In the joint pretrial order, defendants also indicated that they intended to argue that Focus's trade dress definition was required to have been "recited in plaintiffs' business records." *Id.* at 23. The Court granted plaintiffs' motion *in limine* to preclude that line of defense. It ruled: "Focus is right. Defendants have not provided any support for their legal claim in their opposition. They have not identified any statute or case law requiring a plaintiff to produce business records establishing a trade dress definition. Nor has the Court found any." *Id.* at 23–24.[6]

### c. Overall Assessment

Given defendants' multifaceted and protracted litigation misconduct, this case easily qualifies as an "exceptional case" when measured against Lanham Act and Patent Act precedents applying that standard. Cases found "exceptional" based on the unreasonable manner in which the losing party conducted itself in litigation have relied on comparable, and indeed less glaring, records of vexatiousness. *See, e.g.*, *Am. Exch. Time LLC v. Tissot S.A.*, No. 17 Civ. 4737 (VM), 2022 WL 17414348, at *4–5 (S.D.N.Y. Dec. 5, 2022) (finding case exceptional and awarding attorneys' fees where defendants litigated in "unreasonable manner" by filing opposition to trademark application that forced plaintiff to commence litigation; appearing in action and requesting conferences, and then asking to participate as an observer rather than appearing; and filing a new trademark application that led to plaintiff's application being suspended after a year of settlement discussions); *Venus by Maria Tash, Inc. v. Prinatriam Ltd.*, No. 21 Civ. 2098

---

[6] Plaintiffs' motion for fees lists numerous other baseless arguments that defendants pursued. *See* Focus Mem. at 11–13.

(LGS) (RWL), 2022 WL 4085747, at *6 (S.D.N.Y. Aug. 24, 2022) (same, where, *inter alia*, defendants "frustrated the litigation process" by failing to appear), *report and recommendation adopted*, 2022 WL 5110594 (S.D.N.Y. Oct. 4, 2022); *Experience Hendrix, L.L.C. v. Pitsicalis*, No. 17 Civ. 1927 (PAE) (GWG), 2020 WL 3564485, at *15–16 (S.D.N.Y. July 1, 2020) (same, where defendants disobeyed court orders, refused to participate in discovery, and defaulted), *report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020); *Cognex Corp. v. Microscan Sys., Inc.*, No. 13 Civ. 2027 (JSR), 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (same, where defendants offered particularly weak arguments and submitted post-trial motions on issues court had already decided). And where a party found to have willfully infringed engages in unreasonable litigation practices, courts have not hesitated to find this standard met. *See, e.g., Abbott Lab'ys v. H & H Wholesale Servs., Inc.*, No. 15 Civ. 5826 (CBA) (LB), 2022 WL 17977495, at *11 (E.D.N.Y. Dec. 28, 2022); *Experience Hendrix, L.L.C.*, 2020 WL 3564485, at *11, *16; *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 434 (S.D.N.Y. 2013).

Defendants' arguments in opposition largely whitewash or minimize its abusive litigation conduct, in contravention of the formidable record reviewed above. Kartri makes two broader points, but neither carries the day.[7]

---

[7] Marquis likewise, in an anemic four pages, minimizes its litigation misconduct. Marquis Mem. at 1–4. Although this lapse has not formed a basis for the Court's finding that a fee award is warranted, the Court rejects Marquis's claim that it had the Court's permission to file publicly an unredacted version of documents, in violation of the governing protective order. *Id.* at 4. That argument fails for the reasons in plaintiffs' Reply, including that plaintiffs had already provided the initially requested redacted version; that Marquis was aware of the same; and that Marquis failed to consult with plaintiffs before submitting the unredacted version. Marquis violated the protective order on numerous other occasions. *See* Focus Mem. at 9–10.

Kartri notes that it is a family-owned business, owned by its founders' daughters, with fewer resources than Focus. Kartri Mem. at 1. To the extent Kartri seeks thereby to excuse its willful infringement, that argument fails. Whatever the initial sophistication level of its owners, Kartri was explicitly put on written notice of Focus's patent rights, chose to disregard Focus's letter, declined to investigate Focus's claims, spurned an offer of legal assistance on this point, and persisted in blatantly infringing sales, all while designing its trade dress in a manner the Court found to reflect deliberate copying so as to capitalize on competitor Focus's goodwill. *See* Trial Decision at 77–78, 91–92. And the claimed naivete of Kartri's owners does not, at all, excuse its—and its counsels'—persistently disobedient and unreasonable litigation tactics.

Kartri also notes that in defending this case, it took "multiple sound positions" and that some of these were rejected not on their merits, but as untimely. Kartri is correct that some of its unsuccessful litigation positions were nonfrivolous. But to the extent that Kartri suggests that a party who has engaged in wide and protracted unreasonable litigation conduct cannot be found liable for fees where it can cite examples of defensible conduct, that is wrong. No case applying *Octane* has so held. Where a fee application is based on a party's unreasonable litigation conduct, the issue is whether that conduct, *in toto*, rendered the case "exceptional," not whether this misconduct was uninterrupted. *See, e.g.*, *Octane*, 572 U.S. at 554 ("District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the *totality* of the circumstances." (emphasis added)); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) (noting that "many forms of misconduct can support a district court's exceptional case finding, including . . . litigation misconduct, vexatious, unjustified, and otherwise bad faith litigation; [or] a frivolous suit"); *Am.*

*Exch. Time*, 2022 WL 17414348, at *5 (totality of defendants misconduct "evinces exactly the kind of 'unreasonable' litigation that justifies an award of attorneys' fees").

The Court accordingly finds this case "exceptional" under *Octane*, warranting an award of reasonable attorneys' fees to prevailing party Focus.

### 2.   The Amount of the Reasonable Fee Award

Once a court determines that a party has prevailed, it must calculate what constitutes a reasonable attorneys' fee. *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). A presumptively reasonable fee is calculated by using the "lodestar" method, under which the Court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183, 189–90 (2d Cir. 2008); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).

"In determining the amount of the reasonable fee award, the district court is to broadly consider case-specific variables, mindful of the idiosyncratic quality and path many litigations take." *HomeAway.com, Inc. v. City of New York*, 523 F. Supp. 3d 573, 588 (S.D.N.Y. 2021). The Second Circuit has clarified the relationship between the lodestar method and a widely used multifactor test (the "*Johnson* test") that some courts had treated as an alternative mode of calculation. *See Arbor Hill*, 522 F.3d at 188–91 (recapping history of award-calculation methodology). The Circuit concluded:

> We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district

court should consider, among others, the *Johnson* factors[8]; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

*Id.* at 190 (emphasis in original); *see Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983) ("The district court also may consider other factors identified in [*Johnson*], though it should note that many of these factors usually *are subsumed* within the initial calculation of hours reasonably expended at a *reasonable* hourly rate." (emphasis added) (internal citation omitted)); *see also Lilly v. City of New York*, 934 F.3d 222, 228–30 (2d Cir. 2019). "A district court has considerable discretion in determining what constitutes a reasonable fee award." *Ahmed v. City of New York*, No. 17 Civ. 3044 (SHS), 2020 WL 6487521, at *3 (S.D.N.Y. Nov. 4, 2020) (internal quotation marks omitted); *see also Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 307 (2d Cir. 2011).

The Court here first calculates the lodestar. Focus seeks $1,549,544.91 in fees, incurred over the seven-plus year duration of this litigation, based predominantly on the work of three

---

[8] The *Johnson* factors were developed by the Fifth Circuit, which directed lower courts to consider 12 factors in setting a reasonable fee. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). These are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

attorneys (Morris E. Cohen, Lee A. Goldberg, and Limor Wigder) and one paralegal (Sherika Sterling).[9] These fees have been paid by Focus.

Defendants do not dispute the propriety of the billing rates Focus claims for these professionals. These, for Cohen and Goldberg, began at $600/hour and increased in 2021 to $675/hour; for Wigder, began at $425/hour and increased in 2021 to $475/hour; and for Sterling, at all times was $225/hour. The Court agrees that these rates are reasonable. Patent and trademark matters are often complex; in cases calling upon sophistication and expertise, litigators in these disciplines command rates that often exceed those of general commercial litigators. Even putting aside the work occasioned by the defense's obfuscatory submissions and improper tactics, this litigation was undeniably complicated. As the overall record and the Court's bench trial decision reflect, the litigation implicated three patents, two trademarks, trade dress, and unfair competition, and a host of complex issues. Courts in sophisticated intellectual property matters have often approved rates for experienced litigators matching or exceeding those here.[10]

---

[9] Focus also seeks a modest amount of reimbursement of certain fees for the work of a pre-law intern, John Stadler, who assisted with trial preparation and trial in June and July 2022. *See* Focus Mem. at 16–17. The rate at which Stadler's time ($150/hour) was billed, and the work and hours reflected in his time entries, are, the Court finds, reasonable. *See, e.g., Asare v. Change Grp. of N.Y., Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) (rate of $150/hour for staff time reasonable).

[10] *See, e.g., Stuckey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 15 Civ. 6639 (CM), 2015 WL 5547441, at *12 (S.D.N.Y. Sept. 17, 2015) (rates of $625 to $725 per hour for partners and $285 to $475 per hour for associates reasonable); *Sub-Zero, Inc.*, 2014 WL 1303434, at *8–9 (finding partner's rate of $485/hour, senior partner's rate of $785/hour, and paralegal's rate of $200/hour reasonable); *Asare*, 2013 WL 6144764, at *19 (rates of $750 per hour for partner time; $500 per hour for senior associate time; $300 per hour for associate time; and $150 per hour for paralegal time reasonable); *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 Civ. 7493 (VB), 2013 WL 4080946, at *17 (S.D.N.Y. May 30, 2013) (hourly rates ranging from $795 for partners

The legal personnel representing Focus have experience and credentials consistent with these rates. Cohen has more than 27 years' experience as an intellectual property litigator and is an adjunct professor of patent and advanced patent law; Goldberg has 32 years' litigation and extensive trial experience; Wigder has 10 1/2 years' experience; and Sterling has 18 years' experience. Cohen Declaration ¶¶ 8–15. Cohen, Goldberg, and Wigder are also registered patent attorneys. *See id.* Courts in this District have approved the rates charged here though 2020 by Messrs. Cohen and Goldberg, *see Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod., Inc.*, No. 19 Civ. 3766 (GHW), 2021 WL 2333242, at *4 (S.D.N.Y. June 8, 2021); *Best Brands Consumer Prod., Inc. v. Versace 19.69 Abbigliamento Sportivo S.R.L.*, No. 17 Civ. 04593 (VSB) (SDA), 2020 WL 8678085, at *9 n.21 (S.D.N.Y. Oct. 1, 2020); there are no reported cases involving contrary findings as to them.[11] And this Court's assessment of Focus's counsel's work during this extended litigation confirms that the claimed rates are reasonable. Counsel were learned, vigorous, effective, punctilious, and consistently highly professional.

As to the hours component of the lodestar assessment, a party seeking court-ordered compensation for its attorneys' work must document the application with contemporaneous time records. *N.Y. State Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136,1147–48 (2d Cir. 1983). Focus has done so here, submitting the detailed and expansive time records that its counsel

---

and $675/hour or $325/hour for an associate, with bulk of work handled by partner who charged $525/hour, reasonable).

[11] Although another court in this district reduced the fee for Wigder—noting that the case at issue was only her second copyright case—the Court finds her rate reasonable here. *See Beverly Hills Teddy Bear Co.*, 2021 WL 2333242, at *4. Over her 10 1/2 years' experience, Wigder has assisted with numerous patent and trademark cases. Cohen Decl. ¶ 11.

submitted to it, on the basis of which Focus paid counsel's invoices. *See* Cohen Decl., Exs. 1–2 (invoices containing time records); *id.*, Ex. 3 (summary spreadsheet).

To the very limited extent that defendants challenge the adequacy of the billing records, these challenges fail. With few exceptions, defendants—in assailing these records—do not point to specific line entries as problematic. And, based on the Court's review, such a challenge could not viably be made. Running 160 pages, plaintiffs' time records specify, for each timekeeper, the date, hours expended, and the nature of the work done, as the case law requires of a fee application to a court. *See Carey*, 711 F.2d at 1148. Far from being vague or using improper block-billing, plaintiffs' counsels' time records are commendably detailed—among the most thorough this Court has seen in reviewing fee applications. These time records are notable, too, in that they reflect lean—not excessive—staffing. Such discipline was on display at the bench trial, at which plaintiffs brought two attorneys, far from the size of the trial teams that the Court commonly observes in connection with bench trials in comparably complex commercial cases. Defendants' critiques that Focus seeks reimbursement for invoices from other cases or that billed for expense items only, or that Focus seeks to bill defendants for the entirety of fees for which Focus was eligible for a prompt payment discount, *see* Kartri Mem. at 13, 17–18, are errant, for the reasons Focus explains in its reply, *see* Focus Rep. at 15–17.

Defendants do rightly fault two discrete timekeeper line entries that include descriptions of work for Focus unconnected to this litigation. *See* Kartri Mem. at 13–14 (citing time entries billing $4,989, and $360, respectively). But, as Focus fairly rejoins, reasonably reducing the fees attributable to extraneous work covered by these two-time entries to eliminate work on extraneous matters would only marginally reduce Focus's overall fee request. Focus proposes an overall reduction of $680. *See* Focus Rep. at 16 (proposing reductions for these entries of $500,

Appx396

and $180, respectively).  In the interest of assuring that defendants are not made to pay for work
unrelated to this matter, the Court will reduce the lodestar by a larger sum—$1,000—on account
of these errant entries.

More broadly, based on its close review of counsels' time records and its familiarity with
this litigation, the Court's assessment is that the hours worked by its timekeepers—1,300.7 by
Cohen, 859.5 by Goldberg, 175.3 by Wigder, and 297.6 by Sterling—were otherwise reasonable
and proportionate to the demands of this case.  Dkt. 533.  As the overall record, including the
Court's trial decision, reflects, this 7 1/2-year litigation was one of the most complex intellectual
property cases the Court has supervised.  It was factually ornate, implicated wide legal issues,
and was hard-fought from the start.  To master the many challenges and overwhelmingly prevail,
counsel reasonably logged the hours reflected.

Defendants make one substantial point warranting a meaningful reduction in plaintiffs'
fee request.  As they note, Focus, although overwhelmingly the victor, did not prevail on literally
every point.  In particular, defendants note, the parties agreed mid-litigation to stay plaintiffs'
claim of infringement of one of Focus's patents—its design patent—in deference to the ongoing
reexamination proceedings as to that patent, initiated by Kartri, by the United States Patent and
Trademark Office ("USPTO").  Kartri Mem. at 14–15; see Trial Decision at 14, 55.  Defendants
note that the USPTO has since sided with Kartri in rejecting that patent.  Kartri Mem. at 14.
Defendants argue that dozens of time entries refer to the design patent and/or to Focus's expert
witness Ronald Kemnitzer, whose sole role was to defend the design patent.  See Dkts. 524-1 ¶ 4,
524-4.  They ask that any fee award not include counsel's work on this claim.  Kartri Mem. at
14. Focus rejoins that its infringement claim with respect to the design patent was intertwined
with its claims of infringement of its other patents and trade dress, and that its infringement

23

Appx397

claims overwhelmingly derived from common facts—namely, the visual similarities between the EZ-ON design patent and trademark—such that its counsels' workstreams bearing on the design patent were largely necessary for other claims. Focus Rep. at 17–18; *id.*, Ex. 5. It notes case law declining to reduce fee awards where a plaintiff pursued alternative and related legal grounds to the same end, as opposed to grounds distinct from those on which the plaintiff prevailed. *See id.* at 17–18 (citing *LeBlanc-Sternberg*, 143 F.3d at 762 (citing, *inter alia, Hensley*, 461 U.S. at 433–37)).

The Court's assessment, with defendants, is that a reduction in Focus's fee award is warranted to capture the work on the design patent infringement claim that would not have been undertaken had that claim not been brought. *See, e.g., Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 58 (S.D.N.Y. 2015) (reducing fees by 20% to reflect work that, but for Lanham Act claim that did not support a fee award, would not have been done); *Robinson v. City of New York*, No. 05 Civ. 9545 (GEL), 2009 WL 3109846, at *9–10 (S.D.N.Y. Sept. 29, 2009) (reducing fee award by 25% where plaintiffs achieved limited success in relation to relief originally sought). Even if targeting the same offensive product, plaintiffs' design patent claim sought to protect distinct underlying rights, through distinct legal theories, from its other claims. Neither its merits nor counsels' workstreams were inherently intertwined in whole—and they were separated where, as here, the design patent claim was stayed prior to summary judgment briefing and the bench trial. *See, e.g.*, Dkt. 323 at 6; Dkt. 241 at 28 (3/5/2019 conference transcript; Court excludes design patent claim from summary judgment briefing); *see Green v. Torres*, 361 F.3d 96, 99 (2d Cir. 2004) ("Although full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case.").

24

Appx398

Beyond broadly stating that its legal work generally applied to multiple claims, Focus has

not granularly analyzed its time entries to isolate—if even possible today—the work specific to

its design patent claim. *See Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 133–

34 (E.D.N.Y. 1998) (reducing fee by 50% where, *inter alia*, court could not discern which

attorney hours were devoted to unsuccessful claims). The Court need not "become enmeshed in

a meticulous analysis of every detailed facet of the professional representation" to determine the

proper award. *Vogelmann v. Comm'r of Soc. Sec.*, No. 15 Civ. 8717 (PGG) (KNF), 2021 WL

6127077, at *2 (S.D.N.Y. Dec. 28, 2021) (internal quotation mark omitted) (quoting *Seigal v.

Merrick*, 619 F.2d 160, 164 n.8 (2d Cir. 1980)). Nor should "[a] request for attorney's fees . . .

result in a second major litigation." *Hensley*, 461 U.S. at 437. Accordingly, in light of this

case's procedural history, facts, and the degree of plaintiffs' overall success, the Court has

estimated the appropriate reduction in the fee award for this circumstance generously in

defendants' favor. The Court will reduce the lodestar by 10%. This modest reduction, in the

Court's assessment, still reflects the absolute maximum share of plaintiffs' counsels' work that

could conceivably be uniquely attributable to the challenge to the design patent.[12] And, given

the scale of the award plaintiffs will receive even after this reduction, their fee award reflects

their overall success in this litigation. *See LeBlanc*, 143 F.3d at 760 ("The most important factor

in determining a reasonable fee for a prevailing plaintiff is the degree of success obtained."

(internal quotation marks omitted)).

---

[12] Focus has not sought reimbursement for Kemnitzer's work throughout the litigation, but rather
for the attorneys' work in reviewing Kemnitzer's expert report and preparing him for trial. Had
Focus sought such costs, they would have been struck. *See, e.g.*, *Valvo v. City of New York*, No.
13 Civ. 6562 (NG) (SMG), 2018 WL 3999011, at *6 (E.D.N.Y. Jan. 23, 2018) (plaintiff could
not recover costs paid to expert economist for testimony that was relevant only to failed claim).

The Court, finally, has considered whether further reduction is warranted to assure that the fee award—while achieving the statutory goals of deterrence and compensation, but not excessively—accounts for the treble damages that the Court has imposed with respect to a significant portion of plaintiffs' successful claims under the Patent and Lanham Acts. As reflected in the trial decision, the Court has found treble damages warranted for defendants' infringement during the period after February 27, 2015. This adds $1,813,363 to the lost profits damages award, *see* Trial Decision at 160, and $100,742 to the complementary reasonable royalties award, *see id.* at 161. The trebling accounts for $1,914,105 of the overall award of $2,938,337.

Although defendants have curiously not pressed this argument, the Court's judgment is that the reasonable fee award is properly reduced in light of the large treble damages award that plaintiffs stand to receive. That is because the presence of the treble damages award bears on the extent to which a fee award is necessary to achieve the deterrent and compensation goals of the Patent Act and Lanham Act fee provisions. *See Octane*, 572 U.S. at 554 n.6.

As to deterrence, insofar as the Court has anchored its finding of an "exceptional case" here in part on the willfulness of defendants' infringements, defendants' willful conduct was also a basis of the Court's decision to treble damages. The large treble damages award itself can be expected to deter primary conduct by defendants or others who would willfully infringe patents or trademarks. *See, e.g., id.* (discussing deterrence purposes of enhanced damages under § 285); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 263 (2d Cir. 2014) (enhanced damages may be awarded under Lanham Act where "deterrence of willful infringement is needed"); *Streamlight, Inc. v. Gindi*, No. 18 Civ. 987 (NG), 2019 WL 6733022, at *14 (E.D.N.Y. Oct. 1, 2019) (same), *report and recommendation adopted*, 2019 WL 6726152 (E.D.N.Y. Dec. 11, 2019); *All-Star*

26

Appx400

*Mktg. Grp., LLC v. Media Brands Co.*, 775 F. Supp. 2d 613, 622–23 (S.D.N.Y. 2011) (collecting cases); *Polo Ralph Lauren, L.P. v. 3M Trading Co.*, No. 97 Civ. 4824 (JSM) (MH), 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999) ("[A] fairly substantial financial award is appropriate, if for no other reason, to ensure adequate deterrence against the continuation of this conduct by these defendants."). Although a fee award separately is warranted to deter unreasonable litigation conduct such as that here, the Court is unpersuaded that an award of plaintiffs' entire legal fee is necessary to achieve that purpose. *See 4 Pillar Dynasty LLC*, 933 F.3d at 215 (district courts should consider, *inter alia*, need for deterrence in determining fee award); *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *6 (awarding fees, *inter alia*, to deter similarly willful conduct by defendants and other possible infringers); *Streamlight, Inc.*, 2019 WL 6733022, at *17 (same); *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329, 336 (S.D.N.Y. 2014) (same, under Patent Act), *aff'd*, 811 F.3d 479 (Fed. Cir. 2016).

As to compensation, plaintiffs, if fully paid on the judgment including the treble damages, stand to receive an award that will more than compensate them for the combined total of compensatory damages and their legal fees, even before payment of a fee award. As such, the fee award need not be as high as would be warranted absent a treble damages award. *See Experience Hendrix, L.L.C.*, 2020 WL 3564485, at 17 (court should exclude hours from fee award if excessive, redundant, or otherwise unnecessary); *cf., e.g., Gurung v. Malhotra*, 851 F. Supp. 2d 583, 598 (S.D.N.Y. 2012) (reducing attorneys' fees by 25% where excessive); *Days Inn Worldwide, Inc. v. Amar Hotels, Inc.*, No. 05 Civ.10100 (KMW) (KNF), 2008 WL 2485407, at *10 (S.D.N.Y. June 18, 2008) (reducing fees by 75% where substantial amount of work redundant or unnecessary); *see also Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109 (2d Cir. 1988) (under Lanham Act, enhancement or reduction of damages award

Appx401

permitted to correct inadequacy of excessiveness); *Merck Eprova AG*, 920 F. Supp. 2d at 428

(granting enhanced damages because proven damages would not fully compensate plaintiff, but

not as high as the number requested because requested award would be excessive); *In re Agent*

*Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987) (across-the-board percentage cuts in

hours are practical means of "trimming fat from a fee application").

After considered judgment, the Court's determination is that a further 30% reduction in

the fee award best synchronizes the amount of the award to these purposes. The award as results

thus will represent 60% of the requested award (less the $1,000 reduction made earlier). The fee

award is thus $929,126.95—60% of $1,549,544.91, less $1,000. This sum is necessary, and

sufficient, to achieve the goals of a fee award under § 285 of the Patent Act and § 1117(a) of the

Lanham Act. *See Benihana of Tokyo, LLC*, 2018 WL 3574864, at *16 (awarding attorneys' fees

in Lanham Act case, and determining size of fee award to be "merited," where plaintiffs—based

on testimony of their then-attorney—"brought and pursued this case in bad faith with the

admitted ulterior goal of driving up [defendant's] legal expenditures" (emphasis added)); *cf.*

*Pirri v. Cheek*, No. 19 Civ. 180 (PAE), 2020 WL 2520593, at *12 (S.D.N.Y. May 18, 2020) (fee

award under § 285 "serve[d] important purpose of deterring the bringing of lawsuits without

foundation" (internal quotation marks omitted)), *aff'd*, 851 F. App'x 183 (Fed. Cir. 2021);

*Beastie Boys*, 112 F. Supp. 3d at 59 (awarding fees in copyright infringement action as

"sufficient, but not greater than necessary, to deter future would-be infringers"); *see also Lunday*

*v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth

item-by-item findings concerning what may be countless objections to individual billing

items.").

3.    **Amount of the Reasonable Cost Award**

28

An award of costs normally includes those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged to fee-paying clients. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987). Recoverable disbursements include such items as legal research, photocopying, postage, transportation, and filing fees. *See, e.g., Best Brands Consumer Prod., Inc.*, 2020 WL 8678085, at *11 (awarding filing fees, postage, local transportation costs, and FedEx costs); *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *8 (awarding costs for service, delivery other than for service, and research); *Malletier*, 687 F. Supp. 2d at 365 (awarding costs for photocopies, filing fees, court reporter fees, Westlaw research, postage, faxes, and transportation).

Routine costs are normally awarded to the prevailing party. The Court awards such here. *See, e.g., River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13 Civ. 3669 (DLC), 2015 WL 3916271, at *15 (S.D.N.Y. June 25, 2015); *Lumen View Tech., LLC*, 24 F. Supp. 3d at 337 (awarding costs under § 285); *Sub-Zero, Inc.*, 2014 WL 1303434, at *10 (awarding costs under Lanham Act); *Malletier*, 687 F. Supp. 2d at 365 (same); *Union of Orthodox Jewish Congregations of Am. v. Royal Food Distribs. Liab. Co.*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) (same).

To the extent that defendants intend to challenge Focus's costs on a line-item basis, *see, e.g.*, Kartri Mem. at 19, the Clerk of the Court, and not this Court, must resolve those disputes in the first instance. Local Rule 54.1 provides:

> Within thirty (30) days after the entry of final judgment, or, in the case of an appeal by any party, within thirty (30) days after the final disposition of the appeal, unless this period is extended by the Court for good cause shown, any party seeking to recover costs shall file with the Clerk a notice of taxation of costs by Electronic Case Filing. . . . A party objecting to any cost item shall serve objections by Electronic Case Filing. . . . The Clerk will proceed to tax costs at the time scheduled and allow such items as are properly taxable.

Appx403

Accordingly, Focus is directed to present a bill of costs to the Clerk within 30 days of the final disposition of defendants' appeal or, if no appeal is taken, within 30 days of the entry of final judgment by this Court. After the Clerk awards costs, the parties will have seven days to appeal that award to this Court. Fed. R. Civ. P. 54(1)(d). For the time being, the Court does not reach the merits of defendants' objections to the tabulation of costs presented by Focus. *See, e.g., River Light V, L.P.*, 2015 WL 3916271, at *15; *Beastie Boys*, 112 F. Supp. 3d at 60–61.

### 4.    Prejudgment Interest

Focus also moves for prejudgment interest, to be applied at the average yearly prime rates for the infringement period and compounded annually. Focus Mem. at 22–24. Neither Kartri, Kartri Mem. at 19, nor Marquis, Marquis Mem. at 5, disputes the award of prejudgment interest; Kartri solely argues, and anemically, that Focus has offered insufficient documentation to award a specific interest rate at this stage.

The Supreme Court has long recognized that "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). And the Second Circuit has affirmed the award of prejudgment interest in Lanham Act cases where, as here, the factual record readily supported findings of willfulness and bad faith. *See, e.g., Merck Eprova AG*, 760 F.3d at 263–64 ("Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases."). The Court, accordingly, awards prejudgment interest here on plaintiffs' actual damages—that is, the damages before trebling—during the infringing period. *See Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020) (typically, "prejudgment interest should be awarded from the date of the infringement to the date of the judgment" (alterations

30

Appx404

omitted)); *Beatrice Foods Co. v. New Eng. Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991) (under § 284, prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced damage portion of a damage award); *Acticon Techs. v. Heisei Elecs. Co.*, No. 06 Civ. 4316 (KMK), 2008 WL 356872, at *4 (S.D.N.Y. Feb. 5, 2008) (same).

However, the Court declines to award prejudgment interest at the prime rate Focus requests. It instead bases the interest rate on the yield of a one-year U.S. Treasury bill, compounded annually. Where a court awards prejudgment interest, "it is within the trial court's discretion to choose what rate to apply." *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, No. 14 Civ. 6911 (VEC) (JLC), 2016 WL 658310, at *11 (S.D.N.Y. Feb. 17, 2016) (citation omitted), *report and recommendation adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016). In reaching this determination, the Court is guided by the principal purposes of prejudgment interest, in both patent and trademark infringement contexts, of "mak[ing] the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived." *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 634 (E.D.N.Y. 2020); *see also 4 Pillar Dynasty LLC*, 933 F.3d at 216 n.12 (courts exercising discretion as to prejudgment interest may consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court"). Particularly when considered alongside the trebled damages already imposed, the Treasury bill rate adequately compensates Focus. *See, e.g., Samsonite IP Holdings S.ar.l. v. Shenzhen Liangyiyou E-Com. Co.*, No. 19 Civ. 02564 (PGG) (DF), 2021 WL 9036273, at *18 (S.D.N.Y. Apr. 27, 2021) (awarding prejudgment

31

interest at the Treasury yield, the lower of the two rates at issue, where plaintiffs had not demonstrated justification for the higher); *Metso Mins., Inc. v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 344 (E.D.N.Y. 2011) (same); *cf. Abbott Lab'ys*, 2022 WL 17977495, at *12 (awarding lower of proposed prejudgment interest rates where damages had already been doubled under Lanham Act).

Notably, Focus has not offered evidence that it borrowed money during the infringement period, such that the higher prime rate—which is approximately double the U.S. Treasury rate during the applicable years, *see* Focus Mem. at 23 nn.45–46—might be appropriate. *See, e.g.*, *Enzo Biochem, Inc. v. Applera Corp.*, No. 04 Civ. 929 (JBA), 2014 WL 29126, at *4 (D. Conn. Jan. 3, 2014) (declining to adopt prime interest rate where plaintiff had not provided evidence that use of the higher prime rate was necessary to compensate it adequately); *Tomita Tech. USA, LLC v. Nintendo Co., Ltd.*, No. 11 Civ 4256 (JSR), 2013 WL 4101251, at *10 (S.D.N.Y. Aug. 14, 2013) ("Because Tomita fails to suggest that it borrowed money during the infringement period and therefore should be compensated at the higher prime rate, the Court hereby awards prejudgment interest at the Treasury Bill rate."); *see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996) ("Prejudgment interest has no punitive, but only compensatory, purposes. Interest compensates the patent owner for the use of its money between the date of injury and the date of judgment.").

### 5.   Post-Judgment Interest

Focus also requests an award of post-judgment interest under 28 U.S.C. § 1961(a). Focus Mem. at 24. Section 1961 provides for interest on "any money judgment in a civil case recovered in a district court" to be calculated "from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week

Appx406

preceding the date of the judgment," "computed daily to the date of payment," and "compounded annually." 28 U.S.C. §§ 1961(a)–(b).

Accordingly, the Court awards post-judgment interest at the statutory rate. *See, e.g.*, *Venus by Maria Tash, Inc.*, 2022 WL 4085747, at *9 (awarding post-judgment interest in Lanham Act action); *WowWee Grp. Ltd. v. Haoqin*, No. 17 Civ. 9893 (WHP), 2019 WL 1316106, at *4 (S.D.N.Y. Mar. 22, 2019) (same); *Bumble & Bumble, LLC*, 2016 WL 658310, at *12 (same); *Rentrop v. Spectranetics Corp.*, 514 F. Supp. 2d 497, 507 (S.D.N.Y. 2007) (same, as to Patent Act), *aff'd*, 550 F.3d 1112 (Fed. Cir. 2008).

## CONCLUSION

For the foregoing reasons, the Court grants $929,126.95 in attorneys' fees, as well as costs and pre- and post-judgment interest. The Court orders plaintiffs to file, upon issuance of a final judgment, a letter calculating the pre- and post-judgment interest as outlined above. Plaintiffs are also ordered to file a bill of costs, as directed by Local Rule 54.1, with the Clerk of the Court.

The Clerk of the Court is respectfully directed to terminate the motion pending at docket 505. The Court also directs the Clerk of Court to enter judgment in the amounts of $2,938,337 in damages and $929,126.95 in attorneys' fees, as well as costs and pre- and post-judgment interest.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 5, 2023
      New York, New York

33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC,
ZAHNER DESIGN GROUP LTD., HOOKLESS SYSTEMS
OF NORTH AMERICA, INC., SURE FIT HOME
PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS
CORP., *and* SF HOME D DÉCOR, LLC,

                             Plaintiffs,

          -v-

KARTRI SALES COMPANY, INC., *and* MARQUIS MILLS
INTERNATIONAL, INC.,

                             Defendants.

15 Civ. 10154 (PAE) (SDA)

ORDER

---

PAUL A. ENGELMAYER, District Judge

      Clarifying its June 5, 2023 opinion, Dkt. 539 at 33, the Court directs plaintiffs to

electronically file a proposed judgment, which shall include pre- and post-judgment interest in

accordance with that opinion.  Plaintiffs shall file a bill of costs with the Clerk of Court as

directed by Local Rule 54.1.

      SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge

Dated: June 8, 2023
      New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP, LTD., AND HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SF HOME DÉCOR, LLC, SURE FIT HOME DÉCOR HOLDINGS CORP., and SURE FIT HOME PRODUCTS, LLC,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>KARTRI SALES COMPANY, INC. AND MARQUIS MILLS, INTERNATIONAL, INC.,<br><br>　　　　　　Defendants. | Civil Action No.:<br><br>1:15-cv-10154 (PAE)(SDA) |

**FINAL JUDGMENT**

WHEREAS plaintiffs filed a Fourth Amended Complaint in this matter, including:

Count I for patent infringement; Count II for trademark infringement under Section 43(a) of the

Lanham Act, 15 U.S.C. §1125(a); and Count III under the New York Common Law of Unfair

Competition (Dkt. 148);

WHEREAS defendant Kartri Sales Company, Inc. ("Kartri") filed affirmative defenses

and Counterclaims thereto (Dkt. 150);

WHEREAS defendant Marquis Mills International, Inc. ("Marquis") filed affirmative

defenses and Counterclaims thereto (Dkt. 151);

WHEREAS, this Court issued an Order dated April 16, 2020 (Dkt. 297) on the parties'

respective motions for summary judgment on their claims, counterclaims, and defenses; an Order

dated May 3, 2020 (Dkt. 302) on defendants' Motion for Reconsideration, and an Order dated

January 4, 2021 (Dkt. 312) on plaintiffs' Motion for Reconsideration;

1

WHEREAS, the Court issued various pre-trial rulings thereafter addressing the claims, counterclaims, and defenses that the parties proposed to assert at trial;

WHEREAS, the Court issued an Opinion and Order dated December 22, 2022 (Dkt. 501) setting out the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 on the parties' remaining claims and defenses, following a six-day bench trial;

WHEREAS, the Court issued an Order dated June 5, 2023 (Dkt. 538) dismissing plaintiff's claim for infringement of U.S. Design Patent No. D746,078 patent, and dismissing Marquis' counterclaim for the invalidity of that patent, both without prejudice;

WHEREAS, the Court issued an Opinion and Order dated June 5, 2023 (Dkt. 539) granting plaintiffs' motion for an award of reasonable attorneys' fees under the fee provisions of the Patent Act, 35 U.S.C. §285, and the Lanham Act, 15 U.S.C. 1117(a), and awarding pre-judgment interest based on the interest rate on the yield of a one-year U.S. Treasury bill, post-judgment interest, and costs; and,

WHEREAS, no further claims, counterclaims, or defenses remain to be adjudicated;

NOW THEREFORE, pursuant to Fed. R. Civ. P. 54 and 58, and upon all of the rulings and proceedings in this matter, this Court hereby enters Final Judgment in accordance with its prior Opinions, Orders, and rulings, and awards plaintiffs judgment against the defendants in the amount of $2,938,337 in damages (Dkt. 539 at 33), $929,126.95 in attorneys' fees (*id.*), and pre-judgment interest in the amount of $109,086.67, for a total of $3,976,550.62, plus costs.

In accordance with the Court's Order dated June 8, 2023 (Dkt. 540), plaintiffs shall file a bill of costs with the Clerk of Court as directed by Local Rule 54.1.

Post-judgment interest is also awarded from the date of this final judgment at the statutory rate under 28 U.S.C. §1961, i.e. "a rate equal to the weekly average 1-year constant

maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding," which is 5.18% for the preceding week.

A permanent injunction under the Lanham Act and New York law is also awarded as set forth in the Court's Opinion and Order of December 22, 2022 (Dkt. 501 at 167-168).

SO ORDERED.

_____
Hon. Paul A. Engelmayer
United States District Judge
June 14, 2023

3

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2023, a true and correct copy of the foregoing was served on counsel of record via the Court's ECF system.

Dated: June 14,  2023                    */s/ Morris E. Cohen*

                                         ―――――――――――――――――

                                         Morris E. Cohen



US006494248B1

(12) **United States Patent**

Zahner

(10) Patent No.: **US 6,494,248 B1**

(45) Date of Patent: **Dec. 17, 2002**

(54) **SUSPENDED MATERIALS HAVING EXTERNAL SLITS**

(75) Inventor: **David Zahner**, New York, NY (US)

(73) Assignee: **Zahner Design Group, Ltd.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/617,402**

(22) Filed: **Jul. 17, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/143,853, filed on Jul. 15, 1999, provisional application No. 60/150,876, filed on Aug. 26, 1999, provisional application No. 60/171,081, filed on Dec. 15, 1999, and provisional application No. 60/203,873, filed on May 12, 2000.

(51) Int. Cl.[7] .................................... **A47H 1/00**
(52) U.S. Cl. .......................... **160/330**; 160/390
(58) Field of Search ............................ 160/330, 348, 160/383, 384, 385, 390, 327, 368.1; 16/87 R, 87.2; 24/716

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 635,295 A | * 10/1899 | Brown | 16/87.2 |
| 759,045 A | * 5/1904 | Tracy | 16/87.2 |
| 996,886 A | * 7/1911 | Schneider | 16/87.2 |
| 1,564,301 A | * 12/1925 | Wilson | 16/87.2 |
| 2,011,815 A | 8/1935 | Johnson | |
| 2,551,384 A | * 5/1951 | Middleton et al. | 16/87.2 |
| 2,666,481 A | * 1/1954 | White | 160/348 X |
| 2,711,555 A | * 6/1955 | Hanson | 16/87.2 |
| 2,828,900 A | * 4/1958 | Le Roy | 16/87.2 |
| 2,831,538 A | 4/1958 | Lishman | |
| 2,897,535 A | * 8/1959 | Radler | 16/87.2 |
| 3,115,181 A | 12/1963 | Snyder | |
| 3,772,734 A | 11/1973 | Kimel | |
| 4,031,943 A | * 6/1977 | Silvestre | 160/330 |
| 5,101,877 A | 4/1992 | Subecz et al. | |
| 5,111,868 A | * 5/1992 | Sawaya | 160/330 |
| 5,186,232 A | * 2/1993 | Zahner | 160/330 |
| 5,367,742 A | 11/1994 | Bindman | |
| 5,421,059 A | 6/1995 | Leffers, Jr. | |
| 5,806,141 A | 9/1998 | Kolisch | |
| 6,189,597 B1 | * 2/2001 | Cheng | 160/330 X |

* cited by examiner

*Primary Examiner*—David M. Purol

(74) *Attorney, Agent, or Firm*—Morris E. Cohen

(57) **ABSTRACT**

A hanging material such as a curtain is provided with openings each having a slit therein for attachment to a fixed rod. Each opening is reinforced with rings having projecting flanges extending beyond the ring away from the curtain. The projecting flanges of the rings makes it easier to open up the ring thereby facilitating the placement of the curtain upon the fixed rod.

**29 Claims, 7 Drawing Sheets**



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B

FIG. 4C





*FIG. 5*
(PRIOR ART)

*FIG. 6*

*FIG. 7*
(PRIOR ART)

*FIG. 8*

*FIG. 9*

*FIG. 10*

*FIG. 11*
(PRIOR ART)

FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



Case: 23-1446    Document: 48    Page: 495    Filed: 01/26/2024



FIG. 18



FIG. 19



FIG. 20

FIG. 21

Appx417

*FIG. 22*



*FIG. 23*



*FIG. 24*



*FIG. 25*



*FIG. 26*



*FIG. 27*



*FIG. 28*



*FIG. 29*

FIG. 30

344b  344a
350
340

FIG. 31A

375a  370
375b
160
380



FIG. 31B

406  404  402a  412
408
400  402b
401



FIG. 32

160



FIG. 33

390
388a  388b
160

US 6,494,248 B1

1

# SUSPENDED MATERIALS HAVING EXTERNAL SLITS

## RELATED APPLICATIONS

The present application claims all rights of priority to U.S. Provisional Application Serial No. 60/143,853 filed Jul. 15, 1999, U.S. Provisional Application Serial No. 60/150,876, filed Aug. 26, 1999, U.S. Provisional Application Serial No. 60/171,081 filed Dec. 15, 1999, U.S. Provisional Application Serial No. 60/203,873 filed May 12, 2000, and the U.S. Provisional Application entitled "Suspended Bath Products and Clothing and Accessory Receptacles" filed by the present inventor on Jul. 12, 2000 (serial number to be assigned). The contents of all of those prior applications are hereby fully incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to an accessory for attaching and detaching materials from a rod without requiring removal of the rod or adding additional hardware, such as hooks or the like, to the fabric.

## BACKGROUND OF THE INVENTION

U.S. Pat. No. 5,186,232, issued on Feb. 16, 1993 (which is fully incorporated herein by reference), discloses and claims an accessory product for easily mounting and detaching a material from a rod without removing the rod. The accessory product is intended for use with hanging or otherwise suspended materials, such as window treatments (window curtains, drapes, etc.), shower curtains, windscreens, towels, and so forth. Such suspended materials (referred to herein as "hanging materials" for brevity) are well known in the art, and are often mounted onto rods.

In one system of the prior art, separate devices, such as hooks or clips, are utilized to connect portions of the curtain to the rod. In an alternative system of the prior art, the curtain or drape is mounted by threading a rod through the reinforced holes in that curtain.

As an advance over the prior art products, the '232 patent discloses an accessory invention, as shown in FIG. 5, which allows a curtain or so forth to be attached to a mounting rod without the need for hanging support hooks, clips, and so forth, while also avoiding the need to remove the rod from its supports. The accessory is useful in a large variety of applications, including shower curtains and other household and commercial products. It involves a series of reinforced openings with slits provided between alternating paired sets of holes, thereby allowing the hanging material to be attached over the rod without the need for threading or hooks. Further advances and improvements to the inventions disclosed in the '232 patent are provided herein.

## BACKGROUND OF THE INVENTION

In accordance with the invention, a hanging material such as a curtain (e.g. a window curtain or a shower curtain) or other product is provided with a slit therein for attachment of the hanging material to a fixed rod without removing the rod. In a preferred embodiment, the material has a fastener therein, as well, the slit extending through the fastener. In a further preferred embodiment, the hanging material includes at least one external slit, i.e. a slit, at any angle, which intersects an edge of the hanging material. In a further preferred embodiment, the external slit is one (at any angle) which extends through the inside circumference or inner edge of a fastener at one end and the outer edge of the hanging material at the other end.

2

The invention can be used for window treatments, shower curtains, drapery, portieres, room dividers, blinds, accessory tapes, and windscreens, or other hanging items. The fastener, which can be made of a rigid, or semi-rigid material (i.e. a material with some flexibility), is preferably integrated into the hanging material and facilitates the attachment of the material to the rod without the need to remove the rod from its supports. The slit is of any shape or size desired. Further objects and features of the invention will be apparent in conjunction with the drawings and detailed disclosure provided herein.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a front view of an hanging product having at least one external slit therein, in accordance with one embodiment of the present invention.

FIG. 2 is a front view of a hanging product in accordance with a further embodiment of the present invention utilizing an open ring structure.

FIG. 3 is a front view of the product of FIG. 2, showing the product placed onto a rod.

FIGS. 4(a) and 4(b) are front view of further embodiments of the invention, in which the rings of the invention are elongated. FIG. 4(c) is a top view of the embodiment of FIG. 4(b).

FIG. 5 is a front view of a horizontally-slit accessory product, in accordance with the the invention of U.S. Pat. No. 5,186,232.

FIG. 6 is a front view of a hanging product with externally slit rings, in accordance with the present invention.

FIG. 7 is a top view of the embodiment of FIG. 5.

FIG. 8 is a top view of the embodiment of FIG. 6.

FIG. 9 is a perspective view of multiple layers of curtains for sitting on a single rod, at least one curtain having externally slit rings, in accordance with the present invention.

FIG. 10 is a top view of the embodiment of FIG. 9.

FIG. 11 is a front view of a horizontally-slit accessory product in accordance with the prior art.

FIGS. 12 and 13 are front views of open, externally slit, rings in accordance with further embodiments of the present invention.

FIG. 14 is a front view of a rigid or semi-rigid material having a external slit therein, in accordance with the invention.

FIG. 15 is a front view of a externally slit ring having a lower tab for attachment to a hanging sheet of material in accordance with a further embodiment of the present invention.

FIGS. 16 and 17 are front views of slit rings of the present invention in which the rings overlap and extend above the hem of the hanging material.

FIGS. 18, 19 and 20 are front views of further embodiments of the present invention, in which a projection, extension or finger is provided to the slit ring.

FIG. 21 is a front view of a further embodiment of the invention, in which a flat upper surface is provided to the ring to extend along and support the hanging product's hem, with an alternate location for the slit being shown in dotted outline.

FIG. 22 is a front view of a further embodiment of the invention, in which a locking pin is used to open and close the ring.

FIG. 23 is a rear view showing the embodiment of FIG. 22 rotated down 180 degrees.

US 6,494,248 B1

3

FIG. 24 is a side view of the embodiments of FIGS. 22 and 23, showing the ring in the closed position.

FIG. 25 is a side view of the embodiments of FIGS. 22–24, showing the ring in the open position.

FIG. 26 is a front cross-sectional view, of a further embodiment of the present invention.

FIG. 27 is a front view of a further embodiment of the present invention.

FIG. 28 is a front view of an accessory strip and hanging product in accordance with a further embodiment of the present invention.

FIG. 29 is a top view of a method for sequentially arranging the embodiments of the present invention.

FIGS. 30–33 are front views of further embodiments of the present invention.

## DETAILED DESCRIPTION OF THE INVENTIONS AND THE PREFERRED EMBODIMENTS

In accordance with the present invention, an apparatus is provided which allows a curtain or so forth to be attached to a mounting rod without the need for using additional support hooks, clips, or like, and while also avoiding the need to remove the rod from its supports.

In the present invention, as shown in FIG. 1, openings are provided each having a slit provided therein. In accordance with the invention, the slit can be of any shape or size desired, whether straight, curved, or so forth. Likewise it can be of any width desired, whether a uniform width, or a width which changes over the length of the slit, e.g. in an hourglass shape, as with slit **390** of FIG. **33**.

In the embodiment shown in FIG. 1, each opening is reinforced with a fastener such as a ring **10**. Ring **10** can be made of homo polypropylene, ABS, or other suitable materials. These materials are strong enough to support the various fabrics commonly used for curtains, drapes, and so forth. In addition, they also have excellent memory so that, after being flexed to fit over the rod, the ring automatically springs back to its original position.

As disclosed in the '232 patent, pairs of rings can be provided having a horizontal slit connecting each pair. In a further embodiment of the invention, the hanging product includes at least one external slit therein. By external slit, the present application refers to a slit which passes through the material of the hanging product (and through a ring as well if one is provided) to ultimately exit outside the suspended material **20**. Examples of external slits are horizontal external slit **12** and vertical external slit **17**. Various other examples of external slits are provided herein.

The external slit can be in any orientation and, when used in conjunction with a ring, can extend through any position on the ring, whether the "12 o'clock" position, or to 1 o'clock, 2 o'clock, 10 o'clock, 11 o'clock, or so forth. Rings with external slits can be provided to the hanging product in addition to the horizontally slit rings of the '232 patent, as shown, for example, in FIG. 1. Alternatively, the hanging product can be provided with externally slit rings only.

In the embodiment shown in FIG. 1, the ring **10** is located within the suspended material **20** and external slit **17** extends from the ring and through the suspended material **20**, exiting at the suspended material **20**'s edge. In other words, a space of suspended material **20** exists between the ring **10** and the outside of the suspended material **20**, and the external slit extends through that space. Ring **10**, as with the other rings or fasteners of the present invention can be

4

attached to the hanging product via any desired secure means. For example, the rings can be attached by staking, by sealing, by sewing, by welding, or by using any of the methods of U.S. Provisional Application Serial No. 60/150, 876, filed Aug. 26, 1999, whose contents are fully incorporated herein by reference.

In one embodiment of the invention, as shown in FIG. 1, a closed ring **10** is provided. The term closed ring refers to the fact that the external slit is normally "closed"—i.e. the two radial edges which form the slit **17** are pressed together. In this embodiment, the ring has some degree of flexibility, and must be flexed for the slit to open, i.e. for the edges of the slit to move some distance apart. Flexing the ring increases the width of the gap to insert the ring over the rod. The slit extends through the ring until the edge of the hanging product (whether that edge of the hanging product is beyond the edge of the ring or coincides with it as shown in various embodiments below).

In an alternate or additional embodiment of the invention, as shown in FIG. 2, an open ring **30** is provided in the material **32** for attachment of the hanging product to the rod or bar **34**. In accordance with this embodiment, ring **30** is an open ring which is provided with rounded edges **36**. A space is provided between the edges of the open ring, forming a mouth or gap **38** which acts as the external slit. Preferably, the gap is approximately 1/16" to 1/8" in diameter, although larger or smaller gaps can be used, depending on the application, rod size, and shape. Further preferably, the upper edge of ring **30** is tangent to the upper edge **39** of suspended material **32**.

In this embodiment, rounded edges **36** and mouth **38** form an external slit design which is easier for a person to attach to rod **34**. The embodiment of FIG. 2 is to be contrasted with the embodiment shown in FIG. 1. As shown in FIG. 1, a closed ring is provided having a radial slit therethrough. The ring is closed in that the slit **17** consists of a right radial edge and a left radial edge of the ring, those right and left radial edges being pressed against each other. In contrast, the embodiment of FIG. 2 provides an open ring structure in which a gap exists between the left radial edge **36***a* of the ring and the right radial edge **36***b* of the ring, radial edges **36***a* and **36***b* being the edges extending from the outer circumference or outer edge **26** to the inner circumference or inner edge **28** of the fastener or ring.

Furthermore, it is preferred that the radial edges of the open ring be rounded as shown in FIG. 2. Open mouth **38** and rounded edges **36** facilitate the attachment of the ring to the rod from below, and further facilitate the attachment of the ring with one hand. These features are of general advantage to all users, and are of particular advantage to those who may be shorter such as children and the handicapped, or who have trouble opening the ring due to problems such as arthritis.

FIG. 3 illustrates the embodiment of FIG. 2 as attached to rod **34**. In addition to providing ease of attachment, the embodiment of FIG. 2 also provides ease of detachment. Furthermore, as a safety function, if the suspended material is pulled strongly enough from the bottom, the ring and suspended material will easily detach from the rod before pulling the rod out of the wall due to the presence of the wide mouth.

In an alternate embodiment of the invention, ring **50** is elongated in shape, as shown in FIG. 4*a*. In the preferred embodiment, the elongated shape is an oval. The elongated shape of the ring facilitates attachment of the ring to a square or rectangular rod. As a result, the embodiment can be

US 6,494,248 B1

**5**

utilized with drapes, window treatments, blinds, and so forth. Ring **50** can include an open mouth **58**, as in the embodiment of FIG. **2**, or, alternatively, it can have a closed mouth, such as shown in FIG. **1** and, for example, FIGS. **22–27**. The ring can also have the upper edge of ring **50** tangent to upper edge **59** of the suspended material. As an alternative to the use of an oval, which is preferred, the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral. One such shape is provided in FIG. **4**(*b*). Moreover, the external and/or internal edges of the ring need not be rounded although they are preferably so.

The ring **50** can be elongated vertically, as shown in FIG. **4**(*a*), or can be elongated horizontally, as shown in FIG. **4**(*b*). Use of the horizontally elongated ring **70** of FIG. **4**(*b*) allows the curtain **72** to spread more in a lateral direction (i.e. from left to right) along the curtain rod. The same curtain will spread out or widen more along a rod **74** using the horizontally elongated ring of FIG. **4**(*b*) than it would using a rounded ring such as the ring **30** of FIG. **2**. Thus, using the embodiment of FIGS. **4**(*b*) and **4**(*c*), less curtain material is needed to cover the width of a given window, or to extend along the width of a given shower, or so forth. The width of curtain material necessary is less than with the hooks of the prior art and is also less than with the external slit embodiment shown in FIG. **2**. This embodiment is also useful in conjunction with pleated curtains (including shower curtains), blinds, portierres, room dividers, window treatments, drapery, curtains sharper folds, and the like, as in FIG. **4**(*c*).

An illustration of a comparison of the unmodified invention of the '232 patent to the external slit inventions of the present application is shown in FIGS. **5** through **8**. FIG. **5** is a front view of the invention of the '232 patent, with FIG. **7** being a top view thereof. FIG. **6** is a front view of the external slit inventions herein, with FIG. **7** being a top view thereof.

As shown in the figures, in some instances the external slit devices may be used to provide certain patterns of flow of a curtain (e.g. the way it folds, hangs, etc). Depending on the desired results, they may be used in conjunction with the rings of the '232 device or by themselves. As shown in FIG. **5** and in the top view of FIG. **7**, using the devices of the '232 patent, the left (and right) edge of the curtain **82** will normally point outward (away from a shower or window) **45** when placed on a rod **84**. If the end of the '232 curtain were placed on rod **84** to point inward (toward a shower or window, as shown, for example, in FIG. **8** with respect to the external slit embodiment) the horizontal slit between the rings would be forced out toward the viewer. This is unusable, however, since it would make the horizontal slit visible which is aesthetically undesirable. In the normal design of the '232 patent, the horizontal slit is only placed between every second pair of rings rather than between every pair, causing the horizontal slits to all face toward the wall and not toward the viewer. Yet, a consequence of this is that the leftmost and rightmost ends of the curtain are both concave toward the wall, as shown in FIG. **7**.

In many applications (such as with window curtains, for example) it is normally preferable to have the curtain concave toward the viewer, i.e. the edge pointed away from the viewer as shown in FIG. **8**. This effect is produced by the external slit embodiments, as shown in FIGS. **6** and **8**. When the curtain is concave in this fashion, a more aesthetic appearance is produced for the curtain. Indeed, this is the industry standard for curtains. In addition, light is more effectively blocked from the window behind the curtain

**6**

since the curtain cups against the wall, and likewise water is contained more effectively in the shower, as shown in FIG. **8**.

The external slit inventions of the present application can also be used to facilitate the placement of multiple layers of curtains on a rod. In many applications, such hotels, motels, or so forth, a fabric curtain **100** is placed on a rod **104** with a second curtain or liner **120** placed behind it. A decorative fabric shower curtain, for example, is often provided with a plastic liner behind it, the plastic liner protecting the fabric from the water of the shower. In accordance with the external slit inventions of the present application, each layer of curtain can be removed independently from the rod **104** without the need to remove any other layer, as shown in FIGS. **9** and **10**.

If the liner is designed according to the inventions of the '232 patent, for example, to replace the plastic liner, the fabric curtain must first be removed from the rod, then the old liner must be removed from the rod, then the new liner is placed on the rod, and then the fabric curtain is replaced on the rod. With a liner made according to the external slit inventions herein, however, the old liner can be directly removed from the rod and a replacement liner easily placed onto the rod, without the need to remove the fabric curtain, even if the fabric curtain is made according to the '232 patent.

The present inventions also eliminate the problem of possible drooping shown in FIG. **11**. In some instances, e.g. with a heavy or a sheer fabric **110**, or when there is a large spacing between the rings or fasteners the horizontal slit of the '232 inventions may droop, causing an aesthetically unpleasing effect. With the external slit embodiments disclosed herein, however, such droop is obviated.

In addition, the present inventions allow the width and the spacing of the flow of the curtain to be adjusted more readily. Using an approach purely like the '232 patent requires an even number of rings. The use of one or more external slits (in conjunction with the '232 patent design or using only external slits), on the other hand, allows an odd number of rings which is sometimes necessary due to spacing considerations between the rings (e.g. for flow of the curtain) and due to considerations governing the necessary width of the curtain or other hanging product.

In one embodiment of the present inventions, ring **130** is fully within the suspended material **132**. As shown in FIG. **12**, in this embodiment ring **130** is below or touching hem **137** of suspended material **132**.

In an alternate embodiment, ring **140** overlaps with hem **147** of the curtain or suspended material **142**. Preferably, the top of ring **140** is also tangent to top edge **149** of the curtain. The cutting of a series of external slits **133** across the length of the hem **137** of the curtain can often result in a hem which will droop or hang downward. Accordingly, in the embodiment of FIG. **13**, the ring **140** acts to reinforce the hem, suspending the hem upward and preventing drooping. Preferably, the ring is an open ring with rounded edges, as discussed above with respect to FIG. **2**. Likewise, an open ring with rounded edges (or one of the other embodiments of the present invention), or a ring with a locking device (e.g. as shown in FIGS. **22–27**) can also be substituted for the closed ring shown in the other figures of the present application. Even though a simple slit in a closed ring is often provided for simplicity of illustration, the present inventions are not limited to such a closed ring.

In a further alternate embodiment, as shown in FIG. **16**, ring **180** overlaps with the edge of the curtain **182**, such that

US 6,494,248 B1

7

8

ring extends beyond hem **187**. This embodiment can be used, for example, to lengthen the curtain. The embodiment can be used with a externally slit ring **180** as shown in FIG. 16, or with a horizontally slit ring **190**, as shown in FIG. 17. In yet a further embodiment, a tab **175** can be placed at the bottom of a ring **170** (either horizontally slit as shown, or a externally slit ring). Tab **175** is used to attach the ring to a curtain **172**, e.g. at the hem **177**.

Any desired fabric material can be used in accordance with the present invention. For example, the fabric material can be vinyl, cotton, polyester, polyester/cotton or any other natural or synthetic fabric, including woven or non-woven fabrics, and can be rigid, semi-rigid, paper, plastic, wood, metal, or the like. In one embodiment of the invention, two half rings are placed together to encapsulate the fabric material therein. In an alternate embodiment, a single ring is integrated into the fabric material.

In a further embodiment, the ring-like shape is cut directly into the material, without attaching a ring or fastener as an intermediate attachment to the hanging material. Two such embodiments are shown in FIG. 14 (left and right radial edges of slit separate) and FIG. 33 (left and right radial edges of slit touching), although any of the slit designs of the present application can be used. Other examples of preferred embodiments are shown in FIGS. 31–32. The hanging product **160** is preferably made of a relatively rigid or semi-rigid material such as a thick vinyl, either throughout the product, or at least in the area of the ring. For example, the design can be used as part of a set of blinds or so forth. The external slit **153** can be a simple closed slit, if desired, as in FIG. 1. Alternatively, it can be a more rounded design such as shown in FIGS. 2 and 14. An open slit (i.e. one with a gap between the left and right radial edges) with rounded edges is preferred. However, closed slits with rounded radial edges can be provided in this embodiment or any other embodiment of the application, as shown in FIGS. 30–33. Such closed slits with rounded radial edges are ones in which the left and right radial edges are rounded, but are also touching when the slit is not being flexed. Such closed slits with rounded radial edges provided in rings attached to the hanging product as shown, for example, in FIG. 30.

A projection, extension or finger can also be provided to the ring as shown in FIGS. 18, 19 and 20. As illustrated in the figures, in further embodiments of the invention, a ring **200**, **210** or **220** is provided with a projecting edge, flange, extension, or finger **206**, **216** or **226**.

Extensions **206**, **216** or **226** are projections off of the ring (preferably off of the ring's outer circumference), which extend beyond the ring away from the hanging product (i.e. toward the ceiling). The extensions are each located adjacent to and to the side of the slit **204**. Preferably two extensions are provided, one on each side of the slit.

These extensions serve numerous functions. For example, they make it easier to open up the ring when flexing the ring. Extension **206** or **216** of FIGS. 18 and 19, for example, are provided to overlap hems **207** and **217**, respectively, supporting the hems and preventing the drooping of the hem discussed above. Fingers **206** and **216** also cover the slit vertical edge of the hem, preventing it from fraying. Finger **226**, on the other hand, is provided above the hem **227**, with the ring **220** overlapping the hem to support it. In this embodiment, a portion of the ring—the finger only—projects above the upper edge of the curtain, similar in some ways to FIG. 16.

In a further additional design, the fingers can be spread and opposed as shown in FIGS. 18 and 20. As shown in FIG.

20, for example, fingers **226** can be provided as opposed "thumbs". In other words, inner edges **224a** and **224b** are at an angle to each other greater than 0 (zero) degrees but less than 180 degrees. This is in contrast to the inner edges **214a** and **214b** of the fingers of FIG. 19, which are parallel to each other. These spread fingers facilitate attachment of the rings **200** and **220** to a rod. They make it easier to slide the ring into the rod until the ring is pushed over the rod. They also make it easier to spread the ring open by hand to insert it over the rod. They facilitate attachment whether a simple external slit through the ring is used (as shown in FIGS. 18–20), or alternatively in conjunction with open rings with rounded edges (as shown in FIG. 2).

As an alternative to a straight external slit, a curved external slit **232** can be provided as shown in FIG. 20. In one embodiment, curved slit **232** has an upper vertical component **232a**, an approximately horizontal component **232b**, and a radial component **232c**. Radial component **232c** of slit **232** exits the inner circumference of the ring at a location which is offset to the side, rather than exiting the ring at the top of the inner circumference of ring **220** (i.e. rather than exiting directly below vertical component **232a**). In this embodiment, fingers **224a** and **224b** are pulled to the left and right, respectively to open up the ring **220** and insert the rod over a rod. Curved slit **233**, which intersects the inner circumference of the ring at an offset position rather than at the top of the ring, provides an advantage to the user in that the slit **233** will not sit directly on top of the rod while the curtain is in use. This eliminates the problem of the slit riding on the rod when the curtain is pulled open or closed. Instead, a smooth surface of the ring rides on the rod, easing movement of the curtain. The various features of the embodiment of FIG. 20 can also be provided directly to the hanging product (without using a ring) as shown in FIG. 32.

In a further embodiment, the ring **230** can be provided with a flat upper edge **235**, as shown in FIG. 21. Upper edge **235** overlaps with hem **237**. Upper edge, **235**, therefore, provides yet further support for the hem over an extended length of fabric. Using the embodiment of FIG. 21, upper edge **235** provides support over a length equal to approximately the outer diameter of the ring **230** for each ring. This upper edge can be the entire upper edge of the ring. Or, it can be used a portion of the upper edge, e.g. in conjunction with an extension off the ring, as shown, for example in FIGS. 18–20.

Instead of a vertical external slit **233a**, an offset slit **233b** can be provided to any of the embodiments of the invention, as shown, for example, by the dotted line in FIG. 21. Offset slit **233b** is a slit which intersects the inner circle **231** in a secant-like or tangent-like fashion. In other words, offset slit **233b** is off center, such that the line it makes (if extended) would intersect the center of inner circle **231**. This offset slit allows the ring to glide more smoothly along the rod since the slit does not sit directly on the rod's top.

In further embodiments of the invention, a ring is provided which can be selectively opened or sealed, i.e. "locked" as shown in FIGS. 22–25. FIG. 22 is a front view of ring **240**, and FIG. 23 is a rear view of ring **240** after flipping the ring of FIG. 22 180 degrees downward. Ring **240** includes a pin **246** which extends through a opening or channel **242**. In the open position, shown in FIG. 24, the pin **246** is separated from channel **242** forming a gap for placing the ring on a rod. In the closed position, shown in FIG. 24, pin **246** inserts snugly into channel **242** to seal the ring.

In further embodiments of the invention, a ring **250** is provided, as shown in FIG. 26. Ring **250** includes an internal

US 6,494,248 B1

**9**

sliding member 254 which can be pushed or pulled using knob 256. Sliding member 254 slides into and out of internal channel 258 to close and open gap 252. In an alternative embodiment, shown in FIG. 27, a pivoting member 264 is provided, having a pin 265 which inserts into an opening 266. Pivoting member 264 can be rotated to open or close gap 262. In general, the embodiments of FIGS. 22–27 are useful for providing a very secure ring which cannot accidentally be pulled off of a rod. They also increases the smoothness of the sliding of the rings along the rod.

In a further embodiment of the invention, a tape or strip may be provided as shown in FIG. 28. Strip 306 can be used to convert an existing curtain or other hanging product 302 into one of the present invention, or can be used to provide a hanging product in which the specific types of fasteners or provided on top can be interchanged. Strip 306 includes attachment devices 308 which attach to the top of the hanging product 302. The attachment device can be reversibly detachable, e.g. via snaps, a button and hole type design, a zipper, or a hook, or can be more permanent, e.g. via sewing, welding, adhesive, or so forth. Any other attachment methods for attaching the strip to the hanging product can be used as well. In one embodiment, an existing hanging product with holes 310 can easily be converted to one of the present invention by attaching the strip 306 to the hanging product using the holes 310. As with the other hanging products of the present invention, the hanging product 302 can be woven, non-woven, rigid, semi-rigid, or so forth.

Further in accordance with the invention, any of the embodiments of the present application can be placed in sequence from right to left, as shown in FIG. 29. This allows a person to cover a long window, shower or so forth, by using two or more curtains when the item to be covered is longer than the width of a single curtain. In addition, overlaps can be used, as shown in FIG. 29. When the curtains are overlapped, the edge of one curtain 320 extends beyond the edge of the other curtain 330, minimizing or eliminating the appearance of any gap between the curtains.

As shown in FIG. 30, the slit 344 can include a segment or slit 344a which extends through the hanging product 350, and a segment or slit 344b which extends through the ring 340. As previously discussed with respect to FIG. 20, the slit 344 need not be in a straight line. As shown in FIG. 30, slit 344a is at an angle to slit 344b, the angle being other than 180 degrees. If desired, the slits 344a and 344b can combine to form a curved slit, or can be two straight segments at any angle to each other, the latter being shown in FIG. 30.

As shown in FIG. 31(a), in a further preferred embodiment the hanging product includes an inner cut-out area 380, also shown as 151 in FIG. 14. The hanging product includes a slit 370 which extends from the edge of the hanging product to the inner cut-out area 380. Slit 370 includes a left radial edge 375a and a right radial edge 375b. Preferably, the slit is an offset slit. Further preferably, the radius of the left radial edge 375a is different than the radius of the right radial edge 375b. FIG. 31(a) can therefore be contrasted with FIG. 33 which shows an embodiment in which the left and right radial edges 388a and 388b are of equal radii, and wherein the slit is not offset but central, along the radius of the circle. It is also preferred that the left radial edge and right radial edge contact each other, as shown in both FIGS. 31(a) and 33, although a gap can alternately be provided.

A hanging product can also have a ring designed in this fashion, as shown in FIG. 31(b). Ring 400 is provided as part of hanging product 401. Ring 400 includes a slit 412. Slit 412 (and likewise ring 400) has a left radial edge 402a and

**10**

a right radial edge 402b, wherein left radial edge 402a and right radial edge 402b have different radii. The ring 400 includes an edge 404 which is flat along at least a portion of the upper edge of the ring and preferably overlaps hem 406. Extension 408 off of the ring 400 further serves to ease the opening of the ring and its attachment onto a rod, and also serves to support the hem 406.

Although the present inventions have been described in some embodiments using curtains as an illustration, it is to be understood that they may be used with any of the products of the related applications listed above, the contents of which are incorporated herein by reference.

Having described this invention with regard to specific embodiments, it is to be understood that the description is not meant as a limitation since further modifications and variations may be apparent or may suggest themselves. It is intended that the present application cover all such modifications and variations.

What is claimed is:

1. A product comprising:
   an item for hanging, said item comprising an opening for suspending said item from a rod, said item comprising a ring attached to said opening such that said opening is reinforced by said ring, said ring comprising an inner circumference, said inner circumference comprising a top when said item is hanging, said item comprising an upper edge, said item comprising a slit extending from said upper edge through said ring to said opening, said slit intersecting said inner circumference of said ring at a point offset from said top, said slit further comprising an approximately horizontal component when said item is hanging from the rod.

2. A product as claimed in claim 1, wherein said ring is a closed ring.

3. A product as claimed in claim 1, wherein said ring comprises at least one radial edge, said radial edge being rounded.

4. A product as claimed in claim 1, wherein said ring has an upper edge, and said upper edge of said ring is tangent to said upper edge of said item.

5. A product as claimed in claim 1, wherein at least a portion of said ring extends above said upper edge of said item.

6. A product as claimed in claim 1, wherein said item is a curtain.

7. A product as claimed in claim 1, wherein said item is selected from the group consisting of: shower curtains, window curtains, window treatments, blinds, shades, drapery, portierres, room dividers, and windscreens.

8. A product as claimed in claim 1, wherein said slit comprises a left radial edge and a right radial edge and wherein at least one of said left radial edge and said right radial edge is rounded.

9. A product, said product comprising:
   an item for hanging, said item comprising an opening for hanging said item from a rod, said item further comprising a ring attached to said opening such that said ring reinforces said opening, said item comprising an upper edge, said item comprising a slit extending from said upper edge through said ring to said opening;
   said item further comprising at least two projecting fingers for opening said slit to attach said item onto the rod via said slit, said projecting fingers comprising a first projecting finger comprising a first inner edge and a second projecting finger comprising a second inner edge, wherein said first inner edge and said second

US 6,494,248 B1

11

inner edge are at an angle to each other between zero degrees and one hundred eighty degrees.

**10**. A product as claimed in claim **9**, wherein said finger is adjacent to said slit.

**11**. A product as claimed in claim **9**, wherein one of said fingers is located on the right side of said slit and one of said fingers is located on the left side of said slit.

**12**. A product as claimed in claim **9**, wherein said fingers point away from said hanging product.

**13**. A product as claimed in claim **9**, wherein said ring is a closed ring.

**14**. A product as claimed in claim **9**, wherein said ring comprises at least one radial edge, said radial edge being rounded.

**15**. A product as claimed in claim **9**, wherein said ring has an upper edge, and said upper edge of said ring is tangent to said upper edge of said item.

**16**. A product as claimed in claim **9**, wherein said slit has an approximately horizontal component.

**17**. A product as claimed in claim **9**, wherein said item is a curtain.

**18**. A product as claimed in claim **9**, wherein said item is selected from the group consisting of: shower curtains, window curtains, window treatments, blinds, shades, drapery, portierres, room dividers, and windscreens.

**19**. A product as claimed in claim **9**, wherein said slit comprises a left radial edge and a right radial edge and wherein at least one of said left radial edge and said right radial edge is rounded.

**20**. A product, said product comprising:

an item for hanging, said item comprising an opening for hanging said item from a rod, said item further comprising a ring attached to said opening to reinforce said opening, said ring comprising an outer circumference and an inner circumference, said item comprising an upper edge when said item is hanging, said item

12

comprising a curved slit extending from said upper edge to said opening;

said opening further comprising projecting fingers for opening said slit to attach said item onto the rod via said slit, said projecting fingers comprising a first projecting finger comprising a first inner edge and a second projecting finger comprising a second inner edge, wherein said first inner edge and said second inner edge are at an angle to each other between zero degrees and one hundred eighty degrees.

**21**. A product as claimed in claim **20**, wherein said finger points away from said hanging product.

**22**. A product as claimed in claim **20**, wherein said ring is a closed ring.

**23**. A product as claimed in claim **20**, wherein said ring comprises at least one radial edge, said radial edge being rounded.

**24**. A product as claimed in claim **20**, wherein said ring has an upper edge, and said upper edge of said ring is tangent to said upper edge of said item.

**25**. A product as claimed in claim **20**, wherein said ring overlaps said upper edge of said items.

**26**. A product as claimed in claim **20**, wherein said item is a curtain.

**27**. A product as claimed in claim **20**, wherein said item is selected from the group consisting of: shower curtains, window curtains, window treatments, blinds, shades, drapery, portierres, room dividers, and windscreens.

**28**. A product as claimed in claim **20**, wherein said slit comprises a left radial edge and a right radial edge and wherein at least one of said left radial edge and said right radial edge is rounded.

**29**. A product as claimed in claim **20**, wherein one of said fingers is located on the right side of said slit and one of said fingers is located on the left side of said slit.

\* \* \* \* \*



US006494248C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11167th)

# United States Patent

Zahner

(10) Number: **US 6,494,248 C1**

(45) Certificate Issued: **Aug. 29, 2017**

(54) **SUSPENDED MATERIALS HAVING EXTERNAL SLITS**

(76) Inventor: **David Zahner**, New York, NY (US)

**Reexamination Request:**
No. 90/013,779, Jul. 14, 2016

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,494,248** |
| Issued: | **Dec. 17, 2002** |
| Appl. No.: | **09/617,402** |
| Filed: | **Jul. 17, 2000** |

**Related U.S. Application Data**

(60) Provisional application No. 60/143,853, filed on Jul. 15, 1999, provisional application No. 60/150,876, filed on Aug. 26, 1999, provisional application No. 60/171,081, filed on Dec. 15, 1999, provisional application No. 60/203,873, filed on May 12, 2000.

(51) **Int. Cl.**

| | |
|---|---|
| *A47K 3/38* | (2006.01) |
| *A47H 13/00* | (2006.01) |
| *A47H 13/02* | (2006.01) |
| *A47H 15/04* | (2006.01) |
| *H04L 1/00* | (2006.01) |
| *A47K 3/28* | (2006.01) |
| *A47H 15/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *A47H 13/02* (2013.01); *A47H 15/04* (2013.01); *A47K 3/38* (2013.01); *H04L 1/0025* (2013.01); *Y10T 428/24314* (2015.01)

(58) **Field of Classification Search**
CPC ........ A47H 13/00; A47H 13/02; A47H 13/04; A47K 3/38
USPC ................................ 160/330, 383, 388, 390
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,779, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Russell D Stormer

(57) **ABSTRACT**

A hanging material such as a curtain is provided with openings each having a slit therein for attachment to a fixed rod. Each opening is reinforced with rings having projecting flanges extending beyond the ring away from the curtain. The projecting flanges of the rings makes it easier to open up the ring thereby facilitating the placement of the curtain upon the fixed rod.



US 6,494,248 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **6** and **7** are cancelled.

Claim **1** is determined to be patentable as amended.

Claims **2** and **4**, dependent on an amended claim, are
determined to be patentable.

New claims **30** and **31** are added and determined to be
patentable.

Claims **3**, **5**, **8** and **9-29** were not reexamined.

**2**

1. A product comprising:

an item for hanging, *wherein said item is a curtain,* said
item comprising an opening for suspending said item
from a rod, said item comprising a ring attached to said
opening such that said opening is reinforced by said
ring, said ring comprising an inner circumference, said
inner circumference comprising a top when said item is
hanging, said item comprising an upper edge, said item
comprising a slit extending from said upper edge
through said ring to said opening, said slit intersecting
said inner circumference of said ring at a point offset
from said top, said slit further comprising an approxi-
mately horizontal component when said item is hang-
ing from the rod, *and wherein said slit exits said ring
at said upper edge of said curtain.*

*30. A product as claimed in claim 1, wherein said curtain
is a shower curtain.*

*31. A product as claimed in claim 1, wherein said curtain
is a window curtain.*

* * * * *



US007296609B2

## (12) United States Patent
### Zahner

(10) Patent No.: **US 7,296,609 B2**
(45) Date of Patent: **\*Nov. 20, 2007**

(54) **HANGING PRODUCTS**

(75) Inventor: **David Zahner**, New York, NY (US)

(73) Assignee: **Zahner Design Group, Ltd.,** New York, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/209,334**

(22) Filed: **Aug. 23, 2005**

(65) **Prior Publication Data**

US 2006/0037721 A1     Feb. 23, 2006

### Related U.S. Application Data

(60) Continuation of application No. 10/320,340, filed on Dec. 16, 2002, now Pat. No. 6,935,402, and a division of application No. 09/916,603, filed on Jul. 27, 2001, now Pat. No. 7,058,988, and a division of application No. 10/062,588, filed on Jul. 5, 2001, which is a continuation of application No. 09/738,545, filed on Dec. 15, 2000, now abandoned, which is a continuation of application No. 09/738,555, filed on Dec. 15, 2000, now abandoned, which is a continuation of application No. 09/617,402, filed on Jul. 17, 2000, now Pat. No. 6,494,248.

(60) Provisional application No. 60/217,747, filed on Jul. 12, 2000, provisional application No. 60/203,873, filed on May 12, 2000, provisional application No. 60/171,081, filed on Dec. 15, 1999, provisional application No. 60/150,876, filed on Aug. 26, 1999, provisional application No. 60/143,853, filed on Jul. 15, 1999.

(51) **Int. Cl.**
*A47H 1/00*     (2006.01)

(52) **U.S. Cl.** ...................................... 160/330; 160/390

(58) **Field of Classification Search** ............... 160/330, 160/348, 383, 384, 385, 390, 327, 368.1, 160/405; 16/87 R, 87.2; 24/716
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 554,066 A | 2/1896 | Jager | |
| 635,295 A | \* 10/1899 | Brown | 16/87.2 |
| 759,045 A | \* 5/1904 | Tracy | 16/87.2 |
| 987,983 A | 3/1911 | Harris | |
| 996,886 A | 7/1911 | Schneider | |
| 1,193,891 A | 8/1916 | Greene | |
| 1,338,783 A | 5/1920 | Lobar | |
| 1,345,547 A | 7/1920 | McDonald | |
| 1,564,301 A | \* 12/1925 | Wilson | 16/87.2 |
| 1,687,859 A | 10/1928 | Fontaine | |
| 1,831,776 A | 11/1931 | Nelson | |
| 1,957,096 A | 5/1934 | Connell | |
| 1,990,278 A | 2/1935 | Friedman | |
| 2,011,815 A | 8/1935 | Johnson | |

(Continued)

FOREIGN PATENT DOCUMENTS

GB     1490667     11/1977

*Primary Examiner*—David Purol
(74) *Attorney, Agent, or Firm*—Morris E. Cohen

(57)     **ABSTRACT**

Hanging products having an opening for suspending the item from a rod, the hanging product being provided with a ring having a gap, the ring further being provided with a movable member for opening and closing the gap.

**19 Claims, 7 Drawing Sheets**



**US 7,296,609 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,422,963 A | 6/1947 | McDonald | |
| 2,434,430 A | 1/1948 | Paulic | |
| 2,551,384 A | 5/1951 | Middleton et al. | |
| 2,629,436 A | 2/1953 | McDonald | |
| 2,634,422 A | 4/1953 | Cantrell | |
| 2,666,481 A * | 1/1954 | White ..................... | 160/348 |
| 2,711,555 A | 6/1955 | Hanson | |
| 2,828,900 A | 4/1958 | Le Roy | |
| 2,831,538 A * | 4/1958 | Lishman ..................... | 160/330 |
| 2,897,535 A * | 8/1959 | Radler ..................... | 16/87.2 |
| 3,115,181 A | 12/1963 | Snyder | |
| 3,346,879 A | 10/1967 | Buzzelli | |
| 3,388,734 A | 6/1968 | Silvestre | |
| 3,408,703 A | 11/1968 | Brandenburg | |
| 3,664,026 A | 5/1972 | Lawson | |
| 3,772,734 A | 11/1973 | Kirnel | |
| 3,897,535 A | 7/1975 | Lepac et al. | |
| 4,031,943 A * | 6/1977 | Silvestre ..................... | 160/330 |
| 4,928,743 A | 5/1990 | Wojtysiak | |
| 5,101,877 A | 4/1992 | Subecz et al. | |
| 5,111,868 A * | 5/1992 | Sawaya ..................... | 160/330 |
| 5,186,232 A * | 2/1993 | Zahner ..................... | 160/330 |
| 5,367,742 A | 11/1994 | Bindman | |
| 5,421,059 A | 6/1995 | Leffers, Jr. | |
| 5,769,144 A | 6/1998 | Carter | |
| 5,806,141 A | 9/1998 | Kolisch | |
| 6,059,009 A | 5/2000 | Haiber | |
| 6,189,597 B1 * | 2/2001 | Cheng ..................... | 160/383 |
| 6,212,688 B1 | 4/2001 | Leslie | |
| 6,494,248 B1 * | 12/2002 | Zahner ..................... | 160/330 |
| 6,866,082 B1 * | 3/2005 | Zahner ..................... | 160/390 |
| 6,935,402 B2 * | 8/2005 | Zahner ..................... | 160/330 |

* cited by examiner

### FIG. 1



### FIG. 2

### FIG. 3

### FIG. 4A



### FIG. 4B

### FIG. 4C



Appx431



FIG. 5
(PRIOR ART)

FIG. 6

FIG. 7
(PRIOR ART)

FIG. 8

FIG. 9

FIG. 10

FIG. 11
(PRIOR ART)

FIG. 12

FIG. 13



FIG. 14

FIG. 15





FIG. 16

FIG. 17





*FIG. 18*

*FIG. 19*



*FIG. 20*

*FIG. 21*



Appx434

FIG. 22



FIG. 23



FIG. 24



FIG. 25



FIG. 26



FIG. 27



Appx435

*FIG. 28*



*FIG. 29*

Appx436

*FIG. 30*



*FIG. 31A*

*FIG. 31B*



*FIG. 32*

*FIG. 33*





US 7,296,609 B2

1

# HANGING PRODUCTS

## RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002, now U.S. Pat. No. 6,935,402 which is a continuation of U.S. Nonprovisional application Ser. No. 09/617,402 filed Jul. 17, 2000 (patented, U.S. Pat. No. 6,494,248 B1), which claims the benefit of U.S. Provisional Application Ser. No. 60/143,853 filed Jul. 15, 1999, the benefit of U.S. Provisional Application Ser. No. 60/150,876, filed Aug. 26, 1999, the benefit of U.S. Provisional Application Ser. No. 60/171, 081 filed Dec. 15, 1999, and the benefit of U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000.

The parent application, U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002 (pending), is also a divisional of U.S. Nonprovisional application Ser. No. 10/062, 588 filed Jul. 5, 2001 (pending), which is a continuation of U.S. Nonprovisional application Ser. No. 09/738,555 filed Dec. 15, 2000 (abandoned), which claims the benefit of U.S. Provisional Application Ser. No. 60/171,081 filed Dec. 15, 1999, the benefit of U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000, and the benefit of U.S. Provisional Application Ser. No. 60/217,747 filed Jul. 12, 2000.

The parent application, U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002 (pending), is also a divisional of U.S. Nonprovisional application Ser. No. 09/916, 603 filed Jul. 27, 2001 now U.S. Pat. No. 7,058,988, which is a continuation of U.S. Nonprovisional Application Ser. No. filed Ser. No. 09/738,545 filed Dec. 15, 2000 (abandoned), and which claims the benefit of U.S. Provisional Application Ser. No. 60/171,081 filed Dec. 15, 1999, U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000, and U.S. Provisional Application Ser. No. 60/217,747 filed Jul. 12, 2000.

The priority of all of those applications is claimed, and the contents of all of those applications are hereby fully incorporated into this application by reference.

## FIELD OF THE INVENTION

The present invention relates to an accessory for attaching and detaching materials from a rod without requiring removal of the rod or adding additional hardware, such as hooks or the like, to the fabric.

## BACKGROUND OF THE INVENTION

U.S. Pat. No. 5,186,232, issued on Feb. 16, 1993 (which is fully incorporated herein by reference), discloses and claims an accessory product for easily mounting and detaching a material from a rod without removing the rod. The accessory product is intended for use with hanging or otherwise suspended materials, such as window treatments (window curtains, drapes, etc.), shower curtains, windscreens, towels, and so forth. Such suspended materials (referred to herein as "hanging materials" for brevity) are well known in the art, and are often mounted onto rods.

In one system of the prior art, separate devices, such as hooks or clips, are utilized to connect portions of the curtain to the rod. In an alternative system of the prior art, the curtain or drape is mounted by threading a rod through the reinforced holes in that curtain.

As an advance over the prior art products, the '232 patent discloses an accessory invention, as shown in FIG. 5, which

2

allows a curtain or so forth to be attached to a mounting rod without the need for hanging support hooks, clips, and so forth, while also avoiding the need to remove the rod from its supports. The accessory is useful in a large variety of applications, including shower curtains and other household and commercial products. It involves a series of reinforced openings with slits provided between alternating paired sets of holes, thereby allowing the hanging material to be attached over the rod without the need for threading or hooks. Further advances and improvements to the inventions disclosed in the '232 patent are provided herein.

## SUMMARY OF THE INVENTION

In accordance with the invention, a hanging material such as a curtain (e.g. a window curtain or a shower curtain) or other product is provided with a slit therein for attachment of the hanging material to a fixed rod without removing the rod. In a preferred embodiment, the material has a fastener therein, as well, the slit extending through the fastener. In a further preferred embodiment, the hanging material includes at least one external slit, i.e. a slit, at any angle, which intersects an edge of the hanging material. In a further preferred embodiment, the external slit is one (at any angle) which extends through the inside circumference or inner edge of a fastener at one end and the outer edge of the hanging material at the other end.

The invention can be used for window treatments, shower curtains, drapery, portieres, room dividers, blinds, accessory tapes, and windscreens, or other hanging items. The fastener, which can be made of a rigid, or semi-rigid material (i.e. a material with some flexibility), is preferably integrated into the hanging material and facilitates the attachment of the material to the rod without the need to remove the rod from its supports. The slit is of any shape or size desired. Further objects and features of the invention will be apparent in conjunction with the drawings and detailed disclosure provided herein.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a front view of an hanging product having at least one external slit therein, in accordance with one embodiment of the present invention.

FIG. 2 is a front view of a hanging product in accordance with a further embodiment of the present invention, utilizing an open ring structure.

FIG. 3 is a front view of the product of FIG. 2, showing the product placed onto a rod.

FIGS. 4(a) and 4(b) are front view of further embodiments of the invention, in which the rings of the invention are elongated. FIG. 4(c) is a top view of the embodiment of FIG. 4(b).

FIG. 5 is a front view of a horizontally-slit accessory product, in accordance with the invention of U.S. Pat. No. 5,186,232.

FIG. 6 is a front view of a hanging product with externally slit rings, in accordance with the present invention.

FIG. 7 is a top view of the embodiment of FIG. 5.

FIG. 8 is a top view of the embodiment of FIG. 6.

FIG. 9 is a perspective view of multiple layers of curtains for sitting on a single rod, at least one curtain having externally slit rings, in accordance with the present invention.

FIG. 10 is a top view of the embodiment of FIG. 9.

FIG. 11 is a front view of a horizontally-slit accessory product in accordance with the prior art.

US 7,296,609 B2

3

FIGS. **12** and **13** are front views of open, externally slit, rings in accordance with further embodiments of the present invention.

FIG. **14** is front view of a rigid or semi-rigid material having a external slit therein, in accordance with the invention.

FIG. **15** is a front view of a externally slit ring having a lower tab for attachment to a hanging sheet of material in accordance with a further embodiment of the present invention.

FIGS. **16** and **17** are front views of slit rings of the present invention in which the rings overlap and extend above the hem of the hanging material.

FIGS. **18**, **19** and **20** are front views of further embodiments of the present invention, in which a projection, extension or finger is provided to the slit ring.

FIG. **21** is a front view of a further embodiment of the invention, in which a flat upper surface is provided to the ring to extend along and support the hanging product's hem, with an alternate location for the slit being shown in dotted outline.

FIG. **22** is a front view of further embodiments of the invention, showing the front and rear rings cut at offset positions, and showing a locking pin is used to open and close the ring.

FIG. **23** is a rear view showing the embodiment of FIG. **22**.

FIG. **24** is a side view of the embodiments of FIGS. **22** and **23**, showing the ring in the closed position.

FIG. **25** is a side view of the embodiments of FIG. **22-24**, showing the ring in the open position.

FIG. **26** is a front cross-sectional view, of a further embodiment of the present invention.

FIG. **27** is a front view of a further embodiment of the present invention.

FIG. **28** is a front view of an accessory strip and hanging product in accordance with a further embodiment of the present invention.

FIG. **29** is a top view of a method for sequentially arranging the embodiments of the present invention.

FIGS. **30**-**33** are front views of further embodiments of the present invention.

## DETAILED DESCRIPTION OF THE INVENTIONS AND THE PREFERRED EMBODIMENTS

In accordance with the present invention, an apparatus is provided which allows a curtain or so forth to be attached to a mounting rod without the need for using additional support hooks, clips, or like, and while also avoiding the need to remove the rod from its supports.

In the present invention, as shown in FIG. **1**, openings are provided each having a slit provided therein. In accordance with the invention, the slit can be of any shape or size desired, whether straight, curved, or so forth. Likewise it can be of any width desired, whether a uniform width, or a width which changes over the length of the slit, e.g. in an hourglass shape, as with slit **390** of FIG. **33**.

In the embodiment shown in FIG. **1**, each opening is reinforced with a fastener such as a ring **10**. Ring **10** can be made of homo polypropylene, ABS, or other suitable materials. These materials are strong enough to support the various fabrics commonly used for curtains, drapes, and so forth. In addition, they also have excellent memory so that, after being flexed to fit over the rod, the ring automatically springs back to its original position.

4

As disclosed in the '232 patent, pairs of rings can be provided having a horizontal slit connecting each pair. In a further embodiment of the invention, the hanging product includes at least one external slit therein. By external slit, the present application refers to a slit which passes through the material of the hanging product (and through a ring as well if one is provided) to ultimately exit outside the suspended material **20**. Examples of external slits are horizontal external slit **12** and vertical external slit **17**. Various other examples of external slits are provided herein.

The external slit can be in any orientation and, when used in conjunction with a ring, can extend through any position on the ring, whether the "12 o'clock" position, or to 1 o'clock, 2 o'clock, 10 o'clock, 11 o'clock, or so forth. Rings with external slits can be provided to the hanging product in addition to the horizontally slit rings of the '232 patent, as shown, for example, in FIG. **1**. Alternatively, the hanging product can be provided with externally slit rings only.

In the embodiment shown in the FIG. **1**, the ring **10** is located within the suspended material **20** and external slit **17** extends from the ring and through the suspended material **20**, exiting at the suspended material **20**'s edge. In other words, a space of suspended material **20** exists between the ring **10** and the outside of the suspended material **20**, and the external slit extends through that space. Ring **10**, as with the other rings or fasteners of the present invention can be attached to the hanging product via any desired secure means. For example, the rings can be attached by staking, by sealing, by sewing, by welding, or by using any of the methods of U.S. Provisional Application Ser. No. 60/150, 876, filed Aug. 26, 1999, whose contents are fully incorporated herein by reference.

In one embodiment of the invention, as shown in FIG. **1**, a closed ring **10** is provided. The term closed ring refers to the fact that the external slit is normally "closed"—i.e. the two radial edges which form the slit **17** are pressed together. In this embodiment, the ring has some degree of flexibility, and must be flexed for the slit to open, i.e. for the edges of the slit to move some distance apart. Flexing the ring increases the width of the gap to insert the ring over the rod. The slit extends through the ring until the edge of the hanging product (whether that edge of the hanging product is beyond the edge of the ring or coincides with it as shown in various embodiments below).

In an alternate or additional embodiment of the invention, as shown in FIG. **2**, an open ring **30** is provided in the material **32** for attachment of the hanging product to the rod or bar **34**. In accordance with this embodiment, ring **30** is an open ring which is provided with rounded edges **36**. A space is provided between the edges of the open ring, forming a mouth or gap **38** which acts as the external slit. Preferably, the gap is approximately $\frac{1}{16}$" to $\frac{1}{8}$" in diameter, although larger or smaller gaps can be used, depending on the application, rod size, and shape. Further preferably, the upper edge of ring **30** is tangent to the upper edge **39** of suspended material **32**.

In this embodiment, rounded edges **36** and mouth **38** form an external slit design which is easier for a person to attach to rod **34**. The embodiment of FIG. **2** is to be contrasted with the embodiment shown in FIG. **1**. As shown in FIG. **1**, a closed ring is provided having a radial slit therethrough. The ring is closed in that the slit **17** consists of a right radial edge and a left radial edge of the ring, those right and left radial edges being pressed against each other. In contrast, the embodiment of FIG. **2** provides an open ring structure in which a gap exists between the left radial edge **36**$a$ of the ring and the right radial edge **36**$b$ of the ring, radial edges

US 7,296,609 B2

5

36*a* and 36*b* being the edges extending from the outer circumference or outer edge 26 to the inner circumference or inner edge 28 of the fastener or ring.

Furthermore, it is preferred that the radial edges of the open ring be rounded as shown in FIG. 2. Open mouth 38 and rounded edges 36 facilitate the attachment of the ring to the rod from below, and further facilitate the attachment of the ring with one hand. These features are of general advantage to all users, and are of particular advantage to those who may be shorter such as children and the handicapped, or who have trouble opening the ring due to problems such as arthritis.

FIG. 3 illustrates the embodiment of FIG. 2 as attached to rod 34. In addition to providing ease of attachment, the embodiment of FIG. 2 also provides ease of detachment. Furthermore, as a safety function, if the suspended material is pulled strongly enough from the bottom, the ring and suspended material will easily detach from the rod before pulling the rod out of the wall due to the presence of the wide mouth.

In an alternate embodiment of the invention, ring 50 is elongated in shape, as shown in FIG. 4*a*. In the preferred embodiment, the elongated shape is an oval. The elongated shape of the ring facilitates attachment of the ring to a square or rectangular rod. As a result, the embodiment can be utilized with drapes, window treatments, blinds, and so forth. Ring 50 can include an open mouth 58, as in the embodiment of FIG. 2, or, alternatively, it can have a closed mouth, such as shown in FIG. 1 and, for example, FIGS. 22-27. The ring can also have the upper edge of ring 50 tangent to upper edge 59 of the suspended material. As an alternative to the use of an oval, which is preferred, the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral. One such shape is provided in FIG. 4(*b*). Moreover, the external and/or internal edges of the ring need not be rounded although they are preferably so.

The ring 50 can be elongated vertically, as shown in FIG. 4(*a*), or can be elongated horizontally, as shown in FIG. 4(*b*). Use of the horizontally elongated ring 70 of FIG. 4(*b*) allows the curtain 72 to spread more in a lateral direction (i.e. from left to right) along the curtain rod. The same curtain will spread out or widen more along a rod 74 using the horizontally elongated ring of FIG. 4(*b*) than it would using a rounded ring such as the ring 30 of FIG. 2. Thus, using the embodiment of FIGS. 4(*b*) and 4(*c*), less curtain material is needed to cover the width of a given window, or to extend along the width of a given shower, or so forth. The width of curtain material necessary is less than with the hooks of the prior art and is also less than with the external slit embodiment shown in FIG. 2. This embodiment is also useful in conjunction with pleated curtains (including shower curtains), blinds, portierres, room dividers, window treatments, drapery, curtains sharper folds, and the like, as in FIG. 4(*c*).

An illustration of a comparison of the unmodified invention of the '232 patent to the external slit inventions of the present application is shown in FIGS. 5 through 8. FIG. 5 is a front view of the invention of the '232 patent, with FIG. 7 being a top view thereof. FIG. 6 is a front view of the external slit inventions herein, with FIG. 7 being a top view thereof.

As shown in the figures, in some instances the external slit devices may be used to provide certain patterns of flow of a curtain (e.g. the way it folds, hangs, etc). Depending on the desired results, they may be used in conjunction with the rings of the '232 device or by themselves. As shown in FIG. 5 and in the top view of FIG. 7, using the devices of the '232

6

patent, the left (and right) edge of the curtain 82 will normally point outward (away from a shower or window) when placed on a rod 84. If the end of the '232 curtain were placed on rod 84 to point inward (toward a shower or window, as shown, for example, in FIG. 8 with respect to the external slit embodiment) the horizontal slit between the rings would be forced out toward the viewer. This is unusable, however, since it would make the horizontal slit visible which is aesthetically undesirable. In the normal design of the '232 patent, the horizontal slit is only placed between every second pair of rings rather than between every pair, causing the horizontal slits to all face toward the wall and not toward the viewer. Yet, a consequence of this is that the leftmost and rightmost ends of the curtain are both concave toward the wall, as shown in FIG. 7.

In many applications (such as with window curtains, for example) it is normally preferable to have the curtain concave toward the viewer, i.e. the edge pointed away from the viewer as shown in FIG. 8. This effect is produced by the external slit embodiments, as shown in FIGS. 6 and 8. When the curtain is concave in this fashion, a more aesthetic appearance is produced for the curtain. Indeed, this is the industry standard for curtains. In addition, light is more effectively blocked from the window behind the curtain since the curtain cups against the wall, and likewise water is contained more effectively in the shower, as shown in FIG. 8.

The external slit inventions of the present application can also be used to facilitate the placement of multiple layers of curtains on a rod. In many applications, such hotels, motels, or so forth, a fabric curtain 100 is placed on a rod 104 with a second curtain or liner 120 placed behind it. A decorative fabric shower curtain, for example, is often provided with a plastic liner behind it, the plastic liner protecting the fabric from the water of the shower. In accordance with the external slit inventions of the present application, each layer of curtain can be removed independently from the rod 104 without the need to remove any other layer, as shown in FIGS. 9 and 10.

If the liner is designed according to the inventions of the '232 patent, for example, to replace the plastic liner, the fabric curtain must first be removed from the rod, then the old liner must be removed from the rod, then the new liner is placed on the rod, and then the fabric curtain is replaced on the rod. With a liner made according to the external slit inventions herein, however, the old liner can be directly removed from the rod and a replacement liner easily placed onto the rod, without the need to remove the fabric curtain, even if the fabric curtain is made according to the '232 patent.

The present inventions also eliminate the problem of possible drooping shown in FIG. 11. In some instances, e.g. with a heavy or a sheer fabric 110, or when there is a large spacing between the rings or fasteners the horizontal slit of the '232 inventions may droop, causing an aesthetically unpleasing effect. With the external slit embodiments disclosed herein, however, such droop is obviated.

In addition, the present inventions allow the width and the spacing of the flow of the curtain to be adjusted more readily. Using an approach purely like the '232 patent requires an even number of rings. The use of one or more external slits (in conjunction with the '232 patent design or using only external slits), on the other hand, allows an odd number of rings which is sometimes necessary due to spacing considerations between the rings (e.g. for flow of the curtain) and due to considerations governing the necessary width of the curtain or other hanging product.

Appx440

US 7,296,609 B2

7

In one embodiment of the present inventions, ring **130** is fully within the suspended material **132**. As shown in FIG. **12**, in this embodiment ring **130** is below or touching hem **137** of suspended material **132**.

In an alternate embodiment, ring **140** overlaps with hem **147** of the curtain or suspended material **142**. Preferably, the top of ring **140** is also tangent to top edge **149** of the curtain. The cutting of a series of external slits **133** across the length of the hem **137** of the curtain can often result in a hem which will droop or hang downward. Accordingly, in the embodiment of FIG. **13**, the ring **140** acts to reinforce the hem, suspending the hem upward and preventing drooping. Preferably, the ring is an open ring with rounded edges, as discussed above with respect to FIG. **2**. Likewise, an open ring with rounded edges (or one of the other embodiments of the present invention), or a ring with a locking device (e.g. as shown in FIGS. **22-27**) can also be substituted for the closed ring shown in the other figures of the present application. Eventhough a simple slit in a closed ring is often provided for simplicity of illustration, the present inventions are not limited to such a closed ring.

In a further alternate embodiment, as shown in FIG. **16**, ring **180** overlaps with the edge of the curtain **182**, such that ring extends beyond hem **187**. This embodiment can be used, for example, to lengthen the curtain. The embodiment can be used with a externally slit ring **180** as shown in FIG. **16**, or with a horizontally slit ring **190**, as shown in FIG. **17**. In yet a further embodiment, a tab **175** can be placed at the bottom of a ring **170** (either horizontally slit as shown, or a externally slit ring). Tab **175** is used to attach the ring to a curtain **172**, e.g. at the hem **177**.

Any desired fabric material can be used in accordance with the present invention. For example, the fabric material can be vinyl, cotton, polyester, polyester/cotton or any other natural or synthetic fabric, including woven or non-woven fabrics, and can be rigid, semi-rigid, paper, plastic, wood, metal, or the like. In one embodiment of the invention, two half rings are placed together to encapsulate the fabric material therein. In an alternate embodiment, a single ring is integrated into the fabric material.

In a further embodiment, the ring-like shape is cut directly into the material, without attaching a ring or fastener as an intermediate attachment to the hanging material. Two such embodiments are shown in FIG. **14** (left and right radial edges of slit separate) and FIG. **33** (left and right radial edges of slit touching), although any of the slit designs of the present application can be used. Other examples of preferred embodiments are shown in FIGS. **31-32**. The hanging product **160** is preferably made of a relatively rigid or semi-rigid material such as a thick vinyl, either throughout the product, or at least in the area of the ring. For example, the design can be used as part of a set of blinds or so forth. The external slit **153** can be a simple closed slit, if desired, as in FIG. **1**. Alternatively, it can be a more rounded design such as shown in FIGS. **2** and **14**. An open slit (i.e. one with a gap between the left and right radial edges) with rounded edges is preferred. However, closed slits with rounded radial edges can be provided in this embodiment or any other embodiment of the application, as shown in FIGS. **30-33**. Such closed slits with rounded radial edges are ones in which the left and right radial edges are rounded, but are also touching when the slit is not being flexed. Such closed slits with rounded radial edges provided in rings attached to the hanging product as shown, for example, in FIG. **30**.

A projection, extension or finger can also be provided to the ring as shown in FIGS. **18**, **19** and **20**. As illustrated in the figures, in further embodiments of the invention, a ring

8

**200**, **210** or **220** is provided with a projecting edge, flange, extension, or finger **206**, **216** or **226**. Extensions **206**, **216** or **226** are projections off of the ring (preferably off of the ring's outer circumference), which extend beyond the ring away from the hanging product (e.g. toward the ceiling). The extensions are each located adjacent to and to the side of the slit **204**. Preferably two extensions are provided, one on each side of the slit. In the preferred embodiment, the slit preferably exits at the top of the product (i.e. at the 12:00 position), and as a result, the extensions are likewise preferably provided on top of the product, on both sides of the ring. Alternatively, however, the slit in any of the embodiments of the present invention can exit at any side or edge of the product (at any location on the "clock face"), with one or two extensions being preferably provided on the side or sides of the slit, whichever side or edge of the product is chosen.

These extensions serve numerous functions. For example, they make it easier to open up the ring when flexing the ring. Extension **206** or **216** of FIGS. **18** and **19**, for example, are provided to overlap hems **207** and **217**, respectively, supporting the hems and preventing the drooping of the hem discussed above. Fingers **206** and **216** also cover the slit vertical edge of the hem, preventing it from fraying. Finger **226**, on the other hand, is provided above the hem **227**, with the ring **220** overlapping the hem to support it. In this embodiment, a portion of the ring—the finger only—projects above the upper edge of the curtain, similar in some ways to FIG. **16**.

In a further additional design, the fingers can be spread and opposed as shown in FIGS. **18** and **20**. As shown in FIG. **20**, for example, fingers **226** can be provided as opposed "thumbs". In other words, inner edges **224***a* and **224***b* are at an angle to each other greater than 0 (zero) degrees but less than 180 degrees. This is in contrast to the inner edges **214***a* and **214***b* of the fingers of FIG. **19**, which are parallel to each other. These spread fingers facilitate attachment of the rings **200** and **220** to a rod. They make it easier to slide the ring into the rod until the ring is pushed over the rod. They also make it easier to spread the ring open by hand to insert it over the rod, and to spread the ring open to remove it from the rod. They facilitate attachment whether a simple external slit through the ring is used (as shown in FIGS. **18-20**), or alternatively in conjunction with open rings with rounded edges (as shown in FIG. **2**).

As an alternative to a straight external slit, a curved external slit **232** can be preferred. Further preferably, the slit can be curved and offset, as shown, for example, in FIG. **20**. In one embodiment, curved slit **232** has an upper vertical component **232***a*, an approximately horizontal component **232***b*, and a radial component **232***c*. Radial component **232***c* of slit **232** exits the inner circumference of the ring at a location which is offset to the side, rather than exiting the ring at the top of the inner circumference of ring **220** (i.e. rather than exiting directly below vertical component **232***a*). In this embodiment, fingers **224***a* and **224***b* are pulled to the left and right, respectively to open up the ring **220** and insert the ring over a rod. Curved slit **232**, which intersects the inner circumference of the ring at an offset position rather than at the top of the ring, provides an advantage to the user in that the slit **232** will not sit directly on top of the rod while the curtain is in use. This eliminates the problem of the slit riding on the rod when the curtain is pulled open or closed. Instead, a smooth surface of the ring rides on the rod, easing movement of the curtain.

It will be likewise understood, that some or all of the features of FIG. **20** can be provided to any given product.

US 7,296,609 B2

9                                                                        10

For example, the curved slit can be provided with or without offset features, whether offset intersection points, or a bottom offset from the 12:00 position. Likewise, the various features of the embodiment of FIG. 20, whether a curved slit and/or an offset and/or the fingers, can also be provided directly to the hanging product (without using a ring) as shown in FIG. 32.

For example, the curved slit can be provided to exit the edge of the product at any exit point other than the top of the ring, with an offset between the intersection point of the curved slit with the inner circumference/edge of the product and the exit point of the product. In other words, by offset intersection points, the slit's endpoints are spaced from each other at their intersection points such that the two intersection points are not at the same location where they placed on a standard clock. For example, if the intersection of the curved slit with the exit point from the product were at the 12:00 position (as shown in FIG. 20), the intersection of the curved slit at the inner edge would be at a point other than the 12:00 position (approximately 1:00 in FIG. 20). Or, likewise, if the intersection of the curved slit with the exit point from the product were at the 2:60 position instead, the intersection of the curved slit at the inner edge would be at a point other than the 2:00 position.

In a further embodiment, the ring 230 can be provided with a flat upper edge 235, as shown in FIG. 21. Upper edge 235 overlaps with hem 237. Upper edge 235, therefore, provides yet further support for the hem over an extended length of fabric. Using the embodiment of FIG. 21, upper edge 235 provides support over a length equal to approximately the outer diameter of the ring 230 for each ring. This upper edge can be the entire upper edge of the ring. Or, it can be used a portion of the upper edge, e.g. in conjunction with an extension off the ring, as shown, for example in FIGS. 18-20.

Instead of a vertical external slit 233a, a further offset slit 233b can be provided to any of the embodiments of the invention. as shown, for example, by the dotted line in FIG. 21. Offset slit 233b is a slit which intersects the inner circle 231 in a secant-like or tangent-like fashion. Offset slit 233b is off-center, such that the line it makes (if extended) would not intersect the center of inner circle 231. Or, viewing the circumference of the inner circle, the intersection point of the slit with the inner circumference or edge of the product is offset from the 12:00 position on that inner circle. This offset slit allows the ring to glide more smoothly along the rod since the slit does not sit directly on the rod's top. In this further preferred embodiment, regardless of what position is chosen for the exit for the slit from the ring or product, the intersection of the slit at the inner edge is preferably at a point other from the 12:00 position when the product is hanging, so that the slit does not ride on the rod as previously discussed.

In further embodiments of the invention, a ring is provided which can be selectively opened or sealed, i.e. "locked" as shown in FIGS. 22-25. FIG. 22 is a front view of ring 240, and FIG. 23 is a rear view of ring 240. As shown therein, the cut 243 in the top ring shown in FIG. 22 is spaced from the corresponding cut 244 in the bottom ring shown in FIG. 23. In other words, in a preferred embodiment, the cut does not extend through both rings in the same position—as a result, the top and bottom rings have an overlap in the area between the cut in the top and bottom ring as shown in FIGS. 24 and 25. This overlap configuration can be used with any of the embodiments of the present invention. In the embodiments of FIGS. 22-25, it is used with a locking pin to secure the two rings. As shown in the figures,

ring 240 includes a pin 246 which is located in this overlap area extends through a opening or channel 242. In the open position, shown in FIG. 24, the pin 246 is separated from channel 242 forming a gap for placing the ring on a rod. In the closed position, shown in FIG. 24, pin 246 inserts snugly into channel 242 to seal the ring.

In further embodiments of the invention, a ring 250 is provided, as shown in FIG. 26. Ring 250 includes an internal sliding member 254 which can be pushed or pulled using knob 256. Sliding member 254 slides into and out of internal channel 258 to close and open gap 252. In an alternative embodiment, shown in FIG. 27, a pivoting member 264 is provided, having a pin 265 which inserts into an opening 266. Pivoting member 264 can be rotated to open or close gap 262. In general, the embodiments of FIG. 22-27 are useful for providing a very secure ring which cannot accidentally be pulled off of a rod. They also increases the smoothness of the sliding of the rings along the rod.

In a further embodiment of the invention, a tape or strip may be provided as shown in FIG. 28. Strip 306 can be used to convert an existing curtain or other hanging product 302 into one of the present invention, or can be used to provide a hanging product in which the specific types of fasteners or provided on top can be interchanged. Strip 306 includes attachment devices 308 which attach to the top of the hanging product 302. The attachment device can be reversibly detachable, e.g. via snaps, a button and hole type design, a zipper, or a hook, or can be more permanent, e.g. via sewing, welding, adhesive, or so forth. Any other attachment methods for attaching the strip to the hanging product can be used as well. In one embodiment, an existing hanging product with holes 310 can easily be converted to one of the present invention by attaching the strip 306 to the hanging product using the holes 310. As with the other hanging products of the present invention, the hanging product 302 can be woven, non-woven, rigid, semi-rigid, or so forth.

Further in accordance with the invention, any of the embodiments of the present application can be placed in sequence from right to left, as shown in FIG. 29. This allows a person to cover a long window, shower or so forth, by using two or more curtains when the item to be covered is longer than the width of a single curtain. In addition, overlaps can be used, as shown in FIG. 29. When the curtains are overlapped, the edge of one curtain 320 extends beyond the edge of the other curtain 330, minimizing or eliminating the appearance of any gap between the curtains.

As shown in FIG. 30, the slit 344 can include a segment or slit 344a which extends through the hanging product 350, and a segment or slit 344b which extends through the ring 340. As previously discussed with respect to FIG. 20, the slit 344 need not be in a straight line. As shown in FIG. 30, slit 344a is at an angle to slit 344b, the angle being other than 180 degrees. If desired, the slits 344a and 344b can combine to form a curved slit, or can be two straight segments at any angle to each other, the latter being shown in FIG. 30.

As shown in FIG. 31(a), in a further preferred embodiment the hanging product includes an inner cut-out area 380, also shown as 151 in FIG. 14. The hanging product includes a slit 370 which extends from the edge of the hanging product to the inner cut-out area 380. Slit 370 includes a left radial edge 375a and a right radial edge 375b. Preferably, the slit is an offset slit. Further preferably, the radius of the left radial edge 375a is different than that radius of the right radial edge 375b. FIG. 31(a) can therefore be contrasted with FIG. 33 which shows an embodiment in which the left and right radial edges 388a and 388b are of equal radii, and wherein the slit is not offset but central, along the radius of

US 7,296,609 B2

11

the circle. It is also preferred that the left radial edge and right radial edge contact each other, as shown in both FIGS. 31(a) and 33, although a gap can alternately be provided.

A hanging product can also have a ring designed in this fashion, as shown in FIG. 31(b). Ring 400 is provided as part of hanging product 401. Ring 400 includes a slit 412. Slit 412 (and likewise ring 400) has a left radial edge 402a and a right radial edge 402b, wherein left radial edge 402a and right radial edge 402b have different radii. The ring 400 includes an edge 404 which is flat along at least a portion of the upper edge of the ring and preferably overlaps hem 406. Extension 408 off of the ring 400 further serves to ease the opening of the ring and its attachment onto a rod, and also serves to support the hem 406.

Although the present inventions have been described in some embodiments using curtains as an illustration, it is to be understood that they may be used with any of the products of the related applications listed above, the contents of which are incorporated herein by reference.

Having described this invention with regard to specific embodiments, it is to be understood that the description is not meant as a limitation since further modifications and variations may be apparent or may suggest themselves. It is intended that the present application cover all such modifications and variations.

What is claimed is:

1. A product, said product comprising:
a curtain, said curtain comprising a ring, said ring comprising an outer circumference;
said curtain comprising an opening such that said curtain is suitable for suspension from a rod;
said ring comprising a slit extending through said ring to said opening;
wherein said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring, and wherein said projecting edge is provided next to said slit.

2. A product as claimed in claim 1, wherein said curtain is for hanging on a rod which is under a ceiling, and wherein said projecting edge extends toward the ceiling when said curtain is suspended on the rod.

3. A product as claimed in claim 1, wherein said ring comprises two projecting edges, one on each side of said slit.

4. A product as claimed in claim 1, wherein said slit is curved.

5. A product as claimed in claim 1, wherein said ring comprises an inner circumference and a top, and wherein said slit intersects said inner circumference at an position offset from said top.

12

6. A product as claimed in claim 1, wherein said curtain is a shower curtain.

7. A product as claimed in claim 1, wherein said curtain comprises a window treatment.

8. A product as claimed in claim 1, wherein said curtain comprises drapery.

9. A method, comprising:
providing a ring for use to hang an item on a rod, said ring comprising an outer circumference;
said item having an opening suitable for suspension of said ring from a rod;
said ring comprising a slit extending through said ring to said opening;
wherein said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring, and wherein said projecting edge is provided next to said slit.

10. A method as claimed in claim 9, further comprising the step of attaching said ring to the item to hang said item on a rod under a ceiling, such that said projecting edge extends toward the ceiling when the item is suspended on the rod.

11. A method as claimed in claim 9, wherein said ring comprises two projecting edges, one on each side of said slit.

12. A method as claimed in claim 9, wherein said slit is curved.

13. A method as claimed in claim 9, wherein said ring comprises an inner circumference and a top, and wherein said slit intersects said inner circumference at an position offset from said top.

14. A method as claimed in claim 9, wherein the item comprises a shower curtain.

15. A method as claimed in claim 9, wherein the item comprises a window treatment.

16. A method as claimed in claim 9, wherein the item comprises drapery.

17. A product as claimed in claim 1, wherein said slit extends through approximately the 1 o'clock or 2 o'clock position on said ring.

18. A product as claimed in claim 1, wherein said slit extends through approximately the 10 o'clock or 11 o'clock position on said ring.

19. A product as claimed in claim 1, wherein said curtain comprises an upper edge and said projecting edge overlaps said upper edge of said curtain.

* * * * *

US008235088B2

## (12) United States Patent
### Zahner

(10) Patent No.: **US 8,235,088 B2**
(45) Date of Patent: **Aug. 7, 2012**

(54) **HANGING PRODUCTS**

(75) Inventor: **David Zahner**, New York, NY (US)

(73) Assignee: **Zahner Design Group, Ltd.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/978,532**

(22) Filed: **Oct. 29, 2007**

(65) **Prior Publication Data**

US 2008/0202710 A1    Aug. 28, 2008

**Related U.S. Application Data**

(60) Continuation of application No. 11/209,334, filed on Aug. 23, 2005, now Pat. No. 7,296,609, which is a continuation of application No. 10/320,340, filed on Dec. 16, 2002, now Pat. No. 6,935,402, which is a continuation of application No. 09/617,402, filed on Jul. 17, 2000, now Pat. No. 6,494,248, said application No. 10/320,340 is a division of application No. 10/062,588, filed on Jul. 5, 2001, which is a continuation of application No. 09/738,555, filed on Dec. 15, 2000, now abandoned, said application No. 10/320,340 is a division of application No. 09/916,603, filed on Jul. 27, 2001, now Pat. No. 7,058,988, which is a continuation of application No. 09/738,545, filed on Dec. 15, 2000, now abandoned.

(60) Provisional application No. 60/171,081, filed on Dec. 15, 1999, provisional application No. 60/203,873, filed on May 12, 2000, provisional application No. 60/217,747, filed on Jul. 12, 2000, provisional application No. 60/150,876, filed on Aug. 26, 1999, provisional application No. 60/143,853, filed on Jul. 15, 1999.

(51) **Int. Cl.**
*A47H 1/00*    (2006.01)

(52) **U.S. Cl.** .................... 160/330; 160/390; 160/DIG. 6

(58) **Field of Classification Search** ................. 160/330, 160/348, 383, 384, 385, 390, 327, 368.1, 160/405, DIG. 6; 16/87 R, 87.2; 24/716; 4/558, 608

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 554,066 | A | | 2/1896 | Jager |
| 635,295 | A | * | 10/1899 | Brown ...................... 16/87.2 |
| 759,045 | A | | 5/1904 | Tracy |
| 987,983 | A | | 3/1911 | Harris |
| 996,886 | A | * | 7/1911 | Schneider ................. 16/87.2 |
| 1,193,891 | A | | 8/1916 | Greene |
| 1,338,783 | A | | 5/1920 | Lobar |
| 1,345,547 | A | | 7/1920 | McDonald |
| 1,564,301 | A | | 12/1925 | Wilson |
| 1,687,859 | A | | 10/1928 | Fontaine |
| 1,831,776 | A | | 11/1931 | Nelson |
| 1,957,096 | A | | 5/1934 | Connell |
| 1,990,278 | A | | 2/1935 | Freidmann |
| 2,011,815 | A | | 8/1935 | Johnson |
| 2,551,384 | A | | 5/1951 | Middleton et al. |
| 2,613,368 | A | * | 10/1952 | Rosenbaum ................. 4/608 |
| 2,666,481 | A | * | 1/1954 | White ................... 160/348 |
| 2,711,555 | A | | 6/1955 | Hanson |
| 2,828,900 | A | | 4/1958 | Le Roy |
| 2,831,538 | A | * | 4/1958 | Lishman ................... 160/330 |

(Continued)

*Primary Examiner* — David Purol

(74) *Attorney, Agent, or Firm* — Goldberg Cohen LLP

(57)    **ABSTRACT**

Hanging products having an opening for suspending the item from a rod, the hanging product being provided with a ring having a gap, the ring further being provided with a movable member for opening and closing the gap.

**14 Claims, 7 Drawing Sheets**



**US 8,235,088 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,897,535 | A | | 8/1959 | Radler |
| 3,115,181 | A | | 12/1963 | Snyder |
| 3,388,734 | A | * | 6/1968 | Silvestre ..................... 160/348 |
| 3,772,734 | A | | 11/1973 | Kimel |
| 3,897,535 | A | | 7/1975 | Lapac et al. |
| 4,031,943 | A | * | 6/1977 | Silvestre ..................... 160/330 |
| 5,101,877 | A | | 4/1992 | Subecz et al. |
| 5,111,868 | A | * | 5/1992 | Sawaya ..................... 160/330 |
| 5,186,232 | A | * | 2/1993 | Zahner ..................... 160/330 |
| 5,367,742 | A | | 11/1994 | Bindman |
| 5,421,059 | A | | 6/1995 | Leffers, Jr. |
| 5,590,972 | A | | 1/1997 | Shobin |
| 5,806,141 | A | | 9/1998 | Kolisch |
| 6,059,009 | A | * | 5/2000 | Haiber ..................... 160/330 |
| 6,189,597 | B1 | * | 2/2001 | Cheng ..................... 160/383 |
| 6,494,248 | B1 | * | 12/2002 | Zahner ..................... 160/330 |
| 6,935,402 | B2 | * | 8/2005 | Zahner ..................... 160/330 |
| 7,296,609 | B2 | * | 11/2007 | Zahner ..................... 160/330 |

* cited by examiner

FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B

FIG. 4C





FIG. 5
(PRIOR ART)

FIG. 6

FIG. 7
(PRIOR ART)

FIG. 8

FIG. 9

FIG. 10

FIG. 11
(PRIOR ART)

FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



### FIG. 18



### FIG. 19

### FIG. 20



### FIG. 21



*FIG. 22*



*FIG. 23*



*FIG. 24*



*FIG. 25*



*FIG. 26*



*FIG. 27*



Appx450

*FIG. 28*



*FIG. 29*

*FIG. 30*



*FIG. 31A*



*FIG. 31B*



*FIG. 32*



*FIG. 33*



Appx452

US 8,235,088 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# HANGING PRODUCTS

## RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 11/209,334 filed Aug. 23, 2005 (patented, U.S. Pat. No. 7,296,609), which is a continuation of U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002 (patented, U.S. Pat. No. 6,935,402), which is a continuation of U.S. Nonprovisional Application Ser. No. 09/617, 402 filed Jul. 17, 2000 (patented, U.S. Pat. No. 6,494,248 B1), which claims the benefit of U.S. Provisional Application Ser. No. 60/143,853 filed Jul. 15, 1999, the benefit of U.S. Provisional Application Ser. No. 60/150,876, filed Aug. 26, 1999, the benefit of U.S. Provisional Application Ser. No. 60/171, 081 filed Dec. 15, 1999, and the benefit of U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000.

The parent application, U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002 (patented, U.S. Pat. No. 6,935, 402), is also a divisional of U.S. Nonprovisional Application Ser. No. 10/062,588 filed Jul. 5, 2001 (pending), which is a continuation of U.S. Nonprovisional Application Ser. No. 09/738,555 filed Dec. 15, 2000 (abandoned), which claims the benefit of U.S. Provisional Application Ser. No. 60/171, 081 filed Dec. 15, 1999, the benefit of U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000, and the benefit of U.S. Provisional Application Ser. No. 60/217,747 filed Jul. 12, 2000.

The parent application, U.S. patent application Ser. No. 10/320,340 filed Dec. 16, 2002 (patented, U.S. Pat. No. 6,935, 402), is also a divisional of U.S. Nonprovisional Application Ser. No. 09/916,603 filed Jul. 27, 2001 (patented, U.S. Pat. No. 7,058,988), which is a continuation of U.S. Nonprovisional Application Ser. No. filed 09/738,545 filed Dec. 15, 2000 (abandoned), and which claims the benefit of U.S. Provisional Application Ser. No. 60/171,081 filed Dec. 15, 1999, U.S. Provisional Application Ser. No. 60/203,873 filed May 12, 2000, and U.S. Provisional Application Ser. No. 60/217, 747 filed Jul. 12, 2000.

The priority of all of those applications is claimed, and the contents of all of those applications are hereby fully incorporated into this application by reference.

## FIELD OF THE INVENTION

The present invention relates to an accessory for attaching and detaching materials from a rod without requiring removal of the rod or adding additional hardware, such as hooks or the like, to the fabric.

## BACKGROUND OF THE INVENTION

U.S. Pat. No. 5,186,232, issued on Feb. 16, 1993 (which is fully incorporated herein by reference), discloses and claims an accessory product for easily mounting and detaching a material from a rod without removing the rod. The accessory product is intended for use with hanging or otherwise suspended materials, such as window treatments (window curtains, drapes, etc.), shower curtains, windscreens, towels, and so forth. Such suspended materials (referred to herein as "hanging materials" for brevity) are well known in the art, and are often mounted onto rods.

In one system of the prior art, separate devices, such as hooks or clips, are utilized to connect portions of the curtain to the rod. In an alternative system of the prior art, the curtain or drape is mounted by threading a rod through the reinforced holes in that curtain.

As an advance over the prior art products, the '232 patent discloses an accessory invention, as shown in FIG. 5, which allows a curtain or so forth to be attached to a mounting rod without the need for hanging support hooks, clips, and so forth, while also avoiding the need to remove the rod from its supports. The accessory is useful in a large variety of applications, including shower curtains and other household and commercial products. It involves a series of reinforced openings with slits provided between alternating paired sets of holes, thereby allowing the hanging material to be attached over the rod without the need for threading or hooks. Further advances and improvements to the inventions disclosed in the '232 patent are provided herein.

## SUMMARY OF THE INVENTION

In accordance with the invention, a hanging material such as a curtain (e.g. a window curtain or a shower curtain) or other product is provided with a slit therein for attachment of the hanging material to a fixed rod without removing the rod. In a preferred embodiment, the material has a fastener therein, as well, the slit extending through the fastener. In a further preferred embodiment, the hanging material includes at least one external slit, i.e. a slit, at any angle, which intersects an edge of the hanging material. In a further preferred embodiment, the external slit is one (at any angle) which extends through the inside circumference or inner edge of a fastener at one end and the outer edge of the hanging material at the other end.

The invention can be used for window treatments, shower curtains, drapery, portieres, room dividers, blinds, accessory tapes, and windscreens, or other hanging items. The fastener, which can be made of a rigid, or semi-rigid material (i.e. a material with some flexibility), is preferably integrated into the hanging material and facilitates the attachment of the material to the rod without the need to remove the rod from its supports. The slit is of any shape or size desired. Further objects and features of the invention will be apparent in conjunction with the drawings and detailed disclosure provided herein.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a front view of an hanging product having at least one external slit therein, in accordance with one embodiment of the present invention.

FIG. 2 is a front view of a hanging product in accordance with a further embodiment of the present invention, utilizing an open ring structure.

FIG. 3 is a front view of the product of FIG. 2, showing the product placed onto a rod.

FIGS. 4(a) and 4(b) are front view of further embodiments of the invention, in which the rings of the invention are elongated. FIG. 4(c) is a top view of the embodiment of FIG. 4(b).

FIG. 5 is a front view of a horizontally-slit accessory product, in accordance with the invention of U.S. Pat. No. 5,186, 232.

FIG. 6 is a front view of a hanging product with externally slit rings, in accordance with the present invention.

FIG. 7 is a top view of the embodiment of FIG. 5.

FIG. 8 is a top view of the embodiment of FIG. 6.

FIG. 9 is a perspective view of multiple layers of curtains for sitting on a single rod, at least one curtain having externally slit rings, in accordance with the present invention.

FIG. 10 is a top view of the embodiment of FIG. 9.

FIG. 11 is a front view of a horizontally-slit accessory product in accordance with the prior art.

US 8,235,088 B2

3

4

FIGS. **12** and **13** are front views of open, externally slit, rings in accordance with further embodiments of the present invention.

FIG. **14** is front view of a rigid or semi-rigid material having a external slit therein, in accordance with the invention.

FIG. **15** is a front view of a externally slit ring having a lower tab for attachment to a hanging sheet of material in accordance with a further embodiment of the present invention.

FIGS. **16** and **17** are front views of slit rings of the present invention in which the rings overlap and extend above the hem of the hanging material.

FIGS. **18**, **19** and **20** are front views of further embodiments of the present invention, in which a projection, extension or finger is provided to the slit ring.

FIG. **21** is a front view of a further embodiment of the invention, in which a flat upper surface is provided to the ring to extend along and support the hanging product's hem, with an alternate location for the slit being shown in dotted outline.

FIG. **22** is a front view of further embodiments of the invention, showing the front and rear rings cut at offset positions, and showing a locking pin is used to open and close the ring.

FIG. **23** is a rear view showing the embodiment of FIG. **22**.

FIG. **24** is a side view of the embodiments of FIGS. **22** and **23**, showing the ring in the closed position.

FIG. **25** is a side view of the embodiments of FIG. **22-24**, showing the ring in the open position.

FIG. **26** is a front cross-sectional view, of a further embodiment of the present invention.

FIG. **27** is a front view of a further embodiment of the present invention.

FIG. **28** is a front view of an accessory strip and hanging product in accordance with a further embodiment of the present invention.

FIG. **29** is a top view of a method for sequentially arranging the embodiments of the present invention.

FIGS. **30-33** are front views of further embodiments of the present invention.

DETAILED DESCRIPTION OF THE
INVENTIONS AND THE PREFERRED
EMBODIMENTS

In accordance with the present invention, an apparatus is provided which allows a curtain or so forth to be attached to a mounting rod without the need for using additional support hooks, clips, or like, and while also avoiding the need to remove the rod from its supports.

In the present invention, as shown in FIG. **1**, openings are provided each having a slit provided therein. In accordance with the invention, the slit can be of any shape or size desired, whether straight, curved, or so forth. Likewise it can be of any width desired, whether a uniform width, or a width which changes over the length of the slit, e.g. in an hourglass shape, as with slit **390** of FIG. **33**.

In the embodiment shown in FIG. **1**, each opening is reinforced with a fastener such as a ring **10**. Ring **10** can be made of homo polypropylene, ABS, or other suitable materials. These materials are strong enough to support the various fabrics commonly used for curtains, drapes, and so forth. In addition, they also have excellent memory so that, after being flexed to fit over the rod, the ring automatically springs back to its original position.

As disclosed in the '232 patent, pairs of rings can be provided having a horizontal slit connecting each pair. In a fur-

ther embodiment of the invention, the hanging product includes at least one external slit therein. By external slit, the present application refers to a slit which passes through the material of the hanging product (and through a ring as well if one is provided) to ultimately exit outside the suspended material **20**. Examples of external slits are horizontal external slit **12** and vertical external slit **17**. Various other examples of external slits are provided herein.

The external slit can be in any orientation and, when used in conjunction with a ring, can extend through any position on the ring, whether the "12 o'clock" position, or to 1 o'clock, 2 o'clock, 10 o'clock, 11 o'clock, or so forth. Rings with external slits can be provided to the hanging product in addition to the horizontally slit rings of the '232 patent, as shown, for example, in FIG. **1**. Alternatively, the hanging product can be provided with externally slit rings only.

In the embodiment shown in the FIG. **1**, the ring **10** is located within the suspended material **20** and external slit **17** extends from the ring and through the suspended material **20**, exiting at the suspended material **20**'s edge. In other words, a space of suspended material **20** exists between the ring **10** and the outside of the suspended material **20**, and the external slit extends through that space. Ring **10**, as with the other rings or fasteners of the present invention can be attached to the hanging product via any desired secure means. For example, the rings can be attached by staking, by sealing, by sewing, by welding, or by using any of the methods of U.S. Provisional Application Ser. No. 60/150,876, filed Aug. 26, 1999, whose contents are fully incorporated herein by reference.

In one embodiment of the invention, as shown in FIG. **1**, a closed ring **10** is provided. The term closed ring refers to the fact that the external slit is normally "closed"—i.e. the two radial edges which form the slit **17** are pressed together. In this embodiment, the ring has some degree of flexibility, and must be flexed for the slit to open, i.e. for the edges of the slit to move some distance apart. Flexing the ring increases the width of the gap to insert the ring over the rod. The slit extends through the ring until the edge of the hanging product (whether that edge of the hanging product is beyond the edge of the ring or coincides with it as shown in various embodiments below).

In an alternate or additional embodiment of the invention, as shown in FIG. **2**, an open ring **30** is provided in the material **32** for attachment of the hanging product to the rod or bar **34**. In accordance with this embodiment, ring **30** is an open ring which is provided with rounded edges **36**. A space is provided between the edges of the open ring, forming a mouth or gap **38** which acts as the external slit. Preferably, the gap is approximately ¹⁄₁₆" to ⅛" in diameter, although larger or smaller gaps can be used, depending on the application, rod size, and shape. Further preferably, the upper edge of ring **30** is tangent to the upper edge **39** of suspended material **32**.

In this embodiment, rounded edges **36** and mouth **38** form an external slit design which is easier for a person to attach to rod **34**. The embodiment of FIG. **2** is to be contrasted with the embodiment shown in FIG. **1**. As shown in FIG. **1**, a closed ring is provided having a radial slit therethrough. The ring is closed in that the slit **17** consists of a right radial edge and a left radial edge of the ring, those right and left radial edges being pressed against each other. In contrast, the embodiment of FIG. **2** provides an open ring structure in which a gap exists between the left radial edge **36a** of the ring and the right radial edge **36b** of the ring, radial edges **36a** and **36b** being the edges extending from the outer circumference or outer edge **26** to the inner circumference or inner edge **28** of the fastener or ring.

US 8,235,088 B2

5 6

Furthermore, it is preferred that the radial edges of the open ring be rounded as shown in FIG. 2. Open mouth 38 and rounded edges 36 facilitate the attachment of the ring to the rod from below, and further facilitate the attachment of the ring with one hand. These features are of general advantage to all users, and are of particular advantage to those who may be shorter such as children and the handicapped, or who have trouble opening the ring due to problems such as arthritis.

FIG. 3 illustrates the embodiment of FIG. 2 as attached to rod 34. In addition to providing ease of attachment, the embodiment of FIG. 2 also provides ease of detachment. Furthermore, as a safety function, if the suspended material is pulled strongly enough from the bottom, the ring and suspended material will easily detach from the rod before pulling the rod out of the wall due to the presence of the wide mouth.

In an alternate embodiment of the invention, ring 50 is elongated in shape, as shown in FIG. 4a. In the preferred embodiment, the elongated shape is an oval. The elongated shape of the ring facilitates attachment of the ring to a square or rectangular rod. As a result, the embodiment can be utilized with drapes, window treatments, blinds, and so forth. Ring 50 can include an open mouth 58, as in the embodiment of FIG. 2, or, alternatively, it can have a closed mouth, such as shown in FIG. 1 and. for example, FIGS. 22-27. The ring can also have the upper edge of ring 50 tangent to upper edge 59 of the suspended material. As an alternative to the use of an oval, which is preferred, the elongated ring can be any non-circular shape, including, for example, a rectangle or quadrilateral. One such shape is provided in FIG. 4(b). Moreover, the external and/or internal edges of the ring need not be rounded although they are preferably so.

The ring 50 can be elongated vertically, as shown in FIG. 4(a), or can be elongated horizontally, as shown in FIG. 4(b). Use of the horizontally elongated ring 70 of FIG. 4(b) allows the curtain 72 to spread more in a lateral direction (i.e. from left to right) along the curtain rod. The same curtain will spread out or widen more along a rod 74 using the horizontally elongated ring of FIG. 4(b) than it would using a rounded ring such as the ring 30 of FIG. 2. Thus, using the embodiment of FIGS. 4(b) and 4(c), less curtain material is needed to cover the width of a given window, or to extend along the width of a given shower, or so forth. The width of curtain material necessary is less than with the hooks of the prior art and is also less than with the external slit embodiment shown in FIG. 2. This embodiment is also useful in conjunction with pleated curtains (including shower curtains), blinds, portierres, room dividers, window treatments, drapery, curtains sharper folds, and the like, as in FIG. 4(c).

An illustration of a comparison of the unmodified invention of the '232 patent to the external slit inventions of the present application is shown in FIGS. 5 through 8. FIG. 5 is a front view of the invention of the '232 patent, with FIG. 7 being a top view thereof. FIG. 6 is a front view of the external slit inventions herein, with FIG. 7 being a top view thereof.

As shown in the figures, in some instances the external slit devices may be used to provide certain patterns of flow of a curtain (e.g. the way it folds, hangs, etc). Depending on the desired results, they may be used in conjunction with the rings of the '232 device or by themselves. As shown in FIG. 5 and in the top view of FIG. 7, using the devices of the '232 patent, the left (and right) edge of the curtain 82 will normally point outward (away from a shower or window) when placed on a rod 84. If the end of the '232 curtain were placed on rod 84 to point inward (toward a shower or window, as shown, for example, in FIG. 8 with respect to the external slit embodiment) the horizontal slit between the rings would be forced out toward the viewer. This is unusable, however, since it

would make the horizontal slit visible which is aesthetically undesirable. In the normal design of the '232 patent, the horizontal slit is only placed between every second pair of rings rather than between every pair, causing the horizontal slits to all face toward the wall and not toward the viewer. Yet, a consequence of this is that the leftmost and rightmost ends of the curtain are both concave toward the wall, as shown in FIG. 7.

In many applications (such as with window curtains, for example) it is normally preferable to have the curtain concave toward the viewer, i.e. the edge pointed away from the viewer as shown in FIG. 8. This effect is produced by the external slit embodiments, as shown in FIGS. 6 and 8. When the curtain is concave in this fashion, a more aesthetic appearance is produced for the curtain. Indeed, this is the industry standard for curtains. In addition, light is more effectively blocked from the window behind the curtain since the curtain cups against the wall, and likewise water is contained more effectively in the shower, as shown in FIG. 8.

The external slit inventions of the present application can also be used to facilitate the placement of multiple layers of curtains on a rod. In many applications, such hotels, motels, or so forth, a fabric curtain 100 is placed on a rod 104 with a second curtain or liner 120 placed behind it. A decorative fabric shower curtain, is often provided with a plastic liner behind it, the plastic liner protecting the fabric from the water of the shower. In accordance with the external slit inventions of the present application, each layer of curtain can be removed independently from the rod 104 without the need to remove any other layer, as shown in FIGS. 9 and 10.

If the liner is designed according to the inventions of the '232 patent, for example, to replace the plastic liner, the fabric curtain must first be removed from the rod, then the old liner must be removed from the rod, then the new liner is placed on the rod. and then the fabric curtain is replaced on the rod. With a liner made according to the external slit inventions herein, however, the old liner can be directly removed from the rod and a replacement liner easily placed onto the rod, without the need to remove the fabric curtain, even if the fabric curtain is made according to the '232 patent.

The present inventions also eliminate the problem of possible drooping shown in FIG. 11. In some instances, e.g. with a heavy or a sheer fabric 110, or when there is a large spacing between the rings or fasteners the horizontal slit of the '232 inventions may droop, causing an aesthetically unpleasing effect. With the external slit embodiments disclosed herein, however, such droop is obviated.

In addition, the present inventions allow the width and the spacing of the flow of the curtain to be adjusted more readily. Using an approach purely like the '232 patent requires an even number of rings. The use of one or more external slits (in conjunction with the '232 patent design or using only external slits), on the other hand, allows an odd number of rings which is sometimes necessary due to spacing considerations between the rings (e.g. for flow of the curtain) and due to considerations governing the necessary width of the curtain or other hanging product.

In one embodiment of the present inventions, ring 130 is fully within the suspended material 132. As shown in FIG. 12, in this embodiment ring 130 is below or touching hem 137 of suspended material 132.

In an alternate embodiment, ring 140 overlaps with hem 147 of the curtain or suspended material 142. Preferably, the top of ring 140 is also tangent to top edge 149 of the curtain. The cutting of a series of external slits 143 across the length of the hem 137 of the curtain can often result in a hem which will droop or hang downward. Accordingly, in the embodi-

US 8,235,088 B2

7

ment of FIG. **13**, the ring **140** acts to reinforce the hem, suspending the hem upward and preventing drooping. Preferably, the ring is an open ring with rounded edges, as discussed above with respect to FIG. **2**. Likewise, an open ring with rounded edges (or one of the other embodiments of the present invention), or a ring with a locking device (e.g. as shown in FIGS. **22-27**) can also be substituted for the closed ring shown in the other figures of the present application. Even though a simple slit in a closed ring is often provided for simplicity of illustration, the present inventions are not limited to such a closed ring.

In a further alternate embodiment, as shown in FIG. **16**, ring **180** overlaps with the edge of the curtain **182**, such that ring extends beyond hem **187**. This embodiment can be used, for example, to lengthen the curtain. The embodiment can be used with a externally slit ring **180** as shown in FIG. **16**, or with a horizontally slit ring **190**, as shown in FIG. **17**. In yet a further embodiment, a tab **175** can be placed at the bottom of a ring **170** (either horizontally slit as shown, or a externally slit ring). Tab **175** is used to attach the ring to a curtain **172**, e.g. at the hem **177**.

Any desired fabric material can be used in accordance with the present invention. For example, the fabric material can be vinyl, cotton, polyester, polyester/cotton or any other natural or synthetic fabric, including woven or non-woven fabrics, and can be rigid, semi-rigid, paper, plastic, wood, metal, or the like. In one embodiment of the invention, two half rings are placed together to encapsulate the fabric material therein. In an alternate embodiment, a single ring is integrated into the fabric material.

In a further embodiment, the ring-like shape is cut directly into the material, without attaching a ring or fastener as an intermediate attachment to the hanging material. Two such embodiments are shown in FIG. **14** (left and right radial edges of slit separate) and FIG. **33** (left and right radial edges of slit touching), although any of the slit designs of the present application can be used. Other examples of preferred embodiments are shown in FIGS. **31-32**. The hanging product **160** is preferably made of a relatively rigid or semi-rigid material such as a thick vinyl, either throughout the product, or at least in the area of the ring. For example, the design can be used as part of a set of blinds or so forth. The external slit **153** can be a simple closed slit, if desired, as in FIG. **1**. Alternatively, it can be a more rounded design such as shown in FIGS. **2** and **14**. An open slit (i.e. one with a gap between the left and right radial edges) with rounded edges is preferred. However, closed slits with rounded radial edges can be provided in this embodiment or any other embodiment of the application, as shown in FIGS. **30-33**. Such closed slits with rounded radial edges are ones in which the left and right radial edges are rounded, but are also touching when the slit is not being flexed. Such closed slits with rounded radial edges provided in rings attached to the hanging product as shown, for example, in FIG. **30**.

A projection, extension or finger can also be provided to the ring as shown in FIGS. **18**, **19** and **20**. As illustrated in the figures, in further embodiments of the invention, a ring **200**, **210** or **220** is provided with a projecting edge, flange, extension, or finger **206**, **216** or **226**. Extensions **206**, **216** or **226** are projections off of the ring (preferably off of the ring's outer circumference), which extend beyond the ring away from the hanging product (e.g. toward the ceiling). The extensions are each located adjacent to and to the side of the slit **204**. Preferably two extensions are provided, one on each side of the slit. In the preferred embodiment, the slit preferably exits at the top of the product (i.e. at the 12:00 position), and as a result, the extensions are likewise preferably provided on top

8

of the product, on both sides of the ring. Alternatively, however, the slit in any of the embodiments of the present invention can exit at any side or edge of the product (at any location on the "clock face"), with one or two extensions being preferably provided on the side or sides of the slit, whichever side or edge of the product is chosen.

These extensions serve numerous functions. For example, they make it easier to open up the ring when flexing the ring. Extension **206** or **216** of FIGS. **18** and **19**, for example, are provided to overlap hems **207** and **217**, respectively, supporting the hems and preventing the drooping of the hem discussed above. Fingers **206** and **216** also cover the slit vertical edge of the hem, preventing it from fraying. Finger **226**, on the other hand, is provided above the hem **227**, with the ring **220** overlapping the hem to support it. In this embodiment, a portion of the ring—the finger only—projects above the upper edge of the curtain, similar in some ways to FIG. **16**.

In a further additional design, the fingers can be spread and opposed as shown in FIGS. **18** and **20**. As shown in FIG. **20**, for example, fingers **226** can be provided as opposed "thumbs". In other words, inner edges **224a** and **224b** are at an angle to each other greater than 0 (zero) degrees but less than 180 degrees. This is in contrast to the inner edges **214a** and **214b** of the fingers of FIG. **19**, which are parallel to each other. These spread fingers facilitate attachment of the rings **200** and **220** to a rod. They make it easier to slide the ring into the rod until the ring is pushed over the rod. They also make it easier to spread the ring open by hand to insert it over the rod, and to spread the ring open to remove it from the rod. They facilitate attachment whether a simple external slit through the ring is used (as shown in FIGS. **18-20**), or alternatively in conjunction with open rings with rounded edges (as shown in FIG. **2**).

As an alternative to a straight external slit, a curved external slit **232** can be provided. Further preferably, the slit can be curved and offset, as shown, for example, in FIG. **20**. In one embodiment, curved slit **232** has an upper vertical component **232a**, an approximately horizontal component **232b**, and a radial component **232c**. Radial component **232c** of slit **232** exits the inner circumference of the ring at a location which is offset to the side, rather than exiting the ring at the top of the inner circumference of ring **220** (i.e. rather than exiting directly below vertical component **232a**). In this embodiment, fingers **224a** and **224b** are pulled to the left and right, respectively to open up the ring **220** and insert the ring over a rod. Curved slit **232**, which intersects the inner circumference of the ring at an offset position rather than at the top of the ring, provides an advantage to the user in that the slit **232** will not sit directly on top of the rod while the curtain is in use. This eliminates the problem of the slit riding on the rod when the curtain is pulled open or closed. Instead, a smooth surface of the ring rides on the rod, easing movement of the curtain.

It will be likewise understood, that some or all of the features of FIG. **20** can be provided to any given product. For example, the curved slit can be provided with or without offset features, whether offset intersection points, or a bottom offset from the 12:00 position. Likewise, the various features of the embodiment of FIG. **20**, whether a curved slit and/or an offset and/or the fingers, can also be provided directly to the hanging product (without using a ring) as shown in FIG. **32**.

For example, the curved slit can be provided to exit the edge of the product at any exit point other than the top of the ring, with an offset between the intersection point of the curved slit with the inner circumference/edge of the product and the exit point of the product. In other words, by offset intersection points, the slit's endpoints are spaced from each other at their intersection points such that the two intersection

Appx456

US 8,235,088 B2

9

10

points are not at the same location were they placed on a standard clock. For example, if the intersection of the curved slit with the exit point from the product were at the 12:00 position (as shown in FIG. 20), the intersection of the curved slit at the inner edge would be at a point other than the 12:00 position (approximately 1:00 in FIG. 20). Or, likewise, if the intersection of the curved slit with the exit point from the product were at the 2:00 position instead, the intersection of the curved slit at the inner edge would be at a point other than the 2:00 position.

In a further embodiment, the ring 230 can be provided with a flat upper edge 235, as shown in FIG. 21. Upper edge 235 overlaps with hem 237. Upper edge 235, therefore, provides yet further support for the hem over an extended length of fabric. Using the embodiment of FIG. 21, upper edge 235 provides support over a length equal to approximately the outer diameter of the ring 230 for each ring. This upper edge can be the entire upper edge of the ring. Or, it can be used a portion of the upper edge, e.g. in conjunction with an extension off the ring, as shown, for example in FIGS. 18-20.

Instead of a vertical external slit 233a, a further offset slit 233b can be provided to any of the embodiments of the invention, as shown, for example, by the dotted line in FIG. 21. Offset slit 233b is a slit which intersects the inner circle 231 in a secant-like or tangent-like fashion. Offset slit 233b is off center, such that the line it makes (if extended) would not intersect the center of inner circle 231. Or, viewing the circumference of the inner circle, the intersection point of the slit with the inner circumference or edge of the product is offset from the 12:00 position on that inner circle. This offset slit allows the ring to glide more smoothly along the rod since the slit does not sit directly on the rod's top. In this further preferred embodiment, regardless of what position is chosen for the exit of the slit from the ring or product, the intersection of the slit at the inner edge is preferably at a point offset from the 12:00 position when the product is hanging, so that the slit does not ride on the rod as previously discussed.

In further embodiments of the invention, a ring is provided which can be selectively opened or sealed, i.e. "locked" as shown in FIGS. 22-25. FIG. 22 is a front view of ring 240, and FIG. 23 is a rear view of ring 240. As shown therein, the cut 243 in the top ring shown in FIG. 22 is spaced from the corresponding cut 244 in the bottom ring shown in FIG. 23. In other words, in a preferred embodiment, the cut does not extend through both rings in the same position—as a result, the top and bottom rings have an overlap in the area between the cut in the top and bottom ring as shown in FIGS. 24 and 25. This overlap configuration can be used with any of the embodiments of the present invention. In the embodiments of FIGS. 22-25, it is used with a locking pin to secure the two rings. As shown in the figures, ring 240 includes a pin 246 which is located in this overlap area extends through a opening or channel 242. In the open position, shown in FIG. 24, the pin 246 is separated from channel 242 forming a gap for placing the ring on a rod. In the closed position, shown in FIG. 24, pin 246 inserts snugly into channel 242 to seal the ring.

In further embodiments of the invention, a ring 250 is provided, as shown in FIG. 26. Ring 250 includes an internal sliding member 254 which can be pushed or pulled using knob 256. Sliding member 254 slides into and out of internal channel 258 to close and open gap 252. In an alternative embodiment, shown in FIG. 27, a pivoting member 264 is provided, having a pin 265 which inserts into an opening 266. Pivoting member 264 can be rotated to open or close gap 262. In general, the embodiments of FIG. 22-27 are useful for providing a very secure ring which cannot accidentally be

pulled off of a rod. They also increases the smoothness of the sliding of the rings along the rod.

In a further embodiment of the invention, a tape or strip may be provided as shown in FIG. 28. Strip 306 can be used to convert an existing curtain or other hanging product 302 into one of the present invention, or can be used to provide a hanging product in which the specific types of fasteners or provided on top can be interchanged. Strip 306 includes attachment devices 308 which attach to the top of the hanging product 302. The attachment device can be reversibly detachable, e.g. via snaps, a button and hole type design, a zipper, or a hook, or can be more permanent, e.g. via sewing, welding, adhesive, or so forth. Any other attachment methods for attaching the strip to the hanging product can be used as well. In one embodiment, an existing hanging product with holes 310 can easily be converted to one of the present invention by attaching the strip 306 to the hanging product using the holes 310. As with the other hanging products of the present invention, the hanging product 302 can be woven, non-woven, rigid, semi-rigid, or so forth.

Further in accordance with the invention, any of the embodiments of the present application can be placed in sequence from right to left, as shown in FIG. 29. This allows a person to cover a long window, shower or so forth. by using two or more curtains when the item to be covered is longer than the width of a single curtain. In addition, overlaps can be used, as shown in FIG. 29. When the curtains are overlapped, the edge of one curtain 320 extends beyond the edge of the other curtain 330, minimizing or eliminating the appearance of any gap between the curtains.

As shown in FIG. 30, the slit 344 can include a segment or slit 344a which extends through the hanging product 350, and a segment or slit 344b which extends through the ring 340. As previously discussed with respect to FIG. 20, the slit 344 need not be in a straight line. As shown in FIG. 30, slit 344a is at an angle to slit 344b, the angle being other than 180 degrees. If desired, the slits 344a and 344b can combine to form a curved slit, or can be two straight segments at any angle to each other, the latter being shown in FIG. 30.

As shown in FIG. 31(a), in a further preferred embodiment the hanging product includes an inner cut-out area 380, also shown as 151 in FIG. 14. The hanging product includes a slit 370 which extends from the edge of the hanging product to the inner cut-out area 380. Slit 370 includes a left radial edge 375a and a right radial edge 375b. Preferably, the slit is an offset slit. Further preferably, the radius of the left radial edge 375a is different than the radius of the right radial edge 375b. FIG. 31(a) can therefore be contrasted with FIG. 33 which shows an embodiment in which the left and right radial edges 388a and 388b are of equal radii, and wherein the slit is not offset but central, along the radius of the circle. It is also preferred that the left radial edge and right radial edge contact each other, as shown in both FIGS. 31(a) and 33, although a gap can alternately be provided.

A hanging product can also have a ring designed in this fashion, as shown in FIG. 31(b). Ring 400 is provided as part of hanging product 401. Ring 400 includes a slit 412. Slit 412 (and likewise ring 400) has a left radial edge 402a and a right radial edge 402b, wherein left radial edge 402a and right radial edge 402b have different radii. The ring 400 includes an edge 404 which is flat along at least a portion of the upper edge of the ring and preferably overlaps hem 406. Extension 408 off of the ring 400 further serves to ease the opening of the ring and its attachment onto a rod, and also serves to support the hem 406.

Although the present inventions have been described in some embodiments using curtains as an illustration, it is to be

US 8,235,088 B2

11

understood that they may be used with any of the products of the related applications listed above, the contents of which are incorporated herein by reference.

Having described this invention with regard to specific embodiments, it is to be understood that the description is not meant as a limitation since further modifications and variations may be apparent or may suggest themselves. It is intended that the present application cover all such modifications and variations.

What is claimed is:

1. A product, said product comprising:

a shower curtain, said shower curtain comprising an outer edge and an opening such that said product is suitable for suspension from a rod, said shower curtain further comprising a ring, wherein said ring reinforces said opening;

said ring comprising a flat upper edge, an inner circumference, and an outer circumference;

said ring further comprising a slit extending from said inner circumference through said ring and through said outer edge of said shower curtain;

said ring further comprising a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring; and,

wherein said slit exits said inner circumference at a location which is offset from the 12 o'clock position on said inner circumference.

2. A product as claimed in claim 1, wherein said projecting edge is provided adjacent said slit.

3. A product as claimed in claim 1, wherein said slit exits at the 1 o'clock position.

4. A product as claimed in claim 1, wherein said slit exits at the 2 o'clock position.

5. A product as claimed in claim 1, wherein said slit exits at the 10 o'clock position.

6. A product as claimed in claim 1, wherein said slit exits at the 11 o'clock position.

7. A product as claimed in claim 1, wherein said slit comprises a width, and wherein said ring has flexibility allowing increase of said width of said slit to insert said ring onto the rod.

8. A product, said product comprising:

a shower curtain, said shower curtain comprising an outer edge and an opening such that said shower curtain is suitable for suspension from a rod, said shower curtain comprising a front ring and a corresponding back ring such that said front ring and said back ring reinforce said opening;

12

each of said front ring and said back ring comprising a flat upper edge, an inner circumference, and an outer circumference;

said flat upper edge of said front ring being aligned with said flat upper edge of said back ring;

said inner circumference of said front ring being aligned with said inner circumference of said back ring;

said outer circumference of said front ring being aligned with said outer circumference of said back ring;

each of said front ring and said back ring further comprising a projecting edge, said projecting edge of said front ring being an edge which projects from said outer circumference of said front ring, and said projecting edge of said back ring being an edge which projects from said outer circumference of said back ring;

said projecting edge of said front ring being aligned with said projecting edge of said back ring;

each of said front ring and said back ring further comprising a slit, said slit of said front ring extending from said inner circumference of said front ring through said outer edge of said shower curtain, and said slit of said back ring extending from said inner circumference of said back ring through said outer edge of said shower curtain;

wherein said slit of said front ring exits said inner circumference of said front ring at a location which is offset from the 12 o'clock position on said inner circumference of said front ring; and,

wherein said slit of said front ring is aligned with said slit of said back ring.

9. A product as claimed in claim 8, wherein said slit of said front ring exits at the 1 o'clock position.

10. A product as claimed in claim 8, wherein said slit of said front ring exits at the 2 o'clock position.

11. A product as claimed in claim 8, wherein said slit of said front ring exits at the 10 o'clock position.

12. A product as claimed in claim 8, wherein said slit of said front ring exits at the 11 o'clock position.

13. A product as claimed in claim 8, wherein said projecting edge is provided adjacent said slit of said front ring.

14. A product as claimed in claim 8, wherein said slit comprises a width, and wherein said ring has flexibility allowing increase of said width of said slit to insert said ring onto the rod.

* * * * *



US00D746078S

(12) **United States Design Patent**
Zahner

(10) Patent No.: **US D746,078 S**
(45) Date of Patent: ** **Dec. 29, 2015**

(54) **SHOWER CURTAIN**

(71) Applicant: **David Zahner,** New York, NY (US)

(72) Inventor: **David Zahner,** New York, NY (US)

(73) Assignee: **Zahner Design Group, Ltd.,** New York, NY (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/530,488**

(22) Filed: **Jun. 17, 2015**

**Related U.S. Application Data**

(60) Division of application No. 14/458,664, filed on Aug. 13, 2014, which is a division of application No. 13/564,033, filed on Aug. 1, 2012, now abandoned, which is a continuation of application No. 11/978,532, filed on Oct. 29, 2007, now Pat. No. 8,235,088, which is a continuation of application No. 11/209,334, filed

(Continued)

(51) **LOC (10) Cl.** ..................................... **06-10**
(52) **U.S. Cl.**
      USPC ........................................................ **D6/580**
(58) **Field of Classification Search**
      USPC ............ D6/575, 580; D8/349, 352, 354, 367, D8/373
      CPC ....... A41D 27/22; A47H 13/00; A47H 13/02; A47H 15/04; A47H 23/10; A47K 3/38; E06B 9/38; Y10T 16/3797; Y10T 24/51
      See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,666,481 A | 1/1854 | White | |
| 554,066 A | 2/1896 | Jager | |
| 635,295 A | 10/1899 | Brown | |
| 676,650 A * | 6/1901 | Mendels | A41D 27/22 2/271 |
| 759,045 A | 5/1904 | Tracy | |

| | | | |
|---|---|---|---|
| 987,983 A | 3/1911 | Harris |
| 996,886 A | 7/1911 | Schneider |
| 1,193,891 A | 8/1916 | Greene |
| 1,245,354 A | 11/1917 | Kirsch |
| 1,338,783 A | 5/1920 | Lobar |
| 1,345,547 A | 7/1920 | McDonald |
| 1,564,301 A | 12/1925 | Wilson |
| 1,687,859 A | 10/1928 | Fontaine |
| 1,831,776 A | 11/1931 | Nelson |

(Continued)

*Primary Examiner* — Karen S Acker
(74) *Attorney, Agent, or Firm* — Goldberg Cohen LLP

(57) **CLAIM**
I claim the ornamental design for a shower curtain, as shown and described above.

**DESCRIPTION**

FIG. **1** is a front detail view of the shower curtain illustrated in area **1** circumscribed on FIG. **8;**
FIG. **2** is a front left perspective view of a shower curtain of the present invention shown in use on a shower curtain rod;
FIG. **3** is a front view thereof;
FIG. **4** is a back view thereof;
FIG. **5** is a right side view thereof (FIG. **5** being a view when the right front portion of the shower curtain is viewed along the axis of the curtain rod), with the left side view being a minor image thereof;
FIG. **6** is a top view thereof;
FIG. **7** is a bottom view thereof; and,
FIG. **8** is a front view of the shower curtain of FIG. **2** when not in use on a shower curtain rod.
The back of the design shown in FIG. **4** is not included in the claim.
The broken lines on the shower curtain depict features of the article that form no part of the claimed design.
The rod drawn in broken lines showing the shower curtain in use illustrates environmental subject matter not included in the claim.
The jagged line and the area between the jagged line and the solid lines of the claim depict portions of a shower curtain that form no part of the claim.

**1 Claim, 4 Drawing Sheets**



**US D746,078 S**

Page 2

**Related U.S. Application Data**

on Aug. 23, 2005, now Pat. No. 7,296,609, which is a continuation of application No. 10/320,340, filed on Dec. 16, 2002, now Pat. No. 6,935,402, which is a continuation of application No. 09/617,402, filed on Jul. 17, 2000, now Pat. No. 6,494,248, and a division of application No. 10/062,588, filed on Jul. 5, 2001, now Pat. No. 7,788,733, which is a continuation of application No. 09/738,555, filed on Dec. 15, 2000, now abandoned, said application No. 10/320,340 is a division of application No. 09/916,603, filed on Jul. 27, 2001, now Pat. No. 7,058,988, which is a continuation of application No. 09/738,545, filed on Dec. 15, 2000, now abandoned.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,957,096 A | 5/1934 | Connell | |
| 1,990,278 A | 2/1935 | Freidmann | |
| 2,011,815 A | 8/1935 | Johnson | |
| 2,093,069 A | 9/1937 | Geller | |
| 2,180,328 A * | 11/1939 | Carey | A47H 19/00 223/105 |
| 2,247,846 A * | 7/1941 | Perlman | A47H 13/00 160/370 |
| 2,422,963 A | 6/1947 | Alexander | |
| 2,551,384 A | 5/1951 | Middleton et al. | |
| 2,613,368 A | 10/1952 | Rosenbaum | |
| 2,629,436 A | 2/1953 | Alexander | |
| 2,711,555 A | 6/1955 | Hanson | |
| 2,828,900 A | 4/1958 | Le Roy | |
| 2,831,528 A | 4/1958 | Lishman | |
| 2,848,163 A | 8/1958 | Van Horne | |
| 2,888,226 A | 5/1959 | Andriot et al. | |
| 2,897,535 A | 8/1959 | Radler | |
| 2,952,315 A * | 9/1960 | Brontman | A47H 13/00 160/330 |
| 2,962,335 A | 11/1960 | Benson | |
| 2,966,695 A * | 1/1961 | Dwyer | A47H 15/04 16/93 D |
| 3,037,731 A * | 6/1962 | Licklider | A47H 15/00 16/87.4 R |
| 3,115,181 A | 12/1963 | Snyder | |
| 3,148,726 A | 9/1964 | Gerard | |
| 3,178,760 A | 4/1965 | Kalal et al. | |
| 3,192,994 A | 7/1965 | Graber et al. | |
| 3,196,511 A * | 7/1965 | Kintner | A44B 18/00 16/87.2 |
| 3,408,703 A | 8/1965 | Brandenberg | |
| 3,312,273 A * | 4/1967 | Adam | A47H 13/14 16/87.4 R |
| 3,315,683 A | 4/1967 | Rodriguez et al. | |
| 3,346,879 A | 10/1967 | Buzzeli | |
| 3,372,729 A | 3/1968 | Lindenmayer | |
| 3,388,734 A | 6/1968 | Silvestre | |
| 3,434,525 A | 3/1969 | Feldmuehle | |
| 3,602,286 A | 8/1971 | Hachtel | |
| 3,662,026 A | 5/1972 | Lawson | |
| 3,697,035 A | 10/1972 | Baker, Sr. | |
| 3,705,439 A | 12/1972 | Cooksey et al. | |
| 3,772,734 A | 11/1973 | Kimel | |
| 3,871,082 A | 3/1975 | Pflum | |
| 3,881,218 A | 5/1975 | Palmer | |
| 3,897,535 A | 7/1975 | Lapac et al. | |
| 4,031,943 A | 6/1977 | Silvestre | |
| 4,070,735 A * | 1/1978 | Canaday | A47K 3/38 160/349.2 |
| 4,166,494 A | 9/1979 | Utting | |
| 4,193,704 A | 3/1980 | Bushman et al. | |

| | | | |
|---|---|---|---|
| 4,202,059 A | 5/1980 | Faragher, Jr. | |
| 4,430,015 A | 2/1984 | Nerlinger | |
| 4,479,733 A | 10/1984 | Segal | |
| D276,212 S * | 11/1984 | Villanueva | D6/553 |
| 4,718,962 A | 1/1988 | Goodwin | |
| 4,809,401 A | 3/1989 | Honig | |
| 4,820,075 A | 4/1989 | Osono | |
| 4,928,743 A | 5/1990 | Wojtysiak | |
| 4,954,378 A * | 9/1990 | Goodman | A47H 13/02 428/137 |
| D322,211 S * | 12/1991 | Gary | D8/373 |
| 5,101,877 A | 4/1992 | Subecz et al. | |
| 5,111,868 A | 5/1992 | Sawaya | |
| 5,186,232 A | 2/1993 | Zahner | |
| D348,386 S * | 7/1994 | Cogburn | D8/367 |
| 5,367,742 A | 11/1994 | Bindman | |
| 5,421,059 A | 6/1995 | Leffers, Jr. | |
| 5,560,417 A | 10/1996 | Smiley | |
| 5,590,972 A | 1/1997 | Shobin | |
| 5,769,144 A | 6/1998 | Carter | |
| 5,806,141 A | 9/1998 | Kolisch | |
| D403,909 S | 1/1999 | Chen | |
| 5,890,604 A | 4/1999 | Heinz | |
| 6,012,594 A | 1/2000 | Heinz | |
| 6,059,009 A | 5/2000 | Haiber | |
| 6,109,456 A | 8/2000 | Heinz | |
| 6,138,324 A | 10/2000 | Liu | |
| 6,189,597 B1 | 2/2001 | Cheng | |
| 6,212,688 B1 | 4/2001 | Leslie | |
| 6,390,713 B1 | 5/2002 | Moor et al. | |
| D465,188 S * | 11/2002 | McCoy | D12/223 |
| 6,494,248 B1 | 12/2002 | Zahner | |
| 6,514,588 B2 * | 2/2003 | Rosenbaum | G09F 3/02 206/232 |
| 6,532,625 B1 | 3/2003 | Stone | |
| 6,546,571 B2 | 4/2003 | Samelson | |
| 6,935,402 B2 | 8/2005 | Zahner | |
| 7,003,848 B2 | 2/2006 | Ho | |
| D551,950 S | 10/2007 | Davenport | |
| 7,296,609 B2 | 11/2007 | Zahner | |
| D583,602 S | 12/2008 | Pannell | |
| D594,312 S * | 6/2009 | Clarke | D8/354 |
| 7,735,189 B2 | 6/2010 | Richardson | |
| 7,909,082 B2 | 3/2011 | Peoples | |
| D647,387 S | 10/2011 | Pawluk | |
| 8,118,078 B2 | 2/2012 | Freedland | |
| D668,091 S | 10/2012 | Zahner | |
| D696,721 S * | 1/2013 | Zahner | D6/580 |
| D705,040 S * | 5/2014 | Konrad | D8/354 |
| 2004/0031576 A1 | 2/2004 | Zahner | |
| 2006/0037721 A1 | 2/2006 | Zahner | |
| 2006/0260769 A1 | 11/2006 | Nien | |
| 2007/0246174 A1 * | 10/2007 | Barrese | A47H 1/02 160/330 |
| 2008/0010739 A1 | 1/2008 | Barrese | |
| 2008/0072403 A1 * | 3/2008 | Peck | B42F 1/02 24/67.9 |
| 2008/0098570 A1 * | 5/2008 | Ifland | A47H 1/04 16/93 D |
| 2008/0178423 A1 * | 7/2008 | Patel | A47H 13/00 16/87.2 |
| 2008/0202710 A1 | 8/2008 | Zahner | |
| 2009/0236843 A1 * | 9/2009 | Rowe | B42F 11/00 281/27.2 |
| 2010/0065229 A1 | 3/2010 | Hu | |
| 2015/0007950 A1 * | 1/2015 | Ho | A47H 13/02 160/348 |
| 2015/0083345 A1 * | 3/2015 | Buxkemper-Odenkirk | A47H 13/02 160/84.04 |
| 2015/0173549 A1 * | 6/2015 | Zahner | A47H 13/02 160/330 |

* cited by examiner



**FIG. 1**



**FIG. 2**



FIG. 3

FIG. 4



FIG. 6

FIG. 7

FIG. 5



FIG. 8

Appx464



US00D746078C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (12235th)
# United States Patent
Zahner

(10) Number: **US D746,078 C1**

(45) Certificate Issued: **Feb. 28, 2023**

(54) **SHOWER CURTAIN**

(71) Applicant: **David Zahner**, New York, NY (US)

(72) Inventor: **David Zahner**, New York, NY (US)

**Reexamination Request:**
No. 90/013,952, May 8, 2017

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **Des. 746,078** |
| Issued: | **Dec. 29, 2015** |
| Appl. No.: | **29/530,488** |
| Filed: | **Jun. 17, 2015** |

**Related U.S. Application Data**

(60) Division of application No. 14/458,664, filed on Aug. 13. 2014. now Pat. No. 10,045,649. which is a division of application No. 13/564,033, filed on Aug. 1, 2012, now abandoned, which is a continuation of application No. 11/978,532, filed on Oct. 29, 2007, now Pat. No. 8,235,088, which is a continuation of application No. 11/209,334, filed on Aug. 23, 2005, now Pat. No. 7,296,609, which is a continuation of application No. 10/320,340, filed on Dec. 16, 2002, now Pat. No. 6,935,402, which is a division of application No. 09/916,603, filed on Jul. 27, 2001, now Pat. No. 7,058,988, which is a division of application No. 10/062,588, filed on Jul. 5, 2001, now Pat. No. 7,788,733, which is a continuation of application No. 09/738,555, filed on Dec. 15, 2000, now abandoned, and a continuation of application No. 09/738,545, filed on Dec. 15, 2000, now abandoned, and a continuation of application No. 09/617,402, filed on Jul. 17, 2000, now Pat. No. 6,494,248.

(51) **LOC (14) Cl.** .......................................... **06-10**

(52) **U.S. Cl.**
USPC ........................................................ **D6/580**

(58) **Field of Classification Search**
USPC ........................................................ D6/580
CPC ................................................. A41D 27/22
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,952, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Kevin K Rudzinski



US D746,078 C1

1

2

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The claim **1** is cancelled.

\* \* \* \* \*

Int. Cl.: 24

Prior U.S. Cls.: 42 and 50

**Reg. No. 2,355,554**

## United States Patent and Trademark Office

Registered June 6, 2000

## TRADEMARK
### PRINCIPAL REGISTER



ZAHNER DESIGN GROUP, LTD. (NEW YORK COR-
PORATION)
145 W. 78TH STREET
NEW YORK, NY 10024

FOR: SHOWER CURTAINS; INTEGRATED LOOP
FASTENERS FOR SHOWER CURTAINS; HAND AND
BATH TOWELS; WASHCLOTHS; GOLF TOWELS;
WASHCLOTHES AND HAND TOWELS WITH INTE-
GRATED LOOP FASTENERS , IN CLASS 24 (U.S.
CLS. 42 AND 50).

FIRST USE 12–16–1997; IN COMMERCE
12–16–1997.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT
TO USE "HOOKLESS", APART FROM THE MARK
AS SHOWN.

SN 75–197,407, FILED 11–13–1996.

MARK SPARACINO, EXAMINING ATTORNEY

Int. Cl.: 24

Prior U.S. Cls.: 42 and 50

**United States Patent and Trademark Office**

Reg. No. 2,381,995

Registered Aug. 29, 2000

## TRADEMARK
### SUPPLEMENTAL REGISTER

## HOOKLESS

ZAHNER DESIGN GROUP, LTD. (NEW YORK COR-
PORATION)
145 WEST 78TH STREET
NEW YORK, NY 10024

FOR: SHOWER CURTAINS WHICH HANG FROM
INTEGRATED LOOP FASTENERS, IN CLASS 24
(U.S. CLS. 42 AND 50).

FIRST USE 12–16–1997; IN COMMERCE
12–16–1997.

SER. NO. 75–750,611, FILED P.R. 7–14–1999; AM.
S.R. 5–5–2000.

MIDGE BUTLER, EXAMINING ATTORNEY



# United States of America

### United States Patent and Trademark Office

# HOOKLESS

**Reg. No. 3,829,837**
**Registered Aug. 3, 2010**

**Int. Cl.: 24**

**TRADEMARK**
**SUPPLEMENTAL REGISTER**

ZAHNER DESIGN GROUP, LTD. (NEW YORK CORPORATION)
145 WEST 78TH STREET
NEW YORK, NY 10024

FOR: WINDOW CURTAINS, IN CLASS 24 (U.S. CLS. 42 AND 50).

FIRST USE 11-30-2009; IN COMMERCE 11-30-2009.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,355,554 AND 2,381,995.

SER. NO. 77-888,962, FILED P.R. 12-8-2009; AM. S.R. 6-14-2010.

LINDSEY RUBIN, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office



# United States of America
### United States Patent and Trademark Office

# HOOKLESS

**Reg. No. 4,127,283**
**Registered Apr. 17, 2012**

ZAHNER DESIGN GROUP, LTD. (NEW YORK CORPORATION)
145 WEST 78TH STREET
NEW YORK, NY 10024

**Int. Cl.: 24**

FOR: SHOWER CURTAINS, IN CLASS 24 (U.S. CLS. 42 AND 50).

FIRST USE 12-16-1997; IN COMMERCE 12-16-1997.

**TRADEMARK**

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,381,995.

SEC. 2(F).

SER. NO. 77-878,605, FILED 11-23-2009.

SKYE YOUNG, EXAMINING ATTORNEY



David J. Kappos

Director of the United States Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at http://www.uspto.gov.**

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac in 14-point Times New Roman.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains __13,403   words__, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii).

Date: <u>January 26, 2024</u>

By: <u>/s/ Donald J. Cox, Jr.</u>
Donald J. Cox, Jr.
Law Offices of Donald Cox
300 Carnegie Center, Suite 150
Princeton, NJ 08540
(609) 921-0477 (phone)
(609) 921-1166 (fax)
DCox@iplawonline.com

Attorney for Appellant
MARQUIS MILLS,
INTERNATIONAL, INC.